Thomas A. Buford, III (WSBA 52969)
Bush Kornfeld LLP
601 Union St., Suite 5000
Seattle, WA 98101
Telephone: (206) 292-2110
Email: tbuford@bskd.com

Richard M. Pachulski (*Pro Hac Vice* Pending)
Ira Kharasch (*Pro Hac Vice* Pending)
Alan J. Kornfeld (*Pro Hac Vice* Pending)
Jeffrey W. Dulberg (*Pro Hac Vice* Pending)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: 310/ 277-6910
Facsimile: 310/ 201-0760
Email: rpachulski@pszjlaw.com
        akornfeld@pszjlaw.com
        jdulberg@pszjlaw.com

*Proposed Attorneys for Debtor and Debtor in Possession*

HEARING DATE: February 3, 2021
HEARING TIME: 1:00 p.m. PT
RESPONSE DUE: At Hearing
LOCATION: Telephonic

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| In re: | Chapter 11 |
| EASTERDAY RANCHES, INC., | Case No. 21-00141 (WLH) |
| Debtor. | **DECLARATION OF T. SCOTT AVILA IN SUPPORT OF DEBTOR'S BANKRUPTCY PETITION AND EMERGENCY "FIRST DAY" MOTIONS** |

T. SCOTT AVILA declares:

1. I am a co-Chief Restructuring Officer of the above-captioned debtor and debtor in possession, Easterday Ranches, Inc. (the "Debtor"). I am generally familiar with the Debtor's business and financial affairs, and books and records. I am above 18 years of age and I am competent to testify.

2. I am authorized to submit this Declaration on behalf of the Debtor. Except as otherwise indicated, all facts set forth in this Declaration are based upon my

DECLARATION OF T. SCOTT AVILA IN SUPPORT OF DEBTOR'S BANKRUPTCY PETITION AND EMERGENCY "FIRST DAY" MOTIONS

DOCS_SF:104977.2 20375/002

personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information I have received from the Debtor's advisors. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

3. I submit this declaration (the "Declaration") in support of the Debtor's bankruptcy petition and the following two "first day" motions: (a) *Debtor's Emergency Motion for Interim and Final Orders Authorizing Debtor to Use Cash Collateral* (the "Cash Collateral Motion") and (b) *Emergency Motion of Debtor for Order (I) Authorizing Debtor to Continue Using Existing Cash Management System, Bank Accounts, and Business Forms; and (II) Granting Related Relief* (the "Cash Management Motion"). Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the foregoing motions.

### A. Company Background

4. In 1958, Ervin Easterday moved his family and farming operation from Nampa, Idaho to southeastern Washington, where he purchased 300 acres of undeveloped land in the new Columbia Basin Reclamation Irrigation Project. Since then, the Easterday family farm has grown to more than 18,000 acres of potatoes, onions, corn, and wheat. The farm's grain products are sold to the Debtor – the Easterday family's cattle business – where it is used to raise cattle for the Debtor's sole customer, Tyson Fresh Meats, Inc. ("Tyson"), pursuant to that certain *Cattle Feeding Agreement*, dated February 20, 2017 (as amended or supplemented, the "Cattle Feeding Agreement").

### B. The Cattle Feeding Agreement

5. The Debtor purchases and raises cattle for eventual slaughter. Its sole customer is Tyson. The cattle purchased by the Debtor are located and raised at various parcels of real property owned by the Debtor or certain non-Debtor affiliates, which have been developed as feedlots (collectively, the "Feedlots"). The Feedlots

**DECLARATION OF T. SCOTT AVILA IN SUPPORT OF DEBTOR'S BANKRUPTCY PETITION AND EMERGENCY "FIRST DAY" MOTIONS-2**

DOCS_SF:104977.2 20375/002

are specialized facilities for the purpose of feeding, housing, and caring for cattle while the cattle mature to a sufficient weight and size to be processed by Tyson or its designees. As of February 1, 2021 (the "Petition Date"), there are approximately 54,000 head of cattle at the Feedlots at various levels of maturity, ranging from those of just 2-3 months in age to those who have reached a mature, slaughter weight, generally at 12-16 months old. Pursuant to the Cattle Feeding Agreement, Tyson is obligated to reimburse the Debtor, or otherwise fund, 100% of the procurement, feeding, and care cost of the cattle, which are deducted from the sale of the cattle when transferred to Tyson (or its affiliate) for processing pursuant to a formula more fully set forth in the Cattle Feeding Agreement.

### C. Events Leading to the Commencement of the Debtor's Chapter 11 Case

6. On January 24, 2021, Tyson filed a lawsuit against the Debtor in the Superior Court of the State of Washington for Franklin County (the "Tyson Lawsuit") and concurrently filed a *Motion for the Appointment of Receiver* (the "Receiver Motion"). The Tyson Lawsuit alleges, *inter alia*, that the Debtor's former president, Cody Easterday, purportedly engaged in fraudulent "forward billing" practices, resulting in Tyson's overpayment of over $200 million for the purchase and feeding of "non-existent" or "missing" cattle due to the submission of fraudulent invoices and records pursuant to the Cattle Feeding Agreement. The Receiver Motion was set for hearing during the afternoon of February 1, 2021.

7. As a result of the purported fraudulent activity, Tyson unilaterally reduced its payments to the Debtor under the Cattle Feeding Agreement, thereby significantly reducing the Debtor's ability to fund ongoing operations, including the costs associated with caring for and feeding the cattle located on the Feedlots.

8. Notwithstanding the Tyson Lawsuit, in an effort to preserve the Debtor's business operations and protect the cattle in the near term, Tyson has advanced (on a

prepetition basis) certain costs associated with the care and feeding of the cattle located at the Feedlots directly to the Debtor's vendors or other parties.

**D.      The Debtor's Management**

9.      On January 31, 2021, the Debtor's shareholders, who also comprised the Debtor's then-constituted Board of Directors, Cody Easterday, Debby Easterday, and Karen L. Easterday (collectively, the "Former Board"), executed that certain *Action by Written Consent*, to elect Craig A. Barbarosh, R. Todd Neilson, and Thomas Saunders, V, as the Debtor's directors (collectively, the "Independent Board"). Thereafter and on that same date, each member of the Former Board resigned their positions as directors and officers of the Debtor.

10.     Importantly, the members of the Independent Board were selected for their experience and expertise in the cattle and/or restructuring industry. More particularly, Mr. Barbarosh is a nationally recognized restructuring attorney with over twenty-five years of experience. Mr. Barbarosh also has extensive experience serving as director for many troubled or distressed companies. Mr. Neilson has over thirty five years of experience in the restructuring space with a particular emphasis on public and forensic accounting, having previously served as a special agent for the Federal Bureau of Investigation specializing in accounting investigations. Mr. Neilson also has experience serving as a trustee, examiner, financial consultant, and advisor for companies in bankruptcy. Finally, as a sixth-generation cattleman, Mr. Saunders brings a lifetime of experience in the ranching and cattle business to the Independent Board. Mr. Saunders currently owns and operates the 7,000 acre Twin V Ranch located near Fort Worth, Texas, where he manages the Twin V Ranch's cow-calf and equine businesses.

11.     On January 31, 2021, the Independent Board met and unanimously voted to appoint co-Chief Restructuring Officers, myself and Peter Richter. On that same

**DECLARATION OF T. SCOTT AVILA IN SUPPORT OF DEBTOR'S BANKRUPTCY PETITION AND EMERGENCY "FIRST DAY" MOTIONS-4**

DOCS_SF:104977.2 20375/002

date and given the imminent hearing on the Receiver Motion, the Independent Board also voted to authorize the commencement of this chapter 11 case.

E. **Prepetition Capital Structure**

    i. **Revolving Loan Agreement**

12. The Debtor and its non-debtor affiliate, Easterday Farms Partnership ("Farms" and together with the Debtor, the "Borrowers"), are parties to that certain *Revolving Loan Agreement*, dated September 3, 2020 (as amended, the "Revolving Loan Agreement"), by and among the Borrowers, Cody Easterday, Debby Easterday, Karen Easterday, and Gale Easterday as guarantors (collectively, the "Guarantors"), and Washington Trust Bank, as lender (the "Washington Trust").

13. The Revolving Loan Agreement provides for a $45 million revolving credit facility that is purportedly secured by all goods, equipment, farm equipment, inventory, fixtures, accounts, deposit accounts, chattel paper, documents, general intangibles, instruments, investment property, and letter of credit rights.

14. As of the Petition Date, the outstanding principal balance of the Revolving Loan Agreement was approximately $45 million.

15. On January 15, 2021, Washington Trust sent a letter to Farms asserting the existence of certain non-monetary defaults under the Revolving Loan Agreement, principally relating to certain reporting obligations, but agreeing to forbear upon the exercise of remedies until January 31, 2021 to allow Farms to cure the purported default, provided that no further default occur pursuant to the terms of the Revolving Loan Agreement.

16. On January 26, 2021, Washington Trust sent a *Notice of Default* to the Borrowers and Guarantors, asserting certain defaults under the Revolving Loan Agreement related to the filing of the Tyson Lawsuit and the untimely death of Guarantor Gale Easterday in December 2020.

**DECLARATION OF T. SCOTT AVILA IN SUPPORT OF DEBTOR'S BANKRUPTCY PETITION AND EMERGENCY "FIRST DAY" MOTIONS-5**

DOCS_SF:104977.2 20375/002

### ii. Mortgage Loans

17. The Borrowers are also party to that certain *Loan Agreement* dated February 12, 2020 (the "Term Loan"), by and among the Borrowers, as borrowers, the Guarantors, and the Prudential Insurance Company of America, as lender. As of the Petition Date, the aggregate outstanding principal amount of the Term Loan is $50 million.

18. The Term Loan is secured by that certain *Mortgage, Security Agreement, Fixture Filing with Assignment of Rents and Proceeds, Leases and Agreements* dated February 12, 2020, which purportedly covers certain of the Borrowers' owned real estate.

19. The Debtor is party to that certain *Fixed Interest Rate Promissory Note* dated June 4, 2015 (the "Fixed Rate Loan"), by and among the Debtor, as borrower, and Farms and the Guarantors, as guarantors, and AXA Equitable Life Insurance Company, as lender. As of the Petition Date, the aggregate outstanding principal amount of the Fixed Rate Loan is $25.5 million.

20. The Fixed Rate Loan is secured by that certain *Mortgage, Security Agreement, Assignment of Rents and Fixture Filing* dated June 4, 2015, which purportedly covers certain of the Debtor's and Farms' owned real estate.

### iii. General Unsecured Claims

21. In addition to its secured debt, the Debtor's books and records reflect approximately $12.5 million in unsecured debt incurred in the ordinary course of business, principally comprised of trade payables, a portion of which is payable to Farms in the approximate amount of $388,341.

22. As of the Petition Date, the Debtor has approximately 76 employees.

### F. Cash Collateral Motion

23. Through the Cash Collateral Motion, the Debtor seeks interim and final orders: (i) authorizing the Debtor, in its discretion, to use cash collateral in accordance

**DECLARATION OF T. SCOTT AVILA IN SUPPORT OF DEBTOR'S BANKRUPTCY PETITION AND EMERGENCY "FIRST DAY" MOTIONS-6**

DOCS_SF:104977.2 20375/002

with the Budget, including any funds prepaid to the Debtor by Tyson, (ii) granting Washington Trust certain adequate protection in the form of new liens and superpriority claims against the Debtor's estate, to the extent of any diminution in value of Washington Trust's prepetition interests in the Debtor's assets, and (iii) granting such other and further relief as is just and proper under the circumstances.

24. The Debtor commenced this bankruptcy case with minimal cash on hand. Tyson is the Debtor's sole customer and all of the Debtor's operating receipts are generated from its relationship with Tyson. In order to fund the Debtor's ongoing administrative and operating expenses, including the costs associated with feeding and caring for the cattle, the Debtor requires immediate and urgent funding that only Tyson is willing to provide through prepayments against amounts accruing postpetition under the Cattle Feeding Agreement. The Debtor projects that the feed on hand will last no later than Thursday, February 4, 2021, and without funding from Tyson the Debtor will not have sufficient cash to purchase new feed. Hence, absent prompt receipt and access to the funds contemplated by this Motion, the Debtor would face immediate and irreparable harm and would be forced to terminate operations, which would have the drastic effect of putting approximately 54,000 cattle at risk of death.

25. Tyson is prepared to prepay the Debtor's estate certain amounts accruing postpetition under the Cattle Feeding Agreement in order that the estate will have cash on hand. The estate will use that cash to satisfy the obligations set forth in the Budget. To the extent that Washington Trust asserts a lien in any cash collateral of the Debtor, including the funds expected to be prepaid by Tyson, the Debtor filed the Cash Collateral Motion.

26. I believe that the Debtor's proposed use of cash collateral, including any funds to be prepaid by Tyson to the Debtor, represents a sound exercise of business

**DECLARATION OF T. SCOTT AVILA IN SUPPORT OF DEBTOR'S BANKRUPTCY PETITION AND EMERGENCY "FIRST DAY" MOTIONS-7**
DOCS_SF:104977.2 20375/002

21-00141-WLH11    Doc 14    Filed 02/02/21    Entered 02/02/21 11:55:14    Pg 7 of 10

judgment. I further believe that the Debtor's decision to access cash collateral is entirely consistent with the Debtor's fiduciary duties to the estate.

27. I therefore urge the Court to approve the proposed use of cash collateral from Tyson on the terms set forth in the Cash Collateral Motion.

### G. <u>Cash Management Motion</u>

28. Through the Cash Management Motion, the Debtor seeks the entry of interim and final orders authorizing the Debtor to continue to use its cash management system, including the continued maintenance of its existing bank accounts and business forms.

29. The relief requested in the Cash Management Motion is sought on an emergency basis because the uninterrupted use of the Debtor's cash management system is essential to the Debtor's ability to maximize its postpetition operations and adjust smoothly to being an operating debtor in possession. Reestablishing and reconnecting deposits and billings to new accounts would be impractical, costly, and an inefficient use of the Debtor's resources.

30. In the ordinary course of business, the Debtor utilizes an integrated cash management system to collect, concentrate, and disburse funds generated by or received for its operations (the "<u>Cash Management System</u>"). In broad terms, the Debtor's Cash Management System is similar to the cash management systems used by other business operations of a comparable size and complexity.

31. The Cash Management System is tailored to meet the Debtor's operating needs as an operator of certain feedlots at which it houses, cares for, and raises cattle for the benefit of Tyson. The Cash Management System enables the Debtor to efficiently collect and distribute cash generated by its business, pay its financial obligations, control and monitor funds available, comply with requirements of its financing arrangements, reduce administrative expenses, and obtain accurate account

**DECLARATION OF T. SCOTT AVILA IN SUPPORT OF DEBTOR'S BANKRUPTCY PETITION AND EMERGENCY "FIRST DAY" MOTIONS-8**

DOCS_SF:104977.2 20375/002

balances and other financial data. It is critical that the Cash Management System remain intact during this Chapter 11 Case.

32. The Cash Management System currently consists of three (3) bank accounts (collectively, the "Accounts"), listed on Exhibit A to the Cash Management Motion. The Accounts are located Washington Trust Bank, Mechanics Bank, and US Bank. I am informed that each of these banks is designated as an authorized depository by the Office of the United States Trustee for Region 18.

33. All of the Accounts are operational in nature (*e.g.*, payroll, operating disbursements, and operating deposits). As of the Petition Date, the aggregate balance of the Accounts was approximately $213,000.

34. For the foregoing reasons, I urge the Court to approve the continued use of the Debtor's Cash Management System as described in the Cash Management Motion.

*[Remainder of page intentionally left blank]*

**DECLARATION OF T. SCOTT AVILA IN SUPPORT OF DEBTOR'S BANKRUPTCY PETITION AND EMERGENCY "FIRST DAY" MOTIONS-9**
DOCS_SF:104977.2 20375/002

21-00141-WLH11    Doc 14    Filed 02/02/21    Entered 02/02/21 11:55:14    Pg 9 of 10

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 2nd day of February 2021.

/s/ T. Scott Avila
T. Scott Avila

**DECLARATION OF T. SCOTT AVILA IN SUPPORT OF DEBTOR'S BANKRUPTCY PETITION AND EMERGENCY "FIRST DAY" MOTIONS-10**

DOCS_SF:104977.2 20375/002