Alan D. Smith  (WSBA 24964)
Bradley A. Cosman  (*pro hac vice to be submitted*)
PERKINS COIE LLP
1201 Third Avenue
Seattle, WA  98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
E-mail:  ADSmith@perkinscoie.com
           BCosman@perkinscoie.com

Attorneys for Tyson Fresh Meats, Inc.

HON. WHITMAN L. HOLT
Hearing :     March 8, 2021
               10 :00 a.m. PST
Response:   March 1, 2021
               4:00 p.m. PST
Reply:       March 4, 2021

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>EASTERDAY RANCHES, INC.,<br><br><br>        Debtor. | Chapter 11<br><br>Case No.:  21-00141 WLH11<br><br>**MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE** |

Tyson Fresh Meats, Inc. ("***Tyson***") respectfully moves the Court for an order under

§ 1104(a)(1) appointing a Chapter 11 trustee to assume control of the estate of Debtor Easterday

Ranches, Inc. ("***Debtor***" or "***Easterday Ranches***").  There is no dispute over the underlying facts in

this case:  Debtor is responsible for a massive fraud upon Tyson and other creditors.  Debtor now

argues that it has clean hands because it has retained Paladin Management to operate Easterday

Ranches and has retained an independent board.  But even after the fraud was uncovered and

Debtor was operating under the auspices of Paladin, Debtor engineered a surreptitious sale of its

largest unencumbered parcel in a fire sale transaction on the eve of bankruptcy, and then distributed

over eighty-five percent of the proceeds (almost $13 million) to affiliates, insiders, and

professionals rather than to third party creditors.  Debtor's management, however constituted,

cannot be trusted to keep the interests of creditors of this estate, rather than other entities owned by

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 1

the Easterday family, at heart. Further, Debtor's belated wholesale management change – composed of a passel of newly installed professionals selected behind the scenes in an extra-judicial process - demonstrates rather than refutes the case for a trustee. Everyone agrees the company needs management untainted by the Easterday family, providing new, independent guidance. That guidance should come from a trustee appointed in accordance with the Bankruptcy Code, not the proposed more expensive alternative including Paladin, which was selected by the Easterday family and which participated in (or at the least, failed to prevent) the final fraudulent and preferential transactions. For all these reasons, a trustee is necessary for the protection of the estate and is in the best interests of creditors and others.

The Motion is based on the concurrently filed Declaration of Leah Andersen ("**_Andersen Decl._**"), Declaration of Shane Miller ("**_Miller Decl._**"), Declaration of John S. Wilson, Jr. ("**_Wilson Decl_**."), and Request for Judicial Notice ("**_RJN_**"), the following points and authorities, and such other and further evidence and argument as may be provided to the Court at or prior to the hearing on this Motion.

Appended hereto is a [Proposed] Order Directing Appointment of Chapter 11 Trustee.[1]

## **BACKGROUND**

The events that led to this bankruptcy are not in dispute. Easterday Ranches is a feedlot and grow lot operator with significant operations in the Tri-Cities area, both Franklin and Benton Counties. Easterday Ranches purchases calves on behalf of Tyson, then feeds and takes care of the cattle as they grow to marketable size, whereupon the cattle are delivered to Tyson's processing plant in Pasco.

---

[1] This Motion requests appointment of a trustee only for Easterday Ranches. Tyson takes no position at this point on whether a trustee would be appropriate for its sister company Easterday Farms, a general partnership, if and when Easterday Farms files its own bankruptcy petition.

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 2

Cody Easterday, the President of Debtor Easterday Ranches, initiated and carried out a fraudulent scheme whereby Easterday Ranches reported to Tyson purchases of calves that did not exist, requested and received reimbursement from Tyson for those purchases, then reported purchases of feed and other supplies for those fictitious cattle, and requested and received reimbursement from Tyson for the nonexistent feed purchases as well. By the time the fraud was uncovered in December 2020, Tyson had been defrauded out of more than $225 million, and there were more than 200,000 cattle "missing" from Easterday Ranches. Tyson does not believe any of those facts are now controverted by Debtor or anyone else. In any event, those facts were all demonstrated in Tyson's Complaint and Motion for Appointment of Receiver and Injunctive and Other Relief (the "*Tyson Complaint*" and the "*Receiver Motion*") filed January 24 in Franklin County Superior Court.[2] The Receiver Motion was scheduled for hearing the afternoon of February 1, but Debtor filed its chapter 11 petition that morning.[3]

The Receiver Motion requested appointment of a receiver over Easterday Ranches based on the fraud perpetrated by Easterday Ranches and Cody Easterday, and also requested that the Franklin County Superior Court issue a temporary restraining order (TRO) against Easterday Ranches, preventing it from selling the "North Lot" - its most valuable unencumbered real property. When Tyson filed the Receiver Motion, Tyson feared that Debtor would sell the North Lot at a fire-sale price and distribute the proceeds to insiders and others, thus causing three harms: depriving Debtor's estate (whether receivership estate or bankruptcy estate) of a valuable asset for inadequate

---

[2] Tyson is requesting that the Court take judicial notice of the Tyson Complaint, Receiver Motion, and related documents through its Request for Judicial Notice filed concurrently herewith. Although Tyson does not believe any of the recited facts are in dispute, the witnesses who provided declarations in support of the Receiver Motion and whose declarations are included within the Request for Judicial Notice will be available to the Court and others for examination at the hearing on this Motion.

[3] After Tyson filed the Receiver Motion, Washington Trust Bank filed a complaint and motion for receiver over Easterday Farms as well as Easterday Ranches, and noticed its motion for the same time as Tyson's Receiver Motion. At the time this Motion was prepared Easterday Farms had not yet filed a bankruptcy petition.

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 3

consideration; preferring some creditors, even legitimate creditors, to the detriment of others; and sending significant assets out of the estate and to other Easterday family interests, including Easterday Farms and others. What Tyson did not then know was that just two days before the filing of the Receiver Motion, Debtor had already surreptitiously closed on the sale of the North Lot.

### SALE OF THE NORTH LOT

Tyson first learned of the possible sale of the North Lot in a conference call on Friday, January 22, among Cody Easterday, Peter Richter of Paladin Management Group, and several Tyson representatives. The Tyson representatives were told Debtor was selling the North Lot. Andersen Decl. ¶ 7; Miller Decl. ¶ 7. Tyson was not told either that the sale of the North Lot had already closed or that it was in the process of closing that day. *Id*. The Tyson representatives asked the identity of the purchaser of the North lot, and the Easterday representatives refused to disclose such information. Miller Decl. ¶ 8. In a subsequent call later in the day on January 22 between Cody Easterday and Shane Miller of Tyson, Cody Easterday stated that he could disclose the identity of the purchaser of the North Lot only after the close of business on Monday, January 25. *Id*. This led Tyson to believe that the sale of the North Lot would close on Monday, January 25.

Tyson immediately took action to protect its rights, filing the Complaint and Receiver Motion that Sunday (January 24) in an effort to stop the sale of the North Lot before irreparable harms could occur. Only after receiving notice of the Complaint and Receiver Motion did Debtor inform Tyson, on Monday, January 25, that the sale had already closed the previous Friday.

In response to Tyson's request, Debtor later provided Tyson with a schedule disclosing how the proceeds of the North Lot sale were distributed. Andersen Decl., ¶¶ 10-12 and Exhibit A thereto. Of the $16 million sale price, approximately $15.1 million was apparently immediately distributed, and of that $15.1 million:

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 4

- About $5.0 million went to Easterday Farms and another company owned by Easterday family members, English Hay Company, on account of outstanding feed costs.

- About $2.0 million went to Easterday Farms as a prepayment for feed that had not yet been invoiced.

- About $4.75 million went to Easterday Farms on account of a loan, apparently long outstanding and unsecured.[4]

- About $1.2 million went to Debtor's professionals.

Thus, of the $15.1 million in sale proceeds that were disbursed, $13 million went directly to affiliates or professionals: ***only $2.1 million (less than 14%) went to third party creditors and almost $12 million (close to 80%) went directly to Easterday Farms and other Easterday family owned entities***. In short, Tyson was absolutely justified in fearing that the North Lot sale would be used to benefit insiders to the detriment of everyone else.

Further, it appears Tyson was absolutely justified in fearing the North Lot sale would be accomplished through a fire-sale process yielding an inadequate price. There is no indication in any of Debtor's pleadings that there was an organized marketing process for the North Lot. Instead, it appears Debtor went only to one party - a competitor of Tyson's who could be trusted not to let news of the sale leak - and closed the sale in a rush, all behind the backs of Tyson and the other creditors. We will not know how much value Debtor left on the table unless and until the North Lot is the subject of a true marketing process or the transaction is reviewed by an independent party.

---

[4] Easterday Farms is a general partnership composed of four members of the Easterday family, including Cody Easterday, each of whom is therefore liable for all of Easterday Farms' obligations. Those family members thus directly benefited from the payments to Easterday Farms.

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 5

We do have, however, two indications that the value received by the Debtor was woefully inadequate:

- In discussions with Tyson in December over a possible transfer of the North Lot to Tyson to begin to repay some of what was owed Tyson, Cody Easterday claimed the North Lot was worth $20 million. Andersen Decl. ¶ 8; Miller Decl. ¶ 9.[5]

- A prospective buyer of the North Lot - who was **not** contacted by Debtor in its fire-sale process - has informed Tyson that it is very interested in pursuing a purchase of the North Lot at significantly more than $16 million, subject to customary title due diligence. Wilson Decl. ¶ 7.

## MANAGEMENT'S PARTICIPATION

Debtor has made it clear in its first day pleadings and the first day hearing that its principal pitch for opposing a trustee is the presence of a whole new management slate, untainted by Cody Easterday's massive fraud. What Debtor glosses over, however, is that the sale of the North Lot and dissipation of the sale proceeds both occurred under the watch of Paladin Management, the company providing the proposed co-chief restructuring officers. Those egregious transactions cannot be passed off as simply more bad acts by Cody Easterday.

Debtor will no doubt argue that it was in desperate need of cash and that a sale was necessary to keep feed suppliers and other such third party creditors at bay. Debtor's actual use of proceeds from the sale, however, belies that argument. **Almost eighty percent of the distributed proceeds - some $12 million - went straight into the pockets of Easterday family affiliates and not other feed creditors. Further, almost half of the amount sent to Easterday Farms had nothing to do with feed costs - it instead went to repay an apparently unsecured loan from**

---

[5] Those discussions were short lived and were abandoned when the parties mutually concluded the North Lot would have to be used to benefit all creditors, not just Tyson.

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 6

**insider Easterday Farms**.  Fire-selling assets and distributing proceeds to insiders on the eve of bankruptcy are not the acts of an independent fiduciary who can be trusted to look out for the interests of creditors.  They are the acts of people who are looking out for the interests of the Easterday family and the entities they own at the expense of this estate.  This conduct cannot be ignored and it cannot be condoned.

At the first day hearing in this case, counsel for Debtor attempted to minimize Paladin's role in the North Lot sale, arguing they were merely financial advisors, and not yet officially appointed as co-CROs.  That may be true, but Paladin was retained by the Easterday family when Cody Easterday was in control.  Further, Tyson believes, based on the conversations Paladin participated in and which are described in the Andersen and Miller declarations, that Paladin was actively involved in sale of the North Lot and distribution of the proceeds.  A financial advisor who was retained by the fraudulent managers and who then willingly participated in such obviously inappropriate transactions is not the kind of pristine new management required in a situation like this.

### **CLEANING UP THE MESS**

Finally, consideration has to be given to cleaning up the problems caused by the North Lot sale.  Given Paladin's participation in the transaction, it cannot possibly be involved in solving the problems it helped cause.

There are at least three major issues, each of which has already cost the Easterday Ranches estate a massive amount of money and will cost even more to resolve.

- First, there is the blatantly preferential transfer of $4.75 million from Easterday Ranches to Easterday Farms, reportedly on account of an outstanding unsecured loan.  How will that be dealt with?  Is Easterday Farms, or the Easterday family members who are general partners of Easterday Farms, just going to repay that

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 7

money to the Easterday Ranches estate? Not likely. And who is going to prosecute those claims? Easterday Ranches' new management, who helped orchestrate the transfer and is presumably also part of the management of the transferee Easterday Farms? Not likely. Instead, it will require the intervention of a creditors' committee composed of Easterday Ranches creditors (not Easterday Farms creditors) - or some other independent actor untainted by its participation in the transfer, such as a trustee - to prosecute the claim and try to resolve the manifold issues caused by the inappropriate transfer.[6] That is not a simple or inexpensive process, and it cannot be undertaken by current management.

- Second, there is the $7 million paid to Easterday Farms and English Hay Company for feed costs, including a $2 million prepayment to Easterday Farms. Those transfers were clearly preferential over other creditors. They may arguably not be avoidable if the recipients have statutory lien rights, but once again, this is something that will have to be investigated by an independent actor, not one who participated in the transfer.[7]

- Third, there is the fact that a major unencumbered asset is gone from the estate. As noted above, there are very strong indications that the fire sale conducted by Easterday Ranches and Paladin without any semblance of a marketing process yielded a price well under the value of the North Lot. Who will investigate that sale to determine if it was a constructive fraudulent transfer? Was it an actual fraudulent

---

[6] With Easterday Farms likely also soon to be in bankruptcy and beneficiary of its own automatic stay, this may not be a litigation problem. But it will complicate all intercompany dealings and make it even more difficult to find a solution that is fair to creditors of both estates, given the unjustifiable shift of nearly $5 million from one estate to the other on the eve of bankruptcy.

[7] The same preference issues, and presumably the same statutory lien defenses, though without the stench, exist for the handful of true third party creditors paid out of the North Lot sale proceeds.

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 8

transfer?  Was it otherwise avoidable?  Who will study the process to see if it was reasonable and fair?  Current management who participated in the sale and also act as management of the recipient of the sale proceeds?  Not likely.  Yet again, a truly independent manager is needed to look into those issues.

## ONGOING OPERATIONS

Tyson understands the Court and others are interested in Tyson's intended operations at the Easterday Ranches properties.  Tyson has recently determined that the most efficient means of dealing with its 53,000 cattle currently on Debtor's feedlots is to leave the more mature cattle on the Easterday Ranches properties and move the younger cattle off the Easterday Ranches properties. This should allow a cessation of business at the Easterday Ranches feedlots and grow yards by the end of June.  Miller Decl. ¶ 10.  Whatever the scope or length of the operations, of course, Tyson is by an order of magnitude the largest creditor in this case, has intense interest in maximizing the value of the estate and thus in the identity and conduct of management of the Debtor, and believes a trustee should be appointed.

## ARGUMENT

**A.    Standards for Appointment of a Trustee**

Section 1104(a) provides in relevant part:

(a)      At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee -

    (1)      for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by the current management, either before or after the commencement of the case, or similar cause . . .

    (2)      if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . .

The words "including" and "or similar cause" in § 1104(a)(1) reflect that the grounds for appointing a chapter 11 trustee are not limited to those specifically set forth in the statute.  And the

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 9

use of the word "*shall*" indicates the intent of Congress that misconduct by a debtor, prepetition or postpetition, may not easily be ignored.

"Section 1104(a) represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989). "[T]he appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." *In re Nartron Corp.*, 330 B.R. 573, 591-92 (Bankr., W.D. Mich. 2005).

As the *Savino Oil* court explained:

> debtor-in-possession governance is the norm in Chapter 11. However, the encompassing language of 1104(a)(1) prefaced by a mandatory "shall" reflect an equally important countervailing or balancing congressional intent. The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended on to carry out the fiduciary responsibilities of a trustee.

*Savino Oil, supra*, 99 B.R. at 525-26.

Finally, the Court should consider this Motion on a preponderance of the evidence standard. There is case law indicating a trustee motion requires clear and convincing evidence, but that is inconsistent with the Supreme Court's directive in *Grogan v. Garner*, 498 U.S. 279, 286 (1991):

> [W]e begin our inquiry into the appropriate burden of proof under § 523 by examining the language of the statute and its legislative history. The language of § 523 does not prescribe the standard of proof for the discharge exception. The legislative history of § 523 and its predecessor, 11 U.S.C. § 35 (1976 ed.), is also silent. This silence is inconsistent with the view that Congress intended to require a special, heightened standard of proof.

One must only replace § 523 with § 1104 to reach the correct result here. There is nothing in § 1104 or its legislative history respecting burden of proof. The standard is a preponderance of the evidence. *Tradex Corp. v. Morse*, 339 B.R. 823, 829-32 (D. Mass. 2006); *In re Altman*, 230 B.R. 6, 16-17 (Bankr. D. Conn. 1999), *aff'd in part, vacated in part on other grounds*, 254 B.R. 509

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 10

(D. Conn. 2000). In any event, the evidence submitted with this Motion satisfies whatever standard is applied.

**B.    Cause Exists for Appointment of a Trustee Under § 1104(a)(1)**

Easterday Ranches' surreptitious sale of the North Lot and distribution of the proceeds primarily to Easterday family interests is an egregious breach of the fiduciary duties of controlling persons. Easterday Ranches will try to justify the sale based on its need to pay feed suppliers, but the facts speak for themselves: only about $2.1 million (~14%) of the proceeds went to third party creditors. Almost $12 million (~80%) of the proceeds went directly to entities owned by the Easterday family. While about $5 million of that was on account of existing feed-related invoices, Debtor used sale proceeds to pay Easterday Farms a prepayment of uninvoiced deliveries (another $2 million). Insider Easterday Farms was the only feed supplier to get an advance payment from the sale proceeds. And the most egregious of all: Debtor distributed an additional $4.75 million to Easterday Farms on account of a pre-existing unsecured loan.[8] That payment was totally unnecessary and totally inexplicable other than by a desire to help the Easterday family members who are general partners of Easterday Farms, all at the expense of everyone else involved in this case. And it happened on Paladin's watch, presumably with the assistance and cooperation of Paladin.

Debtor will no doubt argue that whatever happened in the past is of no concern because they now have a whole new management slate, some of which was put in place literally on the eve of bankruptcy. But the latest chapters in the Debtor's history - the surreptitious sale of the North Lot in a process free fire sale and the distribution of 80% of the proceeds to the Easterday family - were

---

[8] That is according to Debtor's explanation. It is not evident there was in fact such a pre-existing obligation; that and all other issues raised in this Motion remain to be investigated.

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 11

accomplished while Paladin, part of the new management, selected by the Easterday family, was on board. Paladin should never have allowed that egregious breach of duty to occur.

Such machinations by <u>current</u> management constitute precisely the kind of conduct that has justified appointment of trustees in other cases. *See, e.g., In re Veblen West Dairy LLP*, 434 B.R. 550 (Bankr. D.S.D. 2010) (appointment of trustee appropriate based on suspicious transactions with affiliates); *In re Keeley and Grabanski Land Partnership*, 455 B.R. 153 (8th Cir. B.A.P. 2011) (affirming order appointing trustee based in large part on undermarket leases to, and other transactions with, affiliates).

Cause exists under Section 1104(a)(1) for appointment of a trustee.

**C.     Appointment of a Trustee is in the Interests of Creditors Under § 1104(a)(2)**

The same facts and factors require appointment of a trustee as in the interests of creditors. While different courts sometimes use different methodologies, one of the most commonly used is a four-factor test recently summarized in *In re Vascular Access Ctrs.*, L.P., 611 B.R. 742, 765 (Bankr. E.D. Pa. 2020); see also *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990):

(1)     the trustworthiness of the debtor;

(2)     the debtor in possession's past and present performance and prospects for the debtor's rehabilitation;

(3)     the confidence - or lack thereof - of the business community and of creditors in present management; and

(4)     the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.

Each of these factors supports appointment of a trustee. First, the debtor has shown itself to be completely untrustworthy, having presided over one of the largest frauds perpetrated in this area in recent years. While most of that conduct predated the recently retained management team, as

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 12

discussed at length elsewhere in this Motion the sale of the North Lot and the distribution of proceeds to the Easterday family was on Paladin's watch, apparently affirmatively assisted by Paladin. This factor supports appointment of a trustee.

Second, there is no prospect for this debtor's rehabilitation. This is a liquidation case, with only a few months of operations needed before sale of the remainder of the real estate and other assets. The most that can be hoped for is operations are kept alive long enough to sell as a going concern, but it will still be a sale to new owners, with proceeds going to pay off the hundreds of millions of dollars owed to Tyson and tens of millions of dollars owed to other creditors. A trustee can do that just as well as Debtor's new management team of retained professionals. This factor strongly supports appointment of a trustee.

The third factor, confidence in management, also supports appointment of a trustee. To the extent prior (Cody Easterday and the Easterday family) management is concerned, there is no confidence. To the extent the new management team is concerned, Tyson (Debtor's largest unsecured creditor by an order of magnitude) has lost confidence. While this has yet to be tested in the creditor body at large, given the one transaction with which the new management team has been involved - the North Lot sale - the new team will not pass the test. Tyson believes other creditors will be just as shocked as Tyson was to learn that the Easterday family members were the principal beneficiaries of this desperation sale which Paladin facilitated. This factor favors appointment of a trustee.

The fourth factor is multifaceted. Appointment of a trustee entails a level of expense that in some cases is an additional cost to the estate, but in this case will likely be considerably less than the cost of Debtor's proposed slate of new management professionals. The proposed new management team - all of whom are necessary in order to provide some credulity to the claim that the Easterday family is no longer involved in the management of Easterday Ranches - will cost the

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 13

estate dearly. According to Debtor's budget filed with its cash collateral motion [Dkt. No. 12-1], the new directors will each be paid $20,000 per month, or $60,000 each month for the group. The professionals are requiring new D&O insurance costing some $400,000. Professional fees are budgeted at over $650,000 per month. Counsel's rates, while within the range of national practitioners, are considerably in excess of local prevailing rates - and they require local counsel along with national counsel.

A trustee will of course not be cheap, but a trustee who has experience with similar operations will supplant the co-CROs and avoid that cost, as well as all of the directors' fees, all within a trustee's maximum three percent compensation - about $180,000 per month on the budgeted level of activity, and reducing from there as cattle are moved or sold.[9] The trustee's bond will cost a tiny fraction of the D&O insurance. Trustee counsel's rate will undoubtedly be lower than that proposed by Debtor. Overall, a trustee will yield a considerable reduction in expense to the estate.

As to intangible benefits and detriments, having a trustee will assure the Court and the creditors that the taint of the Easterday family is completely removed from management, and it will ensure there will be no more one-sided transactions favoring Easterday Farms and Easterday family members over creditors of other entities. Any slate of managers appointed or arranged by the Easterday family will be suspect. And there is very little operational advantage in retaining a professional turnaround manager who has been on site for just a few weeks, even if that manager did not have the stigma of having participated in the North Lot sale and distribution of proceeds as Paladin has here. This factor supports appointment of a trustee.

---

[9] That is the maximum trustee fee allowable under Section 326. In chapter 7 cases that is the presumptive fee absent "extraordinary circumstances," *In re Salgado-Nava*, 473 B.R. 911, 921 (9th Cir. B.A.P. 2012), but in chapter 11 cases the court must consider other factors, and in event many chapter 11 trustees agree to accept lodestar rates subject to the statutory cap. *Id.* Thus, this number may well be much higher than a trustee's actual allowed compensation.

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 14

Considering all these factors, appointment of a trustee is in the best interests of the creditors and other parties in interest. While Tyson submits cause exists under § 1104(a)(1), including Paladin's participation in the North Lot sale, § 1104(a)(2) provides the Court with "particularly wide discretion" to appoint a trustee even absent wrongdoing or mismanagement. *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994). That discretion should be exercised here.

**D.     Even if New Management Were Pristine, a Trustee Would Make More Sense Than a Debtor in Possession**

Even if the Court were to conclude that Debtor's management changes leave Debtor with appropriate governance, the wholesale importation of new individuals for that purpose actually supports the appointment of a trustee. What does it mean to have a "debtor in possession" when all of the "debtor in possession's" directors and officers are highly compensated professionals with little or no prior connection to the business?[10] That is little different from appointment of a trustee, and given the number of new professionals required to oversee Debtor's operations under its proposed scenario, it will likely be more cost effective simply to have a trustee.

There is case law respecting the heavy burden a proponent bears in a trustee motion, and Debtor will no doubt supply the Court with many citations noting the presumption that a debtor in possession remains in control. That authority simply has no application in a case like this. As the Third Circuit has noted, "In the usual chapter 11 proceeding, the debtor remains in possession throughout reorganization because current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate. . . . The strong presumption also finds its basis in the debtor-in-possession's usual familiarity with the business it

---

[10] As noted in previous sections, the one with a slight acquaintance with the business is Mr. Richter of Paladin. He has been on hand for a few weeks, but his participation in the North Lot sale is a separate reason for appointment of a trustee, not a reason to avoid a trustee.

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 15

had already been managing at the time of the bankruptcy filing . . . ." *In re G-I Holdings, Inc.*, 385 F.3d 313, 318 (3d Cir. 2004).

Here, there is no rehabilitation - this is a liquidation case with operations for only a limited time. That does not mean the case must immediately be converted to chapter 7. It may well be that the flexibility of chapter 11, and the possibility of a plan that resolves the intercompany relationships, will be needed to sort out the problems of the various Easterday family owned entities. The point is simply that there is no need for management with an historical view of the problems (which new management does not have in any event) to be involved in formulating such a plan.

Further, under Debtor's proposal the new CRO and independent directors have little[11] or no familiarity with Debtor's business - the debtor can avoid a slam dunk trustee motion[12] only by importing an entire slate of new professional management, likely to cost the estate much more than a trustee. The entire rationale for the debtor in possession concept is missing. Everyone agrees there must be a wholesale change of management from the Easterday family regime - the only question is whether it should be a trustee or the proposed quasi-trustee structure of new professionals selected, at least in part, by Cody Easterday.

In short, Debtor's management changes actually support the appointment of a trustee. "If someone must be hired to report to the Court, the United States Trustee rather than the Debtor should select the new fiduciary." *In re Euro-American Lodging Corp.*, 365 B.R. 421, 432 (Bankr. S.D.N.Y. 2007).

---

[11] See the previous footnote.
[12] Tyson does not believe this is an overstatement. Had Debtor suggested an ongoing governance structure involving members of the Easterday family, with or without Cody, it would have been laughable.

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 16

**E.      A Trustee is Particularly Appropriate with the Intercompany Issues Raised in This Case - Soon to be These Cases**

At the time this Motion is filed, Easterday Ranches is the only debtor among the Easterday family of entities.  But counsel for Debtor has announced Easterday Farms, a general partnership composed of four members of the Easterday family, will be filing its own petition within a day or two, and there could well be other filings in the future.  Conflicts among the Easterday bankruptcy estates are not theoretical; they are inevitable.  They already exist as a result of the distribution of almost $5 million in North Lot sale proceeds to Easterday Farms on the eve of bankruptcy - a transfer that is at best clearly preferential and possibly avoidable on other grounds.  Other transactions between the two entities have already been attacked by Washington Trust Bank in its filings.

Tyson understands the creditor bodies of Easterday Ranches and Easterday Farms are quite distinct.  The principal overlap is the real property secured creditors, with some shared collateral, but the companies are in very different businesses and thus the trade creditors are completely different.  As noted above, this Motion requests appointment of a trustee only for Easterday Ranches.  If and when Easterday Farms files, it may or may not be subject to a trustee motion, a trustee may or may not be appointed, and the Court may determine that one trustee or two trustees may be appropriate.  But given the intercompany connections and the diverse creditor bodies, the estate fiduciary making decisions for Easterday Ranches - this Debtor - should be an unimpeachable new player selected by the U.S. Trustee in accordance with the Bankruptcy Code.

## CONCLUSION

This case is the result of an egregious fraud perpetrated by Debtor Easterday Ranches on Tyson and its other creditors.  While Debtor has engineered a last minute change of management in an attempt to paper over the prior problems, that management change installed advisors who assisted in the process-free fire sale of Debtor's most valuable unencumbered asset and the

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 17

distribution of eighty percent of the proceeds to benefit the Easterday family. Further, any presumption of continuity in corporate management and retention of a debtor in possession has no application where Debtor itself acknowledges the need for a whole raft of new highly compensated professionals to oversee the Debtor, all at unnecessary expense.

Under these circumstances, there is cause for appointment of a trustee under § 1104(a)(1), and the totality of facts and circumstances in this case, as well as the practical realities, compel the appointment of a trustee in the best interest of creditors and the estate under § 1104(a)(2). Accordingly, Tyson respectfully requests the Court appoint a chapter 11 trustee and grant any further relief the Court deems appropriate.

Dated: February 8, 2021.

Respectfully submitted,

      /s/ Alan D. Smith
Alan D. Smith, WSBA No. 24964
ADSmith@perkinscoie.com
Bradley A. Cosman (*pro hac vice to be submitted*)
BCosman@perkinscoie.com
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
*Attorneys for Creditor Tyson Fresh Meats, Inc.*

1

## APPENDIX 1

2

## PROPOSED ORDER FOR APPOINTMENT OF TRUSTEE

3

4 See attached.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 19

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Chapter 11 |
| EASTERDAY RANCHES, INC., | Case No.: 21-00141 WLH11 |
| Debtor. | **[PROPOSED] ORDER GRANTING MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE** |

The Motion of Creditor Tyson Fresh Meats, Inc. ("Tyson") for Appointment of Chapter 11 Trustee was filed herein on or about February 5, 2021 as Dkt. No. ___ (the "Trustee Motion"). The Trustee Motion came on regularly for hearing before the Court on March 8, 2021, at 10:00 a.m. after adequate notice (the "Hearing"). Appearances were as noted in the record. The Court has considered the Trustee Motion and the declarations and exhibits filed therewith, along with any oppositions thereto, replies thereto, other pleadings relating thereto, and all evidence filed in connection therewith, and has heard argument of counsel.

Good cause appearing:

1.     The Trustee Motion is hereby GRANTED.  All oppositions thereto are OVERRULED.

2.     The United States Trustee is hereby directed to select a Chapter 11 trustee for appointment in this case.

3.     This Order memorializes the Court's ruling made on the record in open court at the Hearing.  The Court's ruling on the record shall constitute the Court's findings and conclusions on this matter, and shall be deemed adopted herein.

**///End of Order///**

**Presented by:**

_____/s/ *Alan D. Smith*_____
Alan D. Smith, WSBA No. 24964
ADSmith@perkinscoie.com
Bradley A. Cosman (*pro hac vice to be submitted*)
BCosman@perkinscoie.com
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000
*Attorneys for Creditor Tyson Fresh Meats, Inc.*

[PROPOSED] ORDER GRANTING
MOTION FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE – 2