ARMAND J. KORNFELD (WSBA #17214)
THOMAS A. BUFORD (WSBA #52969)
RICHARD B. KEETON (WSBA #51537)
BUSH KORNFELD LLP
601 Union Street, Suite 5000
Seattle, WA 98101
Tel.: (206) 292-2110
Facsimile: (206) 292-2104
Emails: jkornfeld@bskd.com, tbuford@bskd.com,
and rkeeton@bskd.com

RICHARD M. PACHULSKI (admitted *pro hac vice*)
IRA D. KHARASCH (admitted *pro hac vice*)
JEFFREY W. DULBERG (admitted *pro hac vice*)
JASON H. ROSELL (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
Tel: (310) 277-6910
Facsimile: (310) 201-0760
Emails: rpachulski@pszjlaw.com,
ikharasch@pszjlaw.com, jdulberg@pszjlaw.com,
and jrosell@pszjlaw.com

*Attorneys for the Chapter 11 Debtors*
*and Debtors in Possession*

HON. WHITMAN L. HOLT

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re | Chapter 11 |
| EASTERDAY RANCHES, INC., *et al.* | Lead Case No. 21-00141-WLH11 |
| Debtors.[1] | Jointly Administered |
| | **NOTICE OF AUCTION RESULTS** |

---

[1] The Debtors along with their case numbers are as follows: Easterday Ranches, Inc. (21-00141) and Easterday Farms, a Washington general partnership (21-00176).

NOTICE OF AUCTION RESULTS
Page 1

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ef21n001m0

**PLEASE TAKE NOTICE** that, on March 26, 2021, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed a motion [Docket No. 486] in the United States Bankruptcy Court for the Eastern District of Washington, seeking entry of (i) an order (the "Bidding Procedures Order") approving Bidding Procedures for the sale (the "Sale") of certain real property interests (collectively, the "Assets"),[2] (b) approving procedures for the assumption and assignment of designated executory contracts and unexpired leases (the "Transferred Contracts"), (c) scheduling the Auction and Sale Hearing, and (d) granting related relief, and (ii) an order (the "Sale Order") (a) authorizing the Sale(s) of the Assets free and clear of all liens claims, interests, and other encumbrances, other than assumed liabilities (if any), to the Successful Bidder(s) submitting the highest or otherwise best bid, (b) authorizing the assumption and assignment of the Transferred Contracts to the Successful Bidder(s) and authorizing the sale and transfer of other designated contracts, and (c) granting certain related relief.

**PLEASE TAKE FURTHER NOTICE** that, on April 29, 2021, the court entered the Bidding Procedures Order [Docket No. 664].

**PLEASE TAKE FURTHER NOTICE** that, on May 19, 2021, the Debtors filed the *Supplemental Motion for Approval of (A) Designation of Stalking Horse Bidder and Related Bid Protections in Connection With Auction for Sale of Assets; and (B) Granting Related Relief* [Docket No. 724].

**PLEASE TAKE FURTHER NOTICE** that, on May 20, 2021, in accordance with the Bidding Procedures and Bidding Procedures Order, and in consultation with the Consultation Parties, the Debtors extended the Bid Deadline for the Assets from May 31, 2021 at 4:00 p.m. (Pacific Time) to June 4, 2021 at 4:00 p.m. (Pacific Time).

---

[2] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Bidding Procedures or Bidding Procedures Order, as applicable.

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ef21n001m0

PLEASE TAKE FURTHER NOTICE that, on May 25, 2021, the Debtors filed the *Notice of Revised (A) Stalking Horse APA; (B) Form of Sale Order; (C) Sale Notice; and (D) Publication Notice* [Docket No. 737].

PLEASE TAKE FURTHER NOTICE that, on May 28, 2021, the court entered the *Supplemental Order (A) Approving Designation of Stalking Horse Bidder and Related Bid Protections in Connection with Auction for Sale of Assets; and (B) Granting Related Relief* [Docket No. 749], which approved of, *inter alia*, the Debtors' designation of Farmland Reserve, Inc. (the "Farmland Reserve") as the stalking horse bidder in connection with the Sale of Assets, the Debtors providing certain bid protections in connection therewith, and the Debtors' entry into the *Purchase and Sale Agreement* attached as Exhibit A (the "Farmland Reserve PSA") to the *Notice of Revised (A) Stalking Horse APA; (B) Form of Sale Order; (C) Sale Notice; and (D) Publication Notice* [Docket No. 737].

PLEASE TAKE FURTHER NOTICE that, on June 8, 2021, the Debtors, in accordance with the Bidding Procedures and Bidding Procedures Order, and upon notice to the Consultation Parties and any Qualified Bidders, rescheduled the Auction from June 14, 2021 at 10:00 a.m. (Pacific Time) to June 16, 2021 at 10:00 a.m. (Pacific Time).

PLEASE TAKE FURTHER NOTICE that, on June 15, 2021, the Debtors filed the *Notice of Rescheduled Auction Date* [Docket No. 815], rescheduling the Auction to begin June 17, 2021 at 10:00 a.m. (Pacific Time).

PLEASE TAKE FURTHER NOTICE that, on June 17, 2021, the Debtors conducted the Auction virtually via videoconference with the participation of five (5) Qualified Bidders.

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ef21n001m0

**PLEASE TAKE FURTHER NOTICE** that, at the conclusion of the Auction, the Debtors declared Farmland Reserve as the Successful Bidder for the Assets (the "Successful Bidder"), with the highest and otherwise best bid of $209 million. In addition, at the conclusion of the Auction, the Debtors declared 100C, LLC as the Backup Bidder for the Assets (the "Backup Bidder") with a bid of $208 million.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Farmland Reserve PSA is attached hereto as Exhibit A. The *First Amendment to Purchase and Sale Agreement*, which modifies the Farmland Reserve PSA to reflect the outcome of the Auction, is attached hereto as Exhibit B.

**PLEASE TAKE FURTHER NOTICE** that a copy of the *Purchase and Sale Agreement* by and between the Backup Bidder and the Sellers is attached hereto as Exhibit C.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale of the Assets to the Successful Bidder or Backup Bidder (if the Sale with the Successful Bidder does not close) at the Sale Hearing scheduled to commence on **July 14, 2021 at 11:00 a.m. (Pacific Time)** before the Honorable Whitman L. Holt in the United States Bankruptcy Court for the Eastern District of Washington, 402 E. Yakima Avenue, Second Floor Courtroom, Yakima, WA 98901. The Sale Hearing may be adjourned or rescheduled with prior notice filed on the docket of these Chapter 11 Cases or without prior notice by an announcement to the adjourned date at the Sale Hearing.

**THE DEADLINE TO OBJECT TO THE DEBTORS' REQUEST TO APPROVE THE SALE OF THE ASSETS TO THE SUCCESSFUL BIDDER OR BACKUP BIDDER, AS APPLICABLE, IS JUNE 30, 2021 AT 4:00 P.M. (PACIFIC TIME).**

NOTICE OF AUCTION RESULTS
Page 4

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ef21n001m0

To the extent any Contract Counterparty objects to adequate assurance of future performance provided by the Successful Bidder or Backup Bidder, any such objection must be filed no later than June 30, 2021 at 4:00 p.m. (Pacific Time).

Dated: June 21, 2021

BUSH KORNFELD LLP

*/s/ Thomas A. Buford, III*

THOMAS A. BUFORD, III (WSBA 52969)
BUSH KORNFELD LLP

RICHARD M. PACHULSKI (admitted *pro hac vice*)
IRA D. KHARASCH (admitted *pro hac vice*)
JEFFREY W. DULBERG (admitted *pro hac vice*)
JASON H. ROSELL (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP

*Attorneys for Debtors and Debtors in Possession*

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ef21n001m0

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 5 of 379

# EXHIBIT A

*Successful Bidder PSA*

**PURCHASE AND SALE AGREEMENT**

**BY AND AMONG**

**FARMLAND RESERVE, INC. A UTAH NONPROFIT CORPORATION, AS BUYER**

**AND**

**EASTERDAY RANCHES, INC., A WASHINGTON CORPORATION
AND EASTERDAY FARMS, A WASHINGTON GENERAL PARTNERSHIP,
CODY EASTERDAY, DEBBY EASTERDAY AND KAREN EASTERDAY,
COLLECTIVELY AS SELLERS**

4831-5589-2454v.18 0117168-000002

# TABLE OF CONTENTS

**Page**

1. Sale by the Easterdays ........................................................................ 3
2. Purchase and Sale of the Property ...................................................... 5
3. Excluded Property ............................................................................. 7
4. Excluded Liabilities .......................................................................... 8
5. Consideration .................................................................................. 8
   5.1 Purchase Price ........................................................................ 8
   5.2 Assumed Liabilities; Environmental Release .............................. 9
6. Performance ................................................................................... 10
   6.2 Purchase Price Allocation ...................................................... 10
   6.3 Closing Date .......................................................................... 11
   6.4 Easterdays Deliveries at Closing ............................................ 11
   6.6 Buyer's Deliveries to Sellers at Closing .................................. 14
   6.7 Pre-Closing Covenants ........................................................... 15
       6.7.1 Notice to Sellers' Creditors and Counterparties ............... 15
       6.7.2 HSR Act ......................................................................... 15
       6.7.3 WARN Act ...................................................................... 16
       6.7.4 COBRA ........................................................................... 16
       6.7.5 Operation and Maintenance ............................................ 16
       6.7.6 Compliance .................................................................... 16
   6.8 Transfer Taxes; Certain Prorations; Title Insurance; Etc. ......... 17
   6.9 Possession. ............................................................................ 18
   7.1 Conditions to Sellers' Obligations. ......................................... 19
   7.2 Conditions to Buyer's Obligations ........................................... 20
   7.3 Termination ........................................................................... 22
8. Sellers' Representations and Warranties ............................................. 22
   8.1 Power of Sellers ..................................................................... 22
       8.1.1 Easterdays ..................................................................... 22
       8.1.2 Debtors ......................................................................... 22

i

| | 8.2 | Authorization of Sellers | 22 |
| | 8.3 | Real Property | 23 |
| | 8.4 | Environmental Condition | 23 |
| | 8.5 | Compliance with Laws | 23 |
| | 8.6 | Water Rights | 23 |
| | 8.7 | Assigned and Assumed Leases and Contracts | 24 |
| | 8.8 | OFAC | 24 |
| 9. | | Buyer's Representations and Warranties | 24 |
| | 9.1 | Power of Buyer | 24 |
| | 9.2 | Authorization of Buyer | 24 |
| | 9.3 | OFAC | 25 |
| 10. | | AS-IS | 25 |
| 11. | | Bankruptcy Court Approvals | 26 |
| | 11.1 | Supplemental Bidding Procedures Motion | 26 |
| | 11.2 | Stalking Horse Bidder Approval Order | 26 |
| | 11.3 | Sale Order | 26 |
| | 11.4 | Debtor Assigned and Assumed Leases and Contracts | 27 |
| 12. | | Post-Closing Covenants | 27 |
| | 12.1 | Plan Sponsor Contribution | 27 |
| | 12.2 | Consent to Assignment | 28 |
| 13. | | Miscellaneous | 28 |
| | 13.1 | Damage and Destruction; Condemnation | 28 |
| | 13.2 | Seller Default | 29 |
| | 13.3 | Buyer Default | 29 |
| | 13.4 | Attorneys' Fees | 29 |
| | 13.5 | Notices | 29 |
| | 13.6 | Entire Agreement; No Third Party Beneficiaries | 31 |
| | 13.7 | Modification | 31 |
| | 13.8 | Closing Date | 31 |
| | 13.9 | Reporting Requirements | 32 |
| | 13.10 | Cooperation Agreement | 32 |

4831-5589-2454v.18 0117168-000002

13.11 Severability ................................................................................................ 32

13.12 Captions ..................................................................................................... 32

13.13 Further Assurances ..................................................................................... 32

13.14 Waiver ........................................................................................................ 32

13.15 Brokerage Obligations ............................................................................... 32

13.16 Payment of Fees and Expenses .................................................................. 33

13.17 Survival ...................................................................................................... 33

13.18 Assignments .............................................................................................. 33

13.19 Binding Effect ............................................................................................ 33

13.20 Applicable Law .......................................................................................... 33

13.21 Good Faith ................................................................................................. 33

13.22 Construction ............................................................................................... 33

13.23 Counterparts; Electronic Signatures .......................................................... 34

13.24 Time is of the Essence ............................................................................... 34

13.25 Bankruptcy Court Jurisdiction ................................................................... 34

13.26 Interpretation and Rules of Construction ................................................... 34

4831-5589-2454v.18 0117168-000002

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (the "**Agreement**") is made and entered into as of the date of the last Party's signature hereto as set forth below ("**Effective Date**"), by and among Farmland Reserve, Inc. a Utah nonprofit corporation ("**Buyer**"), and Easterday Ranches, Inc., a Washington corporation ("**Ranches**") and Easterday Farms, a Washington general partnership ("**Farms**" and, together with Ranches, "**Debtors**"), each a debtor and debtor in possession under Lead Case No. 21-00141-11 (the "**Cases**") (Jointly Administered) in the United States Bankruptcy Court for the Eastern District of Washington, Yakima Division (the "**Bankruptcy Court**"), and by and among Buyer, Debtors, and Cody Easterday ("**CE**") and Debby Easterday ("**DE**"), husband and wife, and Karen Easterday, in her individual capacity, and as the personal representative in *In the Matter of the Estate of Gale A. Easterday* currently pending in the Franklin County Superior Court, case no. 21-450004-11 ("**KE**," and together with **CE** and **DE**, "**Easterdays**," and, together with Debtors, "**Sellers**"). Collectively, Buyer and Sellers are referred to herein as the "**Parties**."

# RECITALS

A.      Buyer wishes to acquire from Debtors, and Debtors wish to sell to Buyer, all of Debtors' right, title, and interest in and to that property described in Section 1 and Section 2 (collectively, the "**Property**") on the terms and conditions set forth herein.

B.      In the Debtors' business judgment, any sale of the portion of the Property that currently constitutes property of the Debtors' bankruptcy estates (collectively, "**Debtor Property**") can best be maximized for the benefit of Debtors' creditors and parties-in-interest in the Cases if the Debtor Property is marketed for sale with the portion of the Property that is currently owned and/or leased by the Easterdays as described in Section 1 (collectively, "**Easterday Property**").

C.      In Easterdays' business judgment, any sale of the Easterday Property can best be maximized for the benefit of the Easterdays' creditors and their respective parties-in-interest if the Easterday Property is marketed for sale with the Debtor Property.

D.      In furtherance of Sellers' desire to maximize the value of the Property, Debtors filed their *Motion for an Order Authorizing and Approving Cooperation Agreement* in the Cases on March 26, 2021 [Dkt. No. 487, as revised by Dkt. Nos. 493, 576, and 640] (the "**Cooperation Agreement Motion**"). On April 28, 2021, the Bankruptcy Court entered an order approving the Cooperation Agreement Motion [Dkt. No. 655] (the "**Cooperation Agreement Order**").

E.      In furtherance of the Sellers' desire to maximize the value of the Property, Debtors filed their *Notice and Motion for (I) an Order (A) Approving Bid Procedures for the Sale of Assets; (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Scheduling the Auction and Sale Hearing; and (D)*

1

*Granting Related Relief; and (II) an Order (A) Approving the Sale Free and Clear of All Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases; Memorandum of Points and Authorities* in the Cases on March 26, 2021 [Dkt. No. 486] ("**Bidding Procedures and Sale Motion**"). On April 29, 2021, the Bankruptcy Court entered an order approving the Bidding Procedures (as defined in the Bidding Procedures and Sale Motion) (the "**Bidding Procedures Order**").

F.     Cody Easterday entered into a *Plea Agreement* on March 31, 2021 in Case No. 4:21-CR-06012-SAB-1 (the "**Plea Agreement**") in the United States District Court for the Eastern District of Washington.

G.     On the terms and conditions set forth in this Agreement, and subject to higher and better offers in accordance with the Bidding Procedures Order, Buyer wishes to acquire from Debtors all of Debtors' right, title, and interest in and to the Property, free and clear of all liens, claims, rights, encumbrances and interests pursuant to and in accordance with sections 105, 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 4001, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), all as more fully set forth in this Agreement.

H.      The consummation of the transactions described in this Agreement, including, upon Closing, Buyer's lease of the Property to Debtors in order to enable Debtors to complete the current-year wheat crop harvest  and to market and sell certain tangible personal property and equipment ("**Equipment**") will maximize the value of the Property and Equipment for the benefit of the Sellers and their creditors and parties-in-interest.

I.      In Debtors' business judgment, consummation of the transaction described in this Agreement, subject to higher and better offers in accordance with the Bidding Procedures Order, is a necessary condition to Debtors' ability to propose and confirm a joint Chapter 11 plan of liquidation in form and content reasonably acceptable to the Sellers (the "**Joint Plan**") that enables Debtors or their designee to complete the current-year wheat crop harvest and to sell the Equipment in order to best maximize recoveries for all holders of rights and claims against the Sellers and in and to the Property.

J.      Sellers acknowledge and agree that Buyer's obligation to consummate the transactions described in this Agreement on the terms and conditions set forth in the Agreement requires the Easterdays to sell, assign, transfer, convey and deliver to Debtors all right, title and interest in and to the Easterday Property, upon which transfer all of the Easterday Property shall constitute property of Debtors' bankruptcy estates and for which the Easterdays shall receive, in accordance with the Cooperation Agreement and subject to the approval of the Bankruptcy Court, an allocable interest in the Net Sale Proceeds, as such term is defined in the Cooperation Agreement (the "**Proceeds Allocation**").

K.     Debtors acknowledge and agree that the Bidding Procedures Order authorizes Debtors to enter into a Stalking Horse APA (as defined in the Bidding Procedures Order), and,

4831-5589-2454v.18 0117168-000002

subject to approval by the Bankruptcy Court, this Agreement constitutes the Stalking Horse APA for the Property.

L.     Buyer acknowledges and agrees that upon the execution of the Agreement by the Easterdays, Debtors and Buyer, the Agreement shall constitute Buyer's irrevocable offer to purchase the Property on the terms and conditions set forth herein.

M.     The Parties acknowledge and agree that this Agreement was negotiated at arm's length and in good faith, and that the transactions evidenced in this Agreement, and any actions that the Parties deem necessary to comply with and perform under the Agreement and to consummate the transactions set forth herein, are not intended to hinder, delay or defraud creditors of any of the Sellers.

# AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing Recitals, which are incorporated into the agreements of the Parties herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.     Sale by the Easterdays.  On the Closing Date, as hereinafter defined, in consideration of the covenants and obligations of the Parties hereunder, and subject to the conditions set forth herein, in consideration of and in exchange for the Proceeds Allocation, the Easterdays shall sell, assign, transfer, convey and deliver to Debtors, and Debtors shall acquire and accept, all of Easterdays' rights, title, and interest in and to the Easterday Property, as follows:

1.1     All of Easterdays' rights, title and interest in and to the real property located in Benton County, Washington commonly known as Goose Gap Farm, River Farm, Cox Farm, and Farm Manager House, which are legally described on  Schedule 1.1  attached hereto and incorporated by reference (the "**Easterday Land**"), together with all rights, privileges, easements and appurtenances to the Easterday Land (collectively, the "**Easterday Appurtenances**")

1.2     Any transferrable or assignable rights, title and interest in and to any oil, gas, minerals, hydrocarbons, geothermal, sand, rock, or gravel resources on, of, or relating to, the Easterday Land (the "**Easterday Mineral Rights**").

1.3     All of Easterdays' rights, title and interest in and to buildings and related improvements and all fixtures now or hereafter located on the Easterday Land, including (i) all storage facilities and all houses, sheds, warehouses, mobile homes, and other buildings, (ii) all irrigation and drainage equipment located on, within, and serving the Easterday Land, Easterday Appurtenances, or Easterday Water Rights (as defined in Section 1.5), including, without limitation, wells, well casings, pumps, booster pumps, pump station equipment, pipelines, pump houses, motors, meters, engines, electrical panels, gearheads, sand filters and pressure systems pumps, irrigation pivots, sprinklers, drip irrigation systems, tow lines, hand lines, irrigation pipe,

3

drainage pipe and culverts, (iii) all enclosures of the Easterday Land or any part thereof, including, without limitation, fences, gates, shuts, posts, poles, barbed wire and electric wire, (iv) any crop protection equipment and apparatus located on the Easterday Land, including, without limitation, any frost protection equipment and wind machines, (v) all electric, gas and water lines and equipment located on the Easterday Land, including, without limitation, transformers, circuit breakers, switch boxes, fuse and breaker panels, regulators, cut on/off valves, wiring and pipe, and (vi) all trees, vines and other permanent plantings, whether mature or immature, now or hereafter growing on the Easterday Land, together with all trellises, wires, end posts, and stakes relating thereto (collectively, the "**Easterday Improvements**").

1.4     All of Easterdays' transferrable or assignable rights, title and interest in and to any and all (a) land surveys obtained prior to Closing; (b) water sharing agreements and water delivery agreements set forth on <u>Schedule 1.4</u>  attached hereto and incorporated herein ("**Easterday Water Agreements**"); (c) approvals and permits, including, all permits and related easements with respect to the irrigation water pumping plants, pipelines and related facilities, including those set forth on <u>Schedule 1.4</u> attached hereto and incorporated herein (the "**Easterday Irrigation System Permits**"); (d) engineering drawings (including CAD files associated with such engineering drawings) to the extent in Easterdays' possession, custody or control concerning any infrastructure on or serving the Easterday Land, Easterday Appurtenances, or Easterday Improvements, including, without limitation, irrigation systems, wastewater and drainage systems, reservoirs, frost control systems, roads, electrical systems and grading; (e) to the extent in Easterdays' possession, custody or control, manuals, warranties, and service and maintenance records and agreements; (f) to the extent in Easterdays' possession, custody or control, soil analyses, and irrigation and wastewater studies; (g) to the extent in Easterdays' possession, custody or control, records of applications of chemicals, fertilizers, and any other applications on the Easterday Land whatsoever pertaining to the ownership or operation of the Easterday Land, Easterday Appurtenances, Easterday Mineral Rights, Easterday Water Rights (as defined below in <u>Section 1.5</u>) and/or the Easterday Improvements.

1.5     All of Easterdays' transferable or assignable water rights appurtenant to the Easterday Land and all rights to receive or store water that serve the Easterday Land, including, without limitation, to the extent transferable or assignable (i) all appurtenant rights to withdraw groundwater and to divert surface water including by prior appropriation or by or under any certificates, permits, rights or licenses granted by any governmental authority or agency including, without limitation, ground and surface water right certificates and permits listed on <u>Schedule 1.5</u> attached to this Agreement and incorporated herein by reference, (ii) any rights to withdraw, divert or use water granted or created by lease, contract or agreement with any government agency, person or entity; (iii) any water, water right, water allocation, distribution right, delivery right, water storage right, or other water-related entitlement appurtenant or otherwise applicable to the Easterday Land by virtue of the Easterday Land being situated within the boundaries of any district, agency or other governmental entity or within the boundaries of any private water company, mutual water company or other non-governmental entity; (iv) all easements or other rights, including contractual rights, to transport, carry, allocate or otherwise deliver water or any of the foregoing rights from or to the Easterday Land by any means, wherever located; and (v) any shares (or any rights under such shares) of any private

4

water company, mutual water company or other non-governmental entity pursuant to which Easterdays or the Easterday Land may receive and use water (collectively, the "**Easterday Water Rights**").

1.6     All of Easterdays' transferrable or assignable rights, title and interest in and to the contracts and leases listed on Schedule 1.6 attached hereto and incorporated herein (the "**Easterday Assigned and Assumed Leases and Contracts**"). For clarification purposes, effective as of the Closing, the current oral farming leases with respect to the Easterday Land between the Easterdays and the Debtors shall be deemed terminated as of the Closing and are not being assigned.  By executing this Agreement, the Easterdays are not waiving any rights to assert claims against the Debtors for unpaid amounts due under such leases. Buyer shall have no liability with respect to such leases.

1.7     To the extent transferable or assignable, all of Easterdays' rights, title and interest in and to other intangible property and rights pertaining to any of the Easterday Property or its operation or used in connection with the Easterday Property, including, but not limited to, to the extent transferable and assignable, all agreements, licenses, governmental authorizations or permits pertaining thereto or to the use, development, ownership, management, possession, occupancy, or operation thereof (the "**Easterday Intangible Property**").

2.     Purchase and Sale of the Property.  On the Closing Date, as hereinafter defined, in consideration of the covenants and obligations of the Parties hereunder, and subject to the conditions set forth herein, Debtors shall sell, assign, transfer, convey and deliver to Buyer and Buyer shall acquire and accept from Debtors, free and clear of liens, claims, rights, encumbrances, and interests pursuant to and in accordance with sections 363 and 365 of the Bankruptcy Code, except for the Permitted Exceptions (as defined in Section 7.2.11 below), all of Debtors' rights, title and interest in and to the Property as follows:

2.1     All of Debtors' rights, title and interest in and to the real property located in Benton County, Washington commonly known as the Cox Farm, Farm Manager House, River Farm, Nine Canyon Farm, Goose Gap Farm and Storage Complex, which are legally described on Schedule 2.1 attached hereto and incorporated by reference (the "**Land**"), together with all rights, privileges, easements and appurtenances to the Land (collectively, the "**Appurtenances**").

2.2     Any transferrable or assignable rights, title and interest in and to any oil, gas, minerals, hydrocarbons, geothermal, sand, rock, or gravel resources on, of, or relating to, the Land (the "**Mineral Rights**").

2.3     All of Debtors' rights, title and interest in and to buildings and related improvements and all fixtures now or hereafter located on the Land, including (i) all storage facilities and all houses, sheds, warehouses, mobile homes, and other buildings, (ii) all irrigation and drainage equipment located on, within, and serving the Land, Appurtenances, or Water Rights (as defined in Section 2.6), including, without limitation, wells, well casings, pumps, booster pumps, pump station equipment (including, specifically the "Berian", "Irrigo" and River Farm pumping equipment, pipelines, and related facilities), pump houses, motors, meters,

4831-5589-2454v.18 0117168-000002

21-00141-WLH11     Doc 830     Filed 06/21/21     Entered 06/21/21 17:28:37     Pg 15 of 379

engines, electrical panels, gearheads, sand filters and pressure systems pumps, irrigation pivots, sprinklers, drip irrigation systems, tow lines, hand lines, irrigation pipe, drainage pipe and culverts, (iii) all enclosures of the Land or any part thereof, including, without limitation, fences, gates, shuts, posts, poles, barbed wire and electric wire, (iv) any crop protection equipment and apparatus located on the Land, including, without limitation, any frost protection equipment and wind machines, (v) all electric, gas and water lines and equipment located on the Land, including, without limitation, transformers, circuit breakers, switch boxes, fuse and breaker panels, regulators, cut on/off valves, wiring and pipe, and (vi) all trees, vines and other permanent plantings, whether mature or immature, now or hereafter growing on the Land, together with all trellises, wires, end posts, and stakes relating thereto (collectively, the "**Improvements**").

2.4    All of Debtors' transferrable or assignable rights, title and interest in and to any and all (a) land surveys obtained prior to Closing; (b) water sharing agreements and water delivery agreements set forth on Schedule 2.4 attached hereto and incorporated herein ("**Water Agreements**"); (c) approvals and permits, including, all permits and related easements with respect to the irrigation water pumping plants, pipelines and related facilities, including those set forth on Schedule 2.4 attached hereto and incorporated herein (the "**Irrigation System Permits**"); (d) engineering drawings (including CAD files associated with such engineering drawings) to the extent in Debtors' possession and control concerning any infrastructure on or serving the Land, Appurtenances, or Improvements, including, without limitation, irrigation systems, wastewater and drainage systems, reservoirs, frost control systems, roads, electrical systems and grading; (e) to the extent in Debtors' possession, custody, or control, manuals, warranties, and service and maintenance records and agreements; (f) to the extent in Debtors' possession, custody, or control, soil analyses, and irrigation and wastewater studies; (g) to the extent in Debtors' possession, custody or control, records of applications of chemicals, fertilizers, and any other applications on the Land whatsoever pertaining to the ownership or operation of the Land, Appurtenances, Mineral Rights, Water Rights (as defined below in Section 2.6) and/or the Improvements.

2.5    All of Debtors' transferrable or assignable rights, title and interest in and to the contracts and leases listed on Schedule 2.5  attached hereto and incorporated herein (the "**Debtor Assigned and Assumed Leases and Contracts,**" and together with the Easterday Assigned and Assumed Leases and Contracts, the "**Assigned and Assumed Leases and Contracts**").

2.6    All of Debtors' transferable or assignable water rights appurtenant to the Land and all rights to receive or store water that serve the Land, including, without limitation, to the extent transferable or assignable,  (i) all appurtenant rights to withdraw groundwater and to divert surface water including by prior appropriation or by or under any certificates, permits, rights or licenses granted by any governmental authority or agency including, without limitation, ground and surface water right certificates and permits listed on Schedule 2.6 attached to this Agreement and incorporated herein by reference, (ii) any rights to withdraw, divert or use water granted or created by lease, contract or agreement with any government agency, person or entity; (iii) any water, water right, water allocation, distribution right, delivery right, water storage right,

6

4831-5589-2454v.18 0117168-000002

or other water-related entitlement appurtenant or otherwise applicable to the Land by virtue of the Land being situated within the boundaries of any district, agency or other governmental entity or within the boundaries of any private water company, mutual water company or other non-governmental entity; (iv) all easements or other rights, including contractual rights, to transport, carry, allocate or otherwise deliver water or any of the foregoing rights from or to the Land by any means, wherever located; and (v) any shares (or any rights under such shares) of any private water company, mutual water company or other non-governmental entity pursuant to which Sellers or the Land may receive and use water (collectively, the "**Water Rights**").

2.7    To the extent transferable or assignable, all of Debtors' rights, title and interest in and to other intangible property and rights pertaining to any of the Property or its operation or used in connection with the Land, including, but not limited to, to the extent transferable and assignable, all agreements, licenses, governmental authorizations or permits pertaining thereto or to the use, development, ownership, management, possession, occupancy, or operation thereof (the "**Debtor Intangible Property**", together with the Easterday Intangible Property, collectively, the "**Intangible Property**").

3.    <u>Excluded Property</u>.  Notwithstanding anything to the contrary contained herein, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring and no Seller is selling or assigning any asset or property of any of the Sellers other than the Property, and all such other assets and properties of the Sellers shall be excluded from the Property (the "**Excluded Property**"). The Excluded Property includes, but is not limited to: (i) Equipment, including without limitation all machinery, tools, equipment, furniture, movable trade fixtures, office furnishings, spare parts, vehicles, containers, and other tangible personal property of any Seller that is not part of the Property; (ii) any payments received or sums or credits owed to any Seller for or on account of any crop growing on the Property at Closing (it being expressly agreed that Sellers shall be entitled to all such payments, sums and credits); or (iii) any of the Property that, (xx) to the extent constituting Assigned and Assumed Leases and Contracts, are not approved for assumption and assignment by Debtors to Buyer pursuant to section 365 of the Bankruptcy Code, or are not approved for sale by Debtors to Buyer pursuant to section 363 of the Bankruptcy Code upon entry of the Sale Order (as defined in <u>Section 11.3</u> hereof), or (yy) to the extent constituting Assigned and Assumed Leases and Contracts, require approval or consent of a counterparty or other third party prior to any assignment or sale where such consent is not obtained prior to or after the Closing (as defined in <u>Section 6.1</u> hereof), except where the need for such consent or approval described in this clause (yy) is obviated by the effect of the Sale Order. Notwithstanding the foregoing or anything to the contrary in the Agreement, Sellers and Buyer shall cooperate with each other in commercially reasonable respects to obtain any such required consents and/or approvals with respect to the Assigned and Assumed Leases and Contracts as further set forth in <u>Section 12.2</u> such that those contracts, agreements or leases that constitute Assigned and Assumed Leases and Contracts are not Excluded Property and are conveyed to Buyer at Closing or as soon as possible thereafter; *provided that* nothing in this Agreement requires or obligates either Buyer or Sellers to (i) pay any fee or other amount or compensation to any party for its consent or approval, or (ii) initiate or pursue any litigation or other enforcement action against any party to obtain any such consent or approval; *provided further that*, to the extent necessary and at Buyer's sole cost and expense, Sellers shall cooperate

7

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 17 of 379

in a commercially reasonable manner with Buyer, for a period of six (6) months after Closing, in the event Buyer determines that litigation or other enforcement action of any kind or nature is necessary to cause the transfer of any rights, title or interest in and to the Property from Sellers to Buyer. Buyer agrees to defend (in coordination with Sellers' counsel), indemnify and hold Sellers harmless from and against costs (including reasonable attorney fees), claims or liabilities arising from or in connection with Sellers' cooperation with Buyer pursuant to the preceding sentence.

4. <u>Excluded Liabilities</u>. Notwithstanding anything herein to the contrary, Buyer is not assuming, nor will Buyer be obligated to assume or be obliged to pay, perform or otherwise discharge or in any other way be liable or responsible for any liability whatsoever of Sellers or any of their affiliates, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities and, for the avoidance of doubt, all cure amounts for which Buyer is responsible pursuant to <u>Section 11.4</u> hereof (collectively, the "**Excluded Liabilities**"). Without limiting the foregoing, Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, which for the avoidance of doubt, include (a) all liabilities arising, whether prior to, at or after the Closing, under (i) Title IV of ERISA, including with respect to a multi-employer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA) or a defined benefit pension plan maintained at any time by any of the Sellers or any of their affiliates, (ii) all Seller benefit plans (including any COBRA obligations), (iii) any collective bargaining agreement, or (iv) any liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, retaliation, discrimination, termination or other payments or payment obligations; (b) any and all liabilities for taxes of or imposed on Sellers or any of its affiliates or related or attributable to the Property for any pre-Closing tax period other than real estate and personal property taxes expressly assumed by Buyer under this Agreement; (c) all liabilities relating to the Excluded Property; and (d) all cure costs or damages arising under or relating to any of the Assigned and Assumed Leases and Contracts that are ultimately not assumed and assigned to Buyer for any reason.

5. <u>Consideration</u>.

5.1 <u>Purchase Price</u>.

5.1.1 The cash consideration to be paid by Buyer to Debtors for the Property shall be $188,000,000.00, plus any transfer taxes or the like as provided in <u>Section 6.8</u> herein (the **"Purchase Price"**).

5.1.2 The Purchase Price shall be paid as follows:

(a) Within two (2) business days after the Effective Date, Buyer shall deposit into an escrow (the "**Escrow**") with *Chicago Title Insurance Company* ("**CTIC**") (the "**Escrow Holder**" or "**Title Company**") an amount equal to $18,800,000.00 (the **Deposit**) in immediately available, good funds (funds delivered in this manner are referred to herein as "**Good Funds**"), pursuant to escrow instructions in substantially the form of <u>Exhibit A</u> attached hereto and incorporated herein by this reference (the "**Escrow Instructions**"). In turn, the

Escrow Holder shall immediately deposit the Deposit into a segregated, interest-bearing account. At the Closing, the Deposit shall be credited and applied toward payment of the Purchase Price. If the transactions described in this Agreement terminate (A) by reason of Sellers' material default under this Agreement, it being agreed that Buyer shall not have the right to so terminate this Agreement unless Sellers have failed to cure the applicable default within three (3) business days following receipt of written notice thereof from Buyer, or (B) by reason of the failure of a condition to Buyer's obligations hereunder (the failure of which is not itself the result of a material default by Buyer hereunder), or (C) pursuant to Section 6.3 or Section 7.3 in circumstances where such termination was not itself the result of a material default by Buyer hereunder, the Escrow Holder shall return to Buyer the Deposit (together with all interest accrued thereon), but less an amount equal to 1/2 of the Escrow Holder's escrow fees and charges. For clarity, if this Agreement is terminated for any reason other than a Buyer Default, the Deposit shall be returned to Buyer, and further, upon any termination of this Agreement, none of the Parties shall have any further obligations other than as expressly set forth in this Agreement.

(b)     On the Closing Date, (A) Buyer shall deliver into Escrow with the Escrow Holder, Good Funds in the amount of the balance of the Purchase Price, plus any other amounts payable by Buyer hereunder and (B) the Escrow Holder shall release and disburse the Purchase Price proceeds and the Deposit into an escrow in accordance with the Escrow Instructions, this Agreement, the Cooperation Agreement and the mutually approved closing settlement statements delivered at Closing.

5.2     Assumed Liabilities; Environmental Release

(a)     Other than the liabilities and obligations of Sellers expressly assumed by Buyer hereunder or as set forth on Schedule 5.2 ("**Assumed Liabilities**"), if any, any liabilities or obligations that existed, accrued or were incurred prior to the Closing Date constitute Excluded Liabilities.

(b)     Buyer and anyone claiming by, through or under Buyer hereby waives any right to recover from and fully and irrevocably releases Sellers and Sellers' employees, officers, directors, members, partners, principals, representatives, agents, servants, attorneys, affiliates, parent, subsidiaries, bankruptcy estates, successors and assigns, and all persons, firms, corporations and organizations in its behalf (collectively, "**Released Parties**") of and from any and all claims, responsibility and/or liability that it may now have or hereafter acquire against any of the Released Parties for any costs, loss, liability, damage, expenses, demand, action or cause of action arising from or related to the environmental condition or any environmental matters affecting the Property, including, without limitation, geologic conditions and subsurface soil and water conditions.  This release includes claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release to Sellers.  In this connection and to the extent permitted by law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses relating to the

9

environmental condition of or environmental matters affecting the Property, including, without limitation, geologic conditions and subsurface soil and water conditions, which are presently unknown, unanticipated and unsuspected, and Buyer further agrees, represents and warrants that the releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends to release, discharge and acquit the Released Parties from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses relating to or arising in connection with the environmental condition of or environmental matters affecting the Property (including, without limitation, geologic conditions and subsurface soil and water conditions). Notwithstanding any other provision of this Agreement, Buyer's release of any Released Party shall not apply to any actual and intentional fraud committed by such Released Party.

6.   Performance.

6.1   Closing.  The Closing of the transactions described in this Agreement, in accordance with the terms and conditions of this Agreement (the "**Closing**"), shall take place in escrow with the Escrow Holder or at such other place or in such other manner as the Parties may mutually agree upon in writing.  Buyer and Seller acknowledge and agree that upon the occurrence of the Closing, the purchase and sale of the Property shall conclusively be deemed final and complete and, except only for such rights and obligations as expressly survive the Closing hereunder, neither Buyer nor Sellers shall have any right upon any default by the other(s) occurring after the Closing to seek any recourse or remedy in the nature of rescission or which would otherwise have the effect of materially altering the previously consummated purchase and sale of the Property in any way, all of which rights and remedies Buyer and Sellers hereby expressly waive.

6.2   Purchase Price Allocation. No later than the earlier of: (a) 150 days following the Closing and (b) December 31, 2021, Sellers and Buyer shall agree to an allocation of the Purchase Price ("**Purchase Price Allocation**"). In the event the Parties cannot agree on a Purchase Price Allocation, then the Purchase Price Allocation shall be decided by the Bankruptcy Court pursuant to Section 13.25. The Purchase Price Allocation shall be used for purposes of establishing statements of consideration for any county or state transfer tax purposes in connection with recording of the Deeds conveying the Property from Debtors to Buyer. The Parties shall also use the Purchase Price Allocation for accounting and tax purposes in connection with preparing and filing IRS FORM 8594, ASSET ACQUISITION STATEMENT UNDER INTERNAL REVENUE CODE SECTION 1060, which each of the Parties hereto agrees that it or they will file with its or their federal income tax returns consistent with the Purchase Price Allocation and that it or they will also file such further information or take such further actions as may be necessary to comply with the Treasury Regulations that have been promulgated pursuant to Section 1060 of the Internal Revenue Code of 1986, as amended. Neither Buyer nor any Seller shall take any position in connection with the preparation or filing of IRS Form 8594 that is inconsistent with the Purchase Price Allocation unless required to do so by applicable law. Notwithstanding anything herein to the contrary, the Parties agree that the Purchase Price Allocation is separate from and unrelated to the Proceeds Allocation and that the Purchase Price Allocation shall not be binding upon Sellers or used as evidence or otherwise be

4831-5589-2454v.18 0117168-000002

taken into account in connection with the determinations to be made in connection with the Proceeds Allocation under the Cooperation Agreement. Section 6.2 shall survive the Closing Date.

      6.3    Closing Date. The Closing shall be held on or before the date which is three (3) business days following the satisfaction or waiver of the last of Sellers' and Buyer's respective conditions precedent to Closing (as expressly set forth in this Agreement) (the "**Closing Date**"); provided that in no event shall the Closing occur later than August 31, 2021 (the "**Outside Date**"); provided, however, in the event the conditions to Closing have not been satisfied or waived by the Outside Date, then any Party whose default hereunder is not the reason such condition has not been satisfied may terminate this Agreement upon written notice to the other(s) given prior to the satisfaction or waiver of such condition(s). Alternatively, the Parties may mutually agree in writing to an extended Closing Date. Until this Agreement is either terminated or the Parties have agreed in writing upon an extended Closing Date, the Parties shall diligently continue to work to satisfy all conditions to Closing and the transactions described in this Agreement shall close as soon as such conditions are satisfied or waived in writing.

      6.4    Easterdays Deliveries at Closing. On the Closing Date, Easterdays shall make the following deliveries in Escrow for delivery to Debtors or Buyer, as applicable:

      6.4.1    Quitclaim Deeds (the "**Easterday Deeds**"), in the form attached hereto as Exhibit B, duly executed and acknowledged by Easterdays, pursuant to which Easterdays convey to Debtors jointly all of Easterdays' rights, title and interest in and to the Easterday Land, Easterday Appurtenances, Easterday Mineral Rights, Easterday Improvements and Easterday Water Rights.

      6.4.2    A Real Estate Excise Tax Affidavit (the "**Easterday REETA**"), duly executed by Easterdays, as grantor, and Debtors, as grantee. Easterdays and Debtors agree that the gross selling price to be inserted in the Easterday REETA is the market value assessment for the property maintained by the Benton County tax rolls at the Closing Date, or such other value as approved by the county assessor. The Parties agree that the Easterday REETA is separate from and unrelated to the Proceeds Allocation and that nothing set forth in the Easterday REETA shall be binding upon Sellers in connection with the determinations to be made in connection with the Proceeds Allocation under the Cooperation Agreement.

      6.4.3    A Mobile Home Real Estate Excise Tax Affidavit (the "**Easterday Mobile Home REETA**"), duly executed by Easterdays, as grantor, and Debtors, as grantee. Easterdays and Debtors agree that the gross selling price to be inserted in the Easterday Mobile Home REETA is the market value assessment for the property maintained by the Benton County tax rolls at the Closing Date, or such other value as approved by the county assessor. The Parties agree that the Easterday Mobile Home REETA is separate from and unrelated to the Proceeds Allocation and that nothing set forth in the Easterday Mobile Home REETA shall be binding upon Sellers in connection with

4831-5589-2454v.18 0117168-000002

the determinations to be made in connection with the Proceeds Allocation under the Cooperation Agreement.

6.4.4    A Bill of Sale and Assignment (the "**Easterday Bill of Sale**") from Easterdays to Debtors, in the form attached hereto as <u>Exhibit C</u> for any tangible and intangible personal property included in the Easterday Property, including without limitation the Property described in Sections 1.3, 1.4, and 1.7.

6.4.5    An Assignment and Assumption of Contracts and Leases (the "**Easterday Contract/Lease Assignment**"), in the form attached hereto as <u>Exhibit D</u> executed by Easterdays with respect to the Easterday Assigned and Assumed Leases and Contracts.

6.4.6    Washington State Department of Licensing Vehicle/Vessel Bill of Sale ("**Easterday Vehicle Bill of Sale**"), duly executed by Easterdays; provided, however, Easterdays shall not be required to provide the Easterday Vehicle Bill of Sale for the mobile and manufactured homes located on River Farm.

6.4.7    Washington Statement Department of Licensing Affidavit of Loss/Release of Interest ("**Easterday Affidavit of Loss**"), duly executed by Easterdays; provided, however, Easterdays shall not be required to provide the Easterday Affidavit of Loss for the mobile and manufactured homes located on River Farm.

6.4.8    A statement under Section 1445 of the Internal Revenue Code with respect to the Easterday Property (the "**Easterday FIRPTA Statement**").

6.4.9    A preliminary closing statement approved by the Parties and duly executed by Easterdays.

6.4.10  Easterdays' title affidavit ("**Easterday Title Affidavit**"), substantially in Title Company's standard form, and such other documents customarily required by Title Company in order to issue the Title Policy (as defined in <u>Section 7.2.11</u> below).

6.4.11  Reliance letter or letters in ASTM-compliant form for purposes of satisfying "all appropriate inquiries" under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 6901 et seq.), as amended ("**CERCLA**"), with respect to the Phase I Environmental Site Assessments listed on <u>Schedule 6.4.11</u> (the "**Phase I's**"), duly executed by the consultants who performed such assessments, entitling Debtors and Buyer to rely on such assessments. <u>Debtors' Deliveries to Buyer at Closing</u>.

6.5    On the Closing Date, Debtors shall make the following deliveries into Escrow for delivery to Buyer:

6.5.1    Quitclaim Deeds (the "**Deeds**"), in the form attached hereto as <u>Exhibit B</u>, duly executed and acknowledged by Debtors, pursuant to which Debtors convey to Buyer Debtors' rights, title and interest in and to the Land, Appurtenances, Mineral Rights, Improvements and Water Rights.

6.5.2    A duly executed counterpart of the Easterday REETA.

6.5.3    A Real Estate Excise Tax Affidavit (the "**REETA**"), duly executed by Debtors.

6.5.4    A duly-executed counterpart of the Current Use Application Farm and Agricultural Land Classification Parcels with Same Ownership (the "**Current Use Application**").

6.5.5    A duly executed counterpart of the Easterday Mobile Home REETA.

6.5.6    A Mobile Home Real Estate Excise Tax Affidavit (the "**Mobile Home REETA**"), duly executed by Debtors.

6.5.7    A Bill of Sale and Assignment (the "**Bill of Sale**") from Debtors, in the form attached hereto as <u>Exhibit C</u> for any all tangible and intangible personal property included in the Property, including without limitation the Property described in Sections 2.3, 2.4, and 2.7.

6.5.8    An Assignment and Assumption of Contracts and Leases (the " **Debtor Contract/Lease Assignment**"), in the form attached hereto as <u>Exhibit D</u> executed by Debtors with respect to the Debtor Assigned and Assumed Leases and Contracts.

6.5.9    A duly executed counterpart of the Easterday Vehicle Bill of Sale.

6.5.10  Washington State Department of Licensing Vehicle/Vessel Bill of Sale ("**Vehicle Bill of Sale**"), duly executed by Debtors; provided, however, Debtors shall not be required to provide the Vehicle Bill of Sale for the mobile and manufactured homes located on Nine Canyon Farm or River Farm.

6.5.11  Washington Statement Department of Licensing Affidavit of Loss/Release of Interest (the "**Affidavit of Loss**"), duly executed by Debtors; provided, however, Debtors shall not be required to provide the Affidavit of Loss for the mobile and manufactured homes located on Nine Canyon Farm or River Farm.

6.5.12  A statement under Section 1445 of the Internal Revenue Code with respect to the Property (the "**FIRPTA Statement**").

13

6.5.13   A preliminary closing statement approved by the Parties and duly executed by Debtors.

6.5.14   Debtors' title affidavit ("**Title Affidavit**"), in the form attached as <u>Exhibit G</u> and such other documents customarily required by Title Company of debtors in bankruptcy whose affairs are being conducted by restructuring officers in order to issue the Title Policy (as defined in <u>Section 7.2.11</u> below).

6.5.15   Reliance letter or letters in ASTM-compliant form for purposes of satisfying "all appropriate inquiries" under CERCLA, with respect to the Phase I's, duly executed by the consultants who performed such assessments, entitling Buyer to rely on such assessments.

6.5.16   A short-term lease between Buyer, as landlord, and Debtors, as lessees of the Land (the "**Temporary Lease Agreement** "), in the form attached as <u>Exhibit E</u> incorporated herein, pursuant to which Debtors have the right to continue to farm the Land through the end of the current growing season and to harvest and dispose of, solely for Debtors' account, those crops and other farm products described therein which are planted and growing on the Land as of the Closing .

6.5.17   A certified copy of the Sale Order from the Bankruptcy Court.

6.5.18   Permit Assignments for Water Rights permits S4-28998P and G4-30584P on Washington State Department of Ecology standard form ECY 040-1-61 (Rev 09-2015) duly executed by Debtors ("**Water Rights Permit Assignments**").

6.6     <u>Buyer's Deliveries to Sellers at Closing</u>.  On the Closing Date, Buyer shall make the following deliveries into Escrow for delivery to Debtors and Easterdays, as applicable, and take the following actions:

6.6.1    cause Escrow Holder to release and apply the Deposit (together with all interest accrued thereon) to the Purchase Price.

6.6.2    deliver the balance of the Purchase Price in Good Funds as required pursuant to <u>Section 5.1.2(a)</u> and cause to be paid and satisfied all such other amounts to be paid by Buyer at the Closing under the terms and provisions of this Agreement, including that up to $500,000.00 (in the aggregate) of such Good Funds shall be disbursed to Tonkon Torp LLP or Sussman Shank LLP (as directed by the Easterdays) for payment of Easterdays' professionals (including but not limited to attorneys, accountants, consultants and other Easterday professionals) for services provided to the Easterdays in connection with or related to this Agreement or the sale of the Property (as indicated by reasonable supporting documentation of such professional fees and expenses, including invoices).

14

6.6.3   deliver to Escrow Holder a preliminary closing settlement statement approved and duly executed by Buyer.

6.6.4   deliver a duly-executed counterpart of the REETA.

6.6.5   deliver a duly-executed counterpart of the Mobile Home REETA.

6.6.6   deliver a duly-executed counterpart of the Vehicle Bill of Sale.

6.6.7   deliver  a duly-executed counterpart of the Current Use Application.

6.6.8   deliver a duly-executed counterpart of the Debtor Contract/Lease Assignment.

6.6.9   deliver a duly-executed counterpart of the Temporary Lease Agreement.

6.6.10  Water Rights Permit Assignments duly executed by Buyer.

6.7   <u>Pre-Closing Covenants</u>.

6.7.1   <u>Notice to Sellers' Creditors and Counterparties.</u>

(a)   Prior to the filing of the Stalking Horse Bidder Motion (as defined in the Bidding Procedures), Easterdays shall deliver to Debtors a list of all known creditors and contract or lease counterparties of each of the Easterdays (collectively, "Easterday Creditors"), and shall update the list of Easterday Creditors from time to time as necessary, and Debtors shall add the Easterday Creditors to all the creditor matrixes for the Cases, such that the Easterday Creditors receive notice of all motions, pleadings, notices, hearings and deadlines relating to the Agreement and the transactions contemplated herein.

(b)   Debtors shall request through the Stalking Horse Bidder Motion a revised Sale Notice in a form reasonably acceptable to the Buyer, which notice shall be served on all creditors, counterparties, and parties-in-interest of Sellers.

(c)   Within two (2) business days of entry of an order approving the Stalking Horse Bidder Motion, Sellers shall cause notice of the transactions contemplated in this Agreement, as approved by the Bankruptcy Court and in a form reasonably acceptable to the Buyer, to be published once a week through July 14, 2021 in Capital Press, Tri-City Herald, and East Oregonian.

6.7.2   <u>HSR Act</u>. Sellers and Buyer agree to cooperate with one another and provide each other with such information as may be required in order to

determine whether the transactions described in this Agreement evidenced by the Agreement is subject to the notification requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C.A. § 18(a), as amended. If a filing with the Federal Trade Commission ("**FTC**") and U.S. Department of Justice ("**DOJ**") (collectively, the "**Agencies**") is required under the HSR Act, Buyer and Sellers will use commercially reasonable efforts to file notification under the HSR Act within twenty (20) days after entry of the Supplemental Bidding Procedures Order, and Buyer shall pay all filing fees payable in connection therewith.  Buyer and Sellers shall use their respective reasonable best efforts to respond to any request for additional information made by any agencies and to cause the waiting periods or other requirements under the HSR Act to terminate or expire at the earliest possible date and to resist in good faith, at each of their respective cost and expense (including the institution or defense of legal proceedings), any assertion that the transactions contemplated by this Agreement constitutes a violation of the antitrust laws, all to the end of expediting consummation of the transactions contemplated by this Agreement. Each of Buyer and Sellers shall consult with the other prior to any meetings, by telephone or in person, with the staff of the Agencies, and each of Buyers and Sellers shall have the right to have a representative present at any such meeting to the extent permitted by the Agencies.

6.7.3   <u>WARN Act</u>. Sellers shall comply in all material respects with the WARN Act, which, as used herein, means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

6.7.4   <u>COBRA</u>. Sellers shall comply in all material respects with COBRA, which, as used herein, means the federal Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and similar state, local and foreign laws related to group health coverage continuation.

6.7.5   <u>Operation and Maintenance</u>. Prior to Closing, Sellers shall use commercially reasonable efforts to maintain and operate the Property in a manner consistent with the condition in which it is required to be delivered pursuant to <u>Section 6.9</u> below.

6.7.6   <u>Compliance</u>. Sellers shall remain in material compliance with all orders entered by the Bankruptcy Court or by any other court of competent jurisdiction.

6.7.7   <u>No Non-Ordinary Course Transactions</u>. Prior to Closing, Easterdays shall not, except as permitted by the Cooperation Agreement, (i) enter into any non-ordinary course transaction, nor transfer assets or incur obligations outside of the ordinary course, (ii) transfer, or cause the transfer of, any assets, or incur or cause the incurrence of any obligations, with the intent to delay, hinder or defraud creditors, or otherwise for less than reasonably equivalent value, (iii) transfer, or cause the transfer of, any assets, or incur or cause the incurrence of any obligations or debts which they are unable to pay as such debts are matured or that leave the Easterdays or their insiders with

16

unreasonably small capital; or (iv) transfer any assets to or for the benefit of, or incur any obligations on account of or for the benefit of, an insider of the Easterdays prior to the Closing Date; provided that, nothing herein shall prohibit the Easterdays from taking any actions in furtherance of performance under this Agreement and consummation of the transactions described in this Agreement, including executing any agreement, deed, document or other writing that conveys to Debtors all right, title and interest in and to the Easterday Property for the purpose of consummating the transactions in accordance with and pursuant to the requirements of this Agreement and the Sale Order.

6.7.8   <u>No Transfers</u>. Sellers shall not transfer or agree to transfer (other than the transactions contemplated by this Agreement) all or any portion of their right, title or interest in and to any of the Property to any third party.

6.7.9   <u>Necessary Approvals.</u>   Prior to Closing, Debtors shall use commercially reasonable efforts to obtain the Bankruptcy Court Approvals listed in <u>Section 11</u> by the dates set forth in <u>Section 11</u>.

6.8   <u>Transfer Taxes; Certain Prorations; Title Insurance; Etc.</u>  Any sales, excise, purchase, transfer, stamp, documentary stamp, recording, use or similar taxes under the laws of the State of Washington, or any subdivision of such state (collectively, "**Taxes**"), which may be payable by reason of the Easterday Property being conveyed to Debtors and Debtors' sale of the Property to Buyer and/or the recordation of the Easterday Deeds and Deeds under this Agreement shall be borne and timely paid by Buyer.  Real estate and any personal property taxes and assessments and utilities shall be prorated between Sellers and Buyer as of the Closing Date, with Sellers bearing all amounts attributable to the period up to the Closing Date and Buyer bearing all amounts attributable to the period from and after the Closing Date; for clarity, the personal property taxes subject to proration shall be those taxes billable in the year in which the Closing Date occurs based on the levy of taxes in the prior year and not those taxes levied in the year in which the Closing Date occurs, which shall be the responsibility of Buyer.  Some or all of the Property may be classified as farm and agricultural land under RCW 84.34 for real property tax purposes.  Buyer will accept and continue said classifications of all portions of the Property classified as such and will be solely responsible for paying any penalties or additional taxes that result from removing any portion of the Property from said tax classification.  Sellers shall not be responsible to bear or pay any portion of (i) any title insurance premiums, endorsements, or similar fees with respect to any title insurance Buyer may elect to obtain in connection with Buyer's acquisition of the Property, (ii) any cure amounts payable pursuant to the Sale Order in connection with the assumption and assignment, or the sale, of Debtor Assigned and Assumed Contracts and Leases, (iii) any escrow fees and charges (except as provided in Section 5.1.2(a); or (iv) any recording fees and costs. Buyer shall defend and indemnify Seller for any and all costs, expenses, penalties, obligations, and liabilities suffered, sustained or incurred by Seller with respect to, arising from, by reason of, or in connection with any  Taxes (as defined above), including in connection with an audit by the governmental authority having jurisdiction with respect to Taxes, which are due, or which will become due, by reason of the Easterday Property being conveyed to Debtors and Debtors' sale of the Property to Buyer.  This <u>Section 6.8</u>  shall survive Closing.

4831-5589-2454v.18 0117168-000002

6.9    Possession.

6.9.1    Subject to Permitted Exceptions and the Temporary Lease Agreement, on the Closing Date, Easterdays shall deliver to Debtors, and Debtors shall deliver to Buyer, free and clear of all liens, claims, rights, encumbrances and interests, exclusive possession and custody of the Property, in no worse condition than existed as of the Effective Date of this Agreement (ordinary wear and tear and the effects of other actions taken by Sellers consistent with the terms and provisions of this Agreement excepted), and with all Excluded Property removed, including, without limitation, all cattle, all crops in storage, and any equipment not included in the Property, except for any Excluded Property required by Debtors to complete its farming operations under the Temporary Lease Agreement, which shall be removed within the time period identified in the Temporary Lease Agreement. Sellers shall transfer and deliver to Buyer on the Closing Date such keys and other similar items as Buyer may reasonably require to obtain occupancy and control of the Property at Closing.

6.9.2    If the Closing has not occurred by July 31, 2021, and this Agreement has not terminated, Buyer may enter upon the Property for the limited purposes of planning and assessment with respect to Buyer's farm plans to be implemented after Closing ("**Permitted Use**"); provided, however, that (i) Buyer gives Sellers at least 72 hour prior notice of entering onto the Property; (ii) Buyer maintains and provides Sellers certificates of insurance evidencing that Buyer has Commercial General Liability insuring Buyer's interests against claims for personal injury, bodily injury, death and property damage occurring on, in or about the Property, with a "Combined Single Limit" (covering personal injury liability, bodily injury liability and property damage liability) of not less than $2,000,000 per occurrence and $2,000,000 aggregate, (iii) Buyer will use and cause Buyer's agents, employees, consultants and contractors ("**Buyer's Agents**") to use best efforts to minimize any disruption or interference on the Property; and (iv) Buyer promptly pays for and repairs any damage to the Property caused by Buyer's entry onto the Property pursuant to this Section.  Buyer and Buyer's Agents expressly assume all risks when entering or performing work on the Property.  Buyer shall indemnify, defend, and hold harmless Seller and the Property from any and all claims, causes of action, damages (including, without limitation, all foreseeable and unforeseeable consequential damages, injunction and other relief), fines, judgments, penalties, costs, liabilities, losses or expenses (including, without limitation, engineers' and consultants' costs, attorneys' fees and reasonable investigative and discovery costs) arising on account of or in connection with, or directly or indirectly related to: (w) the acts or omissions of Buyer and Buyer's Agents; (x) Buyer's use of the Property, or any work or activity allowed or suffered by Buyer to be done in, on or about the Property; (y) the violation of any laws by Buyer or Buyer's Agents; and (z) the presence, use, generation, storage, or release of hazardous materials in, on, under, or above the Property or adjoining property caused by Buyer's or Buyer's Agents. Buyer's repair and indemnification obligations with respect to this Section 6.9.2 shall remain effective, notwithstanding the termination of this Agreement, as to claims arising or accruing prior to the termination of this Agreement; provided that  Buyer is not indemnifying Sellers for any injury, loss of life, or damage which is caused by the sole

18

negligence or willful misconduct of any Seller. In the event of Buyer Default, then any improvements performed by Buyer to the Property shall become the property of Debtors.

7. <u>Conditions Precedent to Closing</u>.

7.1 <u>Conditions to Sellers' Obligations</u>. Sellers' obligation to make the deliveries required of Sellers on the Closing Date and to otherwise consummate the transactions described in this Agreement shall be subject to the satisfaction or waiver in writing by Sellers of each of the following conditions on or before the date set forth in such condition, or if no date is set forth, then by the Closing Date; *provided, however,* in no event shall approval or consent of a counterparty or other third party to the Assigned and Assumed Leases and Contracts be a condition to Closing:

7.1.1 All of the representations and warranties of Buyer contained herein shall continue to be true and correct at the Closing in all material respects.

7.1.2 Buyer shall have delivered, or shall be prepared to deliver to Debtors at the Closing, the Purchase Price and other amounts payable hereunder to Debtors in all cash, and the documents required of Buyer to be delivered at the Closing pursuant to <u>Section 6.6</u> of this Agreement.

7.1.3 With respect to Debtors, Easterdays shall have delivered, or shall be prepared to deliver to Debtors at the Closing, all documents required of Easterdays to be delivered at the Closing pursuant to <u>Section 6.4</u> of this Agreement.

7.1.4 With respect to Easterdays, Debtors shall have delivered, or shall be prepared to deliver to Easterdays at the Closing, all documents required of Debtors to be delivered at the Closing pursuant to <u>Section 6.5</u> of this Agreement.

7.1.5 No action, suit or other proceedings shall have been filed or be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions described in this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

7.1.6 The filings of Buyer and Sellers pursuant to the HSR Act, if any, shall have been made and the applicable waiting period and any extensions thereof shall have expired or been terminated.

7.1.7 Buyer shall have performed in all material respects the covenants on Buyer's part to be performed which, by their terms, are required to be performed at or before the Closing; *provided that*, with respect to payment of cure amounts payable to the counterparties to the Assigned and Assumed Contracts and Leases being assumed or purchased by the Buyer pursuant to the Sale Order or otherwise, Buyer shall satisfy any cure amounts owed to counterparties at Closing or otherwise provide to

19

the satisfaction of the Bankruptcy Court adequate assurance of its ability to pay such cure amounts at or before the Closing and shall promptly satisfy any cure amounts following the Closing.

7.1.8   With respect to Debtors, Easterdays shall have performed in all material respects the covenants on Easterdays' part to be performed which, by its terms, are required to be performed at or before the Closing.

7.1.9   With respect to Easterdays, Debtors shall have performed in all material respects the covenants on Debtors' part to be performed which, by its terms, are required to be performed at or before the Closing.

7.1.10  The Bankruptcy Court shall have entered the Sale Order in accordance with Section 11.3 below that is substantially in the form and content of Exhibit F, and otherwise reasonably acceptable to the Buyer and Sellers, and the Sale Order shall not have been reversed or stayed or modified in any material respect.

7.2   Conditions to Buyer's Obligations.  Buyer's obligation to make the deliveries required of Buyer at the Closing, and to otherwise close the transactions described in this Agreement, shall be subject to the satisfaction or waiver by Buyer of each of the following conditions on or before the date set forth in such condition, or if no date is set forth, then by the Closing Date; *provided, however,* in no event shall approval or consent of a counterparty or other third party to the Assigned and Assumed Leases and Contracts be a condition to Closing:

7.2.1   Debtors shall have filed the Stalking Horse Bidder Motion (as defined in Section 11.1 below) no later than May 19, 2021.

7.2.2   The Bankruptcy Court shall have entered the Supplemental Bidding Procedures Order in form and content reasonably acceptable to Buyer and Sellers.

7.2.3   Debtors shall have obtained authority from the Bankruptcy Court pursuant to the Sale Order to acquire all rights, title and interest in and to the Easterday Property from the Easterdays, and shall immediately prior to Closing have acquired all of Easterdays' rights, title and interest in and to the Easterday Property.

7.2.4   Sellers shall have performed in all material respects the covenants on Sellers' part to be performed which, by their terms, are required to be performed before the Closing.

7.2.5   Sellers shall have executed and shall be prepared to deliver to each other and Buyer, respectively, the documents required of Sellers pursuant to Sections 6.4  and 6.4.11 of this Agreement.

7.2.6   Sellers shall have delivered or shall be prepared to deliver to Buyer at the Closing, all other documents required of Sellers to be delivered at the Closing.

4831-5589-2454v.18 0117168-000002

7.2.7    No action, suit or other proceedings shall have been filed or be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions described in this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

7.2.8    The filings of Buyer and Seller pursuant to the HSR Act, if any, shall have been made and the applicable waiting period and any extensions thereof shall have expired or been terminated.

7.2.9    The Bankruptcy Court shall have entered the Sale Order in accordance with Section 11.3 below.

7.2.10   Debtors shall have provided Buyer and Title Company with a certified copy of the Sale Order.

7.2.11   Upon payment of the applicable premium by Buyer and satisfaction of all "Requirements" set forth in the Title Commitments No. 62242100670 (dated April 20, 2021), No. 62242100669 (dated February 26, 2021), No. 62242100667 (dated April 20, 2021), No. 62242100664 (dated April 20, 2021), No. 62242100666 (dated April 20, 2021), No. 62242100668 (dated February 26, 2021) each as uploaded to the virtual data room provided by Sellers prior to execution of this Agreement and as may be further updated by the Title Company (collectively, the "**Title Commitments**"), Title Company shall issue an ALTA 2006 form of owners title insurance policy insuring fee simple title, or a leasehold, as applicable, to the Land vested in Buyer (or its designee) in the amount of the Purchase Price in the form of approved Pro Forma Policies for file numbers 62242100670, 62242100669, 62242100667, 62242100664, 62242100666, and 62242100668 attached to the Escrow Instructions in Exhibit A (the "**Title Policy**").  As used in this Agreement, "**Permitted Exceptions**" means any Assumed Liabilities, if any, and the title exceptions listed as "Special Exceptions" in Schedule B – Part II of each of the Title Commitments, including exceptions based on Title Company's review of the ALTA/NSPS land title surveys of the Land posted to the virtual data room provided by Sellers, and any additional title exceptions (which do not result from the breach by any Seller of any obligation or covenant under this Agreement) added to the Title Commitments that do not materially affect value, ownership or operations on the Property, but excluding any judgements, monetary liens, or security interests (not caused by Buyer) and those exceptions identified as "**Excluded Exceptions**" listed on Schedule 7.2.11 to this Agreement.

7.2.12   Sellers shall have obtained from the U.S. Department of Justice and the Federal Commodities Futures Trading Commission a written and duly executed statement or statements in form and content satisfactory to the Title Company (sufficient to issue the Title Policy, as defined above) stating that each agency has received actual notice of the transactions contemplated by this Agreement and that such agency has

no objection to such transactions, unless Title Company agrees to accept lesser assurances from the U.S. Department of Justice and the Federal Commodities Futures Trading Commission.

7.3    <u>Termination</u>.  If any of the above conditions is neither satisfied nor waived by the Party or Parties beneficiary to such condition on or before the date by which the condition is required to be satisfied, the Party beneficiary to such condition, whose default hereunder is not the reason such condition is unsatisfied, may terminate this Agreement by delivering to the other written notice of termination, and the Deposit shall be promptly refunded to Buyer except as otherwise expressly set forth in this Agreement.  Any waiver of a condition shall be effective only if such waiver is stated in writing and signed by the waiving Party who is the beneficiary of the condition; provided, however, that the consent of a Party to the Closing notwithstanding that such condition was unsatisfied shall conclusively be deemed a waiver by such Party of any conditions to Closing not satisfied or waived as of the Closing Date.

8.    <u>Sellers' Representations and Warranties</u>.  Sellers hereby make, each as to themselves only, the following representations and warranties to Buyer, both as of the Effective Date of this Agreement and as of the Closing.  For the purposes of this <u>Section 8</u>, Sellers and Buyer understand and agree that Sellers' representations and warranties in Sections 8.3, 8.4, 8.5, 8.6.2, 8.6.3, and 8.7 made below are based upon Sellers' actual knowledge of the matters represented, without any duty of inquiry, do not include any knowledge imputed to Sellers by constructive notice, and are made solely for the purpose of assuring disclosure of matters known to Sellers that might constitute material defects or material liabilities related to the Property, and that none of the representation and warranties shall survive Closing.

8.1    <u>Power of Sellers</u>.

8.1.1    <u>Easterdays</u>.  Easterdays have the power and authority to execute and deliver this Agreement.

8.1.2    <u>Debtors</u>.

(a)    Debtors have the power and authority to execute and deliver this Agreement pursuant to the Bidding Procedures Order.

(b)    Upon entry of the Sale Order, Debtors will have the power and authority to perform this Agreement and all writings relating hereto, and to consummate the transactions described in this Agreement.

8.2    <u>Authorization of Sellers</u>.  This Agreement has been duly executed and delivered by the Sellers to the Buyer, and subject to the entry of a Sale Order in the Bankruptcy Court in accordance with <u>Section 11.3</u> below, the consummation of the transactions described in this Agreement, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Sellers and assuming due and valid authorization, execution and delivery of

22

4831-5589-2454v.18 0117168-000002

this Agreement by Buyer, this Agreement will constitute a valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms, and does not and will not: (i) to Sellers' knowledge, violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (ii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Sellers are a Party or by which Sellers or their respective assets or properties may be bound.

8.3     Real Property. With respect to Property owned or leased by the Sellers as of the Effective Date, (a) Sellers have valid leasehold interests under the leases included in the Assigned and Assumed Leases and Contracts, and are the sole lessees thereunder with respect to each such leasehold and have not assigned or transferred, or agreed to assign or transfer, any such leasehold to a third party (other than mortgages shown in the Title Commitments, which will be discharged at or prior to Closing); and (b) except as shown in the Title Commitments, are the sole owners of the Land other than those portions of the Land which are leased by Sellers.

8.4     Environmental Condition. Other than as expressly disclosed in any of the Phase I's, Sellers have (a) no actual knowledge of the presence or release of any Hazardous Substances on or from the Property in material violation of Environmental Laws and (b) have received no notice from any governmental authority of any material violation of Environmental Laws with respect to the presence or release of Hazardous Substances on or from the Property. For purposes of this Agreement, (i) "**Hazardous Substances**" means any hazardous, toxic or dangerous waste, substance or material, pollutant or contaminant, as defined for purposes of CERCLA, or the Resource Conservation and Recovery Act (42 U.S.C. Sections 6901 et seq.), as amended ("**RCRA**"), or other Environmental Laws, or any substance which contains gasoline, diesel fuel or other petroleum hydrocarbons, or polychlorinated biphenyls, and (ii) "**Actual knowledge**" of or as to Sellers means and refers only to the current, actual knowledge, without inquiry of the Easterdays, Lance Miller, Peter Richter, or Scott Avila. As used herein, "**Environmental Laws**" means CERCLA, RCRA or other similar federal, state or local laws pertaining to protection of the environment or health and human safety.

8.5     Compliance with Laws. To Sellers' actual knowledge, the Property, including specifically, but without limitation, the feedlot, drainage lagoons and systems, and irrigation ponds, is in material compliance with applicable laws and related permits or governmental approvals.

8.6     Water Rights.

8.6.1     Sellers have not transferred or agreed (other than the transactions contemplated by this Agreement) to transfer the Water Rights to any third party.

8.6.2     Sellers have no actual knowledge of any existing, pending, or threatened actions or claims for cancellation, relinquishment, forfeiture, or abandonment of all or any portion of the Water Rights.

23

8.6.3    Sellers have no actual knowledge of any existing, pending, or threatened claims, suits, proceedings, investigations, or actions against any Seller which, if successful, would result in any legal or equitable monetary lien upon any of the Water Rights.

8.7    <u>Assigned and Assumed Leases and Contracts</u>. All of the Assigned and Assumed Leases and Contracts are in full force and effect and constitute the entire agreement between the applicable Sellers and the counterparties thereto. Except to the extent that the existence of the Cases may be a default under any Assigned and Assumed Leases and Contracts, or as set forth on <u>Schedule 8.7</u> attached hereto and incorporated herein, neither the applicable Sellers nor the other party to any Assigned and Assumed Leases and Contracts is in material default of such Assigned and Assumed Leases and Contracts, nor, to Sellers' actual knowledge, have any events or conditions occurred, which upon the giving of notice or passage of time or both, would constitute a material default by the applicable Sellers or the other party to any such Assigned and Assumed Leases and Contracts.

8.8    <u>OFAC</u>.  Sellers (which, for the purposes of this <u>Section 8.8</u>, shall include their partners, members, principal stockholders and any other constituent entities) (i) have not been designated as a "specifically designated national and blocked person" on the most current list published by OFAC at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list; (ii) are currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in any Seller to any person or entity who is, or any of whose beneficial owners are, listed on the list.

9.    <u>Buyer's Representations and Warranties.</u>  In addition to the representations and warranties contained elsewhere in this Agreement, Buyer hereby makes the following representations and warranties to Sellers:

9.1    <u>Power of Buyer</u>.  Buyer has all requisite power to execute, deliver and perform this Agreement and all writings relating hereto.

9.2    <u>Authorization of Buyer</u>.  This Agreement has been duly executed and delivered by Buyer to the Sellers, and subject to the entry of a Sale Order in the Bankruptcy Court that has not been stayed, reversed or modified in any material respect, the consummation of the transactions described in this Agreement, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer and assuming due and valid authorization, execution and delivery of this Agreement by Sellers, this Agreement will constitute a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms does not and will not: (i) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (ii) violate or conflict with or

24

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 34 of 379

constitute a default under any agreement, instrument or writing of any nature to which Buyer is a Party or by which Buyer or their assets or properties may be bound.

9.3   OFAC.  Buyer (which, for the purposes of this Section 9.3, shall include its partners, members, principal stockholders and any other constituent entities) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by OFAC at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list; (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Buyer to any person or entity who is, or any of whose beneficial owners are, listed on the list.

10.   AS-IS.  BUYER IS A KNOWLEDGEABLE, SOPHISTICATED BUYER WHO IS FAMILIAR AND VERY EXPERIENCED WITH THE ACQUISITION, OWNERSHIP, OPERATION AND DEVELOPMENT OF COMMERCIAL REAL ESTATE, INCLUDING AGRICULTURAL PROPERTIES SIMILAR TO THE PROPERTY.  BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT BUYER HAS PERFORMED AND CONDUCTED ALL SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS BUYER DETERMINED WERE NECESSARY OR APPROPRIATE IN CONNECTION WITH ITS ACQUISITION OF THE PROPERTY AND THAT BUYER WAS SATISFIED WITH THE RESULTS OF SUCH INSPECTIONS AND INVESTIGATION.  ACCORDINGLY, BUYER FURTHER ACKNOWLEDGES AND AGREES THAT SELLERS ARE SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT, EXCEPT WITH RESPECT TO THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 8, SUBJECT TO AND WITHOUT LIMITATION OF SECTION 13.16 (SURVIVAL), BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM ANY SELLER OR ANY SELLER'S REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROPERTY (OR ANY PORTION OR ELEMENT THEREOF), INCLUDING, WITHOUT LIMITATION:  (i) the quality, nature, adequacy and physical condition of the Property, including, but not limited to, the structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, irrigation systems and equipment, and other facilities and appliances comprising part of the Improvements, (ii) the quality, nature, adequacy, and physical condition of soils, geology and any groundwater of, at, on, or under the Land, (iii) the existence, quality, nature, adequacy and physical condition of utilities serving the Land and/or Improvements, (iv) the development potential of the Land and the use, habitability, merchantability, or fitness, suitability, value or adequacy of the Property (or any portion or element thereof) for any particular purpose, (v) the zoning or other legal status of the Land and Improvements or any other public or private restrictions on the use of the Land and/or Improvements, (vi) the compliance of the Land, Improvements or other elements of the Property

with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity, (vii) the presence of Hazardous Materials on, in, under, at or about the Land and/or the Improvements or any adjoining or neighboring property, (viii) the quality of any labor and materials used in any Improvements, (ix) the condition of the Land and/or Improvements (or any portion or element thereof), (x) the quality, nature, adequacy, or extent of the Water Rights, and (xi) the economics of the operation of the Land and Improvements.

11. Bankruptcy Court Approvals.

11.1    Supplemental Bidding Procedures Motion. No later than May 19, 2021, Debtors shall file a motion approving this Agreement as the Stalking Horse APA and Buyer as the Stalking Horse Bidder (as defined in the Bidding Procedures) for all the Property in form and content reasonably acceptable to Buyer ("**Supplemental Bidding Procedures Motion**"); *provided that* Debtors' obligation to file the Supplemental Bidding Procedures Motion is conditioned on the occurrence of the Effective Date.

11.2    Stalking Horse Bidder Approval Order.  No later than May 28, 2021, an order granting the Supplemental Bidding Procedures Motion ("**Supplemental Bidding Procedures Order**"") shall have been entered by the Bankruptcy Court in form and content reasonably acceptable to Buyer and Sellers; *provided, however, that*  the Supplemental Bidding Procedures Order shall not be in form and content reasonably acceptable to Buyer unless the Supplemental Bidding Procedures Order authorizes and directs Debtors to pay Buyer an amount equal to 2.75% of the Purchase Price ("**Breakup Fee**"), and approves an expense reimbursement in an amount not to exceed $1,500,000, subject to Buyer's submission, and the Bankruptcy Court's approval, of the reasonableness of the expenses incurred by Buyer in connection with the transactions described in this Agreement("**Expense Reimbursement,**" and together with the Breakup Fee, the "**Stalking Horse Bidder Allowed Administrative Expense Claim**"), from sale proceeds relating to an alternate transaction.  The Stalking Horse Bidder Allowed Administrative Expense Claim shall be senior to any other administrative expense claim allowed against the Debtors and their respective estates.

11.3    Sale Order. Buyer's and Sellers' obligations to consummate the transactions described in this Agreement shall be conditioned upon the Bankruptcy Court's entry of an order approving this Agreement and the transactions contemplated herein substantially in form and content as attached hereto as Exhibit F and otherwise reasonably acceptable to Buyer and Sellers, and which order shall be effective immediately upon its entry (the "**Sale Order**"), and which Sale Order shall not have been stayed, reversed or modified in any material respect. If the Bankruptcy Court denies the entry of the Sale Order or approves the sale of the Property to one or more alternate third party purchasers at the Sale Hearing, then the transactions described in this Agreement shall automatically terminate and Buyer shall be entitled to payment, as further set forth in the Supplemental Bidding Procedures Order, of the Stalking Horse Bidder Allowed Administrative Expense Claim and to the return of the Deposit within three (3) business days following the closing of an alternate transaction; *provided that* in the event that a third party (an "**Upset Purchaser**" and the underlying agreement between the Upset Purchaser and Sellers,

4831-5589-2454v.18 0117168-000002

the "**Upset Agreement**") is approved by the Bankruptcy Court as the purchaser of the Property at the Sale Hearing, notwithstanding anything to the contrary contained in this Agreement, this Agreement shall not terminate, but rather shall become a "back-up bid" which shall remain open for acceptance by Sellers for a period of thirty days following such hearing, but subject and subordinate in all respects to the rights of the Upset Purchaser under the Upset Agreement; *further provided, however*, this Agreement shall automatically terminate if the Sale Order is for any reason not entered by the Bankruptcy Court on or before July 31, 2021 or if the Closing does not occur by the Outside Date.

        11.4   <u>Debtor Assigned and Assumed Leases and Contracts</u>.  In accordance with the Bid Procedures Order, Buyer shall in all events be required to (i) provide such adequate assurance of future performance as the Bankruptcy Court may require in connection with its approval of Debtors' assumption and assignment to Buyer, and Buyer's assumption, of the Debtor Assigned and Assumed Leases and Contracts, and (ii) bear and pay at Closing or when otherwise required by the Sale Order all cure amounts payable in connection with Debtors' assumption and assignment to Buyer, and Buyer's assumption, of any Debtor Assigned and Assumed Leases and Contracts.  Buyer shall have up until fourteen (14) days prior to the Closing in which to notify Debtors which executory contracts and leases identified in <u>Schedule 2.5</u> that Buyer wishes to, or elects not to, take assignment of and assume, or purchase, at Closing, or to notify Debtors which executory contracts and/or leases Buyer wishes to add to Schedule 2.5 as appropriate, and to take assignment of and assume or purchase at Closing.  To the extent applicable, any contracts and leases that Buyer elects not to take an assignment of at Closing shall not be transferred from Easterdays to Debtors and, to the extent applicable, any contracts and leases that Buyer elects to take an assignment of at Closing shall be transferred from Easterdays to Debtors.  Notwithstanding anything to the contrary in this Agreement, Buyer acknowledges and agrees that if Debtors are unable to assume and assign to Buyer any Debtor Assigned and Assumed Leases and Contracts by reason of Buyer's failure to provide adequate assurance of future performance as a result of a default under section 365(b)(1) of the Bankruptcy Code, the applicable Debtor Assigned and Assumed Leases and Contracts shall be deemed to be Excluded Property for all purposes of this Agreement unless the objecting counterparty to the applicable contract or lease withdraws its objection or its objection is resolved in a manner not adverse to Debtors in connection with the Closing.

       12. <u>Post-Closing Covenants</u>

        12.1   <u>Plan Sponsor Contribution</u>. Upon the occurrence of: (i) the Closing and (ii) the entry of an order of the Bankruptcy Court confirming the Joint Plan (the "**Confirmation Order**"), which Joint Plan and Confirmation Order shall be in form and content consistent with the Sale Order, and the Confirmation Order has not been stayed, reversed or modified in any material respect, Buyer deposit $5,000,000 ("**Plan Sponsor Contribution**") in a deposit account at Debtors' direction, which funds shall be segregated and used on account of and in satisfaction for the administrative expenses incurred by Debtors' estates in connection with and relating to the preparation and confirmation of the Joint Plan and the substantial consummation of the Joint Plan and closing of the Cases. The Plan Sponsor Contribution is in addition to and unrelated to the Purchase Price.

4831-5589-2454v.18 0117168-000002

      12.2    <u>Consent to Assignment</u>.  To the extent any Assigned and Assumed Leases and Contracts may not be assigned to Buyer under applicable law without the consent of the other party, and either (a) the consent of the other party has not been obtained or (b) the Bankruptcy Court has not entered an order approving the assignment or sale of any applicable Assigned and Assumed Leases and Contracts,  then this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Sellers and Buyer shall use commercially reasonable efforts to obtain any such required consent(s) promptly after Closing.  If any such consent shall not be obtained by the Closing Date or if any attempted assignment would be ineffective or unlawful or would impair Buyer's rights under the Property in question such that Buyer would not in effect acquire the benefit of all such rights, Sellers and Buyer shall use commercially reasonable efforts after the Closing, for a period of six months, to obtain for Buyer the benefits thereunder and Sellers shall cooperate with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.  Notwithstanding anything herein to the contrary, in no event shall Sellers have any obligation to incur material cost or expense, initiate litigation or other proceedings, or pay any fees or other consideration to the counterparty to obtain their consent.

      13.  <u>Miscellaneous</u>.

      13.1    <u>Damage and Destruction; Condemnation</u>.  Sellers shall promptly notify Buyer of the occurrence of any material damage to or destruction of the Property that occurs prior to the Closing Date.  In the event of any damage to or destruction of the Property prior to the Closing Date the cost of which to repair would total $4,000,000.00  (the "**Threshold**") or less, then such damage or destruction shall have no effect whatsoever on the Purchase Price or Buyer's or Sellers' obligation to close.  In the event of any damage to or destruction of the Property prior to the Closing Date the cost of which to repair would equal or exceed the Threshold, then unless Sellers cause the same to be repaired and restored in all material respects prior to the Closing Date (in which case the Purchase Price shall be unaffected and the Parties shall proceed with the Closing as though such damage, destruction or proceedings had never occurred or been initiated), Buyer shall receive, as its sole and exclusive remedy by reason of such damage or destruction, a Purchase Price reduction in the amount of the uninsured replacement value of such damage and consummate the transactions as though the damage or destruction had never occurred or been initiated; provided, however, in no event shall Sellers be obligated to close if the amount of the reduction of the Purchase Price pursuant to this sentence would exceed $7,000,000.00.  In all other events, (i) all insurance or condemnation proceeds collected by or paid to Sellers prior to the Closing Date, shall be credited against the Purchase Price on Buyer's account or the Purchase Price shall be adjusted by an amount agreed between Buyer and Sellers, and (ii) all entitlement to all other insurance or condemnation proceeds arising out of such damage or destruction or proceedings and not collected prior to the Closing Date shall be assigned to Buyer at the Closing.  Notwithstanding anything to the contrary in this Agreement, the risk of loss or damage to the Property shall unconditionally shift to the Buyer on the Closing Date effective as of the Closing.  For avoidance of doubt, Buyer and Sellers intend that the provisions of this <u>Section 13.1</u>  shall control over any right or remedy to which the Buyer may otherwise be entitled under this Agreement by reason of the occurrence of any event subject to this <u>Section 13.1</u> .

4831-5589-2454v.18 0117168-000002

13.2    <u>Seller Default</u>. If Sellers default in their obligation to close the transactions contemplated by this Agreement, and such default is not cured within three (3) business days (*i.e.,* excluding Saturdays, Sundays, and national holidays) following receipt of written notice thereof from Buyer, then Buyer's exclusive remedy is to terminate this Agreement and receive the Deposit from Escrow Holder and payment of the Stalking Horse Bidder Allowed Administrative Expense Claim if, as and when provided in the Bid Procedures Order.

13.3    <u>Buyer Default</u>. If Buyer fails without legal excuse to purchase the Property when required to do so hereunder, and such failure continues for more than three (3) business days (*i.e.,* excluding Saturdays, Sundays, and national holidays), following receipt of written notice from Sellers, then Buyer shall be in default hereunder ("**Buyer Default**") and this Agreement shall automatically terminate and the Deposit shall thereupon become nonrefundable and shall be disbursed by Escrow Holder to Sellers.  The Deposit shall serve as liquidated damages to Sellers in the event of a Buyer Default, and Sellers shall be entitled to receive and retain the full amount of the Deposit as Sellers' sole and exclusive right and remedy and in lieu of any other relief.  Regarding the Deposit serving as liquidated damages and being Sellers' sole and exclusive remedy for a Buyer Default, the Parties agree and acknowledge that (i) Sellers would suffer damages by reason of a failure of these transactions to close, (ii) the exact amount of such damages would be difficult to ascertain and to prove with certainty, (iii) the Deposit constitutes a fair and reasonable estimate of the actual damages Sellers would suffer, (iv) the Parties (and/or their representatives) have negotiated and attempted, in good faith, to estimate the amount of such damages and to compensate Seller therefore as set forth herein, and (v) any indemnification obligations of Buyer under <u>Section 6.9.2</u> of this Agreement and Sellers' rights and remedies with respect thereto shall survive the termination of this Agreement and are unaffected by the agreement that the Deposit shall serve as Sellers' sole and exclusive remedy in the event of a Buyer Default.  Except as provided above, Sellers hereby release and waive all other rights and remedies, including, without limitation, any right to specifically enforce performance of this Agreement or to recover any damages incurred as a result of a Buyer Default.

13.4    <u>Attorneys' Fees</u>.  In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that action or proceeding (as determined by the applicable tribunal of competent jurisdiction in such action or proceeding) shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

13.5    <u>Notices</u>.  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other may be effected by personal delivery in writing, by overnight delivery by a nationally recognized express courier service or by registered; or certified mail, postage prepaid, return receipt requested; or via electronic mail transmission. Any notice delivered in accordance with this paragraph shall be deemed given (a) in the case of any notice transmitted by e-mail, on the date on which the transmitting party receives acknowledgement of receipt in writing, including via electronic media, (b) in the case of any

29

notice delivered by a recognized national overnight delivery service, on the day of delivery to the service, or (c) in the case of any notice mailed by certified U.S. mail, three (3) business days after deposit therein.  Mailed notices shall be addressed as set forth below, but each Party may change its address by written notice in accordance with this <u>Section 13.5</u>.

Debtors:

Easterday Farms
Easterday Ranches, Inc.
5235 N Industrial Way
Pasco, WA 99301
Attn:  Messrs. Peter Richter and Scott Avila,
      Co-Chief Restructuring Officers
Email:  savila@paladinmgmt.com
      prichter@paladinmgmt.com


With a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Attn:   Richard Pachulski
      Jason Rosell
Email:  rpachulski@pszjlaw.com
      jrosell@pszjlaw.com

    AND
Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Attn:  Bill Weigand
      Lauren Johnson
Email:  BillWeigand@dwt.com
      laurenjohnson@dwt.com


Easterdays:

Cody and Debby Easterday
830 Bellflower Road
Mesa, WA 99343
Email: cody@easterdayfarms.com

    AND
Karen Easterday
631 Bellflower Road
Mesa, WA 99343

30

4831-5589-2454v.18 0117168-000002

With a copy to:                 Sussman Shank LLP
                                1000 SW Broadway, Suite 1400
                                Portland, OR 97205
                                Attn: Jeffrey Misley
                                Email: jmisley@sussmanshank.com

                                Tonkon Torp LLP
                                888 SW 5th Avenue, Suite 1600
                                Portland, OR 97204
                                Attn: Timothy Conway
                                Email: tim.conway@tonkon.com


Buyer:                          Farmland Reserve, Inc.
                                Attn: Doug Rose
                                79 S. Main St, Suite 500
                                Salt Lake City, UT 84111
                                Email: drose@agreserves.com


With a copy to:                 Stoel Rives LLP
                                760 SW 9th Ave., Suite 3000
                                Portland, OR 9720
                                Attn:  Oren B. Haker
                                       Chris Criglow
                                Email: oren.haker@stoel.com
                                       chris.criglow@stoel.com


       13.6    Entire Agreement; No Third Party Beneficiaries.  This Agreement,
Schedules, and the Exhibits hereto constitute the entire agreement and supersede all prior
agreements and understandings, both written and oral, among the Parties with respect to the
subject matter hereof and thereof and supersede and cancel all prior agreements, negotiations,
correspondence, undertakings, understandings and communications of the Parties, oral and
written, with respect to the subject matter hereof, and are not intended to confer upon any person
or entity other than the Parties hereto and thereto and those Released Parties who are not
signatories of this Agreement any rights or remedies hereunder.  Any oral representations or
modifications concerning this Agreement or any such other document shall be of no force and
effect excepting a subsequent modification in writing, signed by the Party to be charged.

       13.7    Modification.  This Agreement may be modified, amended or
supplemented only by a written instrument duly executed by all the Parties hereto.

       13.8    Closing Date.  All actions to be taken on the Closing pursuant to this
Agreement shall be deemed to have occurred simultaneously, and no act, document or
transaction shall be deemed to have been taken, delivered or effected until all such actions,
documents and transactions have been taken, delivered or effected.

4831-5589-2454v.18 0117168-000002

13.9    Reporting Requirements.  The Parties hereto acknowledge that the transfers of the Easterday Property and the Property must be reported to the Internal Revenue Service as required by Section 6045(e) of the Internal Revenue Code of 1986, as amended (the Code), unless Section 6045(e) provides an exemption to such reporting requirement. Accordingly, on or before the Closing Date, Sellers, Buyer and the Escrow Holder shall enter into a written "designation agreement" as defined in and in accordance with Regulation Section 1.6045-4 of the Code, which designation agreement shall designate the Escrow Holder as the "real estate reporting person" responsible for reporting the respective transfers to the Internal Revenue Service.

13.10   Cooperation Agreement.  As a matter solely between Debtors and Easterdays, if there is any conflict whatsoever between any of the provisions in this Agreement and those in the Cooperation Agreement with respect to the rights of the Easterdays vis a vis the rights of the Debtors, the terms of the Cooperation Agreement will control.  For example, any reference to the "Sellers" in this Agreement, as opposed to using the reference to "Debtors", that might result in a conflict with the Cooperation Agreement, the Cooperation Agreement controls.

13.11   Severability.  Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

13.12   Captions.  All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

13.13   Further Assurances.  Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto; provided that nothing herein shall be deemed to require any Party to execute or deliver any such further assurance, document or instrument to the extent that the same could in any material way increase the burdens, obligations or liabilities otherwise imposed upon such Party by this Agreement.  Without limiting the foregoing, Sellers shall cooperate with Buyer  in executing and delivering such affidavits, certificates and other documents as may be reasonably required (taking into account the status of Debtors as chapter 11 debtors whose affairs are being conducted by restructuring officers and the effect of the Sale Order) in connection with the issuance of the Title Policy or Policies to Buyer in accordance with this Agreement.

13.14   Waiver.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.

13.15   Brokerage Obligations. Except for Root Realty (the "**Broker**"), which Broker Debtors have engaged in connection with the transactions, Sellers and Buyer each

4831-5589-2454v.18 0117168-000002

represent and warrant to the other that, such Party has incurred no liability to any real estate broker or other broker or agent with respect to the payment of any commission regarding the consummation of the transactions. It is agreed that other than the fee or commission payable to Broker (which shall be paid by Debtors), if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Buyer or the Sellers in connection with the transactions contemplated by this Agreement, all such claims shall be handled and paid by the Party whose actions form the basis of such claim and such Party shall indemnify, defend (with counsel reasonably satisfactory to the Party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transactions.

13.16 <u>Payment of Fees and Expenses</u>. Except as provided in <u>Section 13.4</u> above and <u>Section 11.1</u>, each Party shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transactions described in this Agreement.

13.17 <u>Survival</u>. The respective representations, warranties, covenants and agreements of Sellers and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall not survive Closing, unless otherwise provided in this Agreement.

13.18 <u>Assignments</u>. This Agreement shall not be assigned by any Party hereto without the prior written consent of the other Party hereto, which consent the Parties may grant or withhold in their sole and absolute discretion; provided, however, without in any way releasing or relieving Buyer of any obligation or liability under this Agreement, Buyer shall have the right to designate, in whole or in part, an affiliate (i.e., an entity controlled by, controlling or under common control with Buyer) to take title to all or a portion of the Property at the Closing.

13.19 <u>Binding Effect</u>. Subject to the provisions of <u>Section 13.18</u> above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties hereto. In addition, the provisions of <u>Section 5.2</u> shall inure to the benefit of and be enforceable by each of the Released Parties, whether or not such Released Parties are signatories to this Agreement.

13.20 <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Washington.

13.21 <u>Good Faith</u>. All Parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

13.22 <u>Construction</u>. In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

4831-5589-2454v.18 0117168-000002

13.23    Counterparts; Electronic Signatures.  This Agreement may be signed in counterparts.  The Parties further agree that this Agreement may be executed by the exchange of emailed signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon as reasonable following request from the other Parties. In agreeing to permit the use, from time to time where appropriate, of signatures transmitted by e-mail in order to expedite the transactions evidenced by this Agreement, the Parties hereby acknowledge, confirm and agree that (a) they intend to be bound by their respective signatures even though transmitted by e-mail, (b) they are aware that the other(s) will rely upon the signatures of the others which have been transmitted by e-mail, and (c) they waive any defense to the enforcement of the documents affecting the transactions based on the fact that a signature was transmitted by e-mail only.

13.24    Time is of the Essence.  Time is of the essence in this Agreement, and with respect to all of the terms, covenants and conditions hereof.

13.25    Bankruptcy Court Jurisdiction.  THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREIN, OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREIN, AND ANY DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH.  THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE  JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND BUYER AND SELLERS EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

13.26    Interpretation and Rules of Construction.  In this Agreement, except to the extent that the context otherwise requires:

13.26.1 when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

13.26.2 the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

13.26.3 whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

13.26.4 the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

4831-5589-2454v.18 0117168-000082

.

13.26.5 all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

13.26.6 the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

13.26.7 any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

13.26.8 references to a person are also to its permitted successors and assigns; and

13.26.9 the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

[SIGNATURES, EXHIBITS AND SCHEDULES FOLLOW]

4831-5589-2454v.18 0117168-000002

**In Witness Whereof,** Buyer and Sellers have executed this Purchase and Sale Agreement as of the Effective Date.

**BUYER:**

**FARMLAND RESERVE, INC.,**
**a Utah nonprofit corporation**

By: _____
      Doug Rose, President and Chief Executive Officer

Date: May ___, 2021

**SELLERS:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
    Name: _____
    Title: _____
Date: May ___, 2021

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
    Name: Scott Avila
    Title: Co-Chief Restructuring Officer
Date: May ___, 2021

By: _____
    Name: Peter Richter
    Title: Co-Chief Restructuring Officer
Date: May ___, 2021

_____
Cody Easterday

Date: May 19, 2021

Signatures Continued on Next Page

Signatures Continued from Prior Page

**In Witness Whereof**, Buyer and Sellers have executed this Purchase and Sale Agreement as of the Effective Date.

**BUYER:**

**FARMLAND RESERVE, INC.,**
**a Utah nonprofit corporation**

By: _Doug Rose_ _____
    Doug Rose, President and Chief Executive Officer

Date: May __19__ , 2021

**SELLERS:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
    Name: _____
    Title: _____
Date: May ___, 2021

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
    Name: Scott Avila
    Title: Co-Chief Restructuring Officer
Date: May ___, 2021

By: _____
    Name: Peter Richter
    Title: Co-Chief Restructuring Officer
Date: May ___, 2021

_____
Cody Easterday

Date: May ___, 2021

Signatures Continued on Next Page

**In Witness Whereof**, Buyer and Sellers have executed this Purchase and Sale Agreement as of the Effective Date.

**BUYER:**

**FARMLAND RESERVE, INC.,**
**a Utah nonprofit corporation**

By: _____
      Doug Rose, President and Chief Executive Officer

Date: May ___, 2021

**SELLERS:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
      Name: _____
      Title: _____
Date: May ___, 2021

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
      Name: Scott Avila
      Title: Co-Chief Restructuring Officer
Date: May ___, 2021

By: _____
      Name: Peter Richter
      Title: Co-Chief Restructuring Officer
Date: May ___, 2021

_____
Cody Easterday

Date: May ___, 2021

Signatures Continued on Next Page

**In Witness Whereof,** Buyer and Sellers have executed this Purchase and Sale Agreement as of the Effective Date.

**BUYER:**

**FARMLAND RESERVE, INC.,**
**a Utah nonprofit corporation**

By: _____
     Doug Rose, President and Chief Executive Officer

Date: May ___, 2021

**SELLERS:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
     Name: _____
     Title: _____
Date: May ___, 2021

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
     Name: Scott Avila
     Title: Co-Chief Restructuring Officer
Date: May ___, 2021

By: _____
     Name: Peter Richter
     Title: Co-Chief Restructuring Officer
Date: May _17_, 2021

_____
Cody Easterday

Date: May ___, 2021

Signatures Continued on Next Page

Debbie Easterday    Debby Easterday
Date: May 19, 2021

_____
Karen Easterday, in her individual capacity
Date: May ____, 2021

_____
Karen Easterday as personal representative of the
Estate of Gale Easterday
Date: May ____, 2021

Signatures Continued from Prior Page

_____
Debbie Easterday
Date: May ___, 2021

_____
Karen Easterday, in her individual capacity
Date: May 19 , 2021

_____
Karen Easterday as personal representative of the
Estate of Gale Easterday
Date: May 19 , 2021

.

## TABLE OF EXHIBITS AND SCHEDULES

Exhibit A          --    Escrow Instructions
Exhibit B          --    Deeds
Exhibit C          --    Bills of Sale
Exhibit D          --    Contract/Lease Assignments
Exhibit E          --    Temporary Lease Agreement
Exhibit F          --    Form of Sale Order
Exhibit G          --    Title Affidavit


Schedule 1.1       --    Easterday Land
Schedule 1.4       --    Easterday Water Agreements/Irrigation System Permits
Schedule 1. 5      --    Easterday Water Certificates and Permits
Schedule 1.6       --    Easterday Assigned and Assumed Leases and Contracts
Schedule 2.1       --    Land
Schedule 2.4       --    Water Agreements/Irrigation System Permits
Schedule 2.5       --    Debtor Assigned and Assumed Leases and Contracts
Schedule 2.6       --    Water Certificates and Permits
Schedule 5.2       --    Assumed Liabilities
Schedule 6.4.11    --    Phase I's
Schedule 7.2.10    --    Excluded Exceptions
Schedule 8.7       --    Assumed and Assigned Contracts and Leases/Cure Amounts

4831-5589-2454v.18 0117168-000002

Exhibit A
Escrow Instructions

**Escrow Agreement**

This Escrow Agreement (this "**Agreement**") is made as of May 19, 2021 (the "**Effective Date**"), by and among (i) Easterday Ranches, Inc., a Washington corporation ("**Ranches**"), Easterday Farms, a Washington general partnership ("**Farms**" and, together with Ranches, the "**Debtors**"**),** each a debtor and debtor in possession under Lead Case No. 21-00141011 (the "**Cases**") (Jointly Administered) in the United States Bankruptcy Court for the Eastern District of Washington, Yakima Division (the "**Bankruptcy Court**") and Cody Easterday and Debby Easterday, husband and wife, and Karen Easterday, in her individual capacity and as the representative of in *In the Matter of Estate of Gale A. Easterday* currently pending in the Franklin County Superior Court, case no. 21-450004-11 (the "**Easterdays**" and, together with the Debtors, the "**Sellers**"), (ii) Farmland Reserve, Inc., a Utah non-profit corporation ("**Buyer**" and together with Seller, each an "**Escrow Party**" and collectively, the "**Escrow Parties**"), and (iii) Chicago Title Insurance Company ("**Escrow Agent**").

RECITALS

A.      Sellers and Buyer have entered into that certain Purchase and Sale Agreement dated May 19, 2021 (as it may have been amended, the "**Purchase Agreement**"), in connection with the sale and purchase of certain assets and real property of Sellers located in Benton County, Washington.

B.      Pursuant to Section 5.1.2 of the Purchase Agreement, the Escrow Parties have requested Escrow Agent to receive a portion of the Purchase Price as a deposit to be held in escrow and applied in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the above recitals, the mutual promises set forth herein and other good and valuable consideration, the parties agree as follows:

AGREEMENT

1.      DEFINED TERMS.  All capitalized terms used in this Agreement but not otherwise defined herein shall have the meanings set forth for such terms in the Purchase Agreement.

2.      APPOINTMENT OF ESCROW AGENT.  The Escrow Parties hereby designate and appoint Escrow Agent, as escrow agent for the purposes set forth in this Agreement and Escrow Agent hereby agrees to act as escrow agent hereunder, subject to and in accordance with the terms and conditions hereof.

3.      DEPOSIT/PURPOSE.

(a)      Pursuant to Section 5.1.2(a) of the Purchase Agreement, concurrently with the mutual execution and delivery of the Purchase Agreement, Buyer shall deposit into an Escrow with Escrow Agent an amount equal to $18,800,000.00 (the "**Deposit**") in immediately

1

21-00141-WLH11      Doc 830      Filed 06/21/21      Entered 06/21/21 17:28:37      Pg 53 of 379

available, good funds. In turn, the Escrow Agent shall immediately deposit the Deposit into a segregated, interest-bearing account.

(b) The Deposit shall become nonrefundable and shall be disbursed by Escrow Agent to Sellers only upon the termination of the transactions contemplated by the Purchase Agreement by reason of a Buyer Default Termination. Sellers shall not have the right to terminate the Purchase Agreement and receive a disbursement of the Deposit unless Buyer has failed to cure the applicable default within three (3) business days (*i.e.*, excluding Saturdays, Sundays and national holidays) following receipt of written notice thereof from Sellers, in accordance with the terms of the Purchase Agreement.

(c) If the transactions contemplated by the Purchase Agreement terminates (A) by reason of Sellers' material default under the Purchase Agreement, or (B) by reason of the failure of a condition to Buyer's obligations under the Purchase Agreement (the failure of which is not itself the result of a material default by Buyer under the Purchase Agreement), or (C) pursuant to Section 6.3 or Section 7.3 of the Purchase Agreement in circumstances where such termination was not itself the result of a material default by Buyer hereunder, the Escrow Holder shall return to Buyer the Deposit (together with all interest accrued thereon), but less an amount equal to 1/2 of the Escrow Holder's escrow fees and charges. Sellers shall be responsible for paying the remaining 1/2 of the Escrow Agent's escrow fees and charges.

4. DEPOSIT AND INVESTMENT OF ESCROW FUNDS. All checks, money orders or drafts will be processed for collection in the normal course of business. Escrow Agent may initially deposit the Deposit in its custodial clearing accounts or escrow accounts which may result in the funds being commingled with escrow funds of others for a short period of time; however, as soon as the Deposit has been credited as collected funds to Escrow Agent's applicable account, then Escrow Agent shall immediately deposit the Deposit into one or more separate interest-bearing uninvested demand deposit accounts in the name of Escrow Agent, in its capacity as escrow agent for Sellers and Buyer hereunder, maintained with any reputable national trust company, bank, savings bank, or savings association, to be held in escrow for the benefit of the Escrow Parties until such funds are to be released as provided in this Agreement. The Deposit shall be subject to the provisions of applicable state statutes governing unclaimed property. The Escrow Parties will execute IRS Forms W-9 and other appropriate Internal Revenue Service documentation for the giving of taxpayer identification information relating to this account. The Escrow Parties acknowledge that each is aware of the Federal Deposit Insurance Corporation coverages applicable to deposits with a Depository Institution. Further, the Escrow Parties understand that Escrow Agent assumes no responsibility for, and no Escrow Party shall hold Escrow Agent liable for, any loss of the Deposit occurring at any Depository Institution at which the Deposit is deposited on account of a situation or event giving rise to a right to recover insured amounts under applicable Federal Deposit Insurance Corporation coverages.

Escrow Agent shall not be responsible for any penalties, or loss of principal or interest, or any delays in the withdrawal of the funds which may be imposed by the Depository Institution as a result of the making or redeeming of the investment pursuant to the Escrow Parties'

2

instructions.

Escrow Agent hereby waives any and all rights to offset that it may have against the Deposit, including, without limitation, claims arising out of any claims, amounts, liabilities, costs, expenses, damages, or other losses that the Escrow Agent may be otherwise entitled to collect from any party hereto.

     5.     RELEASE AND DISBURSEMENT OF ESCROW FUND.

     (a)     Following receipt of written determination(s) signed by both Buyer and Sellers acknowledging that the transaction contemplated by the Purchase Agreement has been terminated by reason of a Buyer Default Termination, the Escrow Agent will disburse the Deposit to Sellers (together with all interest accrued thereon).

     (b)     Following receipt of written determination(s) signed by both Buyer and Sellers acknowledging that the transaction contemplated by the Purchase Agreement has been terminated by a reason described in Section 3(c) above, the Escrow Agent will disburse the Deposit to Buyer (together with all interest accrued thereon), but less an amount equal to 1/2 of the Escrow Agent's escrow fees and charges. Sellers shall be responsible for paying the remaining 1/2 of the Escrow Agent's escrow fees and charges.

     (c)     On the Closing Date, Buyer shall deliver to the Escrow Agent, Good Funds in the amount of the balance of the Purchase Price and any other amounts payable by Buyer under the Purchase Agreement. Upon receipt by Escrow Agent of (i) the balance of the Purchase Price, (ii) all fully executed documents contemplated by the Purchase Agreement, and (iii) written authorization from Buyer and Sellers to close, the Escrow Agent shall release the Deposit to be credited and applied toward payment of the Purchase Price, and disburse the Purchase Price proceeds in accordance with this Escrow Agreement, the Purchase Agreement, the Sale Order, the Cooperation Agreement Order, and the approved closing settlement statements delivered at Closing pursuant to the Purchase Agreement.

     6.     INTERPLEADER. Escrow Agent is authorized to file an action for interpleader and to deposit the Deposit into any court of competent jurisdiction for a determination as to the proper disposition of any funds held under this Agreement. In the event that the funds are deposited in court, Escrow Agent shall be entitled to file a claim in the proceeding for its costs and counsel fees, if any.

     7.     PERFORMANCE OF DUTIES. In performing any of its duties under this Agreement, or upon the claimed failure to perform its duties hereunder, Escrow Agent shall not be liable to anyone for any damages, losses or expenses which may occur as a result of any action taken, suffered or omitted to be taken by it in good faith; *provided*, *however*, Escrow Agent shall be liable for damages, losses or expenses arising out of its negligence or willful misconduct. Accordingly, Escrow Agent shall not incur any liability with respect to: (i) any good faith, commercially reasonable act or omission upon advice of counsel given with respect to any questions relating to the duties and responsibilities of Escrow Agent hereunder, or (ii) any

3

4831-5589-2454v.18 0117168-000002

good faith, commercially reasonable act or omission in reliance upon any document, including any written notice or instructions provided by all Escrow Parties pursuant to this Agreement, not only as to its due execution and to the validity and effectiveness of its provisions but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the proper person or persons and to conform with the provisions of this Agreement.

8. LIMITATIONS OF LIABILITY. Escrow Agent shall not be liable for any loss or damage resulting from the following:

(a) The financial status or insolvency of any Escrow Party, and/or any misrepresentation of fact made by any Escrow Party;

(b) The default, error, act or failure to act by any Escrow Party;

(c) Any loss, loss of value or impairment of funds which have been deposited in escrow while those funds are in the course of collection or while those funds are on deposit in the Depository Institution if such loss or loss of value or impairment results from the failure, insolvency or suspension of such depository institution; and/or

(d) Escrow Agent's compliance with any legal process, including but not limited to, subpoena, writs, orders, judgments and decrees of any court whether issued with or without jurisdiction and whether or not subsequently vacated, modified, set aside or reversed.

9. HOLD HARMLESS. The Escrow Parties, and each of them, shall indemnify Escrow Agent and hold Escrow Agent harmless from all damage, costs, claims and expenses arising from performance of its duties as Escrow Agent including reasonable attorneys' fees, except for those damages, costs, claims and expenses resulting from the negligence or willful misconduct of Escrow Agent. The Escrow Parties shall each bear one half of any amounts paid to indemnify Escrow Agent pursuant to this Section.

10. TERMINATION. This Agreement shall terminate upon the first to occur of (a) the disbursement by Escrow Agent of all of the Deposit in accordance with this Agreement; (b) the joint written instructions of the Escrow Parties; or (c) the resignation of Escrow Agent upon reasonable notice to the Escrow Parties; provided, that termination under this clause (c) shall not be effective until the transfer and confirmed receipt of the Deposit to the Escrow Parties' designated replacement escrow agent.

11. RELEASE OF PAYMENT. Payment of funds held in escrow by Escrow Agent, provided such payment is made in accordance with the terms, conditions and provisions of this Agreement, shall fully and completely discharge and exonerate Escrow Agent from any and all future liability or obligations of any nature or character at law or equity to the Escrow Parties with respect and only to the extent of the funds paid.

12. NOTICES. All notices under this Agreement shall be in writing and signed by a party or its counsel. Notices may be (i) delivered personally, (ii) delivered by a recognized

4

national overnight delivery service, (iii) mailed by certified United States mail, postage prepaid and return receipt requested or (iv) sent by e-mail to the address below. Notices to any party shall be directed to the address set forth below, or to such other or additional address as any party may specify by notice to the other parties. Any notice delivered in accordance with this paragraph shall be deemed given (a) in the case of any notice transmitted by e-mail, on the date on which the transmitting party receives acknowledgement of receipt by the receiving party by telephone, computer or otherwise, (b) in the case of any notice delivered by a recognized national overnight delivery service, on the day of delivery to the service, or (c) in the case of any notice mailed by certified U.S. mail, three (3) business days after deposit therein.

DEBTOR:
Easterday Ranches, Inc.
Easterday Farms
5235 N Industrial Way
Pasco, WA 99301
Attn:  Messrs. Peter Richter and Scott Avila,
            Co-Chief Restructuring Officers
Email:  savila@paladinmgmt.com
            prichter@paladinmgmt.com

With a Copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd,  13th Floor
Los Angeles, CA  90067
Attn:   Richard M. Pachulski, Esq.
            Jason Rosell, Esq.
Email:  rpachulski@pszjlaw.com
            jrosell@pszjlaw.com

Davis Wright Tremaine LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Attn:  Bill Weigand
            Lauren Johnson
Email: BillWeigand@dwt.com
            laurenjohnson@dwt.com

4831-5589-2454v.18 0117168-000002

EASTERDAYS:        Cody and Debby Easterday
830 Bellflower Road
Mesa, WA 99343
Email: cody@easterdayfarms.com

AND

Karen Easterday
631 Bellflower Road
Mesa, WA 99343


With a Copy to:

Sussman Shank LLP
1000 SW Broadway, Suite 1400
Portland, OR 97205
Attn:  Jeffrey Misley
Email: jmisley@sussmanshank.com

Tonkon Torp LLP
888 SW 5th Avenue, Suite 1600
Portland, OR 97204
Attn: Timothy Conway
Email: tim.conway@tonkon.com


BUYER:        Farmland Reserve, Inc.
Attn: Doug Rose
79 S. Main St, Suite 500
Salt Lake City, UT 84111
Email: drose@agreserves.com

With a copy to:

Stoel Rives LLP
760 SW 9th Ave., Suite 3000
Portland, OR 9720
Attn:  Oren B. Haker
       Chris Criglow
Email: oren.haker@stoel.com
       chris.criglow@stoel.com

6

ESCROW AGENT:    Chicago Title Company of Washington
9001 W. Tucannon, Suite 220
Kennewick, WA 99336
Attn:  Nancy Hirai
Email: Nancy.hirai@ctt.com

13.    TAXES. The Escrow Parties agree that, for purposes of United States federal and other taxes based on income, Buyer shall be treated as the owner of the Deposit until such time as the Deposit has been disbursed to Sellers or Buyer, and that Buyer shall be entitled to receive and shall report the income, if any, that is earned on, or derived from, the Deposit as its income, in the taxable year or years in which such income is properly includible and pay any taxes attributable thereto. The Escrow Agent shall be entitled to deduct and withhold from any amount distributed or released from the Deposit all taxes which may be required to be deducted or withheld under any provision of applicable tax law. All such withheld amounts shall be treated as having been delivered to the party entitled to the amount distributed or released in respect of which such tax has been deducted or withheld.

14.    <u>Bankruptcy Court Jurisdiction</u>. THE ESCROW PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS AGREEMENT. THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE  JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND ESCROW AGENT, BUYER, AND SELLER EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION

15.    MISCELLANEOUS.

    (a)    If any date on which the Escrow Agent is required to make an investment or a delivery pursuant to the provisions hereof is not a day on which the Escrow Agent is open for business (a day on which the Escrow Agent is open for business, a "**Business Day**"), then the Escrow Agent shall make such investment or delivery on the next succeeding Business Day.

    (b)    Except as provided in Section 3(c), Buyer shall pay all of the fees and charges of the Escrow Agent for the services to be rendered by the Escrow Agent pursuant to this Agreement. The escrow fee of $18,000.00 shall be deposited with Escrow Agent at the time of establishing the escrow under this Agreement and shall be disbursed at the time the Deposit is released and disbursed in accordance with this Agreement.

    (c)    This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and assigns.

    (d)    This Agreement shall be governed by and construed in accordance with the laws of the State of Washington.

4831-5589-2454v.18 0117168-000002

.

(e)     This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which, when taken together, shall constitute but one and the same instrument.  Delivery of an executed facsimile or email "pdf" hereof by a party shall constitute delivery of an executed counterpart original hereof by such party.  This Agreement shall become effective and in full force only when duly and properly executed, authorized, and delivered by the parties hereto.

(f)     Time shall be of the essence of this Agreement and each and every term and condition hereof.

(g)     No modification or amendment to this Agreement shall be effective unless in writing and signed by the Escrow Parties and the Escrow Agent.

(h)     As between Sellers and Buyer, in the event of any conflict between the terms of this Agreement and the Purchase Agreement, the Purchase Agreement shall control.

SIGNATURES ON NEXT PAGE

4831-5589-2454v.18 0117168-000002

.

IN WITNESS WHEREOF, the undersigned have caused this Escrow Agreement to be duly executed on the dates set forth below with the intent that it be effective as of the Effective Date first stated above.

4831-5589-2454v.18 0117168-000002

SELLERS:

BUYER:

Easterday Ranches, Inc. a Washington
corporation, Debtor and Debtor in Possession

Farmland Reserve, Inc.

By:_____

By:_____

Name:_____

Name:_____

Title:_____

Title:_____

ESCROW AGENT:

Easterday Farms, a Washington general
partnership, Debtor and Debtor in Possession

Chicago Title Insurance Company

By:_____

By:_____

Name:_____

Name:_____

Title:_____

Title:_____

_____

Cody Easterday

_____

Debbie Easterday

_____

Karen Easterday, in her individual capacity

_____

Karen Easterday as personal representative of
the Estate of Gale Easterday

10

Exhibit B
Deeds

**AFTER RECORDING, RETURN TO**:

_____
_____
_____
_____

---

**QUIT CLAIM DEED**

GRANTOR: _____

GRANTEE: _____

ABBREV. LEGAL
DESCRIPTION: _____

(Full legal description on Exhibit A)

TAX ACCOUNT NUMBER(S): _____

REFERENCE NUMBERS OF
DOCUMENTS ASSIGNED OR
RELEASED (IF
APPLICABLE): _____

- 11 -

4831-5589-2454v.18 0117168-000002

# QUIT CLAIM DEED

The Grantor, _____, a _____, for and in consideration of Ten Dollars ($10.00) conveys and quitclaims to _____, a _____, all of Grantor's interest in the real estate described on Exhibit A (the "Real Estate") attached hereto and incorporated herein, situated in the County of _____, State of Washington, together with all after-acquired title of the Grantor therein.

The Grantor further conveys and quit claims to Grantee all of Grantor's interest in and to all privileges, appurtenances and hereditaments related to the Real Estate, including but not limited to appurtenant water, water rights, and matters appertaining thereto. For purposes of this Deed, water rights include all appurtenant rights under certificates; adjudicated certificates; court decrees; appurtenant and perfected water rights documented by claims registered with the State of Washington under Claims Registration Act, Revised Code of Washington Chapter 90.14; appurtenant rights for water and conveyance of water associated with any federal or state water project, irrigation district water, association, or private company; and water rights under all permits for water right, which are either wholly or partially appurtenant to, or otherwise pursuant to which water is or may be delivered to or used on the Real Estate; or other appurtenant water right identifying information; including, without limitation, all of Grantor's rights, title, and interests in each of the following: Certificate No. S4-23978C, Certificate No. S3-00285C, Certificate No. S3-00284C, Certificate No. S3-22075C, and Certificate No. 3399; Superseding Permit No. S4-28998P and Superseding Permit No. G4-30584P; Certificate No. S3-00591C; and Yakima Adjudication Conditional Final Order Certificate No. S4-83818-J.

DATED this _____ day of _____, 2021.

*[SIGNATURE & ACKNOWLEDGMENT PAGE FOLLOW]*

- 12 -

4831-5589-2454v.18 0117168-000002

*[SIGNATURE & ACKNOWLEDGEMENT PAGE TO QUIT CLAIM DEED]*

**GRANTOR:**

_____

a _____

By: _____
Name: _____
Its: _____


STATE OF WASHINGTON

COUNTY OF _____


    I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the _____ of _____, a _____, to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.


_____
NOTARY PUBLIC for the State of Washington
My Commission Expires: _____


- 13 -

4831-5589-2454v.18 0117168-000002

**EXHIBIT A**

**LEGAL DESCRIPTION**

4831-5589-2454v.18 0117168-000002

Exhibit C
Bills of Sale

## BILL OF SALE AND ASSIGNMENT OF PROPERTY

### (Easterdays)

THIS BILL OF SALE AND ASSIGNMENT OF PROPERTY (this "**Assignment**") is made as of _____, 2021 ("**Effective Date**") by and between _____ ("**Assignor**"), and _____ ("**Assignee**"). Assignor and Assignee are sometimes referred to individually as "Party" and collectively as the "Parties".

### RECITALS

A. This Assignment is given pursuant to that certain Purchase and Sale Agreement dated _____, 2021 (the "**Purchase Agreement**") to which Assignee and Assignor are party. Capitalized terms not otherwise defined in this Assignment have the meanings given in the Purchase Agreement.

B. In connection with the conveyance of the Property to Assignee, Assignor has agreed to convey to Assignee and Assignee has agreed to accept from Assignor certain tangible and intangible personal property, including without limitation the Property described in Sections 1.3, 1.4, and 1.7 of the Purchase Agreement (the "**Assigned Property**") .

### AGREEMENT

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. <u>Assignment of the Assigned Property</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignor grants, sells, bargains, conveys, transfers and assigns unto Assignee all of Assignor's right, title and interest in and to the Assigned Property as described in the Purchase Agreement, all solely to the extent that any such right, title, or interest is assignable to Assignee.

2. <u>Assumption of Assigned Property</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignee hereby assumes and agrees to pay, discharge and perform in accordance with their terms, all of the Assigned Property.

3. <u>Binding Assignment</u>. This Assignment shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.

4. <u>Conflict</u>. Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 10 of the Purchase Agreement). To the extent of any inconsistency between the terms and provisions of the Purchase Agreement and those of this Assignment, the terms and provisions of the Purchase Agreement shall govern and control.

5. <u>Sole Remedy</u>.  The sole and exclusive remedy of the Assignee and Assignor with respect to any breach of this Assignment shall be as set forth in the Purchase Agreement.

6. <u>Severability</u>.  Should any term, provision or paragraph of this Assignment be determined to be illegal or void or of no force and effect, the balance of the Assignment shall survive.

7. <u>Entire Agreement</u>. This Assignment and the Purchase Agreement (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

8. <u>Governing Law</u>. This Assignment shall be governed by and construed in accordance with the laws of the State of Washington.

9. <u>Bankruptcy Court Jurisdiction</u>.   THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS ASSIGNMENT, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS ASSIGNMENT.  THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE  JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND ASSIGNOR AND ASSIGNEE EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

10. <u>Counterparts; Electronic Signatures</u>.   This Assignment may be signed in counterparts.  The Parties further agree that this Assignment may be executed by the exchange of emailed signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon as reasonable following request from the other Parties. In agreeing to permit the use, from time to time where appropriate, of signatures transmitted by e-mail in order to expedite the transactions evidenced by this Assignment, the Parties hereby acknowledge, confirm and agree that (a) they intend to be bound by their respective signatures even though transmitted by e-mail, (b) they are aware that the other(s) will rely upon the signatures of the others which have been transmitted by e-mail, and (c) they waive any defense to the enforcement of the documents affecting the transactions based on the fact that a signature was transmitted by e-mail only..

11. <u>Amendments</u>.  This Assignment may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Assignor and Assignee have caused their duly authorized representatives to execute this Assignment as of the Effective Date.

**ASSIGNEE:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____

      Name: _____

      Title: _____

Date:_____

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____

      Name: _____

      Title: _____

Date: _____

**ASSIGNOR:**

_____

Cody Easterday

Date:_____

_____

Debbie Easterday

Date:_____

_____

Karen Easterday, in her individual capacity

Date: _____

_____

_____

Karen Easterday as personal representative of the
Estate of Gale Easterday

Date:_ _____

# BILL OF SALE AND ASSIGNMENT OF PROPERTY

## (Debtors)

THIS BILL OF SALE AND ASSIGNMENT OF PROPERTY (this "**Assignment**") is made as of _____, 2021 ("**Effective Date**") by and between _____ ("**Assignor**"), and _____ ("**Assignee**").  Assignor and Assignee are sometimes referred to individually as "Party" and collectively as the "Parties".

## RECITALS

C.  This Assignment is given pursuant to that certain Purchase and Sale Agreement dated _____, 2021 (the "**Purchase Agreement**") to which Assignee and Assignor are party.  Capitalized terms not otherwise defined in this Assignment have the meanings given in the Purchase Agreement.


D.  In connection with the conveyance of the Property to Assignee, Assignor has agreed to convey to Assignee and Assignee has agreed to accept from Assignor certain tangible and intangible personal property, including without limitation the Property described in Sections 2.3, 2.4, and 2.7 of the Purchase Agreement (the "**Assigned Property**") .

## AGREEMENT

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

12. <u>Assignment of the Assigned Property</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignor grants, sells, bargains, conveys, transfers and assigns unto Assignee all of Assignor's right, title and interest in and to the Assigned Property as described in the Purchase Agreement, all solely to the extent that any such right, title, or interest is assignable to Assignee.

13. <u>Assumption of Assigned Property</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignee hereby assumes and agrees to pay, discharge and perform in accordance with their terms, all of the Assigned Property.

14. <u>Binding Assignment</u>.  This Assignment shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.

15. <u>Conflict</u>.  Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 10 of the Purchase Agreement).  To the extent of any inconsistency between the terms and provisions of the Purchase Agreement and those of this Assignment, the terms and provisions of the Purchase Agreement shall govern and control.

16. <u>Sole Remedy</u>.  The sole and exclusive remedy of the Assignee and Assignor with respect to any breach of this Assignment shall be as set forth in the Purchase Agreement.

17. <u>Severability</u>.  Should any term, provision or paragraph of this Assignment be determined to be illegal or void or of no force and effect, the balance of the Assignment shall survive.

18. <u>Entire Agreement</u>. This Assignment and the Purchase Agreement (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

19. <u>Governing Law</u>. This Assignment shall be governed by and construed in accordance with the laws of the State of Washington.

20. <u>Bankruptcy Court Jurisdiction</u>.  THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS ASSIGNMENT, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS ASSIGNMENT.  THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE  JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND ASSIGNOR AND ASSIGNEE EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

21. <u>Counterparts; Electronic Signatures</u>.  This Assignment may be signed in counterparts.  The Parties further agree that this Assignment may be executed by the exchange of emailed signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon as reasonable following request from the other Parties. In agreeing to permit the use, from time to time where appropriate, of signatures transmitted by e-mail in order to expedite the transactions evidenced by this Assignment, the Parties hereby acknowledge, confirm and agree that (a) they intend to be bound by their respective signatures even though transmitted by e-mail, (b) they are aware that the other(s) will rely upon the signatures of the others which have been transmitted by e-mail, and (c) they waive any defense to the enforcement of the documents affecting the transactions based on the fact that a signature was transmitted by e-mail only..

22. <u>Amendments</u>.  This Assignment may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

[*Signature Page Follows*]

IN WITNESS WHEREOF, Assignor and Assignee have caused their duly authorized representatives to execute this Assignment as of the Effective Date.

**ASSIGNEE:**

**FARMLAND RESERVE, INC.,**
**a Utah nonprofit corporation**

By: _____
      Doug Rose, President and Chief Executive Officer

Date:_____

**ASSIGNOR:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
      Name: _____
      Title: _____
Date:_____

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
      Name: _____
      Title: _____
Date: _____

By: _____
      Name: _____
      Title: _____

Exhibit D
Contract/Lease Assignments

**ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND LEASES**

**(Easterdays)**

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND LEASES (this "**Assignment**") is made as of _____, 2021 ("**Effective Date**") by and between _____ ("**Assignor**"), and _____ ("**Assignee**"). Assignor and Assignee are sometimes referred to individually as "Party" and collectively as the "Parties".

## RECITALS

E. This Assignment is given pursuant to that certain Purchase and Sale Agreement dated _____, 2021 (the "**Purchase Agreement**") to which Assignee and Assignor are party. Capitalized terms not otherwise defined in this Assignment have the meanings given in the Purchase Agreement.

F. In connection with the conveyance of the Property to Assignee, Assignor has agreed to convey to Assignee and Assignee has agreed to accept from Assignor certain Easterday Assumed and Assigned Leases and Contracts (as defined in the Purchase Agreement).

## AGREEMENT

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

23. <u>Assignment of Assigned Leases and Contracts</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignor, transfers and assigns unto Assignee all of Assignor's right, title and interest in and to the Assigned Leases and Contracts as described in the Purchase Agreement, all solely to the extent that any such right, title, or interest is assignable to Assignee.

24. <u>Assumption of Assigned Leases and Contracts</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignee hereby assumes all of Assignor's rights, title, and interest in, to and under the Assigned Leases and Contracts and shall pay, discharge and perform all obligations, liabilities, and covenants arising under the Assigned Leases and Contracts in accordance with their terms.

25. <u>Indemnification</u>. Assignee hereby agrees to indemnify, save, and hold harmless Assignor against any claims, liabilities or damages arising out of any actions or inactions of Assignee with respect to the Assigned Leases and Contracts from and after the Effective Date.

26. <u>Binding Assignment</u>. This Assignment shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.

27. <u>Conflict</u>. Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer

set forth in Section 10 of the Purchase Agreement). To the extent of any inconsistency between the terms and provisions of the Purchase Agreement and those of this Assignment, the terms and provisions of the Purchase Agreement shall govern and control.

28. <u>Sole Remedy</u>. The sole and exclusive remedy of the Assignee and Assignor with respect to any breach of this Assignment shall be as set forth in the Purchase Agreement.

29. <u>Severability</u>. Should any term, provision or paragraph of this Assignment be determined to be illegal or void or of no force and effect, the balance of the Assignment shall survive.

30. <u>Entire Agreement</u>. This Assignment and the Purchase Agreement (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

31. <u>Governing Law</u>. This Assignment shall be governed by and construed in accordance with the laws of the State of Washington.

32. <u>Bankruptcy Court Jurisdiction</u>. THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS ASSIGNMENT, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS ASSIGNMENT. THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND ASSIGNOR AND ASSIGNEE EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

33. <u>Counterparts; Electronic Signatures</u>. This Assignment may be signed in counterparts. The Parties further agree that this Assignment may be executed by the exchange of emailed signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon as reasonable following request from the other Parties. In agreeing to permit the use, from time to time where appropriate, of signatures transmitted by e-mail in order to expedite the transactions evidenced by this Assignment, the Parties hereby acknowledge, confirm and agree that (a) they intend to be bound by their respective signatures even though transmitted by e-mail, (b) they are aware that the other(s) will rely upon the signatures of the others which have been transmitted by e-mail, and (c) they waive any defense to the enforcement of the documents affecting the transactions based on the fact that a signature was transmitted by e-mail only..

34. <u>Amendments</u>. This Assignment may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Assignor and Assignee have caused their duly authorized representatives to execute this Assignment as of the Effective Date.

**ASSIGNEE:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
      Name: _____
      Title: _____
Date:_____

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
      Name: _____
      Title: _____
Date: _____

**ASSIGNOR:**

_____
Cody Easterday

Date:_____

_____
Debbie Easterday
Date:_____

_____
Karen Easterday, in her individual capacity
Date: _____

_____
_____
Karen Easterday as personal representative of the
Estate of Gale Easterday
Date:_ _____

# ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND LEASES

## (Debtors)

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND LEASES (this "**Assignment**") is made as of _____, 2021 ("**Effective Date**") by and between _____ ("**Assignor**"), and _____ ("**Assignee**"). Assignor and Assignee are sometimes referred to individually as "Party" and collectively as the "Parties".

## RECITALS

G. This Assignment is given pursuant to that certain Purchase and Sale Agreement dated _____, 2021 (the "**Purchase Agreement**") to which Assignee and Assignor are party. Capitalized terms not otherwise defined in this Assignment have the meanings given in the Purchase Agreement.

H. In connection with the conveyance of the Property to Assignee, Assignor has agreed to convey to Assignee and Assignee has agreed to accept from Assignor certain Assumed and Assigned Leases and Contracts (as defined in the Purchase Agreement).

## AGREEMENT

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

35. <u>Assignment of Assigned Leases and Contracts</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignor, transfers and assigns unto Assignee all of Assignor's right, title and interest in and to the Assigned Leases and Contracts as described in the Purchase Agreement, all solely to the extent that any such right, title, or interest is assignable to Assignee.

36. <u>Assumption of Assigned Leases and Contracts</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignee hereby assumes all of Assignor's rights, title, and interest in, to and under the Assigned Leases and Contracts and shall pay, discharge and perform all obligations, liabilities, and covenants arising under the Assigned Leases and Contracts in accordance with their terms.

37. <u>Indemnification</u>. Assignee hereby agrees to indemnify, save, and hold harmless Assignor against any claims, liabilities or damages arising out of any actions or inactions of Assignee with respect to the Assigned Leases and Contracts from and after the Effective Date.

38. <u>Binding Assignment</u>. This Assignment shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.

39. <u>Conflict</u>. Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 10 of the Purchase Agreement). To the extent of any inconsistency between the terms and provisions of the Purchase Agreement and those of this Assignment, the terms and provisions of the Purchase Agreement shall govern and control.

40. <u>Sole Remedy</u>.  The sole and exclusive remedy of the Assignee and Assignor with respect to any breach of this Assignment shall be as set forth in the Purchase Agreement.

41. <u>Severability</u>.  Should any term, provision or paragraph of this Assignment be determined to be illegal or void or of no force and effect, the balance of the Assignment shall survive.

42. <u>Entire Agreement</u>. This Assignment and the Purchase Agreement (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

43. <u>Governing Law</u>. This Assignment shall be governed by and construed in accordance with the laws of the State of Washington.

44. <u>Bankruptcy Court Jurisdiction</u>.   THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS ASSIGNMENT, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS ASSIGNMENT.  THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE  JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND ASSIGNOR AND ASSIGNEE EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

45. <u>Counterparts; Electronic Signatures</u>.   This Assignment may be signed in counterparts.  The Parties further agree that this Assignment may be executed by the exchange of emailed signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon as reasonable following request from the other Parties. In agreeing to permit the use, from time to time where appropriate, of signatures transmitted by e-mail in order to expedite the transactions evidenced by this Assignment, the Parties hereby acknowledge, confirm and agree that (a) they intend to be bound by their respective signatures even though transmitted by e-mail, (b) they are aware that the other(s) will rely upon the signatures of the others which have been transmitted by e-mail, and (c) they waive any defense to the enforcement of the documents affecting the transactions based on the fact that a signature was transmitted by e-mail only..

46. <u>Amendments</u>.  This Assignment may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

[*Signature Page Follows*]

IN WITNESS WHEREOF, Assignor and Assignee have caused their duly authorized representatives to execute this Assignment as of the Effective Date.

**ASSIGNEE:**

**FARMLAND RESERVE, INC.,**
**a Utah nonprofit corporation**

By: _____
Doug Rose, President and Chief Executive Officer

Date:_____

**ASSIGNOR:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
Name: _____
Title: _____
Date:_____

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
Name: _____
Title: _____
Date: _____

By: _____
Name: _____
Title: _____
Date:_

Exhibit E
Temporary Lease Agreement

**TEMPORARY LEASE AGREEMENT**

THIS TEMPORARY LEASE AGREEMENT (this "Agreement") is entered into this _____ day of _____, 2021 (the "Effective Date"), by and between FARMLAND RESERVE, INC., a Utah nonprofit corporation ("Lessor"), and EASTERDAY RANCHES, INC., a Washington corporation ("Ranches") and EASTERDAY FARMS, a Washington general partnership ("Farms" and, together with Ranches, "Lessee") each a debtor and debtor-in-possession, whose estates are being jointly administered in case number 21-00141 pending in the United States Bankruptcy Court for the Eastern District of Washington ("Chapter 11 Cases"). Lessor and Lessee are sometimes referred to individually as "Party" and collectively as the "Parties."

**R E C I T A L S**

A.      Lessor, concurrent with execution of this Agreement, has acquired from Lessee certain real property located in Benton County, State of Washington (the "State") described on the attached "<u>Exhibit A</u>" ("Lessor Property") pursuant to that certain Purchase and Sale Agreement dated May [18], 2021 (the "Purchase Agreement").

B.      Farms desires time to harvest wheat crops and complete its related current-year operations on the Lessor Property and Lessee desires to market and sell certain Excluded Property (as defined in the Purchase Agreement) consisting of certain tangible personal property and equipment, and thus each desires to obtain a temporary, non-exclusive lease (the "Lease") on, over, and across the Lessor Property. Lessor is willing to convey the Lease to Lessee over the Lessor Property for the foregoing purposes subject to and in conformance with the terms and conditions set forth in this Agreement.

**T E R M S   A N D   C O N D I T I O N S**

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1.**      **Grant of Lease; Costs**. Lessor hereby conveys to Ranches and Farms, respectively as provided below, and their designated agents, tenants, employees, contractors and representatives ("Agents"), without warranty, a temporary, non-exclusive lease on, over, and across the Lessor Property for the purpose of (a) as to Farms, completing Lessee's current-year wheat crop harvest operations on the Lessor Property (the "Farming Purpose") and (b) as to Lessee, preparing to market and sell certain Excluded Property (as defined in the Purchase Agreement) and marketing and selling certain Excluded Property (as defined in the Purchase Agreement) consisting of certain tangible personal property and equipment (the "Equipment Sale Purpose", together with the Farming Purpose, the "Lease Purposes"). Lessee shall be responsible for any and all costs of completing the Lease Purposes (e.g. without limitation, power charges). Lessee shall use and maintain the Lessor Property consistent with Lessee's prior practice and in accordance with customary good practices of the farming industry where the Lessor Property is located, subject to the terms and conditions of this Agreement.

**2.**      **Access**. Lessee and its Agents will enter upon the Lessor Property at their sole risk and hazard and shall have the right to use all appurtenances, ingress and egress to and from the Lessor Property over the routes and easements historically used by Lessee for the Farming Purpose. Lessee's access to and use of the

Lessor Property for purposes of the Equipment Sale Purpose shall be limited to designated areas on Lessor's Property approved by Lessor, which approval shall not be unreasonably withheld, conditioned, or delayed.

       **3.**    <u>**Term**</u>. This Agreement and the Lease granted hereunder shall commence on the Effective Date and shall automatically terminate, as to the Farming Purpose, on the earlier of completion of harvest or September 30, 2021, and as to the Equipment Sale Purpose, on the earlier of completion of the sale and removal of all of the Excluded Property or October 31, 2021 (collectively, the "Term").

       **4.**    <u>**Reservation by Lessor**</u>. Lessor hereby reserves the right to use the Lessor Property for any use not inconsistent with Lessee's Lease Purposes of the Lessor Property; provided, however, that Lessor shall use best efforts to not interfere with Lessee's Lease Purposes.

       **5.**    <u>**Condition of the Lessor Property**</u>. Lessee acknowledges that it has previously possessed and maintained and will continue to possess and maintain the Lessor Property through the Term of this Agreement and accepts the Lessor Property and all aspects thereof in "AS IS", "WHERE IS" condition, without warranties, either express or implied, "with all faults", including but not limited to both latent and patent defects, and the existence of hazardous materials, if any.

       **6.**    <u>**Alterations**</u>. Lessee shall not make any additions, alterations or improvements, or erect any structures, buildings, fences, or other improvements, permanent or temporary (collectively, "Alterations") on or to the Lessor Property without obtaining the prior written consent of Lessor, which may be granted or withheld in Lessor's sole and absolute discretion, except that Lessee may erect temporary, movable shelters or structures, and set up temporary signage or other similar temporary and movable items as reasonably appropriate in connection with completion of the Equipment Sale Purpose. Lessee shall expeditiously complete all work with respect to any approved Alterations in a good and workmanlike manner, and the work shall be expeditiously completed in compliance with all applicable Laws. On or before the expiration or earlier termination of the Lease, Lessee, at its sole cost and expense, shall remove all Alterations from the Lessor Property and restore the Lessor Property to the conditions that existed on the Effective Date, unless otherwise directed by Lessor. If Lessor directs that any Alterations remain on the Lessor Property, such Alterations shall be deemed part of the Lessor Property and shall (without any charge to Lessor) become the property of Lessor.

       **7.**    <u>**Damage**</u>. Lessee shall be responsible for any material damage done to the Lessor Property by Lessee or its Agents. To the extent Lessor Property is materially damaged by Lessee or its Agents, then Lessee shall, at its sole cost and expense, promptly repair any such damage and restore the Lessor Property to the same condition that existed before such damage. This provision shall survive termination of this Agreement.

       **8.**    <u>**Compliance with Laws**</u>. To the extent Lessee uses farm labor contractors for the Lessee's Lease Purpose, then Lessee shall obtain and maintain any required Washington farm labor contractor license and, if applicable, shall require the same of any contractors engaged by Lessee. Without limitation, Lessee and Lessee's Agents and contractors shall comply with any and all Laws during the Term. "Laws" means all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, Leases, authorizations, directions and requirements of and agreements with all governments, departments, commissions, boards, courts, authorities, agencies, officials and officers, including, without limitation, the Occupational Safety and Health Act, the Fair Labor Standards Act, the Federal Migrant and Seasonal Agricultural Worker Protection Act, the Americans' with Disabilities Act, any wage and hour laws (and any analogous acts of the State), any and all rules and regulations of the United States Department of Agriculture and of the Department of Agriculture of the State, and/or any Environmental Laws, which now or at any time hereafter may be applicable to Lessor Property or any part thereof. Lessee shall promptly submit to Lessor copies of all documents, including reports, submissions, notices, orders,

directives, findings and correspondence made by Lessee during the Term to any person or governmental authority, or given by any governmental authority or person to Lessee during the Term pursuant to any Laws.

9. **Insurance**. As a condition to the grant of the Lease, Lessee shall obtain and maintain during the Term the following insurance.

9.1. <u>Commercial General Liability Insurance</u>. Lessee shall obtain and thereafter maintain during the Term, at its sole cost and expense, a policy of Commercial General Liability (including pollution legal liability for sudden and accidental spills or releases ("PLL Coverage"), subject to the last sentence of this Section 9.1) insuring Lessee's interests against claims for personal injury, bodily injury, death and property damage occurring on, in or about the Lessor Property, with a "Combined Single Limit" (covering personal injury liability, bodily injury liability and property damage liability) of not less than $2,000,000 per occurance and $2,000,000 aggregate. Notwithstanding the foregoing in this Section 9.1, Lessee shall only be responsible for payment of $5,000.00 of any incremental increase in the premium cost of PLL Coverage over and above the basic commercial general liability coverage. If such incremental cost exceeds $5,000.00, Lessee shall inform Lessor, and Lessor may elect either to pay the excess over $5,000.00, find other more affordable coverage, or waive the requirement of PLL Coverage.

9.2. <u>Commercial Automobile Liability Insurance</u>. Lessee shall obtain and thereafter maintain during the Term, at its sole cost and expense, a policy of Commercial Automobile Liability on any and all owned, leased, hired, or non-owned vehicles used by or for Lessee with a "Combined Single Limit" (covering personal injury liability, bodily injury liability, and property damage liability) of not less than $1,000,000 "Any Auto Basis."

9.3. <u>Workers' Compensation and Employer's Liability Insurance</u>. If Lessee is subject to Workers' Compensation and Employer's Liability under State Laws, Lessee agrees to maintain and keep in force during the Term: (a) Workers' Compensation Insurance and (b) Employer's Liability Insurance of not less than those required by Laws. Lessee agrees to indemnify and hold Lessor harmless from all liability and costs including attorney's and court costs relating to any workers' compensation claim.

9.4. <u>Waiver of Certain Rights</u>. With respect to any loss or damage that may occur to the Lessor Property during the Term or Lessee's crops thereon, arising from any peril customarily insured under an all risk insurance policy, regardless of the cause or origin including Workers' Compensation matters, excluding willful acts of Lessor, Lessor's Affiliates and Lessor's Parties, Lessee hereby releases Lessor's Parties from all claims with respect to such loss; and Lessee agrees that its insurance company shall have no right of subrogation against Lessor's Parties on account of any such loss, and Lessee shall procure from its respective insurers under all such policies a waiver of all rights of subrogation against Lessor's Parties which the insurers might otherwise have under such policies.

9.5. <u>Policy Requirements</u>. Lessor shall be endorsed as an additional insured on the policy of Commercial General Liability Insurance required to be maintained by Lessee. The insurance policies and certificates required by this Section 9 shall require the insurance company to furnish the Lessor at least ten (10) days prior written notice of any cancellation or lapse, or the effective date of any reduction in the amounts or scope of coverage. The insurance which Lessee is required to carry under this Lease shall be with companies satisfactory to Lessor. All policies to be maintained by Lessee shall be primary policies and not contributing with or as excess coverage for any insurance carried by Lessor.

Lessor and Lessee shall fully cooperate in making claims and furnishing information to the insurer or insurers, and obtaining settlements and payments from the insurer or insurers.

10. **Indemnification and Release**.

10.1. <u>Indemnification</u>. Except to the extent resulting from the negligence or willful misconduct of Lessor or Lessor's Parties, Lessee shall defend, indemnify and save and hold harmless Lessor and the officers, directors, shareholders, employees, representatives, servants, agents, contractors, invitees, successors and assigns of Lessor (collectively, "**Lessor's Parties**") from and against any and all liabilities, obligations, losses, damages (but excluding any lost profits or consequential damages), including reasonable attorneys' fees and court costs, incurred by Lessor, arising from: (a) third party claims for injury or death of any person or persons, or property damage, on the Lessor Property during the Term; and/or (b) the use or occupancy of the Lessor Property by Lessee or any Lessee's Agents (defined below) or contractors during the Term. Except to the extent resulting from the negligence or willful misconduct of Lessee or Lessee's Agents, Lessor shall defend, indemnify and save and hold harmless Lessee and the officers, directors, shareholders, employees, representatives, servants, and agents (collectively, "**Lessee's Agents**") from and against any and all liabilities, obligations, losses, damages (but excluding any lost profits or consequential damages), including reasonable attorneys' fees and court costs, incurred by Lessee, arising from the use or occupancy of the Lessor Property by Lessor or Lessor's Parties.

10.2. <u>Release</u>. Except to the extent resulting from the negligence or willful misconduct of Lessor, Lessor's Parties, or Lessor's contractors or invitees, Lessee hereby assumes all risk of damage or injury to any person or property in, on or about the Lessor Property from any cause whatsoever, and hereby releases, remises, acquits and discharges Lessor, and Lessor's Parties from any such damage or injury on behalf of Lessee, and Lessee's Agents. In addition Lessor, and Lessor's Parties shall not be liable for any loss, injury, death, or damage (including any consequential damage) to persons, property, or Lessee's business resulting from any theft, act of God, public enemy, injunction, riot, strike, insurrection, war, court order, requisition, order of governmental body or authority, fire, explosion, collapse of a structure, falling object, steam, water, rain, snow, ice, breakage, leakage, obstruction, or other defects in, on or about the Lessor Property excepting any injury, loss of life, or damage which is caused by the gross negligence or willful misconduct of Lessor and Lessor's Agents. This Section shall survive termination of this Agreement.

11. **Liens**. Lessee shall not do any act or make any contract so as to encumber or affect in any manner the title or rights of Lessor in the Lessor Property. Lessee shall keep the Lessor Property free from and shall promptly discharge any liens arising out of any failure by Lessee to pay any taxes, charges or levies upon the Excluded Property or any of Lessee's personal property or liens arising out of any work performed, materials furnished, or obligations incurred by or for Lessee, and in any event no later than five (5) business days after delivery of written demand by Lessor. Lessee indemnifies, holds harmless and agrees to defend Lessor from and against any and all liability, loss, damage, costs, attorneys' fees and all other expenses on account of claims by any taxing authority or claims of lien of laborers or materialmen or others for work performed or materials or supplies furnished to or for Lessee or persons claiming under Lessee. If Lessee shall be in default in paying any charge for which a bond or other lien claim has been filed and shall not have given Lessor security to protect the Lessor Property and Lessor, then Lessor may, but shall not be obligated to, pay the claim. The total amount of the claim together with any costs and attorneys' fees incurred by Lessor in connection therewith, shall be immediately due and owing from Lessee to Lessor.

12. **Surrender**. Lessee shall, upon the expiration of the Term or earlier termination of this Agreement, according to the termination dates set forth above with respect to the Farming Purpose and/or the Equipment Sale Purpose, peacefully surrender the Lessor Property to Lessor in substantially the same condition as it was received by Lessee, ordinary wear and tear, casualty, and cultivation of any crops excepted,

and deliver to Lessor all keys associated with the Lessor Property. Without limitation, Lessee shall surrender the Lessor Property vacant and free and clear of any individual occupancies, including of manufactured homes conveyed to Lessor as part of the Property pursuant to the Purchase Agreement, and shall defend, indemnify and save and hold harmless Lessor and Lessor's Parties from and against any and all liabilities, obligations, losses, damages (but excluding any lost profits or consequential damages), including reasonable attorneys' fees and court costs, incurred by Lessor, arising from any such occupancies. Lessee acknowledges the fixed nature of the Term, and agrees that any crops and Lessee's Property remaining on the Lessor Property after the expiration of ten (10) days after the expiration of the Term or the earlier termination of the Agreement shall, at the election of Lessor, become the property of Lessor and shall be deemed abandoned in accordance with applicable laws. Lessee hereby waives any and all rights in such crops and the right to compensation for any work or soil preparation performed by Lessee, including, without limitation, any rights arising under any laws and the doctrine of emblements with respect to any such crops. Lessor shall have the right to remove, store, sell and dispose of such crops and Lessee's Property and retain any proceeds derived therefrom pursuant to any and all applicable laws.

      **13.**    **Assignment**. Lessee may not (a) assign or transfer this Agreement or any interest therein, in whole or in part, or (b) sublet or grant any other right to use all or any portion of the Lessor Property, in either case, without the prior express written consent of Lessor, and further provided that no assignment or sublease shall be permitted with respect to the Equipment Sale Purpose, and any proposed assignee or sublessee with respect to the Farming Purpose must, as a condition precedent to the effectiveness of any such assignment or sublease in addition to Lessor's written consent, (i) agree in writing to be bound by all of the terms and conditions of this Agreement with respect to the Farming Purpose, (ii) be a reputable operator in the Columbia River basin region with respect to wheat farming operations of this size and scale with an established history of utilizing best farming practices as generally acknowledged in the Columbia River basin region, (iii) provide evidence satisfactory to Lessor of all of the insurance required to be maintained by Lessee under this Agreement, and (iv) under no circumstances shall Lessee be released or deemed released from its obligations under this Agreement, but rather shall be a joint and several obligor with any such assignee or sublessee. Notwithstanding anything herein to the contrary, Farms shall be permitted to enter into any farm labor contracts necessary for the Farming Purpose without obtaining Lessor's prior consent, and Lessee shall be permitted to enter into any contracts or agreements necessary for the Equipment Sale Purpose without obtaining Lessor's prior consent, providing, however, that, Lessee shall be entirely responsible for such contracts and contractors, and such contracts and contractors shall not violate or be violative any of the terms and conditions of this Agreement.

      **14.**    **Bankruptcy Court Jurisdiction**. LESSOR AND LESSEE AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS AGREEMENT. THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND LESSOR AND LESSEE EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

      **15.**    **Taxes**. Lessor shall pay all taxes, assessments, fees and other similar governmental charges levied against or with respect to the Lessor Property.

      **16.**    **Independent Contractors; No Third Party Beneficiaries; No Shared Employees or Contractors**. The Parties are independent contractors and not partners or joint venturers and neither is agent of or has the power or authority to bind the other. There are no designated or intended third party beneficiaries to this Agreement. The employees or contractors of Lessee are not employees or contractors of Lessor in any

respect, shared or otherwise, and Lessee shall be solely responsible for all matters concerning its employees or contractors.

      17.    **Attorney Fees**. In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that action or proceeding (as determined by the applicable tribunal of competent jurisdiction in such action or proceeding) shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

      18.    **Miscellaneous**. This Agreement was entered into upon Closing, as that term is defined in the Purchase Agreement, of the Purchase Agreement. In the event of any conflict between the terms of this Agreement and the Purchase Agreement, the Purchase Agreement shall control, except that, for clarity, nothing in this Agreement is intended to conflict with agreements of the Parties in the Purchase Agreement with respect conditions or occurrences existing prior to the Closing under the Purchase Agreement; and further, the express terms and conditions of this Agreement with respect to the period commencing with the Effective Date hereof and following are intended to be controlled by this Agreement. No supplement, modification or amendment of this Agreement shall be binding unless in writing and executed by the Parties hereto. This Agreement shall be construed in accordance with and governed by the laws of the State of Washington. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions, whether or not similar, nor shall any waiver be a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver. The headings of this Agreement are for purposes of reference only and shall not limit or define the meaning of the provisions hereof. The Recitals set forth above are incorporated into this Agreement by reference. If any provision of this Agreement or the application thereof to any person, place, or circumstance, shall be held by the Bankruptcy Court to be invalid, unenforceable, or void, the remainder of this Agreement and such provisions as applied to other persons, places, and circumstances shall remain in full force and effect; provided, however, the invalid provision does not have a materially adverse effect on Lessor. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. Neither this Agreement, nor any memorandum or other written evidence of same shall be recorded in any public records

SIGNATURES ON NEXT PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.


**LESSOR**:      FARMLAND RESERVE, INC.,
a Utah nonprofit corporation


By: _____

Name (Print): _____

Its: _____



**LESSEE**:      EASTERDAY FARMS, a Washington general partnership


By: _____

Name (Print): _____

Its: _____


By: _____

Name (Print): _____

Its: _____


EASTERDAY RANCHES, INC., a Washington corporation


By: _____

Name (Print): _____

Its: _____

**<u>EXHIBIT A</u>**

(Description of the Lessor Property)

Exhibit F
Form of Sale Order


[Attached on Next Page]

The Sale Order shall be in the following form, subject to changes to reflect the filing of additional pleadings and entry of additional orders relating to the Sale since the date on which the following form was prepared, and any such other changes to the following form of order as may be necessary to reflect the Purchase and Sale Agreement or as may reasonably be requested by Buyer and approved by Sellers, with such approval not to be unreasonably withheld or delayed.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

In re

EASTERDAY RANCHES, INC., *et al.*

Debtors.[1]

Chapter 11

Lead Case No. 21-00141-WLH11
Jointly Administered

**FORM OF ORDER (A) AUTHORIZING THE DEBTORS TO ACQUIRE CERTAIN ASSETS OWNED BY THE EASTERDAYS; (B) AUTHORIZING THE SALE OF PROPERTY FREE AND CLEAR OF INTERESTS, INCLUDING LIENS, CLAIMS, LIABILITIES AND ENCUMBRANCES; (C) GRANTING THE BUYER THE PROTECTIONS AFFORDED TO A GOOD FAITH PURCHASER; (D) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (E) GRANTING RELATED RELIEF**

Upon the motion filed on March 26, 2021 [Docket No. 486] ("Motion") [2] by above-captioned debtors and debtors in possession (collectively, the "Debtors"), as

---

[1]   The Debtors along with their case numbers are as follows: Easterday Ranches, Inc., (21-00141) and Easterday Farms, a Washington general partnership (21-00176).

[2]   Unless stated otherwise, all capitalized terms not defined herein shall have the same meaning as set forth in the Motion or the Purchase and Sale Agreement. To the extent of any inconsistency between the Motion and the Purchase and Sale Agreement, the Purchase and Sale Agreement shall control.

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

supplemented by the Debtors' *Supplemental Motion for Approval of (A) Designation of Stalking Horse Bidder and Related Bid Protections in Connection with Auction for Sale of Assets; and (B) Granting Related Relief* ("<u>Supplemental Bidding Procedures Motion</u>") [Docket No. [●]] and *Order Approving (A) Designation of Stalking Horse Bidder and Related Bid Protections in Connection with Auction for Sale of Assets; and (B) Granting Related Relief* ("<u>Supplemental Bidding Procedures Order</u>") [Docket No. [●]], for entry of an order (this "<u>Order</u>"), among other things:

(i) authorizing the Debtors to acquire certain assets (the "<u>Easterday Property</u>"), including Land, Appurtenances, Mineral Rights, Improvements, Irrigation System Permits, Water Rights, and Intangible Property (as defined herein), owned by Cody Easterday ("<u>CE</u>") and Debby Easterday ("<u>DE</u>"), as husband and wife, and Karen Easterday (in her individual capacity and as the personal representative in *In the Matter of the Estate of Gale A. Easterday* currently pending in the Franklin County Superior Court, case no. 21-450004-11 ("<u>KE</u>," and together with CE and DE, the "<u>Easterdays</u>" and, together with the Debtors, the "<u>Sellers</u>");

(ii) approving the sale of the Easterday Property and certain property owned and/or leased by the Debtors, including Land, Appurtenances, Mineral Rights, Improvements, Irrigation System Permits, Water Rights and Intangible Property, and the Assigned and Assumed Leases and Contracts (together with (i), (ii), and (iii), the "<u>Property</u>," as further described in the *Purchase and Sale Agreement,* dated as of May 19, 2021, attached hereto as **<u>Exhibit 1</u>** (together with documents referred, necessary or ancillary thereto, the "<u>Purchase and Sale Agreement</u>")) to Farmland Reserve, Inc. or to any affiliate thereof designated in accordance with the Purchase and Sale Agreement, as defined below (the "<u>Buyer</u>"), free and clear of all interests (as such term is used in section 363(f) of the Bankruptcy Code), including without limitation liens, claims, liabilities and encumbrances;

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

**(iii)** granting the Buyer the protections afforded to a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code;

**(iv)** approving the assumption and assignment by the Debtors to the Buyer of the Assigned and Assumed Leases and Contracts pursuant to section 365 of the Bankruptcy Code; and

**(v)** granting certain related relief pursuant to the Bankruptcy Code and/or applicable law (with the foregoing (i) through (v) collectively referred to as the "Sale"); and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors and other parties-in-interest, as well as in the best interests of the Easterdays' creditors; and this United States Bankruptcy Court for the Eastern District of Washington (this "Court") having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion and opportunity for objections or requests for hearing having been filed; and notice of the Sale, including by publication, having been filed; and good and sufficient opportunity for objections or requests for hearing having been afforded parties-in-interest; and based on the statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Motion at a hearing before this Court conducted on July 14, 2021 (the "Sale Hearing"); and it appearing that no other notice need be given; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS THAT:**

A.    This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. § 1334(a). Venue is proper in this District and in this Court pursuant to 28

DOCS_SF:105437.3
FORM OF SALE ORDER – Page 3

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec01cx01m7

U.S.C. §§ 1408 and 1409. The Motion is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2).

B.     This Order constitutes a final and appealable decision within the meaning of 28 U.S.C. § 1291. Notwithstanding Bankruptcy Rule 6006(d), and to any extent necessary under Bankruptcy Rule 9014, this Court expressly finds that there is no just reason for the delay in the effectiveness of this Order, nor any just reason to delay its effect on all holders of rights in and to, and against the Property and the Parties to the Purchase and Sale Agreement, and expressly directs the entry of judgment as set forth herein.

C.     The statutory predicates for the relief requested in the Motion are (i) sections 105(a), 363(b), 363(f), 363(k), 363(m), 365(a), 365(b), 365(e), and 365(f) of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 2002(c)(1), 6004(a), 6004(c), 6004(f), 6004(h), 6006(a), 6006(c), 6006(f), 6006(g) and Local Rules 6004-1 and 6006-1.

## Notice of the Sale, Auction, and Cure Amounts

D.     Actual written notice of the Sale Hearing, the Auction, the Motion, the Sale, the assumption and assignment of the Assigned and Assumed Contracts and Leases, and all notices and deadlines with respect to the foregoing, and a reasonable opportunity to object or be heard with respect to the foregoing and the relief requested therein has been afforded to all known interested persons and entities (together, the "Parties-in-Interest"), including, but not limited to the following parties:

    a.     the United States Trustee;

    b.     any party asserting security interests, encumbrances, mortgages, interests (including all "interests" as such term is used in section 363(f) of the Bankruptcy Code), liens, leases, options, rights of first refusal or first offer, rights of redemption, pledges, charges,

DOCS_SF:105437.3
FORM OF SALE ORDER – Page 4

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

| | | |
|---|---|---|
| 1 | | claims, or licenses to use or exploit the Property, or other rights |
| 2 | | arising by contract, law or equity; |
| 3 | c. | all taxing authorities having jurisdiction over any of the Property, |
| 4 | | including the Internal Revenue Service and the Washington |
| 5 | | Department of Revenue; |
| 6 | d. | all persons known or reasonably believed to have asserted liens on |
| 7 | | any of the Property; |
| 8 | e. | the non-debtor counterparties to the Assigned and Assumed |
| 9 | | Contracts and Leases; |
| 10 | f. | all persons known or reasonably believed to have expressed an |
| 11 | | interest in purchasing the Property; |
| 12 | g. | the Office of the Attorney General in the State of Washington; |
| 13 | h. | the Office of the Secretary of the State of Washington; |
| 14 | i. | all environmental authorities having jurisdiction over any of the |
| 15 | | Property, including the Environmental Protection Agency; |
| 16 | j. | the United States Attorney General/Department of Justice; |
| 17 | k. | the Commodity Futures Trading Commission; |
| 18 | l. | all of the Debtors' known creditors; |
| 19 | m. | all of the Easterdays' known creditors; |
| 20 | n. | all of the Sellers' unknown creditors through publication |
| 21 | | ("Publication Notice"); and |
| 22 | o. | all other parties that have filed a notice of appearance and demand |
| 23 | | for service of papers in these chapter 11 cases under Bankruptcy |
| 24 | | Rule 9010(b) and in any limited or ancillary proceeding in |
| 25 | | connection with these chapter 11 cases. |
| 26 | | |
| 27 | | DOCS_SF:105437.3<br>FORM OF SALE ORDER – Page 5 |
| 28 | | |

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec01cx01m7

E.     In accordance with the provisions of the Bid Procedures Order, the Supplemental Bidding Procedures Order, and the Purchase and Sale Agreement, the Sellers have served notice of the following upon the counterparties to the Sellers' executory contracts and unexpired leases: (i) that the Sellers may seek to assume and assign certain executory contracts and unexpired leases (the "<u>Assigned and Assumed Leases and Contracts</u>") on the Closing Date; (ii) the title of the Assigned and Assumed Contracts and Leases, (iii) the name of the counterparty to the Assigned and Assumed Contracts and Leases, (iv) the Sellers' good faith estimates of the cure amounts required in connection with such Assigned and Assumed Contracts and Leases, (v) the identity of the Buyer, (vi) the deadline by which any such Assigned and Assumed Contracts and Leases counterparty may file an objection to the proposed assumption and assignment and/or cure, and the procedures relating thereto, and (vii) that such Assigned and Assumed Contracts and Leases counterparty's failure to object timely to the proposed assumption or cure amount will be deemed to be consent to such assumption and cure amount. The service of such notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of the assumption and assignment of or establishment of a cure amount for the Assigned and Assumed Leases and Contracts.  Each of the counterparties to the Assigned and Assumed Leases and Contracts has had an opportunity to object to the assumption and assignment of its applicable Assigned and Assumed Leases and Contracts and the cure amounts set forth in such notice.

F.     The Sellers have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion, including, without limitation, determination of the final cure amounts.

G.     The notice of the Bid Procedures, Sale Notice, and Publication Notice provided all Parties-in-Interest with timely and proper notice of the proposed Sale of

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

the Property to the Buyer, the Auction, and the Sale Hearing, and any deadlines to object to the Sale of the Property to the Buyer.

H.     As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate, and sufficient notice of the Motion, Auction, Sale Hearing, and Sale has been provided in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006 and 9014 to all Parties-in-Interest. The Debtors have also complied with all obligations to provide notice of the Motion, Auction, Sale Hearing, and Sale required by the Bid Procedures Order and Supplemental Bidding Procedures Order, including notice by publication of the designation of the Buyer as the Stalking Horse Bidder and the deadline to object to the Sale of the Property to the Stalking Horse Bidder or Successful Purchaser. The notices described above were good, sufficient, and appropriate under the circumstances, and no further or other notice of the Motion, Supplemental Bidding Procedures Motion, Auction, Sale Hearing, Sale, or assumption and assignment of the Assigned and Assumed Contracts and Leases is required.

I.     Disclosures of the Purchase and Sale Agreement, Auction, Sale, Sale Hearing, and the assumption and assignment of the Assigned and Assumed Leases and Contracts were good, complete, and adequate, and reasonable opportunity to object or to be heard regarding the Sale was afforded to all Parties-in-Interest.

**Good Faith of the Buyer**

J.     The Buyer is not an "insider" or otherwise an "affiliate" of any of the Sellers, as those terms are defined in section 101(31) of the Bankruptcy Code.

K.     The Buyer is purchasing the Property in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of those provisions, and otherwise has proceeded in good faith in all respects in connection with the Sale in that, *inter alia*: (i) the Sellers were

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec01cx01m7

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 94 of 379

free to deal with any other party interested in acquiring the Property in accordance with the Bid Procedures; (ii) the Buyer complied with the provisions of the Bid Procedures Order; (iii) the Buyer agreed to submit its bid, in the form of the Purchase and Sale Agreement, to the competitive Bid Procedures set forth in the Bid Procedures Order; (iv) all payments and other consideration to be provided by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (v) the Buyer has not engaged in any action or inaction that would cause or permit the Purchase and Sale Agreement or the Sale to be avoided or would impose any costs or damages under section 363(n) of the Bankruptcy Code; (vi) no common identity of directors or controlling stockholders exists between the Buyer and the Sellers; (vii) the negotiation and execution of the Purchase and Sale Agreement was at arms' length and in good faith at all times; and (viii) the Purchase and Sale Agreement was not entered into for the purpose of hindering, delaying, or defrauding present or future creditors of the Sellers, and neither the Sellers nor the Buyer is entering into the Purchase and Sale Agreement, or proposing to consummate the Sale, fraudulently, for the purpose of statutory and common law fraudulent conveyance, fraudulent transfer, or voidable transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

L.     In the absence of a stay pending appeal, the Buyer is authorized to rely on this Order in closing the Sale on the terms and conditions set forth in the Purchase and Sale Agreement and this Order.

## **Highest and Best Offer**

M.     With the full cooperation of the Easterdays, the Debtors conducted an extensive marketing and sale process in accordance with, and have otherwise

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

complied in all material respects with, the Bid Procedures Order. The sale process set forth in the Bid Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Property.

N.      Based upon the Bid Procedures approved pursuant to the Bid Procedures Order, the Debtors determined that the bid evidenced by the Purchase and Sale Agreement is the highest and best offer for the Property.

O.      The Sale memorialized in the Purchase and Sale Agreement constitutes the highest and best offer for the Property and will provide a greater recovery for the Debtors, the Debtors' estates, and the Easterdays' creditors than would be provided by any other available alternative. The Debtors' determination that the Purchase and Sale Agreement constitutes the highest and best offer constitutes a valid and sound exercise of business judgment by the respective Sellers.

P.      The Property was adequately marketed by the Sellers and their advisors, and the consideration provided by the Buyer under the Purchase and Sale Agreement constitutes the highest and best offer for the Property and will provide greater recoveries for the Sellers' creditors than would be provided by any other available alternative.

Q.      The Purchase and Sale Agreement represents a fair and reasonable offer to purchase the Property under the circumstances of the Chapter 11 Cases.  No other person or entity or group of entities has offered to purchase the Property for greater economic value to the Debtors' estates, including to creditors of the Easterdays who are not parties-in-interest in the Debtors' cases, than the Buyer.

R.      Approval of the Motion and the Purchase and Sale Agreement and the consummation of the Sale are in the best interests of the Debtors, their creditors, their estates, and the creditors of each of the Easterdays and other parties-in-interest.

DOCS_SF:105437.3
FORM OF SALE ORDER – Page 9

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

S.     The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the Sale.

### No Fraudulent Transfer

T.     The consideration provided by the Buyer to the Sellers, and received by the Sellers, is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

U.     The Buyer is not a successor to the Sellers by reason of any theory of law or equity, and the Buyer shall not assume or in any way be responsible for any liability or obligation of any of the Sellers or their respective estates by reason thereof. The Buyer is not a mere continuation of the Debtors or their estates or the Easterdays or their respective estates, as applicable, and there is no continuity between the Buyer and any of the Sellers. The Buyer is not holding itself out to the public as a continuation of the Sellers. The Buyer is not a successor to the Debtors or their estates or the Easterdays or their respective estates, as applicable, and the Sale does not amount to a consolidation, merger, or de facto merger of the Buyer and any of the Sellers.

### Validity of Transfer

V.     The Sellers have full corporate power and authority to execute and deliver the Purchase and Sale Agreement and all other documents contemplated thereby and to perform their obligations thereunder, and no further consents or approvals are required for the Sellers to consummate the Sale, except as otherwise set forth in the Purchase and Sale Agreement.

W.     The transfer of the Property and the assumption and assignment of the Assigned and Assumed Leases and Contracts to the Buyer will be as of the Closing

DOCS_SF:105437.3
FORM OF SALE ORDER – Page 10

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Date a legal, valid, and effective transfer of such Property and the Assigned and Assumed Leases and Contracts, and vests or will vest the Buyer with all rights, title, and interest of the Sellers to the Property free and clear of all Claims, Rights and Encumbrances accruing, arising or relating thereto any time prior to or on the Closing Date, except as set forth in the Purchase and Sale Agreement.

### **Section 363(f) of the Bankruptcy Code**

X. The Purchase Agreement is conditioned upon the sale of the Property to the Buyer, and the assumption, assignment and/or sale of the Assigned and Assumed Leases and Contracts to the Buyer, free and clear of all Claims, Rights and Encumbrances.

Y. The Sellers may sell the Property free and clear of all Claims, Rights and Encumbrances because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Those holders of Claims, Rights and Encumbrances who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code. As to any other holders of Claims, Rights and Encumbrances who filed objections to the Motion not otherwise withdrawn at the Sale Hearing, such Claims, Rights and Encumbrances fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Claims, Rights and Encumbrances either paid in full or assumed by the Buyer upon the Closing Date, or attach to the cash proceeds of the Sale ultimately attributable to the Property in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any and all claims and defenses the Sellers may possess with respect thereto.

Z. The Buyer shall have no obligations with respect to any liabilities of the Sellers except as specifically set forth in, and solely to the extent provided pursuant to,

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec01cx01m7

the Purchase and Sale Agreement, and the Sale will not subject the Buyer or any of the Buyer's assets to any liability for any Claims, Rights, and Encumbrances whatsoever (including, without limitation, under any theory of equitable law, antitrust, setoff, or successor or transferee liability).

AA.  The Buyer would not enter into the Purchase and Sale Agreement and would not consummate the Sale, thus adversely affecting the Debtors, their estates, creditors, employees, the Easterdays and their creditors, and other parties in interest, if the sale of the Property was not free and clear of all Claims, Rights, and Encumbrances or if the Buyer would, or in the future could, be liable for any Claims, Rights, and Encumbrances. The Buyer would not consummate the Sale unless the Purchase and Sale Agreement specifically provides, and this Court specifically orders, that none of the Buyer, its assets, and the Property will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Claims, Rights, and Encumbrances, or any successor or transferee liability for any of the Sellers.

### Assigned and Assumed Leases and Contracts

BB.  The assumption and assignment of the Assigned and Assumed Leases and Contracts pursuant to the terms of this Order is integral to the Purchase and Sale Agreement and is in the best interests of the Sellers and their parties-in-interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

CC.  The respective amounts set forth on **Exhibit 2** attached hereto are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Assigned and Assumed Contracts and Leases (the "Cure Amounts").

DOCS_SF:105437.3
FORM OF SALE ORDER – Page 12

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec01cx01m7

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 99 of 379

DD.  Adequate assurance exists that the Cure Amounts required to be paid under the Purchase and Sale Agreement will be paid and the Buyer will fully perform all future obligations under the Assigned and Assumed Leases and Contracts assumed and assigned to the Buyer under the Purchase and Sale Agreement within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

### Compelling Circumstances for an Immediate Sale

EE.  To maximize the value of the Property, it is essential that the Sale occur within the time constraints set forth in the Purchase and Sale Agreement.  Time is of the essence in consummating the Sale.

FF.  Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the purchase price under the Purchase and Sale Agreement, the proposed Sale to the Buyer on the terms set forth in the Purchase and Sale Agreement constitutes a reasonable and sound exercise of the Sellers' business judgment and should be approved.

GG.  The consummation of the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) and all applicable requirements of such sections have been complied with in respect of the transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

### General Provisions

1.  The relief request in the Motion is granted and approved, and the Sale contemplated thereby and by the Purchase and Sale Agreement is approved as set forth in this Order.

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to this Court or by stipulation filed with this Court, and all reservations of rights included therein, are hereby overruled on the merits or the interests of such objections have been otherwise satisfied or adequately provided for.

**Approval of the Purchase and Sale Agreement**

3.      The Purchase and Sale Agreement, and all the terms and conditions thereof, are hereby approved.

4.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale of the Property to the Buyer pursuant to and in accordance with the terms of the Purchase and Sale Agreement, (b) close the Sale as contemplated by the Purchase and Sale Agreement and this Order, and (c) execute and deliver, perform under, consummate, implement and close fully the Purchase and Sale Agreement, together with all additional instruments and documents that may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase and Sale Agreement and such other ancillary documents.

5.      This Order shall be binding in all respects upon the Sellers, all creditors of any Seller, all holders of equity interests in any Seller, all holders of any interests, liens, claims, liabilities and encumbrances (whether known or unknown) against any Seller or on all or any portion of the Property, all counterparties to the Assigned and Assumed Leases and Contracts, the Buyer and all successors and assigns of the Buyer, and any trustees, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 of the Bankruptcy Code of any of the Debtors' cases. This Order and the Purchase and Sale Agreement shall inure to the benefit of the Debtors, their estates, and the Easterdays' creditors, their estates, as applicable, the

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec01cx01m7

Buyer, and any of the successors and assigns of the foregoing. In the event the Debtors' Cases are dismissed, this Order shall remain enforceable by the Buyer in any court of competent jurisdiction notwithstanding any order dismissing the Debtors' Cases.

**Transfer of the Assets**

6. Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Sellers are authorized to consummate the Sale as set forth in the Purchase and Sale Agreement and transfer the Property on the Closing Date. Such Property shall be transferred to the Buyer "as is where is" with all faults subject to and in accordance with the Purchase and Sale Agreement upon and as of the Closing Date, and upon Buyer's payment in full of the Purchase Price, such transfer shall constitute a legal, valid, binding, and effective transfer of the Property free and clear of all Claims, Rights and Encumbrances. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of title to the Property, including but not limited to the Assigned and Assumed Leases and Contracts shall be free and clear of any and all interests, liens, claims, liabilities and encumbrances (including, without limitation, any and all claims pursuant to any successor-in-interest or fraudulent transfer liability theory). To the extent such interests, liens, claims, liabilities and encumbrances are not paid in full or assumed by Buyer upon the Closing Date, all interests, liens, claims, liabilities and encumbrances on the Property shall attach solely to the proceeds of the Sale with the same validity, priority, force, and effect that they now have as against the Property, subject to any and all claims and defenses the Sellers and their estates may possess with respect thereto.

7. Except as expressly permitted or otherwise specifically provided in the Purchase and Sale Agreement or this Order, all persons or entities holding interests, liens, claims, liabilities and encumbrances in all or any portion of the Property arising

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

under or out of, in connection with, or in any way relating to the Sellers, the Property, the operation of the Sellers' business prior to the Closing Date, the consummation of the Sale and transfer of the Property to the Buyer, hereby are forever barred, estopped and permanently enjoined from asserting against the Buyer, or its successors or assigns, and the Property, such persons' or entities' interests, liens, claims, liabilities and encumbrances in and to the Property and/or against the Buyer. On the Closing Date, each creditor is authorized to execute such documents and take all other actions as may be necessary to release interests, liens, claims, liabilities and encumbrances on the Property, if any, as provided herein, as such interests, liens, claims, liabilities and encumbrances may have been recorded or may otherwise exist. The Sale authorized herein shall be of full force and effect, regardless of any Sellers' lack of good standing in any jurisdiction in which such Seller is formed or authorized to transact business. Upon consummation of the Sale set forth in the Purchase and Sale Agreement, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect or otherwise notice any lien or encumbrance with respect to the Property (but not the proceeds thereof) that is extinguished or otherwise released pursuant to this Order under section 363 and the related provisions of the Bankruptcy Code.

8.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Sellers to sell and transfer the Property to the Buyer in accordance with the terms of the Purchase and Sale Agreement and this Order.

9.     All persons and entities that are in possession of some or all of the Property on the Closing Date are directed to surrender possession of such Property to the Buyer or its assignee at Closing.

DOCS_SF:105437.3
FORM OF SALE ORDER – Page 16

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

10. The provisions of this Order authorizing the Sale of the Property by the Sellers free and clear of interests, liens, claims, liabilities and encumbrances shall be self-executing, and none of the Sellers, the Buyer, or any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents, or other instruments to effectuate, consummate, and/or implement the provisions hereof with respect to the Sale; *provided*, *however*, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the Purchase and Sale Agreement.

11. Without limiting the foregoing, a certified copy of this Order may be filed with the appropriate clerk and/or recorded to act to cancel any of the Claims, Rights and Encumbrances on the Property of record.

12. If any person or entity that has filed statements or other documents or agreements evidencing interests, liens, claims, liabilities and encumbrances on all or a portion of the Property shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Buyer for the purpose of documenting the release of all interests, liens, claims, liabilities and encumbrances on the Property, which the Person or entity has or may assert with respect to all or any portion of the Property, the Sellers are hereby authorized, and the Buyer is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Property.

13. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec01cx01m7

local officials and all other persons or entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any agreement or lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase and Sale Agreement.

14.    Any and all governmental recording offices and all other parties, persons or entities are authorized to accept this Order for recordation on or after the Closing as conclusive evidence of the free and clear, and unencumbered, transfer of all rights, title, interest in, and ownership of and to the Property conveyed to the Buyer at Closing.

### Assigned and Assumed Leases and Contracts

15.    The Debtors are authorized to assume and assign each contract or lease that becomes an Assigned and Assumed Lease and Contracts to the Buyer free and clear of all interests, liens, claims, liabilities and encumbrances as described herein and in the Purchase and Sale Agreement. The payment of the applicable Cure Amounts (if any) in accordance with the Purchase and Sale Agreement shall (a) effect a cure of all defaults existing thereunder as of the Closing Date and (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default. The Buyer shall then have assumed the Assigned and Assumed Lease and Contract and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assigned and Assumed Lease and Contract shall not be a default thereunder. After the Closing Date, the Sellers shall not have any further liabilities to the counterparties to the Assigned and Assumed Lease and Contract.

DOCS_SF:105437.3
FORM OF SALE ORDER – Page 18

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec01cx01m7

16.     Any provisions in any Assigned and Assumed Lease and Contract that prohibit or condition the assignment of such Assigned and Assumed Lease and Contract or allow the counterparty to such Assigned and Assumed Lease and Contract to terminate, recapture, impose any penalty, condition a renewal or extension or modify any term or condition upon the assignment of such Assigned and Assumed Lease and Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of any of the Assigned and Assumed Leases and Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all rights, title, and interest of the Sellers under the Assigned and Assumed Contract or Lease.

17.     Upon the assumption of any of the Assigned and Assumed Leases and Contracts and the payment of the relevant Cure Amounts, if any, in accordance with the Purchase and Sale Agreement, the Buyer shall be deemed to be substituted for the Sellers as a party to the applicable Assigned and Assumed Leases and Contracts, and the Sellers shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, of any further liability under those Assigned and Assumed Leases and Contracts.

18.     Upon the payment of the applicable Cure Amount, if any, the Assigned and Assumed Leases and Contracts will remain in full force and effect, and no default shall exist under any of the Assigned and Assumed Leases and Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

19.     The Buyer has provided adequate assurance of future performance under the relevant Assigned and Assumed Leases and Contracts within the meaning of

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec01cx01m7

sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

20.    There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Sellers as a result of the assumption and assignment of the Assigned and Assumed Leases or Contracts.

21.    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all counterparties to the Assigned and Assumed Leases and Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors or the Buyer any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the applicable Assigned and Assumed Leases and Contracts existing as of the Closing Date or arising by reason of the Closing.

## **Other Provisions**

22.    Effective upon the Closing Date, all persons and entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, its successors and assigns, its property, or the Property, with respect to any (a) interest arising under, out of, in connection with or in any way relating to the Sellers, the Buyer, the Property or the operation of the businesses to which the Property relates prior to or in connection with or relating to the Closing of the Sale, or (b) successor liability or liability under any other theory at law or in equity, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Buyer, its successors or assigns, assets or properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Buyer, its successors or assigns, assets or properties; (iii) creating, perfecting, or enforcing any interest against the Buyer, its successors or assigns, assets

DOCS_SF:105437.3
FORM OF SALE ORDER – Page 20

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

or properties; (iv) asserting any setoff, right or subrogation, or recoupment of any kind against any obligation due the Buyer or its successors or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; (vi) revoking, terminating or failing or refusing to issue or renew any licenses, permits or authorizations to operate any of the Property or conduct any of the businesses operated with the Property or (vii) commencing any action, in any manner or place, arising from, out of, or in connection with the negotiation and formulation of the Purchase and Sale Agreement, and the consummation of the Sale, including any actions necessary in aid thereof.

23. Except for the Assigned and Assumed Leases and Contracts, or as otherwise expressly set forth in this Order or the Purchase and Sale Agreement, the Buyer shall not have any liability or other obligation of the Sellers arising under or related to any of the Property. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Purchase and Sale Agreement, the Buyer shall not be liable for any claims against the Sellers or any of their predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Sellers or any obligations of the Sellers arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Property prior to the Closing. The Buyer has given substantial, fair and reasonably equivalent consideration under the Purchase and

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Sale Agreement for the benefit of the holders of any interests, liens, claims, liabilities and encumbrances. The consideration given by the Buyer shall constitute valid and valuable consideration for the releases of any potential claims of successor or transferee liability of the Buyer, which releases shall be deemed to have been given in favor of the Buyer by all holders of interests, liens, claims, liabilities and encumbrances against any of the Sellers or in any of the Property.

24. The Sale contemplated by the Purchase and Sale Agreement is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code and applicable law, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assigned and Assumed Leases or Contracts), unless such authorization and consummation of the Sale are duly stayed pending such appeal. The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

25. The Sale contemplated in the Purchase and Sale Agreement may not be avoided, and no damages may be assessed against the Buyer under section 363(n) of the Bankruptcy Code.

26. This Order and the Purchase and Sale Agreement shall be binding in all respects upon all creditors (whether known or unknown), counterparties, and Parties-in-Interest, the Debtors, and their affiliates, the Buyer, and any subsequent trustees appointed in the Chapter 11 Cases or upon a conversion to Chapter 7 under the Bankruptcy Code, and shall not be subject to rejection. Nothing contained in any plan of reorganization or liquidation, or order of any type or kind (including any order dismissing the Debtors' bankruptcy cases) entered in (a) these chapter 11 cases, (b)

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

any subsequent chapter 7 case into which any such chapter 11 case may be converted, or (c) any related proceeding subsequent to the entry of this Order, shall conflict with or derogate from the provisions of the Purchase and Sale Agreement or the terms of this Order.

27.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h) and 6006(d), this Order shall be effective immediately upon entry and the Sellers and the Buyer are authorized to close the Sale immediately upon entry of this Order. The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase and Sale Agreement or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence; *provided however*, that this Court shall retain exclusive jurisdiction over any and all disputes and matters arising from or related to the Purchase and Sale Agreement, the Sale and the implementation, interpretation, and enforcement of this Order.

28.     No bulk sales or any similar law of any state or jurisdiction applies in any way to the Sale.

29.     Except for Root Realty, there are no other brokers involved in consummating the Sale for the Sellers and no other brokers' commissions are due and owed by the Sellers.

30.     The failure to specifically include any particular provision of the Purchase and Sale Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Purchase and Sale Agreement be authorized and approved in its entirety.

31.     The Purchase and Sale Agreement and any related agreements, documents or other instruments (other than this Order) may be modified, amended or

DOCS_SF:105437.3
FORM OF SALE ORDER – Page 23

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec01cx01m7

supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates, the Sellers and any estate of any of the Sellers, if applicable, or any Parties-in-Interest to any of the foregoing.

32.     To the extent there are any inconsistencies between the terms of this Order and the Purchase and Sale Agreement (including any ancillary documents executed in connection therewith), the terms of this Order shall govern.

33.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

34.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern.

35.     This Court shall retain jurisdiction to, among other things, interpret, implement and enforce the terms of the Order and the Purchase and Sale Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Sellers and/or Debtors are a party or which had been assigned by the Sellers and/or Debtors to the Buyer, to protect the Buyer and its assets, including the Property, against any Claims, Rights, and Encumbrances and to adjudicate, if necessary, any and all disputes relating in any way to the Sale.

/// END OF ORDER ///

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Presented by:

*/s/ Draft*
THOMAS A. BUFORD, III (WSBA 52969)
BUSH KORNFELD LLP

RICHARD M. PACHULSKI (admitted *pro hac vice*)
JEFFREY W. DULBERG (admitted *pro hac vice*)
MAXIM B. LITVAK (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP

*Attorneys for Debtors and Debtors in Possession*

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

ec01cx01m7

Exhibit G
Title Affidavit

## AFFIDAVIT AND INDEMNITY BY OWNER
### EXTENDED COVERAGE POLICIES

WHEREAS the undersigned Affiant (if more than one, herein collectively called the Affiant) is the owner of the land (the Land) described in that certain Commitment for Title Insurance issued by CHICAGO TITLE INSURANCE COMPANY (the Company) under No. _____ (the Commitment), for an ALTA Owner's and/or Loan Policy of title insurance (the Policy or Policies),

AND WHEREAS, the Proposed Insured(s) under said Commitment is/are requesting the Company to issue its Policy or Policies with Extended Coverage, and to delete therefrom the General Exceptions relating to rights or claims of parties in possession, survey matters, unrecorded easements and statutory lien rights for labor or materials, or other matters determinable only by survey, inspection or inquiry,

AND WHEREAS the Affiant acknowledges that the Company would refrain from issuing said Policy or Policies without showing said General Exceptions in the absence of the representations, agreements and undertakings contained herein.

Nothing contained herein shall be construed so as to obligate the Company to issue said Policy or Policies without showing said General Exceptions. However, should the Company do so, it will do so in part in reliance upon the undertakings of the undersigned Affiant. The issuance of the Policy or Policies shall be the consideration for the undertakings contained herein.

The Company reserves the right to require additional indemnification and/or a survey in connection with analyzing its risk in deleting said General Exceptions, and to take special exception for any adverse matters disclosed by this affidavit, a survey or an inspection of the Land.

# AFFIDAVIT

The Affiant, being first duly sworn, deposes and says that:

1.  Said Land has been owned and occupied by the Affiant for _____ years and the Affiant's enjoyment thereof has been peaceable and undisturbed. There are no other persons (including trusts, corporations, partnerships or limited liability companies) which assert an interest in the property, except (if none, state "**None**"):

2.  The Land at present is in use as: _____.

3.  There are no oral or written leases, tenancies or other occupancies, nor any rights of first refusal or options to purchase said land, except (attach list, if necessary, and attach copies of any written agreements or rent rolls, if any; if none, state "**None**"):

4.  There are no contracts for the making of repairs or for new construction on said Land or for the services of architects, engineers or surveyors, nor are there any unpaid bills or claims for labor or services performed or material furnished or delivered during the last twelve (12) months for alterations, repair work or new construction on said Land, including site preparation, soil tests, site surveys, demolition, etc., except (if none, state "**None**"):

5. Neither the Affiant nor any principal of the Affiant has filed a petition for bankruptcy, which action is pending, nor is Affiant a party to any pending action, nor has Affiant been served with a summons and complaint nor received any notice of any action which is pending against Affiant, except (if none, state "**None**"):

6. There are no unpaid or unsatisfied (1) mortgages, deeds of trust, contracts, security agreements, claims of lien, or judgments, (2) special assessments for sewer, water, road or other local improvement districts, or taxes, including taxes or special assessments which are not yet payable or which are not shown as existing liens by the public records, or (3) service, installation, connection, tap, capacity or construction charges for sewer, water, electricity, natural gas or other utilities, or garbage collection and disposal, which are not shown in the referenced commitment, except (if none, state "**None**"):

7. There are no unpaid amounts of public funds advanced under the provisions of one or more various federal acts relating to heath care (including, but not limited to, the Hill-Burton Act (Title 42 USCA, §291, et seq.) or under any state statutes enacted pursuant thereto, which would constitute a lien against the Land.

## INDEMNITY

The Affiant hereby agrees (1) to indemnify, protect, defend and save harmless the Company from and against any and all loss, costs, damages, and attorney's fees it may suffer, expend or incur under or by reason, or in consequence of or growing out of any such matters not identified in the above affidavit, and (2) to defend at the Affiant's own costs and charges in behalf of and for the protection of the Company and of any parties insured or who may be insured against loss by it under said Policy or Policies (but without prejudice to the right of the Company to defend at the expense of the Affiant if it so elects) any every suit, action or proceeding in which any such matters may be asserted or attempted to be asserted, established or enforced with respect to said Land.

IN WITNESS WHEREOF, the undersigned has/have executed this agreement this _____ day of _____, 20_____.

_____

_____

| Affiant/Indemnitor Name *[Please type or print]*: |
| Address: |
| Telephone: |

| *[Individual Acknowledgment. Attach appropriate form if corporation, partnership or limited liability company]* |

STATE OF                          )
                                  ) SS.:
COUNTY OF                         )

On this day personally appeared before me _____ and _____, to me known to be the individual(s) described in and who executed the within and foregoing instrument and

acknowledged to me that he/she/they signed the same as his/her/their free and voluntary act and deed for the purposes therein mentioned.

Given under my hand and official seal this _____ day of _____, 20_____.

_____
Notary Public in and for the State of _____, residing at _____
My Commission expires: _____

# AFFIDAVIT AND INDEMNITY BY OWNER
## EXTENDED COVERAGE POLICIES

WHEREAS, I, [_____], am a Co-Chief Restructuring Officer (a "CRO") of [_____] Easterday Ranches, Inc., a Washington corporation ("Ranches"), Easterday Farms, a Washington general partnership ("Farms" and, collectively with Ranches, "Affiants"), each a debtor and debtor in possession in the United States Bankruptcy Court for the Eastern District of Washington, Yakima Division (the "Bankruptcy Court"), Ranches in Case No. 21-0041-WLH11 and Farms in Case No. 21-00176-WLH11) (such cases are collectively referred to herein as the "Cases").


WHEREAS, to CRO's knowledge (which, for purposes of this Affidavit, means my actual, current knowledge, without inquiry) the undersigned Affiants are the owners of the land (the Land) described in those certain Commitments for Title Insurance issued by CHICAGO TITLE INSURANCE COMPANY (the Company) under Nos. _____ (collectively, the "Commitment"), for an ALTA Owner's Policy of title insurance (the "Policy" or "Policies"),

AND WHEREAS, the Proposed Insured(s) under said Commitment is/are requesting the Company to issue its Policy or Policies with Extended Coverage, and to delete therefrom the General Exceptions relating to rights or claims of parties in possession, survey matters, unrecorded easements and statutory lien rights for labor or materials, or other matters determinable only by survey, inspection or inquiry,

AND WHEREAS the undersigned Affiants acknowledge that the Company would refrain from issuing said Policy or Policies without showing said General Exceptions in the absence of the representations, agreements and undertakings contained herein.

Nothing contained herein shall be construed so as to obligate the Company to issue said Policy or Policies without showing said General Exceptions. However, should the Company do so, it will do so in part in reliance upon the undertakings of the undersigned Affiant. The issuance of the Policy or Policies shall be the consideration for the undertakings contained herein.

The Company reserves the right to require additional indemnification and/or a survey in connection with analyzing its risk in deleting said General Exceptions, and to take special exception for any adverse matters disclosed by this Affidavit, a survey or an inspection of the Land; provided, however, nothing in this Affidavit shall be deemed to obligate Affiants to provide any such additional indemnification or other assurances the Company may request.

# AFFIDAVIT

The Affiant, being first duly sworn, deposes and says that, to CRO's knowledge:

8.  Said Land has since CRO became Co-Chief Restructuring Officer on [_____], 2021(the period since such date, the "Relevant Period") been owned and occupied by the Affiants and the Affiants' enjoyment thereof has been peaceable and undisturbed. There are no other persons (including trusts, corporations, partnerships or limited liability companies) which assert an interest in the property, except (if none, state "**None**"):


9.  During the Relevant Period, the Land has been and at present is in use as: _____.

10. During the Relevant Period, the CRO has not authorized or approved Affiants' entering into any oral or written leases, tenancies or other occupancies, nor any rights of first refusal or options to purchase said land, except (attach list, if necessary, and attach copies of any written agreements or rent rolls, if any; if none, state "**None**"):

11. During the Relevant Period, CRO has not authorized or approved Affiants' execution of any contracts for the making of repairs or for new construction on said Land or for the services of architects, engineers or surveyors, nor, to CRO's knowledge, are there any unpaid bills or claims for labor or services performed or material furnished or delivered during the last twelve (12) months for alterations, repair work or new construction on said Land, including site preparation, soil tests, site surveys, demolition, etc., except (if none, state "**None**"):

12. Except as may be set forth in the in the schedules filed by Affiants in connection with the Cases (or either of them), there are no unpaid or unsatisfied (1) mortgages, deeds of trust, contracts, security agreements, claims of lien, or judgments, (2) special assessments for sewer, water, road or other local improvement districts, or taxes, including taxes or special assessments which are not yet payable or which are not shown as existing liens by the public records, or (3) service, installation, connection, tap, capacity or construction charges for sewer, water, electricity, natural gas or other utilities, or garbage collection and disposal, which are not shown in the referenced Commitment, except (if none, state "**None**"):

13. There are no unpaid amounts of public funds advanced during the Relevant Period under the provisions of one or more various federal acts relating to heath care (including, but not limited to, the Hill-Burton Act (Title 42 USCA, §291, et seq.) or under any state statutes enacted pursuant thereto, which would constitute a lien against the Land, except (if none, state "**None**"):

## INDEMNITY

The Affiant hereby agrees (1) to indemnify, protect, defend and save harmless the Company from and against any and all loss, costs, damages, and attorney's fees it may suffer, expend or incur to the extent arising under or by reason, or in consequence of or growing out of any  breach or violation of the statements made in the above affidavit, and (2) to defend at the Affiant's own costs and charges on behalf of and for the protection of the Company and of any parties insured or who may be insured against loss by it under said Policy or Policies (but without prejudice to the right of the Company to defend at the expense of the Affiant if it so elects) any and every suit, action or proceeding in which any  matters the existence of which constitute a breach or violation of the statements made by Affiant herein may be asserted or attempted to be asserted, established or enforced with respect to said Land.

IN WITNESS WHEREOF, the undersigned has/have executed this agreement this _____ day of _____, 20_____.

| |
|---|
| Affiant/Indemnitor Name *[Please type or print]*: |
| Address: |
| Telephone: |

_____

_____

*[Individual Acknowledgment. Attach appropriate form if corporation, partnership or limited liability company]*

STATE OF                )
                       ) SS.:
COUNTY OF        )

On this day personally appeared before me _____ and _____, to me known to be the individual(s) described in and who executed the within and foregoing instrument and acknowledged to me that he/she/they signed the same as his/her/their free and voluntary act and deed for the purposes therein mentioned.

Given under my hand and official seal this _____ day of _____, 20_____.

_____
Notary Public in and for the State of _____, residing at _____
My Commission expires: _____

Schedule 1.1
Easterday Land

## COX FARM
## <u>LEGAL DESCRIPTION</u>

- **<u>Cody Allen Easterday and Debby Easterday, husband and wife; and The Heirs and Devisees of Gale A. Easterday; and Karen L. Easterday, as her separate estate.</u>**

PARCEL A: (119602000001000 and 119602000002001)

That portion of Section 19, Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

Beginning at the Northwest corner of said Section 19;
Thence South along the West line of said Section 19, a distance of 925.00 feet at the True Point of Beginning;
Thence South 62°15'12" East a distance of 881.00 feet;
Thence South parallel to the said West line a distance of 1,390.00 feet;
Thence North 62°15'12" West a distance of 881.00 feet to a point on the West line of said Section 19;
Thence North along said West line a distance of 1,390.00 feet to the True Point of Beginning.

- **<u>The Heirs and Devisees of Gale A. Easterday, deceased and Karen L. Easterday, as her separate estate, as to an undivided half interest; and Cody A. Easterday and Debby Easterday, husband and wife, as to an undivided half interest, as tenants in common.</u>**

PARCEL L: (113690000000000)

Section 13, Township 6 North, Range 29 East, W.M., Benton County, Washington, EXCEPT the East 30 feet thereof conveyed to Benton County for road purposes by Deeds recorded under Auditor's File Nos. 624663 and 624765.

PARCEL M: (114690000000000)

Section 14, Township 6 North, Range 29 East, W.M., Benton County, Washington

PARCEL N: (112693000000000)

The South half of the Southwest quarter and the Southeast quarter of Section 12, Township 6 North, Range 29 East, W.M., Benton County, Washington, less portions described as follows:

4831-5589-2454v.18 0117168-000002

(Parcel 1) Measured along the West section line from the Southwest corner of the North half of the Southwest quarter South 298.00 feet;
thence in an Easterly direction to a point 269.00 feet South of the Southeast corner of the North half of the Southwest quarter;
thence North to the Southeast corner of the North half of the Southwest quarter;
thence West to Point of Beginning.

(Parcel 2) From the Northeast corner of the North half of the Southwest quarter South along the East line of said North half of the Southwest quarter to a point 269.00 feet South of the Southeast corner of the North half;
thence East 27.00 feet;
thence North in a straight line to a point 10.00 feet East of the Northeast corner of the North half of the Southwest quarter.

(Parcel 3) From the Northeast corner of the North half of the Southwest quarter South 136.00 feet; thence in an Easterly direction to a point 52.00 feet South of the Southeast corner of the North half of Section 12;
thence North along said Section line to the Southeast corner of the North half of Section 12;
thence West along the South line of the North half of Section 12 to Point of Beginning. (These 3 parcels taken from judgment filed in Benton County Cause No. 18881);
EXCEPT ALSO portion conveyed to Benton County for road purposes by Deed recorded Under Auditors File No. 624764

PARCEL O: (111690000000000)

Section 11, Township 6 North, Range 29 East, W.M., Benton County, Washington,

EXCEPT portions conveyed to Benton County for road purposes by Deeds recorded under Auditor's File Nos. 466635, 624663, 624763, 633680 and 633861.


- **Leasehold Parcel E:  Irrigated Cash Lease commencing January 1, 2017, by the State of Washington, Department of Natural Resources (Lessor) and Cody Easterday, Debby Easterday, Gale Easterday, and Karen Easterday (Lessee).**

PARCEL E: (836690000000000)

All of Section 36, Township 6 North, Range 29 East, W.M., Benton County, Washington.

4831-5589-2454v.18 0117168-000002

# RIVER FARM
## LEGAL DESCRIPTION

- **The Heirs and Devisees of Gale A. Easterday, deceased, and Karen L. Easterday, as her separate estate, as to an undivided half interest; and Cody A. Easterday and Debby Easterday, husband and wife, as to an undivided half interest.**

PARCEL 34: (122602000000000 and 127602000000000)

Section 22, Township 6 North, Range 30 East, W.M., Benton County, Washington, and the North 1/2 of Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT the Southeast quarter of the Northeast quarter of said Section 27; AND ALSO EXCEPT that portion of said Section 22 and Section 27 lying Easterly of the following described centerline:

Commencing at the West quarter corner of said Section 27;
thence North 88°25'05" East 830.79 feet along the South line of the North half thereof to the centerline of the existing river access road and the True Point of Beginning;
thence along said centerline the following bearings and distances;
thence North 13°32'32" East 413.89 feet;
thence North 33°24'40" East 417.71 feet;
thence North 24°32'16" East 125.14 feet;
thence North 32°34'43" East 390.24 feet;
thence North 42°10'26" East 267.96 feet;
thence North 30°03'57" East 148.51 feet;
thence North 12°20'25" East 264.13 feet;
thence North 04°21'08" East 341.89 feet;
thence North 16°48'23" West 63.54 feet;
thence North 45°28'04" West 46.91 feet to the intersection of an existing farm road;
thence along said centerline the following bearings and distances;
thence North 03°09'03" East 177.44 feet;
thence North 00°09'56" East 465.38 feet;
thence North 05°41'43" East 103.99 feet;
thence North 10°39'15" East 121.08 feet;
thence North 15°25'36" East 111.98 feet;
thence North 17°08'00" East 1725.87 feet;
thence North 17°26'47" East 128.61 feet;
thence North 16°34'51" East 129.88 feet;
thence North 16°24'25" East 131.77 feet;
thence North 16°08'19" East 115.56 feet;
thence North 17°04'45" East 121.58 feet;
thence North 18°06'12" East 137.21 feet;
thence North 19°19'27" East 372.24 feet;
thence North 19°55'22" East 278.61 feet;
thence North 24°45'34" East 104.38 feet;

4831-5589-2454v.18 0117168-000002

thence North 28°19'28" East 117.96 feet;
thence North 28°51'35" East 114.65 feet;
thence North 36°43'00" East 131.30 feet;
thence North 47°28'16" East 133.05 feet;
thence North 41°49'59" East 130.92 feet;
thence North 36°06'09" East 111.02 feet;
thence North 31°58'37" East 151.23 feet;
thence North 38°07'28" East 105.75 feet;
thence North 44°54'02" East 109.65 feet;
thence North 43°17'45" East 106.90 feet;
thence North 41°00'56" East 119.24 feet;
thence North 36°32'59" East 103.29 feet;
thence North 29°26'26" East 106.12 feet;
thence North 22°29'40" East 115.80 feet;
thence North 21°31'04" East 103.79 feet;
thence North 32°47'25" East 119.34 feet;
thence North 54°53'36" East 109.28 feet;
thence North 70°15'49" East 109.49 feet;
thence North 78°46'19" East 112.28 feet;
thence North 80°32'41" East 123.19 feet;
thence North 80°55'28" East 111.19 feet;
thence North 79°31'08" East 100.13 feet;
thence North 73°27'59" East 133.21 feet;
thence North 68°04'32" East 122.55 feet; to a point on the North line of said Section 22, lying South 88°53'05" West 623.99 feet from the Northeast corner thereof and the terminus of this centerline.

PARCEL 35: (121600000000000, 128601000000000, 128602000001000 and 120601000000000)

All of Section 21; the East half of the East half of Section 20; the North half and the Southwest quarter and the Northwest quarter of the Southeast quarter of Section 28, EXCEPT a parcel of land situated in the Southwest quarter of the Southwest quarter of Section 28, described as follows:

The Southwest corner of said Section 28, being the True Point of Beginning;
thence North 01°05'50" West along the West line of said Section 28 a distance of 349.60 feet; thence South 85°15'42" East a distance of 1,337.74 feet; thence South 00°00' East a distance of 221.87 feet to a point on the Southerly line of said Section 28;
thence South 89°15'32" West along said South line a distance of 1,326.59 feet to the Southwest corner of said Section 28 and the True Point of Beginning, all in Township 6 North, Range 30 East, W.M., Benton County, Washington.

PARCEL 36: (115604000001000)

2

4831-5589-2454v.18 0117168-000002

That portion of the South half of Section 15, Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

The Southeast corner of said Section 15 being the True Point of Beginning;
thence South 88°53'07" West along the Southerly line of said Section 15, a distance of 4,159.72 feet thence North 48°58'02" East a distance of 3,270.68 feet; thence South 89°58'08" East a distance of 1,653.99 feet to the Easterly line of said Section 15;
thence South 01°02'51" East along said East line a distance of 2,065.70 feet to the Southeast corner of said Section 15 and the True Point of Beginning.

PARCEL 37: (127603000002000)

An undivided one-half interest in and to:

A strip of land situate in Government Lot 4, Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, being 60 feet in width 30 feet lying on each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence North 88°35'17" East along the North line of said Government Lot 4, 168.86 feet to the True Point of Beginning of said centerline and right of way; thence South 15°38'26" East 405.51 feet; thence South 51°50'44" East 629.30 feet;
thence South 10°34'03" West 666.48 feet to the terminus of said centerline.

PARCEL 38: (127603000003000)

An undivided one-half interest in and to:

A strip of land 200 feet in width situated in Government Lot 4, Section 27, township 6 North, Range 30 East, W.M., Benton County, Washington, with 100.00 feet of said width lying in each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence South 01°03'24" East along the West line of said Section 27 a distance of 1,616.27 feet;
thence along a line perpendicular to said West line North 88°56'36" East a distance of 556.17 feet to a point on the Northwesterly right of way line of the Spokane, Portland & Seattle Railway Company, said point being the True Point of Beginning and lying Northwesterly 100.00 feet when measured perpendicular to railroad centerline station 6456+45.3 and railroad mile 207.83; thence North 21°36'15" West perpendicular to said railroad right of way a distance of 150.00 feet to the terminus of said centerline.

PARCEL 44: (107602000001001)

4831-5589-2454v.18 0117168-000002

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 123 of 379

Section 7, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT the North half of the North half thereof; AND EXCEPT portions conveyed to Benton County for road purposes by Deeds recorded under Recording Nos. 624663 and 624762.

And Also Except that portion of said Section described as follows:

Beginning at the Southwest corner of said Section 7; thence North 00°13'16" East, 1019.91 feet along the West line of said Section 7; thence South 89°44'41" East, 30.00 feet to the East line of Nine Canyon Road and the True Point of Beginning.; thence South 89°44'41" East 988.81 feet; thence South 00°13'16" West, 979.91 feet to a point 40.00 feet Northerly of the South line of said Section 7; thence North 89°44'41" West, 988.81 feet parallel with and 40.00 feet Northerly of said South line to a point on the East line of said Nine Canyon road; thence North 00°13'16" East, 979.91 feet along said East line to the True Point of Beginning.

AND ALSO EXCEPT that portion of said Section described as follows:

Beginning at the West Quarter corner of said Section 7; thence North 00°13'16" East 850.00 feet along the West line of said Section 7; thence South 89°46'44" East 60.00 to the East line of Nine Canyon Road and to the True Point of Beginning;

Thence Continuing South 89°46'44" East 950.00 feet; thence South 00°13'16" West 950.00 feet; thence North 89°46'44" West 950.37 feet to the East line of Nine Canyon Road, said point being on the arc of a 3530.00 feet Radius curve (radius point bears North 88°57'04" West); thence Northerly, 51.00 feet along said East line and along the arc of said curve through a central angle of 00°49'40"; thence North 00°13'16" East 899.01 feet along said East line to the True Point of Beginning.

PARCEL 45: (108601000000000)

Section 8, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT the North half of the Northwest quarter thereof.

PARCEL 50: (127603000001001)

Those portions of the following described property lying Northerly of the Northerly right of way line of existing Burlington Northern Santa Fe Railroad ( formerly Spokane, Portland and Seattle Railway).

Government Lot 4, Section 27, Township 6 North, Range 30 East of the Willamette Meridian, Benton County, Washington, Together with that portion of Government Lot 3 of said Section 27 lying Westerly of the following described line:

Beginning at the Northwest corner of said Section 27; thence South 1°03'20" East, 2639.97 feet along the West line of said Section 27 to the West quarter corner of said Section 27; thence North 89°12'10" East, 1783.01 feet along the North line of said Government Lots 4 and 3 to the True Point of Beginning; thence South 0°48'00" East, 1156.00 feet to the North line of the Burlington Northern Santa Fe Railroad right of way and the terminus of said line.

4831-5589-2454v.18 0117168-000002

PARCEL 51: ([128604000002001](#))

Those portions of the following described property lying Northerly of the Northerly right of way line of the existing Burlington Northern Santa Fe Railroad (formerly Spokane, Portland and Seattle Railway)

Government Lot 1, and the East 780 feet of the Southwest quarter of the Southeast quarter of Section 28, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington,

Except right of way for roads, and Except any portion thereof of the above described property lying below 347 feet above mean sea level, United States Coast and Geodetic Survey Datum.

PARCEL 52: ([128604000002002](#))

The Southwest quarter of the Southeast quarter of Section 28, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington lying Northwesterly of the existing Burlington Northern Santa Fe Railroad (formerly Spokane, Portland and Seattle Railway) right of way.

Except the East 780 feet thereof

PARCEL 54: ([133601000001000](#))

Those portions of the following described property lying Northerly of the Northerly right of way line of the existing Burlington Northern Santa Fe Railroad ( formerly Spokane, Portland and Seattle Railway);

The East 780 feet of Government Lot 1, Section 33, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington.

Except right of way for roads, and Except any portion thereof of the above described property lying below 347 feet above mean sea level, United States Coast and Geodetic Survey Datum.

- **The Heirs and Devisees of Gale A. Easterday, deceased, and Karen L. Easterday, as her separate estate, as to an undivided half interest; and Cody A. Easterday, as to his separate estate.**

PARCEL 39: ([110603000000000](#) and [115602000000000](#))

That portion of Sections 10 and 15, Township 6 North, Range 30 East, W.M., Benton County, lying North and West of the following described line:

Beginning at the Southwest corner of said Section 15;
thence North 1°27'28" West along the West line of said Section 15, 1,060.00 feet;

5

4831-5589-2454v.18 0117168-000002

thence North 88°33'31" East 1,304.20 feet;
thence North 49°26'57" East 780.68 feet;
thence North 1°26'29" West 1,920.00 feet;
thence North 39°43'36" East 1,162.50 feet;
thence North 60°39'13" East 2,060.55 feet to the North line of said Section 15, said point being South 89°03'16" West 847.82 feet from the Northeast corner of said Section 15;
thence continuing North 60°39'13" East 522.64 feet;
thence North 0°13'17" West 1,085.00 feet to a point on the North line of the South half of the South half of said Section 10, said point being South 89°06'19" West 400 feet from the Northeast corner of said South half of the South half and the terminus of said line.

PARCEL 40: (103600000000000, 104603000000000, 109601000000000, 110601000000000, 110602000000000)

Section 3; South half of Section 4; North half of Section 9; North half of Section 10; North half of South half of Section 10; EXCEPT the South 200 feet of the East 200 feet of said Section 10; all in Township 6 North, Range 30 East, W.M., Benton County, Washington; EXCEPT Finley Road; AND EXCEPT Brown Road.

PARCEL 41: (127603000002000)

An undivided one-half interest in and to:

A strip of land situated in Government Lot 4, Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, being 60.00 feet in width with 30.00 feet lying on each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence North 88°35'17" East along the North line of said Government Lot 4, 168.86 feet to the True Point of Beginning of said centerline and right of way;
thence South 15°38'26" East 405.51 feet;
thence South 51°50'44" East 629.30 feet;
thence South 10°34'03" West 666.48 feet to the terminus of said centerline.

PARCEL 42: (127603000003000)

An undivided one-half interest in and to:

A strip of land 200 feet in width situated in Government Lot 4, Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, with 100.00 feet of said width lying on each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence South 01°03'24" East along the West line of said Section 27 a distance of 1,616.27 feet;
thence along a line perpendicular to said West line North 88°56'36" East a distance of 556.17 feet to a point on the Northwesterly right of way line of the Spokane, Portland & Seattle Railway

4831-5589-2454v.18 0117168-000002

Company, said point being the True Point of Beginning and lying Northwesterly 100.00 feet when measured perpendicular to railroad centerline station 6456+45.3 and railroad mile 207.83; thence North 21°36'15" West perpendicular to said railroad right of way a distance of 150.00 feet to the terminus of said centerline.

PARCEL 43: (109603000000000)

The South half of Section 9, Township 6 North, Range 30 East, W.M., Benton County, Washington.

- **Cody Easterday and Debby Easterday, husband and wife.**

PARCEL 56: (104601000000000)

The North half of Section 4, Township 6 North, Range 30 E.W.M., Benton County, Washington

- **The Heirs and Devisees of Gale A. Easterday, deceased, and Karen L. Easterday, as her separate estate, as to an undivided half interest; and Cody A. Easterday AND Debby Easterday, husband and wife, as to an undivided half interest.**

EASEMENT PARCEL 46:

An Easement for subsurface irrigation line being the West 60 feet of the South 1,060 feet of the Southwest quarter of Section 15, Township 6 North, Range 30 East, W.M., being a portion of the Easement created by instrument recorded August 9, 1978, under Recording No. 766691.

EASEMENT PARCEL 47:

A roadway easement 30 feet in width the centerline of which is the Easterly boundary of Parcel A described in Statutory Warranty Deed recorded July 25, 1997, under Auditor's File No. 97-17672.

EASEMENT PARCEL 48:

Together with rights described in the following easements, agreements and permits as follows:

Revocable Permit for pipeline right-of-way and for pump plant site granted by the Department of the Army Permits, recorded June 9, 1978, under Recording No. 761253, records of Benton County, Washington.

Burlington Northern, Inc., Revocable Permit, recorded June 9, 1978, under Recording No. 761251, authorizing the construction, operation and maintenance of a 36 inch water pipeline at Survey Station 6455, plus 91.9-mile post 207 plus 4,435.2 feet, in Benton County, Washington

4831-5589-2454v.18 0117168-000002

EASEMENT PARCEL 49:

An easement for ingress and egress purpose situated in Section 15, Township 6 North, Range 30, East, W.M., being 40 feet in width with 20 feet lying on either side of the following described centerline:

Beginning at the Southeast corner of said Section 15;
thence North 01°02'51" West along the East line of said Section 15, a distance of 2,681.27 feet to the true point of beginning;
thence South 89°26'31" West a distance of 352.48 feet; thence South 01°21'21" East a distance of 612.02 feet to the terminus of said line.

4831-5589-2454v.18 0117168-000002

# FARM MANAGER HOUSE
## LEGAL DESCRIPTION

- **Cody Easterday and Debby Easterday, husband and wife**

That portion of Section 7. Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

Beginning at the West Quarter corner of said Section 7; thence North 00°13'16" East 850.00 feet along the West line of said Section 7; thence South 89°46'44" East 60.00 feet to the East line of Nine Canyon Road and to the True Point of Beginning;

thence continuing South 89°46'44" East 950.00 feet; thence South 00°13'16" West 950.00 feet; thence North 89°46'44" West 950.37 feet to the East line on Nine Canyon Road, said point being on the arc of a 3530.00 feet radius curve (Radius point bears North 88°57'04" West); thence Northerly, 51.00 feet along said East line and along the arc of said curve through a central angle of 00°49'40"; thence North 00°13'16" East 899.01 feet along said East line to the True Point of Beginning.

4831-5589-2454v.18 0117168-000002

**Farm Manager House**
**Legal Description**

**GOOSE GAP FARM**
**LEGAL DESCRIPTION**

- **The Heirs and Devisees of Gale A. Easterday, deceased, Karen L. Easterday, Cody A. Easterday, Debby Easterday dba Easterday Farms, a Partnership.**

PARCEL A: ( 101703000001000 )

THAT PORTION OF THE SOUTHWEST QUARTER OF SECTION 1, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON LYING SOUTHWESTERLY OF THE KENNEWICK IRRIGATION DISTRICT MAIN CANAL, EXCEPT THE WEST 30 FEET AND THE SOUTH 30 FEET FOR ROADS.

PARCEL B: ( 111701000000000 )

THE NORTHEAST QUARTER AND THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON.

PARCEL C: ( 1127020000000000 )

THAT PORTION OF SECTION 12 TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, LYING SOUTHERLY OF THE KENNEWICK IRRIGATION DISTRICT MAIN CANAL

PARCEL E: (108713000000000)

THAT PORTION OF SECTION 8, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF SAID SECTION; THENCE EAST ALONG THE SOUTH LINE OF SAID SECTION TO THE WEST LINE OF THE NORTHERN PACIFIC IRRIGATION COMPANY'S CANAL RIGHT OF WAY (NOW COLUMBIA IRRIGATION DISTRICT); THENCE NORTHWESTERLY ALONG SAID CANAL, RIGHT OF WAY TO THE WEST LINE OF SECTION 8; THENCE SOUTH ALONG THE WEST LINE OF SAID SECTION 8 TO THE POINT OF BEGINNING.

PARCEL F: (117712000002001)

THAT PORTION OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 17, TOWNSHIP 7 NORTH, RANGE 31 EAST, WILLAMETTE MERIDIAN, BENTON COUNTY, WASHINGTON LYING WESTERLY OF THE NORTHERN PACIFIC IRRIGATION COMPANY'S CANAL RIGHT OF WAY (NOW COLUMBIA IRRIGATION DISTRICT).

4831-5589-2454v.18 0117168-000002

**Farm Manager House**
**Legal Description**

PARCEL G: ( 11871000000000 )

ALL OF SECTION 18, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON

PARCEL H: ( 113702000000000 )

THE WEST HALF OF SECTION 13, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON.

PARCEL I: ( 114703000000000 )

THAT PORTION OF SECTION 14, TOWNSHIP 7 NORTH, RANGE 30 EAST,W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE SOUTH HALF AND THE SOUTH HALF OF THE NORTHEAST QUARTER. PARCEL J: ( 123700000000000 )

ALL OF SECTION 23, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON

PARCEL K: ( 124701000000000 )

THAT PORTION OF SECTION 24, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE NORTH HALF AND THE SOUTHWEST QUARTER

LESS THAT PORTION CONVEYED TO BENTON COUNTY FOR ROAD BY QUIT CLAIM DEED RECORDED UNDER AUDITOR'S FILE NO. 136125

PARCEL L: ( 11971000000000 )

ALL OF SECTION 19, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON

LESS THAT PORTION DEEDED TO BENTON COUNTY FOR ROAD BY QUIT CLAIM DEED RECORDED UNDER AUDITOR'S FILE NO. 269989.

PARCEL M: (120713000001000)

THAT PORTION OF SECTION 20, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

4831-5589-2454v.18 0117168-000002

THE NORTHWEST QUARTER AND THE NORTH HALF OF THE SOUTHWEST QUARTER.

EXCEPT THAT PORTION OF THE NORTH HALF OF THE NORTHWEST QUARTER LYING NORTHEASTERLY OF AYERS ROAD.

PARCEL N: (120714000001000)

THAT PORTION OF SECTION 20, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M. BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE WEST HALF OF THE EAST HALF, TOGETHER WITH THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER, TOGETHER WITH THE WEST HALF OF THE THE EAST HALF OF THE SOUTHEAST QUARTER, TOGETHER WITH THE SOUTH HALF OF THE SOUTHWEST QUARTER, LESS THAT PORTION DEEDED TO BENTON COUNTY FOR ROAD UNDER AUDITOR'S FILE NO. 269989.

EXCEPT THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER.
PARCEL O: ( 12570000000000 )

ALL OF SECTION 25, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, LESS THAT PORTION CONVEYED TO BENTON COUNTY FOR ROAD BY QUIT CLAIM DEED RECORDED UNDER AUDITOR'S FILE NO. 136209.

PARCEL P: ( 126701000000000 )

THAT PORTION OF SECTION 26, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE NORTH HALF, THE NORTH HALF OF THE SOUTHWEST QUARTER, AND THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER, AND THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER.

4831-5589-2454v.18 0117168-000002

Schedule 1.4
Easterday Water Agreements/Irrigation System Permits

1.  Department of Army Permit dated August 27, 1976 (River Farm Pump Station).

2.  Permit from Burlington Northern Railroad (BNSF) dated February 16, 1978 (River Farm pipeline crossing).

3.  Department of the Army Easement for Pipeline Right of Way recorded April 25, 1994 as Recording No. 94-14256. (Nine Canyon Farms pumping plant and improvements – Section 6, Township 5 North, Range 30 East).

4.  Department of the Army Easement for Pipeline Right of Way recorded April 25, 1994 as Recording No. 94-14257. (Nine Canyon Farms pumping plant and improvements – Section 6, Township 5 North, Range 30 East).

5.  Revocable Permit granted by Burlington Northern, Inc., recorded June 9, 1978 under Recording No. 761251. (River Farm Parcel 48).

6.  Department of Army Easement dated February 10, 1972 (record No. 647551) (Cox Farm "Irrigro" pumping plant).

7.  Department of the Army permit NPW 71-026-72-5 (Cox Farm "Irrigro" pumping plant). (the preceding Items 1-7, the "**Easterday Irrigation System Permits**")

8.  Primary Irrigation System Agreement between Crawford & Sons, Inc., and Barbarosa Farms dated June 5, 1978, including the Modification of Agreement, and Assignment of Agreement to Easterday, and any supplements, amendments or modifications thereof.

9.  Water and Irrigation System Sharing Agreement between Holtzinger Management and Prudential Insurance and any supplements, amendments or modifications thereof.

10. Water and Irrigation System Sharing Agreement by and among Holtzinger Management, Kwong Chung and Christine Lai, and Craig and Sharon Campbell and any supplements, amendments or modifications thereof.

11. Water and Irrigation System Sharing Agreement between Holtzinger Management and Holtzinger Fruit and any supplements, amendments or modifications thereof.

12. Well Agreement between Holtzinger Management and Holtzinger Fruit and any supplements, amendments or modifications thereof.

13. Irrigation System Sharing Agreement between Benton Ranch and Easterday Farms and any supplements, amendments or modifications thereof.

14. Easterday Columbia River Primary Water Delivery Agreement between Easterday Ranches and Easterday Farms dated September 19, 2011, and First Amendment dated August 2012 and any supplements, amendments or modifications thereof.

15. Irrigation Water Agreement between Holtzinger Management and Charlie Cox Farms and any supplements, amendments or modifications thereof.

(the preceding Items 8 -15 , the   "**Easterday Water Agreements**").

4831-5589-2454v.18 0117168-000002

Schedule 1. 5
Easterday Water Certificates and Permits

1. <u>Owned Water Rights</u>

    A. <u>Washington Department of Ecology Water Right Certificates</u>

        i. Certificate No. S4-23978C

        ii. Certificate No. S3-00285C

        iii. Certificate No. S3-00284C

        iv. Certificate No. S3-22075C

        v. Certificate No. 3399

    B. <u>Washington Department of Ecology Water Right Permits</u>

        i. Superseding Permit No. S4-28998P

        ii. Superseding Permit No. G4-30584P

2. <u>Leased Water Rights</u>

    A. <u>Washington Department of Ecology Water Right Certificates</u>

        i. Certificate No. S3-00591C, pursuant to Washington Department of Natural Resources Lease 12-D57294, effective January 1, 2017.

        ii. Yakima Adjudication Conditional Final Order Certificate No. S4-83818-J, pursuant to The Barker Ranch, Ltd. and Shaw Vineyards, Inc. Water Right Lease Agreement (Feb. 26, 2013), as amended; The Barker Ranch's Consent to Shaw Vineyards, Inc.'s Partial Assignment and Sublease to Easterday Farms, Partnership of a Portion of the Water Rights Leased to Shaw Vineyards, Inc. Under the Barker Ranch/ Shaw Vineyards, Inc. Water Rights Lease Agreement of February 26, 2013 (April 29, 2013); and Order *Pendente Lite* Re Temporary Change, Barker Ranch, Claim Nos. 01858, 01859, Yakima County Superior Court No. 77-2-01484 5 (Dec. 12, 2013).

4831-5589-2454v.18 0117168-000002

Schedule 1.6
Easterday Assigned and Assumed Leases and Contracts

1. Irrigated Cash Lease No. 12-D57294 commencing January 1, 2017, by the State of Washington, Department of Natural Resources (Lessor) and Cody Easterday, Debby Easterday, Gale Easterday, and Karen Easterday (Lessee).

2. Farm Lease commencing June 1, 2013, by Wake Family Properties, L.L.C., dba Brad Wake and Brian Wake dba B&B Farms (Lessor) and Cody A. Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday dba Easterday Farms (Lessee).

3. Farm Lease dated November 12, 2014, by Brad Wake and Brian Wake (Lessor) and Cody A. Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday dba Easterday Farms (Lessee).

4831-5589-2454v.18 0117168-000002

Schedule 2.1
Land

**COX FARM**
**LEGAL DESCRIPTION**

PARCEL A: (119602000001000 and 119602000002001)

That portion of Section 19, Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

Beginning at the Northwest corner of said Section 19;
Thence South along the West line of said Section 19, a distance of 925.00 feet at the True Point of Beginning;
Thence South 62°15'12" East a distance of 881.00 feet;
Thence South parallel to the said West line a distance of 1,390.00 feet;
Thence North 62°15'12" West a distance of 881.00 feet to a point on the West line of said Section 19;
Thence North along said West line a distance of 1,390.00 feet to the True Point of Beginning.

PARCEL B: (119602000003001)

That portion of Section 19, Township 6 North, Range 30 East, W.M. Benton County, Washington, described as follows:

The South half of Government Lot 2 EXCEPT for the West 779.70 feet of said South half of Government Lot 2; the West half of the Northeast quarter of Government Lot 2, EXCEPT for the West 119.7 feet of said West half of the Northeast quarter of Government Lot 2; the South half of the Southeast quarter of the Northeast quarter of Government Lot 2; the South half of the Southwest quarter of the Northwest quarter of the Southeast quarter of the Northwest quarter; the South half of the Southeast quarter of the Northwest quarter; the East half of the East half of the Southwest quarter; the South 30 feet of the Southwest quarter of the Southeast quarter of the Southwest quarter; the South 30 feet of the Southeast quarter of the Southwest quarter of the Southwest quarter; the South 30 feet of the East half of the Southwest quarter of the Southwest quarter of the Southwest quarter; the South-west quarter of the Southwest quarter of the Southwest quarter of the Southwest quarter; and the South half of the Northwest quarter of the Southwest quarter of the Southwest quarter of the Southwest quarter.

TOGETHER WITH a parcel of land located in Government Lot 4 of Section 19, Township 6 North, Range 30 East, W.M., Benton County, Washington, more particularly described as follows:
Beginning at the Southwest corner of said Section 19;
thence along the South line of said Section 19, South 89°31'53" East, 1173.99 feet;
thence North 00°28'07" East 30.00 feet to the True Point of Beginning;

4831-5589-2454v.18 0117168-000002

**Cox Farm**
**Legal Description**

thence North 89°31'53" West and parallel to the South line of Section 19, 850.56 feet to the East line of the Southwest quarter of the Southwest quarter of Government Lot 4;
thence North 01°02'49" West along the East line of said subdivision 305.43 feet to the Southeast corner of the South half of the Northwest quarter of the Southwest quarter of Government Lot 4; thence continuing North 01°02'49" West along the East line of said subdivision 22.27 feet to a point on a 923.06 feet radius curve whose center bears South 08°32'10" East;
thence along said curve to the right an arc length of 962.59 feet through an included angle of 59°44'57" around a long chord measuring 919.56 feet, bearing South 68°39'41" East to the True Point of Beginning (also known as Parcel 1, Survey No. 3346, recorded July 21, 2004, under Auditor's File No. 2004-025861).

PARCEL C: (101591000000000)

The North half and the North half of the Northwest quarter of the Southwest quarter of Section 1, Township 5, North, Range 29 East W.M., Benton County, Washington.

PARCEL D: (125690000000000)

All of Section 25, Township 6 North, Range 29 East, W.M., Benton County, Washington.

PARCEL E: (836690000000000)

All of Section 36, Township 6 North, Range 29 East, W.M., Benton County, Washington.

PARCEL F: (101593000000000)

The South half of the Northwest Quarter of the Southwest quarter and that portion of Government Lot 5, Section 1, Township 5 North, Range 29 East, W.M., Benton County, Washington, lying Northerly of the Spokane, Portland and Seattle Railway Company's right-of-way.

PARCEL G: (102591000000000)

All of that portion of Section 2, Township 5 North, Range 29 East, W.M., Benton County, Washington, lying Northerly of the Spokane, Portland and Seattle Railway Company's right-of-way. EXCEPT that portion thereof described as follows:

Beginning at the Southwest corner of said Section 2;
Thence North along the West line of said Section 2 a distance of 208.23 feet;
Thence North 61°38'49" East a distance of 114.91 feet;
Thence North 74°33'05" East a distance of 1700 feet;
Thence South 62°02'17" East a distance of 646.58 feet;
Thence South 84°36'38" East a distance of 260.42 feet to the True Point of Beginning;
Thence North 05°23'22" East a distance of 31 feet;

4831-5589-2454v.18 0117168-000002

# Cox Farm
## Legal Description

Thence South 84°36'38" East a distance of 82 feet;
Thence South 05°23'22" West a distance of 62 feet;
Thence North 84°36'38" West a distance of 82 feet;
Thence North 05°23'22" East a distance of 31 feet to the True Point of Beginning.

PARCEL H: (111592000001000)

All of that portion of Government Lots 1 and 2, Section 11, Township 5 North, Range 29 East, W.M., Benton County, Washington lying Northerly of the Spokane, Portland and Seattle Railway Company's right of way

PARCEL I: (123691000000000)

All of Section 23, Township 6 North, Range 29 East, W.M., Benton County, Washington, EXCEPT the Northwest quarter of the Northwest quarter thereof.

PARCEL J: (135690000000000, 126690000000000, 124690000000000)

All of Sections 24, 26, and 35, Township 6 North, Range 29 East, W.M., Benton County, Washington, EXCEPT the East 30.0 feet of the North 60.0 feet of the Northeast quarter of the Northeast quarter of Section 24, Township 6 North, Range 29 East, W.M., conveyed to Benton County for road purposes by Deed recorded under Auditor's File No. 622670.

PARCEL K:

TOGETHER WITH rights described in the following easements, agreements and permits as follows:

A non-exclusive easement for ingress and egress to Sections 25 and 36, Township 6 North, Range 29 East, W.M., and Section 1, Township 5 North, Range 29 East, W.M., and to the existing river pumping station located at Spukshowski Bay, Lake Wallula on the Columbia River over and across the following described property lying within Township 6 North, Range 30 East, W.M: (1) The West 40 feet of the North 2,351.38 feet of Section 19; (2) the West 20 feet of the South 3,018.62 feet of Section 19; (3) the West 20 feet of Section 30; (4) the West 20 feet of Section 31, Except the South 565.24 feet thereof; and (5) a strip of land being 20.00 feet in width situated in the Southwest quarter of Section 31 with 10.00 feet lying on each side of the following described centerline:

Beginning at the Southwest corner of said Southwest quarter of Section 31;
thence North 01°12'54" West a distance of 565.24 feet to a point on curve and being the True Point of Beginning;
thence 47.32 feet along a curve to the left having a radius 350.00 feet, a central angle of 07°44'46", whose radius point bears North 48°16'45" East to a point of tangent;
thence South 49°28'01" East a distance 75.94 feet;

4831-5589-2454v.18 0117168-000002

**Cox Farm**
**Legal Description**

thence South 37°09'22" East a distance of 116.08 feet to a point of curve;
thence 106.47 feet along a curve to the left having a radius 272.00 feet, a central angle of 22°25'39",
whose radius point bears North 52°50'38" East to a point of tangent;
thence South 59°35'01" East a distance of 169.74 feet to a point of curve
thence 96.69 feet along a curve to the left having a radius 141.00 feet a central angle of 39°17'26", whose
radius point bears North 30°24'59" East to a point of tangent;
thence North 81°07'33" East a distance of 360.19 feet;
thence North 76°25'45" East a distance of 221.99 feet;
thence North 73°19'59" East a distance of 213.13 feet;
thence North 66°29'39" East a distance of 151.05 feet;
thence North 70°25'28" East a distance of 118.26 feet to a point of curve;
thence 476.40 feet along a curve to the right having a radius 302.00 feet, a central angle of 90°22'57",
whose radius point bears South 19°34'32" East to a point of tangent;
thence South 19°11'35" East a distance of 145.90 feet to a point of curve;
thence 140.82 feet along a curve to the left having a radius 667.00 feet, a central angle of 12°05'48", whose radius point bears North 70°48'25" East to a point on the Northerly line of Government Lot 3, Section 6, Township 5 North, Range 30 East, W.M. (as reserved by Grantor, Charlie Cox Farms, Inc., in deed recorded June 21, 1993, under Auditor's File No. 93-20941)

AND an undivided forty percent (40%) interest in the river pumping station platform located on the following described real property:

A parcel of land lying in Government Lots 7 and 8, Section 6, Township 5 North, Range 30 East, W.M., described as follows:

Beginning at a point lying North 75°30'03" East a distance of 2,662 feet from the quarter section corner lying on the West line of said Section 6;
thence North 56°00' West 15 feet;
thence North 34°00' East 120 feet;
thence South 56°00' East 120 feet
thence South 34°00' West 120 feet;
thence North 56°00' West a distance of 105 feet to the Point of Beginning; EXCEPTING THEREFROM (1) all that portion lying above the 347.0 foot contour line near where the same crosses the Northwest boundary of subject parcel; (2) all that portion lying within the right-of-way of the Spokane, Portland and Seattle Railway Company (now Burlington Northern Railway Company).

ALSO EXCEPT right to use pump stations 1 through 6 and the pumps now located in said pump stations 1 through 6, and all pipes, switching gear and other equipment used in connection therewith.

4

4831-5589-2454v.18 0117168-000002

**Cox Farm**
**Legal Description**

AND Department of the Army Easement for Right-of-Way (Pipeline) DACW68-2-73-64, dated February 10, 1972, in favor of Irrigro Limited Partnership for an irrigation pumping plant on the following described real property, recorded April 6, 1973, under Auditor's File No. 647551, records of Benton County, Washington, together with the related, unrecorded Department of the Army permit NPW 71-026-72-5, dated January 24, 1972, for the construction of pumping facility on said following described real property:

A parcel of land lying in Government Lots 7 and 8, Section 6, Township 5 North, Range 30 East, W.M., described as follows:

Beginning at a point lying North 75°30'03" East a distance of 2,662 feet from the quarter section corner lying on the West line of said Section 6;
thence North 56°00' West 15 feet;
thence North 34°00' East 120 feet;
thence South 56°00' East 120 feet;
thence South 34°00' West 120 feet;
thence North 56°00' West a distance of 105 feet to the Point of Beginning;
EXCEPTING THEREFROM (1) all that portion lying above the 347.0 foot contour line near where the same crosses the Northwest boundary of subject parcel; (2) all that portion lying within the right-of-way of the Spokane, Portland and Seattle Railway Company (now Burlington Northern Railway Company).

AND an easement for irrigation pipeline described as follows: A strip of land located in Government Lot 7 and Government Lot 8, Section 6, Township 5 North, Range 30 East, W.M., being 30.00 feet in width and having 15.00 feet on each side of the following described centerline:

Beginning at the West quarter corner of said Section 6;
thence North 01°13'54" West along the West line of said Section 6 a distance of 1,343.05 feet;
thence North 89°00'00" East a distance of 2,400.41 feet to a point on the North line of Government Lot 7 and the True Point of Beginning;
thence South 19°10'40" East a distance of 740.13 feet to terminus of this easement.

Upon the terms and conditions of the following instruments: (1) Instrument dated December 22, 1972, between Jack Hsieh, et ux, et al. and Irrigro Limited Partnership, and recorded January 18, 1973, under Auditor's File Nos. 644246 and 644247; (2) Instrument dated August 18, 1972, between Sherwood and Roberts Tri-Cities, Inc. and Irrigro Limited Partnership, and recorded January 18, 1973, under Auditor's File No. 644248; and (3) Instrument dated December 21, 1972, between Landsco Limited, a Washington Corporation (and Irrigro Limited Partnership), and recorded January 18, 1973, under Auditor's File No. 644249.

4831-5589-2454v.18 0117168-000002

# Cox Farm
## Legal Description

AND Easement for irrigation pipeline described as follows: A strip of land 50 feet wide located in Government Lot 3, Section 6, Township 5 North, Range 30 East, W.M., having 25 feet of said width on either side of the following described centerline:

Beginning at the West quarter corner of said Section 6;
thence North 59°43'03" East a distance of 2,745.85 feet to a point on the South line of said Government Lot 3, being the True Point of Beginning;
thence North 19°10'40" West a distance of 1,413.59 feet to a point on the North line of said Government Lot 3 and terminus of this easement.

Upon the terms and conditions of that certain Grant of Right-of-Way, Serial No. Or. 9596 (Wash.), granted to Irrigro Limited Partnership by the Department of the Interior, Bureau of Land Management, Oregon State Office, by Decision dated August 9, 1972, and recorded August 31, 1972, under Auditor's File No. 639233.

AND right-of-way over a strip of land located in Section 6, Township 5 North, Range 30 East, W.M., for irrigation pipeline, Serial No. Or. 9655 (Wash.) granted to State of Washington, by and through the Department of Natural Resources, by the Department of the Interior, Bureau of Land Management, Oregon State Office, by Decision dated September 29, 1972, and recorded October 11, 1972, under Auditor's File No. 640715, and amended by instrument recorded June 1, 1977, under Auditor's File No. 729002.

AND an easement for irrigation pipeline described as follows: A strip of land 50 feet wide located in Government Lot 2, Section 6, Township 5 North, Range 30 East, W.M., having 25 feet of said width on either side of the following described centerline:

Beginning at the West quarter corner of said Section 6;
thence North 01°13'54" West along the West line of said Section 6 a distance of 1,343.05 feet;
thence North 89°00'00" East a distance of 3,001.29 feet to a point on the South line of said Government Lot 2 and the True Point of Beginning;
thence North 04°26'05" East a distance of 262.92 feet;
thence North 25°55'29" East a distance of 1,212.76 feet to a point on the North line of Section 6, said point being North 89°00'00 East of the Northwest corner of said Section 6, a distance of 3,580.77 feet and terminus of this easement.

Upon the terms and conditions of that certain Grant of Right-of-way Serial No. Or. 11338 (Wash.), granted to Irrigro Limited Partnership by the Department of the Interior, Bureau of Land Management, Oregon State Office, by Decision dated March 6, 1974, and recorded December 13, 1974, under Auditor's File No. 673742.

AND an easement for irrigation pipeline described as follows: A strip of land located in Government Lot 7 and Government Lot 8, Section 6, Township 5 North, Range 30 East, W.M., being 30.00 feet in width and having 15.00 feet on each side of the following described centerline:

4831-5589-2454v.18 0117168-000002

**Cox Farm**
**Legal Description**

Beginning at the West quarter corner of said Section 6;
thence North 01°13'54" West along the West line of said Section 6 a distance of 1,343.05 feet;
thence North 89°00'00" East a distance of 3,001.29 feet to a point on the North line of Government Lot 8 and the True Point of Beginning;
thence South 26°45'00" West a distance of 794.60 feet to terminus of this easement.

Upon the terms and conditions of the following instruments: (1) Instrument dated December 22, 1972, between Jack Hsieh, et ux, et al. and Irrigro Limited Partnership, and recorded January 18, 1973, under Auditor's File Nos. 644246 and 644247; (2) Instrument dated August 18, 1972, between Sherwood and Roberts Tri-Cities, Inc. and Irrigro Limited Partnership, and recorded January 18, 1973, under Auditor's File No. 644248; and (3) Instrument dated December 21, 1972, between Landsco Limited, a Washington Corporation (and Irrigro Limited Partnership), and recorded January 18, 1973, under Auditor's File No. 644249.

PARCEL L: (113690000000000)

Section 13, Township 6 North, Range 29 East, W.M., Benton County, Washington, EXCEPT the East 30 feet thereof conveyed to Benton County for road purposes by Deeds recorded under Auditor's File Nos. 624663 and 624765.

PARCEL M: (114690000000000)

Section 14, Township 6 North, Range 29 East, W.M., Benton County, Washington

PARCEL N: (112693000000000)

The South half of the Southwest quarter and the Southeast quarter of Section 12, Township 6 North, Range 29 East, W.M., Benton County, Washington, less portions described as follows:

(Parcel 1) Measured along the West section line from the Southwest corner of the North half of the Southwest quarter South 298.00 feet;
thence in an Easterly direction to a point 269.00 feet South of the Southeast corner of the North half of the Southwest quarter;
thence North to the Southeast corner of the North half of the Southwest quarter;
thence West to Point of Beginning.

(Parcel 2) From the Northeast corner of the North half of the Southwest quarter South along the East line of said North half of the Southwest quarter to a point 269.00 feet South of the Southeast corner of the North half;
thence East 27.00 feet;
thence North in a straight line to a point 10.00 feet East of the Northeast corner of the North half of the Southwest quarter.

4831-5589-2454v.18 0117168-000002

**Cox Farm**
**Legal Description**

(Parcel 3) From the Northeast corner of the North half of the Southwest quarter South 136.00 feet; thence in an Easterly direction to a point 52.00 feet South of the Southeast corner of the North half of Section 12;
thence North along said Section line to the Southeast corner of the North half of Section 12; thence West along the South line of the North half of Section 12 to Point of Beginning. (These 3 parcels taken from judgment filed in Benton County Cause No. 18881);
EXCEPT ALSO portion conveyed to Benton County for road purposes by Deed recorded Under Auditors File No. 624764

PARCEL O: (111690000000000)

Section 11, Township 6 North, Range 29 East, W.M., Benton County, Washington,

EXCEPT portions conveyed to Benton County for road purposes by Deeds recorded under Auditor's File Nos. 466635, 624663, 624763, 633680 and 633861.

PARCEL P: (130602000001000)

A parcel of land located in Section 30, Township 6 North, Range 30 East, W.M., Benton County, Washington, lying Westerly of the following described line;

Beginning at the Southwest corner of said Section 30;
thence along the South line of said Section 30, North 89°35'15" East, 2,134.18 feet to the True Point of Beginning, said point being on the arc of a 1,294.09 feet radius curve (radius point bears South 69°19'15" West);
thence along said curve to the left an arc length of 1,108.30 feet through an included angle of 49°04'11" around a long chord measuring 1,074.73 feet, bearing North 45°12'51" West;
thence North 12°32'01" East, 20.73 feet to a point on a 1,184.08 foot radius curve whose center bears North 20°07'47" East;
thence along said curve to the left an arc length of 4,584.61 feet through an included angle of 221°50'31" around a long chord measuring 2,212.04 feet, bearing North 00°47'28" West;
thence North 65°01'13" West, 236.15 feet;
thence North 17°27'50" West, 944.61 feet to a point on a 953.06 feet radius curve whose center bears North 32°01'02" West;
thence along said curve to the left an arc length of 1,548.00 feet through an included angle of 93°03'43" around a long chord measuring 1,383.37 feet, bearing North 11°27'06" East to a point on the North line of Section 30 and the terminus of the described line. Said terminus point bears South 89°31'53" East, 1,234.68 feet from the Northwest corner of said Section 30.

PARCEL Q: (131602000001000)

A parcel of land located in the West half of Section 31, Township 6 North, Range 30 East, W.M., Benton County, Washington lying Westerly of the following described line:

4831-5589-2454v.18 0117168-000002

**Cox Farm**
**Legal Description**

Beginning at the Southwest corner of said Section 31;
thence along the South line of said Section 31, North 88°59'38" East, 1,917.03 feet to the True Point of Beginning;
thence North 20°29'35" West, 310.16 feet;
thence North 16°19'09" West, 127.49 feet;
thence North 05°31'51" West, 559.30 feet;
thence North 00°19'28" East, 152.44 feet;
thence North 06°36'17" East, 228.33 feet;
thence North 10°31'48" West, 115.80 feet to a point on a 1,209.08 foot radius curve whose center bears North 74°14'04" West;
thence along said curve to the left an arc length of 820.72 feet through an included angle of 38°53'32" around a long chord measuring 805.06 feet and bearing North 03°40'50" West;
thence North 01°14'16" West, 813.07 feet;
thence North 14°03'09" East, 472.97 feet;
thence North 10°01'13" East, 640.41 feet to a point on a 1,294.09 foot radius curve whose center bears North 55°47'34" West;
thence along said curve to the left an arc length of 1,239.67 feet through an included angle of 54°53'11" around a long chord measuring 1,192.81 feet and bearing North 06°45'50" East to a point on the North line of Section 31 and the terminus of the described line. Said terminus point bears North 89°35'15" East, 2,134.18 feet from the Northwest corner of said Section 31.

4831-5589-2454v.18 0117168-000002

# FARM MANAGER HOUSE
## <u>LEGAL DESCRIPTION</u>

That portion of Section 7. Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

Beginning at the West Quarter corner of said Section 7; thence North 00°13'16" East 850.00 feet along the West line of said Section 7; thence South 89°46'44" East 60.00 feet to the East line of Nine Canyon Road and to the True Point of Beginning;

thence continuing South 89°46'44" East 950.00 feet; thence South 00°13'16" West 950.00 feet; thence North 89°46'44" West 950.37 feet to the East line on Nine Canyon Road, said point being on the arc of a 3530.00 feet radius curve (Radius point bears North 88°57'04" West); thence Northerly, 51.00 feet along said East line and along the arc of said curve through a central angle of 00°49'40"; thence North 00°13'16" East 899.01 feet along said East line to the True Point of Beginning.

4831-5589-2454v.18 0117168-000002

# GOOSE GAP FARM
## LEGAL DESCRIPTION

PARCEL A: ( 101703000001000 )

THAT PORTION OF THE SOUTHWEST QUARTER OF SECTION 1, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON LYING SOUTHWESTERLY OF THE KENNEWICK IRRIGATION DISTRICT MAIN CANAL, EXCEPT THE WEST 30 FEET AND THE SOUTH 30 FEET FOR ROADS.

PARCEL B: ( 111701000000000 )

THE NORTHEAST QUARTER AND THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON.

PARCEL C: ( 1127020000000000 )

THAT PORTION OF SECTION 12 TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, LYING SOUTHERLY OF THE KENNEWICK IRRIGATION DISTRICT MAIN CANAL

PARCEL D: (Leasehold interest in 113704000000000)

The Southeast quarter of Section 13, Township 7 North, Range 30 E.W.M., records of Benton County, Washington.

PARCEL E: (108713000000000)

THAT PORTION OF SECTION 8, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF SAID SECTION; THENCE EAST ALONG THE SOUTH LINE OF SAID SECTION TO THE WEST LINE OF THE NORTHERN PACIFIC IRRIGATION COMPANY'S CANAL RIGHT OF WAY (NOW COLUMBIA IRRIGATION DISTRICT); THENCE NORTHWESTERLY ALONG SAID CANAL, RIGHT OF WAY TO THE WEST LINE OF SECTION 8; THENCE SOUTH ALONG THE WEST LINE OF SAID SECTION 8 TO THE POINT OF BEGINNING.

PARCEL F: (117712000002001)

THAT PORTION OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 17, TOWNSHIP 7 NORTH, RANGE 31 EAST, WILLAMETTE MERIDIAN, BENTON COUNTY, WASHINGTON LYING WESTERLY OF THE NORTHERN PACIFIC IRRIGATION COMPANY'S CANAL RIGHT OF WAY (NOW COLUMBIA IRRIGATION DISTRICT).

4831-5589-2454v.18 0117168-000002

**Goose Gap Farm**
**Legal Description**

PARCEL G: ( 11871000000000 )

ALL OF SECTION 18, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON

PARCEL H: ( 113702000000000 )

THE WEST HALF OF SECTION 13, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON.

PARCEL I: ( 114703000000000 )

THAT PORTION OF SECTION 14, TOWNSHIP 7 NORTH, RANGE 30 EAST,W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE SOUTH HALF AND THE SOUTH HALF OF THE NORTHEAST QUARTER. PARCEL J: ( 123700000000000 )

ALL OF SECTION 23, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON

PARCEL K: ( 124701000000000 )

THAT PORTION OF SECTION 24, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE NORTH HALF AND THE SOUTHWEST QUARTER

LESS THAT PORTION CONVEYED TO BENTON COUNTY FOR ROAD BY QUIT CLAIM DEED RECORDED UNDER AUDITOR'S FILE NO. 136125

PARCEL L: ( 11971000000000 )

ALL OF SECTION 19, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON

LESS THAT PORTION DEEDED TO BENTON COUNTY FOR ROAD BY QUIT CLAIM DEED RECORDED UNDER AUDITOR'S FILE NO. 269989.

PARCEL M: (120713000001000)

THAT PORTION OF SECTION 20, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

4831-5589-2454v.18 0117168-000002

**Goose Gap Farm**
**Legal Description**

THE NORTHWEST QUARTER AND THE NORTH HALF OF THE SOUTHWEST QUARTER.

EXCEPT THAT PORTION OF THE NORTH HALF OF THE NORTHWEST QUARTER LYING NORTHEASTERLY OF AYERS ROAD.

PARCEL N: (120714000001000)

THAT PORTION OF SECTION 20, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M. BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE WEST HALF OF THE EAST HALF, TOGETHER WITH THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER, TOGETHER WITH THE WEST HALF OF THE THE EAST HALF OF THE SOUTHEAST QUARTER, TOGETHER WITH THE SOUTH HALF OF THE SOUTHWEST QUARTER, LESS THAT PORTION DEEDED TO BENTON COUNTY FOR ROAD UNDER AUDITOR'S FILE NO. 269989.

EXCEPT THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER.
PARCEL O: ( 12570000000000 )

ALL OF SECTION 25, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, LESS THAT PORTION CONVEYED TO BENTON COUNTY FOR ROAD BY QUIT CLAIM DEED RECORDED UNDER AUDITOR'S FILE NO. 136209.

PARCEL P: ( 126701000000000 )

THAT PORTION OF SECTION 26, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE NORTH HALF, THE NORTH HALF OF THE SOUTHWEST QUARTER, AND THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER, AND THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER.

PARCEL Q: (Leasehold interest in 114701000000000 and 11170200001000)

REAL PROPERTY LOCATED IN THE WEST HALF OF SECTION 11 AND THE NORTH HALF OF SECTION 14, TOWNSHIP 7 NORTH, RANGE 30 EAST, WILLAMETTE MERIDIAN, BENTON COUNTY, WASHINGTON BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID SECTION 11; THENCE SOUTH 00°57'36" WEST, 5278.69 FEET ALONG THE EAST LINE OF SAID SECTION TO THE SOUTHEAST CORNER OF SAID SECTION 11; THENCE SOUTH 89°40'57" WEST, 150.90

4831-5589-2454v.18 0117168-000002

FEET ALONG THE LINE COMMON TO SAID SECTIONS 11 AND 14 TO A POINT ON THE ARC OF NON-TANGENT CURVE (RADIUS POINT BEARS NORTH 59°23'10" WEST, 1354.85 FEET) AND TO THE TRUE POINT OF BEGINNING;

THENCE SOUTHWESTERLY, WESTERLY AND NORTHWESTERLY, 2756.71 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 116°34'45" TO A POINT ON A NON-TANGENT CURVE (RADIUS POINT BEARS SOUTH 77°40'55" WEST, 1357.58 FEET); THENCE SOUTHWESTERLY, WESTERLY, NORTHWESTERLY, NORTHERLY AND NORTHEASTERLY 6514.76 FEET ALONG THE ARC OF SAID CURE THROUGH A CENTRAL ANGLE OF 274°57'09" TO A POINT ON A NON-TANGENT CURVE (RADIUS POINT BEARS NORTH 09°25'03" EAST, 1190.74 FEET); THENCE NORTHWESTERLY, NORTHERLY, NORTHEASTERLY, EASTERLY AND SOUTHEASTERLY, 4699.87 FEET ALONG THE ARC OF SAID CURE THROUGH A CENTRAL ANGLE OF 226°08'54" TO A POINT ON A NON-TANGENT CURVE (RADIUS POINT BEARS NORTH 74°02'50" EAST, 1354.27 FEET); THENCE NORTHERLY, 1202.48 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 50°52'26" TO A PONT ON THE EAST LINE OF SAID WEST HALF OF SECTION 11; THENCE SOUTH 00°12'43" WEST, 4021.71 FEET ALONG SAID EAST LINE TO THE LINE COMMON TO SAID SECTIONS 11 AND 14; THENCE NORTH 89°40'57" EAST, 2451.43 FEET ALONG SAID COMMON LINE TO THE TRUE POINT OF BEGINNING.

4831-5589-2454v.18 0117168-000002

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 149 of 379

# NINE CANYON FARM
## LEGAL DESCRIPTION

PARCEL 1: ([117602000001000](#))

All of Section 17, Township 6 North, Range 30, East, .W.M., Benton County, Washington; EXCEPT the East 1/2 of the East 1/2;
ALSO EXCEPTING the following described parcel:

Beginning at the Northwest corner of Section 18;
thence South 89°44'56" East, along the North line thereof, 4477 feet to the true point of beginning;
thence South 0°15'04" West, 1433.00 feet;
thence South 89°35'56" East, 1356.00 feet;
thence North 0°24'04" East, 1430.90 feet, more or less, to the North line of said Section 17;
thence North 89°09'11" West, along said North line, 543.22 feet to the section corner common to said Sections 17 and 18;
thence North 89°44'56" West along the North line of said Section 18, 816.55 feet to the true point of beginning.

PARCEL 2: ([117602000002000](#))

That portion of the Northwest 1/4 of Section 17, Township 6 North, Range 30, East, W.M., Benton County, Washington, lying within the described line as follows:

Beginning at the Northwest corner of Section 18;
thence South 89°44'56" East, along the North line thereof 4,477 feet to the true point of beginning;
thence South 0°15'04" West 1,433.00 feet;
thence South 89°35'56" East 1,356.00 feet;
thence North 0°24'04" East 1430.90 feet, more or less, to the North line of said Section 17;
thence North 89°09'11" West along said North line 543.22 feet to the Section corner common to said Sections 17 and 18;
thence North 89°44'56" West along the North line of said Section 18, 816.55 feet to the true point of beginning.

PARCEL 3: ([118601000002000](#))

The East 1/2 of Section 18, Township 6 North, Range 30, East, W.M., Benton County, Washington; EXCEPT the following described parcel:

Beginning at the Northwest corner of said Section 18;
thence South 89°44'56" East, along the North line thereof, 4477.00 feet to the true point of beginning; thence South 0°15'04" West, 1433.00 feet; thence South 89°35'56" East, 1356.00 feet; thence North 0°24'04" East, 1430.90 feet, more or less, to the North line of Section 17; thence North 89°09'11" West, along said North line, 543.22 feet to the section corner common to said

15

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 150 of 379

Sections 17 and 18; thence North 89°44'56" West, along the North line of said Section 18, 816.55 feet to the true point of beginning.

PARCEL 4: (118601000001000)

Portion of the Northeast 1/4 of Section 18, Township 6 North, Range 30, East, W.M., Benton County, Washington, lying within the following described parcel:

Beginning at the Northwest corner of said Section 18; thence South 89°44'56" East, along the North line thereof, 4477.00 feet to the true point of beginning; thence South 0°15'04" West, 1433.00 feet; thence South 89°35'56" East, 1356.00 feet; thence North 0°24'04" East, 1430.00 feet, more or less, to the North line of Section 17; thence North 89°09'11" West, along said North line, 543.22 feet to the section corner common to said Sections 17 and 18; thence North 89°44'56" West, along the North line of said Section 18, 816.55 feet to the true point of beginning.

PARCEL 5: (118602000001000)

The West 1/2 of Section 18, Township 6 North, Range 30, East, W.M., Benton County, Washington; EXCEPT the West 460 feet of the South 1895.00 feet;

ALSO EXCEPT the West 30 feet to County for road right of way.
PARCEL 6: (118602000002000)

The West 460.00 feet of the South 1895.00 feet of the Southwest 1/4 of Section 18, Township 6 North, Range 30, East, W.M., Benton County, Washington;

EXCEPT the West 30 feet to County for road right of way.

PARCEL 7: (119601000001000)

All of Section 19, Township 6 North, Range 30, East, W.M., Benton County, Washington;

EXCEPT that portion described as follows:

Beginning at the Northwest corner of said Section 19; thence South along the West line of said section a distance of 925 feet to the true point of beginning; thence South 62°15'12" East a distance of 881 feet; thence South parallel to said West line a distance of 1390 feet; thence North 62°15'12" West a distance of 881 feet to a point on the West line of said Section 19; thence North along said West line a distance of 1390 feet to the true point of beginning;

ALSO EXCEPT the West 30 feet of the North 60 feet for road right of way conveyed to Benton County by Quit Claim Deed recorded under Recording No. 623211;

4831-5589-2454v.18 0117168-000002

ALSO EXCEPT that portion of said Section 19 defined as follows:
The South 1/2 of Government Lot 2, EXCEPT for the West 779.70 feet of said South 1/2 of Government Lot 2; the West 1/2 of the Northeast 1/4 of Government Lot 2, EXCEPT for the West 119.7 feet of said West 1/2 of the Northeast 1/4 of Government Lot 2; the South 1/2 of the Southeast 1/4 of the Northeast 1/4 of Government Lot 2; the South 1/2 of the Southwest 1/4 of the Northwest 1/4 of the Southeast 1/4 of the Northwest 1/4; the South 1/2 of the Southeast 1/4 of the Northwest 1/4; the East 1/2 of the East 1/2 of the Southwest 1/4; the South 30 feet of the Southwest 1/4 of the Southeast 1/4 of the Southwest 1/4; the South 30 feet of the Southeast 1/4 of the Southwest 1/4 of the Southwest 1/4; the South 30 feet of the East 1/2 of the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4; the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4; And the South 1/2 of the Northwest 1/4 of the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4;

ALSO EXCEPT any portion lying in the Southwest 1/4 and less any portion lying in the Southwest 1/4 of the Southwest 1/4 of the Northwest 1/4.

PARCEL 8: (119603000001001)

The Southwest Quarter and the Southwest Quarter of the Southwest Quarter of the Northwest Quarter of Section 19, Township 6 North, Range 30 East, W.M. EXCEPT Parcels 1, 2, and 3 described below:

Parcel 1: Beginning at the Northwest corner of said Section 19; Thence South along the West line of said Section 19, a distance of 925.00 feet to the True Point of Beginning; Thence South 62°15'12" East a distance of 881.00 feet; Thence South parallel to the said West line a distance of 1,390.00 feet; Thence North 62°15'12" West a distance of 881.00 feet to a point of the West line of said Section 19; Thence North along said West line a distance of 1,390.00 feet to the true point of Beginning.

Parcel 2: A parcel of ground situated in Section 19, Township 6 North, Range 30 East, W.M. consisting of the South half of Government Lot 2, Except for the West 779.70 feet of said South half of Government Lot 2; The West half of the Northeast quarter of Government Lot 2, Except for the West 119.7 feet of said West half of the Northeast quarter of Government Lot 2; The South half of the Southeast quarter of the Northeast quarter of Government Lot 2; The South half of the Southwest quarter of the Northwest quarter of the Southeast quarter of the Northwest quarter; The South half of the Southeast quarter of the Northwest quarter; The East half of the East half of the Southwest quarter; the South 30 feet of the Southwest quarter of the Southeast quarter of the Southwest quarter; The South 30 feet of the Southeast quarter of the Southwest quarter of the Southwest quarter; The South 30 feet of the East half of the Southwest quarter of the Southwest quarter of the Southwest quarter; The Southwest quarter of the Southwest quarter of the Southwest quarter of the Southwest quarter; and the South half of the Northwest quarter of the Southwest quarter of the Southwest quarter of the Southwest quarter.

4831-5589-2454v.18 0117168-000002

**Nine Canyon Farm**
**Legal Description**

Parcel 3: A parcel of land located in Government Lot 4 of Section 19 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington, more particularly described as follows: Beginning at the Southwest corner of said Section 19; thence along the South line of said Section 19, South 89°31'53" East, 1173.99 feet; thence North 00°28'07" East 30.00 feet to the True Point of Beginning; Thence North 89°31'53" West and parallel to the South line of Section 19, 850.56 feet to the East line of the Southwest quarter of the Southwest quarter of the Southwest quarter of Government Lot 4; Thence North 01°02'49" West along the East line of said subdivision 305.43 feet to the Southeast corner of the South half of the Northwest quarter of the Southwest quarter of the Southwest quarter of Government Lot 4; Thence continuing North 01°02'49" West along the East line of said subdivision 22.27 feet to a point on a 923.06 feet radius curve whose center bears South 08°32'10" East; Thence along said curve to the right an arc length of 962.59 feet through an included angle of 59°44'57" around a long chord measuring 919.56 feet, bearing South 68°39'41" East to the True Point of Beginning.

PARCEL 9: ([120602000001000](#))

The West one half and the West one half of the East one half of Section 20, Township 6 North, Range 30, East, W.M., Benton County, Washington;

EXCEPT that portion of the West 1/2 of the East 1/2 of said Section 20, described as follows: Beginning at the Southwest corner of said subdivision; thence North 89°34'18" East, along the South line thereof, 1328.83 feet to the Southeast corner of said subdivision; thence North 00°07'23" East, along the East line thereof 1690.00 feet; thence South 58°11'02" West 461.95 feet; thence South 32°50'05" West 1733.36 feet to the point of beginning.

PARCEL 10: ([129602000000000](#))

That portion of the West 1/2 of Section 29, Township 6 North, Range 30, East, W.M., Benton County, Washington, defined as follows:

Beginning at the Northwest corner of said Section 29; thence North 89°34'18" East along the North line thereof 2657.66 feet to the Northeast corner of the Northwest 1/4 of the said Section 29; thence South 0°41'57" West 2288.34 feet; thence South 55°04'01" West 1850.63 feet; thence South 61°07'10" West 1164.11 feet to the point on the West line of said Section 29, bearing North 01°22'17" West 1400 feet from the Southwest corner of said Section 29; thence North 01°22'17" West along said West line 3891.36 feet to the point of beginning.

PARCEL 11: ([130601000001001](#))

All of Section 30, Township 6 North, Range 30 East, W.M.; EXCEPT Parcels 1 and 2 described as follows:

Parcel 1: Beginning at the Southeast corner of said Section 30; thence North 1°22'17" West 1,400.00 feet; thence South 44°07'45" West 1,962.53 feet to a point on the South line of said

4831-5589-2454v.18 0117168-000002

Section 30, South 89°37'47" West 1,400.00 feet from the Southeast corner thereof; thence North 89°37'47" East 1,400.00 feet to the Point of Beginning.

Parcel 2: A parcel of land located in Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington lying Westerly of the following described line: Beginning at the Southwest corner of said Section 30; thence along the South line of said Section 30, North 89°35'15" East, 2134.18 feet to the True Point of Beginning, said point being on the arc of a 1294.09 feet radius curve (radius point bears South 69°19'15" West); Thence along said curve to the left an arc length of 1108.30 feet through an included angle of 49°04'11" around a long chord measuring 1074.73 feet, bearing North 45°12'51" West; thence North 12°32'01" East, 20.73 feet to a point on a 1184.08 feet radius curve whose center bears North 20°07'47" East; thence along said curve to the left an arc length of 4584.61 feet through an included angle of 221°50'31" around a long chord measuring 2212.04 feet, bearing North 00°47'28" West; thence North 65°01'13" West, 236.15 feet; thence North 17°27'50" West, 944.61 feet to a point on a 953.06 feet radius curve whose center bears North 32°01'02" West; thence along said curve to the left an arc length of 1548.00 feet through an included angle of 93°03'43" around a long chord measuring 1383.37 feet, bearing North 11°27'06" East to a point on the North line of Section 30 and the terminus of the described line. Said terminus point bears South 89°31'53" East, 1234.68 feet from the Northwest corner of said Section 30.

PARCEL 12: (131601000001001)

All of Section 31, Township 6 North, Range 30 East, W.M.; EXCEPT Parcels 1 and 2 described as follows:

Parcel 1: That portion of said Section 31 lying Easterly of the following described line: Beginning at the Northeast corner of said Section 31; thence South 89°37'47" West along the North line thereof 1,400.00 feet to the True Point of Beginning; thence South 16°06'28" West 1,666.28 feet; thence South 0°10'42" East 3,740.49 feet to the South line of said Section 31 and the terminus point of the line herein described.

Parcel 2: A parcel of land located in the West half of Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington lying Westerly of the following described line: Beginning at the Southwest corner of said Section 31; thence along the South line of said Section 31, North 88°59'38" East, 1917.03 feet to the True Point of Beginning; thence North 20°29'35" West, 310.16 feet; thence North 16°19'09" West, 127.49 feet; thence North 05°31'51" West, 559.30 feet; thence North 00°19'28" East, 152.44 feet; thence North 06°36'17" East, 228.33 feet; thence North 10°31'48" West, 115.80 feet to a point on a 1209.08 feet radius curve whose center bears North 74°14'04" West; thence along said curve to the left an arc length of 820.72 feet through an included angle of 38°53'32" around a long chord measuring 805.06 feet and bearing North 03°40'50" West; thence North 01°14'16" West, 813.07 feet; thence North 14°03'09" East, 472.97 feet; thence North 10°01'13" East, 640.41 feet to a point on a 1294.09 feet radius curve whose center bears North 55°47'34" West; thence along said curve to the left an

4831-5589-2454v.18 0117168-000002

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 154 of 379

arc length of 1239.67 feet through an included angle of 54°53'11" around a long chord measuring 1192.81 feet and Bearing North 06°45'50" East to a point on the North line of Section 31 and the terminus of the described line. Said terminus point bears North 89°35'15" East, 2134.18 feet from the Northwest corner of said Section 31.

PARCEL 13: (133602000001002 and 133602000001003)

Government Lots 1, 2, and 3, Section 33, Township 6 North, Range 30 East, W.M., records of Benton County, Washington, lying Northerly of the existing Northerly right of way line of the Spokane, Portland and Seattle Railway; EXCEPT therefrom any portion of said premises lying below elevation 347 above Mean Sea Level, United States Coast and Geodetic Survey Datum; and EXCEPT the East 780 feet of said Government Lot 1.

AND the Northwest Quarter of the Northwest Quarter of Section 33, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT that portion thereof described as follows:

Beginning at the Northwest corner of said Section 33; thence along the North line of said Section 33, South 88°31'46" East, 1137.40 feet to a point on a 1064.58 feet radius curve whose center bears South 89°27'20" East; thence along said curve to the right an arc length of 1715.72 feet through an included angle of 92°20'25" around a long chord measuring 1535.97 feet, bearing South 46°42'52" West to a point on the West line of the Northwest quarter of the Northwest quarter of Section 33; thence along said West line North 01°00'05" West, 1082.47 feet to the Point of Beginning.

PARCEL 14: (106501000000000)

Government Lots 1, 5, 6, 7 and 8, of Section 6, Township 5 North, Range 30 East, W.M., Benton County, Washington, lying Northerly of the Spokane, Portland and Seattle Railway Company right of way; EXCEPT therefrom any portion of the above described tract of land lying below elevation 347 above mean sea level, U.S. Coast and Geodetic Survey Datum;

AND EXCEPT that portion thereof conveyed to Public Utility District No. 1, Benton County, Washington by Instruments recorded January 18, 1973, under Auditor's File Numbers 644246, 644247 and 644248.

PARCEL 15:

An easement for ingress and egress over and across a strip of land being 20 feet in width commencing at the point where that certain easement reserved in the Easement Agreement recorded under Auditor's File No. 93-23911, as modified by document recorded under Auditor's File No. 95-9435, as further modified by document recorded under Auditor's File No. 95-9437, intersects the West border of Section 29, Township 6 North, Range 30, E.W.M.; thence South along the West border of Section 29, to the Southwest corner of said Section; thence East along the South border of Section 29 to the East border of Section 29 and the terminus of the easement.

4831-5589-2454v.18 0117168-000002

PARCEL 16:

An easement for road purposes, being a strip of land located in Government Lot 3, Section 6, Township 5 North, Range 30, East, W.M., Benton County, Washington, being 20.00 feet in width and having 10.00 feet on each side of the following described centerline lying in said Government Lot 3:

Beginning at the Northwest corner of said Section 6; thence North 89°00'01" East along the North line of said Section 6 a distance of 1988.61 feet to a point on a curve and being the true point of beginning; thence 139.21 feet along a curve to the left having a radius of 667.00 feet, a central angle of 11°57'31", whose radius point bears North 58°42'37" East to a point of tangent; thence South 43°14'54" East a distance of 32.37 feet to a point of curve; thence 123.91 feet along a curve to the right having a radius 314.00 feet, a central angle of 22°36'33", whose radius point bears South 46°45'06" West to a point of tangent; thence South 19°51'36" East a distance of 289.99 feet; thence South 14°27'11" East a distance of 264.36 feet to a point of curve; thence 148.26 feet along a curve to the left having a radius of 400.00 feet, a central angle of 21°14'14", whose radius point bears North 75°32'49" East to a point of tangent; thence South 35°41'25" East a distance of 73.27 feet to a point of curve; thence 92.09 feet along a curve to the right having a radius of 340.00 feet, a central angle of 15°31'05", whose radius point bears South 54°18'35" West to a point of tangent; thence South 20°30'09" East a distance of 52.45 feet to a point of curve; thence 127.51 feet along a curve to the right having a radius of 985.00 feet, a central angle of 7°25'02", whose radius point bears South 69°49'41" West to a point of reverse curve; thence 127.97 feet along a curve to the left having a radius 535.00 feet, a central angle of 13°42'18", whose radius point bears North 77°14'42" East to a point on the South line of said Government Lot 3 and terminus of said centerline.

PARCEL 17:

A strip of land for a permanent right-of-way for the construction, operation, use and maintenance of a buried pipeline being 15.00 feet in width situated in Government Lot 2 of Section 6, Township 5 North, Range 30, East, W.M., Benton County, Washington with 7.5 feet lying on each side of the following described centerline:

Beginning at the Northwest corner of said Section 6; thence North 89°00'00" East along the North line of said Section 6 a distance of 3638.29 feet to the true point of beginning; thence South 28°44'03" West a distance of 693.15 feet to a point on the Easterly margin of an existing pipeline easement and terminus of said centerline. The sidelines of said 15.00 foot strip of land to be lengthened and or shortened to terminate at the North line of said section and the Easterly margin of the easement described as Parcel B-1 below.

PARCEL 18:

An easement for irrigation pipeline over a strip of land located in Government Lot 7 and Government Lot 8, Section 6, Township 5 North, Range 30, East, W.M., Benton County,

4831-5589-2454v.18 0117168-000002

Washington, being 30.00 feet in width and having 15.00 feet on each side of the following described centerline:

Beginning at the West 1/4 corner of said Section 6; thence North 01°13'43" West along the West line of said Section 6 a distance of 1343.05 feet; thence North 89°00'00" East a distance of 2400.41 feet to a point on the North line of Government Lot 7 and the true point of beginning; thence South 19°10'40" East a distance of 740.13 feet to terminus of this easement.

PARCEL 19:

An easement for irrigation pipeline over a strip of land 50 feet wide located in Government Lot 3, Section 6, Township 5 North, Range 30, East, W.M., Benton County, Washington, having 25 feet of said width on either side of the following described centerline:

Beginning at the West 1/4 corner of said Section 6; thence North 59°43'03" East a distance of 2745.85 feet to a point on the South line of said Government Lot 3, being the true point of beginning; thence North 19°10'40" West a distance of 1413.59 feet to a point on the North line of said Government Lot 3 and terminus of this easement.

PARCEL 20:

An easement for pumping plant over a parcel of land lying in Government Lots 7 and 8, Section 6, Township 5 North, Range 30, East, W.M., Benton County, Washington, described as follows:

Beginning at a point lying North 75°30'03" East a distance of 2,662 feet from the 1/4 section corner lying on the West line of said Section 6; thence North 56°00' West 15 feet; thence North 34°00' East 120 feet; thence South 56°00' East 120 feet; thence South 34°00' West 120 feet; thence North 56°00' West a distance of 105 feet to the point of beginning EXCEPTING THEREFROM (1) all that portion lying above the 347.0 foot contour line near where the same crosses the Northwest boundary of subject parcel; (2) all that portion lying within the right of way of Spokane, Portland and Seattle Railway Company (Now Burlington Northern Railway Company).

PARCEL 21:

A 40 foot wide easement for ingress and egress over and across the West 40 feet of Section 19, Township 6 North, Range 30, East, W.M., Benton County, Washington, lying within the following described parcel of land:

Beginning at the Northwest corner of said Section 19; thence South along the West line thereof a distance of 925.00 feet to the true point of beginning; thence South 62°15'12" East a distance of 881.00 feet; thence South parallel to the said West line a distance of 1,390.00 feet; thence North

4831-5589-2454v.18 0117168-000002

62°15'12" West a distance of 881.00 feet to a point on the West line of said Section 19; thence North along said West line a distance of 1,390.00 feet to the true point of beginning.

PARCEL 22:

A 50 foot wide easement for ingress and egress over and across that portion of Section 19, Township 6 North, Range 30, East, W.M., Benton County, Washington, described as follows:

Beginning at the Northwest corner of Section 19; thence South along the West line thereof a distance of 925.00 feet to the true point of beginning; thence South 62°15'12" East a distance of 881.00 feet; thence South parallel to the said West line a distance of 1,390.00 feet; thence North 62°15'12" West a distance of 881.00 feet to a point on the West line of said Section 19; thence North along said West line a distance of 1,390.00 feet to the true point of beginning where the same is crossed by a 50 foot wide strip of land, the centerline of which is described as follows:

Beginning at the Northwest corner of Section 19, Township 6, North, Range 30, E.W.M., Benton County, Washington; thence South 1°10'52" East, along the West line thereof a distance of 2,351.38 feet to the true point of beginning; thence South 65°06'00" East a distance of 1,554.75 feet.

PARCEL 23:

A 50 foot wide easement for ingress and egress over a portion of Sections 19 and 30, Township 6 North, Range 30 East, W.M., Benton County, Washington, the centerline of which is described as follows:

Beginning at the Northwest corner of said Section 19; thence South 1°10'52" East, along the West line thereof a distance of 2,351.38 feet to the true point of beginning; thence South 65°06'00" East, a distance of 1,554.75 feet; thence South 68°07'00" East, a distance of 356.56 feet; thence along a curve in a clockwise direction having a delta angle of 51°53'30", an arc distance of 398.50 feet, a radius of 440.00 feet, and a chord of South 42°10'15" East, a distance of 385.02 feet; thence along a curve in a clockwise direction having a delta angle of 27°22'40", an arc distance of 477.84 feet, a radius of 1000.00 feet, and a chord of South 29°54'50" East, a distance of 473.30 feet; thence along a curve in a clockwise direction having a delta angle of 62°44'10", an arc distance of 667.92 feet, a radius of 610.00 feet, and a chord of 12°14'05" East, a distance of 635.05 feet; thence South 19°08'00" West, a distance of 267.25 feet; thence along a curve in a counter clockwise direction having a delta angle of 28°32'00", an arc distance of 298.80 feet, a radius of 600.00 feet, and a chord of South 4°52'00" West, a distance of 295.72 feet; thence South 9°24'00" East, a distance of 276.54 feet; thence along a curve in a clockwise direction, having a delta angle of 42°20'00", an arc distance of 221.66 feet, a radius of 300.00 feet, and a chord of South 11°46'00" West, a distance of 216.65 feet; thence South 32°56'00" West, a distance of 602.87 feet; thence along a curve in a counter clockwise direction having a delta angle of 45°39'00", an arc distance of 478.04 feet a radius of 600.00 feet, and a chord of South 10°06'20" West, a distance of 465.50 feet; thence South 12°43'00" East, a distance of

4831-5589-2454v.18 0117168-000002

95.13 feet; thence along a curve in a counter clockwise direction having a delta angle of 51°00'00" an arc distance of 311.54 feet, a radius of 350.00 feet, and a chord of South 38°13'00" East, a distance of 301.36 feet; thence South 63°43'00" East, a distance of 177.12 feet; thence South 70°46'00" East, a distance of 394.15 feet; thence South 62°06'00" East, a distance of 309.36 feet; thence South 56°07'00" East, a distance of 467.56 feet; thence South 42°47'00" East, a distance of 691.39 feet; thence along a curve in a clockwise direction having a delta angle of 22°14'00", an arc distance of 252.23 feet, a radius of 650.00 feet, and a chord of South 31°40'00" East, a distance of 250.65 feet; thence South 20°33'00" East, a distance of 199.11 feet; thence along a curve in a clockwise direction having a delta angle of 32°22'00", an arc distance of 310.40 feet, a radius of 550.00 feet, and a chord of South 4°22'00" East, a distance of 306.58 feet; thence South 11°49'00" West, a distance of 194.44 feet; thence South 2°53'00" East, a distance of 298.02 feet; thence along a curve in a counter clockwise direction having a delta angle of 40°45'00", an arc distance of 355.61 feet, a radius of 500.00 feet, and a chord of South 23°15'30" East, a distance of 348.16 feet; thence South 43°38'00" East a distance of 153.02 feet; thence along a curve in a counter clockwise direction having a delta angle of 65°34'00", an arc distance of 343.31 feet, a radius of 300.00 feet, and a chord of South 76°25'00" East, a distance of 324.88 feet; thence North 70°48'00" East, a distance of 230.63 feet; thence along a curve in a counter clockwise direction having a delta angle of 35°53'00" an arc distance of 187.89 feet, a radius of 300.00 feet, and a chord of North 52°51'30" East, a distance of 184.83 feet; thence North 34°55'00" East, a distance of 172.28 feet; thence North 42°30'00" East, a distance of 272.61 feet; thence along a curve in a clockwise direction having a delta angle of 157°55'00", an arc distance of 206.71 feet, a radius of 75.00 feet, and a chord of South 58°32'30" East a distance of 147.22 feet; thence South 20°25'00" West, a distance of 182.67 feet; thence South 7°58'00" West, a distance of 277.49 feet; thence along a curve in a clockwise direction having a delta angle of 45°58'00" and arc distance of 240.68 feet, a radius of 300.00 feet, and a chord of South 30°57'00" West, a distance of 234.28 feet; thence South 53°56'00" West, a distance of 353.75 feet; thence along a curve in a counter clockwise direction having a delta angle of 30°36'46", an arc distance of 170.97 feet, a radius of 320.00 feet, and a chord of South 38°37'37" West, a distance of 168.95 feet to the terminus point of the centerline herein described.

PARCEL 24:

A 20 foot wide easement for ingress and egress over and across the West 20 feet of the following two parcels: (1) the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4 of Section 19, Township 6 North, Range 30, East, W.M., Benton County, Washington and (2) the South 1/2 of the Northwest 1/4 of the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4 of said Section 19.

PARCEL 25:

An easement for an irrigation pipeline described as follows: A strip of land 50 feet wide located in Government Lot 2, of Section 6, Township 5 North, Range 30, East, W.M., Benton County, Washington, having 25 feet of said width on either side of the following described centerline:

Beginning at the West 1/4 corner of said Section 6; thence North 01°13'54" West along the West line of said Section 6, a distance of 1343.05 feet; thence North 89°00'00" East a distance of 3001.29 feet to a point on the South line of said Government Lot 2 and the true point of beginning; thence North 04°26'05" East a distance of 262.92 feet; thence North 25°55'29" East a distance of 1212.76 feet to a point on the North line of Section 6, said point being North 89°00'00" East of the Northwest corner of said Section 6 a distance of 3580.77 feet and terminus of this easement.

PARCEL 26:

An easement for ingress and egress reserved in paragraph 2 of that certain Easement Agreement recorded under Auditor's File No. 93-23911, as modified by document recorded under Auditor's File No. 95-9435, as further modified by document recorded under Auditor's File No. 95-9437

PARCEL 27:

Easements for ingress, egress, and utilities, over, under, and across the following described real property:

STRIPS OF LAND located in Sections 19, 28, 30, 31 and 33 Township 6 North, Range 30 East Willamette Meridian and in Sections 24 and 25 Township 6 North, Range 29 East Willamette Meridian all in Benton County, Washington. Said strips of land being described as follows:

Strips of land located in Sections 30 and 31, Township 6 North, Range 30 East Willamette Meridian, and in Sections 24 and 25 Township 6 North, Range 29 East Willamette Meridian, Benton County, Washington, said strips being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerlines:

Beginning at the Southeast corner of said Section 24; thence along the East line of said Section 24 North 01°11'49" West, 232.99 feet to the true point of beginning; thence South 54°18'10" West, 28.25 feet; thence South 58°43'11" West, 72.29 feet; thence South 38°19'15" West, 51.82 feet; thence South 47°15'00" West, 170.38 feet to the beginning of 650.00 feet radius curve to the left,; thence along said curve an arc length of 283.23 feet, through an included angle of 24°57'57" to a point of compound curvature of a 900.00 feet radius to the left; thence along said curve an arc length of 540.37 feet, through an included angle of 34°24'05"; thence South 12°07'02" East, 60.58 feet, to the beginning of 900.00 feet radius curve to the left; thence along said curve an arc length of 421.59 feet through an included angle of 26°50'22"; thence South 38°57'24" East, 226.78 feet; thence South 32°22'23" East, 613.56 feet; thence South 41°54'55" East, 450.34 feet to the beginning of 1000.00 feet radius curve to the right; thence along said curve an arc length of 382.26 feet through an included angle of 21°54'07"; thence South 20°00'48" East, 74.62 feet to the beginning of 1000.00 feet radius curve to the right; thence along said curve an arc length of 500.61 feet through an included angle of 28°40'59"; thence South 08°40'11" West, 150.54 feet; thence South 12°52'27" West, 160.19 feet; thence South 16°58'30" West, 75.61 feet to a point hereinafter referred to as Point "A;" thence

4831-5589-2454v.18 0117168-000002

continuing South 16°58'30" West, 123.39 feet; thence South 21°18'49" West, 246.24 feet; thence South 24°35'21" West, 159.72 feet; thence South 27°44'03" West, 326.43 feet; thence South 30°40'00" West, 236.90 feet; thence South 34°28'08" West, 388.85 feet; thence South 28°20'26" West, 223.44 feet; thence South 23°58'48" West, 118.04 feet; thence South 18°09'34" West, 97.99 feet; thence South 13°38'46" West, 81.28 feet; thence South 07°35'47" West, 66.97 feet to a point hereinafter referred to as Point "B;" thence continuing South 07°35'47" West, 53.81 feet to a point on the South line of Section 25 Township 6 North, Range 29 East Willamette Meridian and the terminus of the centerline. Said terminus point bears South 89°44'32" West, 316.71 feet from the Southeast corner of said Section 25. The side lines of the easement to be shortened or lengthened to meet the said South line of Section 25 and the said East line of Section 24.

A strip of land located in Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the aforementioned Point "A"; thence South 01°36'16" West, 66.84 feet to the beginning of a 750.00 feet radius curve; thence along said curve to the left an arc length of 131.15 feet through an included angle of 10°01'07" to a point of compound curvature of a 1066.00 feet radius curve; thence along said curve to the left an arc length of 772.09 feet through an included angle of 41°29'55" to a point of compound curvature of a 2000.00 feet radius curve; thence along said curve to the left an arc length of 200.65 feet through an included angle of 5°44'53"; thence South 55°39'39" East, 158.20 feet to a point hereinafter referred to as Point "C"; thence continuing South 55°39'39" East, 18.27 feet to the beginning of a 354.55 feet radius curve; thence along said curve to the left an arc length of 151.24 feet through an included angle of 24°26'25" to a point herein after referred to as Point "D"; thence continuing along said curve to the left an arc length of 106.37 feet through an included angle of 17°11'24"; thence North 82°42'32" East, 64.59 feet to the beginning of a 2276.42 feet radius curve; thence along said curve to the left an arc length of 252.03 feet through an included angle of 6°20'36" to a point of compound curvature of a 1060.00 feet radius curve; thence along said curve to the left an arc length of 315.74 feet through an included angle of 17°03'59"; thence North 71°59'10" East, 46.48 feet to the beginning of a 850.00 feet radius curve; thence along said curve to the left an arc length of 354.97 feet through an included angle of 23°55'39"; thence North 48°03'31" East, 38.08 feet to the beginning of a 1348.84 feet radius curve; thence along said curve to the left an arc length of 474.19 feet through an included angle of 20°08'32" to the terminus of the centerline.

A strip of land being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the aforementioned Point "B"; thence North 41°00'03" East, 197.91 feet; thence North 30°30'20" East, 25.66 feet to the beginning of a 1200 feet radius curve; thence along said curve to the right an arc length of 1003.97 feet through an included angle of 47°56'10"; thence North 78°26'29" East, 149.57 feet to the beginning of a 1350.00 feet radius curve; thence along said curve to the right an arc length of 454.93 feet through an included angle of 19°18'28"; thence South 82°15'03" East, 26.48 feet to the aforementioned Point "C" and the terminus of the described centerline.

4831-5589-2454v.18 0117168-000002

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 161 of 379

## Nine Canyon Farm
## Legal Description

A strip of land being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the aforementioned Point "D"; thence South 59°57'03" East, 64.02 feet to the beginning of a 1500.00 feet radius curve; thence along said curve to the right an arc length of 163.06 feet through an included angle of 6°13'42"; thence South 53°43'21" East, 156.61 feet to the beginning of a 700.00 feet radius curve; thence along said curve to the right an arc length of 258.78 feet through an included angle of 21°10'52"; thence South 32°32'29" East, 90.93 feet to the beginning of 900.00 feet radius curve; thence along said curve to the right an arc length of 334.11 feet through an included angle of 21°16'13"; thence South 11°16'16" East, 190.18 feet; thence South 03°39'07" East, 171.87 feet to the terminus of the centerline.

A strip of land located in Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the Northwest corner of said Section 31; thence along the West line of said Section 31 South 01°11'49" East, 1399.02 feet to a point on a 910.00 feet radius curve whose center bears South 53°18'41" West and the true point of beginning; thence along said curve to the right an arc length 1041.79 feet through an included angle of 65°35'37" around a long chord measuring 985.82 feet, bearing South 03°53'30" East; thence South 28°54'18" West, 92.42 feet to a point on the West line of Section 31 and the terminus of the described centerline. The side lines of the easement to be lengthened or shortened to meet the West line of Section 31.

A strip of land located in Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the Southwest corner of said Section 31; thence along the West line of said Section 31, North 01°11'49" West, 571.04 feet and the true point of beginning; thence South 43°46'37" East, 151.96 feet; thence South 40°24'30" East, 170.36 feet; thence South 60°35'21" East, 181.61 feet to the beginning of a 200 feet radius curve to the left; thence along said curve an arc length of 133.78 feet through an included angle of 38°19'35"; thence North 81°05'04" East, 299.49 feet to the beginning of a 1000 feet radius curve to the left; thence along said curve an arc length of 105.80 feet through an included angle of 6°03'42"; thence North 75°01'22" East, 231.49 feet to a point hereafter designated Point "E"; thence continuing North 75°01'22" East, 8.72 feet to the beginning of a 1000 feet radius curve to the left; thence along said curve an arc length of 116.63 feet through an included angle of 6°40'56"; thence North 68°20'26" East; 144.03 feet to the beginning of a 1000 feet radius curve to the right; thence along said curve an arc length of 130.49 feet through an included angle of 7°28'36"; thence North 75°49'02" East; 76.50 feet to the beginning of a 200 feet radius curve to the right; thence along said curve an arc length of 118.61 feet through an included angle of 33°58'47"; thence South 70°12'11" East, 79.32 feet; thence South 51°42'16" East, 19.24 feet to a point on the East line of Parcel 3 (defined below) and the terminus of the described centerline. The side lines of the easement to be lengthened or shortened to meet the West line of Section 31 and the East line of Parcel 3.

4831-5589-2454v.18 0117168-000002

21-00141-WLH11   Doc 830   Filed 06/21/21   Entered 06/21/21 17:28:37   Pg 162 of 379

**Nine Canyon Farm**
**Legal Description**

A strip of land located in Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the afore designated Point "E"; thence North 16°33'34" East, 173.90 feet; thence North 41°26'26" East, 283.03 feet; thence North 49°23'21" East, 217.03 feet; thence North 38°58'41" East, 197.62 feet; thence North 31°07'39" East, 153.43 feet to the East line of Parcel 3 and the terminus of the described centerline. The sidelines of the easement to be lengthened or shortened to meet the East line of said Parcel 3.

A strip of land located in Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the Northwest corner of said Section 31; thence South 1°11'49" East, 1376.95 feet along the West line of said Section 31 to a point on the arc of a 1294.09 feet radius curve (radius point bears North 43°44'09" East) and the true point of beginning; thence Easterly 2178.82 feet along the arc of said curve through a central angle of 96°28'02"; thence leaving said curve South 79°58'47" East, 30.00 feet to the terminus of said centerline.

A strip of land located in Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the Northwest corner of said Section 31; thence South 1°11'49" East, 2509.26 feet along the West line of said Section 31 to a point on the arc of a 1209.08 feet radius curve (radius point bears South 30°52'56" East) and the true point of beginning; thence Easterly 1988.12 feet along the arc of said curve through a central angle of 94°12'45"; thence leaving said curve North 88°45'44" East, 30.00 feet to the terminus of said centerline.

A strip of land located in the Northwest quarter of The Northwest quarter of Section 33, Township 6 North, Range 30 East Willamette Meridian and more particularly described as follows: The North sixty feet and the West sixty feet of the Northwest quarter of the Northwest quarter of Section 33.

A strip of land located in the West half of the Southwest quarter of Government Lot 4 Section 19 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the Southwest corner of said Section 19; thence along the West line of said Section 19, North 01°11'49" West, 232.99 feet to the true point of beginning; thence North 54°18'10" East, 35.48 feet to the beginning of a 600 feet radius curve; thence along said curve an arc length of 232.45 feet through an included angle of 22°11'49"; thence North 76°29'59" East, 85.80 feet to the West line of the East half of the Southwest quarter of Government Lot 4 and the terminus of the centerline. The side lines of the easement to be lengthened or shortened to meet

4831-5589-2454v.18 0117168-000002

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 163 of 379

the West line of Section 19 and the West line of the East half of the Southwest quarter of Government Lot 4.

A strip of land located in Section 28 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington more particularly described as follows:
Beginning at the Southwest corner of said Section 28; thence along the West line of said Section 28, North 01°02'15" West, 46.05 feet; thence North 84°06'41" East, 23.59 feet to the beginning of an 690.00 feet radius curve to the right; thence along said curve an arc length of 144.27 feet, through an included angle of 11°58'47"; thence South 83°54'32" East, 651.41 feet, to a point on the South line of said Section 28; thence along said South line North 88°31'46" West, 814.84 feet to the Southwest corner of said Section 28 and the point of beginning.

As used herein, the term "Parcel 3" shall mean the following described real property:
A parcel of land located in the West half of Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington lying Westerly of the following described line: Beginning at the Southwest corner of said Section 31; thence along the South line of said Section 31, North 88°59'38" East, 1917.03 feet to the True Point of Beginning; thence North 20°29'35" West, 310.16 feet; thence North 16°19'09" West, 127.49 feet; thence North 05°31'51" West, 559.30 feet; thence North 00°19'28" East, 152.44 feet; thence North 06°36'17" East, 228.33 feet; thence North 10°31'48" West, 115.80 feet to a point on a 1209.08 feet radius curve whose center bears North 74°14'04" West; thence along said curve to the left an arc length of 820.72 feet through an included angle of 38°53'32" around a long chord measuring 805.06 feet and bearing North 03°40'50" West; thence North 01°14'16" West, 813.07 feet; thence North 14°03'09" East, 472.97 feet; thence North 10°01'13" East, 640.41 feet to a point on a 1294.09 feet radius curve whose center bears North 55°47'34" West; thence along said curve to the left an arc length of 1239.67 feet through an included angle of 54°53'11" around a long chord measuring 1192.81 feet and Bearing North 06°45'50" East to a point on the North line of Section 31 and the terminus of the described line. Said terminus point bears North 89°35'15" East, 2134.18 feet from the Northwest corner of said Section 31.

PARCEL 28:

Easements for the location, maintenance, repair, and operation of buried irrigation pipelines described as follows:

A strip of land located in Government Lot 4 of Section 19 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington, 100 feet in width with 50 feet of width lying on each side of the following described centerline:
Beginning at the Southwest corner of said Section 19; thence along the South line of said Section 19, South 89°31'53" East, 573.68 feet to the true point of beginning; thence north 17°27'50" west, 387.79 feet to the terminus of the centerline on a 923.06 feet radius curve whose center bears South 00°11'26" West. The sidelines of the easement to be lengthened or shortened to meet said curve and the South line of said Section 19.

4831-5589-2454v.18 0117168-000002

**Nine Canyon Farm**
**Legal Description**

A parcel of land located in the Northwest quarter of Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington and more particularly described as follows:
Beginning at the Northwest corner of said Section 30; thence along the North line of said Section 30, South 89°31'53" East, 521.13 feet to the True Point of Beginning; thence South 17°27'50" East, 1430.61 feet; thence North 72°32'10" East, 10.00 feet to a point on a 953.06 feet radius curve, whose center bears North 32°01'02" West; thence along said curve an arc length of 94.35 feet through an included angle of 05°40'19", around a long chord measuring 94.31 feet, bearing North 55°08'48" East; thence North 17°27'50" West, 1370.06 feet to a point on the North line of Section 30; thence North 89°31'53" West along the North line of Section 30, 105.11 feet to the True Point of Beginning.

A parcel of land located in Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington and more particularly described as follows:
Beginning at the Southwest corner of said Section 30; thence along the South line of said Section 30, North 89°35'15" East, 2259.71 feet; thence North 17°14'03" East, 924.27 feet; thence North 14°39'41" East, 118.56 feet to a point on a 1184.08 feet radius curve whose center bears North 41°12'50" West and the True Point of Beginning; thence along said curve to the left an arc length of 205.54 feet through an included angle of 9°56'44" around a long chord measuring 205.29 feet, bearing North 43°48'47" East; thence North 14°39'41" East, 969.97 feet to a point on a 1184.08 feet radius curve whose center bears South 80°28'57" West; thence along said curve to the left an arc length of 286.46 feet through an included angle of 13°51'41" around a long chord measuring 285.76 feet, bearing North 16°26'54" West; thence North 63°35'00" West, 689.86 feet; thence North 65°01'13" West, 864.02 feet to a point on a 1184.08 feet radius curve whose center bears south 15°23'08" east; thence along said curve to the left an arc length of 130.74 feet through an included angle of 6°19'35" around a long chord measuring 130.68 feet, bearing South 71°27'04" West; thence South 24°58'47" West, 10.00 feet; thence South 65°01'13" East, 957.51 feet; thence South 63°35'00" East, 758.08 feet; thence South 14°39'41" West, 1281.86 feet to the True Point of Beginning.

A parcel of land located in the Southwest quarter of Section 31, Township 6 North, Range 30 East, Willamette Meridian, Benton County, Washington, and more particularly described as follows:
Beginning at the Southwest corner of said Section 31; thence along the South line of said Section 31, North 88°59'36" East, 1917.03 feet; thence North 20°29'35" West, 310.16 feet; thence North 16°19'09" West, 127.49 feet; Thence North 05°31'51" West, 559.30 feet; thence North 00°19'28" East, 152.44 feet; thence North 06°36'17" East, 228.33 feet; thence North 10°31'48" West, 115.80 feet to a point on a 1209.08 feet radius curve whose center bears North 74°14'04" West and the True Point of Beginning; thence along said curve to the left an arc length of 820.72 feet through an included angle of 38°53'32" around a long chord measuring 805.06 feet and bearing North 03°40'50" West; thence South 01°14'16" East, 200.14 feet; thence South 03°25'17" West, 149.43 feet; thence South 03°33'41" East, 228.02 feet; thence South 10°31'48" East, 230.43 feet to the True Point of Beginning.

4831-5589-2454v.18 0117168-000002

21-00141-WLH11     Doc 830     Filed 06/21/21     Entered 06/21/21 17:28:37     Pg 165 of 379

**Nine Canyon Farm**
**Legal Description**

A parcel of land located in the West half of Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington and more particularly described as follows: Beginning at the Southwest corner of said Section 31; thence along the South line of said Section 31, North 88°59'36" East, 1917.03 feet; thence North 20°29'35" West, 310.16 feet; thence North 16°19'09" West, 127.49 feet; thence North 05°31'51" West, 559.30 feet; thence North 00°19'28" East, 152.44 feet; thence North 06°36'17" East, 228.33 feet; thence North 10°31'48" West, 115.80 feet to a point on a 1209.08 feet radius curve whose center bears North 74°14'04" West; thence along said curve to the left an arc length of 820.72 feet through an included angle of 38°53'32" around a long chord measuring 805.06 feet and bearing North 03°40'50" West; thence North 01°14'16" West, 813.07 feet; thence North 14°03'09" East, 472.97 feet; thence North 10°01'13" East, 640.41 feet to a point on a 1294.09 feet radius curve whose center bears North 55°47'34" West and to the True Point of Beginning; thence along said curve to the left an arc length of 998.58 feet through an included angle of 44°12'44" around a long chord measuring 973.99 feet and bearing North 12°06'04" East; thence South 17°14'03" West, 281.64 feet; thence South 10°01'13" West, 693.93 feet to the True Point of Beginning.

PARCEL 29:

An easement in, on, and across the following described real property for work area, which easement shall include, but not be limited to, the right to move, store (on a non-permanent basis), and remove, bins, vehicles, equipment, and supplies:

A parcel of land located in Government Lot 4 of Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington and more particularly described as follows: Beginning at the Southwest corner of said Section 30; thence along the West line of said Section 30 North 01°11'49" West, 1030.39 feet; thence North 88°48'11" East, 947.56 feet to the True Point of Beginning; thence South 49°13'56" East, 287.00 feet; thence South 89°58'28" West, 263.00 feet; thence North 13°40'40" East, 193.00 feet to the True Point of Beginning.

PARCEL 30:

An easements over and across the following described real property for utility purposes:

(a)A strip of land located in Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington, said strip being 50.00 feet in width with 20.00 feet of said width lying on the left and 30.00 feet of said width lying on the right side the following described centerline:
Beginning at the Northwest corner of said Section 30; thence along the West line of said Section 30 South 01°11'49" East, 2388.82 feet; thence North 88°48'11" East, 676.58 feet to the True Point of Beginning; thence continuing North 88°48'11" East, 50.00 feet to the terminus of the described centerline.

4831-5589-2454v.18 0117168-000002

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 166 of 379

# Nine Canyon Farm
## Legal Description

(b)A strip of land located in Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 20.00 feet in width with 10.00 feet of said width lying on each side of the following described centerline:
Beginning at the Northwest corner of said Section 30; thence along the West line of said Section 30 South 01°11'49" East, 2388.82 feet; thence North 88°48'11" East, 676.58 feet; thence continuing North 88°48'11" East, 50.00 feet to the True Point of Beginning; thence continuing North 88°48'11" East, 729.53 feet; thence North 79°27'29" East, 432.46 feet; thence South 73°32'42" East, 270.98 feet; thence North 27°29'02" East, 659.37 feet; thence South 65°19'47" East, 70.00 feet to the terminus of the described centerline.

PARCEL 31:

Easements for ingress, egress, and utilities, over, under, and across the following described real property: A strip of land located in Section 19, Township 6 North, Range 30 East Willamette Meridian in Benton County, Washington. Said strip of land being described as follows:
A strip of land located in the West half of the Southwest quarter of Government Lot 4 Section 19 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the Southwest corner of said Section 19; thence along the West line of said Section 19, North 01°11'49" West, 232.99 feet to the true point of beginning; thence North 54°18'10" East, 35.48 feet to the beginning of a 600 feet radius curve; thence along said curve an arc length of 232.45 feet through an included angle of 22°11'49"; thence North 76°29'59" East, 85.80 feet to the West line of the East half of the Southwest quarter of Government Lot 4 and the terminus of the centerline. The side lines of the easement to be lengthened or shortened to meet the West line of Section 19 and the West line of the East half of the Southwest quarter of Government Lot 4.

PARCEL 32:

An easement for the location, maintenance, repair, and operation of a buried irrigation pipeline described as follows:
A strip of land located in Government Lot 4 of Section 19 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington, 100 feet in width with 50 feet of width lying on each side of the following described centerline:
Beginning at the Southwest corner of said Section 19; thence along the South line of said Section 19, South 89°31'53" East, 573.68 feet to the true point of beginning; thence north 17°27'50" west, 387.79 feet to the terminus of the centerline on a 923.06 feet radius curve whose center bears South 00°11'26" West. The sidelines of the easement to be lengthened or shortened to meet said curve and the South line of said Section 19.

32

4831-5589-2454v.18 0117168-000002

**Nine Canyon Farm**
**Legal Description**

PARCEL 33:

A 20-foot wide non-exclusive easement for ingress and egress over and across that portion of the West 20 feet of Sections 30 and 31, Township 6 North, Range 30 East, W.M., lying within the real property conveyed under that certain Statutory Warranty Deed recorded under Benton County Auditor's File No. 2005-011453.

4831-5589-2454v.18 0117168-000002

**RIVER FARM**
**LEGAL DESCRIPTION**


PARCEL 34: (122602000000000 and 127602000000000)

Section 22, Township 6 North, Range 30 East, W.M., Benton County, Washington, and the North 1/2 of Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT the Southeast quarter of the Northeast quarter of said Section 27; AND ALSO EXCEPT that portion of said Section 22 and Section 27 lying Easterly of the following described centerline:

Commencing at the West quarter corner of said Section 27;
thence North 88°25'05" East 830.79 feet along the South line of the North half thereof to the centerline of the existing river access road and the True Point of Beginning;
thence along said centerline the following bearings and distances;
thence North 13°32'32" East 413.89 feet;
thence North 33°24'40" East 417.71 feet;
thence North 24°32'16" East 125.14 feet;
thence North 32°34'43" East 390.24 feet;
thence North 42°10'26" East 267.96 feet;
thence North 30°03'57" East 148.51 feet;
thence North 12°20'25" East 264.13 feet;
thence North 04°21'08" East 341.89 feet;
thence North 16°48'23" West 63.54 feet;
thence North 45°28'04" West 46.91 feet to the intersection of an existing farm road;
thence along said centerline the following bearings and distances;
thence North 03°09'03" East 177.44 feet;
thence North 00°09'56" East 465.38 feet;
thence North 05°41'43" East 103.99 feet;
thence North 10°39'15" East 121.08 feet;
thence North 15°25'36" East 111.98 feet;
thence North 17°08'00" East 1725.87 feet;
thence North 17°26'47" East 128.61 feet;
thence North 16°34'51" East 129.88 feet;
thence North 16°24'25" East 131.77 feet;
thence North 16°08'19" East 115.56 feet;
thence North 17°04'45" East 121.58 feet;
thence North 18°06'12" East 137.21 feet;
thence North 19°19'27" East 372.24 feet;
thence North 19°55'22" East 278.61 feet;
thence North 24°45'34" East 104.38 feet;
thence North 28°19'28" East 117.96 feet;
thence North 28°51'35" East 114.65 feet;
thence North 36°43'00" East 131.30 feet;
thence North 47°28'16" East 133.05 feet;

4831-5589-2454v.18 0117168-000002

thence North 41°49'59" East 130.92 feet;
thence North 36°06'09" East 111.02 feet;
thence North 31°58'37" East 151.23 feet;
thence North 38°07'28" East 105.75 feet;
thence North 44°54'02" East 109.65 feet;
thence North 43°17'45" East 106.90 feet;
thence North 41°00'56" East 119.24 feet;
thence North 36°32'59" East 103.29 feet;
thence North 29°26'26" East 106.12 feet;
thence North 22°29'40" East 115.80 feet;
thence North 21°31'04" East 103.79 feet;
thence North 32°47'25" East 119.34 feet;
thence North 54°53'36" East 109.28 feet;
thence North 70°15'49" East 109.49 feet;
thence North 78°46'19" East 112.28 feet;
thence North 80°32'41" East 123.19 feet;
thence North 80°55'28" East 111.19 feet;
thence North 79°31'08" East 100.13 feet;
thence North 73°27'59" East 133.21 feet;
thence North 68°04'32" East 122.55 feet; to a point on the North line of said Section 22, lying South 88°53'05" West 623.99 feet from the Northeast corner thereof and the terminus of this centerline.

PARCEL 35: (121600000000000, 128601000000000, 128602000001000 and 120601000000000)

All of Section 21; the East half of the East half of Section 20; the North half and the Southwest quarter and the Northwest quarter of the Southeast quarter of Section 28, EXCEPT a parcel of land situated in the Southwest quarter of the Southwest quarter of Section 28, described as follows:

The Southwest corner of said Section 28, being the True Point of Beginning;
thence North 01°05'50" West along the West line of said Section 28 a distance of 349.60 feet;
thence South 85°15'42" East a distance of 1,337.74 feet; thence South 00°00' East a distance of 221.87 feet to a point on the Southerly line of said Section 28;
thence South 89°15'32" West along said South line a distance of 1,326.59 feet to the Southwest corner of said Section 28 and the True Point of Beginning, all in Township 6 North, Range 30 East, W.M., Benton County, Washington.

PARCEL 36: (115604000001000)

That portion of the South half of Section 15, Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

4831-5589-2454v.18 0117168-000002

**River Farm**
**Legal Description**

The Southeast corner of said Section 15 being the True Point of Beginning;
thence South 88°53'07" West along the Southerly line of said Section 15, a distance of 4,159.72 feet thence North 48°58'02" East a distance of 3,270.68 feet; thence South 89°58'08" East a distance of 1,653.99 feet to the Easterly line of said Section 15;
thence South 01°02'51" East along said East line a distance of 2,065.70 feet to the Southeast corner of said Section 15 and the True Point of Beginning.

PARCEL 37: (127603000002000)

An undivided one-half interest in and to:

A strip of land situate in Government Lot 4, Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, being 60 feet in width 30 feet lying on each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence North 88°35'17" East along the North line of said Government Lot 4, 168.86 feet to the True Point of Beginning of said centerline and right of way; thence South 15°38'26" East 405.51 feet; thence South 51°50'44" East 629.30 feet;
thence South 10°34'03" West 666.48 feet to the terminus of said centerline.

PARCEL 38: (127603000003000)

An undivided one-half interest in and to:

A strip of land 200 feet in width situated in Government Lot 4, Section 27, township 6 North, Range 30 East, W.M., Benton County, Washington, with 100.00 feet of said width lying in each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence South 01°03'24" East along the West line of said Section 27 a distance of 1,616.27 feet;
thence along a line perpendicular to said West line North 88°56'36" East a distance of 556.17 feet to a point on the Northwesterly right of way line of the Spokane, Portland & Seattle Railway Company, said point being the True Point of Beginning and lying Northwesterly 100.00 feet when measured perpendicular to railroad centerline station 6456+45.3 and railroad mile 207.83; thence North 21°36'15" West perpendicular to said railroad right of way a distance of 150.00 feet to the terminus of said centerline.

PARCEL 39: (110603000000000 and 115602000000000)

That portion of Sections 10 and 15, Township 6 North, Range 30 East, W.M., Benton County, lying North and West of the following described line:

Beginning at the Southwest corner of said Section 15;

36

4831-5589-2454v.18 0117168-000002

thence North 1°27'28" West along the West line of said Section 15, 1,060.00 feet;
thence North 88°33'31" East 1,304.20 feet;
thence North 49°26'57" East 780.68 feet;
thence North 1°26'29" West 1,920.00 feet;
thence North 39°43'36" East 1,162.50 feet;
thence North 60°39'13" East 2,060.55 feet to the North line of said Section 15, said point being South 89°03'16" West 847.82 feet from the Northeast corner of said Section 15;
thence continuing North 60°39'13" East 522.64 feet;
thence North 0°13'17" West 1,085.00 feet to a point on the North line of the South half of the South half of said Section 10, said point being South 89°06'19" West 400 feet from the Northeast corner of said South half of the South half and the terminus of said line.

PARCEL 40: (103600000000000, 104603000000000, 109601000000000, 110601000000000, 110602000000000)

Section 3; South half of Section 4; North half of Section 9; North half of Section 10; North half of South half of Section 10; EXCEPT the South 200 feet of the East 200 feet of said Section 10; all in Township 6 North, Range 30 East, W.M., Benton County, Washington; EXCEPT Finley Road; AND EXCEPT Brown Road.

PARCEL 41: (127603000002000)

An undivided one-half interest in and to:

A strip of land situated in Government Lot 4, Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, being 60.00 feet in width with 30.00 feet lying on each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence North 88°35'17" East along the North line of said Government Lot 4, 168.86 feet to the True Point of Beginning of said centerline and right of way;
thence South 15°38'26" East 405.51 feet;
thence South 51°50'44" East 629.30 feet;
thence South 10°34'03" West 666.48 feet to the terminus of said centerline.

PARCEL 42: (127603000003000)

An undivided one-half interest in and to:

A strip of land 200 feet in width situated in Government Lot 4, Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, with 100.00 feet of said width lying on each side of the following described centerline:

4831-5589-2454v.18 0117168-000002

**River Farm**
**Legal Description**

Beginning at the West quarter corner of said Section 27; thence South 01°03'24" East along the West line of said Section 27 a distance of 1,616.27 feet;
thence along a line perpendicular to said West line North 88°56'36" East a distance of 556.17 feet to a point on the Northwesterly right of way line of the Spokane, Portland & Seattle Railway Company, said point being the True Point of Beginning and lying Northwesterly 100.00 feet when measured perpendicular to railroad centerline station 6456+45.3 and railroad mile 207.83; thence North 21°36'15" West perpendicular to said railroad right of way a distance of 150.00 feet to the terminus of said centerline.

PARCEL 43: (109603000000000)

The South half of Section 9, Township 6 North, Range 30 East, W.M., Benton County, Washington.

PARCEL 44: (107602000001001)

Section 7, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT the North half of the North half thereof; AND EXCEPT portions conveyed to Benton County for road purposes by Deeds recorded under Recording Nos. 624663 and 624762.

And Also Except that portion of said Section described as follows:

Beginning at the Southwest corner of said Section 7; thence North 00°13'16" East, 1019.91 feet along the West line of said Section 7; thence South 89°44'41" East, 30.00 feet to the East line of Nine Canyon Road and the True Point of Beginning.; thence South 89°44'41" East 988.81 feet; thence South 00°13'16" West, 979.91 feet to a point 40.00 feet Northerly of the South line of said Section 7; thence North 89°44'41" West, 988.81 feet parallel with and 40.00 feet Northerly of said South line to a point on the East line of said Nine Canyon road; thence North 00°13'16" East, 979.91 feet along said East line to the True Point of Beginning.

AND ALSO EXCEPT that portion of said Section described as follows:

Beginning at the West Quarter corner of said Section 7; thence North 00°13'16" East 850.00 feet along the West line of said Section 7; thence South 89°46'44" East 60.00 to the East line of Nine Canyon Road and to the True Point of Beginning;

Thence Continuing South 89°46'44" East 950.00 feet; thence South 00°13'16" West 950.00 feet; thence North 89°46'44" West 950.37 feet to the East line of Nine Canyon Road, said point being on the arc of a 3530.00 feet Radius curve (radius point bears North 88°57'04" West); thence Northerly, 51.00 feet along said East line and along the arc of said curve through a central angle of 00°49'40"; thence North 00°13'16" East 899.01 feet along said East line to the True Point of Beginning.

4831-5589-2454v.18 0117168-000002

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 173 of 379

**River Farm**
**Legal Description**

PARCEL 45: (108601000000000)

Section 8, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT the North half of the Northwest quarter thereof.

PARCEL 46:

An Easement for subsurface irrigation line being the West 60 feet of the South 1,060 feet of the Southwest quarter of Section 15, Township 6 North, Range 30 East, W.M., being a portion of the Easement created by instrument recorded August 9, 1978, under Recording No. 766691.

PARCEL 47:

A roadway easement 30 feet in width the centerline of which is the Easterly boundary of Parcel A described in Statutory Warranty Deed recorded July 25, 1997, under Auditor's File No. 97-17672.

PARCEL 48:

Together with rights described in the following easements, agreements and permits as follows:

Revocable Permit for pipeline right-of-way and for pump plant site granted by the Department of the Army Permits, recorded June 9, 1978, under Recording No. 761253, records of Benton County, Washington.

Burlington Northern, Inc., Revocable Permit, recorded June 9, 1978, under Recording No. 761251, authorizing the construction, operation and maintenance of a 36 inch water pipeline at Survey Station 6455, plus 91.9-mile post 207 plus 4,435.2 feet, in Benton County, Washington

PARCEL 49:

An easement for ingress and egress purpose situated in Section 15, Township 6 North, Range 30, East, W.M., being 40 feet in width with 20 feet lying on either side of the following described centerline:

Beginning at the Southeast corner of said Section 15;
thence North 01°02'51" West along the East line of said Section 15, a distance of 2,681.27 feet to the true point of beginning;
thence South 89°26'31" West a distance of 352.48 feet; thence South 01°21'21" East a distance of 612.02 feet to the terminus of said line.

39

4831-5589-2454v.18 0117168-000002

**River Farm**
**Legal Description**

PARCEL 50: ([127603000001001](127603000001001))

Those portions of the following described property lying Northerly of the Northerly right of way line of existing Burlington Northern Santa Fe Railroad ( formerly Spokane, Portland and Seattle Railway).

Government Lot 4, Section 27, Township 6 North, Range 30 East of the Willamette Meridian, Benton County, Washington, Together with that portion of Government Lot 3 of said Section 27 lying Westerly of the following described line:

Beginning at the Northwest corner of said Section 27; thence South 1°03'20" East, 2639.97 feet along the West line of said Section 27 to the West quarter corner of said Section 27; thence North 89°12'10" East, 1783.01 feet along the North line of said Government Lots 4 and 3 to the True Point of Beginning; thence South 0°48'00" East, 1156.00 feet to the North line of the Burlington Northern Santa Fe Railroad right of way and the terminus of said line.

PARCEL 51: ([128604000002001](128604000002001))

Those portions of the following described property lying Northerly of the Northerly right of way line of the existing Burlington Northern Santa Fe Railroad (formerly Spokane, Portland and Seattle Railway)

Government Lot 1, and the East 780 feet of the Southwest quarter of the Southeast quarter of Section 28, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington,

Except right of way for roads, and Except any portion thereof of the above described property lying below 347 feet above mean sea level, United States Coast and Geodetic Survey Datum.

PARCEL 52: ([128604000002002](128604000002002))

The Southwest quarter of the Southeast quarter of Section 28, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington lying Northwesterly of the existing Burlington Northern Santa Fe Railroad (formerly Spokane, Portland and Seattle Railway) right of way.

Except the East 780 feet thereof

PARCEL 53: ([128603000001000](128603000001000))

That portion of the Southwest quarter of the Southwest quarter of Section 28, Township 6 North, Range 30, E.W.M., Benton County, Washington, described as follows:

4831-5589-2454v.18 0117168-000002

The Southwest corner of said Section 28 being the True Point of Beginning; thence North 01°05'50" West along the West line of said Section 28, a distance of 349.60 feet; thence South 85°15'42" East, a distance of 1337.74 feet; thence South 00°00' East a distance of 221.87 feet to a point on the Southerly line of said Section 28; thence South 89°15'32" West along said South line a distance of 1326.59 feet to the Southwest corner of said Section 28 and the True Point of Beginning.

PARCEL 54: (133601000001000)

Those portions of the following described property lying Northerly of the Northerly right of way line of the existing Burlington Northern Santa Fe Railroad ( formerly Spokane, Portland and Seattle Railway);

The East 780 feet of Government Lot 1, Section 33, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington.

Except right of way for roads, and Except any portion thereof of the above described property lying below 347 feet above mean sea level, United States Coast and Geodetic Survey Datum.

PARCEL 55: (133602000002001)

A parcel of land located in the Northwest quarter of the Northwest quarter of Section 33, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington more particularly described as follows:

Beginning at the Northwest corner of said Section 33; thence Along the North line of said Section 33, South 88°31'46" East, 1137.40 feet to a point on a 1064.58 feet radius curve whose center bears South 89°27'20" East; thence along said curve to the right an arc length of 1715.72 feet through an included angle of 92°20'25" around a long chard measuring 1535.97 feet, bearing South 46°42'52" West to a point on the West line of the Northwest quarter of the Northwest quarter of Section 33; thence along said West line North 01°00' 05" West, 1082.47 feet to the Point of Beginning.

PARCEL 56: (104601000000000)

The North half of Section 4, Township 6 North, Range 30 E.W.M., Benton County, Washington.

4831-5589-2454v.18 0117168-000002

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 176 of 379

**STORAGE COMPLEX**
**LEGAL DESCRIPTION**


That portion of the Southwest quarter of Section 7, Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

Beginning at the Southwest corner of said Section 7;
Thence North 00°13'16" East 1,019.91 feet along the West line of said Section 7;
Thence South 89°44'41" East, 30.00 feet to the East line of Nine Canyon Road and the True Point of Beginning;
Thence South 89°44'41" East, 988.81 feet;
Thence South 00°13'16" West, 979.91 feet to a point 40.00 feet Northerly of the South line of said Section 7;
Thence North 89°44'41" West, 988.81 feet parallel with and 40.00 feet Northerly of said South line to a point on the East line of said Nine Canyon Road;
Thence North 00°13'16" East, 979.91 feet along said East line to the True Point of Beginning.

4831-5589-2454v.18 0117168-000002

Schedule 2.4
Water Agreements/Irrigation System Permits

1. Department of Army Permit dated August 27, 1976 (River Farm Pump Station).

2. Permit from Burlington Northern Railroad (BNSF) dated February 16, 1978 (River Farm pipeline crossing).

3. Department of the Army Easement for Pipeline Right of Way recorded April 25, 1994 as Recording No. 94-14256. (Nine Canyon Farms pumping plant and improvements – Section 6, Township 5 North, Rane 30 East).

4. Department of the Army Easement for Pipeline Right of Way recorded April 25, 1994 as Recording No. 94-14257. (Nine Canyon Farms pumping plant and improvements – Section 6, Township 5 North, Rane 30 East).

5. Revocable Permit granted by Burlington Northern, Inc., recorded June 9, 1978 under Recording No. 761251. (River Farm Parcel 48).

6. Department of Army Easement dated February 10, 1972 (record No. 647551) (Cox Farm "Irrigro" pumping plant).

7. Department of the Army permit NPW 71-026-72-5 (Cox Farm "Irrigro" pumping plant).

   (the preceding Items 1-7, the "**Irrigation System Permits**")

8. Primary Irrigation System Agreement between Crawford & Sons, Inc., and Barbarosa Farms dated June 5, 1978, including the Modification of Agreement, and Assignment of Agreement to Easterday, and any supplements, amendments or modifications thereof.

9. Water and Irrigation System Sharing Agreement between Holtzinger Management and Prudential Insurance and any supplements, amendments or modifications thereof.

10. Water and Irrigation System Sharing Agreement by and among Holtzinger Management, Kwong Chung and Christine Lai, and Craig and Sharon Campbell and any supplements, amendments or modifications thereof.

11. Water and Irrigation System Sharing Agreement between Holtzinger Management and Holtzinger Fruit and any supplements, amendments or modifications thereof.

12. Well Agreement between Holtzinger Management and Holtzinger Fruit and any supplements, amendments or modifications thereof.

13. Irrigation System Sharing Agreement between Benton Ranch and Easterday Farms and any supplements, amendments or modifications thereof.

14. Easterday Columbia River Primary Water Delivery Agreement between Easterday Ranches and Easterday Farms dated September 19, 2011, and First Amendment dated August 2012 and any supplements, amendments or modifications thereof.

15. Irrigation Water Agreement between Holtzinger Management and Charlie Cox Farms and any supplements, amendments or modifications thereof.

16. Indefinite Term Lease from BNSF to Easterday Farms dated January 1, 1997.

17. Agreement for Private Crossing from BNSF to Easterday Farms dated June 21, 2017.

(the preceding Items 8 -17, the "**Water Agreements**").

1

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 178 of 379

Schedule 2.5
Debtor Assigned and Assumed Leases and Contracts

1. Irrigated Cash Lease No. 12-D57294 commencing January 1, 2017, by the State of Washington, Department of Natural Resources (Lessor) and Cody Easterday, Debby Easterday, Gale Easterday, and Karen Easterday (Lessee).

2. Sublease of Dryland Cash Lease No. 12-D53908 commencing October 1, 2017, by the State of Washington, Department of Natural Resources (Lessor) and Brian Wake and Brad Wake (Lessee).

3. Farm Lease commencing June 1, 2013, by Wake Family Properties, L.L.C., dba Brad Wake and Brian Wake dba B&B Farms (Lessor) and Cody A. Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday dba Easterday Farms (Lessee).

4. Farm Lease dated November 12, 2014, by Brad Wake and Brian Wake (Lessor) and Cody A. Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday dba Easterday Farms (Lessee).

5. The Barker Ranch's Consent to Shaw Vineyards, Inc.'s Partial Assignment and Sublease to Easterday Farms, Partnership of a Portion of the Water Rights Leased to Shaw Vineyards, Inc. Under The Barker Ranch/Shaw Vineyards, Inc. Water Rights Lease Agreement of February 26, 2013, dated April 29th, 2013 between Barker Ranch, Ltd (Lessor) and Shaw Vineyards, Inc. (Lessee 1) and Easterday Farms (Lessee 2).

6. Yakima Adjudication Conditional Final Order Certificate No. S4-83818-J, pursuant to The Barker Ranch, Ltd. and Shaw Vineyards, Inc. Water Right Lease Agreement (Feb. 26, 2013), as amended; The Barker Ranch's Consent to Shaw Vineyards, Inc.'s Partial Assignment and Sublease to Easterday Farms, Partnership of a Portion of the Water Rights Leased to Shaw Vineyards, Inc. Under the Barker Ranch/ Shaw Vineyards, Inc. Water Rights Lease Agreement of February 26, 2013 (April 29, 2013); and Order Pendente Lite Re Temporary Change, Barker Ranch, Claim Nos. 01858, 01859, Yakima County Superior Court No. 77-2-01484 5 (Dec. 12, 2013).

4831-5589-2454v.18 0117168-000002

Schedule 2.6
Water Certificates and Permits

3. <u>Owned Water Rights</u>

    A. <u>Washington Department of Ecology Water Right Certificates</u>

        i. Certificate No. S4-23978C

        ii. Certificate No. S3-00285C

        iii. Certificate No. S3-00284C

        iv. Certificate No. S3-22075C

        v. Certificate No. 3399

    B. <u>Washington Department of Ecology Water Right Permits</u>

        i. Superseding Permit No. S4-28998P

        ii. Superseding Permit No. G4-30584P

4. <u>Leased Water Rights</u>

    A. <u>Washington Department of Ecology Water Right Certificates</u>

        i. Certificate No. S3-00591C, pursuant to Washington Department of Natural Resources Lease 12-D57294, effective January 1, 2017.

        ii. Yakima Adjudication Conditional Final Order Certificate No. S4-83818-J, pursuant to The Barker Ranch, Ltd. and Shaw Vineyards, Inc. Water Right Lease Agreement (Feb. 26, 2013), as amended; The Barker Ranch's Consent to Shaw Vineyards, Inc.'s Partial Assignment and Sublease to Easterday Farms, Partnership of a Portion of the Water Rights Leased to Shaw Vineyards, Inc. Under the Barker Ranch/ Shaw Vineyards, Inc. Water Rights Lease Agreement of February 26, 2013 (April 29, 2013); and Order *Pendente Lite* Re Temporary Change, Barker Ranch, Claim Nos. 01858, 01859, Yakima County Superior Court No. 77-2-01484 5 (Dec. 12, 2013).

1

Schedule 5.2

Assumed Liabilities


NONE

4831-5589-2454v.18 0117168-000002

Schedule 6.4.11
Phase I's


Phase 1 Environmental Site Assessments performed by AECOM dated April 2021 with respect to Cox Farm, River Farm, Nine Canyon Farm, Goose Gap Farm, and the Storage Complex, as posted to Seller's virtual data room prior to the Effective Date of this Agreement.

4831-5589-2454v.18 0117168-000002

Schedule 7.2.10
Excluded Exceptions

General:

-            The lien of any state or federal estate tax by reason of the death of Gale Easterday.
- Any unrecorded leaseholds, right of vendors and holders of security interests on personal property installed upon the Land and rights of tenants to remove trade fixtures at the expiration of the terms.
- Any matters arising out of or by virtue of that certain bankruptcy case:

  Name of Debtor:  Easterday Ranches Inc., and Easterday Farms
  Date of Filing:  February 1, 2021
  U. S. District Court:  Eastern District
  State:  Washington
  Case No.:  21-00141-WLH11
  Chapter:  11

- Pending probate proceedings in the estate of Name of decedent:
  Gale A. Easterday
  Date Filed:  January 14, 2021
  County:  Franklin
  Court:  Superior
  Case No.:  21-4-50004-11
  Personal Representative(s):  Karen Easterday

Cox Farm:

- A mortgage, security agreement, assignment of rents and fixture filing to secure an indebtedness as shown below

  Amount:  $27,000,000.00
  Dated:  June 4, 2015
  Mortgagor:  Easterday Ranches, Inc., a Washington corporation, Cody A. Easterday and Debby Easterday, husband and wife; and Gale A. Easterday and Karen L. Easterday, husband as wife, and Easterday Farms, a Washington general partnership
  Mortgagee:  AXA Equitable Life Insurance Company, a New York corporation
  Loan No.:  60715200
  Recording Date:  June 4, 2015
  Recording No:  2015-015800

- A financing statement as follows:

1

Debtor: Easterday Ranches, Inc.
Secured Party: AXA Equitable Life Insurance Company
Recording Date: June 4, 2015
Recording No: 2015-015801

- A mortgage, security agreement, assignment of rents and fixture filing to secure an indebtedness as shown below Amount: $3,100,000.00

  Dated: June 16, 2020
  Mortgagor: Easterday Ranches, Inc., a Washington corporation, Cody A. Easterday and Debby Easterday, husband and wife; and Gale A. Easterday and Karen L. Easterday, husband as wife, and Easterday Farms, a Washington general partnership
  Mortgagee: AXA Equitable Life Insurance Company, a New York corporation
  Recording Date: June 16, 2020
  Recording No: 2020-20391

- As to Parcel J:
  Claim of Lien
  Claimant: Pegram Construction Inc.
  Against: Easterday Ranches Inc.
  Amount: $123,984.00
  Recorded: February 4, 2021
  Recording No: 2021-5522

- Claim of Lien by Copenhaver Construction, Inc. in the amount of $75,625.00 filed on April 9, 2021.

River Farm:

- A Mortgage, Security Agreement, and Fixture Filing, with Assignment of Rents and Proceeds, Leases and Agreements to secure an indebtedness as shown below

  Amount: $50,000,000.00
  Dated: February 12, 2020
  Mortgagor: EASTERDAY RANCHES, INC., a Washington corporation, EASTERDAY FARMS, a Washington general partnership among Cody A Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday, GALE A. EASTERDAY and KAREN L. EASTERDAY, husband and wife, and CODY A. EASTERDAY and DEBBY EASTERDAY
  Mortgagee: The Prudential Insurance Company of America, a New Jersey Corporation
  Recording Date: February 18, 2020
  Recording No: 2020-005577

Nine Canyon Farm:

4831-5589-2454v.18 0117168-000002

- A Mortgage, Security Agreement, and Fixture Filing, with Assignment of Rents and Proceeds, Leases and Agreements to secure an indebtedness as shown below

  Amount:  $50,000,000.00
  Dated:  February 12, 2020
  Mortgagor:  EASTERDAY RANCHES, INC., a Washington corporation, EASTERDAY FARMS, a Washington general partnership among Cody A Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday, GALE A. EASTERDAY and KAREN L. EASTERDAY, husband and wife, and CODY A. EASTERDAY and DEBBY EASTERDAY
  Mortgagee:  The Prudential Insurance Company of America, a New Jersey Corporation
  Recording Date:  February 18, 2020
  Recording No:  2020-005577

- As to Parcel 6:  Claim of Lien

  Claimant:  AAA Concrete Inc., a Washington Corporation
  Against:  Easterday Farms
  Amount:  $51,329.00
  Recorded:  December 29, 2020
  Recording No:  2020-53403

Goose Gap Farm:

- A Mortgage, Security Agreement, and Fixture Filing, with Assignment of Rents and Proceeds, Leases and Agreements to secure an indebtedness as shown below
  Amount:  $50,000,000.00
  Dated:  February 12, 2020
  Mortgagor:  EASTERDAY RANCHES, INC., a Washington corporation, EASTERDAY FARMS, a Washington general partnership among Cody A Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday, GALE A. EASTERDAY and KAREN L. EASTERDAY, husband and wife, and CODY A. EASTERDAY and DEBBY EASTERDAY
  Mortgagee:  The Prudential Insurance Company of America, a New Jersey Corporation
  Recording Date:  February 18, 2020
  Recording No:  2020-005577

Storage Complex:

- A mortgage to secure an indebtedness as shown below

  Amount:  $6,000,000.00
  Dated:  April 7, 2011
  Mortgagor:  Easterday Farms, a Washington general partnership
  Mortgagee:  LTM Investments LLC, a Washington limited liability company

4831-5589-2454v.18 0117168-000002

Recording Date:  April 8, 2011
Recording No.:  2011-10312
First amendment to Mortgage recorded July 10, 2014 under Auditor's File No. 2014-16432

4831-5589-2454v.18 0117168-000002

Schedule 8.7
Assumed and Assigned Contracts and Leases / Cure Amounts

| Contract or Lease | Cure Amount |
|---|---|
| 1. Irrigated Cash Lease 12-D57294 commencing January 1, 2017, by the State of Washington, Department of Natural Resources (Lessor) and Cody Easterday, Debby Easterday, Gale Easterday, and Karen Easterday (Lessee). | $ |
| 2. Sublease of Dryland Cash Lease commencing October 1, 2017, by the State of Washington, Department of Natural Resources (Lessor) and Brian Wake and Brad Wake (Lessee). | $ |
| 3. Farm Lease commencing June 1, 2013, by Wake Family Properties, L.L.C., dba Brad Wake and Brian Wake dba B&B Farms (Lessor) and Cody A. Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday dba Easterday Farms (Lessee). | $21,962.50 + 12% interest |
| 4. Farm Lease dated November 12, 2014, by Brad Wake and Brian Wake (Lessor) and Cody A. Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday dba Easterday Farms (Lessee). | $9,640.00 + 12% |
| 5. The Barker Ranch's Consent to Shaw Vineyards, Inc.'s Partial Assignment and Sublease to Easterday Farms, Partnership of a Portion of the Water Rights Leased to Shaw Vineyards, Inc. Under The Barker Ranch/Shaw Vineyards, Inc. Water Rights Lease Agreement of February 26, 2013, dated April 29th, 2013 between Barker Ranch, Ltd (Lessor) and Shaw Vineyards, Inc. (Lessee 1) and Easterday Farms (Lessee 2). | $1,800.00 late fee |

1

| Contract or Lease | Cure Amount |
|---|---|
| 6.         Yakima Adjudication Conditional Final Order Certificate No. S4-83818-J, pursuant to The Barker Ranch, Ltd. and Shaw Vineyards, Inc. Water Right Lease Agreement (Feb. 26, 2013), as amended; The Barker Ranch's Consent to Shaw Vineyards, Inc.'s Partial Assignment and Sublease to Easterday Farms, Partnership of a Portion of the Water Rights Leased to Shaw Vineyards, Inc. Under the Barker Ranch/ Shaw Vineyards, Inc. Water Rights Lease Agreement of February 26, 2013 (April 29, 2013); and Order Pendente Lite Re Temporary Change, Barker Ranch, Claim Nos. 01858, 01859, Yakima County Superior Court No. 77-2-01484 5 (Dec. 12, 2013). | $ |

4831-5589-2454v.18 0117168-000002

# **EXHIBIT B**

*First Amendment to Successful Bidder PSA*

# FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

THIS FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "**Amendment**") is made and entered into as of the date of the last Party's signature hereto as set forth below ("**Effective Date**"), by and among Farmland Reserve, Inc. a Utah nonprofit corporation ("**Buyer**"), and Easterday Ranches, Inc., a Washington corporation ("**Ranches**") and Easterday Farms, a Washington general partnership ("**Farms**" and, together with Ranches, and their respective estates, the "**Debtors**"), each a debtor and debtor in possession under Lead Case No. 21-00141-11 (the "**Cases**") (Jointly Administered) in the United States Bankruptcy Court for the Eastern District of Washington, Yakima Division (the "**Bankruptcy Court**"), and by and among Buyer, Debtors, and Cody Easterday ("**CE**") and Debbie Easterday ("**DE**"), husband and wife, and Karen Easterday, in her individual capacity, and as the personal representative in *In the Matter of the Estate of Gale A. Easterday* currently pending in the Franklin County Superior Court, case no. 21-450004-11 ("**KE**," and together with **CE** and **DE**, "**Easterdays**," and, together with Debtors, "**Sellers**"), with respect to that certain Purchase and Sale Agreement by and between the Parties dated May 19, 2021 (the "**Purchase Agreement**"). Collectively, Buyer and Sellers are referred to herein as the "**Parties**." Capitalized terms defined in the Purchase Agreement and used in this Amendment have the same meaning as given in the Purchase Agreement.

The Parties hereby agree as follows:

1.      The Purchase Price set forth in Section 5.1.1 is hereby amended to be TWO HUNDRED AND FOUR MILLION AND NO/100 ($204,000,000.00) Dollars, *less* the stalking horse bidder credit in the amount of $3,400,000.00, *plus* the $5,000,000.00 Plan Sponsor Contribution set forth in Section 12.1, subject to the terms of Section 12.1, plus any transfer taxes or the like as provided in Section 6.8 of the Purchase Agreement.

2.      The definition of "Debtors" is amended to be "Easterday Ranches, Inc., a Washington corporation ("**Ranches**") and Easterday Farms, a Washington general partnership ("**Farms**" and, together with Ranches, and their respective estates, the "**Debtors**")."

3.      Except as expressly provided in this Amendment, the Purchase Agreement remains unchanged.

4.      This Amendment may be executed in counterparts, each of which will be deemed an original, and taken together, will constitute one and the same agreement.

[NOTHING FURTHER – SIGNATURES BEGIN ON THE FOLLOWING PAGE.]

**In Witness Whereof**, Buyer and Sellers have executed this Amendment as of the Effective Date.

**BUYER:**

**FARMLAND RESERVE, INC.,**
**a Utah nonprofit corporation**

By: _Doug Rose_____
     Doug Rose, President and Chief Executive Officer

Date: _June 17, 2021_____

**SELLERS:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
   Name: Scott Avila
   Title: Co-Chief Restructuring Officer
Date: June 18, 2021

By: _____
   Name: Peter Richter
   Title: Co-Chief Restructuring Officer
Date: June 18, 2021

**EASTERDAY FARMS, a Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
   Name: Scott Avila
   Title: Co-Chief Restructuring Officer
Date: June 18, 2021

By: _____
   Name: Peter Richter
   Title: Co-Chief Restructuring Officer
Date: June 18, 2021

_____
**Cody Easterday**
Date: June ____, 2021

_____
**Debby Easterday**
Date: June ____, 2021

_____
**Karen Easterday, in her individual capacity**
Date: June ____, 2021

_____
**Karen Easterday as personal representative**
**of the Estate of Gale Easterday**
Date: June ____, 2021

First Amendment to Purchase and Sale Agreement Signature Page
DOCS_LA:338491.2 20375/001

**SELLERS:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
       Name: Scott Avila
       Title: Co-Chief Restructuring Officer
Date: June 18, 2021

By: _____
       Name: Peter Richter
       Title: Co-Chief Restructuring Officer
Date: June 18, 2021

**EASTERDAY FARMS, a Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
       Name: Scott Avila
       Title: Co-Chief Restructuring Officer
Date: June 18, 2021

By: _____
       Name: Peter Richter
       Title: Co-Chief Restructuring Officer
Date: June 18, 2021

_____
**Cody Easterday**
Date: June 21, 2021

_____
**Debby Easterday**
Date: June 21, 2021

_____
**Karen Easterday, in her individual capacity**
Date: June 21, 2021

_____
**Karen Easterday as personal representative**
**of the Estate of Gale Easterday**
Date: June 21, 2021

First Amendment to Purchase and Sale Agreement Signature Page
DOCS_LA:338491.2 20375/001

# **EXHIBIT C**

*Backup Bidder PSA*

# PURCHASE AND SALE AGREEMENT

## BY AND AMONG

## 100C, LLC, A DELAWARE LIMITED LIABILITY COMPANY, AS BUYER

## AND

## EASTERDAY RANCHES, INC., A WASHINGTON CORPORATION AND EASTERDAY FARMS, A WASHINGTON GENERAL PARTNERSHIP, CODY EASTERDAY, DEBBY EASTERDAY AND KAREN EASTERDAY, COLLECTIVELY AS SELLERS

1006813688v11

# TABLE OF CONTENTS

**Page**

1. Sale by the Easterdays ............................................................................................... 3
2. Purchase and Sale of the Property ........................................................................... 5
3. Excluded Property ....................................................................................................... 7
4. Excluded Liabilities ..................................................................................................... 8
5. Consideration ............................................................................................................... 8
   5.1 Purchase Price ................................................................................................... 8
   5.2 Assumed Liabilities; Environmental Release ............................................. 9
6. Performance ................................................................................................................ 10
   6.2 Purchase Price Allocation ............................................................................ 10
   6.3 Closing Date ..................................................................................................... 11
   6.4 Easterdays Deliveries at Closing ................................................................ 11
   6.6 Buyer's Deliveries to Sellers at Closing .................................................... 15
   6.7 Pre-Closing Covenants .................................................................................. 15
       6.7.1 Intentionally Omitted ....................................................................... 15
       6.7.2 HSR Act .............................................................................................. 16
       6.7.3 WARN Act ........................................................................................... 16
       6.7.4 COBRA ................................................................................................ 16
       6.7.5 Operation and Maintenance ........................................................... 16
       6.7.6 Compliance ......................................................................................... 16
   6.8 Transfer Taxes; Certain Prorations; Title Insurance; Etc .................... 17
   6.9 Possession. ........................................................................................................ 18
   7.1 Conditions to Sellers' Obligations. ............................................................ 19
   7.2 Conditions to Buyer's Obligations. ........................................................... 20
   7.3 Termination ....................................................................................................... 22
8. Sellers' Representations and Warranties ............................................................. 22
   8.1 Power of Sellers .............................................................................................. 22
       8.1.1 Easterdays .......................................................................................... 22
       8.1.2 Debtors ................................................................................................ 22
   8.2 Authorization of Sellers ................................................................................ 23

i

| | | |
|---|---|---|
| 8.3 | Real Property | 23 |
| 8.4 | Environmental Condition | 23 |
| 8.5 | Compliance with Laws | 23 |
| 8.6 | Water Rights | 23 |
| 8.7 | Assigned and Assumed Leases and Contracts | 24 |
| 8.8 | OFAC | 24 |
| 8.9 | Existing Leases and Contracts. | 24 |
| 9. | Buyer's Representations and Warranties | 24 |
| 9.1 | Power of Buyer | 25 |
| 9.2 | Authorization of Buyer | 25 |
| 9.3 | OFAC | 25 |
| 10. | AS-IS | 25 |
| 11. | Bankruptcy Court Approvals | 26 |
| 11.1 | Intentionally Omitted | 26 |
| 11.2 | Intentionally Omitted | 26 |
| 11.3 | Sale Order | 26 |
| 11.4 | Debtor Assigned and Assumed Leases and Contracts | 27 |
| 12. | Post-Closing Covenants | 27 |
| 12.1 | Plan Sponsor Contribution | 27 |
| 12.2 | Consent to Assignment | 27 |
| 12.3 | Water Matters | 28 |
| 13. | Miscellaneous | 28 |
| 13.1 | Damage and Destruction; Condemnation | 28 |
| 13.2 | Seller Default | 29 |
| 13.3 | Buyer Default | 29 |
| 13.4 | Attorneys' Fees | 30 |
| 13.5 | Notices | 30 |
| 13.6 | Entire Agreement; No Third Party Beneficiaries | 32 |
| 13.7 | Modification | 32 |
| 13.8 | Closing Date | 32 |
| 13.9 | Reporting Requirements | 32 |
| 13.10 | Cooperation Agreement | 32 |

1006813688v11

13.11 Severability ................................................................................................ 32

13.12 Captions ..................................................................................................... 32

13.13 Further Assurances ..................................................................................... 33

13.14 Waiver ........................................................................................................ 33

13.15 Brokerage Obligations ............................................................................... 33

13.16 Payment of Fees and Expenses .................................................................. 33

13.17 Survival ...................................................................................................... 33

13.18 Assignments ............................................................................................... 33

13.19 Binding Effect ............................................................................................ 34

13.20 Applicable Law ........................................................................................... 34

13.21 Good Faith .................................................................................................. 34

13.22 Construction ............................................................................................... 34

13.23 Counterparts; Electronic Signatures .......................................................... 34

13.24 Time is of the Essence ................................................................................ 34

13.25 Bankruptcy Court Jurisdiction ................................................................... 34

13.26 Interpretation and Rules of Construction ................................................... 35

13.27 Confidentiality ........................................................................................... 35

iii

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (the "**Agreement**") is made and entered into as of the date of the date of the last Party's signature hereto as set forth below ("**Effective Date**"), by and among 100C, LLC, a Delaware limited liability company ("**Buyer**"), and Easterday Ranches, Inc., a Washington corporation ("**Ranches**"), and Easterday Farms, a Washington general partnership ("**Farms**" and, together with Ranches, "**Debtors**"), each a debtor and debtor in possession under Lead Case No. 21-00141-11 (the "**Cases**") (Jointly Administered) in the United States Bankruptcy Court for the Eastern District of Washington, Yakima Division (the "**Bankruptcy Court**"), and by and among Buyer, Debtors, and Cody Easterday ("**CE**") and Debby Easterday ("**DE**"), husband and wife, and Karen Easterday, in her individual capacity, and as the personal representative in *In the Matter of the Estate of Gale A. Easterday* currently pending in the Franklin County Superior Court, case no. 21-450004-11 ("**KE**," and together with **CE** and **DE**, "**Easterdays**," and, together with Debtors, "**Sellers**"). Collectively, Buyer and Sellers are referred to herein as the "**Parties**."

## RECITALS

A.     Buyer wishes to acquire from Debtors, and Debtors wish to sell to Buyer, all of Debtors' right, title, and interest in and to that property described in Section 1 and Section 2 (collectively, the "**Property**") on the terms and conditions set forth herein.

B.     In the Debtors' business judgment, any sale of the portion of the Property that currently constitutes property of the Debtors' bankruptcy estates (collectively, "**Debtor Property**") can best be maximized for the benefit of Debtors' creditors and parties-in-interest in the Cases if the Debtor Property is marketed for sale with the portion of the Property that is currently owned and/or leased by the Easterdays as described in Section 1 (collectively, "**Easterday Property**").

C.     In Easterdays' business judgment, any sale of the Easterday Property can best be maximized for the benefit of the Easterdays' creditors and their respective parties-in-interest if the Easterday Property is marketed for sale with the Debtor Property.

D.     In furtherance of Sellers' desire to maximize the value of the Property, Debtors filed their *Motion for an Order Authorizing and Approving Cooperation Agreement* in the Cases on March 26, 2021 [Dkt. No. 487, as revised by Dkt. Nos. 493, 576, and 640] (the "**Cooperation Agreement Motion**"). On April 28, 2021, the Bankruptcy Court entered an order approving the Cooperation Agreement Motion [Dkt. No. 655] (the "**Cooperation Agreement Order**").

E.     In furtherance of the Sellers' desire to maximize the value of the Property, Debtors filed their *Notice and Motion for (I) an Order (A) Approving Bid Procedures for the Sale of Assets; (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Scheduling the Auction and Sale Hearing; and (D) Granting Related Relief; and (II) an Order (A) Approving the Sale Free and Clear of All Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment or Rejection of*

1006813688v11

*Executory Contracts and Unexpired Leases; Memorandum of Points and Authorities* in the Cases on March 26, 2021 [Dkt. No. 486] ("**Bidding Procedures and Sale Motion**"). On April 29, 2021, the Bankruptcy Court entered an order approving the Bidding Procedures (as defined in the Bidding Procedures and Sale Motion) (the "**Bidding Procedures Order**").

F. Cody Easterday entered into a *Plea Agreement* on March 31, 2021 in Case No. 4:21-CR-06012-SAB-1 (the "**Plea Agreement**") in the United States District Court for the Eastern District of Washington.

G. On the terms and conditions set forth in this Agreement, and subject to higher and better offers in accordance with the Bidding Procedures Order, Buyer wishes to acquire from Debtors all of Debtors' right, title, and interest in and to the Property, free and clear of all liens, claims, rights, encumbrances and interests pursuant to and in accordance with sections 105, 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 4001, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), all as more fully set forth in this Agreement.

H. The consummation of the transactions described in this Agreement, including, upon Closing, Buyer's lease of the Property to Debtors in order to enable Debtors to complete the current-year wheat crop harvest and to market and sell certain tangible personal property and equipment ("**Equipment**"), will maximize the value of the Property and Equipment for the benefit of the Sellers and their creditors and parties-in-interest.

I. In Debtors' business judgment, consummation of the transaction described in this Agreement, subject to higher and better offers in accordance with the Bidding Procedures Order, is a necessary condition to Debtors' ability to propose and confirm a joint Chapter 11 plan of liquidation in form and content reasonably acceptable to the Sellers (the "**Joint Plan**") that enables Debtors or their designee to complete the current-year wheat crop harvest and to sell the Equipment in order to best maximize recoveries for all holders of rights and claims against the Sellers and in and to the Property.

J. Sellers acknowledge and agree that Buyer's obligation to consummate the transactions described in this Agreement on the terms and conditions set forth in the Agreement requires the Easterdays to sell, assign, transfer, convey and deliver to Debtors all right, title and interest in and to the Easterday Property, upon which transfer all of the Easterday Property shall constitute property of Debtors' bankruptcy estates and for which the Easterdays shall receive, in accordance with the Cooperation Agreement and subject to the approval of the Bankruptcy Court, an allocable interest in the Net Sale Proceeds, as such term is defined in the Cooperation Agreement (the "**Proceeds Allocation**").

K. Buyer acknowledges and agrees that upon the execution of the Agreement by the Easterdays, Debtors and Buyer, the Agreement shall constitute Buyer's irrevocable offer to purchase the Property on the terms and conditions set forth herein.

L. The Parties acknowledge and agree that the Debtors' will be acting as agent for Buyer for the sole purpose of effecting the purchase of the Easterday Property in accordance

1006813688v11

with WAC 458-61A-214 and that Debtors' shall have no fiduciary or other obligations to Buyer except as expressly set forth in this Agreement. All funds paid to Easterdays pursuant to the Cooperation Agreement in acquiring the Easterday Property will be provided by Buyer. Debtors' conveyance of the Easterday Property to Buyer under this Agreement is for the same consideration paid pursuant to the Cooperation Agreement to Easterdays for the Easterday Property. Notwithstanding anything herein to the contrary, the Parties agree that this Recital L is separate from and unrelated to the Proceeds Allocation and that this Recital L shall not be binding upon Sellers or used as evidence or otherwise be taken into account in connection with the determinations to be made in connection with the Proceeds Allocation under the Cooperation Agreement.

      M.     The Parties acknowledge and agree that this Agreement was negotiated at arm's length and in good faith, and that the transactions evidenced in this Agreement, and any actions that the Parties deem necessary to comply with and perform under the Agreement and to consummate the transactions set forth herein, are not intended to hinder, delay or defraud creditors of any of the Sellers.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing Recitals, which are incorporated into the agreements of the Parties herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

      1.     <u>Sale by the Easterdays</u>. On the Closing Date, as hereinafter defined, in consideration of the covenants and obligations of the Parties hereunder, and subject to the conditions set forth herein, in consideration of and in exchange for the Proceeds Allocation, the Easterdays shall sell, assign, transfer, convey and deliver to Debtors, and Debtors shall acquire and accept, all of Easterdays' rights, title, and interest in and to the Easterday Property, as follows:

      1.1     All of Easterdays' rights, title and interest in and to the real property located in Benton County, Washington commonly known as Goose Gap Farm, River Farm, Cox Farm, and Farm Manager House, which are legally described on <u>Schedule 1.1</u> attached hereto and incorporated by reference (the "**Easterday Land**"), together with all rights, privileges, easements and appurtenances to the Easterday Land (collectively, the "**Easterday Appurtenances**")

      1.2     Any transferrable or assignable rights, title and interest in and to any oil, gas, minerals, hydrocarbons, geothermal, sand, rock, or gravel resources on, of, or relating to, the Easterday Land (the "**Easterday Mineral Rights**").

      1.3     All of Easterdays' rights, title and interest in and to buildings and related improvements and all fixtures now or hereafter located on the Easterday Land, including (i) all storage facilities and all houses, sheds, warehouses, mobile homes, and other buildings, (ii) all irrigation and drainage equipment located on, within, and serving the Easterday Land, Easterday Appurtenances, or Easterday Water Rights (as defined in <u>Section 1.5</u>), including, without

3

limitation, wells, well casings, pumps, booster pumps, pump station equipment, pipelines, pump houses, motors, meters, engines, electrical panels, gearheads, sand filters and pressure systems pumps, irrigation pivots, sprinklers, drip irrigation systems, tow lines, hand lines, irrigation pipe, drainage pipe and culverts, (iii) all enclosures of the Easterday Land or any part thereof, including, without limitation, fences, gates, shuts, posts, poles, barbed wire and electric wire, (iv) any crop protection equipment and apparatus located on the Easterday Land, including, without limitation, any frost protection equipment and wind machines, (v) all electric, gas and water lines and equipment located on the Easterday Land, including, without limitation, transformers, circuit breakers, switch boxes, fuse and breaker panels, regulators, cut on/off valves, wiring and pipe, and (vi) all trees, vines and other permanent plantings, whether mature or immature, now or hereafter growing on the Easterday Land, together with all trellises, wires, end posts, and stakes relating thereto (collectively, the "**Easterday Improvements**").

   1.4  All of Easterdays' transferrable or assignable rights, title and interest in and to any and all (a) land surveys obtained prior to Closing; (b) water sharing agreements and water delivery agreements set forth on <u>Schedule 1.4</u>  attached hereto and incorporated herein ("**Easterday Water Agreements**"); (c) approvals and permits, including, all permits and related easements with respect to the irrigation water pumping plants, pipelines and related facilities, including those set forth on <u>Schedule 1.4</u> attached hereto and incorporated herein (the "**Easterday Irrigation System Permits**"); (d) engineering drawings (including CAD files associated with such engineering drawings) to the extent in Easterdays' possession, custody or control concerning any infrastructure on or serving the Easterday Land, Easterday Appurtenances, or Easterday Improvements, including, without limitation, irrigation systems, wastewater and drainage systems, reservoirs, frost control systems, roads, electrical systems and grading; (e) to the extent in Easterdays' possession, custody or control, manuals, warranties, and service and maintenance records and agreements; (f) to the extent in Easterdays' possession, custody or control, soil analyses, and irrigation and wastewater studies; (g) to the extent in Easterdays' possession, custody or control, records of applications of chemicals, fertilizers, and any other applications on the Easterday Land whatsoever pertaining to the ownership or operation of the Easterday Land, Easterday Appurtenances, Easterday Mineral Rights, Easterday Water Rights (as defined below in <u>Section 1.5</u>) and/or the Easterday Improvements.

   1.5  All of Easterdays' transferable or assignable water rights appurtenant to the Easterday Land and all rights to receive or store water that serve the Easterday Land, including, without limitation, to the extent transferable or assignable (i) all appurtenant rights to withdraw groundwater and to divert surface water including by prior appropriation or by or under any certificates, permits, rights or licenses granted by any governmental authority or agency including, without limitation, ground and surface water right certificates and permits listed on <u>Schedule 1.5</u> attached to this Agreement and incorporated herein by reference, (ii) any rights to withdraw, divert or use water granted or created by lease, contract or agreement with any government agency, person or entity; (iii) any water, water right, water allocation, distribution right, delivery right, water storage right, or other water-related entitlement appurtenant or otherwise applicable to the Easterday Land by virtue of the Easterday Land being situated within the boundaries of any district, agency or other governmental entity or within the boundaries of any private water company, mutual water company or other non-governmental entity; (iv) all easements or other rights, including contractual rights, to transport, carry, allocate

4

21-00141-WLH11  Doc 830  Filed 06/21/21  Entered 06/21/21 17:28:37  Pg 202 of 379

or otherwise deliver water or any of the foregoing rights from or to the Easterday Land by any means, wherever located; and (v) any shares (or any rights under such shares) of any private water company, mutual water company or other non-governmental entity pursuant to which Easterdays or the Easterday Land may receive and use water (collectively, the "**Easterday Water Rights**").

1.6     All of Easterdays' transferrable or assignable rights, title and interest in and to the contracts and leases listed on <u>Schedule 1.6</u> attached hereto and incorporated herein (the "**Easterday Assigned and Assumed Leases and Contracts**"). For clarification purposes, effective as of the Closing, the current oral farming leases with respect to the Easterday Land between the Easterdays and the Debtors shall be deemed terminated as of the Closing and are not being assigned.  By executing this Agreement, the Easterdays are not waiving any rights to assert claims against the Debtors for unpaid amounts due under such leases. Buyer shall have no liability with respect to such leases.

1.7     To the extent transferable or assignable, all of Easterdays' rights, title and interest in and to other intangible property and rights pertaining to any of the Easterday Property or its operation or used in connection with the Easterday Property, including, but not limited to, to the extent transferable and assignable, all agreements, licenses, governmental authorizations or permits pertaining thereto or to the use, development, ownership, management, possession, occupancy, or operation thereof (the "**Easterday Intangible Property**").

2.     <u>Purchase and Sale of the Property</u> .  On the Closing Date, as hereinafter defined, in consideration of the covenants and obligations of the Parties hereunder, and subject to the conditions set forth herein, Debtors shall sell, assign, transfer, convey and deliver to Buyer and Buyer shall acquire and accept from Debtors, free and clear of liens, claims, rights, encumbrances, and interests pursuant to and in accordance with sections 363 and 365 of the Bankruptcy Code, except for the Permitted Exceptions (as defined in <u>Section 7.2.11</u> below), all of Debtors' rights, title and interest in and to the Property as follows:

2.1     All of Debtors' rights, title and interest in and to the real property located in Benton County, Washington commonly known as the Cox Farm, Farm Manager House, River Farm, Nine Canyon Farm, Goose Gap Farm and Storage Complex, which are legally described on <u>Schedule 2.1</u> attached hereto and incorporated by reference (the "**Land**"), together with all rights, privileges, easements and appurtenances to the Land (collectively, the "**Appurtenances**").

2.2     Any transferrable or assignable rights, title and interest in and to any oil, gas, minerals, hydrocarbons, geothermal, sand, rock, or gravel resources on, of, or relating to, the Land (the "**Mineral Rights**").

2.3     All of Debtors' rights, title and interest in and to buildings and related improvements and all fixtures now or hereafter located on the Land, including (i) all storage facilities and all houses, sheds, warehouses, mobile homes, and other buildings, (ii) all irrigation and drainage equipment located on, within, and serving the Land, Appurtenances, or Water Rights (as defined in <u>Section 2.6</u>), including, without limitation, wells, well casings, pumps, booster pumps, pump station equipment (including, specifically the "Berian", "Irrigo" and River

5

Farm pumping equipment, pipelines, and related facilities), pump houses, motors, meters, engines, electrical panels, gearheads, sand filters and pressure systems pumps, irrigation pivots, sprinklers, drip irrigation systems, tow lines, hand lines, irrigation pipe, drainage pipe and culverts, (iii) all enclosures of the Land or any part thereof, including, without limitation, fences, gates, shuts, posts, poles, barbed wire and electric wire, (iv) any crop protection equipment and apparatus located on the Land, including, without limitation, any frost protection equipment and wind machines, (v) all electric, gas and water lines and equipment located on the Land, including, without limitation, transformers, circuit breakers, switch boxes, fuse and breaker panels, regulators, cut on/off valves, wiring and pipe, and (vi) all trees, vines and other permanent plantings, whether mature or immature, now or hereafter growing on the Land, together with all trellises, wires, end posts, and stakes relating thereto (collectively, the "**Improvements**").

2.4    All of Debtors' transferrable or assignable rights, title and interest in and to any and all (a) land surveys obtained prior to Closing; (b) water sharing agreements and water delivery agreements set forth on <u>Schedule 2.4</u> attached hereto and incorporated herein ("**Water Agreements**"); (c) approvals and permits, including, all permits and related easements with respect to the irrigation water pumping plants, pipelines and related facilities, including those set forth on <u>Schedule 2.4</u> attached hereto and incorporated herein (the "**Irrigation System Permits**"); (d) engineering drawings (including CAD files associated with such engineering drawings) to the extent in Debtors' possession and control concerning any infrastructure on or serving the Land, Appurtenances, or Improvements, including, without limitation, irrigation systems, wastewater and drainage systems, reservoirs, frost control systems, roads, electrical systems and grading; (e) to the extent in Debtors' possession, custody, or control, manuals, warranties, and service and maintenance records and agreements; (f) to the extent in Debtors' possession, custody, or control, soil analyses, and irrigation and wastewater studies; (g) to the extent in Debtors' possession, custody or control, records of applications of chemicals, fertilizers, and any other applications on the Land whatsoever pertaining to the ownership or operation of the Land, Appurtenances, Mineral Rights, Water Rights (as defined below in <u>Section 2.6</u>) and/or the Improvements.

2.5    All of Debtors' transferrable or assignable rights, title and interest in and to the contracts and leases listed on <u>Schedule 2.5</u>  attached hereto and incorporated herein (the "**Debtor Assigned and Assumed Leases and Contracts,**" and together with the Easterday Assigned and Assumed Leases and Contracts, the "**Assigned and Assumed Leases and Contracts**").

2.6    All of Debtors' transferable or assignable water rights appurtenant to the Land and all rights to receive or store water that serve the Land, including, without limitation, to the extent transferable or assignable,  (i) all appurtenant rights to withdraw groundwater and to divert surface water including by prior appropriation or by or under any certificates, permits, rights or licenses granted by any governmental authority or agency including, without limitation, ground and surface water right certificates and permits listed on <u>Schedule 2.6</u> attached to this Agreement and incorporated herein by reference, (ii) any rights to withdraw, divert or use water granted or created by lease, contract or agreement with any government agency, person or entity; (iii) any water, water right, water allocation, distribution right, delivery right, water storage right,

6

or other water-related entitlement appurtenant or otherwise applicable to the Land by virtue of the Land being situated within the boundaries of any district, agency or other governmental entity or within the boundaries of any private water company, mutual water company or other non-governmental entity; (iv) all easements or other rights, including contractual rights, to transport, carry, allocate or otherwise deliver water or any of the foregoing rights from or to the Land by any means, wherever located; and (v) any shares (or any rights under such shares) of any private water company, mutual water company or other non-governmental entity pursuant to which Sellers or the Land may receive and use water (collectively, the "**Water Rights**").

2.7    To the extent transferable or assignable, all of Debtors' rights, title and interest in and to other intangible property and rights pertaining to any of the Property or its operation or used in connection with the Land, including, but not limited to, to the extent transferable and assignable, all agreements, licenses, governmental authorizations or permits pertaining thereto or to the use, development, ownership, management, possession, occupancy, or operation thereof (the "**Debtor Intangible Property**", together with the Easterday Intangible Property, collectively, the "**Intangible Property**").

3.    <u>Excluded Property</u>.  Notwithstanding anything to the contrary contained herein, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring and no Seller is selling or assigning any asset or property of any of the Sellers other than the Property, and all such other assets and properties of the Sellers shall be excluded from the Property (the "**Excluded Property**"). The Excluded Property includes, but is not limited to: (i) Equipment, including without limitation all machinery, tools, equipment, furniture, movable trade fixtures, office furnishings, spare parts, vehicles, containers, and other tangible personal property of any Seller that is not part of the Property; (ii) any payments received or sums or credits owed to any Seller for or on account of any crop growing on the Property at Closing (it being expressly agreed that Sellers shall be entitled to all such payments, sums and credits); or (iii) any of the Property that, (xx) to the extent constituting Assigned and Assumed Leases and Contracts, are not approved for assumption and assignment by Debtors to Buyer pursuant to section 365 of the Bankruptcy Code, or are not approved for sale by Debtors to Buyer pursuant to section 363 of the Bankruptcy Code upon entry of the Sale Order (as defined in <u>Section 11.3</u> hereof), or (yy) to the extent constituting Assigned and Assumed Leases and Contracts, require approval or consent of a counterparty or other third party prior to any assignment or sale where such consent is not obtained prior to or after the Closing (as defined in <u>Section 6.1</u> hereof), except where the need for such consent or approval described in this clause (yy) is obviated by the effect of the Sale Order.  Notwithstanding the foregoing or anything to the contrary in the Agreement, Sellers and Buyer shall cooperate with each other and use commercially reasonable efforts prior to Closing to obtain any required consents and/or approvals with respect to (1) the Assigned and Assumed Leases and Contracts (including, without limitation, any leases, contracts or agreements with Shaw Vineyards, Inc. or the Department of Natural Resources), (2) any agreements, permits and/or easements with the United States Army and (3) the Easterday Water Agreements, Easterday Irrigation System Permits, Water Agreements and Irrigation System Permits, such that those leases, contracts, agreements, permits and/or easements are not Excluded Property and are conveyed to Buyer at Closing or as soon as possible thereafter; *provided that* nothing in this Agreement requires or obligates either Buyer or Sellers to (i) pay any fee or other amount or compensation to any party for its consent or approval, or (ii) initiate or pursue any litigation or

7

other enforcement action against any party to obtain any such consent or approval; *provided further that*, to the extent necessary and at Buyer's sole cost and expense, Sellers shall cooperate with Buyer and use commercially reasonable efforts, for a period of six (6) months after Closing, in the event Buyer determines that litigation or other enforcement action of any kind or nature is necessary to cause the transfer of any rights, title or interest in and to the Property from Sellers to Buyer. Buyer agrees to defend (in coordination with Sellers' counsel), indemnify and hold Sellers harmless from and against costs (including reasonable attorney fees), claims or liabilities arising from or in connection with Sellers' cooperation with Buyer pursuant to the preceding sentence. The provisions of this <u>Section 3</u> shall survive Closing.

4. <u>Excluded Liabilities</u>. Notwithstanding anything herein to the contrary, Buyer is not assuming, nor will Buyer be obligated to assume or be obliged to pay, perform or otherwise discharge or in any other way be liable or responsible for any liability whatsoever of Sellers or any of their affiliates, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities and, for the avoidance of doubt, all cure amounts for which Buyer is responsible pursuant to <u>Section 11.4</u> hereof (collectively, the "**Excluded Liabilities**"). Without limiting the foregoing, Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, which for the avoidance of doubt, include (a) all liabilities arising, whether prior to, at or after the Closing, under (i) Title IV of ERISA, including with respect to a multi-employer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA) or a defined benefit pension plan maintained at any time by any of the Sellers or any of their affiliates, (ii) all Seller benefit plans (including any COBRA obligations), (iii) any collective bargaining agreement, or (iv) any liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, retaliation, discrimination, termination or other payments or payment obligations; (b) any and all liabilities for taxes of or imposed on Sellers or any of its affiliates or related or attributable to the Property for any pre-Closing tax period other than real estate and personal property taxes expressly assumed by Buyer under this Agreement; (c) all liabilities relating to the Excluded Property; and (d) all cure costs or damages arising under or relating to any of the Assigned and Assumed Leases and Contracts that are ultimately not assumed and assigned to Buyer for any reason.

Notwithstanding anything to the contrary contained herein, (i) Buyer is not a successor to the Sellers or their respective estates by reason of any theory of law or equity, and Buyer shall not assume or in any way be responsible for any liability or obligation of any of Sellers or their respective estates by reason thereof, (ii) Buyer is not a mere continuation of the Debtors or their estates or Easterdays or their respective estates, as applicable, and there is no continuity between Buyer and any of Sellers, (iii) Buyer is not holding itself out to the public as a continuation of Sellers and (iv) the transactions contemplated by this Agreement do not amount to a consolidation, merger, or de facto merger of Buyer and any of Sellers.

5. <u>Consideration</u>.

5.1 <u>Purchase Price</u>.

1006813688v11

5.1.1    The cash consideration to be paid by Buyer to Debtors for the Property shall be $207,000,000, plus any transfer taxes or the like as provided in <u>Section 6.8</u> herein (the **"Purchase Price"**).

5.1.2    The Purchase Price shall be paid as follows:

(a)    On June 4, 2021, Buyer (and a third party designee of Buyer) deposited into a trust account with Debtors' counsel an aggregate amount equal to $20,080,750 (the "**Deposit**") in immediately available, good funds (funds delivered in this manner are referred to herein as "**Good Funds**"), to be held pursuant to the Bidding Procedures (as defined in the Bidding Procedures and Sale Motion).  On the date hereof, Sellers shall direct the Deposit to be transferred into escrow (the "**Escrow**") with *Chicago Title Insurance Company* ("**CTIC**") (the "**Escrow Holder**" or "**Title Company**") to be held pursuant to escrow instructions in substantially the form of <u>Exhibit A</u> attached hereto and incorporated herein by this reference (the "**Escrow Instructions**").  In turn, the Escrow Holder shall immediately deposit the Deposit into a segregated, interest-bearing account. At the Closing, the Deposit shall be credited and applied toward payment of the Purchase Price. If the transactions described in this Agreement terminate (A) by reason of Sellers' material default under this Agreement, it being agreed that Buyer shall not have the right to so terminate this Agreement unless Sellers have failed to cure the applicable default within three (3) business days following receipt of written notice thereof from Buyer, or (B) by reason of the failure of a condition to Buyer's obligations hereunder (the failure of which is not itself the result of a material default by Buyer hereunder), or (C) pursuant to <u>Section 6.3</u>  or <u>Section 7.3</u> in circumstances where such termination was not itself the result of a material default by Buyer hereunder, the Escrow Holder shall return to Buyer the Deposit (together with all interest accrued thereon), but less an amount equal to 1/2 of the Escrow Holder's escrow fees and charges. For clarity, if this Agreement is terminated for any reason other than a Buyer Default, the Deposit shall be returned to Buyer, and further, upon any termination of this Agreement, none of the Parties shall have any further obligations other than as expressly set forth in this Agreement.

(b)    On the Closing Date, (A) Buyer shall deliver into Escrow with the Escrow Holder, Good Funds in the amount of the balance of the Purchase Price, plus any other amounts payable by Buyer hereunder and (B) the Escrow Holder shall release and disburse the Purchase Price proceeds and the Deposit into an escrow in accordance with the Escrow Instructions, this Agreement, the Cooperation Agreement and the mutually approved closing settlement statements delivered at Closing.

5.2    <u>Assumed Liabilities; Environmental Release</u>.

(a)    Other than the liabilities and obligations of Sellers expressly assumed by Buyer hereunder or as set forth on <u>Schedule 5.2</u> ("**Assumed Liabilities**"), if any, any liabilities or obligations that existed, accrued or were incurred prior to the Closing Date constitute Excluded Liabilities.

(b)    Buyer and anyone claiming by, through or under Buyer hereby waives any right to recover from and fully and irrevocably releases Sellers and Sellers'

1006813688v11

employees, officers, directors, members, partners, principals, representatives, agents, servants, attorneys, affiliates, parent, subsidiaries, bankruptcy estates, successors and assigns, and all persons, firms, corporations and organizations in its behalf (collectively, "**Released Parties**") of and from any and all claims, responsibility and/or liability that it may now have or hereafter acquire against any of the Released Parties for any costs, loss, liability, damage, expenses, demand, action or cause of action arising from or related to the environmental condition or any environmental matters affecting the Property, including, without limitation, geologic conditions and subsurface soil and water conditions. This release includes claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release to Sellers. In this connection and to the extent permitted by law, Buyer hereby agrees, represents and warrants that Buyer realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses relating to the environmental condition of or environmental matters affecting the Property, including, without limitation, geologic conditions and subsurface soil and water conditions, which are presently unknown, unanticipated and unsuspected, and Buyer further agrees, represents and warrants that the releases herein have been negotiated and agreed upon in light of that realization and that Buyer nevertheless hereby intends to release, discharge and acquit the Released Parties from any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses relating to or arising in connection with the environmental condition of or environmental matters affecting the Property (including, without limitation, geologic conditions and subsurface soil and water conditions). Notwithstanding any other provision of this Agreement, Buyer's release of any Released Party shall not apply to any actual and intentional fraud committed by such Released Party.

      6.     <u>Performance</u>.

      6.1     <u>Closing</u>. The Closing of the transactions described in this Agreement, in accordance with the terms and conditions of this Agreement (the "**Closing**"), shall take place in escrow with the Escrow Holder or at such other place or in such other manner as the Parties may mutually agree upon in writing. Buyer and Seller acknowledge and agree that upon the occurrence of the Closing, the purchase and sale of the Property shall conclusively be deemed final and complete and, except only for such rights and obligations as expressly survive the Closing hereunder, neither Buyer nor Sellers shall have any right upon any default by the other(s) occurring after the Closing to seek any recourse or remedy in the nature of rescission or which would otherwise have the effect of materially altering the previously consummated purchase and sale of the Property in any way, all of which rights and remedies Buyer and Sellers hereby expressly waive. Upon Closing, the closing documents delivered into Escrow pursuant this Agreement shall be delivered to the applicable parties as set forth herein, and the Deeds and any other documents that Seller or Buyer desires to record shall be recorded with the appropriate county recorder and, after recording, returned to Buyer.

      6.2     <u>Purchase Price Allocation</u>. No later than the earlier of: (a) 150 days following the Closing and (b) December 31, 2021, Sellers and Buyer shall agree to an allocation of the Purchase Price ("**Purchase Price Allocation**"). In the event the Parties cannot agree on a Purchase Price Allocation, then the Purchase Price Allocation shall be decided by the

Bankruptcy Court pursuant to Section 13.25. The Purchase Price Allocation shall be used for purposes of establishing statements of consideration for any county or state transfer tax purposes in connection with recording of the Deeds conveying the Property from Debtors to Buyer. The Parties shall also use the Purchase Price Allocation for accounting and tax purposes in connection with preparing and filing any applicable tax returns. Neither Buyer nor any Seller shall take any position in connection with the preparation or filing of any such tax returns that is inconsistent with the Purchase Price Allocation unless required to do so by applicable law. Notwithstanding anything herein to the contrary, the Parties agree that the Purchase Price Allocation is separate from and unrelated to the Proceeds Allocation and that the Purchase Price Allocation shall not be binding upon Sellers or used as evidence or otherwise be taken into account in connection with the determinations to be made in connection with the Proceeds Allocation under the Cooperation Agreement. Section 6.2 shall survive the Closing Date.

6.3     Closing Date.  The Closing shall be held on or before the date which is five (5) business days following the satisfaction or waiver of the last of Sellers' and Buyer's respective conditions precedent to Closing (as expressly set forth in this Agreement) (the "**Closing Date**"); provided that in no event shall the Closing occur (i) earlier than July 27, 2021 or (ii) later than August 31, 2021 (the "**Outside Date**"); provided, however, in the event the conditions to Closing have not been satisfied or waived by the Outside Date, then any Party whose default hereunder is not the reason such condition has not been satisfied may terminate this Agreement upon written notice to the other(s) given prior to the satisfaction or waiver of such condition(s). Alternatively, the Parties may mutually agree in writing to an extended Closing Date. Until this Agreement is either terminated or the Parties have agreed in writing upon an extended Closing Date, the Parties shall diligently continue to work to satisfy all conditions to Closing and the transactions described in this Agreement shall close as soon as such conditions are satisfied or waived in writing.

6.4     Easterdays Deliveries at Closing.  On the Closing Date, Easterdays shall make the following deliveries in Escrow for delivery to Debtors or Buyer, as applicable:

6.4.1    Quitclaim Deeds (the "**Easterday Deeds**"), in the form attached hereto as Exhibit B, duly executed and acknowledged by Easterdays, pursuant to which Easterdays convey to Debtors jointly all of Easterdays' rights, title and interest in and to the Easterday Land, Easterday Appurtenances, Easterday Mineral Rights, Easterday Improvements and Easterday Water Rights.

6.4.2    A Real Estate Excise Tax Affidavit (the "**Easterday REETA**"), duly executed by Easterdays, as grantor, and Debtors, as grantee. Easterdays and Debtors agree that the gross selling price to be inserted in the Easterday REETA is the market value assessment for the property maintained by the Benton County tax rolls at the Closing Date, or such other value as approved by the county assessor. The Parties agree that the Easterday REETA is separate from and unrelated to the Proceeds Allocation and that nothing set forth in the Easterday REETA shall be binding upon Sellers in connection with the determinations to be made in connection with the Proceeds Allocation under the Cooperation Agreement.

11

6.4.3    A Mobile Home Real Estate Excise Tax Affidavit (the "**Easterday Mobile Home REETA**"), duly executed by Easterdays, as grantor, and Debtors, as grantee.  Easterdays and Debtors agree that the gross selling price to be inserted in the Easterday Mobile Home REETA is the market value assessment for the property maintained by the Benton County tax rolls at the Closing Date, or such other value as approved by the county assessor. The Parties agree that the Easterday Mobile Home REETA is separate from and unrelated to the Proceeds Allocation and that nothing set forth in the Easterday Mobile Home REETA shall be binding upon Sellers in connection with the determinations to be made in connection with the Proceeds Allocation under the Cooperation Agreement.

6.4.4    A Bill of Sale and Assignment (the "**Easterday Bill of Sale**") from Easterdays to Debtors, in the form attached hereto as Exhibit C for any tangible and intangible personal property included in the Easterday Property, including without limitation the Property described in Sections 1.3, 1.4, and 1.7.

6.4.5    An Assignment and Assumption of Contracts and Leases (the "**Easterday Contract/Lease Assignment**"), in the form attached hereto as Exhibit D executed by Easterdays with respect to the Easterday Assigned and Assumed Leases and Contracts.

6.4.6    Washington State Department of Licensing Vehicle/Vessel Bill of Sale ("**Easterday Vehicle Bill of Sale**"), duly executed by Easterdays; provided, however, Easterdays shall not be required to provide the Easterday Vehicle Bill of Sale for the mobile and manufactured homes located on River Farm.

6.4.7    Washington Statement Department of Licensing Affidavit of Loss/Release of Interest ("**Easterday Affidavit of Loss**"), duly executed by Easterdays; provided, however, Easterdays shall not be required to provide the Easterday Affidavit of Loss for the mobile and manufactured homes located on River Farm.

6.4.8    A statement under Section 1445 of the Internal Revenue Code with respect to the Easterday Property (the "**Easterday FIRPTA Statement**").

6.4.9    A preliminary closing statement approved by the Parties and duly executed by Easterdays.

6.4.10   Easterdays' title affidavit ("**Easterday Title Affidavit**"), substantially in Title Company's standard form, and such other documents customarily required by Title Company in order to issue the Title Policy (as defined in Section 7.2.11 below).

6.4.11   Reliance letter or letters in ASTM-compliant form for purposes of satisfying "all appropriate inquiries" under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 6901 et seq.), as amended ("**CERCLA**"), with respect to the Phase I Environmental Site Assessments listed

12

on Schedule 6.4.11 (the "**Phase I's**"), duly executed by the consultants who performed such assessments, entitling Debtors and Buyer to rely on such assessments

6.4.12  Permit Assignments for Water Rights permits S4-28998(A)P and G4-30584P, each on Washington State Department of Ecology standard form ECY 040-1-61 (Rev 09-2015) duly executed by Easterdays ("**Water Rights Permit Assignments**").

6.4.13  Assignments for Water Right Change Authorizations No. CS4-23978(A)C@2, No. CS4-23978(B)C, No. CS4-23874(A)C, CS3-00286C, CS3-22572C, each on Washington State Department of Ecology standard form ECY 040-1-61 (Rev 09-2015) duly executed by Easterdays.

6.5  <u>Debtors' Deliveries to Buyer at Closing</u>.  On the Closing Date, Debtors shall make the following deliveries into Escrow for delivery to Buyer:

6.5.1  Quitclaim Deeds (the "**Deeds**"), in the form attached hereto as <u>Exhibit B</u>, duly executed and acknowledged by Debtors, pursuant to which Debtors convey to Buyer Debtors' rights, title and interest in and to the Land, Appurtenances, Mineral Rights, Improvements and Water Rights.

6.5.2  A duly executed counterpart of the Easterday REETA.

6.5.3  A Real Estate Excise Tax Affidavit (the "**REETA**"), duly executed by Debtors.

6.5.4  A duly-executed counterpart of the Current Use Application Farm and Agricultural Land Classification Parcels with Same Ownership (the "**Current Use Application**").

6.5.5  A duly executed counterpart of the Easterday Mobile Home REETA.

6.5.6  A Mobile Home Real Estate Excise Tax Affidavit (the "**Mobile Home REETA**"), duly executed by Debtors.

6.5.7  A Bill of Sale and Assignment (the "**Bill of Sale**") from Debtors, in the form attached hereto as <u>Exhibit C</u> for any all tangible and intangible personal property included in the Property, including without limitation the Property described in Sections 2.3, 2.4, and 2.7.

6.5.8  An Assignment and Assumption of Contracts and Leases (the " **Debtor Contract/Lease Assignment**"), in the form attached hereto as <u>Exhibit D</u> executed by Debtors with respect to the Debtor Assigned and Assumed Leases and Contracts.

1006813688v11

6.5.9    A duly executed counterpart of the Easterday Vehicle Bill of Sale.

6.5.10  Washington State Department of Licensing Vehicle/Vessel Bill of Sale ("**Vehicle Bill of Sale**"), duly executed by Debtors; provided, however, Debtors shall not be required to provide the Vehicle Bill of Sale for the mobile and manufactured homes located on Nine Canyon Farm or River Farm.

6.5.11  Washington Statement Department of Licensing Affidavit of Loss/Release of Interest (the "**Affidavit of Loss**"), duly executed by Debtors; provided, however, Debtors shall not be required to provide the Affidavit of Loss for the mobile and manufactured homes located on Nine Canyon Farm or River Farm.

6.5.12  A statement under Section 1445 of the Internal Revenue Code with respect to the Property (the "**FIRPTA Statement**").

6.5.13  A preliminary closing statement approved by the Parties and duly executed by Debtors.

6.5.14  Debtors' title affidavit ("**Title Affidavit**"), in the form attached as Exhibit G and such other documents customarily required by Title Company of debtors in bankruptcy whose affairs are being conducted by restructuring officers in order to issue the Title Policy (as defined in Section 7.2.11  below).

6.5.15  Reliance letter or letters in ASTM-compliant form for purposes of satisfying "all appropriate inquiries" under CERCLA, with respect to the Phase I's, duly executed by the consultants who performed such assessments, entitling Buyer to rely on such assessments.

6.5.16  A short-term lease between Buyer, as landlord, and Debtors, as lessees of the Land (the "**Temporary Lease Agreement**"), in the form attached as Exhibit E incorporated herein, pursuant to which Debtors have the right to continue to farm the Land through the end of the current growing season and to harvest and dispose of, solely for Debtors' account, those crops and other farm products described therein which are planted and growing on the Land as of the Closing.

6.5.17  A certified copy of the Sale Order from the Bankruptcy Court.

6.5.18  Permit Assignments for Water Rights permits S4-28998(A)P and G4-30584P, each on Washington State Department of Ecology standard form ECY 040-1-61 (Rev 09-2015) duly executed by Debtors ("**Water Rights Permit Assignments**").

6.5.19  Assignments for Water Right Change Authorizations No. CS4-23978(A)C@2, No. CS4-23978(B)C, No. CS4-23874(A)C, CS3-00286C, CS3-

14

22572C, each on Washington State Department of Ecology standard form ECY 040-1-61 (Rev 09-2015) duly executed by Debtors.

6.6     Buyer's Deliveries to Sellers at Closing.  On the Closing Date, Buyer shall make the following deliveries into Escrow for delivery to Debtors and Easterdays, as applicable, and take the following actions:

6.6.1    cause Escrow Holder to release and apply the Deposit (together with all interest accrued thereon) to the Purchase Price.

6.6.2    deliver the balance of the Purchase Price in Good Funds as required pursuant to Section 5.1.2(a) and cause to be paid and satisfied all such other amounts to be paid by Buyer at the Closing under the terms and provisions of this Agreement, including that up to $500,000.00 (in the aggregate) of such Good Funds shall be disbursed to Tonkon Torp LLP or Sussman Shank LLP (as directed by the Easterdays) for payment of Easterdays' professionals (including but not limited to attorneys, accountants, consultants and other Easterday professionals) for services provided to the Easterdays in connection with or related to this Agreement or the sale of the Property (as indicated by reasonable supporting documentation of such professional fees and expenses, including invoices).

6.6.3    deliver to Escrow Holder a preliminary closing settlement statement approved and duly executed by Buyer.

6.6.4    deliver a duly-executed counterpart of the REETA.

6.6.5    deliver a duly-executed counterpart of the Mobile Home REETA.

6.6.6    deliver a duly-executed counterpart of the Vehicle Bill of Sale.

6.6.7    deliver  a duly-executed counterpart of the Current Use Application.

6.6.8    deliver a duly-executed counterpart of the Debtor Contract/Lease Assignment.

6.6.9     deliver a duly-executed counterpart of the Temporary Lease Agreement.

6.6.10  Water Rights Permit Assignments duly executed by Buyer.

6.7     Pre-Closing Covenants.

6.7.1    Intentionally Omitted.

15

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 213 of 379

6.7.2   <u>HSR Act</u>.  Sellers and Buyer agree to cooperate with one another and provide each other with such information as may be required in order to determine whether the transactions described in this Agreement are subject to the notification requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C.A. § 18(a), as amended. If a filing with the Federal Trade Commission ("**FTC**") and U.S. Department of Justice ("**DOJ**") (collectively, the "**Agencies**") is required under the HSR Act, Buyer and Sellers will use commercially reasonable efforts to file notification under the HSR Act within twenty (20) days after entry of the Sale Order, and Buyer shall pay all filing fees payable in connection therewith. Buyer and Sellers shall use their respective reasonable best efforts to respond to any request for additional information made by any agencies and to cause the waiting periods or other requirements under the HSR Act to terminate or expire at the earliest possible date and to resist in good faith, at each of their respective cost and expense (including the institution or defense of legal proceedings), any assertion that the transactions contemplated by this Agreement constitutes a violation of the antitrust laws, all to the end of expediting consummation of the transactions contemplated by this Agreement.  Each of Buyer and Sellers shall consult with the other prior to any meetings, by telephone or in person, with the staff of the Agencies, and each of Buyers and Sellers shall have the right to have a representative present at any such meeting to the extent permitted by the Agencies.

6.7.3   <u>WARN Act</u>.  Sellers shall comply in all material respects with the WARN Act, which, as used herein, means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

6.7.4   <u>COBRA</u>.  Sellers shall comply in all material respects with COBRA, which, as used herein, means the federal Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and similar state, local and foreign laws related to group health coverage continuation.

6.7.5   <u>Operation and Maintenance</u>.  Prior to Closing, Sellers shall use commercially reasonable efforts to maintain and operate the Property (including, without limitation, maintaining all appropriate insurance) in a manner consistent with the condition in which it is required to be delivered pursuant to <u>Section 6.9</u> below.

6.7.6   <u>Compliance</u>.  Sellers shall remain in material compliance with all orders entered by the Bankruptcy Court or by any other court of competent jurisdiction.

6.7.7   <u>No Non-Ordinary Course Transactions</u>.  Prior to Closing, Easterdays shall not, except as permitted by the Cooperation Agreement, (i) enter into any non-ordinary course transaction, nor transfer assets or incur obligations outside of the ordinary course, (ii) transfer, or cause the transfer of, any assets, or incur or cause the incurrence of any obligations, with the intent to delay, hinder or defraud creditors, or otherwise for less than reasonably equivalent value, (iii) transfer, or cause the transfer of, any assets, or incur or cause the incurrence of any obligations or debts which they are unable to pay as such debts are matured or that leave the Easterdays or their insiders with unreasonably small capital; or (iv) transfer any assets to or for the benefit of, or incur any obligations on account of or for the benefit of, an

16

insider of the Easterdays prior to the Closing Date; provided that, nothing herein shall prohibit the Easterdays from taking any actions in furtherance of performance under this Agreement and consummation of the transactions described in this Agreement, including executing any agreement, deed, document or other writing that conveys to Debtors all right, title and interest in and to the Easterday Property for the purpose of consummating the transactions in accordance with and pursuant to the requirements of this Agreement and the Sale Order.

6.7.8    No Transfers. Sellers shall not transfer or agree to transfer (other than the transactions contemplated by this Agreement, but expressly excluding any new leases or occupancy agreements) all or any portion of their right, title or interest in and to any of the Property to any third party.

6.7.9    Necessary Approvals.   Prior to Closing, Debtors shall use commercially reasonable efforts to obtain the Bankruptcy Court Approvals listed in Section 11 by the dates set forth in Section 11.

6.8    Transfer Taxes; Certain Prorations; Title Insurance; Etc. Any sales, excise, purchase, transfer, stamp, documentary stamp, recording, use or similar taxes under the laws of the State of Washington, or any subdivision of such state (collectively, "**Taxes**"), which may be payable by reason of the Easterday Property being conveyed to Debtors and Debtors' sale of the Property to Buyer and/or the recordation of the Easterday Deeds and Deeds under this Agreement shall be borne and timely paid by Buyer in such amounts (and by allocations among the Properties) as may be reasonably determined by Buyer (after reasonable consultation with Sellers) and in accordance with applicable law.  Real estate and any personal property taxes and assessments and utilities shall be prorated between Sellers and Buyer as of the Closing Date, with Sellers bearing all amounts attributable to the period up to the Closing Date and Buyer bearing all amounts attributable to the period from and after the Closing Date; for clarity, the personal property taxes subject to proration shall be those taxes billable in the year in which the Closing Date occurs based on the levy of taxes in the prior year and not those taxes levied in the year in which the Closing Date occurs, which shall be the responsibility of Buyer.  Some or all of the Property may be classified as farm and agricultural land under RCW 84.34 for real property tax purposes.  Buyer will accept and continue said classifications of all portions of the Property classified as such and will be solely responsible for paying any penalties or additional taxes that result from removing any portion of the Property from said tax classification.  Sellers shall not be responsible to bear or pay any portion of (i) any title insurance premiums, endorsements, or similar fees with respect to any title insurance Buyer may elect to obtain in connection with Buyer's acquisition of the Property, (ii) any cure amounts payable pursuant to the Sale Order in connection with the assumption and assignment, or the sale, of Debtor Assigned and Assumed Contracts and Leases, (iii) any escrow fees and charges (except as provided in Section 5.1.2(a)); or (iv) any recording fees and costs. Buyer shall defend and indemnify Seller for any and all costs, expenses, penalties, obligations, and liabilities suffered, sustained or incurred by Seller with respect to, arising from, by reason of, or in connection with any  Taxes (as defined above), including in connection with an audit by the governmental authority having jurisdiction with respect to Taxes, which are due, or which will become due, by reason of the Easterday Property being conveyed to Debtors and Debtors' sale of the Property to Buyer.  This Section 6.8 shall survive Closing.

17

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 215 of 379

6.9    Possession.

6.9.1    Subject to Permitted Exceptions and the Temporary Lease Agreement, on the Closing Date, Easterdays shall deliver to Debtors, and Debtors shall deliver to Buyer, free and clear of all liens, claims, rights, leases, encumbrances and interests, exclusive possession and custody of the Property, in no worse condition than existed as of the Effective Date of this Agreement (ordinary wear and tear and the effects of other actions taken by Sellers consistent with the terms and provisions of this Agreement excepted), and with all Excluded Property removed, including, without limitation, all cattle, all crops in storage, and any equipment not included in the Property, except for any Excluded Property required by Debtors to complete its farming operations under the Temporary Lease Agreement, which shall be removed within the time period identified in the Temporary Lease Agreement. Sellers shall transfer and deliver to Buyer on the Closing Date such keys and other similar items as Buyer may reasonably require to obtain occupancy and control of the Property at Closing.

6.9.2    If the Closing has not occurred by July 31, 2021, and this Agreement has not terminated, Buyer may enter upon the Property for the limited purposes of planning and assessment with respect to Buyer's farm plans to be implemented after Closing ("**Permitted Use**"); provided, however, that (i) Buyer gives Sellers at least 72 hour prior notice of entering onto the Property; (ii) Buyer maintains and provides Sellers certificates of insurance evidencing that Buyer has Commercial General Liability insuring Buyer's interests against claims for personal injury, bodily injury, death and property damage occurring on, in or about the Property, with a "Combined Single Limit" (covering personal injury liability, bodily injury liability and property damage liability) of not less than $2,000,000 per occurrence and $2,000,000 aggregate, (iii) Buyer will use and cause Buyer's agents, employees, consultants and contractors ("**Buyer's Agents**") to use best efforts to minimize any disruption or interference on the Property; and (iv) Buyer promptly pays for and repairs any damage to the Property caused by Buyer's entry onto the Property pursuant to this Section.  Buyer and Buyer's Agents expressly assume all risks when entering or performing work on the Property.  Buyer shall indemnify, defend, and hold harmless Seller and the Property from any and all claims, causes of action, damages (including, without limitation, all foreseeable and unforeseeable consequential damages, injunction and other relief), fines, judgments, penalties, costs, liabilities, losses or expenses (including, without limitation, engineers' and consultants' costs, attorneys' fees and reasonable investigative and discovery costs) arising on account of or in connection with, or directly or indirectly related to: (w) the acts or omissions of Buyer and Buyer's Agents; (x) Buyer's use of the Property, or any work or activity allowed or suffered by Buyer to be done in, on or about the Property; (y) the violation of any laws by Buyer or Buyer's Agents; and (z) the presence, use, generation, storage, or release of hazardous materials in, on, under, or above the Property or adjoining property caused by Buyer's or Buyer's Agents. Buyer's repair and indemnification obligations with respect to this Section 6.9.2 shall remain effective, notwithstanding the termination of this Agreement, as to claims arising or accruing prior to the termination of this Agreement; provided that Buyer is not indemnifying Sellers for any injury, loss of life, or damage which is caused by (1) the sole negligence or willful misconduct of any Seller or (2) any pre-existing condition (except to

18

the extent such condition was exacerbated by Buyer). In the event of Buyer Default, then any improvements performed by Buyer to the Property shall become the property of Debtors.

7.    Conditions Precedent to Closing.

7.1    Conditions to Sellers' Obligations.    Sellers' obligation to make the deliveries required of Sellers on the Closing Date and to otherwise consummate the transactions described in this Agreement shall be subject to the satisfaction or waiver in writing by Sellers of each of the following conditions on or before the date set forth in such condition, or if no date is set forth, then by the Closing Date; *provided, however,* in no event shall approval or consent of a counterparty or other third party to the Assigned and Assumed Leases and Contracts, Easterday Water Agreements, Easterday Irrigation System Permits, Water Agreements or Irrigation System Permits be a condition to Closing:

7.1.1    All of the representations and warranties of Buyer contained herein shall continue to be true and correct at the Closing in all material respects.

7.1.2    Buyer shall have delivered, or shall be prepared to deliver to Debtors at the Closing, the Purchase Price and other amounts payable hereunder to Debtors in all cash, and the documents required of Buyer to be delivered at the Closing pursuant to Section 6.6 of this Agreement.

7.1.3    With respect to Debtors, Easterdays shall have delivered, or shall be prepared to deliver to Debtors at the Closing, all documents required of Easterday to be delivered at the Closing pursuant to Section 6.4 of this Agreement.

7.1.4    With respect to Easterdays, Debtors shall have delivered, or shall be prepared to deliver to Easterdays at the Closing, all documents required of Debtors to be delivered at the Closing pursuant to Section 6.5 of this Agreement.

7.1.5    No action, suit or other proceedings shall have been filed or be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions described in this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

7.1.6    The filings of Buyer and Sellers pursuant to the HSR Act, if any, shall have been made and the applicable waiting period and any extensions thereof shall have expired or been terminated.

7.1.7    Buyer shall have performed in all material respects the covenants on Buyer's part to be performed which, by their terms, are required to be performed at or before the Closing; *provided that*, with respect to payment of cure amounts payable to the counterparties to the Assigned and Assumed Contracts and Leases being assumed or purchased by the Buyer pursuant to the Sale Order or otherwise, Buyer

19

shall satisfy any cure amounts owed to counterparties at Closing or otherwise provide to the satisfaction of the Bankruptcy Court adequate assurance of its ability to pay such cure amounts at or before the Closing and shall promptly satisfy any cure amounts following the Closing.

7.1.8    With respect to Debtors, Easterdays shall have performed in all material respects the covenants on Easterdays' part to be performed which, by its terms, are required to be performed at or before the Closing.

7.1.9    With respect to Easterdays, Debtors shall have performed in all material respects the covenants on Debtors' part to be performed which, by its terms, are required to be performed at or before the Closing.

7.1.10  The Bankruptcy Court shall have entered the Sale Order in accordance with Section 11.3 below that is substantially in the form and content of Exhibit F, and otherwise reasonably acceptable to the Buyer and Sellers, and the Sale Order shall not have been reversed or stayed or modified in any material respect.

7.2    Conditions to Buyer's Obligations.  Buyer's obligation to make the deliveries required of Buyer at the Closing, and to otherwise close the transactions described in this Agreement, shall be subject to the satisfaction or waiver by Buyer of each of the following conditions on or before the date set forth in such condition, or if no date is set forth, then by the Closing Date; *provided, however,* in no event shall approval or consent of a counterparty or other third party to the Assigned and Assumed Leases and Contracts, Easterday Water Agreements, Easterday Irrigation System Permits, Water Agreements or Irrigation System Permits be a condition to Closing:

7.2.1    Intentionally omitted.

7.2.2    The Bankruptcy Court shall have entered the Supplemental Bidding Procedures Order in form and content reasonably acceptable to Buyer and Sellers.

7.2.3    Debtors shall have obtained authority from the Bankruptcy Court pursuant to the Sale Order to acquire all rights, title and interest in and to the Easterday Property from the Easterdays, and shall immediately prior to Closing have acquired all of Easterdays' rights, title and interest in and to the Easterday Property.

7.2.4    Sellers shall have performed in all material respects the covenants on Sellers' part to be performed which, by their terms, are required to be performed before the Closing.

7.2.5    Sellers shall have executed and shall be prepared to deliver to each other and Buyer, respectively, the documents required of Sellers pursuant to Sections 6.4  and 6.4.11 of this Agreement.

7.2.6    Sellers shall have delivered or shall be prepared to deliver to Buyer at the Closing, all other documents required of Sellers to be delivered at the Closing.

20

7.2.7　No action, suit or other proceedings shall have been filed or be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions described in this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

7.2.8　The filings of Buyer and Seller pursuant to the HSR Act, if any, shall have been made and the applicable waiting period and any extensions thereof shall have expired or been terminated.

7.2.9　The Bankruptcy Court shall have entered the Sale Order in accordance with Section 11.3 below.

7.2.10　Debtors shall have provided Buyer and Title Company with a certified copy of the Sale Order.

7.2.11　Upon payment of the applicable premium by Buyer and satisfaction of all "Requirements" set forth in the Title Commitments No. 62242100670 (dated April 20, 2021), No. 62242100669 (dated February 26, 2021), No. 62242100667 (dated April 20, 2021), No. 62242100664 (dated April 20, 2021), No. 62242100666 (dated April 20, 2021), No. 62242100668 (dated February 26, 2021) each as uploaded to the virtual data room provided by Sellers prior to execution of this Agreement and as may be further updated by the Title Company (collectively, the "**Title Commitments**"), Title Company shall issue an ALTA 2006 form of owners title insurance policy insuring fee simple title, or a leasehold, as applicable, to the Land vested in Buyer (or its designee) in the amount of the Purchase Price in the form of approved Pro Forma Policies attached to the Escrow Instructions in Exhibit A and subject only to the Permitted Exceptions (the "**Title Policy**"). As used in this Agreement, "**Permitted Exceptions**" means any Assumed Liabilities, if any, and the title exceptions listed as "Special Exceptions" in Schedule B – Part II of each of the Title Commitments, including exceptions based on Title Company's review of the ALTA/NSPS land title surveys of the Land posted to the virtual data room provided by Sellers, and any additional title exceptions (which do not result from the breach by any Seller of any obligation or covenant under this Agreement) added to the Title Commitments that do not materially affect value, ownership or operations on the Property, but excluding any judgements, monetary liens, or security interests (not caused by Buyer) and those exceptions identified as "**Excluded Exceptions**" listed on Schedule 7.2.11 to this Agreement.

7.2.12　Sellers shall have obtained from the U.S. Department of Justice and the Federal Commodities Futures Trading Commission a written and duly executed statement or statements in form and content satisfactory to the Title Company (sufficient to issue the Title Policy, as defined above) stating that each agency has received actual notice of the transactions contemplated by this Agreement and that such agency has no objection to such transactions, unless Title Company agrees to accept lesser assurances from the U.S. Department of Justice and the Federal Commodities Futures Trading

21

21-00141-WLH11　　Doc 830　　Filed 06/21/21　　Entered 06/21/21 17:28:37　　Pg 219 of 379

Commission.  Sellers shall promptly notify Buyer in writing of the status of any communications or statements from, and any material developments with, the U.S. Department of Justice and/or the Federal Commodities Futures Trading Commission with respect to the transactions contemplated by this Agreement.

7.2.13  All of the representations and warranties of Seller contained herein shall continue to be true and correct at the Closing in all material respects

7.3    Termination.  If any of the above conditions is neither satisfied nor waived by the Party or Parties beneficiary to such condition on or before the date by which the condition is required to be satisfied, the Party beneficiary to such condition, whose default hereunder is not the reason such condition is unsatisfied, may terminate this Agreement by delivering to the other written notice of termination, and the Deposit shall be promptly refunded to Buyer except as otherwise expressly set forth in this Agreement.  Any waiver of a condition shall be effective only if such waiver is stated in writing and signed by the waiving Party who is the beneficiary of the condition; provided, however, that the consent of a Party to the Closing notwithstanding that such condition was unsatisfied shall conclusively be deemed a waiver by such Party of any conditions to Closing not satisfied or waived as of the Closing Date.

8.    Sellers' Representations and Warranties.  Sellers hereby make, each as to themselves only, the following representations and warranties to Buyer, both as of the Effective Date of this Agreement and as of the Closing.  For the purposes of this Section 8, Sellers and Buyer understand and agree that certain of Sellers' representations and warranties in Sections 8.3, 8.4, 8.5, 8.6.2, 8.6.3, and 8.7 made below are based upon Sellers' actual knowledge of the matters represented, without any duty of inquiry, do not include any knowledge imputed to Sellers by constructive notice, and are made solely for the purpose of assuring disclosure of matters known to Sellers that might constitute material defects or material liabilities related to the Property, and that none of the representation and warranties shall survive Closing.

For purposes of this Agreement, (i) "**Actual knowledge**" of or as to Sellers means and refers only to the current, actual knowledge of the Easterdays, Lance Miller, Peter Richter or Scott Avila, without inquiry, and (ii) "**Actual knowledge**" of or as to Debtors means and refers only to the current, actual knowledge of Lance Miller, Peter Richter or Scott Avila, without inquiry.

8.1    Power of Sellers.

8.1.1    Easterdays.  Easterdays have the power and authority to execute and deliver this Agreement.

8.1.2    Debtors.

(a)    Debtors have the power and authority to execute and deliver this Agreement pursuant to the Bidding Procedures Order.

(b)     Upon entry of the Sale Order, Debtors will have the power and authority to perform this Agreement and all writings relating hereto, and to consummate the transactions described in this Agreement.

8.2     _Authorization of Sellers_.  This Agreement has been duly executed and delivered by the Sellers to the Buyer, and subject to the entry of a Sale Order in the Bankruptcy Court in accordance with Section 11.3 below, the consummation of the transactions described in this Agreement, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Sellers and assuming due and valid authorization, execution and delivery of this Agreement by Buyer,  this Agreement will constitute a valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms, and does not and will not:  (i) to Sellers' knowledge, violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (ii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Sellers are a Party or by which Sellers or their respective assets or properties may be bound.

8.3     _Real Property_.  To Sellers' actual knowledge, with respect to Property owned or leased by the Sellers as of the Effective Date, (a) Sellers have valid leasehold interests under the leases included in the Assigned and Assumed Leases and Contracts, and are the sole lessees thereunder with respect to each such leasehold and have not assigned or transferred, or agreed to assign or transfer, any such leasehold to a third party (other than mortgages shown in the Title Commitments, which will be discharged at or prior to Closing); and (b) except as shown in the Title Commitments, are the sole owners of the Land other than those portions of the Land which are leased by Sellers.

8.4     _Environmental Condition_.  Other than as expressly disclosed in any of the Phase I's, Sellers have (a) no actual knowledge of the presence or release of any Hazardous Substances on or from the Property in material violation of Environmental Laws and (b) have received no notice from any governmental authority of any material violation of Environmental Laws with respect to the presence or release of Hazardous Substances on or from the Property. For purposes of this Agreement, "**Hazardous Substances**" means any hazardous, toxic or dangerous waste, substance or material, pollutant or contaminant, as defined for purposes of CERCLA, or the Resource Conservation and Recovery Act (42 U.S.C. Sections 6901 et seq.), as amended ("**RCRA**"), or other Environmental Laws, or any substance which contains gasoline, diesel fuel or other petroleum hydrocarbons, or polychlorinated biphenyls.  As used herein, "**Environmental Laws**" means CERCLA, RCRA or other similar federal, state or local laws pertaining to protection of the environment or health and human safety.

8.5     _Compliance with Laws_.  To Sellers' actual knowledge, the Property, including specifically, but without limitation, the feedlot, drainage lagoons and systems, and irrigation ponds, is in material compliance with applicable laws and related permits or governmental approvals.

8.6     _Water Rights_.

8.6.1    Sellers have not transferred or agreed (other than the transactions contemplated by this Agreement) to transfer the Water Rights to any third party.

8.6.2    Sellers have no actual knowledge of any existing, pending, or threatened actions or claims for cancellation, relinquishment, forfeiture, abandonment or enforcement actions regarding all or any portion of the Water Rights.

8.6.3    Sellers have no actual knowledge of any existing, pending, or threatened claims, suits, proceedings, investigations, or actions against any Seller which, if successful, would result in any legal or equitable monetary lien upon any of the Water Rights.

8.7    <u>Assigned and Assumed Leases and Contracts</u>.  All of the Assigned and Assumed Leases and Contracts are in full force and effect and constitute the entire agreement between the applicable Sellers and the counterparties thereto. Except to the extent that the existence of the Cases may be a default under any Assigned and Assumed Leases and Contracts, or as set forth on <u>Schedule 8.7</u> attached hereto and incorporated herein, neither the applicable Sellers nor the other party to any Assigned and Assumed Leases and Contracts is in material default of such Assigned and Assumed Leases and Contracts, nor, to Sellers' actual knowledge, have any events or conditions occurred, which upon the giving of notice or passage of time or both, would constitute a material default by the applicable Sellers or the other party to any such Assigned and Assumed Leases and Contracts.

8.8    <u>OFAC</u>.  Sellers (which, for the purposes of this <u>Section 8.8</u>, shall include their partners, members, principal stockholders and any other constituent entities) (i) have not been designated as a "specifically designated national and blocked person" on the most current list published by OFAC at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list; (ii) are currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in any Seller to any person or entity who is, or any of whose beneficial owners are, listed on the list.

8.9    <u>Existing Leases and Contracts</u>.  To Debtors' actual knowledge, the leases and contracts (i) listed on <u>Schedules 1.6, 2.4</u> and <u>2.5</u>, (ii) uploaded to the virtual data room as of June  16, 2021 and (iii) recorded in the official records of Benton County as of May 21, 2021 comprise all of the leases and contracts that affect the Property.

9.    <u>Buyer's Representations and Warranties</u>.  In addition to the representations and warranties contained elsewhere in this Agreement, Buyer hereby makes the following representations and warranties to Sellers:

24

9.1     Power of Buyer.  Buyer has all requisite power to execute, deliver and perform this Agreement and all writings relating hereto.

9.2     Authorization of Buyer.  This Agreement has been duly executed and delivered by Buyer to the Sellers, and subject to the entry of a Sale Order in the Bankruptcy Court that has not been stayed, reversed or modified in any material respect, the consummation of the transactions described in this Agreement, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer and assuming due and valid authorization, execution and delivery of this Agreement by Sellers, this Agreement will constitute a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms does not and will not: (i) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (ii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Buyer is a Party or by which Buyer or their assets or properties may be bound.

9.3     OFAC.  Buyer (which, for the purposes of this Section 9.3, shall include its partners, members, principal stockholders and any other constituent entities) (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by OFAC at its official website (http://www.treas.gov/ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list; (ii) is currently in compliance with and will at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) will not transfer or permit the transfer of any controlling interest in Buyer to any person or entity who is, or any of whose beneficial owners are, listed on the list.

10.     AS-IS.  BUYER IS A KNOWLEDGEABLE, SOPHISTICATED BUYER WHO IS FAMILIAR AND VERY EXPERIENCED WITH THE ACQUISITION, OWNERSHIP, OPERATION AND DEVELOPMENT OF COMMERCIAL REAL ESTATE, INCLUDING AGRICULTURAL PROPERTIES SIMILAR TO THE PROPERTY.  BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT BUYER HAS PERFORMED AND CONDUCTED ALL SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS BUYER DETERMINED WERE NECESSARY OR APPROPRIATE IN CONNECTION WITH ITS ACQUISITION OF THE PROPERTY AND THAT BUYER WAS SATISFIED WITH THE RESULTS OF SUCH INSPECTIONS AND INVESTIGATION.  ACCORDINGLY, BUYER FURTHER ACKNOWLEDGES AND AGREES THAT SELLERS ARE SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT, EXCEPT WITH RESPECT TO THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 8, SUBJECT TO AND WITHOUT LIMITATION OF SECTION 13.16 (SURVIVAL), BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM ANY SELLER OR ANY SELLER'S REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROPERTY (OR ANY PORTION OR ELEMENT THEREOF), INCLUDING, WITHOUT LIMITATION:  (i) the quality, nature, adequacy and

25

physical condition of the Property, including, but not limited to, the structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, irrigation systems and equipment, and other facilities and appliances comprising part of the Improvements, (ii) the quality, nature, adequacy, and physical condition of soils, geology and any groundwater of, at, on, or under the Land, (iii) the existence, quality, nature, adequacy and physical condition of utilities serving the Land and/or Improvements, (iv) the development potential of the Land and the use, habitability, merchantability, or fitness, suitability, value or adequacy of the Property (or any portion or element thereof) for any particular purpose, (v) the zoning or other legal status of the Land and Improvements or any other public or private restrictions on the use of the Land and/or Improvements, (vi) the compliance of the Land, Improvements or other elements of the Property with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity, (vii) the presence of Hazardous Materials on, in, under, at or about the Land and/or the Improvements or any adjoining or neighboring property, (viii) the quality of any labor and materials used in any Improvements, (ix) the condition of the Land and/or Improvements (or any portion or element thereof), (x) the quality, nature, adequacy, or extent of the Water Rights, and (xi) the economics of the operation of the Land and Improvements.

11. <u>Bankruptcy Court Approvals</u>.

11.1 <u>Intentionally Omitted</u>.

11.2 <u>Intentionally Omitted</u>.

11.3 <u>Sale Order</u>. Buyer's and Sellers' obligations to consummate the transactions described in this Agreement shall be conditioned upon the Bankruptcy Court's entry of an order approving this Agreement and the transactions contemplated herein substantially in form and content as attached hereto as <u>Exhibit F</u> and otherwise reasonably acceptable to Buyer and Sellers, and which order shall be effective immediately upon its entry (the "**Sale Order**"), and which Sale Order shall not have been stayed, reversed or modified in any material respect. If the Bankruptcy Court denies the entry of the Sale Order or approves the sale of the Property to one or more alternate third party purchasers at the Sale Hearing, then the transactions described in this Agreement shall automatically terminate and Buyer shall be entitled to the return of the Deposit within three (3) business days following the closing of an alternate transaction; *provided that* in the event that a third party (an "**Upset Purchaser**" and the underlying agreement between the Upset Purchaser and Sellers, the "**Upset Agreement**") is approved by the Bankruptcy Court as the purchaser of the Property at the Sale Hearing, notwithstanding anything to the contrary contained in this Agreement, this Agreement shall not terminate, but rather shall become a "back-up bid" which shall remain open for acceptance by Sellers for a period of thirty (30) days following such hearing, but subject and subordinate in all respects to the rights of the Upset Purchaser under the Upset Agreement; *further provided, however*, this Agreement shall automatically terminate if the Sale Order is for any reason not entered by the Bankruptcy Court on or before July 31, 2021 or if the Closing does not occur by the Outside Date.

1006813688v11

11.4 _Debtor Assigned and Assumed Leases and Contracts_. In accordance with the Bid Procedures Order, Buyer shall in all events be required to (i) provide such adequate assurance of future performance as the Bankruptcy Court may require in connection with its approval of Debtors' assumption and assignment to Buyer, and Buyer's assumption, of the Debtor Assigned and Assumed Leases and Contracts, and (ii) bear and pay at Closing or when otherwise required by the Sale Order all cure amounts payable in connection with Debtors' assumption and assignment to Buyer, and Buyer's assumption, of any Debtor Assigned and Assumed Leases and Contracts. Buyer shall have up until fourteen (14) days prior to the Closing in which to notify Debtors which executory contracts and leases identified in Schedule 2.5 that Buyer wishes to, or elects not to, take assignment of and assume, or purchase, at Closing, or to notify Debtors which executory contracts and/or leases Buyer wishes to add to Schedule 2.5 as appropriate, and to take assignment of and assume or purchase at Closing. To the extent applicable, any contracts and leases that Buyer elects not to take an assignment of at Closing shall not be transferred from Easterdays to Debtors and, to the extent applicable, any contracts and leases that Buyer elects to take an assignment of at Closing shall be transferred from Easterdays to Debtors. Notwithstanding anything to the contrary in this Agreement, Buyer acknowledges and agrees that if Debtors are unable to assume and assign to Buyer any Debtor Assigned and Assumed Leases and Contracts by reason of Buyer's failure to provide adequate assurance of future performance as a result of a default under section 365(b)(1) of the Bankruptcy Code, the applicable Debtor Assigned and Assumed Leases and Contracts shall be deemed to be Excluded Property for all purposes of this Agreement unless the objecting counterparty to the applicable contract or lease withdraws its objection or its objection is resolved in a manner not adverse to Debtors in connection with the Closing.

12. _Post-Closing Covenants_.

12.1 _Plan Sponsor Contribution_. Upon the occurrence of: (i) the Closing and (ii) the entry of an order of the Bankruptcy Court confirming the Joint Plan (the "**Confirmation Order**"), which Joint Plan and Confirmation Order shall be in form and content consistent with the Sale Order, and the Confirmation Order has not been stayed, reversed or modified in any material respect, Buyer shall deposit $1,000,000 ("**Plan Sponsor Contribution**") in a deposit account at Debtors' direction, which funds shall be segregated and used on account of and in satisfaction for the administrative expenses incurred by Debtors' estates in connection with and relating to the preparation and confirmation of the Joint Plan and the substantial consummation of the Joint Plan and closing of the Cases. The Plan Sponsor Contribution is in addition to and unrelated to the Purchase Price.

12.2 _Consent to Assignment_. To the extent any Assigned and Assumed Leases and Contracts may not be assigned to Buyer under applicable law without the consent of the other party, and either (a) the consent of the other party has not been obtained or (b) the Bankruptcy Court has not entered an order approving the assignment or sale of any applicable Assigned and Assumed Leases and Contracts, then this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Sellers and Buyer shall use commercially reasonable efforts to obtain any such required consent(s) promptly after Closing. In addition, if any required consents for the assignment of (1) any agreements, permits and/or easements with the United States Army or (2)

27

the Easterday Water Agreements, Easterday Irrigation System Permits, Water Agreements or Irrigation System Permits are not obtained prior to Closing, then Sellers and Buyer shall use commercially reasonable efforts to obtain any such required consent(s) promptly after Closing. If any such consent shall not be obtained by the Closing Date or if any attempted assignment would be ineffective or unlawful or would impair Buyer's rights under the Property in question such that Buyer would not in effect acquire the benefit of all such rights, Sellers and Buyer shall use commercially reasonable efforts after the Closing, for a period of six (6) months, to obtain for Buyer the benefits thereunder and Sellers shall cooperate with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer. Notwithstanding anything herein to the contrary, in no event shall Sellers have any obligation to incur material cost or expense, initiate litigation or other proceedings, or pay any fees or other consideration to the counterparty to obtain their consent. This <u>Section 12.2</u> shall survive Closing.

12.3 <u>Water Matters</u>. To the extent that Sellers have not obtained all available extensions for Water Rights permits G4-30584P and S3-28998P, Sellers shall cooperate with Buyer for six (6) months after Closing in order to obtain such extensions. In no event shall Sellers have any obligation to incur material cost or expense, initiate litigation or other proceedings, or pay any fees or other consideration in providing information and documentation in obtaining said extensions. This <u>Section 12.3</u> shall survive Closing.

13. <u>Miscellaneous</u>.

13.1 <u>Damage and Destruction; Condemnation</u>. Sellers shall promptly notify Buyer of the occurrence of any material damage to or destruction of the Property that occurs prior to the Closing Date. In the event of any damage to or destruction of the Property prior to the Closing Date the cost of which to repair would total $10,000,000 (the "**Threshold**") or less, as determined by a third party appraiser reasonably approved by Sellers and Buyer, then such damage or destruction shall have no effect whatsoever on the Purchase Price (except as provided below in this <u>Section 13.1</u>) or Buyer's or, subject to the immediately succeeding sentence, Sellers' obligation to close. In the event of any damage to or destruction of the Property prior to the Closing Date the cost of which to repair would equal or exceed the Threshold, as determined by a third party appraiser reasonably approved by Sellers and Buyer, then unless Sellers cause the same to be repaired and restored in all material respects prior to the Closing Date (in which case the Purchase Price shall be unaffected and the Parties shall proceed with the Closing as though such damage, destruction or proceedings had never occurred or been initiated), Buyer shall have the right and option to either (i) terminate the transaction contemplated herein, in which event Sellers shall promptly cause the Deposit to be returned to Buyer, or (ii) elect to receive, as its sole and exclusive remedy by reason of such damage or destruction, a Purchase Price reduction in the amount of the uninsured replacement value of such damage, as determined by a third party appraiser reasonably approved by Sellers and Buyer, and consummate the transactions as though the damage or destruction had never occurred or been initiated; provided, however, in no event shall Sellers be obligated to close if the amount of the reduction of the Purchase Price pursuant to this sentence would exceed $7,000,000.00. In all other events (including, without limitation, in the event of a damage to or destruction of the Property equal to or less than the Threshold that is not repaired in all material respects prior to Closing), or in the event that Buyer elects to consummate the purchase pursuant to clause (ii) above, (xx) all

28

insurance or condemnation proceeds collected by or paid to Sellers prior to the Closing Date shall be credited against the Purchase Price on Buyer's account or the Purchase Price shall be adjusted by an amount agreed between Buyer and Sellers and (yy) all entitlement to all other insurance or condemnation proceeds arising out of such damage or destruction or proceedings and not collected prior to the Closing Date shall be assigned to Buyer at the Closing. Notwithstanding anything to the contrary in this Agreement, the risk of loss or damage to the Property shall unconditionally shift to the Buyer on the Closing Date effective as of the Closing. For avoidance of doubt, Buyer and Sellers intend that the provisions of this Section 13.1 shall control over any right or remedy to which the Buyer may otherwise be entitled under this Agreement by reason of the occurrence of any event subject to this Section 13.1. Notwithstanding anything to the contrary in this Section 13.1, in the event of the occurrence of damage or casualty contemplated by this Section 13.1 as to which the parties cannot agree on the cost to repair and the third party appraiser designated pursuant to this Section 13.1 is not able to or does not provide its determination of the cost to repair prior to the Outside Date, the parties shall negotiate reasonably and in good faith to enter into an arrangement between them that would enable the Parties to proceed to Closing on or prior to the Outside Date or extend the Outside Date and while such appraiser's determination is still pending.

13.2    Seller Default.  If Sellers (or any one of them) default in any material respect under this Agreement or otherwise default in their obligation to close the transactions contemplated by this Agreement, and such default is not cured within three (3) business days (*i.e.,* excluding Saturdays, Sundays, and national holidays) following receipt of written notice thereof from Buyer, then Buyer may elect as its exclusive remedy to either (a) terminate this Agreement and receive (i) the Deposit from Escrow Holder and (ii) reimbursement from Sellers of expenses in an amount not to exceed $1,000,000 (subject to Buyer's submission, and the Bankruptcy Court's approval, of the reasonableness of the expenses incurred by Buyer in connection with the transactions described in this Agreement (the "**Expense Reimbursement**")), or (b) treat this Agreement as being in full force and effect and pursue the remedy of specific performance.  The Expense Reimbursement shall be senior to any other administrative expense claim allowed against the Debtors and their respective estates.  Any liability of Sellers (or any Seller) pursuant to this Agreement shall be joint and several.

13.3    Buyer Default.  If Buyer fails without legal excuse to purchase the Property when required to do so hereunder, and such failure continues for more than three (3) business days (*i.e.,* excluding Saturdays, Sundays, and national holidays), following receipt of written notice from Sellers, then Buyer shall be in default hereunder ("**Buyer Default**") and this Agreement shall automatically terminate and the Deposit shall thereupon become nonrefundable and shall be disbursed by Escrow Holder to Sellers. The Deposit shall serve as liquidated damages to Sellers in the event of a Buyer Default, and Sellers shall be entitled to receive and retain the full amount of the Deposit as Sellers' sole and exclusive right and remedy and in lieu of any other relief.  Regarding the Deposit serving as liquidated damages and being Sellers' sole and exclusive remedy for a Buyer Default, the Parties agree and acknowledge that (i) Sellers would suffer damages by reason of a failure of these transactions to close, (ii) the exact amount of such damages would be difficult to ascertain and to prove with certainty, (iii) the Deposit constitutes a fair and reasonable estimate of the actual damages Sellers would suffer, (iv) the Parties (and/or their representatives) have negotiated and attempted, in good faith, to estimate the

29

amount of such damages and to compensate Seller therefore as set forth herein, and (v) any indemnification obligations of Buyer under Section 6.9.2 of this Agreement and Sellers' rights and remedies with respect thereto shall survive the termination of this Agreement and are unaffected by the agreement that the Deposit shall serve as Sellers' sole and exclusive remedy in the event of a Buyer Default. Except as provided above, Sellers hereby release and waive all other rights and remedies, including, without limitation, any right to specifically enforce performance of this Agreement or to recover any damages incurred as a result of a Buyer Default.

13.4    Attorneys' Fees.  In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that action or proceeding (as determined by the applicable tribunal of competent jurisdiction in such action or proceeding) shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

13.5    Notices.  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other may be effected by personal delivery in writing, by overnight delivery by a nationally recognized express courier service or by registered; or certified mail, postage prepaid, return receipt requested; or via electronic mail transmission. Any notice delivered in accordance with this paragraph shall be deemed given (a) in the case of any notice transmitted by e-mail, on the date on which the transmitting party receives acknowledgement of receipt in writing, including via electronic media, (b) in the case of any notice delivered by a recognized national overnight delivery service, on the day of delivery to the service, or (c) in the case of any notice mailed by certified U.S. mail, three (3) business days after deposit therein.  Mailed notices shall be addressed as set forth below, but each Party may change its address by written notice in accordance with this Section 13.5.

Debtors:                            Easterday Farms
                                    Easterday Ranches, Inc.
                                    5235 N Industrial Way
                                    Pasco, WA 99301
                                    Attn:  Messrs. Peter Richter and Scott Avila,
                                           Co-Chief Restructuring Officers
                                    Email:  savila@paladinmgmt.com
                                            prichter@paladinmgmt.com


With a copy to:                     Pachulski Stang Ziehl & Jones LLP
                                    10100 Santa Monica Blvd., 13th Floor
                                    Los Angeles, CA  90067
                                    Attn:   Richard Pachulski
                                            Jason Rosell
                                    Email: rpachulski@pszjlaw.com
                                            jrosell@pszjlaw.com

30

|  | AND |
|---|---|
|  | Davis Wright Tremaine LLP |
|  | 920 Fifth Avenue, Suite 3300 |
|  | Seattle, WA 98104 |
|  | Attn: Bill Weigand |
|  | Lauren Johnson |
|  | Email: BillWeigand@dwt.com |
|  | laurenjohnson@dwt.com |
| Easterdays: | Cody and Debby Easterday |
|  | 830 Bellflower Road |
|  | Mesa, WA 99343 |
|  | Email: cody@easterdayfarms.com |
|  | AND |
|  | Karen Easterday |
|  | 631 Bellflower Road |
|  | Mesa, WA 99343 |
| With a copy to: | Sussman Shank LLP |
|  | 1000 SW Broadway, Suite 1400 |
|  | Portland, OR 97205 |
|  | Attn: Jeffrey Misley |
|  | Email: jmisley@sussmanshank.com |
|  | Tonkon Torp LLP |
|  | 888 SW 5th Avenue, Suite 1600 |
|  | Portland, OR 97204 |
|  | Attn: Timothy Conway |
|  | Email: tim.conway@tonkon.com |
| Buyer: | c/o Oak River Farms |
|  | 8789 Penrose Lane, Suite 400 |
|  | Lenexa, Kansas 66219 |
|  | Email: legal@oakriverfarms.com |
| With a copy to: | Debevoise & Plimpton LLP |
|  | 919 Third Avenue |
|  | New York, NY 10022 |
|  | Attn: Edward M. Rishty |

31

1006813688v11

13.6     Entire Agreement; No Third Party Beneficiaries.  This Agreement, Schedules, and the Exhibits hereto constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof and thereof and supersede and cancel all prior agreements, negotiations, correspondence, undertakings, understandings and communications of the Parties, oral and written, with respect to the subject matter hereof, and are not intended to confer upon any person or entity other than the Parties hereto and thereto and those Released Parties who are not signatories of this Agreement any rights or remedies hereunder.  Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

13.7     Modification.  This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto.

13.8     Closing Date.  All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

13.9     Reporting Requirements.  The Parties hereto acknowledge that the transfers of the Easterday Property and the Property must be reported to the Internal Revenue Service as required by Section 6045(e) of the Internal Revenue Code of 1986, as amended (the Code), unless Section 6045(e) provides an exemption to such reporting requirement. Accordingly, on or before the Closing Date, Sellers, Buyer and the Escrow Holder shall enter into a written "designation agreement" as defined in and in accordance with Regulation Section 1.6045-4 of the Code, which designation agreement shall designate the Escrow Holder as the "real estate reporting person" responsible for reporting the respective transfers to the Internal Revenue Service.

13.10    Cooperation Agreement.  As a matter solely between Debtors and Easterdays, if there is any conflict whatsoever between any of the provisions in this Agreement and those in the Cooperation Agreement with respect to the rights of the Easterdays vis a vis the rights of the Debtors, the terms of the Cooperation Agreement will control.  For example, any reference to the "Sellers" in this Agreement, as opposed to using the reference to "Debtors", that might result in a conflict with the Cooperation Agreement, the Cooperation Agreement controls.

13.11    Severability.  Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

13.12    Captions.  All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

13.13   Further Assurances.  Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto; provided that nothing herein shall be deemed to require any Party to execute or deliver any such further assurance, document or instrument to the extent that the same could in any material way increase the burdens, obligations or liabilities otherwise imposed upon such Party by this Agreement.  Without limiting the foregoing, Sellers shall cooperate with Buyer in executing and delivering such affidavits, certificates and other documents as may be reasonably required (taking into account the status of Debtors as chapter 11 debtors whose affairs are being conducted by restructuring officers and the effect of the Sale Order) in connection with the issuance of the Title Policy or Policies to Buyer in accordance with this Agreement.

13.14   Waiver.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.

13.15   Brokerage Obligations.  Except for Root Realty (the "**Broker**"), which Broker Debtors have engaged in connection with the transactions, Sellers and Buyer each represent and warrant to the other that, such Party has incurred no liability to any real estate broker or other broker or agent with respect to the payment of any commission regarding the consummation of the transactions.  It is agreed that other than the fee or commission payable to Broker (which shall be paid by Debtors), if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Buyer or the Sellers in connection with the transactions contemplated by this Agreement, all such claims shall be handled and paid by the Party whose actions form the basis of such claim and such Party shall indemnify, defend (with counsel reasonably satisfactory to the Party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transactions.

13.16   Payment of Fees and Expenses.  Except as provided in Section 13.4 above and Section 11.1, each Party shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transactions described in this Agreement.

13.17   Survival.  The respective representations, warranties, covenants and agreements of Sellers and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall  not survive Closing, unless otherwise provided in this Agreement.

13.18   Assignments.  This Agreement shall not be assigned by any Party hereto without the prior written consent of the other Party hereto, which consent the Parties may grant or withhold in their sole and absolute discretion; provided, however, without in any way releasing or relieving Buyer of any obligation or liability under this Agreement, Buyer shall have the right to designate a third party to take title to all or any portion of the Property at the Closing

1006813688v11

(including, without limitation, all or any portion of the Cox Farm), provided that (i) such third party shall take title subject to any post-Closing obligations applicable to such portion of the Property pursuant to the terms of this Agreement (including, if applicable, the Temporary Lease Agreement) and (ii) such portion of the Property is a legally transferable separate parcel of land.

13.19  Binding Effect.  Subject to the provisions of Section 13.18 above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties hereto.  In addition, the provisions of Section 5.2  shall inure to the benefit of and be enforceable by each of the Released Parties, whether or not such Released Parties are signatories to this Agreement.

13.20  Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Washington.

13.21  Good Faith.  All Parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

13.22  Construction.  In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

13.23  Counterparts; Electronic Signatures.  This Agreement may be signed in counterparts.  The Parties further agree that this Agreement may be executed by the exchange of emailed signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon as reasonable following request from the other Parties. In agreeing to permit the use, from time to time where appropriate, of signatures transmitted by e-mail in order to expedite the transactions evidenced by this Agreement, the Parties hereby acknowledge, confirm and agree that (a) they intend to be bound by their respective signatures even though transmitted by e-mail, (b) they are aware that the other(s) will rely upon the signatures of the others which have been transmitted by e-mail, and (c) they waive any defense to the enforcement of the documents affecting the transactions based on the fact that a signature was transmitted by e-mail only.

13.24  Time is of the Essence.  Time is of the essence in this Agreement, and with respect to all of the terms, covenants and conditions hereof.

13.25  Bankruptcy Court Jurisdiction.  THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREIN, OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE SUCH DISPUTES.  THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE  JURISDICTION OVER SUCH MATTERS AND THE

1006813688v11

PARTIES AFFECTED THEREBY AND BUYER AND SELLERS EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

13.26    Interpretation and Rules of Construction.  In this Agreement, except to the extent that the context otherwise requires:

13.26.1 when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

13.26.2 the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

13.26.3 whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

13.26.4 the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

13.26.5 all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

13.26.6 the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

13.26.7 any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

13.26.8 references to a person are also to its permitted successors and assigns; and

13.26.9  the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

13.27    Confidentiality.  Sellers shall not, except as required by law or governmental regulation applicable to Sellers, or as may otherwise be permitted or required pursuant to the Bidding Procedures (as defined in the Bidding Procedures and Sale Motion), disclose the identity of Buyer's direct or indirect owners or principals to any third parties whomsoever other than the principals of the Title Company and such other persons whose assistance is required in carrying out the terms of this Agreement.  Sellers shall not at any time issue a press release or otherwise communicate with media representatives regarding this sale and purchase or the identity of Buyer or any of Buyer's direct or indirect owners or principals

35

1006813688v11

unless such release or communication has received the prior approval of Buyer.  This Section <u>13.27</u> shall survive the Closing or termination of the Agreement.

[SIGNATURES, EXHIBITS AND SCHEDULES FOLLOW]

1006813688v11

**In Witness Whereof**, Buyer and Sellers have executed this Purchase and Sale Agreement as of the Effective Date.

**BUYER:**

**100C, LLC,**
**a Delaware limited liability company**

By: _____
      Name: Peter Headley
      Title:  Authorized Person

Date: _  June 17, 2021 _____

*[Signature pages follow]*

[Signature Page to Purchase and Sale Agreement]

**SELLERS:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
Name: Scott Avila
Title: Co-Chief Restructuring Officer
Date: June 18, 2021

By: _____
Name: Peter Richter
Title: Co-Chief Restructuring Officer
Date: June 18, 2021

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
Name: Scott Avila
Title: Co-Chief Restructuring Officer
Date: June 18, 2021

By: _____
Name: Peter Richter
Title: Co-Chief Restructuring Officer
Date: June 18, 2021


_____
Cody Easterday
Date: June 18, 2021


_____
Debby Easterday
Date: June 18, 2021


_____
Karen Easterday, in her individual capacity
Date: June 18, 2021


_____
Karen Easterday as personal representative of the
Estate of Gale Easterday
Date: June 18, 2021

37

**SELLERS:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
      Name: Scott Avila
      Title: Co-Chief Restructuring Officer
Date:   June 18, 2021

By: _____
      Name: Peter Richter
      Title: Co-Chief Restructuring Officer
Date:   June 18, 2021


**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
      Name: Scott Avila
      Title: Co-Chief Restructuring Officer
Date:   June 18, 2021

By: _____
      Name: Peter Richter
      Title: Co-Chief Restructuring Officer
Date:   June 18, 2021


_____
Cody Easterday
Date: June 18, 2021


_____
Debby Easterday
Date: June 18, 2021


_____
Karen Easterday, in her individual capacity
Date: June 18, 2021


_____
Karen Easterday as personal representative of the
Estate of Gale Easterday
Date:   June 18, 2021

1006813688v11

**SELLERS:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
       Name: Scott Avila
       Title: Co-Chief Restructuring Officer
Date: June 18, 2021

By: _____
       Name: Peter Richter
       Title: Co-Chief Restructuring Officer
Date: June 18, 2021


**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
       Name: Scott Avila
       Title: Co-Chief Restructuring Officer
Date: June 18, 2021

By: _____
       Name: Peter Richter
       Title: Co-Chief Restructuring Officer
Date: June 18, 2021

_____
Cody Easterday
Date: June 18, 2021

_____
Debby Easterday
Date: June 18, 2021

_____
Karen Easterday, in her individual capacity
Date: June 18, 2021

_____
Karen Easterday as personal representative of the
Estate of Gale Easterday
Date: June 18, 2021

37

## TABLE OF EXHIBITS AND SCHEDULES

| | | |
|---|---|---|
| Exhibit A | -- | Escrow Instructions |
| Exhibit B | -- | Deeds |
| Exhibit C | -- | Bills of Sale |
| Exhibit D | -- | Contract/Lease Assignments |
| Exhibit E | -- | Temporary Lease Agreement |
| Exhibit F | -- | Form of Sale Order |
| Exhibit G | -- | Title Affidavit |

| | | |
|---|---|---|
| Schedule 1.1 | -- | Easterday Land |
| Schedule 1.4 | -- | Easterday Water Agreements/Irrigation System Permits |
| Schedule 1.5 | -- | Easterday Water Certificates and Permits |
| Schedule 1.6 | -- | Easterday Assigned and Assumed Leases and Contracts |
| Schedule 2.1 | -- | Land |
| Schedule 2.4 | -- | Water Agreements/Irrigation System Permits |
| Schedule 2.5 | -- | Debtor Assigned and Assumed Leases and Contracts |
| Schedule 2.6 | -- | Water Certificates and Permits |
| Schedule 5.2 | -- | Assumed Liabilities |
| Schedule 6.4.11 | -- | Phase I's |
| Schedule 7.2.11 | -- | Excluded Exceptions |
| Schedule 8.7 | -- | Assumed and Assigned Contracts and Leases/Cure Amounts |

1006813688v11

Exhibit A
Escrow Instructions

**Escrow Agreement**

This Escrow Agreement (this "**Agreement**") is made as of June [__], 2021 (the "**Effective Date**"), by and among (i) Easterday Ranches, Inc., a Washington corporation ("**Ranches**"), Easterday Farms, a Washington general partnership ("**Farms**" and, together with Ranches, the "**Debtors**")**,** each a debtor and debtor in possession under Lead Case No. 21-00141011 (the "**Cases**") (Jointly Administered) in the United States Bankruptcy Court for the Eastern District of Washington, Yakima Division (the "**Bankruptcy Court**") and Cody Easterday and Debby Easterday, husband and wife, and Karen Easterday, in her individual capacity and as the representative of in *In the Matter of Estate of Gale A. Easterday* currently pending in the Franklin County Superior Court, case no. 21-450004-11 (the "**Easterdays**" and, together with the Debtors, the "**Sellers**"), (ii) 100C, LLC, a Delaware limited liability company ("**Buyer**" and together with Seller, each an "**Escrow Party**" and collectively, the "**Escrow Parties**"), and (iii) Chicago Title Insurance Company ("**Escrow Agent**").

RECITALS

A.      Sellers and Buyer have entered into that certain Purchase and Sale Agreement dated June [__], 2021 (as it may have been amended, the "**Purchase Agreement**"), in connection with the sale and purchase of certain assets and real property of Sellers located in Benton County, Washington.

B.      Pursuant to Section 5.1.2 of the Purchase Agreement, the Escrow Parties have requested Escrow Agent to receive a portion of the Purchase Price as a deposit to be held in escrow and applied in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the above recitals, the mutual promises set forth herein and other good and valuable consideration, the parties agree as follows:

AGREEMENT

1.      DEFINED TERMS.  All capitalized terms used in this Agreement but not otherwise defined herein shall have the meanings set forth for such terms in the Purchase Agreement.

2.      APPOINTMENT OF ESCROW AGENT.  The Escrow Parties hereby designate and appoint Escrow Agent, as escrow agent for the purposes set forth in this Agreement and Escrow Agent hereby agrees to act as escrow agent hereunder, subject to and in accordance with the terms and conditions hereof.

3.      DEPOSIT/PURPOSE.

(a)      Pursuant to Section 5.1.2(a) of the Purchase Agreement, concurrently with the mutual execution and delivery of the Purchase Agreement, Buyer shall deposit into an Escrow with Escrow Agent an amount equal to [$_____] (the "**Deposit**") in immediately

1

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 240 of 379

available, good funds. In turn, the Escrow Agent shall immediately deposit the Deposit into a segregated, interest-bearing account.

(b)     The Deposit shall become nonrefundable and shall be disbursed by Escrow Agent to Sellers only upon the termination of the transactions contemplated by the Purchase Agreement by reason of a Buyer Default Termination. Sellers shall not have the right to terminate the Purchase Agreement and receive a disbursement of the Deposit unless Buyer has failed to cure the applicable default within three (3) business days (*i.e.*, excluding Saturdays, Sundays and national holidays) following receipt of written notice thereof from Sellers, in accordance with the terms of the Purchase Agreement.

(c)     If the transactions contemplated by the Purchase Agreement terminate (A) by reason of Sellers' material default under the Purchase Agreement (or as otherwise set forth in Section 13.2 of the Purchase Agreement), (B) by reason of the failure of a condition to Buyer's obligations under the Purchase Agreement (the failure of which is not itself the result of a material default by Buyer under the Purchase Agreement), (C) pursuant to Section 6.3  or Section 7.3 of the Purchase Agreement in circumstances where such termination was not itself the result of a material default by Buyer hereunder, or (D) pursuant to Section 13.1 of the Purchase Agreement, the Escrow Holder shall return to Buyer the Deposit (together with all interest accrued thereon), but less an amount equal to 1/2 of the Escrow Holder's escrow fees and charges. Sellers shall be responsible for paying the remaining 1/2 of the Escrow Agent's escrow fees and charges.

4.     DEPOSIT AND INVESTMENT OF ESCROW FUNDS.  All checks, money orders or drafts will be processed for collection in the normal course of business. Escrow Agent may initially deposit the Deposit in its custodial clearing accounts or escrow accounts which may result in the funds being commingled with escrow funds of others for a short period of time; however, as soon as the Deposit has been credited as collected funds to Escrow Agent's applicable account, then Escrow Agent shall immediately deposit the Deposit into one or more separate interest-bearing uninvested demand deposit accounts in the name of Escrow Agent, in its capacity as escrow agent for Sellers and Buyer hereunder, maintained with any reputable national trust company, bank, savings bank, or savings association, to be held in escrow for the benefit of the Escrow Parties until such funds are to be released as provided in this Agreement. The Deposit shall be subject to the provisions of applicable state statutes governing unclaimed property.  The Escrow Parties will execute IRS Forms W-9 and other appropriate Internal Revenue Service documentation for the giving of taxpayer identification information relating to this account.  The Escrow Parties acknowledge that each is aware of the Federal Deposit Insurance Corporation coverages applicable to deposits with a Depository Institution.  Further, the Escrow Parties understand that Escrow Agent assumes no responsibility for, and no Escrow Party shall hold Escrow Agent liable for, any loss of the Deposit occurring at any Depository Institution at which the Deposit is deposited on account of a situation or event giving rise to a right to recover insured amounts under applicable Federal Deposit Insurance Corporation coverages.

Escrow Agent shall not be responsible for any penalties, or loss of principal or interest, or any delays in the withdrawal of the funds which may be imposed by the Depository Institution as

1006813688v11

a result of the making or redeeming of the investment pursuant to the Escrow Parties' instructions.

Escrow Agent hereby waives any and all rights to offset that it may have against the Deposit, including, without limitation, claims arising out of any claims, amounts, liabilities, costs, expenses, damages, or other losses that the Escrow Agent may be otherwise entitled to collect from any party hereto.

5.    RELEASE AND DISBURSEMENT OF ESCROW FUND.

(a)    Following receipt of written determination(s) signed by both Buyer and Sellers acknowledging that the transaction contemplated by the Purchase Agreement has been terminated by reason of a Buyer Default Termination, the Escrow Agent will disburse the Deposit to Sellers (together with all interest accrued thereon).

(b)    Following receipt of written determination(s) signed by both Buyer and Sellers acknowledging that the transaction contemplated by the Purchase Agreement has been terminated by a reason described in Section 3(c) above, the Escrow Agent will disburse the Deposit to Buyer (together with all interest accrued thereon), but less an amount equal to 1/2 of the Escrow Agent's escrow fees and charges.  Sellers shall be responsible for paying the remaining 1/2 of the Escrow Agent's escrow fees and charges.

(c)    On the Closing Date, Buyer shall deliver to the Escrow Agent, Good Funds in the amount of the balance of the Purchase Price and any other amounts payable by Buyer under the Purchase Agreement.  Upon receipt by Escrow Agent of (i) the balance of the Purchase Price, (ii) all fully executed documents contemplated by the Purchase Agreement, and (iii) written authorization from Buyer and Sellers to close, the Escrow Agent shall release the Deposit to be credited and applied toward payment of the Purchase Price, and disburse the Purchase Price proceeds in accordance with this Escrow Agreement, the Purchase Agreement, the Sale Order, the Cooperation Agreement Order, and the approved closing settlement statements delivered at Closing pursuant to the Purchase Agreement.

6.    INTERPLEADER.  Escrow Agent is authorized to file an action for interpleader and to deposit the Deposit into any court of competent jurisdiction for a determination as to the proper disposition of any funds held under this Agreement.  In the event that the funds are deposited in court, Escrow Agent shall be entitled to file a claim in the proceeding for its costs and counsel fees, if any.

7.    PERFORMANCE OF DUTIES.  In performing any of its duties under this Agreement, or upon the claimed failure to perform its duties hereunder, Escrow Agent shall not be liable to anyone for any damages, losses or expenses which may occur as a result of any action taken, suffered or omitted to be taken by it in good faith; *provided*, *however*, Escrow Agent shall be liable for damages, losses or expenses arising out of its negligence or willful misconduct.  Accordingly, Escrow Agent shall not incur any liability with respect to: (i) any good faith, commercially reasonable act or omission upon advice of counsel given with respect to any questions relating to the duties and responsibilities of Escrow Agent hereunder, or (ii) any

3

good faith, commercially reasonable act or omission in reliance upon any document, including any written notice or instructions provided by all Escrow Parties pursuant to this Agreement, not only as to its due execution and to the validity and effectiveness of its provisions but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the proper person or persons and to conform with the provisions of this Agreement.

8.      LIMITATIONS OF LIABILITY.  Escrow Agent shall not be liable for any loss or damage resulting from the following:

(a)      The financial status or insolvency of any Escrow Party, and/or any misrepresentation of fact made by any Escrow Party;

(b)      The default, error, act or failure to act by any Escrow Party;

(c)      Any loss, loss of value or impairment of funds which have been deposited in escrow while those funds are in the course of collection or while those funds are on deposit in the Depository Institution if such loss or loss of value or impairment results from the failure, insolvency or suspension of such depository institution; and/or

(d)      Escrow Agent's compliance with any legal process, including but not limited to, subpoena, writs, orders, judgments and decrees of any court whether issued with or without jurisdiction and whether or not subsequently vacated, modified, set aside or reversed.

9.      HOLD HARMLESS.  The Escrow Parties, and each of them, shall indemnify Escrow Agent and hold Escrow Agent harmless from all damage, costs, claims and expenses arising from performance of its duties as Escrow Agent including reasonable attorneys' fees, except for those damages, costs, claims and expenses resulting from the negligence or willful misconduct of Escrow Agent.  The Escrow Parties shall each bear one half of any amounts paid to indemnify Escrow Agent pursuant to this Section.

10.     TERMINATION.  This Agreement shall terminate upon the first to occur of (a) the disbursement by Escrow Agent of all of the Deposit in accordance with this Agreement; (b) the joint written instructions of the Escrow Parties; or (c) the resignation of Escrow Agent upon reasonable notice to the Escrow Parties; provided, that termination under this clause (c) shall not be effective until the transfer and confirmed receipt of the Deposit to the Escrow Parties' designated replacement escrow agent.

11.     RELEASE OF PAYMENT.  Payment of funds held in escrow by Escrow Agent, provided such payment is made in accordance with the terms, conditions and provisions of this Agreement, shall fully and completely discharge and exonerate Escrow Agent from any and all future liability or obligations of any nature or character at law or equity to the Escrow Parties with respect and only to the extent of the funds paid.

12.     NOTICES.  All notices under this Agreement shall be in writing and signed by a party or its counsel.  Notices may be (i) delivered personally, (ii) delivered by a recognized national overnight delivery service, (iii) mailed by certified United States mail, postage prepaid

4

and return receipt requested or (iv) sent by e-mail to the address below.  Notices to any party shall be directed to the address set forth below, or to such other or additional address as any party may specify by notice to the other parties.   Any notice delivered in accordance with this paragraph shall be deemed given (a) in the case of any notice transmitted by e-mail, on the date on which the transmitting party receives acknowledgement of receipt by the receiving party by telephone, computer or otherwise, (b) in the case of any notice delivered by a recognized national overnight delivery service, on the day of delivery to the service, or (c) in the case of any notice mailed by certified U.S. mail, three (3) business days after deposit therein.

DEBTOR:     Easterday Ranches, Inc.
           Easterday Farms
           5235 N Industrial Way
           Pasco, WA 99301
           Attn:  Messrs. Peter Richter and Scott Avila,
             Co-Chief Restructuring Officers
           Email:  savila@paladinmgmt.com
             prichter@paladinmgmt.com

           With a Copy to:

           Pachulski Stang Ziehl & Jones LLP
           10100 Santa Monica Blvd,  13th Floor
           Los Angeles, CA  90067
           Attn:   Richard M. Pachulski, Esq.
             Jason Rosell, Esq.
           Email:  rpachulski@pszjlaw.com
             jrosell@pszjlaw.com


           Davis Wright Tremaine LLP
           920 Fifth Avenue, Suite 3300
           Seattle, WA 98104
           Attn:  Bill Weigand
             Lauren Johnson
           Email:  BillWeigand@dwt.com
             laurenjohnson@dwt.com

1006813688v11

EASTERDAYS:        Cody and Debby Easterday
830 Bellflower Road
Mesa, WA 99343
Email: cody@easterdayfarms.com

AND

Karen Easterday
631 Bellflower Road
Mesa, WA 99343

With a Copy to:

Sussman Shank LLP
1000 SW Broadway, Suite 1400
Portland, OR 97205
Attn:   Jeffrey Misley
Email: jmisley@sussmanshank.com

Tonkon Torp LLP
888 SW 5th Avenue, Suite 1600
Portland, OR 97204
Attn:  Timothy Conway
Email: tim.conway@tonkon.com

BUYER:        c/o Cottonwood Ag Management, LLC
Attn: General Counsel
2365 Carillon Point
Kirkland, WA 98033
Email: legal@bmgigroup.com

With a copy to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attn:   Edward M. Rishty
Email: emrishty@debevoise.com

1006813688v11

ESCROW AGENT:   Chicago Title Company of Washington
9001 W. Tucannon, Suite 220
Kennewick, WA 99336
Attn:  Nancy Hirai
Email: Nancy.hirai@ctt.com

13.    TAXES. The Escrow Parties agree that, for purposes of United States federal and other taxes based on income, Buyer shall be treated as the owner of the Deposit until such time as the Deposit has been disbursed to Sellers or Buyer, and that Buyer shall be entitled to receive and shall report the income, if any, that is earned on, or derived from, the Deposit as its income, in the taxable year or years in which such income is properly includible and pay any taxes attributable thereto. The Escrow Agent shall be entitled to deduct and withhold from any amount distributed or released from the Deposit all taxes which may be required to be deducted or withheld under any provision of applicable tax law. All such withheld amounts shall be treated as having been delivered to the party entitled to the amount distributed or released in respect of which such tax has been deducted or withheld.

14.    <u>Bankruptcy Court Jurisdiction</u>. THE ESCROW PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS AGREEMENT. THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND ESCROW AGENT, BUYER, AND SELLER EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION

15.    MISCELLANEOUS.

(a)    If any date on which the Escrow Agent is required to make an investment or a delivery pursuant to the provisions hereof is not a day on which the Escrow Agent is open for business (a day on which the Escrow Agent is open for business, a "**Business Day**"), then the Escrow Agent shall make such investment or delivery on the next succeeding Business Day.

(b)    Except as provided in Section 3(c), Buyer shall pay all of the fees and charges of the Escrow Agent for the services to be rendered by the Escrow Agent pursuant to this Agreement. The escrow fee of $18,000.00 shall be deposited with Escrow Agent at the time of establishing the escrow under this Agreement and shall be disbursed at the time the Deposit is released and disbursed in accordance with this Agreement.

(c)    This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and assigns.

(d)    This Agreement shall be governed by and construed in accordance with the laws of the State of Washington.

7

(e)     This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which, when taken together, shall constitute but one and the same instrument.  Delivery of an executed facsimile or email "pdf" hereof by a party shall constitute delivery of an executed counterpart original hereof by such party.  This Agreement shall become effective and in full force only when duly and properly executed, authorized, and delivered by the parties hereto.

(f)     Time shall be of the essence of this Agreement and each and every term and condition hereof.

(g)     No modification or amendment to this Agreement shall be effective unless in writing and signed by the Escrow Parties and the Escrow Agent.

(h)     As between Sellers and Buyer, in the event of any conflict between the terms of this Agreement and the Purchase Agreement, the Purchase Agreement shall control.

SIGNATURES ON NEXT PAGE

1006813688v11

IN WITNESS WHEREOF, the undersigned have caused this Escrow Agreement to be duly executed on the dates set forth below with the intent that it be effective as of the Effective Date first stated above.

SELLERS:

Easterday Ranches, Inc. a Washington corporation, Debtor and Debtor in Possession

By:_____

Name:_____

Title:_____

Easterday Farms, a Washington general partnership, Debtor and Debtor in Possession

By:_____

Name:_____

Title:_____

_____

Cody Easterday

_____

Debbie Easterday

_____

Karen Easterday, in her individual capacity

_____

Karen Easterday as personal representative of the Estate of Gale Easterday

BUYER:

100C, LLC, a Delaware limited liability company

By:_____

Name:_____

Title:_____

ESCROW AGENT:

Chicago Title Insurance Company

By:_____

Name:_____

Title:_____

9

10

1006813688v11

Exhibit B
Deeds

**AFTER RECORDING, RETURN TO**:

_____

_____

_____

_____

---

**QUIT CLAIM DEED**

GRANTOR: _____

GRANTEE: _____

ABBREV. LEGAL
DESCRIPTION: _____

(Full legal description on Exhibit A)

TAX ACCOUNT NUMBER(S): _____

REFERENCE NUMBERS OF
DOCUMENTS ASSIGNED OR
RELEASED (IF
APPLICABLE): _____

- 11 -

1006813688v11

# QUIT CLAIM DEED

The Grantor, _____, a _____, for and in consideration of Ten Dollars ($10.00) conveys and quitclaims to _____, a _____, all of Grantor's interest in the real estate described on Exhibit A (the "Real Estate") attached hereto and incorporated herein, situated in the County of Benton, State of Washington, together with all after-acquired title of the Grantor therein.

The Grantor further conveys and quit claims to Grantee all of Grantor's interest in and to all privileges, appurtenances and hereditaments related to the Real Estate, including but not limited to appurtenant water, water rights, and matters appertaining thereto. For purposes of this Deed, water rights include all appurtenant rights under certificates; adjudicated certificates; court decrees; appurtenant and perfected water rights documented by claims registered with the State of Washington under Claims Registration Act, Revised Code of Washington Chapter 90.14; appurtenant rights for water and conveyance of water associated with any federal or state water project, irrigation district water, association, or private company; and water rights under all permits for water right, which are either wholly or partially appurtenant to, or otherwise pursuant to which water is or may be delivered to or used on the Real Estate; or other appurtenant water right identifying information; including, without limitation, all of Grantor's rights, title, and interests in each of the following: Certificate No. S4-23978C, change authorizations No. CS4-23978(A)C@2, No. CS4-23978(B)C, No. CS4-23874(A)C, CS3-00286C, CS3-22572C, Certificate No. S3-00285C, Certificate No. S3-00284C, Certificate No. S3-22075C, and Certificate No. G4-04819CWRIS (3399); Superseding Permit No. S4-28998(A)P and Superseding Permit No. G4-30584P; Certificate No. S3-00591C; and Yakima Adjudication Conditional Final Order Certificate No. S4-83818-J.

DATED this _____ day of _____, 2021.

*[SIGNATURE & ACKNOWLEDGMENT PAGE FOLLOW]*

- 12 -

1006813688v11

*[SIGNATURE & ACKNOWLEDGEMENT PAGE TO QUIT CLAIM DEED]*

**GRANTOR:**

_____

a _____

By:    _____

Name: _____

Its:    _____

STATE OF WASHINGTON

COUNTY OF _____

    I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the _____ of _____, a _____, to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

_____

NOTARY PUBLIC for the State of Washington

My Commission Expires: _____

1006813688v11

21-00141-WLH11     Doc 830     Filed 06/21/21     Entered 06/21/21 17:28:37     Pg 252 of 379

**EXHIBIT A**

**<u>LEGAL DESCRIPTION</u>**

1006813688v11

Exhibit C
Bills of Sale

**BILL OF SALE AND ASSIGNMENT OF PROPERTY**

**(Easterdays)**

THIS BILL OF SALE AND ASSIGNMENT OF PROPERTY (this "**Assignment**") is made as of _____, 2021 ("**Effective Date**") by and between _____ ("**Assignor**"), and _____ ("**Assignee**").  Assignor and Assignee are sometimes referred to individually as "Party" and collectively as the "Parties".

**RECITALS**

A.  This Assignment is given pursuant to that certain Purchase and Sale Agreement dated _____, 2021 (the "**Purchase Agreement**") to which Assignee and Assignor are party.  Capitalized terms not otherwise defined in this Assignment have the meanings given in the Purchase Agreement.


B.  In connection with the conveyance of the Property to Assignee, Assignor has agreed to convey to Assignee and Assignee has agreed to accept from Assignor certain tangible and intangible personal property, including without limitation the Property described in Sections 1.3, 1.4, and 1.7 of the Purchase Agreement (the "**Assigned Property**") .

**AGREEMENT**

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  <u>Assignment of the Assigned Property</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignor grants, sells, bargains, conveys, transfers and assigns unto Assignee all of Assignor's right, title and interest in and to the Assigned Property as described in the Purchase Agreement, all solely to the extent that any such right, title, or interest is assignable to Assignee.

2.  <u>Assumption of Assigned Property</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignee hereby assumes and agrees to pay, discharge and perform in accordance with their terms, all of the Assigned Property.

3.  <u>Binding Assignment</u>.  This Assignment shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.

4.  <u>Conflict</u>.  Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 10 of the Purchase Agreement).  To the extent of any inconsistency between

the terms and provisions of the Purchase Agreement and those of this Assignment, the terms and provisions of the Purchase Agreement shall govern and control.

5. <u>Sole Remedy</u>.  The sole and exclusive remedy of the Assignee and Assignor with respect to any breach of this Assignment shall be as set forth in the Purchase Agreement.

6. <u>Severability</u>.  Should any term, provision or paragraph of this Assignment be determined to be illegal or void or of no force and effect, the balance of the Assignment shall survive.

7. <u>Entire Agreement</u>. This Assignment and the Purchase Agreement (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

8. <u>Governing Law</u>. This Assignment shall be governed by and construed in accordance with the laws of the State of Washington.

9. <u>Bankruptcy Court Jurisdiction</u>.  THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS ASSIGNMENT, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS ASSIGNMENT.  THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE  JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND ASSIGNOR AND ASSIGNEE EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

10. <u>Counterparts; Electronic Signatures</u>.  This Assignment may be signed in counterparts.  The Parties further agree that this Assignment may be executed by the exchange of emailed signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon as reasonable following request from the other Parties. In agreeing to permit the use, from time to time where appropriate, of signatures transmitted by e-mail in order to expedite the transactions evidenced by this Assignment, the Parties hereby acknowledge, confirm and agree that (a) they intend to be bound by their respective signatures even though transmitted by e-mail, (b) they are aware that the other(s) will rely upon the signatures of the others which have been transmitted by e-mail, and (c) they waive any defense to the enforcement of the documents affecting the transactions based on the fact that a signature was transmitted by e-mail only.

11. <u>Amendments</u>.  This Assignment may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

*[Signature Page Follows]*

1006813688v11

IN WITNESS WHEREOF, Assignor and Assignee have caused their duly authorized representatives to execute this Assignment as of the Effective Date.

**ASSIGNEE:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
      Name: _____
      Title: _____
Date:_____

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
      Name: _____
      Title: _____
Date: _____

**ASSIGNOR:**

_____
Cody Easterday

Date:_____

_____
Debbie Easterday
Date:_____

_____
Karen Easterday, in her individual capacity
Date: _____

_____

_____
Karen Easterday as personal representative of the Estate of Gale Easterday
Date:\_ _____

# BILL OF SALE AND ASSIGNMENT OF PROPERTY

## (Debtors)

THIS BILL OF SALE AND ASSIGNMENT OF PROPERTY (this "**Assignment**") is made as of _____, 2021 ("**Effective Date**") by and between _____ ("**Assignor**"), and _____ ("**Assignee**").  Assignor and Assignee are sometimes referred to individually as "Party" and collectively as the "Parties".

## RECITALS

C.  This Assignment is given pursuant to that certain Purchase and Sale Agreement dated _____, 2021 (the "**Purchase Agreement**") to which Assignee and Assignor are party.  Capitalized terms not otherwise defined in this Assignment have the meanings given in the Purchase Agreement.


D.  In connection with the conveyance of the Property to Assignee, Assignor has agreed to convey to Assignee and Assignee has agreed to accept from Assignor certain tangible and intangible personal property, including without limitation the Property described in Sections 2.3, 2.4, and 2.7 of the Purchase Agreement (the "**Assigned Property**") .

## AGREEMENT

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  <u>Assignment of the Assigned Property</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignor grants, sells, bargains, conveys, transfers and assigns unto Assignee all of Assignor's right, title and interest in and to the Assigned Property as described in the Purchase Agreement, all solely to the extent that any such right, title, or interest is assignable to Assignee.

2.  <u>Assumption of Assigned Property</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignee hereby assumes and agrees to pay, discharge and perform in accordance with their terms, all of the Assigned Property.

3.  <u>Binding Assignment</u>.  This Assignment shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.

4.  <u>Conflict</u>.  Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 10 of the Purchase Agreement).  To the extent of any inconsistency between the terms and provisions of the Purchase Agreement and those of this Assignment, the terms and provisions of the Purchase Agreement shall govern and control.

5.  <u>Sole Remedy</u>.  The sole and exclusive remedy of the Assignee and Assignor with respect to any breach of this Assignment shall be as set forth in the Purchase Agreement.

6.  <u>Severability</u>.  Should any term, provision or paragraph of this Assignment be determined to be illegal or void or of no force and effect, the balance of the Assignment shall survive.

7.  <u>Entire Agreement</u>. This Assignment and the Purchase Agreement (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

8.  <u>Governing Law</u>. This Assignment shall be governed by and construed in accordance with the laws of the State of Washington.

9.  <u>Bankruptcy Court Jurisdiction</u>.  THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS ASSIGNMENT, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS ASSIGNMENT.  THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE  JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND ASSIGNOR AND ASSIGNEE EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

10.  <u>Counterparts; Electronic Signatures</u>.  This Assignment may be signed in counterparts.  The Parties further agree that this Assignment may be executed by the exchange of emailed signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon as reasonable following request from the other Parties. In agreeing to permit the use, from time to time where appropriate, of signatures transmitted by e-mail in order to expedite the transactions evidenced by this Assignment, the Parties hereby acknowledge, confirm and agree that (a) they intend to be bound by their respective signatures even though transmitted by e-mail, (b) they are aware that the other(s) will rely upon the signatures of the others which have been transmitted by e-mail, and (c) they waive any defense to the enforcement of the documents affecting the transactions based on the fact that a signature was transmitted by e-mail only.

11.  <u>Amendments</u>.  This Assignment may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Assignor and Assignee have caused their duly authorized representatives to execute this Assignment as of the Effective Date.

**ASSIGNEE:**

**100C, LLC,**
**a Delaware limited liability company**

By: _____
       Name:
       Title:

Date:_____

**ASSIGNOR:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
       Name: _____
       Title: _____
Date:_____

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
       Name: _____
       Title: _____
Date: _____

By: _____
       Name: _____
       Title: _____

Exhibit D
Contract/Lease Assignments

**ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND LEASES**

**(Easterdays)**

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND LEASES (this "**Assignment**") is made as of _____, 2021 ("**Effective Date**") by and between _____ ("**Assignor**"), and _____ ("**Assignee**"). Assignor and Assignee are sometimes referred to individually as "Party" and collectively as the "Parties".

**RECITALS**

E. This Assignment is given pursuant to that certain Purchase and Sale Agreement dated _____, 2021 (the "**Purchase Agreement**") to which Assignee and Assignor are party. Capitalized terms not otherwise defined in this Assignment have the meanings given in the Purchase Agreement.

F. In connection with the conveyance of the Property to Assignee, Assignor has agreed to convey to Assignee and Assignee has agreed to accept from Assignor certain Easterday Assumed and Assigned Leases and Contracts (as defined in the Purchase Agreement).

**AGREEMENT**

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. <u>Assignment of Assigned Leases and Contracts</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignor, transfers and assigns unto Assignee all of Assignor's right, title and interest in and to the Assigned Leases and Contracts as described in the Purchase Agreement, all solely to the extent that any such right, title, or interest is assignable to Assignee.

2. <u>Assumption of Assigned Leases and Contracts</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignee hereby assumes all of Assignor's rights, title, and interest in, to and under the Assigned Leases and Contracts and shall pay, discharge and perform all obligations, liabilities, and covenants arising under the Assigned Leases and Contracts in accordance with their terms.

3. <u>Indemnification</u>. Assignee hereby agrees to indemnify, save, and hold harmless Assignor against any claims, liabilities or damages arising out of any actions or inactions of Assignee with respect to the Assigned Leases and Contracts from and after the Effective Date.

4. <u>Binding Assignment</u>. This Assignment shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.

5. <u>Conflict</u>. Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions

of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 10 of the Purchase Agreement). To the extent of any inconsistency between the terms and provisions of the Purchase Agreement and those of this Assignment, the terms and provisions of the Purchase Agreement shall govern and control.

6. <u>Sole Remedy</u>. The sole and exclusive remedy of the Assignee and Assignor with respect to any breach of this Assignment shall be as set forth in the Purchase Agreement.

7. <u>Severability</u>. Should any term, provision or paragraph of this Assignment be determined to be illegal or void or of no force and effect, the balance of the Assignment shall survive.

8. <u>Entire Agreement</u>. This Assignment and the Purchase Agreement (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

9. <u>Governing Law</u>. This Assignment shall be governed by and construed in accordance with the laws of the State of Washington.

10. <u>Bankruptcy Court Jurisdiction</u>. THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS ASSIGNMENT, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS ASSIGNMENT. THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND ASSIGNOR AND ASSIGNEE EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

11. <u>Counterparts; Electronic Signatures</u>. This Assignment may be signed in counterparts. The Parties further agree that this Assignment may be executed by the exchange of emailed signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon as reasonable following request from the other Parties. In agreeing to permit the use, from time to time where appropriate, of signatures transmitted by e-mail in order to expedite the transactions evidenced by this Assignment, the Parties hereby acknowledge, confirm and agree that (a) they intend to be bound by their respective signatures even though transmitted by e-mail, (b) they are aware that the other(s) will rely upon the signatures of the others which have been transmitted by e-mail, and (c) they waive any defense to the enforcement of the documents affecting the transactions based on the fact that a signature was transmitted by e-mail only.

12. <u>Amendments</u>. This Assignment may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Assignor and Assignee have caused their duly authorized representatives to execute this Assignment as of the Effective Date.

**ASSIGNEE:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____

Name: _____

Title: _____

Date:_____

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____

Name: _____

Title: _____

Date: _____

**ASSIGNOR:**

_____

Cody Easterday

Date:_____

_____

Debbie Easterday
Date:_____

_____

Karen Easterday, in her individual capacity
Date: _____

_____
_____

Karen Easterday as personal representative of the
Estate of Gale Easterday
Date:_ _____

# ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND LEASES

## (Debtors)

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND LEASES (this "**Assignment**") is made as of _____, 2021 ("**Effective Date**") by and between _____ ("**Assignor**"), and _____ ("**Assignee**"). Assignor and Assignee are sometimes referred to individually as "Party" and collectively as the "Parties".

## RECITALS

G. This Assignment is given pursuant to that certain Purchase and Sale Agreement dated _____, 2021 (the "**Purchase Agreement**") to which Assignee and Assignor are party. Capitalized terms not otherwise defined in this Assignment have the meanings given in the Purchase Agreement.

H. In connection with the conveyance of the Property to Assignee, Assignor has agreed to convey to Assignee and Assignee has agreed to accept from Assignor certain Assumed and Assigned Leases and Contracts (as defined in the Purchase Agreement).

## AGREEMENT

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. <u>Assignment of Assigned Leases and Contracts</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignor, transfers and assigns unto Assignee all of Assignor's right, title and interest in and to the Assigned Leases and Contracts as described in the Purchase Agreement, all solely to the extent that any such right, title, or interest is assignable to Assignee.

2. <u>Assumption of Assigned Leases and Contracts</u>: Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement, Assignee hereby assumes all of Assignor's rights, title, and interest in, to and under the Assigned Leases and Contracts and shall pay, discharge and perform all obligations, liabilities, and covenants arising under the Assigned Leases and Contracts in accordance with their terms.

3. <u>Indemnification</u>. Assignee hereby agrees to indemnify, save, and hold harmless Assignor against any claims, liabilities or damages arising out of any actions or inactions of Assignee with respect to the Assigned Leases and Contracts from and after the Effective Date.

4. <u>Binding Assignment</u>. This Assignment shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.

5. <u>Conflict</u>. Notwithstanding anything to the contrary herein, Assignor is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 10 of the Purchase Agreement). To the extent of any inconsistency between the terms and provisions of the Purchase Agreement and those of this Assignment, the terms and provisions of the Purchase Agreement shall govern and control.

6. <u>Sole Remedy</u>.  The sole and exclusive remedy of the Assignee and Assignor with respect to any breach of this Assignment shall be as set forth in the Purchase Agreement.

7. <u>Severability</u>.  Should any term, provision or paragraph of this Assignment be determined to be illegal or void or of no force and effect, the balance of the Assignment shall survive.

8. <u>Entire Agreement</u>. This Assignment and the Purchase Agreement (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

9. <u>Governing Law</u>. This Assignment shall be governed by and construed in accordance with the laws of the State of Washington.

10. <u>Bankruptcy Court Jurisdiction</u>.   THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS ASSIGNMENT, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS ASSIGNMENT.  THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE   JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND ASSIGNOR AND ASSIGNEE EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

11. <u>Counterparts; Electronic Signatures</u>.   This Assignment may be signed in counterparts.  The Parties further agree that this Assignment may be executed by the exchange of emailed signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon as reasonable following request from the other Parties. In agreeing to permit the use, from time to time where appropriate, of signatures transmitted by e-mail in order to expedite the transactions evidenced by this Assignment, the Parties hereby acknowledge, confirm and agree that (a) they intend to be bound by their respective signatures even though transmitted by e-mail, (b) they are aware that the other(s) will rely upon the signatures of the others which have been transmitted by e-mail, and (c) they waive any defense to the enforcement of the documents affecting the transactions based on the fact that a signature was transmitted by e-mail only.

12. <u>Amendments</u>.  This Assignment may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Assignor and Assignee have caused their duly authorized representatives to execute this Assignment as of the Effective Date.

**ASSIGNEE:**

**100C, LLC,**
**a Delaware limited liability company**

By: _____
      Name:
      Title:

Date:_____

**ASSIGNOR:**

**EASTERDAY RANCHES, INC.,**
**a Washington corporation and Debtor and Debtor in Possession**

By: _____
      Name: _____
      Title: _____
Date:_____

**EASTERDAY FARMS, Washington general partnership**
**and Debtor and Debtor in Possession**

By: _____
      Name: _____
      Title: _____
Date: _____

By: _____
      Name: _____
      Title: _____
Date:

Exhibit E
Temporary Lease Agreement

**TEMPORARY LEASE AGREEMENT**

THIS TEMPORARY LEASE AGREEMENT (this "Agreement") is entered into this _____ day of _____, 2021 (the "Effective Date"), by and between 100C, LLC, a Delaware limited liability company ("Lessor"), and EASTERDAY RANCHES, INC., a Washington corporation ("Ranches") and EASTERDAY FARMS, a Washington general partnership ("Farms" and, together with Ranches, "Lessee") each a debtor and debtor-in-possession, whose estates are being jointly administered in case number 21-00141 pending in the United States Bankruptcy Court for the Eastern District of Washington ("Chapter 11 Cases"). Lessor and Lessee are sometimes referred to individually as "Party" and collectively as the "Parties."

## R E C I T A L S

A.      Lessor, concurrent with execution of this Agreement, has acquired from Lessee  certain real property located in Benton County, State of Washington (the "State") described on the attached "Exhibit A" ("Lessor Property") pursuant to that certain Purchase and Sale Agreement dated June [__], 2021 (the "Purchase Agreement").

B.      Farms desires time to harvest wheat crops and complete its related current-year operations on the Lessor Property and Lessee desires to market and sell certain Excluded Property (as defined in the Purchase Agreement) consisting of certain tangible personal property and equipment, and thus each desires to obtain a temporary, non-exclusive lease (the "Lease") on, over, and across the Lessor Property.  Lessor is willing to convey the Lease to Lessee over the Lessor Property for the foregoing purposes subject to and in conformance with the terms and conditions set forth in this Agreement.

## T E R M S   A N D   C O N D I T I O N S

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      **Grant of Lease; Costs**. Lessor hereby conveys to Ranches and Farms, respectively as provided below, and their designated agents, tenants, employees, contractors and representatives ("Agents"), without warranty, a temporary, non-exclusive lease on, over, and across the Lessor Property for the purpose of (a) as to Farms, completing Lessee's current-year wheat crop harvest operations on the Lessor Property (the "Farming Purpose") and (b) as to Lessee, preparing to market and sell certain Excluded Property (as defined in the Purchase Agreement) and marketing and selling certain Excluded Property (as defined in the Purchase Agreement) consisting of certain tangible personal property and equipment (the "Equipment Sale Purpose", together with the Farming Purpose, the  "Lease Purposes"). Lessee shall be responsible for any and all costs of completing the Lease Purposes (e.g. without limitation, power charges). Lessee shall use and maintain the Lessor Property consistent with Lessee's prior practice and in accordance with customary good practices of the farming industry where the Lessor Property is located, subject to the terms and conditions of this Agreement.

2.      **Access**. Lessee and its Agents will enter upon the Lessor Property at their sole risk and hazard and shall have the right to use all appurtenances, ingress and egress to and from the Lessor Property over the routes and easements historically used by Lessee for the Farming Purpose. Lessee's access to and use of the

21-00141-WLH11     Doc 830     Filed 06/21/21     Entered 06/21/21 17:28:37     Pg 266 of 379

Lessor Property for purposes of the Equipment Sale Purpose shall be limited to designated areas on Lessor's Property approved by Lessor, which approval shall not be unreasonably withheld, conditioned, or delayed.

**3.** **Term**. This Agreement and the Lease granted hereunder shall commence on the Effective Date and shall automatically terminate, as to the Farming Purpose, on the earlier of completion of harvest or September 30, 2021, and as to the Equipment Sale Purpose, on the earlier of completion of the sale and removal of all of the Excluded Property or October 31, 2021 (collectively, the "Term").

**4.** **Reservation by Lessor**. Lessor hereby reserves the right to use the Lessor Property for any use not inconsistent with Lessee's Lease Purposes of the Lessor Property; provided, however, that Lessor shall use best efforts to not interfere with Lessee's Lease Purposes.

**5.** **Condition of the Lessor Property**. Lessee acknowledges that it has previously possessed and maintained and will continue to possess and maintain the Lessor Property through the Term of this Agreement and accepts the Lessor Property and all aspects thereof in "AS IS", "WHERE IS" condition, without warranties, either express or implied, "with all faults", including but not limited to both latent and patent defects, and the existence of hazardous materials, if any.

**6.** **Alterations**. Lessee shall not make any additions, alterations or improvements, or erect any structures, buildings, fences, or other improvements, permanent or temporary (collectively, "Alterations") on or to the Lessor Property without obtaining the prior written consent of Lessor, which may be granted or withheld in Lessor's sole and absolute discretion, except that Lessee may erect temporary, movable shelters or structures, and set up temporary signage or other similar temporary and movable items as reasonably appropriate in connection with completion of the Equipment Sale Purpose. Lessee shall expeditiously complete all work with respect to any approved Alterations in a good and workmanlike manner, and the work shall be expeditiously completed in compliance with all applicable Laws. On or before the expiration or earlier termination of the Lease, Lessee, at its sole cost and expense, shall remove all Alterations from the Lessor Property and restore the Lessor Property to the conditions that existed on the Effective Date, unless otherwise directed by Lessor. If Lessor directs that any Alterations remain on the Lessor Property, such Alterations shall be deemed part of the Lessor Property and shall (without any charge to Lessor) become the property of Lessor.

**7.** **Damage**. Lessee shall be responsible for any material damage done to the Lessor Property by Lessee or its Agents. To the extent Lessor Property is materially damaged by Lessee or its Agents, then Lessee shall, at its sole cost and expense, promptly repair any such damage and restore the Lessor Property to the same condition that existed before such damage. This provision shall survive termination of this Agreement.

**8.** **Compliance with Laws**. To the extent Lessee uses farm labor contractors for the Lessee's Lease Purpose, then Lessee shall obtain and maintain any required Washington farm labor contractor license and, if applicable, shall require the same of any contractors engaged by Lessee. Without limitation, Lessee and Lessee's Agents and contractors shall comply with any and all Laws during the Term. "Laws" means all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, Leases, authorizations, directions and requirements of and agreements with all governments, departments, commissions, boards, courts, authorities, agencies, officials and officers, including, without limitation, the Occupational Safety and Health Act, the Fair Labor Standards Act, the Federal Migrant and Seasonal Agricultural Worker Protection Act, the Americans' with Disabilities Act, any wage and hour laws (and any analogous acts of the State), any and all rules and regulations of the United States Department of Agriculture and of the Department of Agriculture of the State, and/or any Environmental Laws, which now or at any time hereafter may be applicable to Lessor Property or any part thereof. Lessee shall promptly submit to Lessor copies of all documents, including reports, submissions, notices, orders,

directives, findings and correspondence made by Lessee during the Term to any person or governmental authority, or given by any governmental authority or person to Lessee during the Term pursuant to any Laws.

**9.** **Insurance**. As a condition to the grant of the Lease, Lessee shall obtain and maintain during the Term the following insurance.

**9.1.** Commercial General Liability Insurance. Lessee shall obtain and thereafter maintain during the Term, at its sole cost and expense, a policy of Commercial General Liability (including pollution legal liability for sudden and accidental spills or releases ("PLL Coverage"), subject to the last sentence of this Section 9.1) insuring Lessee's interests against claims for personal injury, bodily injury, death and property damage occurring on, in or about the Lessor Property, with a "Combined Single Limit" (covering personal injury liability, bodily injury liability and property damage liability) of not less than $2,000,000 per occurance and $2,000,000 aggregate. Notwithstanding the foregoing in this Section 9.1, Lessee shall only be responsible for payment of $5,000.00 of any incremental increase in the premium cost of PLL Coverage over and above the basic commercial general liability coverage. If such incremental cost exceeds $5,000.00, Lessee shall inform Lessor, and Lessor may elect either to pay the excess over $5,000.00, find other more affordable coverage, or waive the requirement of PLL Coverage.

**9.2.** Commercial Automobile Liability Insurance. Lessee shall obtain and thereafter maintain during the Term, at its sole cost and expense, a policy of Commercial Automobile Liability on any and all owned, leased, hired, or non-owned vehicles used by or for Lessee with a "Combined Single Limit" (covering personal injury liability, bodily injury liability, and property damage liability) of not less than $1,000,000 "Any Auto Basis."

**9.3.** Workers' Compensation and Employer's Liability Insurance. If Lessee is subject to Workers' Compensation and Employer's Liability under State Laws, Lessee agrees to maintain and keep in force during the Term: (a) Workers' Compensation Insurance and (b) Employer's Liability Insurance of not less than those required by Laws. Lessee agrees to indemnify and hold Lessor harmless from all liability and costs including attorney's and court costs relating to any workers' compensation claim.

**9.4.** Waiver of Certain Rights. With respect to any loss or damage that may occur to the Lessor Property during the Term or Lessee's crops thereon, arising from any peril customarily insured under an all risk insurance policy, regardless of the cause or origin including Workers' Compensation matters, excluding willful acts of Lessor, Lessor's Affiliates and Lessor's Parties, Lessee hereby releases Lessor's Parties from all claims with respect to such loss; and Lessee agrees that its insurance company shall have no right of subrogation against Lessor's Parties on account of any such loss, and Lessee shall procure from its respective insurers under all such policies a waiver of all rights of subrogation against Lessor's Parties which the insurers might otherwise have under such policies.

**9.5.** Policy Requirements. Lessor shall be endorsed as an additional insured on the policy of Commercial General Liability Insurance required to be maintained by Lessee. The insurance policies and certificates required by this Section 9 shall require the insurance company to furnish the Lessor at least ten (10) days prior written notice of any cancellation or lapse, or the effective date of any reduction in the amounts or scope of coverage. The insurance which Lessee is required to carry under this Lease shall be with companies satisfactory to Lessor. All policies to be maintained by Lessee shall be primary policies and not contributing with or as excess coverage for any insurance carried by Lessor.

Lessor and Lessee shall fully cooperate in making claims and furnishing information to the insurer or insurers, and obtaining settlements and payments from the insurer or insurers.

10. **Indemnification and Release**.

      10.1.  <u>Indemnification</u>. Except to the extent resulting from the negligence or willful misconduct of Lessor or Lessor's Parties, Lessee shall defend, indemnify and save and hold harmless Lessor and the officers, directors, shareholders, employees, representatives, servants, agents, contractors, invitees, successors and assigns of Lessor (collectively, "**Lessor's Parties**") from and against any and all liabilities, obligations, losses, damages (but excluding any lost profits or consequential damages), including reasonable attorneys' fees and court costs, incurred by Lessor, arising from: (a) third party claims for injury or death of any person or persons, or property damage, on the Lessor Property during the Term; and/or (b) the use or occupancy of the Lessor Property by Lessee or any Lessee's Agents (defined below) or contractors during the Term. Except to the extent resulting from the negligence or willful misconduct of Lessee or Lessee's Agents, Lessor shall defend, indemnify and save and hold harmless Lessee and the officers, directors, shareholders, employees, representatives, servants, and agents (collectively, "**Lessee's Agents**") from and against any and all liabilities, obligations, losses, damages (but excluding any lost profits or consequential damages), including reasonable attorneys' fees and court costs, incurred by Lessee, arising from the use or occupancy of the Lessor Property by Lessor or Lessor's Parties.

      10.2.  <u>Release</u>. Except to the extent resulting from the negligence or willful misconduct of Lessor, Lessor's Parties, or Lessor's contractors or invitees, Lessee hereby assumes all risk of damage or injury to any person or property in, on or about the Lessor Property from any cause whatsoever, and hereby releases, remises, acquits and discharges Lessor, and Lessor's Parties from any such damage or injury on behalf of Lessee, and Lessee's Agents. In addition Lessor, and Lessor's Parties shall not be liable for any loss, injury, death, or damage (including any consequential damage) to persons, property, or Lessee's business resulting from any theft, act of God, public enemy, injunction, riot, strike, insurrection, war, court order, requisition, order of governmental body or authority, fire, explosion, collapse of a structure, falling object, steam, water, rain, snow, ice, breakage, leakage, obstruction, or other defects in, on or about the Lessor Property excepting any injury, loss of life, or damage which is caused by the gross negligence or willful misconduct of Lessor and Lessor's Agents. This Section shall survive termination of this Agreement.

11. **Liens**. Lessee shall not do any act or make any contract so as to encumber or affect in any manner the title or rights of Lessor in the Lessor Property. Lessee shall keep the Lessor Property free from and shall promptly discharge any liens arising out of any failure by Lessee to pay any taxes, charges or levies upon the Excluded Property or any of Lessee's personal property or liens arising out of any work performed, materials furnished, or obligations incurred by or for Lessee, and in any event no later than five (5) business days after delivery of written demand by Lessor. Lessee indemnifies, holds harmless and agrees to defend Lessor from and against any and all liability, loss, damage, costs, attorneys' fees and all other expenses on account of claims by any taxing authority or claims of lien of laborers or materialmen or others for work performed or materials or supplies furnished to or for Lessee or persons claiming under Lessee. If Lessee shall be in default in paying any charge for which a bond or other lien claim has been filed and shall not have given Lessor security to protect the Lessor Property and Lessor, then Lessor may, but shall not be obligated to, pay the claim. The total amount of the claim together with any costs and attorneys' fees incurred by Lessor in connection therewith, shall be immediately due and owing from Lessee to Lessor.

12. **Surrender**. Lessee shall, upon the expiration of the Term or earlier termination of this Agreement, according to the termination dates set forth above with respect to the Farming Purpose and/or the Equipment Sale Purpose, peacefully surrender the Lessor Property to Lessor in substantially the same condition as it was received by Lessee, ordinary wear and tear, casualty, and cultivation of any crops excepted,

and deliver to Lessor all keys associated with the Lessor Property. Without limitation, Lessee shall surrender the Lessor Property vacant and free and clear of any individual occupancies, including of manufactured homes conveyed to Lessor as part of the Property pursuant to the Purchase Agreement, and shall defend, indemnify and save and hold harmless Lessor and Lessor's Parties from and against any and all liabilities, obligations, losses, damages (but excluding any lost profits or consequential damages), including reasonable attorneys' fees and court costs, incurred by Lessor, arising from any such occupancies. Lessee acknowledges the fixed nature of the Term, and agrees that any crops and Lessee's Property remaining on the Lessor Property after the expiration of ten (10) days after the expiration of the Term or the earlier termination of the Agreement shall, at the election of Lessor, become the property of Lessor and shall be deemed abandoned in accordance with applicable laws. Lessee hereby waives any and all rights in such crops and the right to compensation for any work or soil preparation performed by Lessee, including, without limitation, any rights arising under any laws and the doctrine of emblements with respect to any such crops. Lessor shall have the right to remove, store, sell and dispose of such crops and Lessee's Property and retain any proceeds derived therefrom pursuant to any and all applicable laws.

13. **Assignment**. Lessee may not (a) assign or transfer this Agreement or any interest therein, in whole or in part, or (b) sublet or grant any other right to use all or any portion of the Lessor Property, in either case, without the prior express written consent of Lessor, and further provided that no assignment or sublease shall be permitted with respect to the Equipment Sale Purpose, and any proposed assignee or sublessee with respect to the Farming Purpose must, as a condition precedent to the effectiveness of any such assignment or sublease in addition to Lessor's written consent, (i) agree in writing to be bound by all of the terms and conditions of this Agreement with respect to the Farming Purpose, (ii) be a reputable operator in the Columbia River basin region with respect to wheat farming operations of this size and scale with an established history of utilizing best farming practices as generally acknowledged in the Columbia River basin region, (iii) provide evidence satisfactory to Lessor of all of the insurance required to be maintained by Lessee under this Agreement, and (iv) under no circumstances shall Lessee be released or deemed released from its obligations under this Agreement, but rather shall be a joint and several obligor with any such assignee or sublessee. Notwithstanding anything herein to the contrary, Farms shall be permitted to enter into any farm labor contracts necessary for the Farming Purpose without obtaining Lessor's prior consent, and Lessee shall be permitted to enter into any contracts or agreements necessary for the Equipment Sale Purpose without obtaining Lessor's prior consent, providing, however, that, Lessee shall be entirely responsible for such contracts and contractors, and such contracts and contractors shall not violate or be violative any of the terms and conditions of this Agreement.

14. **Bankruptcy Court Jurisdiction**. LESSOR AND LESSEE AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THIS AGREEMENT. THE BANKRUPTCY COURT SHALL HAVE ORIGINAL AND EXCLUSIVE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND LESSOR AND LESSEE EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

15. **Taxes**. Lessor shall pay all taxes, assessments, fees and other similar governmental charges levied against or with respect to the Lessor Property.

16. **Independent Contractors; No Third Party Beneficiaries; No Shared Employees or Contractors**. The Parties are independent contractors and not partners or joint venturers and neither is agent of or has the power or authority to bind the other. There are no designated or intended third party beneficiaries to this Agreement. The employees or contractors of Lessee are not employees or contractors of Lessor in any

respect, shared or otherwise, and Lessee shall be solely responsible for all matters concerning its employees or contractors.

      17.    **Attorney Fees**. In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that action or proceeding (as determined by the applicable tribunal of competent jurisdiction in such action or proceeding) shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

      18.    **Miscellaneous**. This Agreement was entered into upon Closing, as that term is defined in the Purchase Agreement, of the Purchase Agreement. In the event of any conflict between the terms of this Agreement and the Purchase Agreement, the Purchase Agreement shall control, except that, for clarity, nothing in this Agreement is intended to conflict with agreements of the Parties in the Purchase Agreement with respect conditions or occurrences existing prior to the Closing under the Purchase Agreement; and further, the express terms and conditions of this Agreement with respect to the period commencing with the Effective Date hereof and following are intended to be controlled by this Agreement. No supplement, modification or amendment of this Agreement shall be binding unless in writing and executed by the Parties hereto. This Agreement shall be construed in accordance with and governed by the laws of the State of Washington. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions, whether or not similar, nor shall any waiver be a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver. The headings of this Agreement are for purposes of reference only and shall not limit or define the meaning of the provisions hereof. The Recitals set forth above are incorporated into this Agreement by reference. If any provision of this Agreement or the application thereof to any person, place, or circumstance, shall be held by the Bankruptcy Court to be invalid, unenforceable, or void, the remainder of this Agreement and such provisions as applied to other persons, places, and circumstances shall remain in full force and effect; provided, however, the invalid provision does not have a materially adverse effect on Lessor. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. Neither this Agreement, nor any memorandum or other written evidence of same shall be recorded in any public records

SIGNATURES ON NEXT PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**LESSOR**:        100C, LLC,
a Delaware limited liability company

By: _____

Name (Print): _____

Its: _____

**LESSEE**:        EASTERDAY FARMS, a Washington general partnership

By: _____

Name (Print): _____

Its: _____

By: _____

Name (Print): _____

Its: _____

EASTERDAY RANCHES, INC., a Washington corporation

By: _____

Name (Print): _____

Its: _____

## EXHIBIT A

(Description of the Lessor Property)

1006813688v11

Exhibit F
Form of Sale Order

1006813688v11

The Sale Order shall be in the following form, subject to changes to reflect the filing of additional pleadings and entry of additional orders relating to the Sale since the date on which the following form was prepared, and any such other changes to the following form of order as may be necessary to reflect the Purchase and Sale Agreement or as may reasonably be requested by Buyer and approved by Sellers, with such approval not to be unreasonably withheld or delayed.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re | Chapter 11 |
| EASTERDAY RANCHES, INC., *et al.* | Lead Case No. 21-00141-WLH11 |
| Debtors.[1] | Jointly Administered |
| | **[PROPOSED] ORDER (A) AUTHORIZING THE DEBTORS TO ACQUIRE CERTAIN ASSETS OWNED BY THE EASTERDAYS; (B) AUTHORIZING THE SALE OF PROPERTY FREE AND CLEAR OF INTERESTS, INCLUDING LIENS, CLAIMS, LIABILITIES AND ENCUMBRANCES; (C) GRANTING THE BUYER THE PROTECTIONS AFFORDED TO A GOOD FAITH PURCHASER; (D) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (E) GRANTING RELATED RELIEF** |

Upon the motion filed on March 26, 2021 [Docket No. 486] (the "<u>Sale Motion</u>") by above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), as supplemented by the Debtors' *Supplemental Motion for Approval of (A) Designation of Stalking Horse Bidder and Related Bid Protections in Connection with Auction for Sale of Assets; and (B) Granting Related Relief* ("<u>Supplemental Bidding</u>

---

[1] The Debtors along with their case numbers are as follows: Easterday Ranches, Inc., (21-00141) and Easterday Farms, a Washington general partnership (21-00176).

FORM OF SALE ORDER – Page 1

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Procedures Motion") [Docket No. 724] and *Order Approving (A) Designation of Stalking Horse Bidder and Related Bid Protections in Connection with Auction for Sale of Assets; and (B) Granting Related Relief* ("Supplemental Bidding Procedures Order") [Docket No. [●]] (collectively, with the Sale Motion and Purchase and Sale Agreement (defined herein), the "Motion"), for entry of an order (this "Order") authorizing the Debtors, the Easterdays (as defined herein), and the Buyer (as defined herein) to consummate the *Purchase and Sale Agreement* dated May 19, 2021 attached hereto as Exhibit 1 (together with documents referred, necessary or ancillary thereto, the "Purchase and Sale Agreement").[2] The relief requested includes, among other things:

   i.     authorization for the Debtors to acquire certain assets (collectively, the "Easterday Property"), as described in Section 1 of the Purchase and Sale Agreement, including Easterday Land, Easterday Appurtenances, Easterday Mineral Rights, Easterday Improvements, Easterday Irrigation System Permits, Easterday Water Agreements, Easterday Water Rights, Easterday Intangible Property, and Easterday Assigned and Assumed Leases and Contracts , owned by Cody Easterday ("CE") and Debby Easterday ("DE"), as husband and wife, and Karen Easterday (in her individual capacity and as the personal representative in *In the Matter of the Estate of Gale A. Easterday* currently pending in the Franklin County Superior Court, case no. 21-450004-11) ("KE," and together with CE and DE, the "Easterdays" and, together with the Debtors, the "Sellers");

   ii.    approval of and authorization to consummate the sale of the Easterday Property and certain property owned and/or leased by the Debtors, as described in Section 2 of the Purchase and Sale Agreement, including Land, Appurtenances,

---

[2]   Unless stated otherwise, all capitalized terms not defined herein shall have the same meaning as set forth in the Purchase and Sale Agreement. In the event of any inconsistency between this Order and the Motion, the Order shall govern.

FORM OF SALE ORDER – Page 2

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13ᵗʰ Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Mineral Rights, Improvements, Water Agreements, Irrigation System Permits, Water Rights, Intangible Property, and the Assigned and Assumed Leases and Contracts (collectively, and as further described in the Purchase and Sale Agreement, the "Property") to Farmland Reserve, Inc. ("FRI") or to any affiliate thereof designated in accordance with the Purchase and Sale Agreement (the "Buyer"), free and clear of all interests (as such term is used in section 363(f) of the Bankruptcy Code), including without limitation, liens, claims, encumbrances, leases, options to purchase, agreements to sell, rights of first refusal or first offer (or any rights similar to the foregoing), rights of redemption, pledges, and charges (collectively, the "Claims, Rights, and Encumbrances");

       iii.    granting the Buyer the protections afforded to a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code;

       iv.    approving the assumption and assignment by the Debtors to the Buyer of the Assigned and Assumed Leases and Contracts pursuant to section 365 of the Bankruptcy Code; and

       v.    granting certain related relief pursuant to the Bankruptcy Code and/or applicable law (with the foregoing (i) through (v) collectively referred to as the "Sale").

It appearing that the relief requested is in the best interests of the Debtors' estates, their creditors and other parties-in-interest, as well as in the best interests of the Easterdays' creditors; and this United States Bankruptcy Court for the Eastern District of Washington (this "Court") having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion and opportunity for objections or requests for hearing having been filed; and notice of the Sale, including by publication, having been filed; and good and sufficient opportunity to

FORM OF SALE ORDER – Page 3

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

object and to be heard with respect to the Sale, the Motion and the relief requested therein having been afforded all interested persons and entities; and based on the statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Motion at a hearing before this Court conducted on July 14, 2021 (the "Sale Hearing"); and it appearing that no other notice need be given; and it further appearing that the legal and factual bases set forth in the Motion and supporting declarations, and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND CONCLUDES THAT:[3]**

A.    This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. § 1334(a). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Motion is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2).

B.    This Order constitutes a final and appealable decision within the meaning of 28 U.S.C. § 1291. Notwithstanding Bankruptcy Rule 6006(d), and to any extent necessary under Bankruptcy Rule 9014, this Court expressly finds that there is no just reason for the delay in the effectiveness of this Order, nor any just reason to delay its effect on all holders of rights in and to, and against the Property and the Parties to the Purchase and Sale Agreement, and expressly directs the entry of this Order as set forth herein.

C.    The statutory predicates for the relief requested in the Motion are (i) sections 105(a), 363(b), 363(f), 363(k), 363(m), 365(a), 365(b), 365(e), 365(f), and 541(a)(7) of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 2002(c)(1), 6004(a),

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law. *See* Fed. R. Bankr. P. 7052.

FORM OF SALE ORDER – Page 4

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

6004(c), 6004(f), 6004(h), 6006(a), 6006(c), 6006(f), 6006(g) and Local Rules 6004-1 and 6006-1.

## <u>Notice of the Sale, Auction, and Cure Amounts</u>

D.      Actual written notice of the Sale Hearing, the Auction, the Motion, the Sale, the assumption and assignment of the Assigned and Assumed Contracts and Leases, and all notices and deadlines with respect to the foregoing, and a reasonable opportunity to object or be heard with respect to the foregoing and the relief requested therein has been afforded to all known interested persons and entities (together, the "<u>Parties-in-Interest</u>"), including, but not limited to the following parties:

  a. the United States Trustee;

  b. any party asserting Claims, Rights, and Encumbrances;

  c. all taxing authorities having jurisdiction over any of the Property, including the Internal Revenue Service and the Washington Department of Revenue;

  d. all persons known or reasonably believed to have asserted liens on any of the Property;

  e. the counterparties to the Assigned and Assumed Contracts and Leases;

  f. all persons known or reasonably believed to have expressed an interest in purchasing the Property;

  g. the Office of the Attorney General in the State of Washington;

  h. the Office of the Secretary of the State of Washington;

  i. all environmental authorities having jurisdiction over any of the Property, including the Environmental Protection Agency and the Washington Department of Ecology;

  j. the United States Attorney General/Department of Justice;

FORM OF SALE ORDER – Page 5

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

k.  the Commodity Futures Trading Commission;

l.  all of the Debtors' known creditors;

m.  all of the Easterdays' known creditors;

n.  all of the Sellers' unknown creditors through publication ("Publication Notice"); and

o.  all other parties that have filed a notice of appearance and demand for service of papers in these chapter 11 cases under Bankruptcy Rule 9010(b) and in any limited or ancillary proceeding in connection with these chapter 11 cases.

E.  In accordance with the provisions of the Bid Procedures Order, the Supplemental Bidding Procedures Order, and the Purchase and Sale Agreement, the Sellers have served notice of the following upon the counterparties to the Sellers' executory contracts and unexpired leases: (i) that the Sellers may seek to assume and assign certain executory contracts and unexpired leases (the "Assigned and Assumed Leases and Contracts") on the Closing Date; (ii) the title of the Assigned and Assumed Contracts and Leases, (iii) the name of the counterparty to the Assigned and Assumed Contracts and Leases, (iv) the Sellers' good faith estimates of the cure amounts required in connection with such Assigned and Assumed Contracts and Leases, (v) the identity of the Buyer, (vi) the deadline by which any such Assigned and Assumed Contracts and Leases counterparty may file an objection to the proposed assumption and assignment and/or cure, and the procedures relating thereto, and (vii) that such Assigned and Assumed Contracts and Leases counterparty's failure to object timely to the proposed assumption or cure amount will be deemed to be consent to such assumption and cure amount. The service of such notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of the assumption and assignment of or establishment of a cure amount for the Assigned

FORM OF SALE ORDER – Page 6

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

and Assumed Leases and Contracts. Each of the counterparties to the Assigned and Assumed Leases and Contracts has had an opportunity to object to the assumption and assignment of its applicable Assigned and Assumed Leases and Contracts and the cure amounts set forth in such notice.

F.    The Sellers have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion, including, without limitation, the Debtors' acquisition of the Easterday Property pursuant to section 363(b) of the Bankruptcy Code, the Sale of the Property pursuant to section 363(b) of the Bankruptcy Code, and the assumption and assignment of the Assigned and Assumed Lease and Contracts and determination of the final cure amounts.

G.    The Sale Notice, Publication Notice, and the Assumption and Assignment/Cure Notice provided all Parties-in-Interest with timely and proper notice of the Sale, Auction, Sale Hearing, and any deadlines to object to the Sale.

H.    As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate, and sufficient notice of the Motion, Auction, Sale Hearing, and Sale has been provided in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006 and 9014 to all Parties-in-Interest. The Debtors have also complied with all obligations to provide notice of the Motion, Auction, Sale Hearing, and Sale required by the Bid Procedures Order and Supplemental Bidding Procedures Order, including notice by publication of the designation of the Buyer as the Stalking Horse Bidder and the deadline to object to the Sale of the Property to the Stalking Horse Bidder or Successful Purchaser. The notices described above were good, sufficient, and appropriate under the circumstances, and no further or other notice of the Motion, Auction, Sale Hearing, Sale, or assumption and assignment of the Assigned and Assumed Contracts and Leases is required.

FORM OF SALE ORDER – Page 7

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

I.      Disclosures of the Purchase and Sale Agreement, Auction, Sale, Sale Hearing, and the assumption and assignment of the Assigned and Assumed Leases and Contracts were good, complete, and adequate, and reasonable opportunity to object or to be heard regarding the Sale was afforded to all Parties-in-Interest.

### Good Faith of the Buyer

J.      The Buyer is not an "insider" or otherwise an "affiliate" of any of the Sellers, as those terms are defined in section 101(31) of the Bankruptcy Code or under the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transaction Act, and any laws of the United States, any state, territory, possession thereof, or the District of Columbia.

K.      The Buyer is purchasing the Property in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and under the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transaction Act, and any laws of the United States, any state, territory, possession thereof, or the District of Columbia, and is therefore entitled to the full protection of those provisions, and otherwise has proceeded in good faith in all respects in connection with the Sale in that, *inter alia*: (i) the Sellers were free to deal with any other party interested in acquiring the Property in accordance with the Bid Procedures; (ii) the Buyer complied with the provisions of the Bid Procedures Order; (iii) the Buyer agreed to submit its bid, in the form of the Purchase and Sale Agreement, to the competitive Bid Procedures set forth in the Bid Procedures Order; (iv) all payments and other consideration to be provided by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (v) the Buyer has not engaged in any action or inaction that would cause or permit the Purchase and Sale Agreement or the Sale to be avoided or would impose any costs or damages under section 363(n) of the Bankruptcy Code;

FORM OF SALE ORDER – Page 8

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

(vi) no common identity of directors or controlling stockholders exists between the Buyer and the Sellers; (vii) the negotiation and execution of the Purchase and Sale Agreement was at arms' length and in good faith at all times, and each Party was represented by separate and competent counsel and other professionals; and (viii) the Purchase and Sale Agreement was not entered into for the purpose of hindering, delaying, or defrauding present or future creditors of the Sellers, and neither the Sellers nor the Buyer is entering into the Purchase and Sale Agreement, or proposing to consummate the Sale, fraudulently, for the purpose of statutory and common law fraudulent conveyance, fraudulent transfer, or voidable transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

L. In the absence of a stay pending appeal, the Buyer is authorized to rely on this Order in closing the Sale on the terms and conditions set forth in the Purchase and Sale Agreement and this Order.

## **Highest and Best Offer**

M. With the full cooperation of the Easterdays, the Debtors conducted an extensive marketing and sale process in accordance with, and have otherwise complied in all material respects with, the Bid Procedures Order. The sale process set forth in the Bid Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Property.

N. Based upon the Bid Procedures approved pursuant to the Bid Procedures Order, the Debtors determined that the bid evidenced by the Purchase and Sale Agreement is the highest and best offer for the Property.

FORM OF SALE ORDER – Page 9

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

O.    The Sale memorialized in the Purchase and Sale Agreement constitutes the highest and best offer for the Property and will provide a greater recovery for the Debtors, the Debtors' estates, and the Easterdays' creditors than would be provided by any other available alternative. The Debtors' determination that the Purchase and Sale Agreement constitutes the highest and best offer constitutes a valid and sound exercise of business judgment by the respective Sellers.

P.    The Property was adequately marketed by the Sellers and their advisors, and the consideration provided by the Buyer under the Purchase and Sale Agreement constitutes the highest and best offer for the Property and will provide greater recoveries for the Sellers' creditors than would be provided by any other available alternative.

Q.    The Purchase and Sale Agreement represents a fair and reasonable offer to purchase the Property under the circumstances of the Chapter 11 Cases.  No other person or entity or group of entities has offered to purchase the Property for greater economic value to the Debtors' estates or to the Easterdays than the Buyer.

R.    Approval of the Motion and the Purchase and Sale Agreement and the consummation of the Sale are in the best interests of the Debtors, their creditors, their estates, and the creditors of each of the Easterdays and other parties-in-interest.

S.    The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the Sale.

## No Fraudulent Transfer

T.    The consideration provided by the Buyer to the Sellers, and received by the Sellers, is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

FORM OF SALE ORDER – Page 10

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

U.     The Buyer is not a successor to the Sellers or their respective estates by reason of any theory of law or equity, and the Buyer shall not assume or in any way be responsible for any liability or obligation of any of the Sellers or their respective estates by reason thereof. The Buyer is not a mere continuation of the Debtors or their estates or the Easterdays or their respective estates, as applicable, and there is no continuity between the Buyer and any of the Sellers. The Buyer is not holding itself out to the public as a continuation of the Sellers. The Sale does not amount to a consolidation, merger, or de facto merger of the Buyer and any of the Sellers.

### Validity of Transfer

V.     The Sellers have full corporate power and authority to execute and deliver the Purchase and Sale Agreement and all other documents contemplated thereby and to perform their obligations thereunder, and no further consents or approvals are required for the Sellers to consummate the Sale, except as otherwise set forth in the Purchase and Sale Agreement.

W.     The transfer of the Property and the assumption and assignment of the Assigned and Assumed Leases and Contracts to the Buyer will be as of the Closing Date a legal, valid, and effective transfer of such Property and the Assigned and Assumed Leases and Contracts, and vests or will vest the Buyer with all rights, title, and interest of the Sellers to the Property free and clear of all Claims, Rights and Encumbrances accruing, arising or relating thereto any time prior to or on the Closing Date, except as set forth in the Purchase and Sale Agreement.

### Section 541(a)(7) of the Bankruptcy Code

X.     The Purchase and Sale Agreement and the Easterday Property upon its acquisition by the Debtors from the Easterdays constitute property of the Debtors' bankruptcy estates pursuant to section 541(a)(7) of the Bankruptcy Code. The Debtors are properly exercising their business judgment in acquiring the Easterday Property to

FORM OF SALE ORDER – Page 11

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13ᵗʰ Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

maximize the value of the Property for the benefit of all Parties-in-Interest. Notwithstanding the Debtors' acquisition of the Easterday Property and sale of the Property (including the Easterday Property) to the Buyer, the Easterdays shall retain their right to the proceeds from the sale of the Easterday Property as determined in accordance with the Cooperation Agreement.

## **Section 363(f) of the Bankruptcy Code**

Y.     The Purchase Agreement is conditioned upon the sale of the Property to the Buyer, and the assumption, assignment and/or sale of the Assigned and Assumed Leases and Contracts to the Buyer, free and clear of all Claims, Rights and Encumbrances.

Z.     The Sellers may sell the Property free and clear of all Claims, Rights and Encumbrances because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Those holders of Claims, Rights and Encumbrances who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code.   As to any other holders of Claims, Rights and Encumbrances who filed objections to the Motion not otherwise withdrawn at the Sale Hearing, such Claims, Rights and Encumbrances fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Claims, Rights and Encumbrances either paid in full or assumed by the Buyer upon the Closing Date, or attach to the cash proceeds of the Sale ultimately attributable to the Property in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any and all claims and defenses the Sellers may possess with respect thereto.

AA.   The Buyer shall have no obligations with respect to any liabilities of the Sellers except as specifically set forth in, and solely to the extent provided pursuant to,

FORM OF SALE ORDER – Page 12

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

the Purchase and Sale Agreement, and the Sale will not subject the Buyer or any of the Buyer's assets to any liability for any Claims, Rights, and Encumbrances whatsoever (including, without limitation, under any theory of equitable law, antitrust, setoff, or successor or transferee liability).

BB.    The Buyer would not enter into the Purchase and Sale Agreement and would not consummate the Sale, thus adversely affecting the Debtors, their estates, creditors, employees, the Easterdays and their creditors, and other parties in interest, if the sale of the Property was not free and clear of all Claims, Rights, and Encumbrances or if the Buyer would, or in the future could, be liable for any Claims, Rights, and Encumbrances. The Buyer would not consummate the Sale unless the Purchase and Sale Agreement specifically provides, and this Court specifically orders, that none of the Buyer, its assets, and the Property will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Claims, Rights, and Encumbrances, or any successor or transferee liability for any of the Sellers.

### Assigned and Assumed Leases and Contracts

CC.    The assumption and assignment of the Assigned and Assumed Leases and Contracts pursuant to the terms of this Order is integral to the Purchase and Sale Agreement and is in the best interests of the Sellers and their parties-in-interest, and represents the reasonable exercise of sound and prudent business judgment by the Sellers.

DD.    The respective amounts set forth on **Exhibit 2** attached hereto are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Assigned and Assumed Contracts and Leases (the "Cure Amounts").

FORM OF SALE ORDER – Page 13

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

EE. Adequate assurance exists that the Cure Amounts required to be paid under the Purchase and Sale Agreement will be paid and the Buyer will fully perform all future obligations under the Assigned and Assumed Leases and Contracts assumed and assigned to the Buyer under the Purchase and Sale Agreement within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

**Compelling Circumstances for an Immediate Sale**

FF. To maximize the value of the Property, it is essential that the Sale occur within the time constraints set forth in the Purchase and Sale Agreement. Time is of the essence in consummating the Sale.

GG. Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the purchase price under the Purchase and Sale Agreement, the proposed Sale to the Buyer on the terms set forth in the Purchase and Sale Agreement constitutes a reasonable and sound exercise of the Sellers' business judgment and should be approved.

HH. The consummation of the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) and all applicable requirements of such sections have been complied with in respect of the transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

1. The relief request in the Motion is granted and approved, and the Sale contemplated thereby and by the Purchase and Sale Agreement is approved as set forth in this Order.

FORM OF SALE ORDER – Page 14

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

2.     All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to this Court or by stipulation filed with this Court, and all reservations of rights included therein, are hereby overruled on the merits or the interests of such objections have been otherwise satisfied or adequately provided for.

### **Approval of the Purchase and Sale Agreement**

3.     The Purchase and Sale Agreement, and all the terms and conditions thereof, are hereby approved.

4.     Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) acquire the Easterday Property, (b) consummate the Sale of the Property to the Buyer pursuant to and in accordance with the terms of the Purchase and Sale Agreement, (c) close the Sale as contemplated by the Purchase and Sale Agreement and this Order, and (d) execute and deliver, perform under, consummate, implement and close fully the Purchase and Sale Agreement, together with all additional instruments and documents that may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase and Sale Agreement and such other ancillary documents.

5.     This Order shall be binding in all respects upon the Sellers, all creditors of any Seller, all holders of equity interests in any Seller, all holders of any interests, liens, claims, liabilities and encumbrances (whether known or unknown) against any Seller or on all or any portion of the Property, all counterparties to the Assigned and Assumed Leases and Contracts, the Buyer and all successors and assigns of the Buyer, and any trustees, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 of the Bankruptcy Code of any of the Debtors' cases. This Order and the Purchase and Sale Agreement shall inure to the benefit of

FORM OF SALE ORDER – Page 15

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

the Debtors, their estates, and the Easterdays' creditors, their estates, as applicable, the Buyer, and any of the successors and assigns of the foregoing. In the event the Debtors' Cases are dismissed, this Order shall remain enforceable by the Buyer in any court of competent jurisdiction notwithstanding any order dismissing the Debtors' Cases.

### Transfer of the Assets

6.     Pursuant to sections 105(a), 363(b), 363(f), 365(b), 365(f), and 541(a)(7) of the Bankruptcy Code, the Sellers are authorized to consummate the Sale as set forth in the Purchase and Sale Agreement and transfer the Property on the Closing Date. Such Property shall be transferred to the Buyer "as is where is" with all faults subject to and in accordance with the Purchase and Sale Agreement upon and as of the Closing Date, and upon Buyer's payment in full of the Purchase Price, such transfer shall constitute a legal, valid, binding, and effective transfer of the Property free and clear of all Claims, Rights and Encumbrances. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of title to the Property, including but not limited to the Assigned and Assumed Leases and Contracts, shall be free and clear of any and all Claims, Rights, and Encumbrances (including, without limitation, any and all claims pursuant to any successor-in-interest or fraudulent transfer liability theory). To the extent such Claims, Rights, and Encumbrances are not paid in full or assumed by Buyer upon the Closing Date, all Claims, Rights, and Encumbrances on the Property shall attach solely to the proceeds of the Sale with the same validity, priority, force, and effect that they now have as against the Property, subject to any and all claims and defenses the Sellers and their estates may possess with respect thereto.

7.     Except as expressly permitted or otherwise specifically provided in the Purchase and Sale Agreement or this Order, all persons or entities holding Claims, Rights, and Encumbrances in all or any portion of the Property arising under or out of,

FORM OF SALE ORDER – Page 16

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13ᵗʰ Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

in connection with, or in any way relating to the Sellers, the Property, the operation of the Sellers' business prior to the Closing Date, the consummation of the Sale and transfer of the Property to the Buyer, hereby are forever barred, estopped and permanently enjoined from asserting against the Buyer, or its successors or assigns, and the Property, such persons' or entities' Claims, Rights, and Encumbrances in and to the Property and/or against the Buyer. On the Closing Date, each creditor is authorized to execute such documents and take all other actions as may be necessary to release Claims, Rights, and Encumbrances on the Property, if any, as provided herein, as such Claims, Rights, and Encumbrances may have been recorded or may otherwise exist. The Sale authorized herein shall be of full force and effect, regardless of any Sellers' lack of good standing in any jurisdiction in which such Seller is formed or authorized to transact business. Upon consummation of the Sale set forth in the Purchase and Sale Agreement, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect or otherwise notice any lien or encumbrance with respect to the Property (but not the proceeds thereof) that is extinguished or otherwise released pursuant to this Order under section 363 and the related provisions of the Bankruptcy Code.

8. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Sellers to sell and transfer the Property to the Buyer in accordance with the terms of the Purchase and Sale Agreement and this Order.

9. All persons and entities that are in possession of some or all of the Property on the Closing Date are directed to surrender possession of such Property to the Buyer or its assignee at Closing.

FORM OF SALE ORDER – Page 17

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

10. The provisions of this Order authorizing the Sale of the Property by the Sellers free and clear of Claims, Rights, and Encumbrances shall be self-executing, and none of the Sellers, the Buyer, or any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents, or other instruments to effectuate, consummate, and/or implement the provisions hereof with respect to the Sale; *provided*, *however*, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the Purchase and Sale Agreement.

11. Without limiting the foregoing, a certified copy of this Order may be filed with the appropriate clerk or clerks and/or agencies or departments and/or recorded to act to cancel any of the Claims, Rights and Encumbrances on the Property of record.

12. If any person or entity that has filed statements or other documents or agreements evidencing interests, liens, claims, liabilities and encumbrances on all or a portion of the Property shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Buyer for the purpose of documenting the release of all Claims, Rights, and Encumbrances on the Property, which the Person or entity has or may assert with respect to all or any portion of the Property, the Sellers are hereby authorized, and the Buyer is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Property.

13. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

FORM OF SALE ORDER – Page 18

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons or entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any agreement or lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase and Sale Agreement.

14. Any and all governmental recording offices and all other parties, persons or entities are authorized to accept this Order for recordation on or after the Closing as conclusive evidence of the free and clear, and unencumbered, transfer of all rights, title, interest in, and ownership of and to the Property conveyed to the Buyer at Closing.

### Assigned and Assumed Leases and Contracts

15. The Debtors are authorized to assume and assign each contract or lease that becomes an Assigned and Assumed Lease and Contracts to the Buyer free and clear of all interests, liens, claims, liabilities and encumbrances as described herein and in the Purchase and Sale Agreement. The payment of the applicable Cure Amounts (if any) in accordance with the Purchase and Sale Agreement shall (a) effect a cure of all defaults existing thereunder as of the Closing Date and (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default. The Buyer shall then have assumed the Assigned and Assumed Lease and Contract and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assigned and Assumed Lease and Contract shall not be a default thereunder. After the Closing Date, the Sellers shall not have any further liabilities to the counterparties to the Assigned and Assumed Lease and Contract.

FORM OF SALE ORDER – Page 19

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

16.     Any provisions in any Assigned and Assumed Lease and Contract that prohibit or condition the assignment of such Assigned and Assumed Lease and Contract or allow the counterparty to such Assigned and Assumed Lease and Contract to terminate, recapture, impose any penalty, condition a renewal or extension or modify any term or condition upon the assignment of such Assigned and Assumed Lease and Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of any of the Assigned and Assumed Leases and Contracts have been satisfied.  Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all rights, title, and interest of the Sellers under the Assigned and Assumed Contract or Lease.

17.     Upon the assumption of any of the Assigned and Assumed Leases and Contracts and the payment of the relevant Cure Amounts, if any, in accordance with the Purchase and Sale Agreement, the Buyer shall be deemed to be substituted for the Sellers as a party to the applicable Assigned and Assumed Leases and Contracts, and the Sellers shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, of any further liability under those Assigned and Assumed Leases and Contracts.

18.     Upon the payment of the applicable Cure Amount, if any, the Assigned and Assumed Leases and Contracts will remain in full force and effect, and no default shall exist under any of the Assigned and Assumed Leases and Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

19.     The Buyer has provided adequate assurance of future performance under the relevant Assigned and Assumed Leases and Contracts within the meaning of

FORM OF SALE ORDER – Page 20

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

20.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Sellers as a result of the assumption and assignment of the Assigned and Assumed Leases or Contracts.

21.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all counterparties to the Assigned and Assumed Leases and Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors or the Buyer any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the applicable Assigned and Assumed Leases and Contracts existing as of the Closing Date or arising by reason of the Closing.

## **PROTECTIONS OF THE BUYER**

22.     Effective upon the Closing Date, all persons and entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, its successors and assigns, its property, or the Property, with respect to any (a) Claims, Rights, and Encumbrances arising under, out of, in connection with or in any way relating to the Sellers, the Buyer, the Property or the operation of the businesses to which the Property relates prior to or in connection with or relating to the Closing of the Sale, or (b) successor liability or liability under any other theory at law or in equity with respect to transferee liability, including, without limitation, with respect to the foregoing (a) and (b), the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Buyer, its successors or assigns, assets or properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Buyer, its successors or assigns,

FORM OF SALE ORDER – Page 21

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

assets or properties; (iii) creating, perfecting, or enforcing any Claims, Rights, and Encumbrances against the Buyer, its successors or assigns, assets or properties; (iv) asserting any setoff, right or subrogation, or recoupment of any kind against any obligation due the Buyer or its successors or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; (vi) revoking, terminating or failing or refusing to issue or renew any licenses, permits or authorizations to operate any of the Property or conduct any of the businesses operated with the Property or (vii) commencing any action, in any manner or place, arising from, out of, or in connection with the negotiation and formulation of the Purchase and Sale Agreement, and the consummation of the Sale, including any actions necessary in aid thereof.

23. Except for the Assigned and Assumed Leases and Contracts, or as otherwise expressly set forth in this Order or the Purchase and Sale Agreement, the Buyer shall not have any liability or other obligation of the Sellers arising under or related to any of the Property. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Purchase and Sale Agreement, the Buyer shall not be liable for any claims against the Sellers or any of their predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Sellers or any obligations of the Sellers arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of

FORM OF SALE ORDER – Page 22

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

any of the Property prior to the Closing. The Buyer has given, and the Sellers have received, substantial, fair and reasonably equivalent consideration under the Purchase and Sale Agreement for the benefit of the holders of any Claims, Rights, and Encumbrances. The consideration given by the Buyer shall constitute valid and valuable consideration for the releases of any potential claims of successor or transferee liability of the Buyer, which releases shall be deemed to have been given in favor of the Buyer by all holders of Claims, Rights, and Encumbrances against any of the Sellers or in any of the Property.

24. The Sale contemplated by the Purchase and Sale Agreement is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code and applicable law, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assigned and Assumed Leases or Contracts), unless such authorization and consummation of the Sale are duly stayed pending such appeal. The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and applicable law and as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

25. The Sale contemplated in the Purchase and Sale Agreement may not be avoided, and no damages may be assessed against the Buyer under section 363(n) of the Bankruptcy Code or applicable law.

### **Reservation of Rights**

26. Notwithstanding anything contained in this Order, the Purchase and Sale Agreement, or any ancillary agreements thereto, neither the (a) form of title in which the Debtors take title to the Easterday Property nor (b) the Debtor entity that accepts title to the Easterday Land or assignment of any of the Easterday Assigned and

FORM OF SALE ORDER – Page 23

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

Assumed Leases and Contracts, shall prejudice, impair, or otherwise affect any Parties-In-Interests' rights (including the Debtors' rights) with respect to the allocation of the Sale Proceeds as contemplated by the Cooperation Agreement. Notwithstanding anything contained in this Order, the Purchase and Sale Agreement, or any ancillary agreements thereto, the Easterdays shall retain their right to the proceeds from the sale of the Easterday Property as determined in accordance with the Cooperation Agreement.

## **Other Provisions**

27. This Order and the Purchase and Sale Agreement shall be binding in all respects upon all creditors (whether known or unknown), counterparties, and Parties-in-Interest, the Debtors and their affiliates, the Buyer, the Easterdays and their affiliates, and any subsequent trustees appointed in the Chapter 11 Cases or upon a conversion to Chapter 7 under the Bankruptcy Code, and shall not be subject to rejection.

28. Nothing contained in any plan of reorganization or liquidation, or order of any type or kind (including any order dismissing the Debtors' bankruptcy cases) entered in (a) these chapter 11 cases, (b) any subsequent chapter 7 case into which any such chapter 11 case may be converted, or (c) any related proceeding subsequent to the entry of this Order, shall conflict with or derogate from the provisions of the Purchase and Sale Agreement or the terms of this Order.

29. Pursuant to Bankruptcy Rules 7062, 9014, 6004(h) and 6006(d), this Order shall be effective immediately upon entry and the Sellers and the Buyer are authorized to close the Sale immediately upon entry of this Order. The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase and Sale Agreement or any other sale-related document. The automatic stay imposed by section

FORM OF SALE ORDER – Page 24

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence; *provided however*, that this Court shall retain exclusive jurisdiction over any and all disputes and matters arising from or related to the Purchase and Sale Agreement, the Sale and the implementation, interpretation, and enforcement of this Order.

30.     No bulk sales or any similar law of any state or jurisdiction applies in any way to the Sale.

31.     Except for Root Realty, there are no other brokers involved in consummating the Sale for the Sellers and no other brokers' commissions are due and owed by the Sellers.

32.     The failure to specifically include any particular provision of the Purchase and Sale Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the terms and conditions of the Purchase and Sale Agreement be authorized and approved in their entirety.

33.     The Purchase and Sale Agreement and any related agreements, documents or other instruments (other than this Order) may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates, the Sellers and any estate of any of the Sellers, if applicable, or any Parties-in-Interest to any of the foregoing.

34.     To the extent there are any inconsistencies between the terms of this Order and the Purchase and Sale Agreement (including any ancillary documents executed in connection therewith), the terms of this Order shall govern.

FORM OF SALE ORDER – Page 25

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

35.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

36.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern.

37.     This Court shall retain jurisdiction to, among other things, interpret, implement and enforce the terms of the Order and the Purchase and Sale Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Sellers and/or Debtors are a party or which had been assigned by the Sellers and/or Debtors to the Buyer, to protect the Buyer and its assets, including the Property, against any Claims, Rights, and Encumbrances and to adjudicate, if necessary, any and all disputes relating in any way to the Sale.

/// END OF ORDER ///

FORM OF SALE ORDER – Page 26

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Presented by:

*/s/ Draft*
THOMAS A. BUFORD, III (WSBA 52969)
BUSH KORNFELD LLP

RICHARD M. PACHULSKI (admitted *pro hac vice*)
JEFFREY W. DULBERG (admitted *pro hac vice*)
MAXIM B. LITVAK (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP

*Attorneys for Debtors and Debtors in Possession*

FORM OF SALE ORDER – Page 27

PACHULSKI STANG
ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067-4003
Telephone (310) 277-6910
Facsimile (310) 201-0760

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

DOCS_SF:105437.7 20375/001

Exhibit G
Title Affidavit

## AFFIDAVIT AND INDEMNITY BY OWNER
### EXTENDED COVERAGE POLICIES

WHEREAS the undersigned Affiant (if more than one, herein collectively called the Affiant) is the owner of the land (the Land) described in that certain Commitment for Title Insurance issued by CHICAGO TITLE INSURANCE COMPANY (the Company) under No. _____ (the Commitment), for an ALTA Owner's and/or Loan Policy of title insurance (the Policy or Policies),

AND WHEREAS, the Proposed Insured(s) under said Commitment is/are requesting the Company to issue its Policy or Policies with Extended Coverage, and to delete therefrom the General Exceptions relating to rights or claims of parties in possession, survey matters, unrecorded easements and statutory lien rights for labor or materials, or other matters determinable only by survey, inspection or inquiry,

AND WHEREAS the Affiant acknowledges that the Company would refrain from issuing said Policy or Policies without showing said General Exceptions in the absence of the representations, agreements and undertakings contained herein.

Nothing contained herein shall be construed so as to obligate the Company to issue said Policy or Policies without showing said General Exceptions. However, should the Company do so, it will do so in part in reliance upon the undertakings of the undersigned Affiant. The issuance of the Policy or Policies shall be the consideration for the undertakings contained herein.

The Company reserves the right to require additional indemnification and/or a survey in connection with analyzing its risk in deleting said General Exceptions, and to take special exception for any adverse matters disclosed by this affidavit, a survey or an inspection of the Land.

# AFFIDAVIT

The Affiant, being first duly sworn, deposes and says that:

1. Said Land has been owned and occupied by the Affiant for _____ years and the Affiant's enjoyment thereof has been peaceable and undisturbed. There are no other persons (including trusts, corporations, partnerships or limited liability companies) which assert an interest in the property, except (if none, state "**None**"):

2. The Land at present is in use as: _____.

3. There are no oral or written leases, tenancies or other occupancies, nor any rights of first refusal or options to purchase said land, except (attach list, if necessary, and attach copies of any written agreements or rent rolls, if any; if none, state "**None**"):

4. There are no contracts for the making of repairs or for new construction on said Land or for the services of architects, engineers or surveyors, nor are there any unpaid bills or claims for labor or services performed or material furnished or delivered during the last twelve (12) months for alterations, repair work or new construction on said Land, including site preparation, soil tests, site surveys, demolition, etc., except (if none, state "**None**"):

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 302 of 379

5. Neither the Affiant nor any principal of the Affiant has filed a petition for bankruptcy, which action is pending, nor is Affiant a party to any pending action, nor has Affiant been served with a summons and complaint nor received any notice of any action which is pending against Affiant, except (if none, state "**None**"):

6. There are no unpaid or unsatisfied (1) mortgages, deeds of trust, contracts, security agreements, claims of lien, or judgments, (2) special assessments for sewer, water, road or other local improvement districts, or taxes, including taxes or special assessments which are not yet payable or which are not shown as existing liens by the public records, or (3) service, installation, connection, tap, capacity or construction charges for sewer, water, electricity, natural gas or other utilities, or garbage collection and disposal, which are not shown in the referenced commitment, except (if none, state "**None**"):

7. There are no unpaid amounts of public funds advanced under the provisions of one or more various federal acts relating to heath care (including, but not limited to, the Hill-Burton Act (Title 42 USCA, §291, et seq.) or under any state statutes enacted pursuant thereto, which would constitute a lien against the Land.

## INDEMNITY

The Affiant hereby agrees (1) to indemnify, protect, defend and save harmless the Company from and against any and all loss, costs, damages, and attorney's fees it may suffer, expend or incur under or by reason, or in consequence of or growing out of any such matters not identified in the above affidavit, and (2) to defend at the Affiant's own costs and charges in behalf of and for the protection of the Company and of any parties insured or who may be insured against loss by it under said Policy or Policies (but without prejudice to the right of the Company to defend at the expense of the Affiant if it so elects) any every suit, action or proceeding in which any such matters may be asserted or attempted to be asserted, established or enforced with respect to said Land.

IN WITNESS WHEREOF, the undersigned has/have executed this agreement this _____ day of _____, 20_____.

| |
|---|
| Affiant/Indemnitor Name *[Please type or print]*: |
| Address: |
| Telephone: |

_____

_____

| [Individual Acknowledgment. Attach appropriate form if corporation, partnership or limited liability company] |
|---|

STATE OF                          )
                                  ) SS.:
COUNTY OF                         )

On this day personally appeared before me _____ and _____, to me known to be the individual(s) described in and who executed the within and foregoing instrument and

acknowledged to me that he/she/they signed the same as his/her/their free and voluntary act and deed for the purposes therein mentioned.

Given under my hand and official seal this _____ day of _____, 20_____.

_____
Notary Public in and for the State of _____, residing at _____
My Commission expires: _____

# AFFIDAVIT AND INDEMNITY BY OWNER
## EXTENDED COVERAGE POLICIES

WHEREAS, I, [_____], am a Co-Chief Restructuring Officer (a "CRO") of [_____] Easterday Ranches, Inc., a Washington corporation ("Ranches"), Easterday Farms, a Washington general partnership ("Farms" and, collectively with Ranches, "Affiants"), each a debtor and debtor in possession in the United States Bankruptcy Court for the Eastern District of Washington, Yakima Division (the "Bankruptcy Court"), Ranches in Case No. 21-0041-WLH11 and Farms in Case No. 21-00176-WLH11) (such cases are collectively referred to herein as the "Cases").


WHEREAS, to CRO's knowledge (which, for purposes of this Affidavit, means my actual, current knowledge, without inquiry) the undersigned Affiants are the owners of the land (the Land) described in those certain Commitments for Title Insurance issued by CHICAGO TITLE INSURANCE COMPANY (the Company) under Nos. _____ (collectively, the "Commitment"), for an ALTA Owner's Policy of title insurance (the "Policy" or "Policies"),

AND WHEREAS, the Proposed Insured(s) under said Commitment is/are requesting the Company to issue its Policy or Policies with Extended Coverage, and to delete therefrom the General Exceptions relating to rights or claims of parties in possession, survey matters, unrecorded easements and statutory lien rights for labor or materials, or other matters determinable only by survey, inspection or inquiry,

AND WHEREAS the undersigned Affiants acknowledge that the Company would refrain from issuing said Policy or Policies without showing said General Exceptions in the absence of the representations, agreements and undertakings contained herein.

Nothing contained herein shall be construed so as to obligate the Company to issue said Policy or Policies without showing said General Exceptions. However, should the Company do so, it will do so in part in reliance upon the undertakings of the undersigned Affiant. The issuance of the Policy or Policies shall be the consideration for the undertakings contained herein.

The Company reserves the right to require additional indemnification and/or a survey in connection with analyzing its risk in deleting said General Exceptions, and to take special exception for any adverse matters disclosed by this Affidavit, a survey or an inspection of the Land; provided, however, nothing in this Affidavit shall be deemed to obligate Affiants to provide any such additional indemnification or other assurances the Company may request.

# AFFIDAVIT

The Affiant, being first duly sworn, deposes and says that, to CRO's knowledge:

1. Said Land has since CRO became Co-Chief Restructuring Officer on [_____], 2021(the period since such date, the "Relevant Period") been owned and occupied by the Affiants and the Affiants' enjoyment thereof has been peaceable and undisturbed. There are no other persons (including trusts, corporations, partnerships or limited liability companies) which assert an interest in the property, except (if none, state "**None**"):


2. During the Relevant Period, the Land has been and at present is in use as: _____.

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 305 of 379

3. During the Relevant Period, the CRO has not authorized or approved Affiants' entering into any oral or written leases, tenancies or other occupancies, nor any rights of first refusal or options to purchase said land, except (attach list, if necessary, and attach copies of any written agreements or rent rolls, if any; if none, state "**None**"):

4. During the Relevant Period, CRO has not authorized or approved Affiants' execution of any contracts for the making of repairs or for new construction on said Land or for the services of architects, engineers or surveyors, nor, to CRO's knowledge, are there any unpaid bills or claims for labor or services performed or material furnished or delivered during the last twelve (12) months for alterations, repair work or new construction on said Land, including site preparation, soil tests, site surveys, demolition, etc., except (if none, state "**None**"):

5. Except as may be set forth in the in the schedules filed by Affiants in connection with the Cases (or either of them), there are no unpaid or unsatisfied (1) mortgages, deeds of trust, contracts, security agreements, claims of lien, or judgments, (2) special assessments for sewer, water, road or other local improvement districts, or taxes, including taxes or special assessments which are not yet payable or which are not shown as existing liens by the public records, or (3) service, installation, connection, tap, capacity or construction charges for sewer, water, electricity, natural gas or other utilities, or garbage collection and disposal, which are not shown in the referenced Commitment, except (if none, state "**None**"):

6. There are no unpaid amounts of public funds advanced during the Relevant Period under the provisions of one or more various federal acts relating to heath care (including, but not limited to, the Hill-Burton Act (Title 42 USCA, §291, et seq.) or under any state statutes enacted pursuant thereto, which would constitute a lien against the Land, except (if none, state **"None"**):

## INDEMNITY

The Affiant hereby agrees (1) to indemnify, protect, defend and save harmless the Company from and against any and all loss, costs, damages, and attorney's fees it may suffer, expend or incur to the extent arising under or by reason, or in consequence of or growing out of any breach or violation of the statements made in the above affidavit, and (2) to defend at the Affiant's own costs and charges on behalf of and for the protection of the Company and of any parties insured or who may be insured against loss by it under said Policy or Policies (but without prejudice to the right of the Company to defend at the expense of the Affiant if it so elects) any and every suit, action or proceeding in which any matters the existence of which constitute a breach or violation of the statements made by Affiant herein may be asserted or attempted to be asserted, established or enforced with respect to said Land.

IN WITNESS WHEREOF, the undersigned has/have executed this agreement this _____ day of _____, 20_____.

_____

_____

| Affiant/Indemnitor Name *[Please type or print]*: |
| --- |
| Address: |
| Telephone: |

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 306 of 379

| **[Individual Acknowledgment. Attach appropriate form if corporation, partnership or limited liability company]** |
|---|

STATE OF                       )
                                   ) SS.:
COUNTY OF                )

On this day personally appeared before me _____ and _____, to me known to be the individual(s) described in and who executed the within and foregoing instrument and acknowledged to me that he/she/they signed the same as his/her/their free and voluntary act and deed for the purposes therein mentioned.

Given under my hand and official seal this _____ day of _____, 20_____.

_____
Notary Public in and for the State of _____, residing at _____
My Commission expires: _____

1006813688v11

Schedule 1.1
Easterday Land

## COX FARM
## <u>LEGAL DESCRIPTION</u>

- **<u>Cody Allen Easterday and Debby Easterday, husband and wife; and The Heirs and Devisees of Gale A. Easterday; and Karen L. Easterday, as her separate estate.</u>**

PARCEL A: (<u>119602000001000</u> and <u>119602000002001</u>)

That portion of Section 19, Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

Beginning at the Northwest corner of said Section 19;
Thence South along the West line of said Section 19, a distance of 925.00 feet at the True Point of Beginning;
Thence South 62°15'12" East a distance of 881.00 feet;
Thence South parallel to the said West line a distance of 1,390.00 feet;
Thence North 62°15'12" West a distance of 881.00 feet to a point on the West line of said Section 19;
Thence North along said West line a distance of 1,390.00 feet to the True Point of Beginning.

- **<u>The Heirs and Devisees of Gale A. Easterday, deceased and Karen L. Easterday, as her separate estate, as to an undivided half interest; and Cody A. Easterday and Debby Easterday, husband and wife, as to an undivided half interest, as tenants in common.</u>**

PARCEL L: (<u>113690000000000</u>)

Section 13, Township 6 North, Range 29 East, W.M., Benton County, Washington, EXCEPT the East 30 feet thereof conveyed to Benton County for road purposes by Deeds recorded under Auditor's File Nos. <u>624663</u> and <u>624765</u>.

PARCEL M: (<u>114690000000000</u>)

Section 14, Township 6 North, Range 29 East, W.M., Benton County, Washington

PARCEL N: (<u>112693000000000</u>)

The South half of the Southwest quarter and the Southeast quarter of Section 12, Township 6 North, Range 29 East, W.M., Benton County, Washington, less portions described as follows:

1

4831-5589-2454v.18 0117168-000002
1006813688v11

(Parcel 1) Measured along the West section line from the Southwest corner of the North half of the Southwest quarter South 298.00 feet;
thence in an Easterly direction to a point 269.00 feet South of the Southeast corner of the North half of the Southwest quarter;
thence North to the Southeast corner of the North half of the Southwest quarter;
thence West to Point of Beginning.

(Parcel 2) From the Northeast corner of the North half of the Southwest quarter South along the East line of said North half of the Southwest quarter to a point 269.00 feet South of the Southeast corner of the North half;
thence East 27.00 feet;
thence North in a straight line to a point 10.00 feet East of the Northeast corner of the North half of the Southwest quarter.

(Parcel 3) From the Northeast corner of the North half of the Southwest quarter South 136.00 feet; thence in an Easterly direction to a point 52.00 feet South of the Southeast corner of the North half of Section 12;
thence North along said Section line to the Southeast corner of the North half of Section 12;
thence West along the South line of the North half of Section 12 to Point of Beginning. (These 3 parcels taken from judgment filed in Benton County Cause No. 18881);
EXCEPT ALSO portion conveyed to Benton County for road purposes by Deed recorded Under Auditors File No. 624764

PARCEL O: (111690000000000)

Section 11, Township 6 North, Range 29 East, W.M., Benton County, Washington,

EXCEPT portions conveyed to Benton County for road purposes by Deeds recorded under Auditor's File Nos. 466635, 624663, 624763, 633680 and 633861.

- **Leasehold Parcel E:  Irrigated Cash Lease commencing January 1, 2017, by the State of Washington, Department of Natural Resources (Lessor) and Cody Easterday, Debby Easterday, Gale Easterday, and Karen Easterday (Lessee).**

PARCEL E: (836690000000000)

All of Section 36, Township 6 North, Range 29 East, W.M., Benton County, Washington.

4831-5589-2454v.18 0117168-000002
1006813688v11

**RIVER FARM**
**LEGAL DESCRIPTION**


- **The Heirs and Devisees of Gale A. Easterday, deceased, and Karen L. Easterday, as**
  **her separate estate, as to an undivided half interest; and Cody A. Easterday and**
  **Debby Easterday, husband and wife, as to an undivided half interest.**

PARCEL 34: (122602000000000 and 127602000000000)

Section 22, Township 6 North, Range 30 East, W.M., Benton County, Washington, and the
North 1/2 of Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington,
EXCEPT the Southeast quarter of the Northeast quarter of said Section 27; AND ALSO
EXCEPT that portion of said Section 22 and Section 27 lying Easterly of the following described
centerline:

Commencing at the West quarter corner of said Section 27;
thence North 88°25'05" East 830.79 feet along the South line of the North half thereof to the
centerline of the existing river access road and the True Point of Beginning;
thence along said centerline the following bearings and distances;
thence North 13°32'32" East 413.89 feet;
thence North 33°24'40" East 417.71 feet;
thence North 24°32'16" East 125.14 feet;
thence North 32°34'43" East 390.24 feet;
thence North 42°10'26" East 267.96 feet;
thence North 30°03'57" East 148.51 feet;
thence North 12°20'25" East 264.13 feet;
thence North 04°21'08" East 341.89 feet;
thence North 16°48'23" West 63.54 feet;
thence North 45°28'04" West 46.91 feet to the intersection of an existing farm road;
thence along said centerline the following bearings and distances;
thence North 03°09'03" East 177.44 feet;
thence North 00°09'56" East 465.38 feet;
thence North 05°41'43" East 103.99 feet;
thence North 10°39'15" East 121.08 feet;
thence North 15°25'36" East 111.98 feet;
thence North 17°08'00" East 1725.87 feet;
thence North 17°26'47" East 128.61 feet;
thence North 16°34'51" East 129.88 feet;
thence North 16°24'25" East 131.77 feet;
thence North 16°08'19" East 115.56 feet;
thence North 17°04'45" East 121.58 feet;
thence North 18°06'12" East 137.21 feet;
thence North 19°19'27" East 372.24 feet;
thence North 19°55'22" East 278.61 feet;
thence North 24°45'34" East 104.38 feet;

1

4831-5589-2454v.18 0117168-000002
1006813688v11

thence North 28°19'28" East 117.96 feet;
thence North 28°51'35" East 114.65 feet;
thence North 36°43'00" East 131.30 feet;
thence North 47°28'16" East 133.05 feet;
thence North 41°49'59" East 130.92 feet;
thence North 36°06'09" East 111.02 feet;
thence North 31°58'37" East 151.23 feet;
thence North 38°07'28" East 105.75 feet;
thence North 44°54'02" East 109.65 feet;
thence North 43°17'45" East 106.90 feet;
thence North 41°00'56" East 119.24 feet;
thence North 36°32'59" East 103.29 feet;
thence North 29°26'26" East 106.12 feet;
thence North 22°29'40" East 115.80 feet;
thence North 21°31'04" East 103.79 feet;
thence North 32°47'25" East 119.34 feet;
thence North 54°53'36" East 109.28 feet;
thence North 70°15'49" East 109.49 feet;
thence North 78°46'19" East 112.28 feet;
thence North 80°32'41" East 123.19 feet;
thence North 80°55'28" East 111.19 feet;
thence North 79°31'08" East 100.13 feet;
thence North 73°27'59" East 133.21 feet;
thence North 68°04'32" East 122.55 feet; to a point on the North line of said Section 22, lying South 88°53'05" West 623.99 feet from the Northeast corner thereof and the terminus of this centerline.

PARCEL 35: (121600000000000, 128601000000000, 128602000001000 and 120601000000000)

All of Section 21; the East half of the East half of Section 20; the North half and the Southwest quarter and the Northwest quarter of the Southeast quarter of Section 28, EXCEPT a parcel of land situated in the Southwest quarter of the Southwest quarter of Section 28, described as follows:

The Southwest corner of said Section 28, being the True Point of Beginning;
thence North 01°05'50" West along the West line of said Section 28 a distance of 349.60 feet;
thence South 85°15'42" East a distance of 1,337.74 feet; thence South 00°00' East a distance of 221.87 feet to a point on the Southerly line of said Section 28;
thence South 89°15'32" West along said South line a distance of 1,326.59 feet to the Southwest corner of said Section 28 and the True Point of Beginning, all in Township 6 North, Range 30 East, W.M., Benton County, Washington.

PARCEL 36: (115604000001000)

2

That portion of the South half of Section 15, Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

The Southeast corner of said Section 15 being the True Point of Beginning;
thence South 88°53'07" West along the Southerly line of said Section 15, a distance of 4,159.72 feet thence North 48°58'02" East a distance of 3,270.68 feet; thence South 89°58'08" East a distance of 1,653.99 feet to the Easterly line of said Section 15;
thence South 01°02'51" East along said East line a distance of 2,065.70 feet to the Southeast corner of said Section 15 and the True Point of Beginning.

PARCEL 37: (127603000002000)

An undivided one-half interest in and to:

A strip of land situate in Government Lot 4, Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, being 60 feet in width 30 feet lying on each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence North 88°35'17" East along the North line of said Government Lot 4, 168.86 feet to the True Point of Beginning of said centerline and right of way; thence South 15°38'26" East 405.51 feet; thence South 51°50'44" East 629.30 feet;
thence South 10°34'03" West 666.48 feet to the terminus of said centerline.

PARCEL 38: (127603000003000)

An undivided one-half interest in and to:

A strip of land 200 feet in width situated in Government Lot 4, Section 27, township 6 North, Range 30 East, W.M., Benton County, Washington, with 100.00 feet of said width lying in each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence South 01°03'24" East along the West line of said Section 27 a distance of 1,616.27 feet;
thence along a line perpendicular to said West line North 88°56'36" East a distance of 556.17 feet to a point on the Northwesterly right of way line of the Spokane, Portland & Seattle Railway Company, said point being the True Point of Beginning and lying Northwesterly 100.00 feet when measured perpendicular to railroad centerline station 6456+45.3 and railroad mile 207.83; thence North 21°36'15" West perpendicular to said railroad right of way a distance of 150.00 feet to the terminus of said centerline.

PARCEL 44: (107602000001001)

4831-5589-2454v.18 0117168-000002
1006813688v11

Section 7, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT the North half of the North half thereof; AND EXCEPT portions conveyed to Benton County for road purposes by Deeds recorded under Recording Nos. 624663 and 624762.

And Also Except that portion of said Section described as follows:

Beginning at the Southwest corner of said Section 7; thence North 00°13'16" East, 1019.91 feet along the West line of said Section 7; thence South 89°44'41" East, 30.00 feet to the East line of Nine Canyon Road and the True Point of Beginning.; thence South 89°44'41" East 988.81 feet; thence South 00°13'16" West, 979.91 feet to a point 40.00 feet Northerly of the South line of said Section 7; thence North 89°44'41" West, 988.81 feet parallel with and 40.00 feet Northerly of said South line to a point on the East line of said Nine Canyon road; thence North 00°13'16" East, 979.91 feet along said East line to the True Point of Beginning.

AND ALSO EXCEPT that portion of said Section described as follows:

Beginning at the West Quarter corner of said Section 7; thence North 00°13'16" East 850.00 feet along the West line of said Section 7; thence South 89°46'44" East 60.00 to the East line of Nine Canyon Road and to the True Point of Beginning;

Thence Continuing South 89°46'44" East 950.00 feet; thence South 00°13'16" West 950.00 feet; thence North 89°46'44" West 950.37 feet to the East line of Nine Canyon Road, said point being on the arc of a 3530.00 feet Radius curve (radius point bears North 88°57'04" West); thence Northerly, 51.00 feet along said East line and along the arc of said curve through a central angle of 00°49'40"; thence North 00°13'16" East 899.01 feet along said East line to the True Point of Beginning.

PARCEL 45: (108601000000000)

Section 8, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT the North half of the Northwest quarter thereof.

PARCEL 50: (127603000001001)

Those portions of the following described property lying Northerly of the Northerly right of way line of existing Burlington Northern Santa Fe Railroad ( formerly Spokane, Portland and Seattle Railway).

Government Lot 4, Section 27, Township 6 North, Range 30 East of the Willamette Meridian, Benton County, Washington, Together with that portion of Government Lot 3 of said Section 27 lying Westerly of the following described line:

Beginning at the Northwest corner of said Section 27; thence South 1°03'20" East, 2639.97 feet along the West line of said Section 27 to the West quarter corner of said Section 27; thence North 89°12'10" East, 1783.01 feet along the North line of said Government Lots 4 and 3 to the True Point of Beginning; thence South 0°48'00" East, 1156.00 feet to the North line of the Burlington Northern Santa Fe Railroad right of way and the terminus of said line.

4831-5589-2454v.18 0117168-000002
1006813688v11

PARCEL 51: ([128604000002001](#))

Those portions of the following described property lying Northerly of the Northerly right of way line of the existing Burlington Northern Santa Fe Railroad (formerly Spokane, Portland and Seattle Railway)

Government Lot 1, and the East 780 feet of the Southwest quarter of the Southeast quarter of Section 28, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington,

Except right of way for roads, and Except any portion thereof of the above described property lying below 347 feet above mean sea level, United States Coast and Geodetic Survey Datum.

PARCEL 52: ([128604000002002](#))

The Southwest quarter of the Southeast quarter of Section 28, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington lying Northwesterly of the existing Burlington Northern Santa Fe Railroad (formerly Spokane, Portland and Seattle Railway) right of way.

Except the East 780 feet thereof

PARCEL 54: ([133601000001000](#))

Those portions of the following described property lying Northerly of the Northerly right of way line of the existing Burlington Northern Santa Fe Railroad ( formerly Spokane, Portland and Seattle Railway);

The East 780 feet of Government Lot 1, Section 33, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington.

Except right of way for roads, and Except any portion thereof of the above described property lying below 347 feet above mean sea level, United States Coast and Geodetic Survey Datum.


- **The Heirs and Devisees of Gale A. Easterday, deceased, and Karen L. Easterday, as her separate estate, as to an undivided half interest; and Cody A. Easterday, as to his separate estate.**

PARCEL 39: ([110603000000000](#) and [115602000000000](#))

That portion of Sections 10 and 15, Township 6 North, Range 30 East, W.M., Benton County, lying North and West of the following described line:

Beginning at the Southwest corner of said Section 15;
thence North 1°27'28" West along the West line of said Section 15, 1,060.00 feet;

4831-5589-2454v.18 0117168-000002
1006813688v11

thence North 88°33'31" East 1,304.20 feet;
thence North 49°26'57" East 780.68 feet;
thence North 1°26'29" West 1,920.00 feet;
thence North 39°43'36" East 1,162.50 feet;
thence North 60°39'13" East 2,060.55 feet to the North line of said Section 15, said point being South 89°03'16" West 847.82 feet from the Northeast corner of said Section 15;
thence continuing North 60°39'13" East 522.64 feet;
thence North 0°13'17" West 1,085.00 feet to a point on the North line of the South half of the South half of said Section 10, said point being South 89°06'19" West 400 feet from the Northeast corner of said South half of the South half and the terminus of said line.

PARCEL 40: (103600000000000, 104603000000000, 109601000000000, 110601000000000, 110602000000000)

Section 3; South half of Section 4; North half of Section 9; North half of Section 10; North half of South half of Section 10; EXCEPT the South 200 feet of the East 200 feet of said Section 10; all in Township 6 North, Range 30 East, W.M., Benton County, Washington; EXCEPT Finley Road; AND EXCEPT Brown Road.

PARCEL 41: (127603000002000)

An undivided one-half interest in and to:

A strip of land situated in Government Lot 4, Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, being 60.00 feet in width with 30.00 feet lying on each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence North 88°35'17" East along the North line of said Government Lot 4, 168.86 feet to the True Point of Beginning of said centerline and right of way;
thence South 15°38'26" East 405.51 feet;
thence South 51°50'44" East 629.30 feet;
thence South 10°34'03" West 666.48 feet to the terminus of said centerline.

PARCEL 42: (127603000003000)

An undivided one-half interest in and to:

A strip of land 200 feet in width situated in Government Lot 4, Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, with 100.00 feet of said width lying on each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence South 01°03'24" East along the West line of said Section 27 a distance of 1,616.27 feet;
thence along a line perpendicular to said West line North 88°56'36" East a distance of 556.17 feet to a point on the Northwesterly right of way line of the Spokane, Portland & Seattle Railway

4831-5589-2454v.18 0117168-000002
1006813688v11

Company, said point being the True Point of Beginning and lying Northwesterly 100.00 feet when measured perpendicular to railroad centerline station 6456+45.3 and railroad mile 207.83; thence North 21°36'15" West perpendicular to said railroad right of way a distance of 150.00 feet to the terminus of said centerline.

PARCEL 43: (109603000000000)

The South half of Section 9, Township 6 North, Range 30 East, W.M., Benton County, Washington.

- **Cody Easterday and Debby Easterday, husband and wife.**

PARCEL 56: (104601000000000)

The North half of Section 4, Township 6 North, Range 30 E.W.M., Benton County, Washington

- **The Heirs and Devisees of Gale A. Easterday, deceased, and Karen L. Easterday, as her separate estate, as to an undivided half interest; and Cody A. Easterday AND Debby Easterday, husband and wife, as to an undivided half interest.**

EASEMENT PARCEL 46:

An Easement for subsurface irrigation line being the West 60 feet of the South 1,060 feet of the Southwest quarter of Section 15, Township 6 North, Range 30 East, W.M., being a portion of the Easement created by instrument recorded August 9, 1978, under Recording No. 766691.

EASEMENT PARCEL 47:

A roadway easement 30 feet in width the centerline of which is the Easterly boundary of Parcel A described in Statutory Warranty Deed recorded July 25, 1997, under Auditor's File No. 97-17672.

EASEMENT PARCEL 48:

Together with rights described in the following easements, agreements and permits as follows:

Revocable Permit for pipeline right-of-way and for pump plant site granted by the Department of the Army Permits, recorded June 9, 1978, under Recording No. 761253, records of Benton County, Washington.

Burlington Northern, Inc., Revocable Permit, recorded June 9, 1978, under Recording No. 761251, authorizing the construction, operation and maintenance of a 36 inch water pipeline at Survey Station 6455, plus 91.9-mile post 207 plus 4,435.2 feet, in Benton County, Washington

4831-5589-2454v.18 0117168-000002
1006813688v11

EASEMENT PARCEL 49:

An easement for ingress and egress purpose situated in Section 15, Township 6 North, Range 30, East, W.M., being 40 feet in width with 20 feet lying on either side of the following described centerline:

Beginning at the Southeast corner of said Section 15;
thence North 01°02'51" West along the East line of said Section 15, a distance of 2,681.27 feet to the true point of beginning;
thence South 89°26'31" West a distance of 352.48 feet; thence South 01°21'21" East a distance of 612.02 feet to the terminus of said line.

4831-5589-2454v.18 0117168-000002
1006813688v11

# FARM MANAGER HOUSE
## <u>LEGAL DESCRIPTION</u>

- ### <u>Cody Easterday and Debby Easterday, husband and wife</u>

That portion of Section 7. Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

Beginning at the West Quarter corner of said Section 7; thence North 00°13'16" East 850.00 feet along the West line of said Section 7; thence South 89°46'44" East 60.00 feet to the East line of Nine Canyon Road and to the True Point of Beginning;

thence continuing South 89°46'44" East 950.00 feet; thence South 00°13'16" West 950.00 feet; thence North 89°46'44" West 950.37 feet to the East line on Nine Canyon Road, said point being on the arc of a 3530.00 feet radius curve (Radius point bears North 88°57'04" West); thence Northerly, 51.00 feet along said East line and along the arc of said curve through a central angle of 00°49'40"; thence North 00°13'16" East 899.01 feet along said East line to the True Point of Beginning.

4831-5589-2454v.18 0117168-000002
1006813688v11

**Farm Manager House**
**Legal Description**


**GOOSE GAP FARM**
**LEGAL DESCRIPTION**


- **The Heirs and Devisees of Gale A. Easterday, deceased, Karen L. Easterday, Cody A. Easterday, Debby Easterday dba Easterday Farms, a Partnership.**

PARCEL A: ( 101703000001000 )

THAT PORTION OF THE SOUTHWEST QUARTER OF SECTION 1, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON LYING SOUTHWESTERLY OF THE KENNEWICK IRRIGATION DISTRICT MAIN CANAL, EXCEPT THE WEST 30 FEET AND THE SOUTH 30 FEET FOR ROADS.

PARCEL B: ( 111701000000000 )

THE NORTHEAST QUARTER AND THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON.

PARCEL C: ( 112702000000000 )

THAT PORTION OF SECTION 12 TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, LYING SOUTHERLY OF THE KENNEWICK IRRIGATION DISTRICT MAIN CANAL

PARCEL E: (108713000000000)

THAT PORTION OF SECTION 8, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF SAID SECTION; THENCE EAST ALONG THE SOUTH LINE OF SAID SECTION TO THE WEST LINE OF THE NORTHERN PACIFIC IRRIGATION COMPANY'S CANAL RIGHT OF WAY (NOW COLUMBIA IRRIGATION DISTRICT); THENCE NORTHWESTERLY ALONG SAID CANAL, RIGHT OF WAY TO THE WEST LINE OF SECTION 8; THENCE SOUTH ALONG THE WEST LINE OF SAID SECTION 8 TO THE POINT OF BEGINNING.

PARCEL F: (117712000002001)

THAT PORTION OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 17, TOWNSHIP 7 NORTH, RANGE 31 EAST, WILLAMETTE MERIDIAN, BENTON COUNTY, WASHINGTON LYING WESTERLY OF THE NORTHERN PACIFIC IRRIGATION COMPANY'S CANAL RIGHT OF WAY (NOW COLUMBIA IRRIGATION DISTRICT).

1006813688v11

**Farm Manager House**
**Legal Description**

PARCEL G: ( 11871000000000 )

ALL OF SECTION 18, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON

PARCEL H: ( 113702000000000 )

THE WEST HALF OF SECTION 13, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON.

PARCEL I: ( 114703000000000 )

THAT PORTION OF SECTION 14, TOWNSHIP 7 NORTH, RANGE 30 EAST,W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE SOUTH HALF AND THE SOUTH HALF OF THE NORTHEAST QUARTER. PARCEL J: ( 123700000000000 )

ALL OF SECTION 23, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON

PARCEL K: ( 124701000000000 )

THAT PORTION OF SECTION 24, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE NORTH HALF AND THE SOUTHWEST QUARTER

LESS THAT PORTION CONVEYED TO BENTON COUNTY FOR ROAD BY QUIT CLAIM DEED RECORDED UNDER AUDITOR'S FILE NO. 136125

PARCEL L: ( 11971000000000 )

ALL OF SECTION 19, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON

LESS THAT PORTION DEEDED TO BENTON COUNTY FOR ROAD BY QUIT CLAIM DEED RECORDED UNDER AUDITOR'S FILE NO. 269989.

PARCEL M: (120713000001000)

THAT PORTION OF SECTION 20, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

1006813688v11

**Farm Manager House**
**Legal Description**

THE NORTHWEST QUARTER AND THE NORTH HALF OF THE SOUTHWEST QUARTER.

EXCEPT THAT PORTION OF THE NORTH HALF OF THE NORTHWEST QUARTER LYING NORTHEASTERLY OF AYERS ROAD.

PARCEL N: (120714000001000)

THAT PORTION OF SECTION 20, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M. BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE WEST HALF OF THE EAST HALF, TOGETHER WITH THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER, TOGETHER WITH THE WEST HALF OF THE THE EAST HALF OF THE SOUTHEAST QUARTER, TOGETHER WITH THE SOUTH HALF OF THE SOUTHWEST QUARTER, LESS THAT PORTION DEEDED TO BENTON COUNTY FOR ROAD UNDER AUDITOR'S FILE NO. 269989.

EXCEPT THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER.
PARCEL O: ( 12570000000000 )

ALL OF SECTION 25, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, LESS THAT PORTION CONVEYED TO BENTON COUNTY FOR ROAD BY QUIT CLAIM DEED RECORDED UNDER AUDITOR'S FILE NO. 136209.

PARCEL P: ( 126701000000000 )

THAT PORTION OF SECTION 26, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE NORTH HALF, THE NORTH HALF OF THE SOUTHWEST QUARTER, AND THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER, AND THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER.

1006813688v11

Schedule 1.4
Easterday Water Agreements/Irrigation System Permits

1. Department of Army Permit dated August 27, 1976 (River Farm Pump Station).

2. Permit from Burlington Northern Railroad (BNSF) dated February 16, 1978 (River Farm pipeline crossing).

3. Department of the Army Easement for Pipeline Right of Way recorded April 25, 1994 as Recording No. 94-14256. (Nine Canyon Farms pumping plant and improvements – Section 6, Township 5 North, Range 30 East).

4. Department of the Army Easement for Pipeline Right of Way recorded April 25, 1994 as Recording No. 94-14257. (Nine Canyon Farms pumping plant and improvements – Section 6, Township 5 North, Range 30 East).

5. Revocable Permit granted by Burlington Northern, Inc., recorded June 9, 1978 under Recording No. 761251. (River Farm Parcel 48).

6. Department of Army Easement dated February 10, 1972 (record No. 647551) (Cox Farm "Irrigro" pumping plant).

7. Department of the Army permit NPW 71-026-72-5 (Cox Farm "Irrigro" pumping plant). (the preceding Items 1-7, the "**Easterday Irrigation System Permits**")

8. Primary Irrigation System Agreement between Crawford & Sons, Inc., and Barbarosa Farms dated June 5, 1978, including the Modification of Agreement, and Assignment of Agreement to Easterday, and any supplements, amendments or modifications thereof.

9. Water and Irrigation System Sharing Agreement between Holtzinger Management and Prudential Insurance and any supplements, amendments or modifications thereof.

10. Water and Irrigation System Sharing Agreement by and among Holtzinger Management, Kwong Chung and Christine Lai, and Craig and Sharon Campbell and any supplements, amendments or modifications thereof.

11. Water and Irrigation System Sharing Agreement between Holtzinger Management and Holtzinger Fruit and any supplements, amendments or modifications thereof.

12. Well Agreement between Holtzinger Management and Holtzinger Fruit and any supplements, amendments or modifications thereof.

13. Irrigation System Sharing Agreement between Benton Ranch and Easterday Farms and any supplements, amendments or modifications thereof.

14. Easterday Columbia River Primary Water Delivery Agreement between Easterday Ranches and Easterday Farms dated September 19, 2011, and First Amendment dated August 2012 and any supplements, amendments or modifications thereof.

15. Irrigation Water Agreement between Holtzinger Management and Charlie Cox Farms and any supplements, amendments or modifications thereof.

(the preceding Items 8 -15 , the   "**Easterday Water Agreements**").

1006813688v11

Schedule 1.5
Easterday Water Certificates and Permits

1. <u>Owned Water Rights</u>

    A. <u>Washington Department of Ecology Water Right Certificates</u>

        i. Certificate No. S4-23978C

        ii. Certificate No. S3-00285C

        iii. Certificate No. S3-00284C

        iv. Certificate No. S3-22075C

        v. Certificate No. G4-04819CWRIS (3399)

    B. <u>Washington Department of Ecology Water Right Permits</u>

        i. Superseding Permit No. S4-28998(A)P

        ii. Superseding Permit No. G4-30584P

    C. Change Authorizations (Consolidated Water Rights)

        i. CS4-23978(A)C@2
        ii. CS4-23978(B)C
        iii. CS4-23874(A)C
        iv. CS3-00286C
        v. CS3-22572C

2. <u>Leased Water Rights</u>

    A. <u>Washington Department of Ecology Water Right Certificates</u>

        i. Certificate No. S3-00591C, pursuant to Washington Department of Natural Resources Lease 12-D57294, effective January 1, 2017.

        ii. Yakima Adjudication Conditional Final Order Certificate No. S4-83818-J, pursuant to The Barker Ranch, Ltd. and Shaw Vineyards, Inc. Water Right Lease Agreement (Feb. 26, 2013), as amended; The Barker Ranch's Consent to Shaw Vineyards, Inc.'s Partial Assignment and Sublease to Easterday Farms, Partnership of a Portion of the Water Rights Leased to

1

1006813688v11

Shaw Vineyards, Inc. Under the Barker Ranch/ Shaw Vineyards, Inc. Water Rights Lease Agreement of February 26, 2013 (April 29, 2013); and Order *Pendente Lite* Re Temporary Change, Barker Ranch, Claim Nos. 01858, 01859, Yakima County Superior Court No. 77-2-01484 5 (Dec. 12, 2013).

1006813688v11

Schedule 1.6
Easterday Assigned and Assumed Leases and Contracts

1. Irrigated Cash Lease No. 12-D57294 commencing January 1, 2017, by the State of Washington, Department of Natural Resources (Lessor) and Cody Easterday, Debby Easterday, Gale Easterday, and Karen Easterday (Lessee).

2. Farm Lease commencing June 1, 2013, by Wake Family Properties, L.L.C., dba Brad Wake and Brian Wake dba B&B Farms (Lessor) and Cody A. Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday dba Easterday Farms (Lessee).

3. Farm Lease dated November 12, 2014, by Brad Wake and Brian Wake (Lessor) and Cody A. Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday dba Easterday Farms (Lessee).

1006813688v11

Schedule 2.1
Land

**COX FARM**
**LEGAL DESCRIPTION**


PARCEL A: (119602000001000 and 119602000002001)

That portion of Section 19, Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

Beginning at the Northwest corner of said Section 19;
Thence South along the West line of said Section 19, a distance of 925.00 feet at the True Point of Beginning;
Thence South 62°15'12" East a distance of 881.00 feet;
Thence South parallel to the said West line a distance of 1,390.00 feet;
Thence North 62°15'12" West a distance of 881.00 feet to a point on the West line of said Section 19;
Thence North along said West line a distance of 1,390.00 feet to the True Point of Beginning.

PARCEL B: (119602000003001)

That portion of Section 19, Township 6 North, Range 30 East, W.M. Benton County, Washington, described as follows:

The South half of Government Lot 2 EXCEPT for the West 779.70 feet of said South half of Government Lot 2; the West half of the Northeast quarter of Government Lot 2, EXCEPT for the West 119.7 feet of said West half of the Northeast quarter of Government Lot 2; the South half of the Southeast quarter of the Northeast quarter of Government Lot 2; the South half of the Southwest quarter of the Northwest quarter of the Southeast quarter of the Northwest quarter; the South half of the Southeast quarter of the Northwest quarter; the East half of the East half of the Southwest quarter; the South 30 feet of the Southwest quarter of the Southeast quarter of the Southwest quarter; the South 30 feet of the Southeast quarter of the Southwest quarter of the Southwest quarter; the South 30 feet of the East half of the Southwest quarter of the Southwest quarter of the Southwest quarter; the South-west quarter of the Southwest quarter of the Southwest quarter of the Southwest quarter; and the South half of the Northwest quarter of the Southwest quarter of the Southwest quarter of the Southwest quarter.

TOGETHER WITH a parcel of land located in Government Lot 4 of Section 19, Township 6 North, Range 30 East, W.M., Benton County, Washington, more particularly described as follows:
Beginning at the Southwest corner of said Section 19;
thence along the South line of said Section 19, South 89°31'53" East, 1173.99 feet;
thence North 00°28'07" East 30.00 feet to the True Point of Beginning;

1

21-00141-WLH11     Doc 830     Filed 06/21/21     Entered 06/21/21 17:28:37     Pg 326 of 379

thence North 89°31'53" West and parallel to the South line of Section 19, 850.56 feet to the East line of the Southwest quarter of the Southwest quarter of Government Lot 4;
thence North 01°02'49" West along the East line of said subdivision 305.43 feet to the Southeast corner of the South half of the Northwest quarter of the Southwest quarter of Government Lot 4;
thence continuing North 01°02'49" West along the East line of said subdivision 22.27 feet to a point on a 923.06 feet radius curve whose center bears South 08°32'10" East;
thence along said curve to the right an arc length of 962.59 feet through an included angle of 59°44'57" around a long chord measuring 919.56 feet, bearing South 68°39'41" East to the True Point of Beginning (also known as Parcel 1, Survey No. 3346, recorded July 21, 2004, under Auditor's File No. 2004-025861).

PARCEL C: (101591000000000)

The North half and the North half of the Northwest quarter of the Southwest quarter of Section 1, Township 5, North, Range 29 East W.M., Benton County, Washington.

PARCEL D: (125690000000000)

All of Section 25, Township 6 North, Range 29 East, W.M., Benton County, Washington.

PARCEL E: (836690000000000)

All of Section 36, Township 6 North, Range 29 East, W.M., Benton County, Washington.

PARCEL F: (101593000000000)

The South half of the Northwest Quarter of the Southwest quarter and that portion of Government Lot 5, Section 1, Township 5 North, Range 29 East, W.M., Benton County, Washington, lying Northerly of the Spokane, Portland and Seattle Railway Company's right-of-way.

PARCEL G: (102591000000000)

All of that portion of Section 2, Township 5 North, Range 29 East, W.M., Benton County, Washington, lying Northerly of the Spokane, Portland and Seattle Railway Company's right-of-way. EXCEPT that portion thereof described as follows:

Beginning at the Southwest corner of said Section 2;
Thence North along the West line of said Section 2 a distance of 208.23 feet;
Thence North 61°38'49" East a distance of 114.91 feet;
Thence North 74°33'05" East a distance of 1700 feet;
Thence South 62°02'17" East a distance of 646.58 feet;
Thence South 84°36'38" East a distance of 260.42 feet to the True Point of Beginning;
Thence North 05°23'22" East a distance of 31 feet;

2

4831-5589-2454v.18 0117168-000002
1006813688v11

**Cox Farm**
**Legal Description**

Thence South 84°36'38" East a distance of 82 feet;
Thence South 05°23'22" West a distance of 62 feet;
Thence North 84°36'38" West a distance of 82 feet;
Thence North 05°23'22" East a distance of 31 feet to the True Point of Beginning.

PARCEL H: (111592000001000)

All of that portion of Government Lots 1 and 2, Section 11, Township 5 North, Range 29 East, W.M., Benton County, Washington lying Northerly of the Spokane, Portland and Seattle Railway Company's right of way

PARCEL I: (123691000000000)

All of Section 23, Township 6 North, Range 29 East, W.M., Benton County, Washington, EXCEPT the Northwest quarter of the Northwest quarter thereof.

PARCEL J: (135690000000000, 126690000000000, 124690000000000)

All of Sections 24, 26, and 35, Township 6 North, Range 29 East, W.M., Benton County, Washington, EXCEPT the East 30.0 feet of the North 60.0 feet of the Northeast quarter of the Northeast quarter of Section 24, Township 6 North, Range 29 East, W.M., conveyed to Benton County for road purposes by Deed recorded under Auditor's File No. 622670.

PARCEL K:

TOGETHER WITH rights described in the following easements, agreements and permits as follows:

A non-exclusive easement for ingress and egress to Sections 25 and 36, Township 6 North, Range 29 East, W.M., and Section 1, Township 5 North, Range 29 East, W.M., and to the existing river pumping station located at Spukshowski Bay, Lake Wallula on the Columbia River over and across the following described property lying within Township 6 North, Range 30 East, W.M: (1) The West 40 feet of the North 2,351.38 feet of Section 19; (2) the West 20 feet of the South 3,018.62 feet of Section 19; (3) the West 20 feet of Section 30; (4) the West 20 feet of Section 31, Except the South 565.24 feet thereof; and (5) a strip of land being 20.00 feet in width situated in the Southwest quarter of Section 31 with 10.00 feet lying on each side of the following described centerline:

Beginning at the Southwest corner of said Southwest quarter of Section 31;
thence North 01°12'54" West a distance of 565.24 feet to a point on curve and being the True Point of Beginning;
thence 47.32 feet along a curve to the left having a radius 350.00 feet, a central angle of 07°44'46", whose radius point bears North 48°16'45" East to a point of tangent;
thence South 49°28'01" East a distance 75.94 feet;

3

4831-5589-2454v.18 0117168-000002
1006813688v11

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 328 of 379

thence South 37°09'22" East a distance of 116.08 feet to a point of curve;
thence 106.47 feet along a curve to the left having a radius 272.00 feet, a central angle of 22°25'39",
whose radius point bears North 52°50'38" East to a point of tangent;
thence South 59°35'01" East a distance of 169.74 feet to a point of curve
thence 96.69 feet along a curve to the left having a radius 141.00 feet a central angle of 39°17'26", whose
radius point bears North 30°24'59" East to a point of tangent;
thence North 81°07'33" East a distance of 360.19 feet;
thence North 76°25'45" East a distance of 221.99 feet;
thence North 73°19'59" East a distance of 213.13 feet;
thence North 66°29'39" East a distance of 151.05 feet;
thence North 70°25'28" East a distance of 118.26 feet to a point of curve;
thence 476.40 feet along a curve to the right having a radius 302.00 feet, a central angle of 90°22'57",
whose radius point bears South 19°34'32" East to a point of tangent;
thence South 19°11'35" East a distance of 145.90 feet to a point of curve;
thence 140.82 feet along a curve to the left having a radius 667.00 feet, a central angle of 12°05'48", whose radius point bears North 70°48'25" East to a point on the Northerly line of Government Lot 3, Section 6, Township 5 North, Range 30 East, W.M. (as reserved by Grantor, Charlie Cox Farms, Inc., in deed recorded June 21, 1993, under Auditor's File No. 93-20941)

AND an undivided forty percent (40%) interest in the river pumping station platform located on the following described real property:

A parcel of land lying in Government Lots 7 and 8, Section 6, Township 5 North, Range 30 East, W.M., described as follows:

Beginning at a point lying North 75°30'03" East a distance of 2,662 feet from the quarter section corner lying on the West line of said Section 6;
thence North 56°00' West 15 feet;
thence North 34°00' East 120 feet;
thence South 56°00' East 120 feet
thence South 34°00' West 120 feet;
thence North 56°00' West a distance of 105 feet to the Point of Beginning; EXCEPTING THEREFROM (1) all that portion lying above the 347.0 foot contour line near where the same crosses the Northwest boundary of subject parcel; (2) all that portion lying within the right-of-way of the Spokane, Portland and Seattle Railway Company (now Burlington Northern Railway Company).

ALSO EXCEPT right to use pump stations 1 through 6 and the pumps now located in said pump stations 1 through 6, and all pipes, switching gear and other equipment used in connection therewith.

4831-5589-2454v.18 0117168-000002
1006813688v11

**Cox Farm**
**Legal Description**

AND Department of the Army Easement for Right-of-Way (Pipeline) DACW68-2-73-64, dated February 10, 1972, in favor of Irrigro Limited Partnership for an irrigation pumping plant on the following described real property, recorded April 6, 1973, under Auditor's File No. 647551, records of Benton County, Washington, together with the related, unrecorded Department of the Army permit NPW 71-026-72-5, dated January 24, 1972, for the construction of pumping facility on said following described real property:

A parcel of land lying in Government Lots 7 and 8, Section 6, Township 5 North, Range 30 East, W.M., described as follows:

Beginning at a point lying North 75°30'03" East a distance of 2,662 feet from the quarter section corner lying on the West line of said Section 6;
thence North 56°00' West 15 feet;
thence North 34°00' East 120 feet;
thence South 56°00' East 120 feet;
thence South 34°00' West 120 feet;
thence North 56°00' West a distance of 105 feet to the Point of Beginning;
EXCEPTING THEREFROM (1) all that portion lying above the 347.0 foot contour line near where the same crosses the Northwest boundary of subject parcel; (2) all that portion lying within the right-of-way of the Spokane, Portland and Seattle Railway Company (now Burlington Northern Railway Company).

AND an easement for irrigation pipeline described as follows: A strip of land located in Government Lot 7 and Government Lot 8, Section 6, Township 5 North, Range 30 East, W.M., being 30.00 feet in width and having 15.00 feet on each side of the following described centerline:

Beginning at the West quarter corner of said Section 6;
thence North 01°13'54" West along the West line of said Section 6 a distance of 1,343.05 feet;
thence North 89°00'00" East a distance of 2,400.41 feet to a point on the North line of Government Lot 7 and the True Point of Beginning;
thence South 19°10'40" East a distance of 740.13 feet to terminus of this easement.

Upon the terms and conditions of the following instruments: (1) Instrument dated December 22, 1972, between Jack Hsieh, et ux, et al. and Irrigro Limited Partnership, and recorded January 18, 1973, under Auditor's File Nos. 644246 and 644247; (2) Instrument dated August 18, 1972, between Sherwood and Roberts Tri-Cities, Inc. and Irrigro Limited Partnership, and recorded January 18, 1973, under Auditor's File No. 644248; and (3) Instrument dated December 21, 1972, between Landsco Limited, a Washington Corporation (and Irrigro Limited Partnership), and recorded January 18, 1973, under Auditor's File No. 644249.

4831-5589-2454v.18 0117168-000002
1006813688v11

**Cox Farm**
**Legal Description**

AND Easement for irrigation pipeline described as follows: A strip of land 50 feet wide located in Government Lot 3, Section 6, Township 5 North, Range 30 East, W.M., having 25 feet of said width on either side of the following described centerline:

Beginning at the West quarter corner of said Section 6;
thence North 59°43'03" East a distance of 2,745.85 feet to a point on the South line of said Government Lot 3, being the True Point of Beginning;
thence North 19°10'40" West a distance of 1,413.59 feet to a point on the North line of said Government Lot 3 and terminus of this easement.

Upon the terms and conditions of that certain Grant of Right-of-Way, Serial No. Or. 9596 (Wash.), granted to Irrigro Limited Partnership by the Department of the Interior, Bureau of Land Management, Oregon State Office, by Decision dated August 9, 1972, and recorded August 31, 1972, under Auditor's File No. 639233.

AND right-of-way over a strip of land located in Section 6, Township 5 North, Range 30 East, W.M., for irrigation pipeline, Serial No. Or. 9655 (Wash.) granted to State of Washington, by and through the Department of Natural Resources, by the Department of the Interior, Bureau of Land Management, Oregon State Office, by Decision dated September 29, 1972, and recorded October 11, 1972, under Auditor's File No. 640715, and amended by instrument recorded June 1, 1977, under Auditor's File No. 729002.

AND an easement for irrigation pipeline described as follows: A strip of land 50 feet wide located in Government Lot 2, Section 6, Township 5 North, Range 30 East, W.M., having 25 feet of said width on either side of the following described centerline:

Beginning at the West quarter corner of said Section 6;
thence North 01°13'54" West along the West line of said Section 6 a distance of 1,343.05 feet;
thence North 89°00'00" East a distance of 3,001.29 feet to a point on the South line of said Government Lot 2 and the True Point of Beginning;
thence North 04°26'05" East a distance of 262.92 feet;
thence North 25°55'29" East a distance of 1,212.76 feet to a point on the North line of Section 6, said point being North 89°00'00 East of the Northwest corner of said Section 6, a distance of 3,580.77 feet and terminus of this easement.

Upon the terms and conditions of that certain Grant of Right-of-way Serial No. Or. 11338 (Wash.), granted to Irrigro Limited Partnership by the Department of the Interior, Bureau of Land Management, Oregon State Office, by Decision dated March 6, 1974, and recorded December 13, 1974, under Auditor's File No. 673742.

AND an easement for irrigation pipeline described as follows: A strip of land located in Government Lot 7 and Government Lot 8, Section 6, Township 5 North, Range 30 East, W.M., being 30.00 feet in width and having 15.00 feet on each side of the following described centerline:

6

4831-5589-2454v.18 0117168-000002
1006813688v11

**Cox Farm**
**Legal Description**

Beginning at the West quarter corner of said Section 6;
thence North 01°13'54" West along the West line of said Section 6 a distance of 1,343.05 feet;
thence North 89°00'00" East a distance of 3,001.29 feet to a point on the North line of Government Lot 8 and the True Point of Beginning;
thence South 26°45'00" West a distance of 794.60 feet to terminus of this easement.

Upon the terms and conditions of the following instruments: (1) Instrument dated December 22, 1972, between Jack Hsieh, et ux, et al. and Irrigo Limited Partnership, and recorded January 18, 1973, under Auditor's File Nos. 644246 and 644247; (2) Instrument dated August 18, 1972, between Sherwood and Roberts Tri-Cities, Inc. and Irrigro Limited Partnership, and recorded January 18, 1973, under Auditor's File No. 644248; and (3) Instrument dated December 21, 1972, between Landsco Limited, a Washington Corporation (and Irrigro Limited Partnership), and recorded January 18, 1973, under Auditor's File No. 644249.

PARCEL L: (113690000000000)

Section 13, Township 6 North, Range 29 East, W.M., Benton County, Washington, EXCEPT the East 30 feet thereof conveyed to Benton County for road purposes by Deeds recorded under Auditor's File Nos. 624663 and 624765.

PARCEL M: (114690000000000)

Section 14, Township 6 North, Range 29 East, W.M., Benton County, Washington

PARCEL N: (112693000000000)

The South half of the Southwest quarter and the Southeast quarter of Section 12, Township 6 North, Range 29 East, W.M., Benton County, Washington, less portions described as follows:

(Parcel 1) Measured along the West section line from the Southwest corner of the North half of the Southwest quarter South 298.00 feet;
thence in an Easterly direction to a point 269.00 feet South of the Southeast corner of the North half of the Southwest quarter;
thence North to the Southeast corner of the North half of the Southwest quarter;
thence West to Point of Beginning.

(Parcel 2) From the Northeast corner of the North half of the Southwest quarter South along the East line of said North half of the Southwest quarter to a point 269.00 feet South of the Southeast corner of the North half;
thence East 27.00 feet;
thence North in a straight line to a point 10.00 feet East of the Northeast corner of the North half of the Southwest quarter.

7

(Parcel 3) From the Northeast corner of the North half of the Southwest quarter South 136.00 feet; thence in an Easterly direction to a point 52.00 feet South of the Southeast corner of the North half of Section 12;
thence North along said Section line to the Southeast corner of the North half of Section 12;
thence West along the South line of the North half of Section 12 to Point of Beginning. (These 3 parcels taken from judgment filed in Benton County Cause No. 18881);
EXCEPT ALSO portion conveyed to Benton County for road purposes by Deed recorded Under Auditors File No. 624764

PARCEL O: (111690000000000)

Section 11, Township 6 North, Range 29 East, W.M., Benton County, Washington,

EXCEPT portions conveyed to Benton County for road purposes by Deeds recorded under Auditor's File Nos. 466635, 624663, 624763, 633680 and 633861.

PARCEL P: (130602000001000)

A parcel of land located in Section 30, Township 6 North, Range 30 East, W.M., Benton County, Washington, lying Westerly of the following described line;

Beginning at the Southwest corner of said Section 30;
thence along the South line of said Section 30, North 89°35'15" East, 2,134.18 feet to the True Point of Beginning, said point being on the arc of a 1,294.09 feet radius curve (radius point bears South 69°19'15" West);
thence along said curve to the left an arc length of 1,108.30 feet through an included angle of 49°04'11" around a long chord measuring 1,074.73 feet, bearing North 45°12'51" West;
thence North 12°32'01" East, 20.73 feet to a point on a 1,184.08 foot radius curve whose center bears North 20°07'47" East;
thence along said curve to the left an arc length of 4,584.61 feet through an included angle of 221°50'31" around a long chord measuring 2,212.04 feet, bearing North 00°47'28" West;
thence North 65°01'13" West, 236.15 feet;
thence North 17°27'50" West, 944.61 feet to a point on a 953.06 feet radius curve whose center bears North 32°01'02" West;
thence along said curve to the left an arc length of 1,548.00 feet through an included angle of 93°03'43" around a long chord measuring 1,383.37 feet, bearing North 11°27'06" East to a point on the North line of Section 30 and the terminus of the described line. Said terminus point bears South 89°31'53" East, 1,234.68 feet from the Northwest corner of said Section 30.

PARCEL Q: (131602000001000)

A parcel of land located in the West half of Section 31, Township 6 North, Range 30 East, W.M., Benton County, Washington lying Westerly of the following described line:

4831-5589-2454v.18 0117168-000002
1006813688v11

**Cox Farm**
**Legal Description**

Beginning at the Southwest corner of said Section 31;
thence along the South line of said Section 31, North 88°59'38" East, 1,917.03 feet to the True Point of Beginning;
thence North 20°29'35" West, 310.16 feet;
thence North 16°19'09" West, 127.49 feet;
thence North 05°31'51" West, 559.30 feet;
thence North 00°19'28" East, 152.44 feet;
thence North 06°36'17" East, 228.33 feet;
thence North 10°31'48" West, 115.80 feet to a point on a 1,209.08 foot radius curve whose center bears North 74°14'04" West;
thence along said curve to the left an arc length of 820.72 feet through an included angle of 38°53'32" around a long chord measuring 805.06 feet and bearing North 03°40'50" West;
thence North 01°14'16" West, 813.07 feet;
thence North 14°03'09" East, 472.97 feet;
thence North 10°01'13" East, 640.41 feet to a point on a 1,294.09 foot radius curve whose center bears North 55°47'34" West;
thence along said curve to the left an arc length of 1,239.67 feet through an included angle of 54°53'11" around a long chord measuring 1,192.81 feet and bearing North 06°45'50" East to a point on the North line of Section 31 and the terminus of the described line. Said terminus point bears North 89°35'15" East, 2,134.18 feet from the Northwest corner of said Section 31.

4831-5589-2454v.18 0117168-000002
1006813688v11

**FARM MANAGER HOUSE**
**<u>LEGAL DESCRIPTION</u>**

That portion of Section 7. Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

Beginning at the West Quarter corner of said Section 7; thence North 00°13'16" East 850.00 feet along the West line of said Section 7; thence South 89°46'44" East 60.00 feet to the East line of Nine Canyon Road and to the True Point of Beginning;

thence continuing South 89°46'44" East 950.00 feet; thence South 00°13'16" West 950.00 feet; thence North 89°46'44" West 950.37 feet to the East line on Nine Canyon Road, said point being on the arc of a 3530.00 feet radius curve (Radius point bears North 88°57'04" West); thence Northerly, 51.00 feet along said East line and along the arc of said curve through a central angle of 00°49'40"; thence North 00°13'16" East 899.01 feet along said East line to the True Point of Beginning.

4831-5589-2454v.18 0117168-000002
1006813688v11

**GOOSE GAP FARM**
**LEGAL DESCRIPTION**

PARCEL A: ( 101703000001000 )

THAT PORTION OF THE SOUTHWEST QUARTER OF SECTION 1, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON LYING SOUTHWESTERLY OF THE KENNEWICK IRRIGATION DISTRICT MAIN CANAL, EXCEPT THE WEST 30 FEET AND THE SOUTH 30 FEET FOR ROADS.

PARCEL B: ( 111701000000000 )

THE NORTHEAST QUARTER AND THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON.

PARCEL C: ( 1127020000000000 )

THAT PORTION OF SECTION 12 TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, LYING SOUTHERLY OF THE KENNEWICK IRRIGATION DISTRICT MAIN CANAL

PARCEL D: (Leasehold interest in 113704000000000)

The Southeast quarter of Section 13, Township 7 North, Range 30 E.W.M., records of Benton County, Washington.

PARCEL E: (108713000000000)

THAT PORTION OF SECTION 8, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF SAID SECTION; THENCE EAST ALONG THE SOUTH LINE OF SAID SECTION TO THE WEST LINE OF THE NORTHERN PACIFIC IRRIGATION COMPANY'S CANAL RIGHT OF WAY (NOW COLUMBIA IRRIGATION DISTRICT); THENCE NORTHWESTERLY ALONG SAID CANAL, RIGHT OF WAY TO THE WEST LINE OF SECTION 8; THENCE SOUTH ALONG THE WEST LINE OF SAID SECTION 8 TO THE POINT OF BEGINNING.

PARCEL F: (117712000002001)

THAT PORTION OF THE WEST HALF OF THE NORTHWEST QUARTER OF SECTION 17, TOWNSHIP 7 NORTH, RANGE 31 EAST, WILLAMETTE MERIDIAN, BENTON COUNTY, WASHINGTON LYING WESTERLY OF THE NORTHERN PACIFIC IRRIGATION COMPANY'S CANAL RIGHT OF WAY (NOW COLUMBIA IRRIGATION DISTRICT).

4831-5589-2454v.18 0117168-000002
1006813688v11

**Goose Gap Farm**
**Legal Description**

PARCEL G: ( 11871000000000 )

ALL OF SECTION 18, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON

PARCEL H: ( 113702000000000 )

THE WEST HALF OF SECTION 13, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON.

PARCEL I: ( 114703000000000 )

THAT PORTION OF SECTION 14, TOWNSHIP 7 NORTH, RANGE 30 EAST,W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE SOUTH HALF AND THE SOUTH HALF OF THE NORTHEAST QUARTER. PARCEL J: ( 123700000000000 )

ALL OF SECTION 23, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON

PARCEL K: ( 124701000000000 )

THAT PORTION OF SECTION 24, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE NORTH HALF AND THE SOUTHWEST QUARTER

LESS THAT PORTION CONVEYED TO BENTON COUNTY FOR ROAD BY QUIT CLAIM DEED RECORDED UNDER AUDITOR'S FILE NO. 136125

PARCEL L: ( 11971000000000 )

ALL OF SECTION 19, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON

LESS THAT PORTION DEEDED TO BENTON COUNTY FOR ROAD BY QUIT CLAIM DEED RECORDED UNDER AUDITOR'S FILE NO. 269989.

PARCEL M: (120713000001000)

THAT PORTION OF SECTION 20, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

4831-5589-2454v.18 0117168-000002
1006813688v11

**Goose Gap Farm**
**Legal Description**

THE NORTHWEST QUARTER AND THE NORTH HALF OF THE SOUTHWEST QUARTER.

EXCEPT THAT PORTION OF THE NORTH HALF OF THE NORTHWEST QUARTER LYING NORTHEASTERLY OF AYERS ROAD.

PARCEL N: (120714000001000)

THAT PORTION OF SECTION 20, TOWNSHIP 7 NORTH, RANGE 31 EAST, W.M. BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE WEST HALF OF THE EAST HALF, TOGETHER WITH THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER, TOGETHER WITH THE WEST HALF OF THE THE EAST HALF OF THE SOUTHEAST QUARTER, TOGETHER WITH THE SOUTH HALF OF THE SOUTHWEST QUARTER, LESS THAT PORTION DEEDED TO BENTON COUNTY FOR ROAD UNDER AUDITOR'S FILE NO. 269989.

EXCEPT THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER.
PARCEL O: ( 12570000000000 )

ALL OF SECTION 25, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, LESS THAT PORTION CONVEYED TO BENTON COUNTY FOR ROAD BY QUIT CLAIM DEED RECORDED UNDER AUDITOR'S FILE NO. 136209.

PARCEL P: ( 126701000000000 )

THAT PORTION OF SECTION 26, TOWNSHIP 7 NORTH, RANGE 30 EAST, W.M., BENTON COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

THE NORTH HALF, THE NORTH HALF OF THE SOUTHWEST QUARTER, AND THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER, AND THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER.

PARCEL Q: (Leasehold interest in 114701000000000 and 11170200001000)

REAL PROPERTY LOCATED IN THE WEST HALF OF SECTION 11 AND THE NORTH HALF OF SECTION 14, TOWNSHIP 7 NORTH, RANGE 30 EAST, WILLAMETTE MERIDIAN, BENTON COUNTY, WASHINGTON BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID SECTION 11; THENCE SOUTH 00°57'36" WEST, 5278.69 FEET ALONG THE EAST LINE OF SAID SECTION TO THE SOUTHEAST CORNER OF SAID SECTION 11; THENCE SOUTH 89°40'57" WEST, 150.90

4831-5589-2454v.18 0117168-000002
1006813688v11

**Goose Gap Farm**
**Legal Description**

FEET ALONG THE LINE COMMON TO SAID SECTIONS 11 AND 14 TO A POINT ON THE ARC OF NON-TANGENT CURVE (RADIUS POINT BEARS NORTH 59°23'10" WEST, 1354.85 FEET) AND TO THE TRUE POINT OF BEGINNING;

THENCE SOUTHWESTERLY, WESTERLY AND NORTHWESTERLY, 2756.71 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 116°34'45" TO A POINT ON A NON-TANGENT CURVE (RADIUS POINT BEARS SOUTH 77°40'55" WEST, 1357.58 FEET); THENCE SOUTHWESTERLY, WESTERLY, NORTHWESTERLY, NORTHERLY AND NORTHEASTERLY 6514.76 FEET ALONG THE ARC OF SAID CURE THROUGH A CENTRAL ANGLE OF 274°57'09" TO A POINT ON A NON-TANGENT CURVE (RADIUS POINT BEARS NORTH 09?25'03" EAST, 1190.74 FEET); THENCE NORTHWESTERLY, NORTHERLY, NORTHEASTERLY, EASTERLY AND SOUTHEASTERLY, 4699.87 FEET ALONG THE ARC OF SAID CURE THROUGH A CENTRAL ANGLE OF 226°08'54" TO A POINT ON A NON-TANGENT CURVE (RADIUS POINT BEARS NORTH 74°02'50" EAST, 1354.27 FEET); THENCE NORTHERLY, 1202.48 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 50°52'26" TO A PONT ON THE EAST LINE OF SAID WEST HALF OF SECTION 11; THENCE SOUTH 00°12'43" WEST, 4021.71 FEET ALONG SAID EAST LINE TO THE LINE COMMON TO SAID SECTIONS 11 AND 14; THENCE NORTH 89°40'57" EAST, 2451.43 FEET ALONG SAID COMMON LINE TO THE TRUE POINT OF BEGINNING.

4831-5589-2454v.18 0117168-000002
1006813688v11

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 339 of 379

# NINE CANYON FARM
## LEGAL DESCRIPTION

PARCEL 1: ([117602000001000](#))

All of Section 17, Township 6 North, Range 30, East, .W.M., Benton County, Washington;
EXCEPT the East 1/2 of the East 1/2;
ALSO EXCEPTING the following described parcel:

Beginning at the Northwest corner of Section 18;
thence South 89°44'56" East, along the North line thereof, 4477 feet to the true point of
beginning;
thence South 0°15'04" West, 1433.00 feet;
thence South 89°35'56" East, 1356.00 feet;
thence North 0°24'04" East, 1430.90 feet, more or less, to the North line of said Section 17;
thence North 89°09'11" West, along said North line, 543.22 feet to the section corner common to
said Sections 17 and 18;
thence North 89°44'56" West along the North line of said Section 18, 816.55 feet to the true
point of beginning.

PARCEL 2: ([117602000002000](#))

That portion of the Northwest 1/4 of Section 17, Township 6 North, Range 30, East, W.M.,
Benton County, Washington, lying within the described line as follows:

Beginning at the Northwest corner of Section 18;
thence South 89°44'56" East, along the North line thereof 4,477 feet to the true point of
beginning;
thence South 0°15'04" West 1,433.00 feet;
thence South 89°35'56" East 1,356.00 feet;
thence North 0°24'04" East 1430.90 feet, more or less, to the North line of said Section 17;
thence North 89°09'11" West along said North line 543.22 feet to the Section corner common to
said Sections 17 and 18;
thence North 89°44'56" West along the North line of said Section 18, 816.55 feet to the true
point of beginning.

PARCEL 3: ([118601000002000](#))

The East 1/2 of Section 18, Township 6 North, Range 30, East, W.M., Benton County,
Washington; EXCEPT the following described parcel:

Beginning at the Northwest corner of said Section 18;
thence South 89°44'56" East, along the North line thereof, 4477.00 feet to the true point of
beginning; thence South 0°15'04" West, 1433.00 feet; thence South 89°35'56" East, 1356.00 feet;
thence North 0°24'04" East, 1430.90 feet, more or less, to the North line of Section 17; thence
North 89°09'11" West, along said North line, 543.22 feet to the section corner common to said

15

4831-5589-2454v.18 0117168-000002
1006813688v11

Sections 17 and 18; thence North 89°44'56" West, along the North line of said Section 18, 816.55 feet to the true point of beginning.

PARCEL 4: (118601000001000)

Portion of the Northeast 1/4 of Section 18, Township 6 North, Range 30, East, W.M., Benton County, Washington, lying within the following described parcel:

Beginning at the Northwest corner of said Section 18; thence South 89°44'56" East, along the North line thereof, 4477.00 feet to the true point of beginning; thence South 0°15'04" West, 1433.00 feet; thence South 89°35'56" East, 1356.00 feet; thence North 0°24'04" East, 1430.00 feet, more or less, to the North line of Section 17; thence North 89°09'11" West, along said North line, 543.22 feet to the section corner common to said Sections 17 and 18; thence North 89°44'56" West, along the North line of said Section 18, 816.55 feet to the true point of beginning.

PARCEL 5: (118602000001000)

The West 1/2 of Section 18, Township 6 North, Range 30, East, W.M., Benton County, Washington; EXCEPT the West 460 feet of the South 1895.00 feet;

ALSO EXCEPT the West 30 feet to County for road right of way.
PARCEL 6: (118602000002000)

The West 460.00 feet of the South 1895.00 feet of the Southwest 1/4 of Section 18, Township 6 North, Range 30, East, W.M., Benton County, Washington;

EXCEPT the West 30 feet to County for road right of way.

PARCEL 7: (119601000001000)

All of Section 19, Township 6 North, Range 30, East, W.M., Benton County, Washington;

EXCEPT that portion described as follows:

Beginning at the Northwest corner of said Section 19; thence South along the West line of said section a distance of 925 feet to the true point of beginning; thence South 62°15'12" East a distance of 881 feet; thence South parallel to said West line a distance of 1390 feet; thence North 62°15'12" West a distance of 881 feet to a point on the West line of said Section 19; thence North along said West line a distance of 1390 feet to the true point of beginning;

ALSO EXCEPT the West 30 feet of the North 60 feet for road right of way conveyed to Benton County by Quit Claim Deed recorded under Recording No. 623211;

4831-5589-2454v.18 0117168-000002
1006813688v11

ALSO EXCEPT that portion of said Section 19 defined as follows:
The South 1/2 of Government Lot 2, EXCEPT for the West 779.70 feet of said South 1/2 of Government Lot 2; the West 1/2 of the Northeast 1/4 of Government Lot 2, EXCEPT for the West 119.7 feet of said West 1/2 of the Northeast 1/4 of Government Lot 2; the South 1/2 of the Southeast 1/4 of the Northeast 1/4 of Government Lot 2; the South 1/2 of the Southwest 1/4 of the Northwest 1/4 of the Southeast 1/4 of the Northwest 1/4; the South 1/2 of the Southeast 1/4 of the Northwest 1/4; the East 1/2 of the East 1/2 of the Southwest 1/4; the South 30 feet of the Southwest 1/4 of the Southeast 1/4 of the Southwest 1/4; the South 30 feet of the Southeast 1/4 of the Southwest 1/4 of the Southwest 1/4; the South 30 feet of the East 1/2 of the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4; the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4; And the South 1/2 of the Northwest 1/4 of the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4;

ALSO EXCEPT any portion lying in the Southwest 1/4 and less any portion lying in the Southwest 1/4 of the Southwest 1/4 of the Northwest 1/4.

PARCEL 8: (119603000001001)

The Southwest Quarter and the Southwest Quarter of the Southwest Quarter of the Northwest Quarter of Section 19, Township 6 North, Range 30 East, W.M. EXCEPT Parcels 1, 2, and 3 described below:

Parcel 1: Beginning at the Northwest corner of said Section 19; Thence South along the West line of said Section 19, a distance of 925.00 feet to the True Point of Beginning; Thence South 62°15'12" East a distance of 881.00 feet; Thence South parallel to the said West line a distance of 1,390.00 feet; Thence North 62°15'12" West a distance of 881.00 feet to a point of the West line of said Section 19; Thence North along said West line a distance of 1,390.00 feet to the true point of Beginning.

Parcel 2: A parcel of ground situated in Section 19, Township 6 North, Range 30 East, W.M. consisting of the South half of Government Lot 2, Except for the West 779.70 feet of said South half of Government Lot 2; The West half of the Northeast quarter of Government Lot 2, Except for the West 119.7 feet of said West half of the Northeast quarter of Government Lot 2; The South half of the Southeast quarter of the Northeast quarter of Government Lot 2; The South half of the Southwest quarter of the Northwest quarter of the Southeast quarter of the Northwest quarter; The South half of the Southeast quarter of the Northwest quarter; The East half of the East half of the Southwest quarter; the South 30 feet of the Southwest quarter of the Southeast quarter of the Southwest quarter; The South 30 feet of the Southeast quarter of the Southwest quarter of the Southwest quarter; The South 30 feet of the East half of the Southwest quarter of the Southwest quarter of the Southwest quarter; The Southwest quarter of the Southwest quarter of the Southwest quarter of the Southwest quarter; and the South half of the Northwest quarter of the Southwest quarter of the Southwest quarter of the Southwest quarter.

4831-5589-2454v.18 0117168-000002
1006813688v11

**Nine Canyon Farm**
**Legal Description**

Parcel 3: A parcel of land located in Government Lot 4 of Section 19 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington, more particularly described as follows: Beginning at the Southwest corner of said Section 19; thence along the South line of said Section 19, South 89°31'53" East, 1173.99 feet; thence North 00°28'07" East 30.00 feet to the True Point of Beginning; Thence North 89°31'53" West and parallel to the South line of Section 19, 850.56 feet to the East line of the Southwest quarter of the Southwest quarter of Government Lot 4; Thence North 01°02'49" West along the East line of said subdivision 305.43 feet to the Southeast corner of the South half of the Northwest quarter of the Southwest quarter of the Southwest quarter of Government Lot 4; Thence continuing North 01°02'49" West along the East line of said subdivision 22.27 feet to a point on a 923.06 feet radius curve whose center bears South 08°32'10" East; Thence along said curve to the right an arc length of 962.59 feet through an included angle of 59°44'57" around a long chord measuring 919.56 feet, bearing South 68°39'41" East to the True Point of Beginning.

PARCEL 9: (120602000001000)

The West one half and the West one half of the East one half of Section 20, Township 6 North, Range 30, East, W.M., Benton County, Washington;

EXCEPT that portion of the West 1/2 of the East 1/2 of said Section 20, described as follows: Beginning at the Southwest corner of said subdivision; thence North 89°34'18" East, along the South line thereof, 1328.83 feet to the Southeast corner of said subdivision; thence North 00°07'23" East, along the East line thereof 1690.00 feet; thence South 58°11'02" West 461.95 feet; thence South 32°50'05" West 1733.36 feet to the point of beginning.

PARCEL 10: (129602000000000)

That portion of the West 1/2 of Section 29, Township 6 North, Range 30, East, W.M., Benton County, Washington, defined as follows:

Beginning at the Northwest corner of said Section 29; thence North 89°34'18" East along the North line thereof 2657.66 feet to the Northeast corner of the Northwest 1/4 of the said Section 29; thence South 0°41'57" West 2288.34 feet; thence South 55°04'01" West 1850.63 feet; thence South 61°07'10" West 1164.11 feet to the point on the West line of said Section 29, bearing North 01°22'17" West 1400 feet from the Southwest corner of said Section 29; thence North 01°22'17" West along said West line 3891.36 feet to the point of beginning.

PARCEL 11: (130601000001001)

All of Section 30, Township 6 North, Range 30 East, W.M.; EXCEPT Parcels 1 and 2 described as follows:

Parcel 1: Beginning at the Southeast corner of said Section 30; thence North 1°22'17" West 1,400.00 feet; thence South 44°07'45" West 1,962.53 feet to a point on the South line of said

18

Section 30, South 89°37'47" West 1,400.00 feet from the Southeast corner thereof; thence North 89°37'47" East 1,400.00 feet to the Point of Beginning.

Parcel 2: A parcel of land located in Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington lying Westerly of the following described line: Beginning at the Southwest corner of said Section 30; thence along the South line of said Section 30, North 89°35'15" East, 2134.18 feet to the True Point of Beginning, said point being on the arc of a 1294.09 feet radius curve (radius point bears South 69°19'15" West); Thence along said curve to the left an arc length of 1108.30 feet through an included angle of 49°04'11" around a long chord measuring 1074.73 feet, bearing North 45°12'51" West; thence North 12°32'01" East, 20.73 feet to a point on a 1184.08 feet radius curve whose center bears North 20°07'47" East; thence along said curve to the left an arc length of 4584.61 feet through an included angle of 221°50'31" around a long chord measuring 2212.04 feet, bearing North 00°47'28" West; thence North 65°01'13" West, 236.15 feet; thence North 17°27'50" West, 944.61 feet to a point on a 953.06 feet radius curve whose center bears North 32°01'02" West; thence along said curve to the left an arc length of 1548.00 feet through an included angle of 93°03'43" around a long chord measuring 1383.37 feet, bearing North 11°27'06" East to a point on the North line of Section 30 and the terminus of the described line. Said terminus point bears South 89°31'53" East, 1234.68 feet from the Northwest corner of said Section 30.

PARCEL 12: (131601000001001)

All of Section 31, Township 6 North, Range 30 East, W.M.; EXCEPT Parcels 1 and 2 described as follows:

Parcel 1: That portion of said Section 31 lying Easterly of the following described line: Beginning at the Northeast corner of said Section 31; thence South 89°37'47" West along the North line thereof 1,400.00 feet to the True Point of Beginning; thence South 16°06'28" West 1,666.28 feet; thence South 0°10'42" East 3,740.49 feet to the South line of said Section 31 and the terminus point of the line herein described.

Parcel 2: A parcel of land located in the West half of Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington lying Westerly of the following described line: Beginning at the Southwest corner of said Section 31; thence along the South line of said Section 31, North 88°59'38" East, 1917.03 feet to the True Point of Beginning; thence North 20°29'35" West, 310.16 feet; thence North 16°19'09" West, 127.49 feet; thence North 05°31'51" West, 559.30 feet; thence North 00°19'28" East, 152.44 feet; thence North 06°36'17" East, 228.33 feet; thence North 10°31'48" West, 115.80 feet to a point on a 1209.08 feet radius curve whose center bears North 74°14'04" West; thence along said curve to the left an arc length of 820.72 feet through an included angle of 38°53'32" around a long chord measuring 805.06 feet and bearing North 03°40'50" West; thence North 01°14'16" West, 813.07 feet; thence North 14°03'09" East, 472.97 feet; thence North 10°01'13" East, 640.41 feet to a point on a 1294.09 feet radius curve whose center bears North 55°47'34" West; thence along said curve to the left an

19

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 344 of 379

arc length of 1239.67 feet through an included angle of 54°53'11" around a long chord measuring 1192.81 feet and Bearing North 06°45'50" East to a point on the North line of Section 31 and the terminus of the described line. Said terminus point bears North 89°35'15" East, 2134.18 feet from the Northwest corner of said Section 31.

PARCEL 13: (133602000001002 and 133602000001003)

Government Lots 1, 2, and 3, Section 33, Township 6 North, Range 30 East, W.M., records of Benton County, Washington, lying Northerly of the existing Northerly right of way line of the Spokane, Portland and Seattle Railway; EXCEPT therefrom any portion of said premises lying below elevation 347 above Mean Sea Level, United States Coast and Geodetic Survey Datum; and EXCEPT the East 780 feet of said Government Lot 1.

AND the Northwest Quarter of the Northwest Quarter of Section 33, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT that portion thereof described as follows:

Beginning at the Northwest corner of said Section 33; thence along the North line of said Section 33, South 88°31'46" East, 1137.40 feet to a point on a 1064.58 feet radius curve whose center bears South 89°27'20" East; thence along said curve to the right an arc length of 1715.72 feet through an included angle of 92°20'25" around a long chord measuring 1535.97 feet, bearing South 46°42'52" West to a point on the West line of the Northwest quarter of the Northwest quarter of Section 33; thence along said West line North 01°00'05" West, 1082.47 feet to the Point of Beginning.

PARCEL 14: (106501000000000)

Government Lots 1, 5, 6, 7 and 8, of Section 6, Township 5 North, Range 30 East, W.M., Benton County, Washington, lying Northerly of the Spokane, Portland and Seattle Railway Company right of way; EXCEPT therefrom any portion of the above described tract of land lying below elevation 347 above mean sea level, U.S. Coast and Geodetic Survey Datum;

AND EXCEPT that portion thereof conveyed to Public Utility District No. 1, Benton County, Washington by Instruments recorded January 18, 1973, under Auditor's File Numbers 644246, 644247 and 644248.

PARCEL 15:

An easement for ingress and egress over and across a strip of land being 20 feet in width commencing at the point where that certain easement reserved in the Easement Agreement recorded under Auditor's File No. 93-23911, as modified by document recorded under Auditor's File No. 95-9435, as further modified by document recorded under Auditor's File No. 95-9437, intersects the West border of Section 29, Township 6 North, Range 30, E.W.M.; thence South along the West border of Section 29, to the Southwest corner of said Section; thence East along the South border of Section 29 to the East border of Section 29 and the terminus of the easement.

4831-5589-2454v.18 0117168-000002
1006813688v11

# Nine Canyon Farm
## Legal Description

PARCEL 16:

An easement for road purposes, being a strip of land located in Government Lot 3, Section 6, Township 5 North, Range 30, East, W.M., Benton County, Washington, being 20.00 feet in width and having 10.00 feet on each side of the following described centerline lying in said Government Lot 3:

Beginning at the Northwest corner of said Section 6; thence North 89°00'01" East along the North line of said Section 6 a distance of 1988.61 feet to a point on a curve and being the true point of beginning; thence 139.21 feet along a curve to the left having a radius of 667.00 feet, a central angle of 11°57'31", whose radius point bears North 58°42'37" East to a point of tangent; thence South 43°14'54" East a distance of 32.37 feet to a point of curve; thence 123.91 feet along a curve to the right having a radius 314.00 feet, a central angle of 22°36'33", whose radius point bears South 46°45'06" West to a point of tangent; thence South 19°51'36" East a distance of 289.99 feet; thence South 14°27'11" East a distance of 264.36 feet to a point of curve; thence 148.26 feet along a curve to the left having a radius of 400.00 feet, a central angle of 21°14'14", whose radius point bears North 75°32'49" East to a point of tangent; thence South 35°41'25" East a distance of 73.27 feet to a point of curve; thence 92.09 feet along a curve to the right having a radius of 340.00 feet, a central angle of 15°31'05", whose radius point bears South 54°18'35" West to a point of tangent; thence South 20°30'09" East a distance of 52.45 feet to a point of curve; thence 127.51 feet along a curve to the right having a radius of 985.00 feet, a central angle of 7°25'02", whose radius point bears South 69°49'41" West to a point of reverse curve; thence 127.97 feet along a curve to the left having a radius 535.00 feet, a central angle of 13°42'18", whose radius point bears North 77°14'42" East to a point on the South line of said Government Lot 3 and terminus of said centerline.

PARCEL 17:

A strip of land for a permanent right-of-way for the construction, operation, use and maintenance of a buried pipeline being 15.00 feet in width situated in Government Lot 2 of Section 6, Township 5 North, Range 30, East, W.M., Benton County, Washington with 7.5 feet lying on each side of the following described centerline:

Beginning at the Northwest corner of said Section 6; thence North 89°00'00" East along the North line of said Section 6 a distance of 3638.29 feet to the true point of beginning; thence South 28°44'03" West a distance of 693.15 feet to a point on the Easterly margin of an existing pipeline easement and terminus of said centerline. The sidelines of said 15.00 foot strip of land to be lengthened and or shortened to terminate at the North line of said section and the Easterly margin of the easement described as Parcel B-1 below.

PARCEL 18:

An easement for irrigation pipeline over a strip of land located in Government Lot 7 and Government Lot 8, Section 6, Township 5 North, Range 30, East, W.M., Benton County,

4831-5589-2454v.18 0117168-000002
1006813688v11

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 346 of 379

**Nine Canyon Farm**
**Legal Description**

Washington, being 30.00 feet in width and having 15.00 feet on each side of the following described centerline:

Beginning at the West 1/4 corner of said Section 6; thence North 01°13'43" West along the West line of said Section 6 a distance of 1343.05 feet; thence North 89°00'00" East a distance of 2400.41 feet to a point on the North line of Government Lot 7 and the true point of beginning; thence South 19°10'40" East a distance of 740.13 feet to terminus of this easement.

PARCEL 19:

An easement for irrigation pipeline over a strip of land 50 feet wide located in Government Lot 3, Section 6, Township 5 North, Range 30, East, W.M., Benton County, Washington, having 25 feet of said width on either side of the following described centerline:

Beginning at the West 1/4 corner of said Section 6; thence North 59°43'03" East a distance of 2745.85 feet to a point on the South line of said Government Lot 3, being the true point of beginning; thence North 19°10'40" West a distance of 1413.59 feet to a point on the North line of said Government Lot 3 and terminus of this easement.

PARCEL 20:

An easement for pumping plant over a parcel of land lying in Government Lots 7 and 8, Section 6, Township 5 North, Range 30, East, W.M., Benton County, Washington, described as follows:

Beginning at a point lying North 75°30'03" East a distance of 2,662 feet from the 1/4 section corner lying on the West line of said Section 6; thence North 56°00' West 15 feet; thence North 34°00' East 120 feet; thence South 56°00' East 120 feet; thence South 34°00' West 120 feet; thence North 56°00' West a distance of 105 feet to the point of beginning EXCEPTING THEREFROM (1) all that portion lying above the 347.0 foot contour line near where the same crosses the Northwest boundary of subject parcel; (2) all that portion lying within the right of way of Spokane, Portland and Seattle Railway Company (Now Burlington Northern Railway Company).

PARCEL 21:

A 40 foot wide easement for ingress and egress over and across the West 40 feet of Section 19, Township 6 North, Range 30, East, W.M., Benton County, Washington, lying within the following described parcel of land:

Beginning at the Northwest corner of said Section 19; thence South along the West line thereof a distance of 925.00 feet to the true point of beginning; thence South 62°15'12" East a distance of 881.00 feet; thence South parallel to the said West line a distance of 1,390.00 feet; thence North

4831-5589-2454v.18 0117168-000002
1006813688v11

62°15'12" West a distance of 881.00 feet to a point on the West line of said Section 19; thence North along said West line a distance of 1,390.00 feet to the true point of beginning.

PARCEL 22:

A 50 foot wide easement for ingress and egress over and across that portion of Section 19, Township 6 North, Range 30, East, W.M., Benton County, Washington, described as follows:

Beginning at the Northwest corner of Section 19; thence South along the West line thereof a distance of 925.00 feet to the true point of beginning; thence South 62°15'12" East a distance of 881.00 feet; thence South parallel to the said West line a distance of 1,390.00 feet; thence North 62°15'12" West a distance of 881.00 feet to a point on the West line of said Section 19; thence North along said West line a distance of 1,390.00 feet to the true point of beginning where the same is crossed by a 50 foot wide strip of land, the centerline of which is described as follows:

Beginning at the Northwest corner of Section 19, Township 6, North, Range 30, E.W.M., Benton County, Washington; thence South 1°10'52" East, along the West line thereof a distance of 2,351.38 feet to the true point of beginning; thence South 65°06'00" East a distance of 1,554.75 feet.

PARCEL 23:

A 50 foot wide easement for ingress and egress over a portion of Sections 19 and 30, Township 6 North, Range 30 East, W.M., Benton County, Washington, the centerline of which is described as follows:

Beginning at the Northwest corner of said Section 19; thence South 1°10'52" East, along the West line thereof a distance of 2,351.38 feet to the true point of beginning; thence South 65°06'00" East, a distance of 1,554.75 feet; thence South 68°07'00" East, a distance of 356.56 feet; thence along a curve in a clockwise direction having a delta angle of 51°53'30", an arc distance of 398.50 feet, a radius of 440.00 feet, and a chord of South 42°10'15" East, a distance of 385.02 feet; thence along a curve in a clockwise direction having a delta angle of 27°22'40", an arc distance of 477.84 feet, a radius of 1000.00 feet, and a chord of South 29°54'50" East, a distance of 473.30 feet; thence along a curve in a clockwise direction having a delta angle of 62°44'10", an arc distance of 667.92 feet, a radius of 610.00 feet, and a chord of 12°14'05" East, a distance of 635.05 feet; thence South 19°08'00" West, a distance of 267.25 feet; thence along a curve in a counter clockwise direction having a delta angle of 28°32'00", an arc distance of 298.80 feet, a radius of 600.00 feet, and a chord of South 4°52'00" West, a distance of 295.72 feet; thence South 9°24'00" East, a distance of 276.54 feet; thence along a curve in a clockwise direction, having a delta angle of 42°20'00", an arc distance of 221.66 feet, a radius of 300.00 feet, and a chord of South 11°46'00" West, a distance of 216.65 feet; thence South 32°56'00" West, a distance of 602.87 feet; thence along a curve in a counter clockwise direction having a delta angle of 45°39'00", an arc distance of 478.04 feet a radius of 600.00 feet, and a chord of South 10°06'20" West, a distance of 465.50 feet; thence South 12°43'00" East, a distance of

23

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 348 of 379

95.13 feet; thence along a curve in a counter clockwise direction having a delta angle of 51°00'00" an arc distance of 311.54 feet, a radius of 350.00 feet, and a chord of South 38°13'00" East, a distance of 301.36 feet; thence South 63°43'00" East, a distance of 177.12 feet; thence South 70°46'00" East, a distance of 394.15 feet; thence South 62°06'00" East, a distance of 309.36 feet; thence South 56°07'00" East, a distance of 467.56 feet; thence South 42°47'00" East, a distance of 691.39 feet; thence along a curve in a clockwise direction having a delta angle of 22°14'00", an arc distance of 252.23 feet, a radius of 650.00 feet, and a chord of South 31°40'00" East, a distance of 250.65 feet; thence South 20°33'00" East, a distance of 199.11 feet; thence along a curve in a clockwise direction having a delta angle of 32°22'00", an arc distance of 310.40 feet, a radius of 550.00 feet, and a chord of South 4°22'00" East, a distance of 306.58 feet; thence South 11°49'00" West, a distance of 194.44 feet; thence South 2°53'00" East, a distance of 298.02 feet; thence along a curve in a counter clockwise direction having a delta angle of 40°45'00", an arc distance of 355.61 feet, a radius of 500.00 feet, and a chord of South 23°15'30" East, a distance of 348.16 feet; thence South 43°38'00" East a distance of 153.02 feet; thence along a curve in a counter clockwise direction having a delta angle of 65°34'00", an arc distance of 343.31 feet, a radius of 300.00 feet, and a chord of South 76°25'00" East, a distance of 324.88 feet; thence North 70°48'00" East, a distance of 230.63 feet; thence along a curve in a counter clockwise direction having a delta angle of 35°53'00" an arc distance of 187.89 feet, a radius of 300.00 feet, and a chord of North 52°51'30" East, a distance of 184.83 feet; thence North 34°55'00" East, a distance of 172.28 feet; thence North 42°30'00" East, a distance of 272.61 feet; thence along a curve in a clockwise direction having a delta angle of 157°55'00", an arc distance of 206.71 feet, a radius of 75.00 feet, and a chord of South 58°32'30" East a distance of 147.22 feet; thence South 20°25'00" West, a distance of 182.67 feet; thence South 7°58'00" West, a distance of 277.49 feet; thence along a curve in a clockwise direction having a delta angle of 45°58'00" and arc distance of 240.68 feet, a radius of 300.00 feet, and a chord of South 30°57'00" West, a distance of 234.28 feet; thence South 53°56'00" West, a distance of 353.75 feet; thence along a curve in a counter clockwise direction having a delta angle of 30°36'46", an arc distance of 170.97 feet, a radius of 320.00 feet, and a chord of South 38°37'37" West, a distance of 168.95 feet to the terminus point of the centerline herein described.

PARCEL 24:

A 20 foot wide easement for ingress and egress over and across the West 20 feet of the following two parcels: (1) the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4 of Section 19, Township 6 North, Range 30, East, W.M., Benton County, Washington and (2) the South 1/2 of the Northwest 1/4 of the Southwest 1/4 of the Southwest 1/4 of the Southwest 1/4 of said Section 19.

PARCEL 25:

An easement for an irrigation pipeline described as follows: A strip of land 50 feet wide located in Government Lot 2, of Section 6, Township 5 North, Range 30, East, W.M., Benton County, Washington, having 25 feet of said width on either side of the following described centerline:

4831-5589-2454v.18 0117168-000002
1006813688v11

**Nine Canyon Farm**
**Legal Description**

Beginning at the West 1/4 corner of said Section 6; thence North 01°13'54" West along the West line of said Section 6, a distance of 1343.05 feet; thence North 89°00'00" East a distance of 3001.29 feet to a point on the South line of said Government Lot 2 and the true point of beginning; thence North 04°26'05" East a distance of 262.92 feet; thence North 25°55'29" East a distance of 1212.76 feet to a point on the North line of Section 6, said point being North 89°00'00" East of the Northwest corner of said Section 6 a distance of 3580.77 feet and terminus of this easement.

PARCEL 26:

An easement for ingress and egress reserved in paragraph 2 of that certain Easement Agreement recorded under Auditor's File No. 93-23911, as modified by document recorded under Auditor's File No. 95-9435, as further modified by document recorded under Auditor's File No. 95-9437

PARCEL 27:

Easements for ingress, egress, and utilities, over, under, and across the following described real property:

STRIPS OF LAND located in Sections 19, 28, 30, 31 and 33 Township 6 North, Range 30 East Willamette Meridian and in Sections 24 and 25 Township 6 North, Range 29 East Willamette Meridian all in Benton County, Washington. Said strips of land being described as follows:

Strips of land located in Sections 30 and 31, Township 6 North, Range 30 East Willamette Meridian, and in Sections 24 and 25 Township 6 North, Range 29 East Willamette Meridian, Benton County, Washington, said strips being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerlines:

Beginning at the Southeast corner of said Section 24; thence along the East line of said Section 24 North 01°11'49" West, 232.99 feet to the true point of beginning; thence South 54°18'10" West, 28.25 feet; thence South 58°43'11" West, 72.29 feet; thence South 38°19'15" West, 51.82 feet; thence South 47°15'00" West, 170.38 feet to the beginning of 650.00 feet radius curve to the left,; thence along said curve an arc length of 283.23 feet, through an included angle of 24°57'57" to a point of compound curvature of a 900.00 feet radius to the left; thence along said curve an arc length of 540.37 feet, through an included angle of 34°24'05"; thence South 12°07'02" East, 60.58 feet, to the beginning of 900.00 feet radius curve to the left; thence along said curve an arc length of 421.59 feet through an included angle of 26°50'22"; thence South 38°57'24" East, 226.78 feet; thence South 32°22'23" East, 613.56 feet; thence South 41°54'55" East, 450.34 feet to the beginning of 1000.00 feet radius curve to the right; thence along said curve an arc length of 382.26 feet through an included angle of 21°54'07"; thence South 20°00'48" East, 74.62 feet to the beginning of 1000.00 feet radius curve to the right; thence along said curve an arc length of 500.61 feet through an included angle of 28°40'59"; thence South 08°40'11" West, 150.54 feet; thence South 12°52'27" West, 160.19 feet; thence South 16°58'30" West, 75.61 feet to a point hereinafter referred to as Point "A;" thence

25

4831-5589-2454v.18 0117168-000002
1006813688v11

continuing South 16°58'30" West, 123.39 feet; thence South 21°18'49" West, 246.24 feet; thence South 24°35'21" West, 159.72 feet; thence South 27°44'03" West, 326.43 feet; thence South 30°40'00" West, 236.90 feet; thence South 34°28'08" West, 388.85 feet; thence South 28°20'26" West, 223.44 feet; thence South 23°58'48" West, 118.04 feet; thence South 18°09'34" West, 97.99 feet; thence South 13°38'46" West, 81.28 feet; thence South 07°35'47" West, 66.97 feet to a point hereinafter referred to as Point "B;" thence continuing South 07°35'47" West, 53.81 feet to a point on the South line of Section 25 Township 6 North, Range 29 East Willamette Meridian and the terminus of the centerline. Said terminus point bears South 89°44'32" West, 316.71 feet from the Southeast corner of said Section 25. The side lines of the easement to be shortened or lengthened to meet the said South line of Section 25 and the said East line of Section 24.

A strip of land located in Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the aforementioned Point "A"; thence South 01°36'16" West, 66.84 feet to the beginning of a 750.00 feet radius curve; thence along said curve to the left an arc length of 131.15 feet through an included angle of 10°01'07" to a point of compound curvature of a 1066.00 feet radius curve; thence along said curve to the left an arc length of 772.09 feet through an included angle of 41°29'55" to a point of compound curvature of a 2000.00 feet radius curve; thence along said curve to the left an arc length of 200.65 feet through an included angle of 5°44'53"; thence South 55°39'39" East, 158.20 feet to a point hereinafter referred to as Point "C"; thence continuing South 55°39'39" East, 18.27 feet to the beginning of a 354.55 feet radius curve; thence along said curve to the left an arc length of 151.24 feet through an included angle of 24°26'25" to a point herein after referred to as Point "D"; thence continuing along said curve to the left an arc length of 106.37 feet through an included angle of 17°11'24"; thence North 82°42'32" East, 64.59 feet to the beginning of a 2276.42 feet radius curve; thence along said curve to the left an arc length of 252.03 feet through an included angle of 6°20'36" to a point of compound curvature of a 1060.00 feet radius curve; thence along said curve to the left an arc length of 315.74 feet through an included angle of 17°03'59"; thence North 71°59'10" East, 46.48 feet to the beginning of a 850.00 feet radius curve; thence along said curve to the left an arc length of 354.97 feet through an included angle of 23°55'39"; thence North 48°03'31" East, 38.08 feet to the beginning of a 1348.84 feet radius curve; thence along said curve to the left an arc length of 474.19 feet through an included angle of 20°08'32" to the terminus of the centerline.

A strip of land being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the aforementioned Point "B"; thence North 41°00'03" East, 197.91 feet; thence North 30°30'20" East, 25.66 feet to the beginning of a 1200 feet radius curve; thence along said curve to the right an arc length of 1003.97 feet through an included angle of 47°56'10"; thence North 78°26'29" East, 149.57 feet to the beginning of a 1350.00 feet radius curve; thence along said curve to the right an arc length of 454.93 feet through an included angle of 19°18'28"; thence South 82°15'03" East, 26.48 feet to the aforementioned Point "C" and the terminus of the described centerline.

4831-5589-2454v.18 0117168-000002
1006813688v11

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 351 of 379

## Nine Canyon Farm
## Legal Description

A strip of land being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the aforementioned Point "D"; thence South 59°57'03" East, 64.02 feet to the beginning of a 1500.00 feet radius curve; thence along said curve to the right an arc length of 163.06 feet through an included angle of 6°13'42"; thence South 53°43'21" East, 156.61 feet to the beginning of a 700.00 feet radius curve; thence along said curve to the right an arc length of 258.78 feet through an included angle of 21°10'52"; thence South 32°32'29" East, 90.93 feet to the beginning of 900.00 feet radius curve; thence along said curve to the right an arc length of 334.11 feet through an included angle of 21°16'13"; thence South 11°16'16" East, 190.18 feet; thence South 03°39'07" East, 171.87 feet to the terminus of the centerline.

A strip of land located in Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the Northwest corner of said Section 31; thence along the West line of said Section 31 South 01°11'49" East, 1399.02 feet to a point on a 910.00 feet radius curve whose center bears South 53°18'41" West and the true point of beginning; thence along said curve to the right an arc length 1041.79 feet through an included angle of 65°35'37" around a long chord measuring 985.82 feet, bearing South 03°53'30" East; thence South 28°54'18" West, 92.42 feet to a point on the West line of Section 31 and the terminus of the described centerline. The side lines of the easement to be lengthened or shortened to meet the West line of Section 31.

A strip of land located in Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the Southwest corner of said Section 31; thence along the West line of said Section 31, North 01°11'49" West, 571.04 feet and the true point of beginning; thence South 43°46'37" East, 151.96 feet; thence South 40°24'30" East, 170.36 feet; thence South 60°35'21" East, 181.61 feet to the beginning of a 200 feet radius curve to the left; thence along said curve an arc length of 133.78 feet through an included angle of 38°19'35"; thence North 81°05'04" East, 299.49 feet to the beginning of a 1000 feet radius curve to the left; thence along said curve an arc length of 105.80 feet through an included angle of 6°03'42"; thence North 75°01'22" East, 231.49 feet to a point hereafter designated Point "E"; thence continuing North 75°01'22" East, 8.72 feet to the beginning of a 1000 feet radius curve to the left; thence along said curve an arc length of 116.63 feet through an included angle of 6°40'56"; thence North 68°20'26" East; 144.03 feet to the beginning of a 1000 feet radius curve to the right; thence along said curve an arc length of 130.49 feet through an included angle of 7°28'36"; thence North 75°49'02" East; 76.50 feet to the beginning of a 200 feet radius curve to the right; thence along said curve an arc length of 118.61 feet through an included angle of 33°58'47"; thence South 70°12'11" East, 79.32 feet; thence South 51°42'16" East, 19.24 feet to a point on the East line of Parcel 3 (defined below) and the terminus of the described centerline. The side lines of the easement to be lengthened or shortened to meet the West line of Section 31 and the East line of Parcel 3.

4831-5589-2454v.18 0117168-000002
1006813688v11

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 352 of 379

**Nine Canyon Farm**
**Legal Description**

A strip of land located in Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the afore designated Point "E"; thence North 16°33'34" East, 173.90 feet; thence North 41°26'26" East, 283.03 feet; thence North 49°23'21" East, 217.03 feet; thence North 38°58'41" East, 197.62 feet; thence North 31°07'39" East, 153.43 feet to the East line of Parcel 2 and the terminus of the described centerline. The sidelines of the easement to be lengthened or shortened to meet the East line of said Parcel 3.

A strip of land located in Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the Northwest corner of said Section 31; thence South 1°11'49" East, 1376.95 feet along the West line of said Section 31 to a point on the arc of a 1294.09 feet radius curve (radius point bears North 43°44'09" East) and the true point of beginning; thence Easterly 2178.82 feet along the arc of said curve through a central angle of 96°28'02"; thence leaving said curve South 79°58'47" East, 30.00 feet to the terminus of said centerline.

A strip of land located in Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the Northwest corner of said Section 31; thence South 1°11'49" East, 2509.26 feet along the West line of said Section 31 to a point on the arc of a 1209.08 feet radius curve (radius point bears South 30°52'56" East) and the true point of beginning; thence Easterly 1988.12 feet along the arc of said curve through a central angle of 94°12'45"; thence leaving said curve North 88°45'44" East, 30.00 feet to the terminus of said centerline.

A strip of land located in the Northwest quarter of The Northwest quarter of Section 33, Township 6 North, Range 30 East Willamette Meridian and more particularly described as follows: The North sixty feet and the West sixty feet of the Northwest quarter of the Northwest quarter of Section 33.

A strip of land located in the West half of the Southwest quarter of Government Lot 4 Section 19 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the Southwest corner of said Section 19; thence along the West line of said Section 19, North 01°11'49" West, 232.99 feet to the true point of beginning; thence North 54°18'10" East, 35.48 feet to the beginning of a 600 feet radius curve; thence along said curve an arc length of 232.45 feet through an included angle of 22°11'49"; thence North 76°29'59" East, 85.80 feet to the West line of the East half of the Southwest quarter of Government Lot 4 and the terminus of the centerline. The side lines of the easement to be lengthened or shortened to meet

4831-5589-2454v.18 0117168-000002
1006813688v11

21-00141-WLH11   Doc 830   Filed 06/21/21   Entered 06/21/21 17:28:37   Pg 353 of 379

the West line of Section 19 and the West line of the East half of the Southwest quarter of Government Lot 4.

A strip of land located in Section 28 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington more particularly described as follows:
Beginning at the Southwest corner of said Section 28; thence along the West line of said Section 28, North 01°02'15" West, 46.05 feet; thence North 84°06'41" East, 23.59 feet to the beginning of an 690.00 feet radius curve to the right; thence along said curve an arc length of 144.27 feet, through an included angle of 11°58'47"; thence South 83°54'32" East, 651.41 feet, to a point on the South line of said Section 28; thence along said South line North 88°31'46" West, 814.84 feet to the Southwest corner of said Section 28 and the point of beginning.

As used herein, the term "Parcel 3" shall mean the following described real property:
A parcel of land located in the West half of Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington lying Westerly of the following described line: Beginning at the Southwest corner of said Section 31; thence along the South line of said Section 31, North 88°59'38" East, 1917.03 feet to the True Point of Beginning; thence North 20°29'35" West, 310.16 feet; thence North 16°19'09" West, 127.49 feet; thence North 05°31'51" West, 559.30 feet; thence North 00°19'28" East, 152.44 feet; thence North 06°36'17" East, 228.33 feet; thence North 10°31'48" West, 115.80 feet to a point on a 1209.08 feet radius curve whose center bears North 74°14'04" West; thence along said curve to the left an arc length of 820.72 feet through an included angle of 38°53'32" around a long chord measuring 805.06 feet and bearing North 03°40'50" West; thence North 01°14'16" West, 813.07 feet; thence North 14°03'09" East, 472.97 feet; thence North 10°01'13" East, 640.41 feet to a point on a 1294.09 feet radius curve whose center bears North 55°47'34" West; thence along said curve to the left an arc length of 1239.67 feet through an included angle of 54°53'11" around a long chord measuring 1192.81 feet and Bearing North 06°45'50" East to a point on the North line of Section 31 and the terminus of the described line. Said terminus point bears North 89°35'15" East, 2134.18 feet from the Northwest corner of said Section 31.

PARCEL 28:

Easements for the location, maintenance, repair, and operation of buried irrigation pipelines described as follows:

A strip of land located in Government Lot 4 of Section 19 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington, 100 feet in width with 50 feet of width lying on each side of the following described centerline:
Beginning at the Southwest corner of said Section 19; thence along the South line of said Section 19, South 89°31'53" East, 573.68 feet to the true point of beginning; thence north 17°27'50" west, 387.79 feet to the terminus of the centerline on a 923.06 feet radius curve whose center bears South 00°11'26" West. The sidelines of the easement to be lengthened or shortened to meet said curve and the South line of said Section 19.

4831-5589-2454v.18 0117168-000002
1006813688v11

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 354 of 379

**Nine Canyon Farm**
**Legal Description**

A parcel of land located in the Northwest quarter of Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington and more particularly described as follows:
Beginning at the Northwest corner of said Section 30; thence along the North line of said Section 30, South 89°31'53" East, 521.13 feet to the True Point of Beginning; thence South 17°27'50" East, 1430.61 feet; thence North 72°32'10" East, 10.00 feet to a point on a 953.06 feet radius curve, whose center bears North 32°01'02" West; thence along said curve an arc length of 94.35 feet through an included angle of 05°40'19", around a long chord measuring 94.31 feet, bearing North 55°08'48" East; thence North 17°27'50" West, 1370.06 feet to a point on the North line of Section 30; thence North 89°31'53" West along the North line of Section 30, 105.11 feet to the True Point of Beginning.

A parcel of land located in Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington and more particularly described as follows:
Beginning at the Southwest corner of said Section 30; thence along the South line of said Section 30, North 89°35'15" East, 2259.71 feet; thence North 17°14'03" East, 924.27 feet; thence North 14°39'41" East, 118.56 feet to a point on a 1184.08 feet radius curve whose center bears North 41°12'50" West and the True Point of Beginning; thence along said curve to the left an arc length of 205.54 feet through an included angle of 9°56'44" around a long chord measuring 205.29 feet, bearing North 43°48'47" East; thence North 14°39'41" East, 969.97 feet to a point on a 1184.08 feet radius curve whose center bears South 80°28'57" West; thence along said curve to the left an arc length of 286.46 feet through an included angle of 13°51'41" around a long chord measuring 285.76 feet, bearing North 16°26'54" West; thence North 63°35'00" West, 689.86 feet; thence North 65°01'13" West, 864.02 feet to a point on a 1184.08 feet radius curve whose center bears south 15°23'08" east; thence along said curve to the left an arc length of 130.74 feet through an included angle of 6°19'35" around a long chord measuring 130.68 feet, bearing South 71°27'04" West; thence South 24°58'47" West, 10.00 feet; thence South 65°01'13" East, 957.51 feet; thence South 63°35'00" East, 758.08 feet; thence South 14°39'41" West, 1281.86 feet to the True Point of Beginning.

A parcel of land located in the Southwest quarter of Section 31, Township 6 North, Range 30 East, Willamette Meridian, Benton County, Washington, and more particularly described as follows:
Beginning at the Southwest corner of said Section 31; thence along the South line of said Section 31, North 88°59'36" East, 1917.03 feet; thence North 20°29'35" West, 310.16 feet; thence North 16°19'09" West, 127.49 feet; Thence North 05°31'51" West, 559.30 feet; thence North 00°19'28" East, 152.44 feet; thence North 06°36'17" East, 228.33 feet; thence North 10°31'48" West, 115.80 feet to a point on a 1209.08 feet radius curve whose center bears North 74°14'04" West and the True Point of Beginning; thence along said curve to the left an arc length of 820.72 feet through an included angle of 38°53'32" around a long chord measuring 805.06 feet and bearing North 03°40'50" West; thence South 01°14'16" East, 200.14 feet; thence South 03°25'17" West, 149.43 feet; thence South 03°33'41" East, 228.02 feet; thence South 10°31'48" East, 230.43 feet to the True Point of Beginning.

4831-5589-2454v.18 0117168-000002
1006813688v11

**Nine Canyon Farm**
**Legal Description**

A parcel of land located in the West half of Section 31 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington and more particularly described as follows: Beginning at the Southwest corner of said Section 31; thence along the South line of said Section 31, North 88°59'36" East, 1917.03 feet; thence North 20°29'35" West, 310.16 feet; thence North 16°19'09" West, 127.49 feet; thence North 05°31'51" West, 559.30 feet; thence North 00°19'28" East, 152.44 feet; thence North 06°36'17" East, 228.33 feet; thence North 10°31'48" West, 115.80 feet to a point on a 1209.08 feet radius curve whose center bears North 74°14'04" West; thence along said curve to the left an arc length of 820.72 feet through an included angle of 38°53'32" around a long chord measuring 805.06 feet and bearing North 03°40'50" West; thence North 01°14'16" West, 813.07 feet; thence North 14°03'09" East, 472.97 feet; thence North 10°01'13" East, 640.41 feet to a point on a 1294.09 feet radius curve whose center bears North 55°47'34" West and to the True Point of Beginning; thence along said curve to the left an arc length of 998.58 feet through an included angle of 44°12'44" around a long chord measuring 973.99 feet and bearing North 12°06'04" East; thence South 17°14'03" West, 281.64 feet; thence South 10°01'13" West, 693.93 feet to the True Point of Beginning.

PARCEL 29:

An easement in, on, and across the following described real property for work area, which easement shall include, but not be limited to, the right to move, store (on a non-permanent basis), and remove, bins, vehicles, equipment, and supplies:

A parcel of land located in Government Lot 4 of Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington and more particularly described as follows: Beginning at the Southwest corner of said Section 30; thence along the West line of said Section 30 North 01°11'49" West, 1030.39 feet; thence North 88°48'11" East, 947.56 feet to the True Point of Beginning; thence South 49°13'56" East, 287.00 feet; thence South 89°58'28" West, 263.00 feet; thence North 13°40'40" East, 193.00 feet to the True Point of Beginning.

PARCEL 30:

An easements over and across the following described real property for utility purposes:

(a)A strip of land located in Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington, said strip being 50.00 feet in width with 20.00 feet of said width lying on the left and 30.00 feet of said width lying on the right side the following described centerline:
Beginning at the Northwest corner of said Section 30; thence along the West line of said Section 30 South 01°11'49" East, 2388.82 feet; thence North 88°48'11" East, 676.58 feet to the True Point of Beginning; thence continuing North 88°48'11" East, 50.00 feet to the terminus of the described centerline.

4831-5589-2454v.18 0117168-000002
1006813688v11

(b)A strip of land located in Section 30 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 20.00 feet in width with 10.00 feet of said width lying on each side of the following described centerline:
Beginning at the Northwest corner of said Section 30; thence along the West line of said Section 30 South 01°11'49" East, 2388.82 feet; thence North 88°48'11" East, 676.58 feet; thence continuing North 88°48'11" East, 50.00 feet to the True Point of Beginning; thence continuing North 88°48'11" East, 729.53 feet; thence North 79°27'29" East, 432.46 feet; thence South 73°32'42" East, 270.98 feet; thence North 27°29'02" East, 659.37 feet; thence South 65°19'47" East, 70.00 feet to the terminus of the described centerline.

PARCEL 31:

Easements for ingress, egress, and utilities, over, under, and across the following described real property: A strip of land located in Section 19, Township 6 North, Range 30 East Willamette Meridian in Benton County, Washington. Said strip of land being described as follows:
A strip of land located in the West half of the Southwest quarter of Government Lot 4 Section 19 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington said strip being 60.00 feet in width with 30.00 feet of said width lying on each side of the following described centerline:
Beginning at the Southwest corner of said Section 19; thence along the West line of said Section 19, North 01°11'49" West, 232.99 feet to the true point of beginning; thence North 54°18'10" East, 35.48 feet to the beginning of a 600 feet radius curve; thence along said curve an arc length of 232.45 feet through an included angle of 22°11'49"; thence North 76°29'59" East, 85.80 feet to the West line of the East half of the Southwest quarter of Government Lot 4 and the terminus of the centerline. The side lines of the easement to be lengthened or shortened to meet the West line of Section 19 and the West line of the East half of the Southwest quarter of Government Lot 4.

PARCEL 32:

An easement for the location, maintenance, repair, and operation of a buried irrigation pipeline described as follows:
A strip of land located in Government Lot 4 of Section 19 Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington, 100 feet in width with 50 feet of width lying on each side of the following described centerline:
Beginning at the Southwest corner of said Section 19; thence along the South line of said Section 19, South 89°31'53" East, 573.68 feet to the true point of beginning; thence north 17°27'50" west, 387.79 feet to the terminus of the centerline on a 923.06 feet radius curve whose center bears South 00°11'26" West. The sidelines of the easement to be lengthened or shortened to meet said curve and the South line of said Section 19.

4831-5589-2454v.18 0117168-000002
1006813688v11

21-00141-WLH11   Doc 830   Filed 06/21/21   Entered 06/21/21 17:28:37   Pg 357 of 379

**Nine Canyon Farm**
**Legal Description**

PARCEL 33:

A 20-foot wide non-exclusive easement for ingress and egress over and across that portion of the West 20 feet of Sections 30 and 31, Township 6 North, Range 30 East, W.M., lying within the real property conveyed under that certain Statutory Warranty Deed recorded under Benton County Auditor's File No. 2005-011453.

4831-5589-2454v.18 0117168-000002
1006813688v11

# RIVER FARM
## <u>LEGAL DESCRIPTION</u>

PARCEL 34: (122602000000000 and 127602000000000)

Section 22, Township 6 North, Range 30 East, W.M., Benton County, Washington, and the North 1/2 of Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT the Southeast quarter of the Northeast quarter of said Section 27; AND ALSO EXCEPT that portion of said Section 22 and Section 27 lying Easterly of the following described centerline:

Commencing at the West quarter corner of said Section 27;
thence North 88°25'05" East 830.79 feet along the South line of the North half thereof to the centerline of the existing river access road and the True Point of Beginning;
thence along said centerline the following bearings and distances;
thence North 13°32'32" East 413.89 feet;
thence North 33°24'40" East 417.71 feet;
thence North 24°32'16" East 125.14 feet;
thence North 32°34'43" East 390.24 feet;
thence North 42°10'26" East 267.96 feet;
thence North 30°03'57" East 148.51 feet;
thence North 12°20'25" East 264.13 feet;
thence North 04°21'08" East 341.89 feet;
thence North 16°48'23" West 63.54 feet;
thence North 45°28'04" West 46.91 feet to the intersection of an existing farm road;
thence along said centerline the following bearings and distances;
thence North 03°09'03" East 177.44 feet;
thence North 00°09'56" East 465.38 feet;
thence North 05°41'43" East 103.99 feet;
thence North 10°39'15" East 121.08 feet;
thence North 15°25'36" East 111.98 feet;
thence North 17°08'00" East 1725.87 feet;
thence North 17°26'47" East 128.61 feet;
thence North 16°34'51" East 129.88 feet;
thence North 16°24'25" East 131.77 feet;
thence North 16°08'19" East 115.56 feet;
thence North 17°04'45" East 121.58 feet;
thence North 18°06'12" East 137.21 feet;
thence North 19°19'27" East 372.24 feet;
thence North 19°55'22" East 278.61 feet;
thence North 24°45'34" East 104.38 feet;
thence North 28°19'28" East 117.96 feet;
thence North 28°51'35" East 114.65 feet;
thence North 36°43'00" East 131.30 feet;
thence North 47°28'16" East 133.05 feet;

4831-5589-2454v.18 0117168-000002
1006813688v11

thence North 41°49'59" East 130.92 feet;
thence North 36°06'09" East 111.02 feet;
thence North 31°58'37" East 151.23 feet;
thence North 38°07'28" East 105.75 feet;
thence North 44°54'02" East 109.65 feet;
thence North 43°17'45" East 106.90 feet;
thence North 41°00'56" East 119.24 feet;
thence North 36°32'59" East 103.29 feet;
thence North 29°26'26" East 106.12 feet;
thence North 22°29'40" East 115.80 feet;
thence North 21°31'04" East 103.79 feet;
thence North 32°47'25" East 119.34 feet;
thence North 54°53'36" East 109.28 feet;
thence North 70°15'49" East 109.49 feet;
thence North 78°46'19" East 112.28 feet;
thence North 80°32'41" East 123.19 feet;
thence North 80°55'28" East 111.19 feet;
thence North 79°31'08" East 100.13 feet;
thence North 73°27'59" East 133.21 feet;
thence North 68°04'32" East 122.55 feet; to a point on the North line of said Section 22, lying South 88°53'05" West 623.99 feet from the Northeast corner thereof and the terminus of this centerline.

PARCEL 35: (121600000000000, 128601000000000, 128602000001000 and 120601000000000)

All of Section 21; the East half of the East half of Section 20; the North half and the Southwest quarter and the Northwest quarter of the Southeast quarter of Section 28, EXCEPT a parcel of land situated in the Southwest quarter of the Southwest quarter of Section 28, described as follows:

The Southwest corner of said Section 28, being the True Point of Beginning;
thence North 01°05'50" West along the West line of said Section 28 a distance of 349.60 feet;
thence South 85°15'42" East a distance of 1,337.74 feet; thence South 00°00' East a distance of 221.87 feet to a point on the Southerly line of said Section 28;
thence South 89°15'32" West along said South line a distance of 1,326.59 feet to the Southwest corner of said Section 28 and the True Point of Beginning, all in Township 6 North, Range 30 East, W.M., Benton County, Washington.

PARCEL 36: (115604000001000)

That portion of the South half of Section 15, Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

1006813688v11

**River Farm**
**Legal Description**

The Southeast corner of said Section 15 being the True Point of Beginning;
thence South 88°53'07" West along the Southerly line of said Section 15, a distance of 4,159.72 feet thence North 48°58'02" East a distance of 3,270.68 feet; thence South 89°58'08" East a distance of 1,653.99 feet to the Easterly line of said Section 15;
thence South 01°02'51" East along said East line a distance of 2,065.70 feet to the Southeast corner of said Section 15 and the True Point of Beginning.

PARCEL 37: (127603000002000)

An undivided one-half interest in and to:

A strip of land situate in Government Lot 4, Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, being 60 feet in width 30 feet lying on each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence North 88°35'17" East along the North line of said Government Lot 4, 168.86 feet to the True Point of Beginning of said centerline and right of way; thence South 15°38'26" East 405.51 feet; thence South 51°50'44" East 629.30 feet;
thence South 10°34'03" West 666.48 feet to the terminus of said centerline.

PARCEL 38: (127603000003000)

An undivided one-half interest in and to:

A strip of land 200 feet in width situated in Government Lot 4, Section 27, township 6 North, Range 30 East, W.M., Benton County, Washington, with 100.00 feet of said width lying in each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence South 01°03'24" East along the West line of said Section 27 a distance of 1,616.27 feet;
thence along a line perpendicular to said West line North 88°56'36" East a distance of 556.17 feet to a point on the Northwesterly right of way line of the Spokane, Portland & Seattle Railway Company, said point being the True Point of Beginning and lying Northwesterly 100.00 feet when measured perpendicular to railroad centerline station 6456+45.3 and railroad mile 207.83; thence North 21°36'15" West perpendicular to said railroad right of way a distance of 150.00 feet to the terminus of said centerline.

PARCEL 39: (110603000000000 and 115602000000000)

That portion of Sections 10 and 15, Township 6 North, Range 30 East, W.M., Benton County, lying North and West of the following described line:

Beginning at the Southwest corner of said Section 15;

1006813688v11

thence North 1°27'28" West along the West line of said Section 15, 1,060.00 feet;
thence North 88°33'31" East 1,304.20 feet;
thence North 49°26'57" East 780.68 feet;
thence North 1°26'29" West 1,920.00 feet;
thence North 39°43'36" East 1,162.50 feet;
thence North 60°39'13" East 2,060.55 feet to the North line of said Section 15, said point being South 89°03'16" West 847.82 feet from the Northeast corner of said Section 15;
thence continuing North 60°39'13" East 522.64 feet;
thence North 0°13'17" West 1,085.00 feet to a point on the North line of the South half of the South half of said Section 10, said point being South 89°06'19" West 400 feet from the Northeast corner of said South half of the South half and the terminus of said line.

PARCEL 40: (103600000000000, 104603000000000, 109601000000000, 110601000000000, 110602000000000)

Section 3; South half of Section 4; North half of Section 9; North half of Section 10; North half of South half of Section 10; EXCEPT the South 200 feet of the East 200 feet of said Section 10; all in Township 6 North, Range 30 East, W.M., Benton County, Washington; EXCEPT Finley Road; AND EXCEPT Brown Road.

PARCEL 41: (127603000002000)

An undivided one-half interest in and to:

A strip of land situated in Government Lot 4, Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, being 60.00 feet in width with 30.00 feet lying on each side of the following described centerline:

Beginning at the West quarter corner of said Section 27; thence North 88°35'17" East along the North line of said Government Lot 4, 168.86 feet to the True Point of Beginning of said centerline and right of way;
thence South 15°38'26" East 405.51 feet;
thence South 51°50'44" East 629.30 feet;
thence South 10°34'03" West 666.48 feet to the terminus of said centerline.

PARCEL 42: (127603000003000)

An undivided one-half interest in and to:

A strip of land 200 feet in width situated in Government Lot 4, Section 27, Township 6 North, Range 30 East, W.M., Benton County, Washington, with 100.00 feet of said width lying on each side of the following described centerline:

1006813688v11

**River Farm**
**Legal Description**

Beginning at the West quarter corner of said Section 27; thence South 01°03'24" East along the West line of said Section 27 a distance of 1,616.27 feet;
thence along a line perpendicular to said West line North 88°56'36" East a distance of 556.17 feet to a point on the Northwesterly right of way line of the Spokane, Portland & Seattle Railway Company, said point being the True Point of Beginning and lying Northwesterly 100.00 feet when measured perpendicular to railroad centerline station 6456+45.3 and railroad mile 207.83; thence North 21°36'15" West perpendicular to said railroad right of way a distance of 150.00 feet to the terminus of said centerline.

PARCEL 43: (109603000000000)

The South half of Section 9, Township 6 North, Range 30 East, W.M., Benton County, Washington.

PARCEL 44: (107602000001001)

Section 7, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT the North half of the North half thereof; AND EXCEPT portions conveyed to Benton County for road purposes by Deeds recorded under Recording Nos. 624663 and 624762.

And Also Except that portion of said Section described as follows:

Beginning at the Southwest corner of said Section 7; thence North 00°13'16" East, 1019.91 feet along the West line of said Section 7; thence South 89°44'41" East, 30.00 feet to the East line of Nine Canyon Road and the True Point of Beginning.; thence South 89°44'41" East 988.81 feet; thence South 00°13'16" West, 979.91 feet to a point 40.00 feet Northerly of the South line of said Section 7; thence North 89°44'41" West, 988.81 feet parallel with and 40.00 feet Northerly of said South line to a point on the East line of said Nine Canyon road; thence North 00°13'16" East, 979.91 feet along said East line to the True Point of Beginning.

AND ALSO EXCEPT that portion of said Section described as follows:

Beginning at the West Quarter corner of said Section 7; thence North 00°13'16" East 850.00 feet along the West line of said Section 7; thence South 89°46'44" East 60.00 to the East line of Nine Canyon Road and to the True Point of Beginning;

Thence Continuing South 89°46'44" East 950.00 feet; thence South 00°13'16" West 950.00 feet; thence North 89°46'44" West 950.37 feet to the East line of Nine Canyon Road, said point being on the arc of a 3530.00 feet Radius curve (radius point bears North 88°57'04" West); thence Northerly, 51.00 feet along said East line and along the arc of said curve through a central angle of 00°49'40"; thence North 00°13'16" East 899.01 feet along said East line to the True Point of Beginning.

**River Farm**
**Legal Description**

PARCEL 45: (108601000000000)

Section 8, Township 6 North, Range 30 East, W.M., Benton County, Washington, EXCEPT the North half of the Northwest quarter thereof.

PARCEL 46:

An Easement for subsurface irrigation line being the West 60 feet of the South 1,060 feet of the Southwest quarter of Section 15, Township 6 North, Range 30 East, W.M., being a portion of the Easement created by instrument recorded August 9, 1978, under Recording No. 766691.

PARCEL 47:

A roadway easement 30 feet in width the centerline of which is the Easterly boundary of Parcel A described in Statutory Warranty Deed recorded July 25, 1997, under Auditor's File No. 97-17672.

PARCEL 48:

Together with rights described in the following easements, agreements and permits as follows:

Revocable Permit for pipeline right-of-way and for pump plant site granted by the Department of the Army Permits, recorded June 9, 1978, under Recording No. 761253, records of Benton County, Washington.

Burlington Northern, Inc., Revocable Permit, recorded June 9, 1978, under Recording No. 761251, authorizing the construction, operation and maintenance of a 36 inch water pipeline at Survey Station 6455, plus 91.9-mile post 207 plus 4,435.2 feet, in Benton County, Washington

PARCEL 49:

An easement for ingress and egress purpose situated in Section 15, Township 6 North, Range 30, East, W.M., being 40 feet in width with 20 feet lying on either side of the following described centerline:

Beginning at the Southeast corner of said Section 15;
thence North 01°02'51" West along the East line of said Section 15, a distance of 2,681.27 feet to the true point of beginning;
thence South 89°26'31" West a distance of 352.48 feet; thence South 01°21'21" East a distance of 612.02 feet to the terminus of said line.

1006813688v11

PARCEL 50: ([127603000001001](#))

Those portions of the following described property lying Northerly of the Northerly right of way line of existing Burlington Northern Santa Fe Railroad ( formerly Spokane, Portland and Seattle Railway).

Government Lot 4, Section 27, Township 6 North, Range 30 East of the Willamette Meridian, Benton County, Washington, Together with that portion of Government Lot 3 of said Section 27 lying Westerly of the following described line:

Beginning at the Northwest corner of said Section 27; thence South 1°03'20" East, 2639.97 feet along the West line of said Section 27 to the West quarter corner of said Section 27; thence North 89°12'10" East, 1783.01 feet along the North line of said Government Lots 4 and 3 to the True Point of Beginning; thence South 0°48'00" East, 1156.00 feet to the North line of the Burlington Northern Santa Fe Railroad right of way and the terminus of said line.

PARCEL 51: ([128604000002001](#))

Those portions of the following described property lying Northerly of the Northerly right of way line of the existing Burlington Northern Santa Fe Railroad (formerly Spokane, Portland and Seattle Railway)

Government Lot 1, and the East 780 feet of the Southwest quarter of the Southeast quarter of Section 28, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington,

Except right of way for roads, and Except any portion thereof of the above described property lying below 347 feet above mean sea level, United States Coast and Geodetic Survey Datum.

PARCEL 52: ([128604000002002](#))

The Southwest quarter of the Southeast quarter of Section 28, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington lying Northwesterly of the existing Burlington Northern Santa Fe Railroad (formerly Spokane, Portland and Seattle Railway) right of way.

Except the East 780 feet thereof

PARCEL 53: ([128603000001000](#))

That portion of the Southwest quarter of the Southwest quarter of Section 28, Township 6 North, Range 30, E.W.M., Benton County, Washington, described as follows:

The Southwest corner of said Section 28 being the True Point of Beginning; thence North 01°05'50" West along the West line of said Section 28, a distance of 349.60 feet; thence South 85°15'42" East, a distance of 1337.74 feet; thence South 00°00' East a distance of 221.87 feet to a point on the Southerly line of said Section 28; thence South 89°15'32" West along said South line a distance of 1326.59 feet to the Southwest corner of said Section 28 and the True Point of Beginning.

PARCEL 54: (133601000001000)

Those portions of the following described property lying Northerly of the Northerly right of way line of the existing Burlington Northern Santa Fe Railroad ( formerly Spokane, Portland and Seattle Railway);

The East 780 feet of Government Lot 1, Section 33, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington.

Except right of way for roads, and Except any portion thereof of the above described property lying below 347 feet above mean sea level, United States Coast and Geodetic Survey Datum.

PARCEL 55: (133602000002001)

A parcel of land located in the Northwest quarter of the Northwest quarter of Section 33, Township 6 North, Range 30 East Willamette Meridian, Benton County, Washington more particularly described as follows:

Beginning at the Northwest corner of said Section 33; thence Along the North line of said Section 33, South 88°31'46" East, 1137.40 feet to a point on a 1064.58 feet radius curve whose center bears South 89°27'20" East; thence along said curve to the right an arc length of 1715.72 feet through an included angle of 92°20'25" around a long chard measuring 1535.97 feet, bearing South 46°42'52" West to a point on the West line of the Northwest quarter of the Northwest quarter of Section 33; thence along said West line North 01°00' 05" West, 1082.47 feet to the Point of Beginning.

PARCEL 56: (104601000000000)

The North half of Section 4, Township 6 North, Range 30 E.W.M., Benton County, Washington.

1006813688v11

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 366 of 379

**STORAGE COMPLEX**
**<u>LEGAL DESCRIPTION</u>**

That portion of the Southwest quarter of Section 7, Township 6 North, Range 30 East, W.M., Benton County, Washington, described as follows:

Beginning at the Southwest corner of said Section 7;
Thence North 00°13'16" East 1,019.91 feet along the West line of said Section 7;
Thence South 89°44'41" East, 30.00 feet to the East line of Nine Canyon Road and the True Point of Beginning;
Thence South 89°44'41" East, 988.81 feet;
Thence South 00°13'16" West, 979.91 feet to a point 40.00 feet Northerly of the South line of said Section 7;
Thence North 89°44'41" West, 988.81 feet parallel with and 40.00 feet Northerly of said South line to a point on the East line of said Nine Canyon Road;
Thence North 00°13'16" East, 979.91 feet along said East line to the True Point of Beginning.

1

1006813688v11

Schedule 2.4
Water Agreements/Irrigation System Permits

1. Department of Army Permit dated August 27, 1976 (River Farm Pump Station).

2. Permit from Burlington Northern Railroad (BNSF) dated February 16, 1978 (River Farm pipeline crossing).

3. Department of the Army Easement for Pipeline Right of Way recorded April 25, 1994 as Recording No. 94-14256. (Nine Canyon Farms pumping plant and improvements – Section 6, Township 5 North, Rane 30 East).

4. Department of the Army Easement for Pipeline Right of Way recorded April 25, 1994 as Recording No. 94-14257. (Nine Canyon Farms pumping plant and improvements – Section 6, Township 5 North, Rane 30 East).

5. Revocable Permit granted by Burlington Northern, Inc., recorded June 9, 1978 under Recording No. 761251. (River Farm Parcel 48).

6. Department of Army Easement dated February 10, 1972 (record No. 647551) (Cox Farm "Irrigro" pumping plant).

7. Department of the Army permit NPW 71-026-72-5 (Cox Farm "Irrigro" pumping plant).

   (the preceding Items 1-7, the "**Irrigation System Permits**")

8. Primary Irrigation System Agreement between Crawford & Sons, Inc., and Barbarosa Farms dated June 5, 1978, including the Modification of Agreement, and Assignment of Agreement to Easterday, and any supplements, amendments or modifications thereof.

9. Water and Irrigation System Sharing Agreement between Holtzinger Management and Prudential Insurance and any supplements, amendments or modifications thereof.

10. Water and Irrigation System Sharing Agreement by and among Holtzinger Management, Kwong Chung and Christine Lai, and Craig and Sharon Campbell and any supplements, amendments or modifications thereof.

11. Water and Irrigation System Sharing Agreement between Holtzinger Management and Holtzinger Fruit and any supplements, amendments or modifications thereof.

12. Well Agreement between Holtzinger Management and Holtzinger Fruit and any supplements, amendments or modifications thereof.

13. Irrigation System Sharing Agreement between Benton Ranch and Easterday Farms and any supplements, amendments or modifications thereof.

14. Easterday Columbia River Primary Water Delivery Agreement between Easterday Ranches and Easterday Farms dated September 19, 2011, and First Amendment dated August 2012 and any supplements, amendments or modifications thereof.

15. Irrigation Water Agreement between Holtzinger Management and Charlie Cox Farms and any supplements, amendments or modifications thereof.

16. Indefinite Term Lease from BNSF to Easterday Farms dated January 1, 1997.

17. Agreement for Private Crossing from BNSF to Easterday Farms dated June 21, 2017.

(the preceding Items 8 -17, the "**Water Agreements**").

1006813688v11

Schedule 2.5
Debtor Assigned and Assumed Leases and Contracts

1. Irrigated Cash Lease No. 12-D57294 commencing January 1, 2017, by the State of Washington, Department of Natural Resources (Lessor) and Cody Easterday, Debby Easterday, Gale Easterday, and Karen Easterday (Lessee).

2. Sublease of Dryland Cash Lease No. 12-D53908 commencing October 1, 2017, by the State of Washington, Department of Natural Resources (Lessor) and Brian Wake and Brad Wake (Lessee).

3. Farm Lease commencing June 1, 2013, by Wake Family Properties, L.L.C., dba Brad Wake and Brian Wake dba B&B Farms (Lessor) and Cody A. Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday dba Easterday Farms (Lessee).

4. Farm Lease dated November 12, 2014, by Brad Wake and Brian Wake (Lessor) and Cody A. Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday dba Easterday Farms (Lessee).

5. The Barker Ranch's Consent to Shaw Vineyards, Inc.'s Partial Assignment and Sublease to Easterday Farms, Partnership of a Portion of the Water Rights Leased to Shaw Vineyards, Inc. Under The Barker Ranch/Shaw Vineyards, Inc. Water Rights Lease Agreement of February 26, 2013, dated April 29th, 2013 between Barker Ranch, Ltd (Lessor) and Shaw Vineyards, Inc. (Lessee 1) and Easterday Farms (Lessee 2).

6. Yakima Adjudication Conditional Final Order Certificate No. S4-83818-J, pursuant to The Barker Ranch, Ltd. and Shaw Vineyards, Inc. Water Right Lease Agreement (Feb. 26, 2013), as amended; The Barker Ranch's Consent to Shaw Vineyards, Inc.'s Partial Assignment and Sublease to Easterday Farms, Partnership of a Portion of the Water Rights Leased to Shaw Vineyards, Inc. Under the Barker Ranch/ Shaw Vineyards, Inc. Water Rights Lease Agreement of February 26, 2013 (April 29, 2013); and Order Pendente Lite Re Temporary Change, Barker Ranch, Claim Nos. 01858, 01859, Yakima County Superior Court No. 77-2-01484 5 (Dec. 12, 2013).

1006813688v11

Schedule 2.6
Water Certificates and Permits

3.  <u>Owned Water Rights</u>

    A.  <u>Washington Department of Ecology Water Right Certificates</u>

        i.  Certificate No. S4-23978C

        ii.  Certificate No. S3-00285C

        iii.  Certificate No. S3-00284C

        iv.  Certificate No. S3-22075C

        v.  Certificate No. 3399

    B.  <u>Washington Department of Ecology Water Right Permits</u>

        i.  Superseding Permit No. S4-28998(A)P

        ii.  Superseding Permit No. G4-30584P

    C.  Change Authorizations (Consolidated Water Rights)
        i.  No. CS4-23978(A)C@2
        ii.  No. CS4-23978(B)C
        iii.  No. CS4-23874(A)C
        iv.  N0. CS3-00286C
        v.  No. CS3-22572C

4.  <u>Leased Water Rights</u>

    A.  <u>Washington Department of Ecology Water Right Certificates</u>

        i.  Certificate No. S3-00591C, pursuant to Washington Department of
            Natural Resources Lease 12-D57294, effective January 1, 2017.

        ii.  Yakima Adjudication Conditional Final Order Certificate No. S4-83818-J,
             pursuant to The Barker Ranch, Ltd. and Shaw Vineyards, Inc. Water Right
             Lease Agreement (Feb. 26, 2013), as amended; The Barker Ranch's
             Consent to Shaw Vineyards, Inc.'s Partial Assignment and Sublease to
             Easterday Farms, Partnership of a Portion of the Water Rights Leased to
             Shaw Vineyards, Inc. Under the Barker Ranch/ Shaw Vineyards, Inc.

1

21-00141-WLH11     Doc 830     Filed 06/21/21     Entered 06/21/21 17:28:37     Pg 370 of 379

Water Rights Lease Agreement of February 26, 2013 (April 29, 2013); and Order *Pendente Lite* Re Temporary Change, Barker Ranch, Claim Nos. 01858, 01859, Yakima County Superior Court No. 77-2-01484 5 (Dec. 12, 2013).

1006813688v11

Schedule 5.2

Assumed Liabilities


NONE

1006813688v11

Schedule 6.4.11
Phase I's


Phase 1 Environmental Site Assessments performed by AECOM dated April 2021 with respect to Cox Farm, River Farm, Nine Canyon Farm, Goose Gap Farm, and the Storage Complex, as posted to Seller's virtual data room prior to the Effective Date of this Agreement.

1006813688v11

Schedule 7.2.11
Excluded Exceptions

General:

- The lien of any state or federal estate tax by reason of the death of Gale Easterday.
- Any unrecorded leaseholds, right of vendors and holders of security interests on personal property installed upon the Land and rights of tenants to remove trade fixtures at the expiration of the terms.
- Any matters arising out of or by virtue of that certain bankruptcy case:

  Name of Debtor:  Easterday Ranches Inc., and Easterday Farms
  Date of Filing:  February 1, 2021
  U. S. District Court:  Eastern District
  State:  Washington
  Case No.:  21-00141-WLH11
  Chapter:  11

- Pending probate proceedings in the estate of Name of decedent:
  Gale A. Easterday
  Date Filed:  January 14, 2021
  County:  Franklin
  Court:  Superior
  Case No.:  21-4-50004-11
  Personal Representative(s):  Karen Easterday

Cox Farm:

- A mortgage, security agreement, assignment of rents and fixture filing to secure an indebtedness as shown below

  Amount:  $27,000,000.00
  Dated:  June 4, 2015
  Mortgagor:  Easterday Ranches, Inc., a Washington corporation, Cody A. Easterday and Debby Easterday, husband and wife; and Gale A. Easterday and Karen L. Easterday, husband as wife, and Easterday Farms, a Washington general partnership
  Mortgagee:  AXA Equitable Life Insurance Company, a New York corporation
  Loan No.:  60715200
  Recording Date:  June 4, 2015
  Recording No:  2015-015800

- A financing statement as follows:

  Debtor:  Easterday Ranches, Inc.

1006813688v11

Secured Party: AXA Equitable Life Insurance Company
Recording Date: June 4, 2015
Recording No: 2015-015801

- A mortgage, security agreement, assignment of rents and fixture filing to secure an indebtedness as shown below Amount: $3,100,000.00

  Dated: June 16, 2020
  Mortgagor: Easterday Ranches, Inc., a Washington corporation, Cody A. Easterday and Debby Easterday, husband and wife; and Gale A. Easterday and Karen L. Easterday, husband as wife, and Easterday Farms, a Washington general partnership
  Mortgagee: AXA Equitable Life Insurance Company, a New York corporation
  Recording Date: June 16, 2020
  Recording No: 2020-20391

- As to Parcel J:
  Claim of Lien
  Claimant: Pegram Construction Inc.
  Against: Easterday Ranches Inc.
  Amount: $123,984.00
  Recorded: February 4, 2021
  Recording No: 2021-5522

- Claim of Lien by Copenhaver Construction, Inc. in the amount of $75,625.00 filed on April 9, 2021.

River Farm:

- A Mortgage, Security Agreement, and Fixture Filing, with Assignment of Rents and Proceeds, Leases and Agreements to secure an indebtedness as shown below

  Amount: $50,000,000.00
  Dated: February 12, 2020
  Mortgagor: EASTERDAY RANCHES, INC., a Washington corporation, EASTERDAY FARMS, a Washington general partnership among Cody A Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday, GALE A. EASTERDAY and KAREN L. EASTERDAY, husband and wife, and CODY A. EASTERDAY and DEBBY EASTERDAY
  Mortgagee: The Prudential Insurance Company of America, a New Jersey Corporation
  Recording Date: February 18, 2020
  Recording No: 2020-005577

Nine Canyon Farm:

- A Mortgage, Security Agreement, and Fixture Filing, with Assignment of Rents and Proceeds, Leases and Agreements to secure an indebtedness as shown below

  Amount:  $50,000,000.00
  Dated:  February 12, 2020
  Mortgagor:  EASTERDAY RANCHES, INC., a Washington corporation, EASTERDAY FARMS, a Washington general partnership among Cody A Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday, GALE A. EASTERDAY and KAREN L. EASTERDAY, husband and wife, and CODY A. EASTERDAY and DEBBY EASTERDAY
  Mortgagee:  The Prudential Insurance Company of America, a New Jersey Corporation
  Recording Date:  February 18, 2020
  Recording No:  2020-005577

- As to Parcel 6:  Claim of Lien

  Claimant:  AAA Concrete Inc., a Washington Corporation
  Against:  Easterday Farms
  Amount:  $51,329.00
  Recorded:  December 29, 2020
  Recording No:  2020-53403

Goose Gap Farm:

- A Mortgage, Security Agreement, and Fixture Filing, with Assignment of Rents and Proceeds, Leases and Agreements to secure an indebtedness as shown below
  Amount:  $50,000,000.00
  Dated:  February 12, 2020
  Mortgagor:  EASTERDAY RANCHES, INC., a Washington corporation, EASTERDAY FARMS, a Washington general partnership among Cody A Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday, GALE A. EASTERDAY and KAREN L. EASTERDAY, husband and wife, and CODY A. EASTERDAY and DEBBY EASTERDAY
  Mortgagee:  The Prudential Insurance Company of America, a New Jersey Corporation
  Recording Date:  February 18, 2020
  Recording No:  2020-005577

Storage Complex:

- A mortgage to secure an indebtedness as shown below

  Amount:  $6,000,000.00
  Dated:  April 7, 2011
  Mortgagor:  Easterday Farms, a Washington general partnership
  Mortgagee:  LTM Investments LLC, a Washington limited liability company

3

1006813688v11

Recording Date:  April 8, 2011
Recording No.:  2011-10312
First amendment to Mortgage recorded July 10, 2014 under Auditor's File No. 2014-16432

1006813688v11

Schedule 8.7
Assumed and Assigned Contracts and Leases / Cure Amounts

| Contract or Lease | Cure Amount |
|---|---|
| 1. Irrigated Cash Lease 12-D57294 commencing January 1, 2017, by the State of Washington, Department of Natural Resources (Lessor) and Cody Easterday, Debby Easterday, Gale Easterday, and Karen Easterday (Lessee). | $ |
| 2. Sublease of Dryland Cash Lease commencing October 1, 2017, by the State of Washington, Department of Natural Resources (Lessor) and Brian Wake and Brad Wake (Lessee). | $ |
| 3. Farm Lease commencing June 1, 2013, by Wake Family Properties, L.L.C., dba Brad Wake and Brian Wake dba B&B Farms (Lessor) and Cody A. Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday dba Easterday Farms (Lessee). | $21,962.50 + 12% interest |
| 4. Farm Lease dated November 12, 2014, by Brad Wake and Brian Wake (Lessor) and Cody A. Easterday, Debby Easterday, Gale A. Easterday, and Karen L. Easterday dba Easterday Farms (Lessee). | $9,640.00 + 12% |
| 5. The Barker Ranch's Consent to Shaw Vineyards, Inc.'s Partial Assignment and Sublease to Easterday Farms, Partnership of a Portion of the Water Rights Leased to Shaw Vineyards, Inc. Under The Barker Ranch/Shaw Vineyards, Inc. Water Rights Lease Agreement of February 26, 2013, dated April 29th, 2013 between Barker Ranch, Ltd (Lessor) and Shaw Vineyards, Inc. (Lessee 1) and Easterday Farms (Lessee 2). | $1,800.00 late fee |

1

21-00141-WLH11    Doc 830    Filed 06/21/21    Entered 06/21/21 17:28:37    Pg 378 of 379

| Contract or Lease | Cure Amount |
|---|---|
| 6.       Yakima Adjudication Conditional Final Order Certificate No. S4-83818-J, pursuant to The Barker Ranch, Ltd. and Shaw Vineyards, Inc. Water Right Lease Agreement (Feb. 26, 2013), as amended; The Barker Ranch's Consent to Shaw Vineyards, Inc.'s Partial Assignment and Sublease to Easterday Farms, Partnership of a Portion of the Water Rights Leased to Shaw Vineyards, Inc. Under the Barker Ranch/ Shaw Vineyards, Inc. Water Rights Lease Agreement of February 26, 2013 (April 29, 2013); and Order Pendente Lite Re Temporary Change, Barker Ranch, Claim Nos. 01858, 01859, Yakima County Superior Court No. 77-2-01484 5 (Dec. 12, 2013). | $ |

2