Alan D. Smith (WSBA 24964)
Bradley A. Cosman (*pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue
Seattle, WA 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
E-mail: ADSmith@perkinscoie.com
BCosman@perkinscoie.com

*Attorneys for Tyson Fresh Meats, Inc.*

HON. WHITMAN L. HOLT

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>EASTERDAY RANCHES, INC., *et al*.<br><br>Debtors | Chapter 11<br><br>Lead Case No.: 21-00141 WLH11<br>Jointly Administered<br><br>**MOTION FOR DERIVATIVE STANDING AND AUTHORITY TO PROSECUTE FRAUDULENT TRANSFER CLAIMS AGAINST AB LIVESTOCK LLC ON BEHALF OF EASTERDAY RANCHES' ESTATE** |

Tyson Fresh Meats, Inc. ("**Tyson**") moves this Court for an order authorizing Tyson to prosecute—on behalf of, and for the benefit of, the Easterday Ranches' estate—fraudulent transfer claims arising from Easterday Ranches' prepetition sale of the cattle feeding facility commonly known as the North Lot.

As originally detailed in Tyson's Trustee Motion,[1] Easterday Ranches, Inc. ("**Debtor**") engineered a surreptitious sale of the North Lot—its largest unencumbered asset—in a fire sale transaction on the eve of bankruptcy. Without marketing the North Lot—and without soliciting a higher and better offer from Tyson (an obvious potential buyer)—the Debtor sold the North Lot to AB Livestock, LLC ("**Agri Beef**") for $16.0 million. The Debtor then immediately distributed over

---

[1] Motion for Appointment of Chapter 11 Trustee ("**Trustee Motion**") [Doc 79].

Motion for Derivative Standing – 1

80% of the proceeds to insiders, affiliates, and professionals, thereby hindering, delaying, and defrauding creditors. Further, the Debtor's fire sale failed to obtain reasonably equivalent value. Indeed, Tyson has offered and remains willing to buy the North Lot for $25.0 million—roughly 56% more than what Agri Beef paid. Notwithstanding Tyson's materially better offer, the Debtor refuses to initiate an action against Agri Beef to avoid the sale. The Debtor contends the sale to Agri Beef yielded reasonably equivalent value based on a self-serving and flawed post hoc appraisal. Another theory better explains the Debtor's refusal: the Debtor has a conflict because the Debtor's current management and counsel were involved in the prepetition sale.

With the Debtor refusing to initiate an action against Agri Beef, Tyson approached the Ranches Committee,[2] explained Tyson's higher and better offer for the North Lot, and requested that the Ranches Committee seek derivative standing to challenge the prepetition sale. Two months later, however, the Ranches Committee is apparently still investigating and is not prepared to proceed. The Ranches Committee's delay effectively constitutes a pocket veto and is unjustified. The estate cannot afford further delay as the Debtor is now seeking approval of a follow-on sale of rolling stock to Agri Beef.[3] In fairness to the parties, including Agri Beef, a challenge to the North Lot sale should be brought now, before the Court approves a follow-on sale that is predicated on Agri Beef's purchase of the North Lot.

Since the Debtor will not pursue the action for the benefit of the estate, and since the Ranches Committee is unprepared to pursue the action for the benefit of the estate, and because the pending AB Sale Motion dictates action be taken now, Tyson seeks permission to initiate and litigate

---

[2] Official Committee of Unsecured Creditors of Easterday Ranches, Inc. ("**Ranches Committee**").
[3] *See Notice and Debtors' Motion for Entry of an order (A) Approving Private Sale of Assets to AB Livestock LLC; and (B) Granting Related Relief; Memorandum of Points and Authorities; Declaration of Peter Richter* ("**AB Sale Motion**") [Doc 920]. Tyson has contemporaneously filed an objection to the AB Sale Motion.

Motion for Derivative Standing – 2

153275441.2

fraudulent transfer claims against Agri Beef on behalf of, and for the benefit of, the estate as set forth in the draft complaint attached to this motion as **Exhibit A** ("**Draft Complaint**").[4]

## BACKGROUND

### A. Debtor Sells North Lot Before State Court Can Hold TRO Hearing

The prepetition fraud perpetrated by Cody Easterday, as President of the Debtor, is well documented and need not be repeated here. Suffice it to say that the Debtor, by and through Cody Easterday, initiated and carried out a fraudulent scheme whereby the Debtor requested and received reimbursement from Tyson for the purchase of cows, feed, and other supplies that never existed. By the time the fraud was uncovered in December 2020, Tyson had been defrauded out of more than $225 million.

On Friday, January 22 in a conference call among Debtor and Tyson representatives, the Debtor informed Tyson that the North Lot had been sold.[5] This was the first Tyson had heard of a possible sale of the North Lot.[6] In a subsequent call later that same day between Cody Easterday and Shane Miller of Tyson, Cody Easterday stated that he could disclose the identity of the purchaser of the North Lot only after the close of business on Monday, January 25.[7] This led Tyson to believe that the sale of the North Lot would close on Monday, January 25.

To prevent the Debtor from selling the North Lot in such a private, process-free transaction, Tyson filed a complaint and motion for the appointment of a receiver that Sunday, January 24. Tyson's complaint included a request for a temporary restraining order (TRO) preventing the Debtor from selling the North Lot. What Tyson did not know at the time was that the Debtor had actually closed on the surreptitious sale on Friday, January 22, thereby mooting Tyson's request for a TRO.

---

[4] Tyson reserves the right to amend the Draft Complaint on any additional factual or legal grounds that would support a colorable claim to avoid transfer of the North Lot.
[5] *Declaration of Leah Andersen In Support of Motion for Appointment of Chapter 11 Trustee* ("**Andersen Decl.**") [Doc 80] (attached to this Motion as **Exhibit C**. Those initial communications were unclear as to whether the sale had already been accomplished or the property sale was under contract.
[6] *Id.*
[7] *Id.*

Motion for Derivative Standing – 3

Tyson does not believe the Debtors undertook any public or organized marketing of the North Lot before selling the North Lot to Agri Beef. Instead, it appears the Debtor went only to Agri Beef—a competitor of Tyson's who could be trusted to keep Tyson and other creditors in the dark about the sale. The Debtor did not solicit an offer to purchase the North Lot from Tyson (an obvious potential buyer) and did not afford Tyson an opportunity to overbid Agri Beef.

### B. Debtor Hinders and Delays Creditors by Immediately Distributing Proceeds to Affiliates, Insiders, and Professionals

Despite knowing Tyson objected to the sale, and despite knowing the Debtor was insolvent, the Debtor immediately distributed roughly $13 million of the $16 million sale proceeds (more than 80%) to, and for the benefit of, insiders and affiliates. Specifically, the Debtor distributed more than $11.7 million to affiliates Easterday Farms[8] and English Hay Company;[9] and more than $1.2 million to the Debtor's restructuring advisors and counsel. According to the accounting provided by the Debtor, only about $2.1 million of the North Lot sale proceeds actually went to third party creditors.[10] While some of the money paid to Easterday Farms was on account of outstanding feed bills to the Debtor, $2 million was a purported prepayment of feed bills not even prepared yet, and almost $5 million was a purported repayment of an intercompany loan from Easterday Farms. (In fact, that intercompany loan from Farms to the Debtor did not exist: the Debtors' current financial analyses show that Farms already owed the Debtor some $10 million at that time, and the cash transfer from the Debtor to Farms increased Farms' obligation to the Debtor to over $15 million).

As a result of using the unencumbered sale proceeds to pay insiders, affiliates, and professionals rather than current operating expenses, the Debtor quickly ran out of cash again and filed bankruptcy just 10 days after the North Lot sale closed. Indeed, by diverting the North Lot sale

---

[8] Easterday Farms is a general partnership and its general partners comprise Easterday family members.
[9] English Hay Company is owned by Easterday family members.
[10] Andersen Decl. at Ex. A.

Motion for Derivative Standing – 4

21-00141-WLH11    Doc 979    Filed 08/09/21    Entered 08/09/21 15:26:07    Pg 4 of 10
153275441.2

proceeds to Farms and others, the Debtor manufactured a postpetition cash crunch under which it needed emergency payments from Tyson plus a third-party DIP loan in order to continue feeding and caring for the cattle.

### C. Tyson Makes $25 Million Offer and Demands Estate Initiate Avoidance Action

The $16 million purchase price for the North Lot was woefully inadequate. First, in discussions with Tyson in December 2020 over a possible assignment of the North Lot to Tyson as restitution for some of what was owed Tyson, Cody Easterday claimed the North Lot was worth $20 million.[11] Second, after the Debtor filed bankruptcy Tyson was contacted by a prospective buyer of the North Lot who informed Tyson that had they been contacted by the Debtor with respect to the North Lot, they would have been very interested in pursuing a purchase of the North Lot at significantly more than $16 million. Third, the Debtor was aware[12] that the North Lot would be of particular value to Tyson since Tyson has a packing facility nearby in Pasco.

Recognizing the inadequacy of the $16 million purchase price, Tyson sent the Debtor and the Ranches Committee a letter on May 28, 2021 (attached to this Motion as **Exhibit B**, "**Tyson Offer**") offering to purchase the North Lot for $25 million, including a $1.25 million deposit. The Tyson Offer was an "as is, where is" offer subject only to environmental and narrow due diligence contingencies.

Tyson recognized that the Debtor would first need to avoid the prepetition sale to Agri Beef as a fraudulent transfer before the Debtor could sell the North Lot to Tyson. Accordingly, Tyson demanded the Debtor investigate and initiate such an action. The Debtor, through counsel, subsequently advised Tyson that the Debtor would not pursue such an action.[13] The Debtor's principal argument against initiating the action is that even though Tyson's offer is a higher offer for the

---

[11] Id.
[12] The Debtor has been delivering cattle to Tyson's Pasco facility for years.
[13] The Debtor has thus also rejected Tyson's request for access to the North Lot (which the Debtor is now leasing from Agri Beef) to conduct unobtrusive due diligence.

Motion for Derivative Standing – 5

property, the Debtor received reasonably equivalent value based on a post hoc appraisal suggesting a value of $9.0 million.[14] Tyson believes the Debtor's post hoc appraisal is flawed because (among other things) the appraisal suggests the value of the North Lot is only $9 million even though Agri Beef had just paid $16.0 million for the property, and the appraisal does not consider Tyson's interest in the property (now evidenced by the $25.0 million offer).

Tyson believes a different theory explains the Debtor's refusal. The Debtor's financial advisory firm, including the co-CROs, and the Debtor's current lead bankruptcy counsel were involved in the prepetition sale to Agri Beef.[15] Each received $600,000 of the North Lot sale proceeds as a retainer or payment for accrued fees.[16] Accordingly, the Debtor's current management and counsel have conflicts in examining the propriety of the prepetition sale.

Anticipating the Debtor's refusal, Tyson contemporaneously sent the Tyson Offer to the Ranches Committee. For all the reasons above, Tyson demanded the Ranches Committee seek derivative standing to pursue the action for the benefit of the estate. Though the Ranches Committee has informed Tyson that the Ranches Committee continues to investigate the sale, the delay at this point is tantamount to a pocket veto. Moreover, given the Debtor's pending AB Sale Motion, the Ranches' Committee delay and refusal is unjustified.

D.  **Pending Follow-On Sale to Agri Beef**

On July 19 the Debtor filed the AB Sale Motion [Doc 920] seeking authorization for a follow-on sale of certain rolling stock and equipment to Agri Beef. It appears all of such rolling stock and equipment were used by the Debtor in its North Lot operations. Therefore, Agri Beef's purchase of the rolling stock is predicated on Agri Beef's ownership of the North Lot. If this motion is granted,

---

[14] The Debtor's post hoc appraisal was obtained after Tyson began discussing challenges to the sale with the Debtor.
[15] The notice provision of the prepetition *Purchase and Sale Agreement* dated January 15, 2021 between the Debtor and Agri Beef directs copies of notices and communications under the agreement be sent to Pachulski Stang Ziehl & Jones. Paladin, who is now the Debtor's Chief Restructuring Officer, acted as the Debtor's financial advisor prepetition.
[16] Andersen Decl.

Motion for Derivative Standing – 6

21-00141-WLH11    Doc 979    Filed 08/09/21    Entered 08/09/21 15:26:07    Pg 6 of 10
153275441.2

however, Tyson will have standing to file an action against Agri Beef that, if successful, would unwind the North Lot sale. Accordingly, and in fairness to Agri Beef, Tyson believes this motion should be resolved before the Court rules on the AB Sale Motion.[17]

## RELIEF REQUESTED[18]

### A. Four-Factor Test for Derivative Standing

Bankruptcy courts within the Ninth Circuit and the Ninth Circuit B.A.P. recognize that "in appropriate situations the bankruptcy court may allow a party other than the trustee or debtor-in-possession to pursue the estate's litigation."[19] "[I]f a debtor has a cognizable claim, but refuses to pursue that claim, an important objective of the Code [the recovery and collection of estate property] would be impeded if the bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead."[20]

To this end, Bankruptcy Code § 503(b)(3)(B) provides that "a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor" may be entitled to an allowed administrative expense claim for the actual, necessary expenses incurred by it.[21] In *Cybergenics*,[22] the Third Circuit analyzed § 503(b)(3)(B) and decided that, while § 503(b)(3)(B) did not provide *express* statutory basis for a bankruptcy court conferring derivative

---

[17] Tyson has contemporaneously filed an objection to the AB Sale Motion that incorporates this motion.
[18] The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 USC §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2).
[19] *In re Yellowstone Mt. Club, LLC*, No. 08-61570-11, 2009 Bankr. LEXIS 4443, at *15-16 (Bankr. D. Mont. Jan. 16, 2009) (citing cases); *see also Morabito v. JH Inc. (In re Consol. Nev. Corp.)*, BAP No. NV-17-1210-FLTi, 2017 Bankr. LEXIS 4393, at *17-20 (B.A.P. 9th Cir. Dec. 1, 2017).
[20] *In re iPCS, Inc.*, 297 B.R. 283, 290 (Bankr. N.D. Ga. 2003); *see also In re Joyanna Holitogs, Inc.*, 21 B.R. 323, 326 (Bankr. S.D.N.Y. 1982) (holding that the general right to be heard would be an empty grant unless those who have such a right are also given the right to do something where the debtors will not).
[21] Also note that § 503(b)(4) provides a mechanism for a possible administrative expense claim for an attorney for a creditor that recovers property for the benefit of the estate.
[22] *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F. 3d 548, 567 (3d Cir. 2003) (finding derivative standing appropriate where a "debtor unreasonably refuses to pursue" a fraudulent transfer action); *see also In re STN Enterprises*, 779 F.2d 901 (2d Cir. 1985) (holding although "no explicit authority for creditors' committees to initiate adversary proceedings" exists in the Bankruptcy Code, creditors have an implied, qualified right to bring suit on behalf of the estate under 11 U.S.C. §§ 1103 (c)(5) and 1109(b)).

Motion for Derivative Standing – 7

153275441.2

standing on a creditor to pursue avoidance actions, § 503(b)(3)(B) would be meaningless unless authority to give a creditor derivative standing somehow otherwise existed.

In *Yellowstone Mountain Club*, the court examined tests for granting a creditor derivative standing from other jurisdictions and adopted the following four-factor test:

i. A demand has been made upon the statutorily authorized party to take action;

ii. The demand is declined;

iii. A colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and

iv. The inaction is an abuse of discretion ("unjustified") in light of the debtor-in-possessions duties in a Chapter 11 case.

All four of these factors are satisfied in this case. First, Tyson made demands upon both the Debtor and the Committee. Second, those demands were denied. In the case of the Debtor, Tyson's demand was formally denied, while the Ranches Committee has effectively denied the demand by suppressing it.

The third factor, requiring a colorable claim that would benefit the estate, is a "relatively easy one to make."[23] Courts typically evaluate the colorability factor through the lens of FRCP 12(b)(6).[24] To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[25] Here, the Draft Complaint contains sufficient allegations to withstand a Rule 12(b)(6) motion to dismiss. The Draft Complaint contains detailed, plausible allegations that the Debtor fraudulently transferred the North Lot to Agri Beef. Specifically, the Draft

---

[23] *In re Adelphia Communs. Corp.*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005).
[24] *Morabito v. JH Inc. (In re Consol. Nev. Corp.)*, BAP No. NV-17-1210-FLTi, 2017 Bankr. LEXIS 4393, at *19-20, n.5 (B.A.P. 9th Cir. Dec. 1, 2017)
[25] *Id.* at *20 (internal citation omitted).

Motion for Derivative Standing – 8

153275441.2

Complaint details how the Debtor hindered, delayed, and defrauded creditors by stripping the estate of a valuable unencumbered asset and then routed nearly all of the sale proceeds to insiders, affiliates, and professionals. The Draft Complaint also details how the Debtor's surreptitious sale process precluded the Debtor from realizing reasonably equivalent value for the North Lot. Between the Debtor's prepetition indications of value, the post-sale indications of interest from third parties, and Tyson's offer to purchase the North Lot for $25 million, there is a colorable claim that the Debtor did not receive reasonably equivalent value through the prepetition sale. Finally, a cost-benefit analysis further supports granting Tyson derivative standing to pursue the claim. Tyson—who ultimately bears more than 90% of the administrative costs of the estate because of Tyson's overwhelming general unsecured claim—supported pursuit of the action by the estate (either the Debtor or the Ranches Committee) knowing full well such pursuit would necessitate material administrative expense for the estate. And now, the cost-benefit analysis is even stronger because, if Tyson is granted derivative standing, Tyson will directly incur the litigation costs necessary to pursue the action for the benefit of the estate.[26] Although litigating avoidance of the prepetition sale will increase administrative expenses, Tyson remains prepared to purchase the North Lot for $25.0 million, which would represent an additional $9.0 million of proceeds for the estate. The additional proceeds from Tyson's offer would more than offset the additional administrative expense and would ultimately inure to the benefit of all unsecured creditors on a pro rata basis.

Fourth, the refusals to challenge the sale to Agri Beef are unjustified. The Debtor's refusal is predicated on a flawed and self-serving post hoc appraisal. Moreover, the Debtor's refusal is tainted by a conflict. The Ranches Committee's pocket refusal is unjustified. It is possible the Ranches Committee is skirting the issue because the economic benefits of a successful challenge would inure

---

[26] Tyson reserves all rights to seek allowance, reimbursement, and payment of expenses and compensation under Bankruptcy Code §§ 503(b)(3)(B) and 503(b)(4) for recovering property for the benefit of the estate.

Motion for Derivative Standing – 9

to *all* unsecured creditors including Tyson, not just non-Tyson unsecured creditors. But stalling a fraudulent transfer action against Agri Beef simply because the benefits of such action would be shared among all unsecured creditors (including Tyson) is unjustified—especially considering Tyson will directly or indirectly bear the administrative costs to pursue such action.

**CONCLUSION**

For the reasons above, Tyson requests the Court enter an order granting Tyson derivative standing (on behalf of and for the benefit of the estate) to assert, prosecute, and litigate fraudulent transfer claims against Agri Beef based on the Debtor's prepetition sale of the North Lot as set forth in the Draft Complaint, and for any other relief the Court deems appropriate.

Dated: August 9, 2021.

Respectfully submitted,

*/s/ Alan D. Smith*
Alan D. Smith, WSBA No. 24964
ADSmith@perkinscoie.com
Bradley A. Cosman (*pro hac vice*)
BCosman@perkinscoie.com
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

*Attorneys for Tyson Fresh Meats, Inc.*