# EXHIBIT A

Alan D. Smith, WSBA No. 24964
Bradley A. Cosman (*pro hac vice*)
ADSmith@perkinscoie.com
BCosman@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

*Attorneys for Creditor Tyson Fresh Meats, Inc.*

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re<br><br>EASTERDAY RANCHES, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 21-00141-11 WLH11<br>Jointly Administered |
| TYSON FRESH MEATS, INC., on behalf of and for the benefit of the ESTATE of EASTERDAY RANCHES, INC.<br><br>Creditor,<br><br>vs.<br><br>AB LIVESTOCK, LLC.<br><br>Defendant. | Adv. Proc. No. _____<br><br>**COMPLAINT FOR AVOIDING AND RECOVERING FRAUDULENT TRANSFER** |

COMPLAINT – 1

Creditor Tyson Fresh Meats, Inc. ("Tyson"), by and on behalf of the bankruptcy estate of Easterday Ranches ("Easterday Ranches" or "Debtor") in and for its complaint, alleges as follows:

## PARTIES

1. Tyson is a Delaware corporation. Tyson maintains its headquarters and principal places of business in South Dakota and Illinois.

2. Easterday Ranches is a Washington corporation. Easterday Ranches maintains its headquarters and principal place of business in Washington.

3. Defendant AB Livestock, LLC ("Agri Beef") is an Idaho corporation. Agri Beef maintains its headquarters and principal place of business in Idaho.

## JURISDICTION AND VENUE

4. This is an action to avoid and recover a fraudulent transfer.

5. Tyson, on behalf of the estate and for purposes of this action, consents to entry of final orders or judgment by the bankruptcy court.

6. This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and (b), 1334(a) and (b), and 11 U.S.C. §§ 105, 544, 547, 548, 550 and 551.

7. Venue is proper under 28 U.S.C. § 1409.

## FACTUAL ALLEGATIONS

### I. Cody Easterday Defrauds Tyson Out of Over $225 Million

8. The Debtor was a feedlot and grow lot operator with significant operations in the Tri-Cities area, both Franklin and Benton Counties. Tyson is the Debtor's largest creditor. The Debtor purchased calves on behalf of Tyson, then fed and took care of the cattle as they grew to marketable size, whereupon the cattle were delivered to Tyson's processing plant in Pasco.

9. Cody Easterday ("Easterday"), the President of the Debtor, initiated and carried out a fraudulent scheme whereby the Debtor reported to Tyson

COMPLAINT – 2

purchases of calves that did not exist, requested and received reimbursement from Tyson for those purchases, then reported purchases of feed and other supplies for those fictitious cattle, and requested and received reimbursement from Tyson for the nonexistent feed purchases as well. By the time the fraud was uncovered in December 2020, Tyson had been defrauded out of more than $225 million, and there were more than 200,000 cattle "missing" from the Debtor.

10. When Tyson found out about the fraud, the Debtor owned a piece of unencumbered farmland referred to as the North Lot. In late-December 2020 and early-January 2021, the Debtor and Tyson had engaged in extensive correspondence about the North Lot. During those correspondences, the Debtor had expressed a willingness to transfer ownership of the property to Tyson in partial satisfaction of the Debtor's obligations to Tyson. Prior to selling the North Lot to Agri Beef, the Debtor did not advise Tyson that the Debtor was considering selling the property.

**II. Easterday Ranches Fraudulently Transfers the North Lot to Agri Beef**

11. Tyson first learned that the Debtor was selling the North Lot to a different purchaser in a conference call on Friday, January 22, among Easterday, Peter Richter of Paladin Management Group, and several Tyson representatives. Tyson was not told either that the sale of the North Lot had already closed or that it was in the process of closing that day. The Tyson representatives asked for the identity of the purchaser of the North Lot, and the Debtor's representatives refused to disclose such information.

12. In a call later that day (Friday, January 22) between Easterday and Shane Miller of Tyson, Easterday stated that he could disclose the identity of the purchaser of the North Lot only after the close of business on Monday, January 25.

COMPLAINT – 3
153317100.1

This led Tyson to believe that the sale of the North Lot would close on Monday, January 25.

13. On the next Sunday, just two days later, Tyson filed an action against the Debtor in the Franklin County Superior Court, Case No. 21-2-50034-11, which included a motion for appointment of receiver and a request for a temporary restraining order in an effort to stop the sale of the North Lot. On Monday, January 25, the Debtor informed Tyson that the sale had already closed the previous Friday, and that the buyer was Agri Beef (one of Tyson's major competitors). On information and belief, Agri Beef had known about Tyson's interest in the land and expedited the fire sale to avoid confrontation with Tyson.

14. Shortly before the motion for appointment of receiver was scheduled to be heard, on February 1, 2021, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, Case No. 21-00141-WLH11, United States Bankruptcy Court, Eastern District of Washington. The Debtor's bankruptcy case remains pending, and the Franklin County action is stayed under 11 U.S.C. § 362(a).

15. In response to Tyson's request, the Debtor later provided Tyson with a schedule disclosing how the proceeds of the North Lot sale were distributed, a copy of which is attached as **Exhibit A**. Of the $16 million sale price, approximately $15.1 million was apparently immediately distributed, and of that $15.1 million:

- More than $11.7 million went to affiliates Easterday Farms and English Hay Company; and
- More than $1.2 million went to the Debtor's restructuring advisors and counsel.

16. Thus, of the $15.1 million in sale proceeds that were disbursed, $13 million went directly to affiliates or professionals. Only $2.1 million (less than

COMPLAINT – 4
153317100.1

14%) went to third party creditors and almost $12 million (more than 80%) went directly to Easterday Farms and other Easterday family owned entities.

17. Further, there was not an organized marketing process for the North Lot. Instead, Debtor went only to one party, Agri Beef, a competitor of Tyson's who could be trusted not to let news of the sale leak, and closed the sale in a rush, all behind the backs of Tyson and the other creditors.

### III. Tyson Makes a $25 Million Offer for the North Lot

18. The $16 million purchase price for the North Lot was woefully inadequate. First, in discussions with Tyson in December 2020 over a possible assignment of the North Lot to Tyson as restitution for some of what was owed Tyson, the Debtor claimed the North Lot was worth $20 million. Second, after the Debtor filed bankruptcy, a prospective buyer of the North Lot informed Tyson that had they been contacted by the Debtor with respect to the North Lot, they would have been very interested in pursuing a purchase of the North Lot at significantly more than $16 million. Third, the Debtor was aware that the North Lot would be of particular value to Tyson since Tyson has a packing facility nearby in Pasco.

19. Recognizing the inadequacy of the $16 million purchase price, Tyson sent the Debtor and the Ranches Committee a letter on May 28, 2021, a true and correct copy of which is attached as **Exhibit B** (the "Tyson Offer"), offering to purchase the North Lot for $25 million, including a $1.25 million deposit. The Tyson Offer was an "as is, where is" offer subject only to environmental and narrow due diligence contingencies.

20. In order for the Debtor to sell the North Lot to Tyson, the Debtor first needs to avoid the sale of the property to Agri Beef as a fraudulent transfer. Accordingly, Tyson demanded the Debtor investigate and initiate such an action. The Debtor, through counsel, subsequently advised Tyson that the Debtor would not

COMPLAINT – 5
153317100.1

pursue such an action. The Debtor's principal argument against initiating the action is that even though Tyson's offer is a higher offer for the property, the Debtor received reasonably equivalent value based on a post hoc appraisal suggesting a value of $9.0 million. However, Agri Beef had just paid $16 million for the North Lot, and yet, the Debtor's post hoc appraisal only values the property at $9 million. Additionally, the appraisal does not consider Tyson's interest in the property or Tyson's $25 million offer.

21. The Debtor's financial advisory firm and the Debtor's current lead bankruptcy counsel were involved in the prepetition sale to Agri Beef. Each received $600,000 of the North Lot sale proceeds as a retainer or payment for accrued fees. Accordingly, the Debtor's current management and counsel have conflicts in examining the propriety of the prepetition sale.

## FIRST CAUSE OF ACTION—FRAUDULENT TRANSFER UNDER 11 U.S.C. §544 AND RCW 19.40

22. Tyson realleges and incorporates by reference, as if fully set forth herein, the allegations in the paragraphs above.

23. Under 11 U.S.C. § 544, the transfer of the North Lot from the Debtor to Agri Beef is avoidable pursuant to RCW 19.40.010 et. seq.

24. The sale of the North Lot was made with actual intent to hinder, delay, or defraud creditors of the Debtor. Specifically, the Debtor knew that Tyson was owed more than $225 million as a creditor and knew (or should have known) that Tyson was interested in procuring the North Lot. Moreover, the sale was conducted as a fire sale of the property, orchestrated purposefully to avoid any objections by Tyson.

25. The sale of the North Lot was made without the Debtor receiving reasonably equivalent value in exchange for the North Lot.

COMPLAINT – 6
153317100.1

26. The proceeds of the sale were fraudulently diverted to Easterday and the Debtor and not to the Debtor's legitimate creditors nor to the Debtor's bankruptcy estate.

27. The sale caused the Debtor to engage or thereafter engage in business for which the remaining assets of the Debtor were unreasonably small in relation to the business or transactions.

28. The Debtor was insolvent on the date of the sale. Alternatively, the Debtor became insolvent as a result of the sale.

## SECOND CAUSE OF ACTION—FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548

29. Tyson realleges and incorporates by reference, as if fully set forth herein, the allegations in the paragraphs above.

30. The sale of the North Lot was made without the Debtor receiving reasonably equivalent value in exchange for the North Lot.

31. The Debtor was insolvent on the date of the sale. Alternatively, the Debtor became insolvent as a result of the sale.

32. The sale was made with actual intent to hinder, delay, or defraud creditors of the Debtor. Specifically, both the Debtor and Agri Beef knew that Tyson was owed more than $225 million as a creditor and knew that Tyson was interested in procuring the North Lot. Moreover, the sale was conducted as a fire sale of the property, orchestrated purposefully to avoid any objections by Tyson.

33. The sale is therefore avoidable pursuant to 11 U.S.C. § 548.

## PRAYER FOR RELIEF

WHEREFORE, Tyson prays for relief as follows:

A. For a judgment granting an avoidance and recovery of the sale of the North Lot from the Debtor to Agri Beef; and

COMPLAINT – 7

153317100.1

153317100.2
21-00141-WLH11    Doc 979-1    Filed 08/09/21    Entered 08/09/21 15:26:07    Pg 8 of 15

B. For such other and further relief as the Court deems just and equitable.

Dated: August [   ], 2021

*Draft*
Alan D. Smith (WSBA 24964)
Bradley A. Cosman (pro hac vice)
**PERKINS COIE LLP**
1201 Third Avenue
Seattle, WA 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
E-mail: ADSmith@perkinscoie.com
BCosman@perkinscoie.com

*Attorneys for Creditor Tyson Fresh Meats, Inc.*

COMPLAINT – 8
153317100.1

# EXHIBIT A

| Vendor | Amount Owed | Actual Payment from N. Lot Sale | Balance Owing after Paydown | Add Back of 1/15/21 Tyson Billed and unpaid | Estimated January Feed Bill | Adjusted Balance | Description |
|---|---|---|---|---|---|---|---|
| **EASTERDAY RANCHES, INC. (1/25)** | | | | | | | |
| AAA Concrete, Inc. | 31,636 | 31,208 | 428 | | | 428 | Concrete |
| Animal Health International | 985,319 | 181,074 | 804,246 | 277,388 | | 1,081,634 | Vet/Meds |
| Baker Commodities | 9,515 | 9,515 | - | | | - | Deads |
| Bird Control Systems | 10,669 | 10,669 | - | | | - | Bird mitigation/control |
| Bison Pipe & Supply | 64,165 | 64,165 | - | | | - | Fence repair |
| Cenex Harvest States | 274,596 | - | 274,596 | | | 274,596 | Feed/Supplement |
| Central Machinery-Sales, Inc. | 1,259 | 1,259 | - | | | - | Parts & repair |
| CH20 International | 5,551 | 5,551 | - | | | - | Boiler supplies |
| Clemente Garza Trucking | 17,291 | 17,291 | - | | | - | Feed trucking |
| Commodities Plus II, LLC | 15,160 | 15,160 | - | | | - | Feed |
| Conrado Garza Trucking | 22,217 | 22,217 | - | | | - | Feed trucking |
| Easterday Farms | 3,826,307 | 5,826,307 | (2,000,000) | 388,341 | 2,100,000 | 488,341 | Feed plus estimate of unbilled feed - they bill once a month |
| English Hay Company | 1,261,281 | 1,172,702 | 88,579 | 385,657 | | 474,235 | Feed |
| Northwest Equipment Sales | 24,131 | 24,131 | - | | | - | Parts & repair |
| NW Mixer Feeders | 20,710 | 20,710 | - | | | - | Parts & repair |
| Pape Machinery, Inc. | 73,904 | 73,767 | 137 | | | 137 | Parts & repair |
| Pasco Auto Parts-NAPA | 12,754 | 12,754 | - | | | - | Parts & repair |
| Performix Nutrition Systems | 41,276 | 41,276 | - | | | - | Supplement |
| PGT | 1,308,504 | 1,308,504 | - | | | - | Feed |
| *Production Animal Consulting* | *56,309* | *-* | *56,309* | | | *56,309* | *Veterinary Consulting* |
| Randy Allred Livestock LLC | 45,625 | 45,625 | - | | | - | Rent |
| Rangeview Ag Labor LLC | 39,185 | 39,185 | - | | | - | Fencing |
| RDO Equipment | 1,857 | 1,857 | - | | | - | Parts & repair |
| Regency Mill Services, LLC | 14,658 | 14,658 | - | | | - | Parts & repair |
| Star Rentals & Sales | 28,505 | 21,695 | 6,810 | | | 6,810 | Equipment rental |
| *Tri Cities Grain* | *106,616* | *-* | *106,616* | | | *106,616* | *Feed* |
| US Linen & Uniforms | 4,299 | 4,299 | - | | | - | Laundry |
| Sun Basin Operations - CHS | 489,870 | - | 489,870 | | | 489,870 | Feed/Supplement |
| *Western Stockmen's* | *140,784* | *-* | *140,784* | | | *140,784* | *Vet/Med* |
| Yakima Mechanical | 18,717 | 8,550 | 10,167 | | | 10,167 | Mill parts & repair |
| Ziply Fiber | 180 | 180 | - | | | - | Parts & repair |
| Viterra Canada Inc. | 253,919 | 176,509 | 77,410 | | | 77,410 | Feed |
| All other vendors | 9,055,821 | - | 9,055,821 | 101,902 | | 9,157,722 | |
| *Paladin (retainer)* | *-* | *625,604* | *-* | | | *-* | |
| *Pachulski Stang Ziehl & Jones LLP (retainer)* | *-* | *600,000* | *-* | | | *-* | |
| Easterday Farms (loan) * | - | 4,748,089 | - | | | - | |
| **Subtotal - Ranches** | **18,262,590** | **15,124,511** | **9,111,772** | **1,153,287** | **2,100,000** | **12,365,060** | |

* This was a paydown of an intercompany loan from 2020, estimated balance of $16mm. It was cross collateralize, Canyon Farm I and II.

# EXHIBIT B



May 28th, 2021

<u>Via email</u>

Pachulski Stang Ziehl & Jones LLP
Attn: Richard Pachulski
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
rpachulski@pszjlaw.com

Cooley LLP
Attn: Jay R. Indyke
55 Hudson Yards
New York, NY 10001
jindyke@cooley.com

## LETTER OF INTENT

RE: **Proposed Purchase of North Lot Facility**

Gentlemen:

This letter of intent sets forth the basic terms and conditions by which Tyson Fresh Meats, Inc. or its designee ("**Tyson**") is prepared to purchase the Facility (defined below) from the bankruptcy estate of Easterday Ranches, Inc. ("**Seller**"). This letter of intent outlines the basic business terms and understandings with respect to Tyson's proposed purchase of the Facility, but Tyson's offer to purchase the Facility remains subject to negotiation and execution of a definitive purchase and sale agreement in a customary market form for a transaction of this nature. The proposed basic terms and conditions of Tyson's offer for the Facility are:

1. **Facility**. Tyson is prepared to purchase the cattle feed operation located at 8230 Blanton Road, Pasco, WA 99301 and certain improvements and fixtures related thereto which are collectively defined as the "**Facility**" in the Purchase and Sale Agreement dated January 15, 2021 between Seller and AB Livestock, LLC ("**AB Livestock PSA**").[1] Tyson is prepared to purchase the Facility from Seller in its current, "AS IS", "WHERE IS", with all faults condition, without further responsibility on the part of Seller for any construction, repairs, alterations, or additions thereto.

2. **Purchase Price**. The total purchase price ("**Purchase Price**") will be $25,000,000, all cash. The Purchase Price will be paid to Seller as follows: (1) an initial earnest money deposit of $1,250,000 (together with all interest earned thereon, the "**Deposit**"), paid to Seller within two business days after mutual

---

[1] The Facility includes certain real property identified in Schedule 1.1(a) of the AB Livestock PSA, certain improvements and fixtures set forth on Schedule 1.1(b) of the AB Livestock PSA, and certain additional related assets defined in Section 1.1 of the AB Livestock PSA.



execution and delivery of the Purchase Agreement (defined below); and (2) the balance of the Purchase Price (reduced by the credit for the Deposit) payable at closing by wire transfer of immediately available funds.

3.     **Deposit**.  The Deposit will be held in an interest-bearing account for the benefit of Seller and Tyson. Unless (1) Tyson terminates the Purchase Agreement on account of the Environmental Contingency or Due Diligence Contingency as provided in Paragraph 5 below, or (2) the Sunset Date passes before the Closing Date, the Deposit is non-refundable to Buyer. If Tyson terminates the Purchase Agreement on account of the limited contingencies as provided in Paragraph 5 of this letter of intent, or if the Sunset Date occurs before the Closing Date, then the Deposit must be immediately refunded to Tyson. If Tyson fails or refuses to consummate the purchase of the Facility pursuant to the Purchase Agreement at the Closing or defaults under the Purchase Agreement, and such default is not caused by Seller's default under the Purchase Agreement, then Seller will have the right to terminate the Purchase Agreement and receive the Deposit as liquidated damages, which will be Seller's sole remedy for such default, whereupon neither party shall have any further rights or obligations hereunder.

4.     **Closing**.  The consummation of the purchase and sale of the Facility between Tyson and Seller will occur 5 days after the order approving avoidance of the prepetition transfer of the Facility to AB Livestock, LLC becomes a final, non-appealable order ("**Closing Date**"), provided, however, that in no circumstance may the Closing Date be more than 120 days after mutual execution and delivery of the Purchase Agreement by Tyson and Seller ("**Sunset Date**"), unless Tyson (in its sole discretion) agrees in writing to extend such date.

5.     **Contingencies; Diligence & Title Materials**.

       A.     _Contingencies_.  Other than the environmental contingency and the due diligence contingency discussed below, Tyson's offer to purchase the Facility is not subject to any buyer contingencies.

       B.     _Environmental Contingency_.  Tyson acknowledges that Seller does not currently own the Facility but leases the Facility. Tyson will accept the Facility in its present "**AS IS**", "**WHERE IS**", **with all faults condition**, with any changes caused by normal wear and tear before the Closing provided Tyson is given reasonable and sufficient access to the Facility prior to the Closing Date to complete an environmental audit (at Tyson's sole expense). Should Tyson in its sole discretion disapprove of the results of the environmental audit (or should Tyson not be granted reasonable and sufficient access to the Facility to conduct an environmental access in advance of the Closing Date), then any Purchase Agreement between Tyson and Seller will be null and void and of no further force and effect, escrow shall be cancelled, the Deposit will be returned to Tyson, and neither party shall have any further rights or obligations to the other. The environmental contingency will expire 30 days after Tyson and its consultants first get access to the Facility for the purpose of conducting such environmental audit.

**Tyson Foods**  2200 W. Don Tyson Parkway   Springdale, Arkansas 72762
800-643-3410   479-290-400



C.      *Due Diligence Contingency*.  Seller will provide Tyson with a copy of all Due Diligence Materials (as that term is defined in Section 4 of the AB Livestock PSA), title reports, title policies, and title exception documents that were provided to AB Livestock, LLC in connection with the AB Livestock PSA. After Seller confirms to Tyson in writing that Seller has provided Tyson with all Due Diligence Materials, title reports, title policies, and title exception documents called for in the AB Livestock PSA, Tyson will have 15 days ("**Due Diligence Period**") to review such information. On or before expiration of the Due Diligence Period, Tyson will deliver a written notice to Seller state either (i) that Tyson, subject only to the Environmental Contingency, accepts the condition of the Facility and elects to proceed to Closing, or (ii) that Tyson has determined that Facility is unacceptable (in Tyson's sole discretion) and that Tyson elects not to proceed to Closing.

6.      **Condition Precedent to Seller's Obligation**.  This letter of intent is subject to Seller obtaining title to the Facility by avoiding the prepetition transfer of the Facility, and subject to Seller obtaining any court approvals that are required of Seller in order to consummate the transaction on the Closing Date.

7.      **Purchase Agreement Negotiations**.  Tyson and Seller will both use their commercially reasonable efforts to diligently and continuously pursue and negotiate, as early as practicably possible, the execution and delivery of a definitive purchase and sale agreement for the Facility on terms and conditions mutually acceptable to Tyson and Seller and consistent with the terms of this letter of intent ("**Purchase Agreement**").  Tyson shall present a draft Purchase Agreement to Buyer as the starting point for such negotiations. If Tyson and Seller are unable (for any reason) to agree on a definitive form of the Purchase Agreement within 45 days after the date of this letter of intent, Tyson and Seller will have no further rights or obligations under this letter of intent.  For the avoidance of doubt, Tyson acknowledges that such Purchase Agreement, though executed by the parties, will specifically limit Seller's obligations as set forth in the preceding paragraph.

Please advise no later than June 7, 2021 if the general terms and conditions outlined in this letter of intent are an acceptable basis on which to enter into further negotiations.

Regards,

*Shane Miller*
Shane Miller (May 28, 2021 15:45 CDT)

Shane Miller
Group President, Fresh Meats
Tyson Fresh Meats, Inc.