ARMAND J. KORNFELD (WSBA #17214)
THOMAS A. BUFORD (WSBA #52969)
RICHARD B. KEETON (WSBA #51537)
BUSH KORNFELD LLP
601 Union Street, Suite 5000
Seattle, WA 98101
Tel.: (206) 292-2110
Facsimile: (206) 292-2104
Emails: jkornfeld@bskd.com,
tbuford@bskd.com, and rkeeton@bskd.com

RICHARD M. PACHULSKI (CA Bar #90073)*
JEFFREY W. DULBERG (CA Bar #181200)*
MAXIM B. LITVAK (CA Bar #215852)*
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
Tel: (310) 277-6910
Facsimile: (310) 201-0760
Emails: rpachulski@pszjlaw.com,
jdulberg@pszjlaw.com, and
mlitvak@pszjlaw.com

*Admitted *Pro Hac Vice*

*Attorneys for Debtors and Debtors in Possession*

HON. WHITMAN L. HOLT
Hearing Date: May 25, 2022
Hearing Time: 10:00 a.m.
Location: Telephonic

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re<br><br>EASTERDAY RANCHES, INC., *et al.*<br><br>Debtors.[1] | Chapter 11<br><br>Lead Case No. 21-00141-11<br>Jointly Administered<br><br>**DISCLOSURE STATEMENT FOR THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF EASTERDAY RANCHES, INC. AND EASTERDAY FARMS** |

**NOTE: THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE**

---

[1] The Debtors along with their case numbers are as follows: Easterday Ranches, Inc. (21-00141) and Easterday Farms, a Washington general partnership (21-00176).

## **DISCLAIMER**

**THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF DEBTORS EASTERDAY RANCHES, INC. AND EASTERDAY FARMS, WHICH BANKRUPTCY PLAN THE DEBTORS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.**

**THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN. ALTHOUGH THE DEBTORS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERIES UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OR DO NOT OCCUR.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR ANY OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE**

2

COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ALL PERSONS OR ENTITIES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENTS WERE PREPARED.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER THE FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES AND REPRESENT THE DEBTORS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE DEBTORS' PLAN OR DISTRIBUTIONS THEREUNDER. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.

DOCS_NY:45732.2

# TABLE OF CONTENTS

GENERAL OVERVIEW AND SUMMARY ...................................................2

I.      INTRODUCTION ..............................................................................2

    A.      Overview of the Plan ..........................................................3

        1.      General Structure of the Plan ...............................3

        2.      Material Terms of the Plan ...................................7

        3.      Summary of Treatment of Claims and Interests Under the Plan ...............................8

    B.      Plan Voting Instructions and Procedures ...........................10

        1.      Voting Rights ......................................................10

        2.      Solicitation Materials .........................................11

        3.      Voting Instructions and Procedures ....................13

        4.      Confirmation Hearing and Deadline for Objections to Confirmation ...............................16

II.     BACKGROUND REGARDING THE DEBTORS ...............16

    A.      Overview of the Debtors .....................................................16

    B.      Debtors' Management .........................................................17

    C.      Debtors' Prepetition Capital Structure ...............................19

        1.      Assets & Sale Thereof .......................................19

        2.      Liabilities ...........................................................19

    D.      Events Leading to the Chapter 11 Cases ............................25

III.    THE CHAPTER 11 CASES .............................................26

    A.      First Day Orders and Initial Employment Applications ..................27

    B.      Appointment of the Unsecured Creditors' Committees ..................27

    C.      United States Trustee .........................................................28

    D.      Meeting of Creditors ..........................................................28

    E.      Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims ...............................28

1

| | | |
|---|---|---|
| F. | Cash Collateral Motions | 29 |
| G. | Lindsay Canyon Term Sheet and DIP Loan | 30 |
| H. | Tyson | 31 |
| I. | WTB Trustee Motion | 33 |
| J. | Commodity Futures Trading Commission Action | 33 |
| K. | Lamb Weston Agreement | 35 |
| L. | Rejection or Assumption of Certain Executory Contracts and Unexpired Leases | 36 |
| | 1. Basin City Rejection | 36 |
| | 2. Rejection of Karen Easterday Lease | 36 |
| | 3. Assumption & Assignment of Certain Leases | 37 |
| | 4. Rejection of Lindsay Canyon and Additional Basin City Leases | 37 |
| | 5. Assumption of Certain Agreements in Connection with the Sale Process | 37 |
| | 6. Equipment Leases | 38 |
| | 7. Sale of Farm Equipment | 38 |
| | 8. Termination of Retirement Plan | 38 |
| M. | Cooperation Agreement | 39 |
| N. | Rabo Injunction | 42 |
| O. | The Sale Process | 43 |
| P. | Treatment of Prudential and Equitable Secured Claims | 47 |
| Q. | Plan Process/Agreement with the Partners | 50 |
| R. | Plan Filing & Solicitation Exclusivity | 51 |
| S. | Tyson Derivative Standing Motion | 53 |
| T. | Aircraft Sale | 54 |
| U. | Complaint Against 3E | 54 |
| V. | The WTB and CHS Settlements | 54 |

DOCS_NY:45732.2

| | | | |
|---|---|---|---|
| | W. | The Post-petition Corporate Actions and Governance Adversary Proceeding | 56 |
| | X. | Global Settlement | 57 |
| IV. | | SUMMARY OF THE JOINT CHAPTER 11 PLAN | 61 |
| | A. | Purpose and Effect of the Plan | 62 |
| | B. | Classification of Claims and Interests Under the Plan | 63 |
| | | 1. Subordinated Claims | 63 |
| | | 2. Classification and Voting Controversies | 63 |
| | C. | Treatment of Claims and Interests Under the Plan | 63 |
| | | 1. Unclassified Claims | 63 |
| | D. | Releases and Related Matters | 72 |
| | | 1. Debtor Releases | 72 |
| | | 2. Third Party Releases | 74 |
| | E. | Exculpation and Limitation of Liability | 76 |
| | F. | Term of Injunctions or Stays | 77 |
| | G. | Good Faith | 79 |
| | H. | The Post-Effective Date Debtors | 79 |
| | | 1. Estimated Recoveries for Ranches General Unsecured Claims (Class 4), Tyson (Class 5) and Segale (Class 6) | 80 |
| V. | | MEANS FOR IMPLEMENTATION OF PLAN | 81 |
| | A. | Implementation of the Plan | 81 |
| | | 1. Sale Transaction | 82 |
| | | 2. Net Sale Proceeds | 83 |
| | B. | Streamlining of the Debtors' Corporate Affairs | 83 |
| | | 1. Debtors' Existing Directors, Officers, and Managers | 83 |
| | | 2. Dissolution of the Debtors | 84 |
| | | 3. Corporate Documents and Corporate Authority | 84 |
| | C. | Plan Administrator | 84 |

DOCS_NY:45732.2

  1.  Appointments ................................................................. 84

  2.  Vesting of Post-Effective Date Debtors' Assets ...................... 85

  3.  Authority of the Plan Administrator ......................................... 86

  4.  Limitation of Liability ................................................................ 87

  5.  Indemnification ........................................................................ 88

  6.  Insurance ................................................................................. 89

  7.  Tax Reporting .......................................................................... 89

  8.  Cash Investments .................................................................... 89

  9.  Pursuit and Resolution of Post-Effective Date Debtors'
     Causes of Action .................................................................. 89

  10.  No Successor Liability ........................................................... 90

  11.  Preservation of Privileges and Defenses ............................... 90

 D. Preservation of Rights of Action ................................................... 91

  1.  Maintenance of Avoidance Actions and Causes of Action ...... 91

  2.  Preservation of All Post-Effective Date Debtors' Causes of
     Action Not Expressly Settled or Released ............................... 92

 E. Cancellation of Instruments .......................................................... 93

VI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................... 93

 A. Rejection of Executory Contracts and Unexpired Leases ................ 93

  1.  Rejection of Agreements. ......................................................... 93

VII. RISK FACTORS ................................................................................. 95

 A. Parties May Object to the Plan's Classification of Claims and
   Interests ......................................................................................... 95

 B. The Debtors May Not Be Able to Obtain Confirmation of the Plan .. 95

 C. The Conditions Precedent to the Effective Date of the Plan May
   Not Occur ....................................................................................... 96

 D. Claims Estimation and Allowance of Claims ................................. 97

 E. Tax Considerations ........................................................................ 97

4

DOCS_NY:45732.2

21-00141-WLH11  Doc 1642  Filed 05/24/22  Entered 05/24/22 14:27:50  Pg 7 of 154

VIII. CONFIRMATION OF THE PLAN .................................................................97

    A.    The Confirmation Hearing ..................................................97

    B.    Requirements for Confirmation of the Plan.........................98

    C.    Best Interests of Creditors ................................................99

    D.    Feasibility ....................................................................101

    E.    Acceptance by Impaired Classes .....................................101

    F.    Confirmation Without Acceptance by All Impaired Classes............102

        1.    No Unfair Discrimination .......................................103

        2.    Fair and Equitable Test ..........................................103

    G.    Alternatives to Confirmation and Consummation of the Plan..........103

    H.    Revocation, Withdrawal, or Non-Consummation. ..........................104

IX.    CERTAIN UNITED STATES FEDERAL  INCOME TAX CONSEQUENCES OF THE  PLAN TO HOLDERS OF ALLOWED CLAIMS .................................................................105

    A.    Certain Tax Consequences to Holders of Allowed Claims ..............108

    B.    Disputed Ownership Funds ..............................................110

    C.    Backup Withholding ......................................................111

    D.    Importance of Obtaining Professional Tax Assistance....................111

X.    RECOMMENDATION...............................................................112

DOCS_NY:45732.2

## **EXHIBITS & SCHEDULES**

EXHIBIT A         Modified Third Amended Joint Chapter 11 Plan of Liquidation

EXHIBIT B         Liquidation Analysis

EXHIBIT C         Description of Potential Claims Against the Easterday Family

EXHIBIT D         Statement of Easterday Family Regarding the Easterday Family Contributions

EXHIBIT E         Ranches Committee's Statement in Support of the Plan

EXHIBIT F         Farms Committee's Statement in Support of the Plan

## **GENERAL OVERVIEW AND SUMMARY**

This disclosure statement (the "Disclosure Statement") (a) describes the historical background that led to the bankruptcy cases of Easterday Ranches, Inc. ("Ranches") and Easterday Farms ("Farms"), debtors and debtors in possession (collectively, the "Debtors"), (b) explains what has happened in the months since the Debtors commenced their bankruptcy cases, and (c) sets forth the treatment of creditors in the *Modified Third Amended Joint Chapter 11 Plan of Liquidation of Easterday Ranches, Inc. and Easterday Farms* (as amended, modified, or supplemented from time to time pursuant to its terms, the "Plan"). A copy of the Plan is attached hereto as **Exhibit A**.[1] This Disclosure Statement is qualified in all respects by the *express* terms of the Plan.

## **I.    INTRODUCTION**

The Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this Disclosure Statement pursuant to sections 1125 and 1126(b) of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes on the Plan.

The Plan incorporates the Global Settlement among the Settling Parties representing all of the key constituencies and significant stakeholders in these cases.

---

[1] All capitalized terms used but not defined herein shall have the meanings provided to such terms in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan will control and govern. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, any other order entered in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence, except as otherwise expressly stated in the Plan; *provided*, *however*, that the Confirmation Order shall control and take precedence in the event of any inconsistency between the Confirmation Order, any provision of the Plan, and any of the foregoing documents.

2

Among myriad disputes among the Settling Parties, the Global Settlement resolves the Allocation Adversary and allows for the release of the remaining Net Sale Proceeds from the Escrow Account to make Distributions to Creditors in the near term following Confirmation of the Plan. In accordance with the Global Settlement, the Plan also provides for releases of certain parties, including the Easterday Family Released Parties.

The purpose of this Disclosure Statement is to enable Creditors whose Claims are Impaired under the Plan and who are entitled to vote on the Plan to make an informed decision when exercising their right to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection under chapter 11 of the Bankruptcy Code, and the course of these Chapter 11 Cases. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting and election procedures that Creditors entitled to vote under the Plan must follow for their votes to be counted.

### A. Overview of the Plan

#### 1. General Structure of the Plan

A bankruptcy plan is a vehicle for satisfying the rights of holders of claims against and equity interests in a debtor. Consummation of a plan is the overriding purpose of a chapter 11 case. Upon confirmation and effectiveness, a plan becomes binding on the debtor and all of its creditors and equity interest holders. As described in Article IV. D., E., and F. below, the Plan contains certain provisions relating to (a) the release of the Released Parties, including the Easterday Family Released Parties, (b) exculpation of the Exculpated Parties, and (c) certain injunctions protecting the assets of the Estates to be distributed under the Plan as more specifically described in Section 10 of the Plan, and, if the Plan is confirmed and the Effective Date occurs, such releases,

3

exculpations and injunctions shall be binding on the Holders of Claims and Interests except as otherwise described in Article IV. D. below.

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

In these Chapter 11 Cases, the Plan contemplates an orderly liquidation of the remaining assets of both Debtors and the distribution of available assets to Creditors.

The Distributable Assets of each Debtor primarily consist of each Debtor's respective interest in the Net Sale Proceeds from the disposition of the Debtors' principal assets, the Plan Sponsor Contribution, certain crops and equipment, Cash, the Post-Effective Date Debtors' Causes of Action[2] and certain Cash and other contributions to be made by the Easterday Family in connection with the Global Settlement. The estimated recoveries to Creditors set forth in this Disclosure Statement do not take into account potential proceeds of the Post-Effective Date Debtors' Causes

---

[2] All Avoidance Actions against Holders of Allowed Farms General Unsecured Claims, Allowed Ranches General Unsecured Claims, Allowed Tyson Claims and Allowed Segale Claims are being resolved through the Plan and shall not be included in the Post-Effective Date Debtors' Causes of Action. Additionally, the Causes of Action shall not include the North Lot Actions or the Canyon Farm Avoidance Actions. As a result, the Debtors do not anticipate that there will be any material Post-Effective Date Debtors' Causes of Action.

4

of Action as Debtors do not anticipate any meaningful recovery from any such Causes of Action, if any.

On the Effective Date, (1) the Net Sale Proceeds shall be released pursuant to the terms of the Global Settlement to the Debtors and Post-Effective Date Debtors, as applicable, to fund Plan distributions to Holders of Impaired Claims; (2) no Easterday Family Tax Payments shall be funded by the Debtors' Estates, and (3) only Tyson and Segale will be beneficiaries of the proceeds Easterday Family Contribution Instruments.

All rights of Tyson, Segale, and Cody Easterday with respect to the restitution claims against Cody Easterday shall be fully reserved under all circumstances notwithstanding any other provision of the Plan.

The Plan provides for the wind-down and dissolution of each Debtor's business. The Plan Administrator will be appointed on the Effective Date and will administer and liquidate all remaining property of each Debtor and its Estate. The Plan also provides for Distributions to be made to certain Holders of Administrative Claims, Professional Fee Claims, Priority Tax Claims, Secured Claims, Priority Claims, Farms General Unsecured Claims, Ranches General Unsecured Claims, Tyson Claims, and Segale Claims.

Pursuant to the terms of the Plan, each Holder of an Allowed Farms General Unsecured Claim shall receive, as the sole distribution or dividend by Farms or its Estate under the Plan on account of such Allowed Farms General Unsecured Claim Cash from the Post-Effective Date Debtors in a fixed amount equal to one hundred percent (100%) of such Holder's Allowed Class 3 Claim, *provided however*, that no Allowed Class 3 Claims shall include or be otherwise entitled to any amount of post-petition interest or attorneys' fees in connection with such Allowed Class 3 Claim.

All Avoidance Actions against Holders of Allowed Class 3 Claims shall be deemed released and waived upon the Effective Date and shall not be included in the Post-Effective Date Debtors' Assets

5

DOCS_NY:45732.2

On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 4 Claim shall receive (a) its Pro Rata share of the Class 4 Initial Payment ($[1,712,000]) and (b) its Pro Rata share of the Class 4 Net Distributable Assets (subject to any Distribution Reserve).

The Holders of Allowed Class 4 Claims shall not have any interest in any of the Easterday Family Contribution Instruments, restitution claims against Cody Easterday, or the North Lot Actions.

All Avoidance Actions against Holders of Allowed Class 4 Claims shall be deemed released and waived upon the Effective Date and shall not be included in the Post-Effective Date Debtors' Assets.

Tyson shall have an Allowed Class 5 Claim in the amount of $261,316,000.00. On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 5 Claim shall receive (a) its Pro Rata share of the Class 5 Initial Payment ([$1,566,000]), (b) its Pro Rata share of the Class 5 Net Distributable Assets (subject to any Distribution Reserve), (c) its Pro Rata share of the proceeds of the Easterday Family Contribution Instruments, and (d) assignment of the North Lot Actions.

All Estate claims against Tyson, including any Avoidance Actions, shall be deemed released and waived upon the Effective Date.

At the Effective Date, the North Lot Actions will be deemed assigned to Tyson, including, but not limited to, any prepetition claims Tyson may have had relating to the transfer of the North Lot. Tyson will be the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3) regarding the assigned North Lot Actions and Tyson will have exclusive authority to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw the North Lot Actions without any further order of the Bankruptcy Court. Any proceeds related to the North Lot Actions belong exclusively to Tyson. However, any costs or expenses that may be incurred by the Post-Effective Date Debtors, the Plan

6

Administrator, or any of its employees, representatives, or professionals in connection with the North Lot Actions, if any, shall be reimbursed and borne entirely by Tyson.

Segale shall have an Allowed Class 6 Claim in the amount of $7,830,641. On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 6 Claim shall receive (a) its Pro Rata share of the Class 6 Initial Payment ([$922,000]), (b) its Pro Rata share of the Class 6 Net Distributable Assets (subject to any Distribution Reserve), and (c) its Pro Rata share of the proceeds of the Easterday Family Contribution Instruments.

All Estate claims against Segale, including any Avoidance Actions, shall be deemed released and waived upon the Effective Date.

The Holders of Allowed Class 6 Claims shall not have any interest in the North Lot Actions.

Holders of Subordinated Claims in Class 7 and Interests in Class 9 will not receive any recovery on account of such Claims or Interests under the Plan.

**THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CONSTITUENTS. FOR THESE REASONS, THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN.**

### 2. Material Terms of the Plan

The following is a general overview of certain material terms of the Plan:

- The Plan incorporates the terms of the Global Settlement among the Settling Parties. As described further herein, the resolution of myriad disputes through the Global Settlement will maximize the Distributions to be made pursuant to the Plan and will avoid years of expensive litigation and uncertain outcomes, and is in the best interests of the Estates and their creditors.

- The Net Sale Proceeds in the Escrow Account shall be released for the payment of Allowed Claims in accordance with the Plan.

7

- All Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Priority Claims will be paid or otherwise satisfied in full as required by the Bankruptcy Code, unless otherwise agreed to by the Holders of such Claims and the Plan Administrator.

- The Plan effectuates a global resolution of disputes between the Farms and Ranches Estates such that the Holders of Farms General Unsecured Claims in Class 3 receive a fixed recovery of 100%. As necessary, the Ranches Estate will fund recoveries by Holders of Class 3 Claims against the Farms Estate in order to ensure a fixed recovery by such Holders.

- The Plan also effectuates a resolution of certain disputes among the Holders of Allowed Ranches Unsecured Claims, Tyson, and Segale providing for the division of Net Distributable Assets among them. Tyson and Segale will share the proceeds of the Easterday Family Contribution Instruments Pro Rata.

- The Post-Effective Date Debtors will (a) hold and distribute (in accordance with the Plan) the Distributable Assets; (b) pursue the Post-Effective Date Debtors' Causes of Action, if any (c) reconcile Claims against the Debtors, and (d) pay Distributions, in accordance with the Plan.

- The Post-Effective Date Debtors will be automatically vested with all of the Debtors' and the Estates' respective rights, title, and interest in and to all Post-Effective Date Debtors' Assets.

### 3. Summary of Treatment of Claims and Interests Under the Plan

The table below summarizes the classification and treatment of Claims and Interests under the Plan.

**THE PROJECTED RECOVERIES FOR THE CLAIMS SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ACTUAL RECOVERIES MAY DIFFER.**

| Class | Description | Impaired/ Unimpaired | Projected Recovery |
|---|---|---|---|
| None | Administrative Claims | Unimpaired (deemed to accept) | 100% |

8

| Class | Description | Impaired/Unimpaired | Projected Recovery |
|---|---|---|---|
| None | Professional Fee Claims | Unimpaired (deemed to accept) | 100% |
| None | Priority Tax Claims | Unimpaired (deemed to accept) | 100% |
| Class 1 | Secured Claims3 | Unimpaired (deemed to accept) | 100% |
| Class 2 | Priority Claims | Unimpaired (deemed to accept) | 100% |
| Class 3 | Farms General Unsecured Claims | Impaired (entitled to vote) | 100% ($18.5 million) |
| Class 4 | Ranches General Unsecured Claims | Impaired (entitled to vote) | 65.3% ($2.6 million) |
| Class 5 | Tyson Claims | Impaired (entitled to vote) | 23.6% ($61.6 million) |
| Class 6 | Segale Claims Against Ranches | Impaired (entitled to vote) | 34.5% ($2.7 million) |
| Class 7 | Subordinated Claims | Impaired (deemed to reject) | No Recovery |
| Class 8 | Intercompany Claims | Impaired (deemed to accept as plan proponent) | No Recovery |

---

[3]   To comply with Bankruptcy Code section 1122(a), each Allowed Secured Claim shall be deemed to be in its own subclass (unless such Holder shares the same Lien on Collateral with a different Holder of another Secured Claim, in which case such Claims shall be deemed to be included together in the same subclass).

9

| Class | Description | Impaired/ Unimpaired | Projected Recovery |
|---|---|---|---|
| Class 9 | Interests | Impaired (deemed to reject) | No Recovery |

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

**B.  Plan Voting Instructions and Procedures**

**1.  Voting Rights**

Under the Bankruptcy Code, only classes of claims or interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan under Bankruptcy Code section 1126 are entitled to vote to accept or reject such plan. Any class that is "unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted such plan. As set forth in Bankruptcy Code section 1124, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered by the proposed plan. Holders of claims or interests within an impaired class are entitled to vote to accept or reject a plan if such claims or interests are "allowed" under Bankruptcy Code section 502.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the amount of allowed claims voting to accept such plan. Acceptance by a class of claims requires more than one-half of the number of total allowed claims voting in the class to vote in favor of the plan and at least two-thirds in dollar amount of the total allowed claims voting in the class to vote in favor of the plan; only those non-insider holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a Class of Claims will have voted to accept the Plan only if

10

two-thirds in amount and a majority in number that actually vote cast their Ballots in favor of acceptance.

Pursuant to the Plan, Claims in Classes 1, 3, 4, 5 and 6 are Impaired by, and entitled to receive a Distribution under, the Plan, and only the Holders of Claims in those Classes that are Allowed Claims or have been deemed Allowed for voting purposes are entitled to vote to accept or reject the Plan. Only Holders of Claims in Classes 3, 4, 5 and 6 as of May 25, 2022 (the "Voting Record Date") may vote to accept or reject the Plan.

Pursuant to the Plan, Claims in Classes 1 and 2 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, Subordinated Claims in Class 7 and Interests in Class 9 will not receive or retain any property under the Plan on account of such Subordinated Claims or Interests, and are therefore deemed to reject the Plan and are not entitled to vote on the Plan.

### 2. Solicitation Materials

Pachulski Stang Ziehl & Jones LLP, counsel to the Debtors, with the approval of the Bankruptcy Court, will serve as the voting agent (the "Voting Agent") to process and tabulate Ballots and to generally oversee the voting process. The following materials constitute the solicitation package (the "Solicitation Package"):

- This Disclosure Statement, including the Plan and all other Exhibits and Schedules thereto;

- The Bankruptcy Court order approving this Disclosure Statement (the "Disclosure Statement Order") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

11

- A letter in support of the Plan from the Farms Committee or Ranches Committee, as applicable;

- One or more Ballots, to be used in voting to accept or to reject the Plan and applicable instructions with respect thereto (the "Voting Instructions");

- A pre-addressed, postage pre-paid return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtors, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order. The Solicitation Package is also available without charge by written request to the Voting Agent at the below address. https://cases.creditorinfo.com/EasterdayRanches.

On or before the date that is seven (7) calendar days prior to the Voting Deadline (defined below), the Debtors will File a Plan Supplement. As the Plan Supplement is updated or otherwise modified, it will be made available by written request to the Voting Agent at the below address.

If you are the Holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by electronic mail at: pjeffries@pszjlaw.com.

If your Claim is subject to a pending claim objection and you wish to vote on the Plan, you must File a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes and your Claim or portion thereof, as applicable, must be temporarily allowed by the Bankruptcy Court for voting purposes by the Voting Deadline or you will not be entitled to vote to accept or reject the Plan.

**THE DEBTORS AND THE PLAN ADMINISTRATOR, AS APPLICABLE, RESERVE THE RIGHT, THROUGH THE CLAIM OBJECTION PROCESS, TO OBJECT TO OR SEEK TO DISALLOW OR**

12

**SUBORDINATE ANY CLAIM FOR DISTRIBUTION PURPOSES, EXCEPT AS MAY BE EXPRESSLY PROVIDED OTHERWISE IN THE PLAN OR CONFIRMATION ORDER.**

### 3. Voting Instructions and Procedures

As set forth in the Disclosure Statement Order, all votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtors or the Voting Agent. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed the Voting Record Date as the date for the determination of the Holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot. **The deadline to vote on the Plan is [the date that is 14 calendar days prior to the Confirmation Hearing] at 5:00 p.m. (Pacific Time) (the "Voting Deadline").** In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and actually received no later than the Voting Deadline at the following address:

**Physical Mail:**

**Easterday Ballot Processing Center**

**c/o Pachulski Stang Ziehl & Jones LLP**

**10100 Santa Monica Blvd, 13th Floor**

**Los Angeles, CA 90067-4003**

**Attn: Patricia Jeffries**

**-or-**

13

**Electronic Mail:**

**Email Address: pjeffries@pszjlaw.com**

**Subject Line: Easterday Ballot Submission**

**Attachment: A completed and signed ballot must be attached in PDF format.**

Only the Holders of Allowed Claims or Claims that are deemed allowed for purposes of voting on the Plan in Classes 3, 4, 5 and 6 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning those Ballots in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline. Each Holder of a Claim must vote its entire Claim either to accept or to reject the Plan and may not split such vote. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific Voting Instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions accompanying the Ballots, the following Ballots will not be counted in determining whether the Plan has been accepted or rejected:

- Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan;

- Any Ballot received after the Voting Deadline, except if the Debtors have granted an extension of the Voting Deadline with respect to such Ballot in writing, or by order of the Bankruptcy Court;

- Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

- Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;

- Any Ballot cast by a Person that does not hold a Claim in the voting Class; and

- Any Ballot that is not signed or does not contain an original signature.

14

DOCS_NY:45732.2

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote or elections by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Any party who has delivered a properly completed Ballot for the acceptance or rejection of the Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Voting Agent prior to the Voting Deadline.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or making elections on your Ballot, (b) the Solicitation Package that you have received, or (c) the amount of your Claim, or if you wish to obtain, free of charge, an additional copy of the Plan, this Disclosure Statement, or any appendices, schedules, or exhibits to such documents, please contact the Voting Agent at the address specified above.

15

DOCS_NY:45732.2

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will File a voting report (the "Voting Report") prior to the Confirmation Hearing. The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**

### 4. Confirmation Hearing and Deadline for Objections to Confirmation

Objections to Confirmation of the Plan must be Filed and served on the Debtors and certain other entities, all in accordance with the Confirmation Hearing Notice, so that such objections are actually received by no later than [**the date that is 10 calendar days prior to the Confirmation Hearing**] at **5:00 p.m. (Pacific Time)**. Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court. For further information, refer to Article VIII of this Disclosure Statement, "Confirmation of the Plan."

## II. BACKGROUND REGARDING THE DEBTORS

### A. Overview of the Debtors

In 1958, Ervin Easterday moved his family and farming operation from Nampa, Idaho to southeastern Washington, where he purchased 300 acres of undeveloped land in the new Columbia Basin Reclamation Irrigation Project. As of the Petition Date, the Debtors were primarily involved in two lines of business – farming and cattle feeding. Farms was responsible for growing onions, corn, and wheat on its more than 22,500 acres of farmland.

DOCS_NY:45732.2

Farms produced (a) feed for cattle and (b) crop, including among others, potatoes and onions, for a variety of buyers. Farms' feed was primarily sold to its sister company, Ranches, the family's cattle business. Ranches purchased Farms' feed and used it to raise cattle. Most of the cattle raised by Ranches was for Tyson Fresh Meats, Inc. ("Tyson").

Prior to a sale of assets approved by the Bankruptcy Court as addressed further below, the Debtors' expansive commercial farming and cattle feeding operations required significant acreage. These operations spanned approximately 22,500 acres over multiple farms, lots/ranches, and other complexes and facilities, which are generally referred to by their common names: (i) Goose Gap Farm, (ii) River Farm, (iii) Nine Canyon Farm, (iv) Cox Farm, and (v) the Storage Complex on River Farm (collectively, the "Sale Properties").

Although the Storage Complex and Nine Canyon Farm (the "Debtor Properties") were owned by Debtors, the partners of Farms, the Easterday Family (the "Partners"), asserted that they owned, in their own names, separate parcels of real property contained within the larger boundaries of Cox Farm and River Farm (the "Joint Properties"). The Partners also asserted that they owned Goose Gap Farm, which is adjacent to or connected with the Joint Properties and/or the Debtors Properties, in their own names and individual capacities (the "Non-Debtor Property"). There was no known dispute as to the ownership of the property at the inception of the case but later, Debtors disputed the alleged ownership interests of the Partners in the Joint Properties and the Non-Debtor Property.

## B.    Debtors' Management

On January 29, 2021, the Ranches' shareholders, who also comprised the then-constituted Board of Directors of Ranches - Cody Easterday, Debby Easterday, and Karen L. Easterday (collectively, the "Former Board") - executed that certain Action by Written Consent to elect Craig A. Barbarosh, R. Todd Neilson, and Thomas Saunders,

17

DOCS_NY:45732.2

V, as Ranches' directors (collectively, the "Ranches Independent Board"). Thereafter and on that same date, each member of the Former Board resigned their positions as directors and officers of Ranches.

On January 31, 2021, the Partners executed that certain Amendment No. 1 to Easterday Farms Partnership Agreement, thereby transferring control of Farms to a Board of Directors comprised solely of Craig A. Barbarosh, R. Todd Neilson, and Thomas Saunders, V (the "Farms Independent Board" and together with the Ranches Independent Board, the "Independent Board").

Importantly, the members of the Independent Board were selected for their experience and expertise in the cattle and/or restructuring industry. More particularly, Mr. Barbarosh is a nationally recognized restructuring attorney with over twenty-five years of experience. Mr. Barbarosh also has extensive experience serving as director for many troubled or distressed companies. Mr. Neilson has over thirty-five years of experience in the restructuring space with a particular emphasis on public and forensic accounting, having previously served as a special agent for the Federal Bureau of Investigation specializing in accounting investigations. Mr. Neilson also has experience serving as a trustee, examiner, financial consultant, and advisor for companies in bankruptcy. Finally, as a sixth-generation cattleman, Mr. Saunders brings a lifetime of experience in the ranching and cattle business to the Independent Board. Mr. Saunders currently owns and operates the 7,000 acre Twin V Ranch located near Fort Worth, Texas, where he manages the Twin V Ranch's cow-calf and equine businesses.

On January 31, 2021, the Independent Board met and unanimously voted to appoint co-Chief Restructuring Officers, T. Scott Avila and Peter Richter, at Ranches and Farms.

DOCS_NY:45732.2

## C. Debtors' Prepetition Capital Structure

### 1. Assets & Sale Thereof

The Debtors' principal assets are their respective interests in the Sale Properties. The sale of the Sale Properties closed on July 31, 2021. The Cash sale proceeds (the "Sale Proceeds") paid at the closing of the sale were distributed to pay fees and expenses relating to the transaction (including a break-up fee to the stalking horse), and to satisfy the claims of the mortgagees. Following such payments, the Net Sale Proceeds of approximately $104,000,000 were placed in escrow pending a resolution of the allocation of such Net Sale Proceeds among the owners of the Sale Properties. The Debtors initiated the Allocation Adversary seeking a judicial determination of disputes relating to the ownership of the Sale Properties. Following extensive negotiations among the Debtors, the Easterday Family and other key stakeholders, the Settling Parties reached an agreement on the distribution of the Net Sale Proceeds that is reflected in the Global Settlement.

Each of the Debtors also had interests in equipment, crops and other assets. As will be discussed below, certain of the equipment, crops and other assets may have been sold during the course of the Chapter 11 Cases. Any remaining assets will be vested in the Post-Effective Date Debtors, and the Plan Administrator shall be responsible for the disposition of any such assets in accordance with the terms of the Plan.

### 2. Liabilities

The Debtors were parties to various prepetition loan agreements. The following table is a summary of the Debtors' most significant *secured* loan balances as of the Petition Dates:

| Primary Obligor | Lender | Loan | Approx. Balance |
|---|---|---|---|
| Debtors | Washington Trust Bank | Revolving Loan Agreement | $44,511,784 |

19

| | | | |
|---|---|---|---|
| Ranches | Prudential Insurance Company of America | Loan Agreement (Ranches Note) | $29,464,517 |
| Farms | Prudential Insurance Company of America | Loan Agreement (Farms Note) | $19,643,012 |
| Debtors | CHS Capital, LLC | Agricultural Loan Agreement | $5,375,000 |
| Ranches | Equitable Financial Life Insurance Company | Fixed Interest Rate Promissory Note | $22,400,000 |
| Ranches | Equitable Financial Life Insurance Company | Adjustable Interest Rate Promissory Note | $3,135,000 |
| Farms | LTM Investments LLC | Loan Agreement | $758,000 |
| | | **TOTAL:** | **$125,287,313.00** |

i.      **WTB Revolving Loan Agreement**

The Debtors are parties to that certain *Revolving Loan Agreement*, dated September 3, 2020 (as amended, the "Revolving Loan Agreement"), by and among the Debtors, as borrowers, Cody Easterday, Debby Easterday, Karen Easterday, and Gale Easterday, as guarantors (collectively, the "Guarantors"), and Washington Trust Bank ("WTB"), as lender.

The Revolving Loan Agreement provides for a $45 million revolving credit facility that was purportedly secured by all goods, equipment, farm equipment, inventory, fixtures, accounts, deposit accounts, chattel paper, documents, general intangibles, instruments, investment property, and letter of credit rights.

As of the Petition Dates, the outstanding principal balance of the Revolving Loan Agreement was approximately $44.4 million.

On January 15, 2021, WTB sent a letter to the Debtors asserting the existence of certain non-monetary defaults under the Revolving Loan Agreement, principally relating to certain reporting obligations, but agreeing to forbear upon the exercise of remedies until January 31, 2021 to allow the Debtors to cure the purported default,

provided that no further default occur pursuant to the terms of the Revolving Loan Agreement.

On January 26, 2021, WTB sent a *Notice of Default* to the Debtors and Guarantors, asserting certain defaults under the Revolving Loan Agreement related to the filing of a lawsuit by Tyson and the untimely death of Guarantor Gale Easterday in December 2020.

As discussed further below, the Debtors and WTB reached a resolution regarding WTB's claims and WTB's claims were satisfied by the Debtors in accordance with the WTB Settlement (defined below).

### ii.     Paycheck Protection Program Loans

Farms is party to that certain *Promissory Note* dated April 14, 2020 in an aggregate principal amount of approximately $1.704 million in connection with a Paycheck Protection Program Loan (the "Farms PPP Loan") that was scheduled to mature on April 14, 2022. The Farms PPP Loan was entered into pursuant to sections 1102 and 1106 of the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") and the rules relating thereto promulgated by the U.S. Small Business Administration. The Farms PPP Loan was funded through WTB.

Ranches is party to that certain *Promissory Note* dated April 17, 2020 in an aggregate principal amount of approximately $876,100 in connection with a Paycheck Protection Program Loan (the "Ranches PPP Loan") that was scheduled to mature on April 17, 2022. The Ranches PPP Loan was entered into pursuant to sections 1102 and 1106 of the CARES Act and the rules relating thereto promulgated by the U.S. Small Business Administration. The Ranches PPP Loan was also funded through WTB. The Farms PPP Loan and the Ranches PPP Loan have each been forgiven and neither Debtor has any remaining liability for such PPP Loans.

DOCS_NY:45732.2

### iii. Loans Secured by Mortgages on Real Property

#### a. *Prudential Term Loan*

The Debtors are parties to that certain *Loan Agreement* dated February 12, 2020 (as may have been amended, modified or supplemented, the "Term Loan"), by and among the Debtors, as borrowers, the Guarantors, and Prudential, as lender. As of the Petition Dates, the aggregate outstanding principal amount of the Term Loan was approximately $50 million.

The Term Loan was secured by that certain *Mortgage, Security Agreement, Fixture Filing with Assignment of Rents and Proceeds, Leases and Agreements* dated February 12, 2020, which covered certain of the Debtors' real estate. The Debtors obligations under the Term Loan have been satisfied and no further amounts are due or owing.

#### b. *Equitable Life Fixed Rate Loan*

The Debtors are parties to that certain *Fixed Interest Rate Promissory Note* dated June 4, 2015 (the "Fixed Rate Loan"), by and among the Debtors, as borrowers, the Guarantors, as guarantors, and Equitable Life, as lender. As of the Petition Dates, the aggregate outstanding principal amount of the Fixed Rate Loan was approximately $22.4 million.

The Fixed Rate Loan was secured by that certain *Mortgage, Security Agreement, Assignment of Rents and Fixture Filing* dated June 4, 2015, which covered certain of the Debtors' real estate and personal property. The Debtors obligations under the Fixed Rate Loan have been satisfied and no further amounts are due or owing.

#### c. *Equitable Life Adjustable Interest Rate Loan*

The Debtors are also parties to that certain *Adjustable Interest Rate Promissory Note* (the "Adjustable Rate Loan"), dated June 16, 2020 by and among the Debtors, as borrowers, the Guarantors, as guarantors, and Equitable Life, as lender, in an aggregate principal amount of $3.1 million.

DOCS_NY:45732.2

The Adjustable Rate Loan was secured by that certain Mortgage, Security Agreement, Assignment of Rents and Fixture Filing dated June 16, 2020, which covered certain of the Debtors' real estate and certain personal property.

As of the Petition Dates, the aggregate outstanding principal balance of the Adjustable Interest Rate Loan was approximately $3.135 million. The Debtors obligations under the Adjustable Rate Loan have been satisfied and no further amounts are due or owing.

> d.    *LTM Project Loan*

Farms is party to that certain *Loan Agreement* dated April 7, 2011 (as the same may have been amended, modified or supplemented, the "Project Loan"), by and between LTM and Farms in an aggregate principal amount of $9.440 million. As of the Petition Dates, the aggregate outstanding principal amount of the Project Loan is approximately $638,000.

The Project Loan was secured by that certain *Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing* dated April 7, 2011, which covered certain of Farms' real estate. The Debtors obligations under the Project Loan have been satisfied and no further amounts are due or owing.

**iv.    Other Secured Obligations**

> a.    *CHS Agricultural Loan*

The Debtors are parties to that certain *Agricultural Loan Agreement* dated as of April 13, 2020 (the "Agricultural Loan") by and among the Debtors and Guarantors, as borrowers, and CHS Capital, LLC ("CHS"), as lender, in an aggregate principal amount of $6 million. CHS previously asserted that the aggregate current principal balance of the Agricultural Loan is approximately $5.54 million.

The Agricultural Loan was secured by that certain *Agricultural Security Agreement* dated as of April 13, 2020, purportedly covering certain personal property and assets of the Debtors.

DOCS_NY:45732.2

On January 28, 2021, CHS sent a *Notice of Default* to the Debtors asserting certain defaults under the Agricultural Loan related to the default by Ranches under the Cattle Feeding Agreement (defined below). The claims of CHS relating to the Agricultural Loan were acquired by WTB and were resolved pursuant to the WTB Settlement.

### b. <u>Equipment Liens</u>

Certain parties have asserted secured interests in specific pieces of equipment that were owned by the Debtors and have filed UCC-1 financing statements with respect to those interests.

### c. <u>Statutory Liens</u>

A number of parties have asserted liens, pursuant to applicable non-bankruptcy law, on certain of the Debtors' assets, including Weyn's Farms, LLC, Sunray Farms, LLC, and Simplot AB Retail, Inc.

### v. General Unsecured Claims

In addition to the debt discussed above, the Debtors' books and records reflect approximately $4.2 million and $17.8 million, at Ranches and Farms, respectively, in unsecured debt incurred in the ordinary course of business, principally comprised of trade payables. Creditors and interested parties should review the Debtors' Schedules (defined below) and Proofs of Claim Filed with the Bankruptcy Court for more complete information concerning the nature and amount of the Debtors' liabilities as of the Petition Date.

Based on the Debtors' Schedules and internal estimates, the Debtors estimate that Allowed General Unsecured Claims against (i) Farms are approximately $33.17 million (of which approximately $15.4 million is an intercompany claim owed to Ranches), and (ii) Ranches are approximately $273 million (of which approximately $261.3 million relates to claims asserted by Tyson and $7.7 million asserted by Segale). This estimate, however, is based on the Debtors' judgment and assumes the benefit of anticipated

24

Claim objections. Thus, the total amount of Allowed General Unsecured Claims may greatly exceed or fall short of the estimates set forth herein.

### vi.    Equity and Partnership Interests

Ranches is a corporation and its stock is held by the Easterday Family. The stock and any other interests of the Easterday Family in Ranches will be canceled as of the Effective Date of the Plan (except to the extent necessary for the Plan Administrator to administer the assets of the Post-Effective Date Ranches Debtor and its Estates), and the Easterday Family will not receive any distribution on account of such Interests.

The Easterday Family are the general partners of Farms. The Partners will not retain any partnership interest in Farms and such Interests will be deemed satisfied through the Plan and will be terminated.

### D.    Events Leading to the Chapter 11 Cases

On January 24, 2021, Tyson filed a lawsuit against Ranches (the "Tyson Lawsuit") in the Superior Court of the State of Washington for Franklin County (the "Washington State Court") and concurrently filed a motion for the appointment of a receiver (the "Tyson Receiver Motion"). The Tyson Lawsuit alleged, *inter alia*, that Ranches' former president, Cody Easterday, purportedly engaged in fraudulent "forward billing" practices, resulting in Tyson's overpayment of over $200 million for the purchase and feeding of "non-existent" or "missing" cattle due to the submission of fraudulent invoices and records pursuant to the Cattle Feeding Agreement. The Tyson Receiver Motion was set for hearing during the afternoon of February 1, 2021.

On February 1, 2021, WTB filed a lawsuit against each of the Debtors as well as the Partners in Washington State Court (the "WTB Lawsuit") and concurrently filed a motion to appoint a receiver (the "WTB Receiver Motion," and collectively with the Tyson Receiver Motion, the "Receiver Motions"). The WTB Lawsuit alleged, *inter alia*, certain defaults arising under one of the Debtors' loans with WTB, principally relating to the filing of the Tyson Lawsuit and the Tyson Receiver Motion as well as

DOCS_NY:45732.2

the death of Gale Easterday. The WTB Receiver Motion was set for hearing concurrently with the Tyson Receiver Motion.

On the morning of February 1, 2021 (the "Ranches Petition Date"), Ranches filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, staying the Tyson Lawsuit and Tyson Receiver Motion. The WTB Lawsuit and the WTB Receiver Motion were also stayed, solely as to Ranches. At the hearing on the Receiver Motions, the Debtors disclosed Ranches' chapter 11 filing and Farms' imminent chapter 11 filing. As a result, the Washington State Court stayed the proceedings with respect to Ranches and issued a Temporary Restraining Order against Farms, which generally prohibited it from transferring property outside the ordinary course of business.

On February 8, 2021 (the "Farms Petition Date," and together with the Ranches Petition Date, the "Petition Dates"), Farms filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, staying the WTB Lawsuit and the WTB Receiver Motion against it.

On April 12, 2021, WTB filed a *Notice of Removal* of the WTB Lawsuit from the Washington State Court to the Bankruptcy Court that is now Adversary Proceeding No. 21-80010-WLH.

The Plan effectuates settlements among the Debtors and each of Tyson and WTB, and such settlements resolve the Tyson Lawsuit, the Tyson Receiver Motion, the WTB Lawsuit and the WTB Receiver Motion with respect to the Debtors.

## III.  THE CHAPTER 11 CASES

On the respective Petition Dates, the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Chapter 11 Cases are being jointly administered under the case caption *In re Easterday Ranches, Inc., et al, LLC, et al.*, Case No. 21-00141-11 (Bankr. E.D. Wa.). An immediate effect of commencement of the Chapter 11 Cases was the imposition of the automatic stay under Bankruptcy Code section 362(a), which, with limited exceptions, enjoined the

26

commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors during the pendency of the Chapter 11 Cases. The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the Effective Date.

### A. First Day Orders and Initial Employment Applications

On or about the Farms Petition Date, the Debtors filed certain "first day" motions and applications with the Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of these Chapter 11 Cases and to facilitate the Debtors' transition to debtor-in-possession status. In connection with these hearings, the Bankruptcy Court entered a series of customary "first day" and "second day" orders, including the payment of employee wages, maintenance of the existing cash management system, and payments relating to utilities. [*See* Docket Nos. 140, 143, 316 and 317].

Shortly after the Farms Petition Date, the Debtors filed applications to employ:

Bush Kornfeld LLP as Local Counsel for the Debtors (Order Entered on March 16, 2021 [Docket No. 385]);

Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors (Order Entered on March 16, 2021 [Docket No. 386]);

Davis Wright Tremain LLP as Special Counsel for the Debtors (Order Entered on April 15, 2021 [Docket No. 584]);

Paladin Management Group as Co-Chief Restructuring Officers and Additional Personnel to the Debtors (Order Entered on March 16, 2021 [Docket No. 387]); and

Root Realty LLC as Broker for the Debtors (Order Entered on April 9, 2021 [Docket No. 538]).

### B. Appointment of the Unsecured Creditors' Committees

On February 16, 2021, the Office of the United States Trustee for the Eastern District of Washington (the "U.S. Trustee") appointed the following creditors to the

DOCS_NY:45732.2

Ranches Official Committee of Unsecured Creditors, as amended [Docket Nos. 152, 154, and 155] (the "Ranches Committee"): (i) J.R. Simplot; (ii) Alto Nutrients; and (iii) Animal Health International.

The Ranches Committee initially retained Dentons US LLP as its counsel and B. Riley Advisors as its financial advisor. The Ranches Committee subsequently retained Cooley LLP as its counsel, replacing Dentons US LLP.

On February 22, 2021, the U.S. Trustee appointed the following creditors to the Farms Official Committee of Unsecured Creditors, as amended [Docket Nos. 187 and 188] (the "Farms Committee") and together with the Ranches Committee, the "Committees"): (i) Labor Plus Solutions, Inc.; (ii) the McGregor Company; (iii) John Deer Financial; (iv) Dykman Electrical; (v) Two Rivers Terminal; and (vi) Frank Bushman.

The Farms Committee retained Buchalter, a Professional Corporation as its counsel and Dundon Advisers LLC as its financial advisor.

### C.    United States Trustee

Gary W. Dyer is the trial attorney for the U.S. Trustee in connection with these Chapter 11 Cases. The Debtors and the Committees have worked cooperatively to address concerns and comments from the U.S. Trustee's office during these Chapter 11 Cases.

### D.    Meeting of Creditors

The initial meeting of creditors under Bankruptcy Code section 341(a) was held via telephone. At the initial meeting of creditors, the U.S. Trustee and creditors asked questions of a representative of the Debtors.

### E.    Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims

On April 9, 2021, the Debtors Filed their Schedules and Statements of Financial Affairs. A Creditor whose Claim is set forth in the Schedules and not identified as

28

contingent, unliquidated, or disputed may, but need not, have filed a proof of claim to be entitled to participate in the Chapter 11 Cases or to receive a Distribution under the Plan.[4]

On February 12, 2021, the Bankruptcy Court entered its *Order (I) Extending and Establishing the Debtors' Deadlines to File Schedules and Statements of Financial Affairs; (II) Extending and Establishing Deadlines by Which Proofs of Claim Must Be Filed; and (III) Granting Related Relief* [Docket No. 139] (the "<u>Bar Date Order</u>"), establishing May 28, 2021 as the General Claims Bar Date.

As of July 31, 2021, approximately 112 proofs of claim appeared on the official claims register for Ranches, and approximately 150 proofs of claim appear on the official claims register for Farms, although some of those claims have been withdrawn or superseded by other claims. The Debtors have not completed claim reconciliation work and do not anticipate doing so before the Effective Date of the Plan.

### F.    Cash Collateral Motions

In order to continue operations during the Bankruptcy Cases, including with respect to the feeding and maintenance of the cattle being cared for by Ranches, each Debtor sought the right to use its cash collateral in accordance with the terms of a budget agreed to with certain of the secured parties, including WTB and CHS, and providing adequate protection to the secured creditors for any diminution in the value of their collateral during the pendency of the Bankruptcy Cases.

On March 25, 2021, the Bankruptcy Court entered a Final Order approving the use of the cash collateral of Ranches and a Final Order approving the use of the cash collateral of Farms.  In connection with the Cash Collateral Orders, the Bankruptcy

---

[4]    A Creditor claiming to hold a prepetition Claim who neither files a proof of claim nor has its Claim set forth in the Schedules as being other than contingent, unliquidated or disputed, and whose Claim is not expressly Allowed under the Plan or in the Confirmation Order, has no right to payment or Distribution under the Plan.

Court provided for adequate protection of the secured parties, including replacement liens, adequate protection liens, and adequate protection claims for any diminution in value as set forth in the Cash Collateral Orders. Notably, the budget for Farms that was approved by the Bankruptcy Court, and subsequently extended without objection from WTB, included funding of a "wheat plan" so that the Debtors' agricultural lands could be preserved and the value maximized therefrom.

### G. Lindsay Canyon Term Sheet and DIP Loan

Canyon Farm II, LLC ("Canyon Farm II") was the landlord and Farms was the tenant under that certain *Amended and Restated Farm Lease* dated effective as of March 1, 2019 (together with all amendments, assignments, renewals, replacements, supplements and other modifications thereto, the "Canyon Farm II Lease"). Pursuant to the Canyon Farm II Lease, Canyon Farm II leased to Farms the Farmland (as defined in the Canyon Farm II Lease) through December 31, 2028. The Farmland consisted of approximately 6,557 acres, of which 5,193 acres were irrigated, in Morrow County, Oregon situated on what is commonly referred to as the Lindsay Canyon Farm.

The Canyon Farm II Lease was cross-defaulted with certain other agreements with non-debtor Dairy, including, but not limited to, the following (each as defined in the Canyon Farm II Lease): (i) Permit Documents, (ii) Post-Closing Agreement, (iii) Loan Documents, (iv) Manure Easement, (v) Farmland Development Agreement, and (vi) Roadway Easements.

After the Petition Dates, the Debtors and their professionals engaged in discussions with the parties regarding various outstanding issues and disputes regarding the Canyon Farm II Lease and reached an agreement on a term sheet (the "Lindsay Canyon Term Sheet") to resolve the outstanding issues. The Debtors filed a motion,

DOCS_NY:45732.2

which was granted, seeking approval of the Lindsay Canyon Term Sheet.[5] As part of the Lindsay Canyon Term Sheet, (i) the Canyon Farm II Lease was rejected, (ii) Canyon Farm II waived any claims associated with such rejection, including any rejection damage claims, and (iii) Canyon Farm II paid $2.0 million to Farms. In exchange, the Debtors waived all claims against Canyon Farm, LLC and Canyon Farm II arising under or related to the Canyon Farm II Lease, including but not limited to all claims under chapter 5 of the Bankruptcy Code limited to the Canyon Farm II Lease only. For the avoidance of doubt, the Debtors preserved the Canyon Farm Avoidance Actions.

Pursuant to the Lindsay Canyon Term Sheet, Farms entered into an unsecured $2.0 million single draw debtor-in-possession financing term loan (the "Lindsay Canyon DIP Loan") with Canyon Farm II or its affiliate as the DIP lender. The Lindsay Canyon DIP Loan provides additional working capital and liquidity as may be needed at minimal cost to the Farms estate as the Lindsay Canyon DIP Loan is non-interest bearing and only provides a modest reimbursement of DIP lender fees. The Lindsay Canyon DIP Loan has been satisfied in full.

## H. Tyson

Prior to the Petition Date, Ranches and Tyson were parties to that certain *Cattle Feeding Agreement*, dated February 20, 2017 (as subsequently amended or supplemented, the "Cattle Feeding Agreement"), whereby Ranches was required to, among other things, purchase and raise cattle on behalf of Tyson.

As of its Petition Date, Ranches was caring for tens of thousands of cattle for Tyson pursuant to the Cattle Feeding Agreement. On February 8, 2021, Tyson filed that certain *Motion for Appointment of Chapter 11 Trustee* [Docket No. 79] (the "Tyson

---

[5] The motion seeking approval of the Lindsay Canyon Term Sheet and related relief can be found at Docket No. 465. The Order approving Debtors' entry into the Lindsay Canyon Term Sheet was entered on April 2, 2021 [Docket No. 518]. The Order approving Farms' entry into the Lindsay Canyon DIP Loan was entered on April 13, 2021 [Docket No. 560].

Trustee Motion"), seeking, *inter alia*, to appoint a chapter 11 trustee over Ranches' chapter 11 estate.

Following the filing of the Tyson Trustee Motion, Ranches and Tyson engaged in negotiations concerning the Tyson Trustee Motion as well as Tyson advancing funds to Ranches to provide for the care and feeding of Tyson's cattle. Ranches and Tyson also engaged in negotiations regarding Tyson's ability to move certain cattle from Ranches' feedlots to third party grow lots in exchange for economic consideration necessary for Ranches to appropriately care for the cattle pending such transfers.

Ranches and Tyson entered into a binding term sheet (the "Cattle Term Sheet") that provided, among other things, for (i) a schedule regarding the timing and amount of cattle to be transferred, and (ii) Tyson to make certain advances as prepayments of Tyson's payment obligations arising under the Cattle Feeding Agreement to ensure the availability of funds necessary for the continued care and feeding of the cattle. Ranches' entry into the Cattle Term Sheet was approved by the Bankruptcy Court on February 18, 2021 [Docket No. 174].

Subsequent to entering into the Cattle Term Sheet, Ranches and Tyson entered into a stipulation (the "Tyson Stipulation") to resolve a number of ongoing issues between the parties, including the Tyson Trustee Motion. Pursuant to the Tyson Stipulation, Ranches and Tyson agreed to, among other things, (i) an approved budget relating to the continued operations of Ranches, including for the maintenance and movement of the cattle, (ii) a billing and reconciliation process for the continued funding of Ranches by Tyson through the Cattle Term Sheet, and (iii) certain case milestones, including but not limited to milestones relating to a sale process and the filing of a disclosure statement and plan. Pursuant to the Tyson Stipulation, Tyson agreed to withdraw, without prejudice, the Tyson Trustee Motion subject to Ranches continuing to perform under the terms of the Tyson Stipulation and Cattle Term Sheet.

DOCS_NY:45732.2

21-00141-WLH11    Doc 1642    Filed 05/24/22    Entered 05/24/22 14:27:50    Pg 40 of 154

The Bankruptcy Court approved the entry of Ranches into the Stipulation on March 4, 2021 [Docket No. 265].

## I. WTB Trustee Motion

On February 19, 2021, WTB filed the *Washington Trust Bank's Motion to Appoint Ch. 11 Trustee and Joinder in Tyson Fresh Meat, Inc. Motion for Appointment of Chapter 11 Trustee* [Docket No. 177] (the "WTB Trustee Motion"), seeking to appoint a chapter 11 trustee over Farms' chapter 11 estate and joining the Tyson Trustee Motion.

Following the resolution of the Tyson Trustee Motion as described above, Farms and WTB reached an agreement regarding the WTB Trustee Motion. Pursuant to a stipulation [Docket No. 242] (the "WTB Stipulation") Farms reached with WTB, Farms stipulated to the same case and sale milestones that were provided for in the Tyson Stipulation. In return, WTB agreed to withdraw the WTB Trustee Motion without prejudice to refile it if Farms defaulted under the terms of the Tyson Stipulation. The Bankruptcy Court approved the WTB Stipulation on March 4, 2021 [Docket No. 266]. Subsequently, the Debtors and WTB agreed upon the terms of the WTB Settlement (defined below).

## J. Commodity Futures Trading Commission Action

The Commodity Futures Trading Commission (the "CFTC") is an independent agency of the United States federal government that regulates certain derivative markets in the United States. The CFTC alleges that, prior to the Petition Date, Ranches violated certain provisions of the Commodity Exchange Act, 7 U.S.C. §§ 1-26. On March 31, 2021, the CFTC filed an action in the United States District Court for the Eastern District of Washington, captioned *CFTC v. Cody Easterday and Easterday Ranches, Inc.*, E.D. Wa. Case No. 4:21-cv-5050 (the "CFTC Action"). The CFTC Action named Ranches, but not Farms, as a defendant. In the CFTC Action, the CFTC seeks injunctive relief, restitution, a civil monetary penalty, and other relief against Ranches.

33

During the pendency of its Chapter 11 Case, Ranches negotiated a resolution of the CFTC Action with the CTFC in accordance with the terms of a consent order, agreed to by Ranches and the CFTC (the "CFTC Consent Order").  The primary terms of the CFTC Consent Order include the following:

- *Declaratory Relief*: Ranches stipulated to the violation of (i) Section 6(c) of the Commodities Exchange Act, 7 U.S.C. §§ 1-26 (2018) and 17 C.F.R. § 180.1(a)(1)(-(3) (2020) in connection with the submission of fraudulent invoices to Tyson; (ii) Section 9(a)(4) of the Commodities Exchange Act, 7 U.S.C. § 13(a)(4) (2018) in connection with the submission of fraudulent statements to a registered entity; and (iii) Section 4a(e) of the Commodities Exchange Act, 7 U.S.C. § 6a(e) (2018) in connection with the submission of fraudulent hedge position-limit exemption applications.

- *Injunctive Relief*:   Ranches is permanently restrained from directly or indirectly (i) engaging in fraudulent or deceptive actions in violation of the Commodities Exchange Act; (ii) applying for or claiming exception from registration with the CFTC; and (iii) engaging in, or acting on behalf of another that is registered or exempt from registration with the CFTC, any activity requiring registration with the CFTC, except as provided for in 17 C.F.R. § 4.14(a)(9).

- *Monetary Claims and Penalties*: Ranches is required to provide Tyson restitution through the allowance of a pre-petition general unsecured claim in the amount of $233,008,042 (the "CFTC Claim"), which shall be subordinated to all other Allowed General Unsecured Caims that are not otherwise subordinated.[6]

Ranches filed a *Motion to Approve Settlement with Commodity Futures Trading Commission under Fed. R. Bankr. P. 9019* [Docket No. 1203] (the "CFTC 9019 Motion") seeking Bankruptcy Court approval of the settlement with the CFTC.  The Bankruptcy Court granted the CFTC 9019 Motion on November 17, 2021 [Docket No. 1269].

---

[6]   The CFTC Claim is classified as an Allowed Subordinated Claim in Class 9 of the Plan.

34

### K. Lamb Weston Agreement

Prior to the Petition Date, Farms and Lamb Weston were parties to that certain *Potato Supply Agreement (Multi-Year)* dated February 14, 2011, as subsequently amended by, among other amendments, the *Amendment to Multi-Year Potato Supply Agreement*, dated on or around December, 2017 (the "Multi-Year Agreement"), and the *Potato Purchase Agreement*, dated June 3, 2020 (the "2020 Agreement," and collectively with the Multi-Year Agreement, the "Potato Agreements"). The Potato Agreements involve the farming, storage, and sale of potatoes from Farms to Lamb Weston.

On January 28, 2021, Lamb Weston sent Farms a demand for adequate assurance of due performance of the Potato Agreements. After receiving the request for adequate assurance, Farms and Lamb Weston negotiated a resolution of their respective concerns in connection with (i) delivery of the 2020 potato crop currently in storage for Lamb Weston's benefit, and (ii) Farms' intention to perform under the Potato Agreements after the 2020 growing season.

As of the Petition Date, Farms had possession and ownership of approximately 42,500 tons of potatoes from Farms' 2020 potato crop ("Farms' 2020 Potatoes"). Lamb Weston had taken delivery of approximately 30% of those potatoes post-petition, with Farms' approval and cooperation. The remainder of Farms' 2020 potatoes were being held in storage at the various locations. Farms and Lamb Weston reached an agreement to sell Farms' 2020 Potatoes to Lamb Weston with some modification to the terms of the Potato Agreements and Lamb Weston agreed to purchase the potatoes from Farms on the same terms as the Potato Agreements. The stipulation with Lamb Weston provides for the purchase and sale of Farms' 2020 Potatoes from Farms to Lamb Weston free and clear of liens pursuant to section 363(f) of the Bankruptcy Code. Lamb Weston agreed to pay the same price for Farms' 2020 Potatoes that it would have paid under the Potato Agreements. Farms agreed to give Lamb Weston full credit for its prepetition

35

payments. Pursuant to the stipulation, Farms and Lamb Weston also agreed to the rejection of the Potato Agreements. The Bankruptcy Court approved Farms' entry into the stipulation with Lamb Weston on March 25, 2022 [Docket No. 476].

## L. Rejection or Assumption of Certain Executory Contracts and Unexpired Leases

During the Chapter 11 Cases, the Debtors have rejected and assumed certain executory contracts and unexpired leases pursuant to Bankruptcy Code section 365. Pursuant to the terms of the Plan, any contracts or leases not expressly assumed by the Debtors shall be deemed rejected.

### 1. Basin City Rejection

On March 3, 2021, Farms moved [Docket No. 260] to reject 13 leases relating to approximately 4,000 acres of farmland in the Basin City area of Washington (the "<u>Basin City Leases</u>") as Farms was not in a position to pay the rent for the leased land as it became due under the Basin City Leases and was also not in a position to expend the resources necessary to farm the leased land. The Court granted Farms' motion permitting the rejection of the Basin City Leases on March 16, 2021 [Docket No. 388].

### 2. Rejection of Karen Easterday Lease

On March 9, 2021, Farms filed a motion [Docket No. 320] to reject an oral lease with Karen Easterday for approximately 800 acres of farmland. The annual lease cost for this land was $480,000. Although Farms was not farming the land, Farms continued to occupy a portion of the property for: (i) feed storage; (ii) rolling stock and other farm equipment storage and security; and (iii) hog feeding (feeds and sells for harvest). Farms was not in a position to pay the rent for the leased land as it was to become due under the lease nor was Farms in a position to expend the resources necessary to farm the land. Thus Farms sought and was granted approval to reject the lease on March 16, 2021 [Docket No. 389].

36

### 3. Assumption & Assignment of Certain Leases

Farms was the lessee of certain non-residential real property leases with FLF Columbia, Barbara Jolly & Dena Roberts and Michael Corrales (collectively, the "Corrales Leases"). Farms was not currently farming any of the Corrales Leases and had subleased certain of the Corrales Leases to Michael Corrales ("Corrales"). Debtors filed a motion on March 10, 2021 [Docket No. 326] to assume and assign the Corrales Leases to Corrales subject to higher and better offers. The Bankruptcy Court approved the assumption and assignment of the Corrales Leases on March 16, 2021 [Docket No. 390].

### 4. Rejection of Lindsay Canyon and Additional Basin City Leases

The Debtors leased approximately 1,000 acres of farmland in Basin City and Lindsay Canyon but were not in a position to pay the rent for those premises as the rent would become due under the respective leases. The Debtors were also not in a position to expend the resources necessary to farm the land. The Debtors, in their business judgment, determined the costs and resources necessary to market the applicable leases substantially outweighed any potential economic recovery related to selling or otherwise transferring the leases. The Debtors therefore determined to reject the leases as well as a related oral profit sharing contract. The Bankruptcy Court granted the Debtors' motion to reject the leases on April 27, 2021 [Docket No. 639].

### 5. Assumption of Certain Agreements in Connection with the Sale Process

In connection with the Sale Process (defined below), the Debtors also sought the assumption and assignment of certain contracts and leases to FRI. The Bankruptcy Court approved the assumption and assignment of those contracts and leases in connection with the Sale Order.

DOCS_NY:45732.2

### 6. Equipment Leases

As the Debtors worked through the restructuring process, the Debtors have been appraising and evaluating their equipment and their continuing need for certain of the equipment.

As part of that process, and in response to motions for relief from stay of certain equipment lessors, Debtors, exercising their business judgment returned certain equipment to the lessors, as the costs of using and maintaining such equipment outweighed the value of such equipment to the estate.

Debtors also established procedures for leasing certain otherwise idle equipment to neighboring farms. The Bankruptcy Court approved those procedures on April 1, 2021 [Docket No. 514].

### 7. Sale of Farm Equipment

At a hearing held on September 22, 2021, the Bankruptcy Court entered an order [Docket No. 1144] approving (i) the sale of substantially all of the Debtors' farm equipment and related personal property, including, without limitation, rolling stock and other equipment used in connection with the Debtors' operations (collectively, the "Farm Equipment") to Blue Tag Farms LLC for approximately $14 million, as well as covering the cost of transportation of the equipment off of the Debtors' property.

The sale of the Farm Equipment closed on September 24, 2021.

### 8. Termination of Retirement Plan

The Debtors offered all employees the opportunity to participate in an IRC § 401(k) defined contribution retirement plan, which allowed for voluntary employee pre-tax deferrals and matching employer-provided contributions and employer provided contributions (the "Retirement Plan"). The Debtors in their business judgment determined that it was necessary to terminate the Retirement Plan. The Debtors filed a motion seeking the Bankruptcy Court's approval of the Debtors' termination of the Retirement Plan and the implementation of termination procedures for the Retirement Plan [Docket No. 622] (the "Retirement Plan Motion"). On May 14, 2021, the

38

Bankruptcy Court entered an order granting the Retirement Plan Motion [Docket No. 709].

## M. Cooperation Agreement

From the inception of these Chapter 11 Cases, the Debtors, through their professionals, have endeavored to maximize value for all of the Estates' stakeholders by, among other things, marketing and selling the Sale Properties in the Sale Process. In no small part, the Debtors' business judgment has been guided by the integrated nature (contiguous parcels) and operations conducted on the Sale Properties. The Debtors found that in order to avoid a material downward risk in sale value, the properties should be sold at the same time with the allocation of the sale proceeds to be determined after the sale had closed. Proceeding in this manner, according to the Debtors, would allow the Debtors to more efficiently market and sell the Sale Properties with the Partners' cooperation and yield the highest and best value for the Debtors' Estates.

In order to execute on this strategy, the Debtors (i) entered into a Cooperation Agreement whereby the Partners pledged to fully cooperate in connection with the Sale Process, including the ultimate sale of any Sale Property to a buyer, and (ii) crafted a set of Bidding Procedures (as defined below) providing for a Sale Process with maximum flexibility. Together, the Cooperation Agreement and Bidding Procedures were designed to ensure a collaborative and value maximizing process for the benefit of all of the Debtors' stakeholders.

Because of the location and relationship of the Sale Properties, it was critical that the Debtors be able to market and sell all of the Sale Properties in the single Sale Process. Doing so maximized value for all of the Debtors' stakeholders, and conversely, the failure to employ this cooperative approach would have had a material negative impact on the proceeds that could be realized from the Sale Properties.

39

The complex inter-relationship between the Partners and the Debtors, including, but not limited to, issues relating to the ownership of individual parcels making up the boundaries of the Joint Properties, the interrelationship of the businesses and activities (including, but not limited to water delivery systems) conducted by the Debtors and Partners on the Sale Properties created complicated issues, including with respect to allocation and application of sale proceeds. The Debtors and the Partners agreed through the Cooperation Agreement that those complicated issues should not delay or hinder the effort to sell the Sale Properties. Rather, the parties to the Cooperation Agreement agreed to work together to maximize the value of the sale and then determine how the resulting proceeds should be allocated.

Under the terms of the Cooperation Agreement, the Debtors and Partners agreed that the Sale Proceeds would be distributed as follows:

*First*, to the applicable Mortgagee (as defined in the Cooperation Agreement) for such Sale Property in satisfaction of the obligations owed to such Mortgagee that are secured by the applicable mortgage (the "Mortgagee Amounts"), *provided however*, that to the extent that any party filed a challenge (a "Mortgage Challenge") with respect to the amount, validity, perfection or priority of any lien asserted by a Mortgagee prior to the closing of the applicable Sales Transaction, then the undisputed portion (if any) of the Mortgagee Amounts would be distributed to the Mortgagee, and the disputed portion of the Mortgagee Amounts with respect to such Mortgagee would be placed in an escrow account (on terms and conditions reasonably agreed by Debtors and such Mortgagee) pending a final order of the Bankruptcy Court with respect to such Mortgage Challenge.

*Second*, to the applicable party for the payment of transaction costs (the "Transaction Costs") relating to such sale transaction (including, but not limited to, break-up fees, costs and expenses) approved by the Bankruptcy Court as part of the Bid Procedures or in conjunction with the sale transaction.

DOCS_NY:45732.2

*Third,* any remaining Sale Proceeds after funding the Transaction Costs and Mortgagee Amounts (the "Net Sale Proceeds"), would be deposited in an escrow account pursuant to an escrow agreement negotiated between the Debtors and the Partners (the "Escrow Account").

The Debtors and the Partners further agreed that in no case would there be any distribution from the Escrow Account in advance of either (A) an order of the Bankruptcy Court approving a stipulation of all of the selling parties relating to the allocation of the Net Sale Proceeds and the distribution of Net Sale Proceeds in accordance with such allocation, or (B) an Order of the Bankruptcy Court following a motion and hearing regarding allocation of the Net Sale Proceeds.

In connection with the Cooperation Agreement, the Debtors and the Partners agreed to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Net Sale Proceeds (the "Allocation Protocol"), which Allocation Protocol would provide procedures for determining allocation of Net Sales Proceeds where the selling parties in such sale transaction have been unable to reach agreement regarding such allocation with any allocation determination being subject to approval by the Bankruptcy Court. The Debtors agreed to include the Committees, the Mortgagees and the Enjoined Parties (as defined in the Cooperation Agreement) in such negotiations but the consent of those parties would not be required for Debtors' agreement with the Partners with respect to any Allocation Protocol. The Cooperation Agreement further provides that any Allocation Protocol would be subject to approval by the Bankruptcy Court.

The Bankruptcy Court approved the Debtors' entry into the Cooperation Agreement on April 28, 2021 [Docket No. 655].

The Cooperation Agreement terminated on December 31, 2021.

DOCS_NY:45732.2

### N. Rabo Injunction

In exchange for the cooperation of the Partners with respect to the Sale Process and to prevent lenders and others from interfering with the sales process by, inter alia, seeking to foreclose on sale properties titled in the Easterday Family name, as part of the Cooperation Agreement, the Debtors agreed to obtain through stipulation or order of the Bankruptcy Court an injunction against certain third parties identified in the Cooperation Agreement (the "Enjoined Parties"), prohibiting such Enjoined Parties from taking action with respect to assets or property of any of the Partners. Though five of the six Enjoined Parties consented to forbear or stay any action against the Partners, Rabo Agrifinance LLC ("Rabo") refused to consent and continued to prosecute an action (the "Rabo Foreclosure Action") filed in the United States District Court for the Eastern District of Washington, seeking judicial foreclosure of an alleged first position mortgage against the Onion Shed Property (defined below). The Rabo Foreclosure Action is pending as Civil No. 4:21-CV-05066-SAB, and names the Easterday Family and Jody Easterday as defendants. The Onion Shed Property is also the subject of the 3E Properties Complaint (defined below).

As a result of Rabo's continued prosecution of the Rabo Foreclosure Action, on June 28, 2021, the Debtors filed a *Complaint for Injunctive Relief* [Adv. Proc. No. 21-80044] (the "Rabo Adversary") against Rabo, seeking injunctive relief to prohibit Rabo from engaging in collection efforts against the Partners.

In addition to the filing of the Rabo Adversary, on June 28, 2021, the Debtors filed a *Motion for a Temporary Restraining Order and Preliminary Injunction* [Rabo Adversary Docket No. 2] (the "Rabo TRO Motion"), seeking a temporary restraining order and preliminary injunction, until the effective date of a plan in these Chapter 11 Cases, prohibiting Rabo from engaging in collection efforts against the Partners.

The Debtors, Rabo, and the Partners reached an agreement with respect to the Rabo Adversary and the Rabo TRO Motion, and on August 24, 2021 the Bankruptcy

Court entered the *Order Approving Stipulation Among Debtors and Rabo Agrifinance LLC Regarding Withdrawal of Adversary Proceeding Without Prejudice and Resolving Motion for Temporary Restraining Order* [Rabo Adversary Docket No. 27] (the "Rabo Stipulation").  Pursuant to the Rabo Stipulation, any agreed restraint on Rabo's pursuit of the Rabo Foreclosure Action expired on December 31, 2021.

On September 9, 2021, the Bankruptcy Court entered an *Order Dismissing Adversary Proceeding Without Prejudice* [Rabo Adversary Docket No. 32], pursuant to the terms of the parties' *Stipulation of Dismissal* [Rabo Adversary Docket No. 30].

### O.  The Sale Process

During the Chapter 11 Cases, the Debtors sought to maximize the value of their Estates by methodically and opportunistically selling the Sale Properties (the "Sale Process")

The Debtors, with the assistance of their Co-Chief Restructuring Officers, investigated and analyzed their restructuring options in order to maximize the value of the Debtors' Estates. In this regard, the Debtors determined to continue a robust marketing process begun prior to the Petition Dates, in which they engaged Root Realty LLC, d/b/a Root Agricultural Advisory ("Root") as their broker to market and potentially sell the Sale Properties.

In late December 2020, Root began reaching out to its expansive network of brokers, landowners, and operators in the western United States who Root determined might be interested in acquiring some or all of the Sale Properties, preparing marketing information for the Sale Properties, and entering into appropriate nondisclosure agreements with potential purchasers to provide additional information regarding the Sale Properties.

Root's professionals became well acquainted with the Sale Properties, toured the Sale Properties, established a data room for interested parties, created marketing materials to be provided to potential buyers, and distributed "teaser" emails to potential

buyers. Furthermore, the Debtors received signed nondisclosure agreements from 128 parties, nine of which indicated an intent to submit offers on some or all of the assets.

Additionally, in order to facilitate bidding and streamline due diligence and the Sale Process, the Debtors obtained certain inspections, environmental studies, and property surveys and made them available to all potential bidders in the data room.

On March 26, 2021, the Debtors filed a motion seeking to sell the Sale Properties (the "Sale Motion") and approval of bidding procedures with respect thereto. Specifically, the Debtors sought entry of an order (the "Bidding Procedures Order") approving the Sale Process, including Bidding Procedures (defined below), an auction, a sale objection deadline and setting a sale hearing, as well as entry of a sale order relating to the sale itself.

On April 29, 2021, the Bankruptcy Court entered the Bidding Procedures Order which, among other things, (i) approved certain procedures for submitting offers and bidding at an auction ("Bidding Procedures"), including the Debtors' ability to designate a stalking horse bidder for the Sale Properties, (ii) approved the procedures for the assumption and assignment of certain executory contracts and unexpired leases, (iii) scheduled a hearing on the sale, and (iv) granted related relief.

On May 19, 2021, in accordance with the Bidding Procedures, the Debtors and the Partners entered into a Purchase and Sale Agreement (the "Stalking Horse APA") with FRI, pursuant to which and subject only to higher and better offers:

(i)     the Partners agreed to sell, assign, transfer, convey and deliver to the Debtors, and the Debtors would acquire and accept, all rights, title and interest in and to any Sale Property owned by the Partners, upon which transfer all such Sale Property would constitute property of the Debtors' Estates and for which the Partners would receive, subject to the approval of the Bankruptcy Court, an allocable interest in the Net Sale Proceeds, as such term was defined in the Cooperation Agreement;

44

(ii)    the Debtors agreed to sell, assign, transfer, convey and deliver to FRI, and FRI shall acquire and accept from Debtors, free and clear of all Claims, Rights, and Encumbrances (as defined in the proposed Sale Order), all of the Debtors' rights, title and interest in and to the Sale Property; and

(iii)   FRI agreed to pay $188 million plus any transfer taxes or the like for the Sale Properties.

Also on May 19, 2021, in connection with the entry of the Stalking Horse APA, and in accordance with the Bidding Procedures Order, the Debtors filed with the Bankruptcy Court a motion to supplement the Sale Motion for entry of an order authorizing the Debtors to designate FRI as the stalking horse bidder with respect to the Sale Properties and provide FRI with certain bid protections as described therein, among other related relief (the "Supplemental Bidding Procedures Motion"). The Debtors filed a further revised order in connection with the Supplemental Bidding Procedures Motion on May 25, 2021. The Bankruptcy Court approved the Supplemental Bidding Procedures Motion on May 28, 2021 [Docket No. 749].

On June 17, 2021, in accordance with the Bidding Procedures, the Debtors conducted the auction virtually via videoconference with the participation of five (5) Qualified Bidders (as defined in the Bidding Procedures). At the conclusion of the auction, the Debtors declared FRI as the successful bidder for the assets (the "Successful Bidder"), with the highest and otherwise best bid of $209 million. In addition, at the conclusion of the auction, the Debtors declared 100C, LLC as the backup bidder for the assets (the "Backup Bidder"), with a bid of $208 million.

Prior to the hearing on the sale, Prudential and Equitable Life raised certain objections to the proposed sale, including whether the sale could be made free and clear of their asserted interests and liens on the respective Sale Properties if they were not paid the entire amount of their asserted claims at the closing of the sale based on a Mortgage Challenge filed by the Debtors or the Easterday Family in accordance with

45

the Cooperation Agreement. The objections were resolved with the addition of language to the Sale Order relating to the distribution of the Sale Proceeds to Prudential and Equitable Life, respectively, as more fully discussed below.

A hearing to approve the sale to the Successful Bidder was held before the Bankruptcy Court on July 14, 2021. On July 20, 2021, the Bankruptcy Court entered the Sale Order [Docket No. 927] authorizing and approving the two-step Sale Transaction pursuant to which the Debtors acquired, to the extent necessary, all of the Easterday Family's right, title and interest to certain property (as defined under the Purchase and Sale Agreement) and then sold the FRI Assets to FRI, subject only to FRI's agreement to lease back certain of the FRI Assets to the Debtors, subject to the Temporary Lease Agreement. The Plan presumes that, at Confirmation, the Temporary Lease Agreement shall have terminated on its terms and that to the extent the Debtors or FRI may have claims, rights, or ongoing obligations to each other under the Temporary Lease Agreement that survive the termination, such claims, rights, or ongoing obligations shall have been fully and finally resolved at Confirmation, and that the Post-Effective Date Debtors shall not inherit any claims, rights, benefits, or Causes of Action arising under, relating to, or in connection with the Purchase and Sale Agreement, the Temporary Lease Agreement, or any other agreement relating to the foregoing.

The Sale Transaction closed on July 30, 2021. The Cash sale proceeds paid at the closing of the sale were used to make certain payments or placed in the Escrow Account.

As part of the Purchase and Sale Agreement, FRI also agreed, as a post-closing matter, that following the closing of the Sale Transaction, and entry of a Final Order confirming a plan consistent with the Sale Order, FRI will deposit $5 million in a segregated account of the Debtors to satisfy administrative expenses incurred by the

46

Debtors' estates in connection with and relating to the preparation, confirmation and consummation of such plan.

Nothing in the Plan, other than Section 9.5 of the Plan, is intended to, nor shall be construed to, alter any of the terms and conditions upon which the Sale Transaction was approved as set forth in the Purchase and Sale Agreement or in any agreement referenced in or related to the Purchase and Sale Agreement. Neither the Plan nor the Confirmation Order shall limit or otherwise affect any of the Bankruptcy Court's findings, conclusions, orders, and judgments as set forth in the Sale Order, and insofar as any of the protections afforded FRI by the Sale Order conflict with or contradict certain terms and conditions in the Plan or any findings, conclusions, orders or judgments in the Confirmation Order, the Sale Order shall govern and control with respect to FRI.

Notwithstanding anything that may suggest otherwise in the Plan, the Plan Supplement, any Schedule or Exhibit to either of the foregoing, or any other document executed in connection with Confirmation or these Chapter 11 Cases, neither the Post-Effective Date Debtors nor any Holder of any Claim or Interest shall have any claim, cause of action, right or recourse against FRI or the FRI Assets on account of or in connection with the Sale Transaction, the Purchase and Sale Agreement, the Temporary Lease Agreement, or any other agreement or document executed in connection with the consummation of the Sale Transaction between and among FRI, the Debtors and the Easterday Family.

**P.        Treatment of Prudential and Equitable Secured Claims**

Prudential and Equitable Life each asserted that they were entitled under their respective loan documents to certain prepayment premiums (the "Prepayment Premiums") and have also asserted that they are entitled to interest at the applicable default rate of interest in their respective loan documents (the "Default Interest Amounts"). The Debtors and the Partners disputed whether either Prudential or

47

Equitable Life were entitled to the Prepayment Premiums or the Default Interest Amounts.

In order to resolve the objections of Prudential and Equitable Life to the Sale Transaction, the Debtors, the Partners, Equitable Life and Prudential agreed, and the Sale Order reflects, that, upon closing of the sale, (i) Prudential and Equitable Life would be paid at closing of the Sale Transaction the full amount of their then outstanding (a) principal, non-default interest, and the reasonable fees and charges due and owing under their respective loan agreements (the "P&I Amount") and (b) the Default Interest Amount (as defined in the Sale Order, and together with the P&I Amount, the "Initial Paydown Amount"), (ii) the Debtors would escrow (a) the amount of the Prepayment Premiums, (b) a reasonable estimate of the fees and expenses Equitable Life or Prudential incurred relating to the determination of any Mortgage Challenge (the "Fee Escrow Amount"), and (c) the non-default interest and default interest that might have accrued pending such determination (the "Escrowed Interest Amount" and, together with the Fee Escrow Amount, the "Additional Escrow Amounts").

Additionally, the Debtors agreed to waive the right to file a Mortgage Challenge with respect to the P&I Amounts to be paid to Equitable Life and Prudential but reserved their rights to file a Mortgage Challenge, on or before September 1, 2021 (the "Mortgage Challenge Deadline"), with respect to: (i) the amount, validity, and priority of the Default Interest Amount and seek to recover such amounts, (ii) the amount, validity, and priority of any Prepayment Premium; and (iii) the entitlement to the Escrowed Interest Amount. Equitable Life and Prudential each retained all rights, claims, and defenses to the Default Interest Amount, the Prepayment Premium, and the Escrowed Interest Amount, including any rights of appeal in connection with a successful Mortgage Challenge.

DOCS_NY:45732.2

On September 1, 2021, the Debtors filed their (i) *Objection to Claim Numbers 25 and 38 of The Prudential Insurance Company of America* [Docket No. 1041] (the "Prudential Mortgage Challenge") and (ii) *Objection to Claim Numbers 45 and 101 of Equitable Financial Life Insurance Company* [Docket No. 1042] (the "Equitable Mortgage Challenge"), to which the Ranches Committee filed joinders to both objections [Docket Nos. 1044 and 1045, respectively].

By the respective Mortgage Challenges, the Debtors sought disallowance of the Prepayment Premiums and the Default Interest Amounts, including disgorgement of sums previously distributed to Prudential and Equitable Life on account thereof. In addition, the Debtors sought (i) disallowance of any additional accrued attorney's fees and any costs incurred by Prudential associated with a litigation guarantee policy; (ii) disallowance of any additional fees and costs that may be incurred by Equitable Life; and (iii) that remaining escrowed amounts should be released to the Debtors' estates.

The Debtors and Equitable Life resolved the Equitable Mortgage Challenge (the "Equitable Settlement") pursuant to the terms of a settlement agreement, as summarized below:

- Upon the occurrence of the effective date of the Equitable Settlement, Equitable Life would be deemed to have an allowed secured claim against the Debtors, which claim will be satisfied in full by the following distributions from the Net Sale Proceeds: (a) the sum of $2,250,000 to Equitable Life on account of its claim for a Prepayment Premium and (b) all reasonable fees and expenses actually incurred by Equitable Life's counsel from the date of the closing of the Sale Transaction through the effective date of the Equitable Settlement, *provided that* such fees and expenses would not exceed $100,000.

The Bankruptcy Court approved the Debtors' entry into the Equitable Settlement on October 19, 2021 [Docket No. 1210].

The Debtors and Prudential resolved the Prudential Mortgage Challenge pursuant to the terms of a settlement agreement (the "Prudential Settlement"), as summarized below:

49

- Upon the occurrence of the effective date of the Prudential Settlement, Prudential was deemed to have an allowed secured claim against the Debtors, which claim would be deemed satisfied in full by virtue of: (i) the prior payment to Prudential; (ii) a distribution from the Net Sale Proceeds in the amount of $3,158,418.38; and (iii) payment of the reasonable fees and expenses actually incurred by Prudential's counsel and other professionals from the date of the closing of the Sale through the effective date of the Prudential Settlement, not to exceed $215,000.

- Upon the occurrence of the effective date of the Prudential Settlement, except for the allowed claim and the distributions set forth in the first bullet point above, (a) Prudential retained all prior distributions from the Debtors in the Chapter 11 Cases, (b) the Prudential's Filed proofs of claim were deemed fully satisfied, and (c) Prudential was deemed to have no claim against the Net Sale Proceeds, the Debtors' estates, or the Easterday Family.

- Mutual releases and covenant not to sue between the Debtors' estates and Prudential, except for the obligations under the Prudential Settlement.

The Bankruptcy Court approved the Debtors' entry into the Prudential Settlement on November 29, 2021 [Docket No. 1277].

### Q.     Plan Process/Agreement with the Partners

As noted in section M above, through the Cooperation Agreement, the Debtors agreed with Partners and other parties to move forward with the Sale Process and then separately address allocation issues relating to the Net Sale Proceeds.

As part of the process of developing a consensual plan of liquidation, the Debtors engaged with their major stakeholders, including the Committees, the Partners, Tyson and WTB, in an effort to resolve myriad issues in the Chapter 11 Cases, including the allocation of the Net Sale Proceeds.

The Debtors contend that a key issue in this process was the ownership of the respective Sale Properties. During the Sale Process, the Debtors continued to diligence ownership of the Sale Properties for the purpose of determining the allocation of the

50

Sale Proceeds and worked with the Easterday Family to better understand these issues. As noted above, on September 22, 2021, the Debtors filed the Ownership Complaint seeking a determination regarding the interests of the Debtors' estates in the Disputed Property that was allegedly owned, at least in part, by individual members of the Easterday Family. On November 17, 2021, the Easterday Family filed their respective answers to the Ownership Complaint asserting affirmative defenses as well as counterclaims against the Debtors for breach of the Cooperation Agreement and seeking a comprehensive declaration as to the ownership interests between and among Farms, Ranches and the Easterday Family with respect to the land, property improvements, and associated water rights.

The Debtors, the Easterday Family, and other key stakeholders continued their negotiations and ultimately agreed on the terms of the Global Settlement resolving numerous disputed issues among the Settling Parties, including the allocation of the Sale Proceeds.

As a result of the Global Settlement, the Allocation Adversary will be resolved and the remaining Net Sale Proceeds will be released from the Escrow Account to satisfy the claims of creditors in accordance with the Plan. As described more particularly in Exhibit C hereto, the Debtors submit that the resolution of the Allocation Adversary pursuant to the terms of the Global Settlement is in the best interests of the Estates and their creditors avoiding the time, expense and risk of litigation and providing for a near-term distribution of significant value to the creditors of these Estates.

### R. Plan Filing & Solicitation Exclusivity

On August 2, 2021, the Debtors filed the (i) *Joint Chapter 11 Plan of Liquidation of Easterday Ranches, Inc. and Easterday Farms* [Docket No. 965], (ii) the *Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of Easterday Ranches, Inc. and Easterday Farms* [Docket No. 964], and (iii) the *Joint Motion for an Order Approving:*

*(I) Proposed Disclosure Statement; (II) Solicitation and Voting Procedures; (III) Notice and Objection Procedures for Confirmation of Joint Plan of Reorganization; and (IV) Granting Related Relief* [Docket No. 966] (the "<u>Solicitation Procedures Motion</u>").

On October 14, 2021, the Bankruptcy Court entered an order [Docket No. 1190] further extending the Plan Exclusivity Deadline to December 31, 2021 and the Solicitation Exclusivity Deadline to February 5, 2022.

On December 1, 2021, the Debtors filed their *First Amended Joint Chapter 11 Plan of Liquidation of Easterday Ranches, Inc. and Easterday Farms* [Docket No. 1284] *and Disclosure Statement for the First Amended Joint Chapter 11 Plan of Liquidation of Easterday Ranches, Inc. and Easterday Farms* [Docket No. 1283].

On December 28, 2021, the Debtors filed a motion to further extend their plan filing and solicitation exclusivity deadlines by an additional 120 days to May 2, 2022 and June 6, 2022, respectively. [Docket No. 1317]. The Bankruptcy Court granted the order on February 11, 2022 [Docket No. 1408]

On February 2, 2022, the Debtors filed their *Second Amended Joint Chapter 11 Plan of Liquidation of Easterday Ranches, Inc. and Easterday Farms* [Docket No. 1383] and Disclosure Statement for the *Second Amended Joint Chapter 11 Plan of Liquidation of Easterday Ranches, Inc. and Easterday Farms* [Docket No. 1382].

On April 20, 2022, the Debtors filed a motion to further extend their plan filing and solicitation exclusivity deadlines by an additional 120 days to July 1, 2022 and September 5, 2022, respectively. [Docket No. 1559]. The Bankruptcy Court granted the order on May 16, 2022 [Docket No. 1620].

On May 11, 2022, the Debtors filed their *Third Amended Joint Chapter 11 Plan of Liquidation of Easterday Ranches, Inc. and Easterday Farms* [Docket No. 1606] and

52

the Disclosure Statement *Third Amended Joint Chapter 11 Plan of Liquidation of Easterday Ranches, Inc. and Easterday Farms* [Docket No. 1607].[7]

### S. Tyson Derivative Standing Motion

On August 9, 2021, Tyson filed a motion (the "Derivative Standing Motion") seeking an order authorizing Tyson to prosecute—on behalf of, and for the benefit of, the Easterday Ranches' Estate—fraudulent transfer claims arising from Easterday Ranches' prepetition sale of the cattle feeding facility commonly known as the "North Lot."

At a status conference held on August 18, 2021, the Bankruptcy Court provided direction as to a discovery dispute between the Debtors and Tyson with respect to the Derivative Standing Motion and set a hearing for August 25, 2021, at which time the Bankruptcy Court granted in part and denied in part *Tyson's Motion for Protective Order, or in the Alternative, Motion to Stay Discovery* [Docket No.1014], and entered an order with respect thereto on September 2, 2021 [Docket No. 1047].

At a hearing held on September 22, 2021, the Bankruptcy Court denied the Derivative Standing Motion, and the subsequent request for abandonment of the causes of action by Tyson was also denied, without prejudice [Docket No. 1143].

In connection with the Plan, the Debtors have agreed with Tyson that at the Effective Date, the North Lot Actions will be deemed assigned to Tyson, including but not limited to any prepetition claims Tyson may have had respecting transfer of the North Lot. Tyson will be the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3) regarding the assigned North Lot Actions and Tyson will have exclusive authority to institute, commence, file, pursue, prosecute,

---

[7] On May 24, 2022, the Debtors filed their *Modified Third Amended Joint Chapter 11 Plan of Liquidation of Easterday Ranches, Inc. and Easterday Farms* [Docket No. _____] and this Disclosure Statement.

DOCS_NY:45732.2

enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw and North Lot Actions without any further order of the Bankruptcy Court. Any proceeds related to the North Lot Actions belong exclusively to Tyson. However, any costs or expenses that may be incurred by the Post-Effective Date Debtors, the Plan Administrator, or any of their respective employees, representatives, or professionals in connection with the North Lot Actions, if any, shall be reimbursed and borne entirely by Tyson.

**T.    Aircraft Sale**

At a hearing held on shortened notice on August 25, 2021, the Bankruptcy Court granted the *Debtors' Motion for Entry of Order (A) Approving the Sale of Aircraft to Albert G. Lee, Jr. and (B) Granting Related Relief* [Docket No. 992], and entered an order [Docket No. 1024] authorizing the sale of a 1985 Beechcraft King Air C-90A turbojet and related aviation assets for $680,000.00. The sale of the aircraft closed on September 3, 2021.

**U.    Complaint Against 3E**

On December 27, 2021, Farms filed a complaint against 3E, Jody Easterday, the Estate of Gale A. Easterday (Deceased), Karen L. Easterday, Cody A. Easterday, and Debby Easterday [Adv. Proc. No. 21-80057] (the "3E Complaint"), seeking a determination of the ownership interests of Farms' estate in that certain property commonly referred to as the "Onion Shed" located in Pasco, Washington (the "Onion Shed Property"). The Defendants each filed Answers, Affirmative Defenses, and Counterclaims. In connection with the Global Settlement, the Debtors have agreed to dismiss the 3E Complaint with prejudice as of the Effective Date.

**V.    The WTB and CHS Settlements**

On February 17, 2022, the Debtors filed a motion [Docket No. 1431] (the "WTB 9019 Motion") to approve that certain Settlement Agreement and Release (the "WTB Settlement Agreement") between the Debtors and WTB to fully and finally resolve the disputes that currently exist between them pursuant to the terms of the WTB Settlement

54

DOCS_NY:45732.2

Agreement. Specifically, the terms of the WTB Settlement Agreement proposed to reduce WTB's allowed secured claim by 10% and, upon payment, assign to the Debtors' Estates or any successor thereto all of WTB's rights under the applicable loan documents, including any right to pursue deficiency claims against non-Debtors (*i.e.*, the Easterday Family).

On February 18, 2022, the Debtors filed a motion [Docket No. 1433] (the "CHS 9019 Motion") to approve that certain Settlement Agreement between the Debtors and CHS, Inc. (the "CHS Settlement Agreement") in full resolution of the claims asserted by CHS, Inc. and each of its affiliates and subsidiaries, including CHS Hedging, LLC and CHS Capital, LLC (collectively, the "CHS Parties") against the Debtors. The CHS Settlement Agreement is a full settlement among the Debtors and the CHS Parties that resolves numerous inbound and outbound claims, such as (i) claims asserted by the CHS Parties against the Debtors on account of feed and fuel supplies and (ii) claims asserted by the Debtors against the CHS Parties relating to their role in the hedging activities. Under the terms of the CHS Settlement Agreement, the Debtors were to receive $7.4 million and a release of any claims by the CHS Parties, thereby avoiding years of protracted and expensive litigation.

On March 11, 2022, the Easterday Family filed objections [Docket Nos. 1465 and 1468] (together, the "Easterday WTB Objections") to the WTB 9019 Motion, asserting, among other things, that the terms of the settlement (i) are not reasonable, appropriate, fair or equitable, (ii) are designed to exert maximum pressure on the Easterday Family by assigning the deficiency claims against them to the Debtors' Estates, and (iii) are the product of conflicts of interest between the Debtors and breaches of their various fiduciary duties. On March 11, 2022, Cody and Debby Easterday filed an objection [Docket No. 1466] to the CHS 9019 Motion, to which Karen Easterday joined [Docket No. 1469] (together, the "Easterday CHS Objections"), on the basis that they have an ownership interest in the accrued patronage (one element

DOCS_NY:45732.2

of the settlement).  The Debtors opposed the Easterday CHS Objections.  *See* Docket No. 1476. The Debtors also opposed the Easterday WTB Objections. *See* Docket No. 1477.

As part of the Global Settlement, the Easterday Family agreed to withdraw the Easterday CHS Objections and the Easterday WTB Objections, subject to certain modifications to the WTB Settlement Agreement.  The Bankruptcy Court approved the WTB Settlement on April 21, 2022 (the "WTB Settlement Order") and the CHS Settlement Agreement on April 20, 2022 (the "CHS Settlement Order").  The Debtors effectuated the WTB Settlement Order and CHS Settlement Order in accordance with their terms.  As a result, the claims of WTB and CHS are not addressed in the Plan.

## W.    The Post-petition Corporate Actions and Governance Adversary Proceeding

On March 12, 2022, the Easterday Family took action to remove the individual members of the Board of Directors for each of the Debtors (collectively, the "Independent Directors") and install replacement directors and managers (the "Replacement Directors and Officers").    More particularly, the members of the Easterday Family executed (i) a unanimous written consent of the shareholders of Ranches to remove the Independent Directors and (ii) an amendment to the Easterday Farms partnership agreement to replace the Independent Directors with a manager (together, the "Post-petition Corporate Actions").

On March 14, 2022, the Debtors filed that certain *Complaint for Injunctive Relief* against the Easterday Family, which initiated Adversary Proceeding No. 22-80008 (the "Governance Adversary Proceeding").  In the Governance Adversary Proceeding, the Debtors seek, *inter alia*, declaratory and injunctive relief with respect to the Post-petition Corporate Actions.  Concurrently with initiating the Governance Adversary Proceeding, the Debtors filed a motion [Governance Adv. Pro. Docket No. 2] (the "TRO Motion") seeking a temporary restraining order and preliminary injunction with respect

56

to the Post-petition Corporate Actions. The Easterday Family filed responses and declarations in opposition to the TRO Motion. *See* Governance Adv. Pro Docket Nos. 11-13, 15-17. Tyson filed a joinder in support of the TRO Motion. *See* Governance Adv. Pro. Docket No. 10.

On March 16, 2022, the Bankruptcy Court conducted a hearing (the "TRO Hearing") on the TRO Motion and ruled to, *inter alia*, maintain the status quo pending a full evidentiary hearing to be conducted on April 18, 2022 (the "PI Hearing"). Following the TRO Hearing, the Debtors and Easterday Family submitted competing orders incorporating their respective understandings of the Bankruptcy Court's ruling and their agreements at the TRO Hearing. *See* Governance Adv. Pro. Docket No. 26. Thereafter, the Bankruptcy Court entered that certain *Scheduling and Abatement Order* [Governance Adv. Pro. Docket No. 27] (the "Scheduling and Abatement Order"), based upon the Debtors' proposed form of order with a number of material revisions.[8] Thereafter, Karen Easterday filed a motion seeking reconsideration of the Scheduling and Abatement Order, which the Debtors opposed. *See* Governance Adv. Pro. Docket Nos. 28, 29. As part of the Global Settlement, the Debtors and the Easterday Family are resolving the Governance Adversary, and, on the Effective Date of the Plan, the Governance Adversary will be deemed dismissed with prejudice.

## X. Global Settlement

Following a months' long, extensive, arm's-length, and exceptionally hard-fought negotiation and litigation process, the Debtors and the Easterday Family, along with the support and consent of the other Settlement Parties (including both Committees), entered into the Global Settlement Term Sheet. The entry of the Debtors into the Global Settlement Term Sheet was approved by the Bankruptcy Court on April 20, 2022 [Docket No. 1560]. The Global Settlement Term Sheet provides for a

---

[8] The Scheduling and Abatement Order was entered in the Chapter 11 Cases, the Allocation Adversary, and the 3E Properties Adversary Proceeding.

consensual framework that has been incorporated into the Plan, resolving all material disputes and issues among the Settling Parties as of the Effective Date. The material terms of the Global Settlement are set forth below.[9]

- **Proceeds from FRI Sale:** Other than the Karen Easterday Settlement Amount, the Easterday Family shall release any and all interests in the Net Sale Proceeds;

- **The Karen Easterday Settlement Amount:** Upon the Effective Date, and in satisfaction of Karen Easterday's claims asserted in the Allocation Adversary proceeding, Farms will pay $6 million to Karen Easterday reduced by the Basin City Cash Purchase Price ($4.2 million) and the Idaho Contribution ($669,300). The remaining $1,130,700 of the Karen Easterday Settlement Amount will be applied to the Easterday Dairy LLC Note and BC 140 LLC Secured Guaranty, such that the net cash payment by Farms on account of the Karen Settlement Amount will be $0;

- **The Karen Easterday Secured Note:** On the Effective Date, Karen Easterday will issue the Karen Easterday Secured Note to the Administrative Agent to be held for the benefit of the Holders of Allowed Claims in Classes 5 and 6. The Karen Easteday Secured Note will be in the amount of $5 million with 3% simple interest paid at maturity, which will occur two years after the Effective Date. The Karen Easterday Secured Note will be secured by a first deed of trust or mortgage on Karen Easterday's Franklin County, Washington home and surrounding property;

- **The Idaho Contribution:** On account of a property in Kootenai County, Idaho in which Karen Easterday owns an interest, Karen Easterday will provide, on the Effective Date of the Plan, an additional payment to the Debtors equal to $669,300.00, which represents 30% of the difference between the Appraised Value ($9,231,000) and the negotiated Baseline Value ($7 million). The Idaho Contribution shall by paid as a reduction of the Karen Easterday Settlement Amount.

- **The Basin City Sale:** On the Effective Date, Cody and Debby Easterday shall

---

[9] The following summary of the terms of the Global Settlement is intended for illustrative purposes only. Accordingly, to the extent that the following summary diverges from the terms of the Global Settlement Term Sheet, the Global Settlement Term Sheet controls.

58

sell their interests in the Basin City Properties to BC 140 LLC, for the Basin City Cash Purchase Price ($4.2 million) <u>plus</u> the assumption the liability for the loan from Equitable Life, subject to consent of Equitable Life.

- **The Easterday Dairy LLC Note and BC 140 LLC Secured Guaranty**:  In full satisfaction of the outstanding note receivable owed by Dairy to Farms, on the Effective Date of the Plan, Dairy will issue the Easterday Dairy LLC Note with 3% interest, in the amount of $2,169,300 to the Administrative Agent to be held for the benefit of Holders of Allowed Claims in Classes 5 and 6 in accordance with the terms of the Administrative Agent Agreement. The Easterday Dairy LLC Note shall be guaranteed by BC 140 LLC, which shall be secured pursuant to the BC 140 LLC Secured Guaranty.  The full amount of the Easterday Dairy, LLC Note, including principal and accrued interest, shall be due and payable two years from the Effective Date of the Plan. The BC 140 LLC Secured Guaranty shall be issued to and held by the Administrative Agent for the benefit of Holders of Allowed Claims in Classes 5 and 6 in accordance with the terms of the Administrative Agent Agreement.

- **The Transfer of Steer Head Brand:** The Debtors shall transfer all rights, interests, and ownership of the "steer head" brand to Karen Easterday or her designee at the sole expense of Karen Easterday or her designee.

- **The Assignment of Claims Against Canyon Farm:** Debtors agree to assign the Canyon Farm Avoidance Actions to Karen Easterday or her designee.

- **The 3E and Easterday Farms Produce Contribution:** 3E and Produce shall buy back Cody and Debby Easterday's equity interests in 3E and Produce for the 3E-Produce Purchase Price ($2,274,210). The 3E-Produce Purchase Price shall be in the form of the 3E-Produce Secured Note from 3E and Produce as joint obligors at 4.5% interest with $100,000 due and payable every 6-months with the first payment due 90 days after the Effective Date.  The balance of the 3E-Produce Secured Note will be due two years after the Effective Date of the Plan.  The 3E-Produce Secured Note shall be secured by a pledge of 33% of the equity interests in 3E and Produce.  At closing of the sale of their interests in 3E and Produce, Cody and Debby Easterday shall assign their rights in the 3E-Produce Secured Note to the Administrative Agent to be held for the benefit of Holders of Allowed Claims in Classes 5 and 6 in accordance with the terms of the Administrative Agent Agreement.  The Administrative Agent Agreement shall be substantially in the form Filed in the Plan Supplement, which shall be in form and substance reasonably acceptable to the Debtors, the Administrative Agent, the Easterday Family, 3E Produce,

59

Dairy, Tyson, and Segale.

- **The Easterday Family Contribution Instruments:** The Easterday Family Contribution Instruments (the Karen Easterday Secured Note, the Easterday Dairy LLC Note, the BC 140 LLC Secured Guaranty and the 3E-Produce Secured Note) will be held by the Administrative Agent solely for the benefit of the Holders of Allowed Claims in Classes 5 and 6 in accordance with the terms of the Administrative Agent Agreement.

- **The Easterday Family Tax Payments:** The Debtors' Estates shall have no responsibility whatsoever for the Easterday Tax Payments, all of which shall be borne entirely by the Easterday Family.

- **The Restitution Claims:** All rights of Tyson, Segale, and Cody Easterday with respect to the restitution claims against Cody Easterday shall be fully reserved under all circumstances notwithstanding any other provision of the Plan.

- **The Criminal Proceedings:** The Debtors agree not to appear, file, or otherwise make any statements in connection with the proceeding entitled *United States of America v Cody Allen Easterday*, Case No. 4:21-CR-06012-SAB-1 pending in the United States District Court for the District of Washington.

- **The Consent of the Department of Justice:** The Debtors, Tyson, and Segale will cooperate with Cody and Debby Easterday to get the DOJ to consent to the settlements and releases of properties and interests included in the Term Sheet and Plan. The DOJ's consent is a condition of the Global Settlement and a condition precedent to the Effective Date of the Plan.

- **The Replacement Director Fees:** Within fourteen (14) calendar days of the Effective Date, the Plan Administrator shall pay the Replacement Director Fees.

- **Releases and Exculpation:** The Global Settlement also provides for certain releases of the Released Parties and exculpation of the Exculpated Parties, including the Easterday Family and their Related Parties. These release and exculpation provisions are described more fully herein at Article IV. D. and E.

60

DOCS_NY:45732.2

The Debtors believe that the Global Settlement is in the bests interests of these Estates and their creditors and represents a great result for the creditors of the Estates as it enables the Farms General Unsecured Creditors receive 100% recovery and the Ranches General Unsecured Creditors receiving a meaningful distribution. Additionally, as more fully described in <u>Exhibit C</u> hereto, the Global Settlement resolves myriad issues that could have involved substantial litigation taking years and significant amounts to resolve. The results of this case as embodied in the Plan, including the sale of the Sale Properties for over $200 million, would not have been possible without the efforts of the Debtors' Chief Restructuring Officers and Paladin Management Group.

## IV. <u>SUMMARY OF THE JOINT CHAPTER 11 PLAN</u>

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such

documents for the full and complete statement of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding on all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict, inconsistency, or discrepancy between this Disclosure Statement and the Plan, the Confirmation Order, the Plan Supplement, or any other operative document, the terms of the Plan, Confirmation Order, Plan Supplement, or such other operative document, as applicable,

61

shall govern and control; *provided* that, in any event, the terms of (1) the Confirmation Order and then (2) the Plan, inclusive of any Plan Supplement, in that order, shall govern and control over all other related documents.

### A.    Purpose and Effect of the Plan

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its constituents. Chapter 11 also specifically allows a debtor to formulate and consummate a plan of liquidation. *See* 11 U.S.C. § 1129(a)(11). A plan of liquidation sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan of liquidation by a bankruptcy court makes that plan binding on the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The Plan provides for the distribution of the proceeds of the liquidation of all Estate Assets to various creditors as contemplated thereunder and for the wind-up of the Debtors' business affairs.

Under the Plan, Claims against, and Interests in, the Debtors are divided into Classes according to their relative seniority and other criteria. If the Plan is confirmed by the Bankruptcy Court and consummated, the Claims and Interests of the various Classes will be treated in accordance with the provisions in the Plan for each such Class and the Plan Administrator will make Distributions as provided in the Plan. A general description of the Classes of Claims and Interests created under the Plan, the treatment of those Classes under the Plan, and the property to be distributed under the Plan are described below.

DOCS_NY:45732.2

**B. Classification of Claims and Interests Under the Plan**

**1. Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan, including Subordinated Claims, shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Bankruptcy Code sections 510(a) or 510(b), or otherwise. Pursuant to Bankruptcy Code section 510, the Debtors and the Plan Administrator shall reserve the right to re-classify, or to seek to subordinate, any Claim as a Subordinated Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a Subordinated Claim at any time shall be modified to reflect such subordination.

**2. Classification and Voting Controversies**

If a controversy arises regarding whether any Claim is properly classified under the Plan, then the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.

If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

**C. Treatment of Claims and Interests Under the Plan**

**1. Unclassified Claims**

**i. Administrative Claims**

Except as otherwise provided for in the Plan, and subject to the requirements of therein, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) thirty (30) calendar days following the date on which an Administrative Claim becomes an Allowed Administrative Claim, the Holder of such Allowed Administrative

63

Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such other less favorable treatment as to which such Holder and the Plan Administrator shall have agreed upon in writing.

### ii.     Professional Fee Claims

Professional Fee Claims shall be paid as set forth in Section 12.2 of the Plan.

### iii.    Priority Tax Claims

In full satisfaction, settlement, and release of and in exchange for such Claims, Allowed Priority Tax Claims shall be paid, at the Plan Administrator's option, as follows: (a) Cash equal to the unpaid portion of such Allowed Priority Tax Claim on the later of the Effective Date and thirty (30) calendar days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; (b) in regular installment payments in Cash over a period not exceeding five (5) years after the Petition Date, plus interest on the unpaid portion thereof at the rate determined under applicable nonbankruptcy law as of the calendar month in which the Effective Date occurs (provided that such election shall be without prejudice to the right to prepay any such Allowed Priority Tax Claim in full or in part without penalty); or (c) such other treatment as to which the Holder of an Allowed Priority Tax Claim and the Plan Administrator shall have agreed upon in writing.

### iv.    Class 1: Secured Claims

Classification.  Class 1 consists of all Secured Claims against the Debtors, including Secured Tax Claims.

Treatment.  The legal, equitable, and contractual rights of Holders of Allowed Class 1 Claims are unaltered by the Plan and the Liens of the Holders of Allowed Class 1 Claims will continue to attach to their respective Collateral, provided that all such Claims shall remain subject to any and all defenses, challenges, counterclaims, and

64

setoff or recoupment rights with respect thereto. Unless the Plan Administrator and the Holder of an Allowed Class 1 Claim agree to other treatment, on or as soon as is reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim shall receive, at the option of the Plan Administrator: (i) Cash in the Allowed amount of such Holder's Allowed Class 1 Claim; (ii) the return of the Collateral securing such Allowed Class 1 Claim, without representation or warranty by any Person (and without recourse against any Person regarding such Secured Claim); or (iii) (A) the cure of any default, other than a default of the kind specified in Bankruptcy Code section 365(b)(2), that Bankruptcy Code section 1124(2) requires to be cured, with respect to such Holder's Allowed Class 1 Claim, without recognition of any default rate of interest or similar penalty or charge, and upon such cure, no default shall exist; (B) the reinstatement of the maturity of such Allowed Class 1 Claim as the maturity existed before any default, without recognition of any default rate of interest or similar penalty or charge; and (C) retention of its unaltered legal, equitable, and contractual rights with respect to such Allowed Class 1 Claim, including through the retention of any associated Lien on the Collateral securing such Allowed Class 1 Claim.

The Bankruptcy Court shall retain jurisdiction and power to determine the amount necessary to satisfy any Allowed Class 1 Claim for which treatment is elected under clause (i) or clause (iii) of the immediately foregoing paragraph. With respect to any Allowed Class 1 Claim for which treatment is elected under clause (i), any Holder of such Allowed Class 1 Claim shall release (and by the Confirmation Order shall be deemed to release) all Liens against any Estate Assets. Notwithstanding anything else in the Plan, the Holders of Allowed Class 1 Claims will have no right to receive any Distribution from, or otherwise share in, any of the Easterday Family Consideration.

Voting. Claims in Class 1 are Unimpaired. Each Holder of an Allowed Class 1 Claim is conclusively presumed to have accepted this Plan and, therefore, is not entitled to vote

65

### v. Class 2: Priority Claims.

Classification. Class 2 consists of all Priority Claims. Class 2 is Unimpaired under the Plan.

Treatment. On, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) the date on which a Priority Claim becomes payable pursuant to and as specified by an order of the Bankruptcy Court, the Holder of such Allowed Priority Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Claim, either (a) Cash from the Post-Effective Date Debtors equal to the unpaid portion of such Allowed Priority Claim or (b) such other less favorable treatment to which such Holder and the Plan Administrator shall have agreed upon in writing.

Voting. Class 2 is Unimpaired under the Plan and not entitled to vote to accept or reject the Plan.

### vi. Class 3: Farms General Unsecured Claims.

Classification. Class 3 consists of all Farms General Unsecured Claims. Class 3 is Impaired under the Plan and entitled to vote.

Treatment. On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 3 Claim shall receive, as the sole distribution or dividend by Farms or its Estate under the Plan on account of such Allowed Class 3 Claim, Cash from the Post-Effective Date Debtors in a fixed amount equal to 100% of such Holder's Allowed Class 3 Claim. Allowed Class 3 Claims shall not include any amounts for interest or attorneys' fees with respect to such Class 3 Claims. The Class 3 Claims set forth on the Farms GUC Claims Schedule (Exhibit J to the Plan) shall be Allowed in the amounts set forth in the Farms GUC Claims Schedule for all purposes under the Plan, including for purposes of receiving Distributions under the Plan; *provided that*, for the avoidance of doubt, any Class 3 Claim that is not included on the Farms GUC Claims Schedule but is otherwise Allowed shall be entitled to the full treatment afforded to Class 3

Claims under the Plan. Notwithstanding anything to the contrary in the Plan, the Debtors or the Post-Effective Date Debtors, as applicable, shall complete distributions to the Holders of Allowed Class 3 Claims set forth on the Farms GUC Claims Schedule within seven (7) calendar days after the Effective Date.

All Avoidance Actions against Holders of Allowed Farms General Unsecured Claims shall be deemed resolved upon the Effective Date and shall not be included in the Post-Effective Date Debtors' Assets.

Voting. Class 3 Claims are Impaired and, therefore, each Holder of an Allowed Class 3 Claim is entitled to vote on the Plan.

**vii. Class 4: Ranches General Unsecured Claims.**

Classification. Class 4 consists of all Ranches General Unsecured Claims.

Treatment. On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 4 Claim shall receive (a) its Pro Rata share of the Class 4 Initial Payment ([$1,712,000]) and (b) its Pro Rata share of the Class 4 Net Distributable Assets (subject to any Distribution Reserve).

The Holders of Allowed Class 4 Claims shall not have any interest in any of the Easterday Family Contribution Instruments, restitution claims against Cody Easterday, or the North Lot Actions.

All Avoidance Actions against Holders of Allowed Class 4 Claims shall be deemed released and waived upon the Effective Date and shall not be included in the Post-Effective Date Debtors' Assets.

Voting. Class 4 Claims are Impaired and, therefore, each Holder of an Allowed Class 4 Claim is entitled to vote.

**viii. Class 5: Tyson Claims.**

Classification. Class 5 consists of all Tyson Claims.

Treatment. Tyson shall have an Allowed Class 5 Claim in the amount of $261,316,000.00. On or as soon as practicable after the Effective Date, each Holder of

an Allowed Class 5 Claim shall receive (a) its Pro Rata share of the Class 5 Initial Payment ([$1,566,000]), (b) its Pro Rata share of the Class 5 Net Distributable Assets (subject to any Distribution Reserve), (c) its Pro Rata share of the proceeds of the Easterday Family Contribution Instruments, and (d) assignment of the North Lot Actions.

All Estate claims against Tyson, including any Avoidance Actions, shall be deemed released and waived upon the Effective Date.

At the Effective Date, the North Lot Actions will be deemed assigned to Tyson, including, but not limited to, any prepetition claims Tyson may have had relating to the transfer of the North Lot. Tyson will be the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3) regarding the assigned North Lot Actions and Tyson will have exclusive authority to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw the North Lot Actions without any further order of the Bankruptcy Court. Any proceeds related to the North Lot Actions belong exclusively to Tyson. However, any costs or expenses that may be incurred by the Post-Effective Date Debtors, the Plan Administrator, or any of its employees, representatives, or professionals in connection with the North Lot Actions, if any, shall be reimbursed and borne entirely by Tyson.

Voting. Class 5 Claims are Impaired and, therefore, each Holder of an Allowed Class 5 Claim is entitled to vote on the Plan.

### ix.  Class 6: Segale Claims.

Classification. Class 6 consists of all Segale Claims against Ranches.[10]

Treatment.  Segale shall have an Allowed Class 6 Claim in the amount of $7,830,641.  On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 6 Claim shall receive (a) its Pro Rata share of the Class 6 Initial Payment

---

[10]  For the avoidance of doubt, Segale shall also have an Allowed Class 3 Claim that shall receive the same treatment as other Allowed Class 3 Claims.

68

([$922,000]), (b) its Pro Rata share of the Class 6 Net Distributable Assets (subject to any Distribution Reserve), and (c) its Pro Rata share of the proceeds of the Easterday Family Contribution Instruments.

All Estate claims against Segale, including any Avoidance Actions, shall be deemed released and waived upon the Effective Date.

The Holders of Allowed Class 6 Claims shall not have any interest in the North Lot Actions.

### x.    Class 7: Subordinated Claims.

<u>Classification</u>.  Class 7 consists of all Subordinated Claims.

<u>Treatment</u>.  Holders of Class 7 Claims shall not receive any payment on account of their Claims.

<u>Voting</u>.  Each Holder of a Class 7 Claim will be deemed to have rejected the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

### xi.    Class 8: Intercompany Claim.

<u>Classification</u>.  Class 8 consists of all Intercompany Claims.

<u>Treatment</u>.  Holders of Allowed Class 8 Claims shall not receive any payment on account of their Claims.

<u>Voting</u>.  Each Holder of a Class 8 Claim is a proponent of the Plan and will therefore conclusively be deemed to have accepted this Plan.

### xii.    Class 9: Interests.

<u>Classification</u>. Class 9 consists of all Interests. Class 9 is Impaired under the Plan and deemed to reject the Plan.

<u>Treatment</u>.   As of the Effective Date, all Interests shall be deemed void, cancelled, and of no further force and effect. On and after the Effective Date, Holders of Interests shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Interests.

69

Voting.  Class 9 is deemed to have rejected the Plan and, therefore, Holders of Interests are not entitled to vote to accept or reject the Plan.

### xiii.    Special Provisions Regarding Insured Claims.

Any Allowed General Unsecured Claim with respect to an Insured Claim shall be limited to the Uninsured Portion of such Claim, provided such Claims have been timely Filed by the applicable Claims Bar Date.

If there is insurance purchased by or otherwise applicable to the Debtors, any Person with rights against or under the applicable insurance policy, including the Post-Effective Date Debtors and Holders of Insured Claims, may pursue such rights.

Nothing in Section 3.11 of the Plan shall constitute a waiver of any Causes of Action the Debtors, the Estates, or the Post-Effective Date Debtors may hold against any Person, including the Debtors' insurance carriers; and nothing in Section 3.11 of the Plan is intended to, shall, or shall be deemed to preclude any Holder of an Insured Claim from seeking or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any Distribution such Holder may receive under the Plan; *provided, however*, that the Debtors and the Post-Effective Date Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

The Plan shall not expand the scope of, or alter in any other way, the rights and obligations of the Debtors' insurers under their policies, and the Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest or litigate with any Person the existence, primacy, or scope of available coverage under any allegedly applicable policy. The Plan shall not operate as a waiver of any other Claims the Debtors' insurers have asserted or may assert in any proof of claim or of any objections or defenses to any such Claims.

DOCS_NY:45732.2

### xiv. Comprehensive Settlement of Claims and Controversies.

Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, the Plan effectuates a global resolution of disputes among the Settling Parties. The Plan is a vehicle for the near-term resolution of the myriad complex legal issues and disputes that have arisen in the Chapter 11 Cases, including among the Settling Parties. The Plan resolves several major issues that would otherwise have to be judicially determined through lengthy, expensive, and inherently uncertain litigation. Moreover, if such issues were litigated, it could be years before creditors receive distributions, if any, from the Post-Effective Date Debtors. In contrast, the Plan provides a mechanism for significant Distributions to be made to Creditors in a more timely and orderly fashion.

The Plan also resolves all Avoidance Actions with Tyson. Notwithstanding anything in the Plan to the contrary, on the Effective Date, all Avoidance Actions and any possible objections, defenses, challenges, setoffs, recoupment, or other basis for challenging or diminishing the Tyson Claim are deemed settled for a deemed payment of $29,050,000, including but not limited to any claims relating to the prepetition transfer of "Customer 3 Cattle" to Tyson worth an estimated $58,100,000. The net effect of such deemed settlement has been incorporated into the Plan through, among other things, the allocation of Initial Net Distributable Proceeds among the Class 4 Initial Payment, the Class 5 Initial Payment, and the Class 6 Initial Payment.

Furthermore, the Debtors are strongly of the view that all elements of the comprehensive compromise and settlement to be effected under the Plan are superior to the disorderly and uncertain alternatives. The terms of the resolution under the Plan were heavily negotiated by Settling Parties, each of which acted at arm's length and had the benefit of sophisticated external advisers.

Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith

71

compromise and settlement of all claims and controversies relating to the rights that a Holder of a Claim or an Interest may have against either Debtor or the Easterday Family Released Parties with respect to any Claim, Interest, or any Distribution on account thereof, as well as of all potential Intercompany Claims and Causes of Action against either Debtor. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies as well as any and all claims of the Debtors against the Easterday Family Released Parties and the Bankruptcy Court's finding that all such compromises or settlements are (i) in the best interest of the Debtors, their Estates, and their respective stakeholders; and (ii) fair, equitable, and reasonable. This comprehensive compromise and settlement is a critical component of the Plan and is designed to provide a resolution of myriad disputed intercompany and intercreditor Claims, and Causes of Action that otherwise could take years to resolve, which would delay and undoubtedly reduce the Distributions that ultimately would be available for all creditors.

### D. Releases and Related Matters

#### 1. Debtor Releases

**On the Effective Date and to the fullest extent authorized by applicable law, the Released Parties and their respective property will be expressly, unconditionally, generally, individually, and collectively released, acquitted, and discharged by the Debtors on behalf of themselves, their estates, the Post-Effective Date Debtors, and the Plan Administrator (such that the Post-Effective Date Debtors and Plan Administrator will not hold any Claims or Causes of Action released pursuant to this Plan), for the good and valuable consideration provided by each of the Released Parties, from any and all actions, claims, debts, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative or deficiency claims asserted or that could be asserted by or on behalf of the Debtors, whether known or unknown, foreseen or unforeseen,**

72

DOCS_NY:45732.2

matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by state law (including Washington State partnership law), statute, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, any of the Debtors' present or former assets, the Released Parties' interests in or management of the Debtors, this Plan, the Disclosure Statement, these Chapter 11 Cases, or the Sale Transaction, including those that the Debtors, the Post-Effective Date Debtors, or the Plan Administrator would have been legally entitled to assert or that any Holder of a Claim against or interest in the Debtors or any other Entity could have been legally entitled to assert derivatively or on behalf of the Debtors or their Estates; *provided*, *however*, that the foregoing Debtors' Releases shall not operate to waive or release any Claims or Causes of Action of the Debtors or their Estates against a Released Party arising under any contractual obligation owed to the Debtors, the Post-Effective Date Debtors, or the Plan Administrator that is entered into pursuant to this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtors' Releases set forth in Section 10.1(a) of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Debtors' Releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of the Claims released by the Debtors' Releases; (3) in the best interests of the Estates and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar against any of the Estates, the Post-Effective Date

73

Debtors, or the Plan Administrator, asserting any Claim or Cause of Action released pursuant to the Debtors' Releases.

The foregoing Debtors' Releases are an integral component of the Global Settlement.

### 2. Third Party Releases

On the Effective Date and to the fullest extent authorized by applicable law, the Releasing Parties shall be deemed to have expressly, unconditionally, generally, individually, and collectively, released and acquitted the Released Parties and their respective property from any and all actions, Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative or deficiency claims asserted or that could be asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that such Holder (whether individually or collectively) ever had, now has, or hereafter can, shall or may have, based on or relating to, or in any manner arising from or related in any way to the Debtors, any of the Debtors' present or former assets, the Released Parties' interests in or management of the Debtors, the business, or contractual arrangements between the Debtors and any Released Party, this Plan, the Disclosure Statement, the Chapter 11 Cases, or the Sale Transaction, including those that the Debtors, the Post-Effective Date Debtors, or the Plan Administrator would have been legally entitled to assert or that any Holder of a Claim against or interest in the Debtors or any other Entity could have been legally entitled to assert derivatively or on behalf of the Debtors or their Estates, including any deficiency claim under Washington State partnership law, except for (1) Tyson-Segale Preserved Claims, (2) Cody Easterday Preserved Claims, and (3) the right to receive Distributions from the Debtors, the Post-Effective Date Debtors, or the Plan Administrator on

74

account of an Allowed Claim against the Debtors pursuant to this Plan. For the avoidance of doubt, the Releasing Parties shall include (1) the Released Parties, (2) Holders of Interests except as carved out for certain Creditors, and (3) all Holders of Claims that (a) vote to accept the Plan and (b) do not affirmatively opt out of the Third Party Release provided by this section pursuant to a duly executed ballot. Notwithstanding anything to the contrary contained herein, in no event shall an Entity that (1) does not vote to accept or reject this Plan, (2) votes to reject the Plan, or (3) appropriately marks the ballot to opt out of the Third Party Release provided in this section and returns such ballot in accordance with the Solicitation Procedures Order, be a Releasing Party unless they have otherwise agreed to a release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Releases set forth in Section 10.2 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of the Claims released by the Third Party Releases; (3) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar against any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Releases.

The foregoing Third Party Releases are an integral component of the Global Settlement.

DOCS_NY:45732.2

### E.    Exculpation and Limitation of Liability

The Exculpated Parties will neither have nor incur any liability to any entity for any claims or Causes of Action arising on or after the Petition Date and prior to the Effective Date for any act taken or omitted to be taken in connection with, or related to (i) the Chapter 11 Cases, (ii) the Sale Transaction (including the leaseback by FRI of certain FRI Assets to the Debtors pursuant to the Temporary Lease Agreement), (iii) any other sales consummated during the Chapter 11 Cases, (iv) the Global Settlement Term Sheet, (v) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan, including this Disclosure Statement, (vi) any other postpetition act taken or omitted to be taken in connection with or in contemplation of Confirmation of the Plan, or (vii) the approval of the Disclosure Statement and Plan or Confirmation or Consummation of the Plan, *provided*, *however*, that the foregoing provisions will have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence, actual fraud, or willful misconduct.

The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and Distributions pursuant to the Plan, and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan.

DOCS_NY:45732.2

### F. Term of Injunctions or Stays

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN SECTIONS 10.1 THORUGH 10.3 OF THE PLAN, THE APPLICABLE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED UNDER THE PLAN OR THE CONFIRMATION ORDER.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO THE PLAN OR THAT ARE SUBJECT TO THE EXCULPATORY PROVISIONS OF SECTION 10.2, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON

77

ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS THEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE PLAN ADMINISTRATOR, THE POST-EFFECTIVE DATE DEBTORS, THE ADMINISTRATIVE AGENT, AND EACH OF THEIR RESPECTIVE ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE. NOTHING IN SECTION 10.4 OF THE PLAN SHALL ENJOIN ANY CLAIM OR CAUSE OF ACTION THAT IS NOT RELEASED OR

EXCULPATED PURSUANT TO SECTIONS 10.1, 10.2, AND 10.3 OF THE PLAN OR THE CONFIRMATION ORDER.

NOTWITHSTANDING ANY OTHER PROVISION OF THE PLAN TO THE CONTRARY, THE DEBTORS SHALL NOT RECEIVE A DISCHARGE.

### G.     Good Faith.

Confirmation of the Plan shall constitute a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the Debtors, the Settling Parties and all of their respective Related Parties have acted in good faith in connection therewith.

### H.     The Post-Effective Date Debtors

All Distributable Assets of each Debtor will vest in the Post-Effective Date Debtors to be administered by the Plan Administrator. The Plan Administrator will proceed to liquidate the Post-Effective Debtors' Assets, which consist primarily of each Debtors' interest in the Net Sale Proceeds in the Escrow Account, certain equipment, and inventory or crops of the respective Debtors, in an orderly fashion.  The Plan Administrator will pursue, as appropriate, the Post-Effective Date Debtors' Causes of Action, if any, consistent with the terms of the Plan.  The applicable Post-Effective Debtor will be funded with any Cash it may generate by prosecuting the Post-Effective Date Debtors Causes of Action. The Plan Administrator will make Distributions of Cash to Creditors.  After the initial Distributions, the Plan Administrator may also may make, in its discretion, periodic Distributions of additional Net Distributable Assets, including from the release of any Distribution Reserve, to the Holders of Allowed Claims as provided for in the Plan at any time following the Effective Date.

DOCS_NY:45732.2

### 1. Estimated Recoveries for Ranches General Unsecured Claims (Class 4), Tyson (Class 5) and Segale (Class 6)

On or as soon as practicable after the Effective Date, Holders of Allowed Class 4 Claims (Ranches General Unsecured Claims) shall receive (a) their Pro Rata share of the Class 4 Initial Payment (subject to any Distribution Reserve) and (b) their Pro Rata share of the Class 4 Net Distributable Assets. The Holders of Allowed Class 4 Claims shall not have any interest in any of the Easterday Family Contribution Instruments.

On or as soon as practicable after the Effective Date, Holders of Allowed Class 5 Claims (Tyson) shall receive (a) their Pro Rata share of the Class 5 Initial Payment (subject to any Distribution Reserve), (b) their Pro Rata share of the Class 5 Net Distributable Assets, (c) their Pro Rata share of the proceeds of the Easterday Family Contribution Instruments, and (d) assignment of the North Lot Actions.

On or as soon as practicable after the Effective Date, Holders of Allowed Class 6 Claims (Segale) shall receive (a) their Pro Rata share of the Class 6 Initial Payment (subject to any Distribution Reserve), (b) their Pro Rata share of the Class 6 Net Distributable Assets, and (c) their Pro Rata share of the proceeds of the Easterday Family Contribution Instruments.

The Debtors estimate that Holders of (i) Ranches General Unsecured Claims shall receive approximately 65.3% of their Allowed Class 4 Claim, (ii) Tyson shall receive approximately 23.6% of its Allowed Class 5 Claim, and (iii) Segale shall receive approximately 34.5% of its Allowed Class 6 Claim.[11]

**THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION OR PLAN RECOVERY IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND**

---

[11] For the avoidance of doubt, such treatment applies to Segale's Allowed Claims against Ranches. Segale also has an Allowed Claim in Class 3 (Farms General Unsecured Creditors) that shall be treated in accordance with the treatment of Allowed Class 3 Claims under the Plan.

**ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES, INCLUDING BUT NOT LIMITED TO, THE AMOUNT OF THE CLAIMS ULTIMATELY ALLOWED AGAINST THE DEBTORS AND THE NET DISTRIBUTABLE ASSETS AVAILABLE FOR DISTRIBUTION, AND SUCH UNCERTAINTIES AND CONTINGENCIES ARE BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. THE FINANCIAL INFORMATION ON WHICH THE PLAN IS BASED, HAS NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.**

## V. MEANS FOR IMPLEMENTATION OF PLAN

### A. Implementation of the Plan

Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, the Plan effectuates a global resolution of, among other things, disputes between the Farms and Ranches Estates. In accordance with the Global Settlement Term Sheet, Holders of Allowed Class 3 Claims (Farms General Unsecured Claims) receive a 100% recovery, excluding postpetition interest and attorneys' fees. The Plan Administrator is authorized and directed to make Distributions of the Distributable Assets pursuant to and in accordance with the Plan.

The Plan also effectuates a global resolution of disputes between and/or among the Easterday Family, 3E, Produce, Dairy, the Debtors, the Farms Committee, the Ranches Committee, Tyson, and Segale pursuant to the contribution of funds and release of claims as set forth herein by the Easterday Family and an agreed allocation

of distributions to be made by the Debtors and Post-Effective Date Debtors on account of the Allowed Claims in Classes 4, 5, and 6 of the Plan. Holders of Allowed Claims in Classes 5 and 6 of the Plan shall also receive the Easterday Family Contribution Instruments to be held by the Administrative Agent in accordance with and pursuant to the terms of the Administrative Agent Agreement.

For the avoidance of doubt, the claims being resolved as part of the global resolution include but are not limited to any and all claims and controversies by the Debtors against the Easterday Family Released Parties, including, but not limited to, any deficiency claims held by the Farms Estate against the Easterday Family, as well as claims against 3E, Produce, Dairy, and any and all claims by the Ranches Estate related to breaches of any duty by the Easterday Family.

## 1. Sale Transaction

On July 20, 2021, the Bankruptcy Court entered the Sale Order authorizing and approving the two-step Sale Transaction pursuant to which the Debtors acquired, to the extent necessary, all of the Easterday Family's right, title and interest to certain property (as defined under the Purchase and Sale Agreement) and then sold the FRI Assets to FRI, subject only to FRI's agreement to lease back certain of the FRI Assets to the Debtors pursuant to the Temporary Lease Agreement. The Plan presumes that, at Confirmation, the Temporary Lease Agreement shall have terminated on its terms and that to the extent the Debtors or FRI may have claims, rights, or ongoing obligations to each other under the Temporary Lease Agreement that survive the termination, such claims, rights, or ongoing obligations shall have been fully and finally resolved at Confirmation such that any claims, rights or ongoing obligations shall cease to exist on the Effective Date, and that the Post-Effective Date Debtors shall not inherit any claims, rights, benefits, or Causes of Action arising under, relating to, or in connection with the Purchase and Sale Agreement.

82

Nothing in the Plan is intended to, nor shall be construed to, alter any of the terms and conditions upon which the Sale Transaction was approved as set forth in the Purchase and Sale Agreement or in any agreement referenced in or related to the Purchase and Sale Agreement. Neither the Plan nor the Confirmation Order shall limit or otherwise affect any of the Bankruptcy Court's findings, conclusions, orders, and judgments as set forth in the Sale Order, and insofar as any of the protections afforded FRI by the Sale Order conflict with or contradict certain terms and conditions in the Plan or any findings, conclusions, orders or judgments in the Confirmation Order, the Sale Order shall govern and control with respect to FRI.

Notwithstanding anything that may suggest otherwise in the Plan, the Plan Supplement, any Schedule or Exhibit to either of the foregoing, or any other document executed in connection with Confirmation or these Chapter 11 Cases, neither the Post-Effective Date Debtors nor any Holder of any Claim or Interest shall have any claim, cause of action, right or recourse against FRI or the FRI Assets on account of or in connection with the Sale Transaction, the Purchase and Sale Agreement, the Temporary Lease Agreement, or any other agreement or document executed in connection with the consummation of the Sale Transaction between and among FRI, the Debtors and the Easterday Family.

### 2. Net Sale Proceeds

In accordance with the terms of the Global Settlement, the Net Sale Proceeds shall vest with the Post-Effective Date Debtors and shall be used to fund distributions under the Plan

### B. Streamlining of the Debtors' Corporate Affairs

### 1. Debtors' Existing Directors, Officers, and Managers

On the Effective Date, each of the Debtors' existing directors, officers, and managers shall be terminated automatically without the need for any Corporate Action and without the need for any corporate or partnership filings, and shall have no ongoing

83

rights against or obligations to the Debtors or the Estates, including under any applicable prepetition agreements (all of which will be deemed terminated). On the Effective Date, the Plan Administrator shall succeed to all such powers as would have been applicable to the Debtors' officers and managers in respect of all Post-Effective Date Debtors' Assets; provided, however, that the Plan Administrator may continue to consult with or employ the Debtors' former officers, employees, and managers in its reasonable discretion.

### 2. Dissolution of the Debtors

Each of the Debtors may be dissolved by the Plan Administrator, in its reasonable discretion and the Plan Administrator may file any certificates of cancellation or similar documents as may be appropriate in connection with dissolution of either Debtor.

### 3. Corporate Documents and Corporate Authority

On the Effective Date, the certificates of incorporation, bylaws, partnership agreements, and articles of organization, as applicable, of both Debtors shall be deemed amended to the extent necessary to carry out the provisions of the Plan. The entry of the Confirmation Order shall constitute authorization for the Debtors, the Post-Effective Date Debtors and the Plan Administrator, as applicable, to take or cause to be taken all actions (including, if applicable, Corporate Actions) necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on, and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation. On the date the Confirmation Order becomes a Final Order, the Post-petition Corporate Actions shall be deemed null and void and as never having had effect.

### C. Plan Administrator

### 1. Appointments

On the Effective Date, the initial Plan Administrator shall be appointed. The compensation of the Plan Administrator shall be agreed to by the Debtors and the

Settling Parties and disclosed prior to the Confirmation Hearing, provided that regular hourly compensation shall be deemed acceptable in the absence of an alternative agreement. The Plan Administrator may employ, without further order of the Bankruptcy Court, legal counsel and other professionals as necessary to assist in carrying out his duties and may compensate and reimburse the reasonable expenses of those professionals without further order of the Bankruptcy Court in accordance with the Plan and Plan Administrator Agreement.

## 2. Vesting of Post-Effective Date Debtors' Assets

On the Effective Date, the Post-Effective Date Debtors' will be automatically vested with all of the Debtors' and the Estates' respective rights, title, and interest in and to all Post-Effective Date Debtors' Assets.[12] Except as specifically provided in the Plan or the Confirmation Order, the Post-Effective Date Debtors' Assets shall automatically vest in the Post-Effective Date Debtors free and clear of all Claims, Liens, or interests and such vesting shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax. The Plan Administrator shall be the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3) regarding all Post-Effective Date Debtors' Assets. The Plan Administrator shall hold and distribute the Post-Effective Date Debtors' Assets in accordance with the provisions of the Plan, *provided further*, that the Plan Administrator will have the power and discretion to close the Farms bankruptcy case following making the completion of all required Distributions to the Holders of Allowed Claims against the Farms Estate and any remaining Post-Effective Date Debtors' Assets shall be fully vested in the Post-Effective Date Ranches Debtor, *provided that*, notwithstanding the foregoing sentence, in the event a Holder of an Allowed Claim against the Farms Estate does not receive the full treatment or distribution afforded such a Holder on the Effective Date and the

---

[12] For the avoidance of doubt, the Post-Effective Date Debtors' Assets do not include the North Lot Actions.

85

DOCS_NY:45732.2

Farms bankruptcy case is closed, such Holder shall be entitled to receive its treatment or distribution from the Post-Effective Date Ranches Debtor.

### 3. Authority of the Plan Administrator

The Plan Administrator shall have the authority and right on behalf of the Debtors and the Estates and without the need for Bankruptcy Court approval (in each case, unless otherwise provided in the Plan) to carry out and implement all applicable provisions of the Plan, including to:

(a) review, reconcile, compromise, settle, or object to Claims and resolve such objections as set forth in the Plan, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules;

(b) calculate and make Distributions and calculate and establish reserves under and in accordance with the Plan;

(c) retain, compensate, and employ professionals and other Persons to represent the Plan Administrator with respect to and in connection with its rights and responsibilities;

(d) establish, maintain, and administer documents and accounts of the Debtors as appropriate, which shall be segregated to the extent appropriate in accordance with the Plan;

(e) maintain, conserve, collect, settle, and protect the Post-Effective Date Debtors' Assets (subject to the limitations described herein);

(f) sell, liquidate, transfer, assign, distribute, abandon, or otherwise dispose of the Post-Effective Date Debtors' Assets, including the Distributable Assets and the Net Distributable Assets, or any part thereof or interest therein upon such terms as the Plan Administrator determines to be necessary, appropriate, or desirable;

(g) negotiate, incur, and pay the Post-Effective Date Debtors' Expenses;

(h) prepare and file any and all informational returns, reports, statements, returns, and other documents or disclosures relating to the Debtors that are required under the Plan, by any governmental unit, or by applicable law;

(i) compile and maintain the official claims register, including for purposes of making initial and subsequent Distributions under the Plan;

86

(j)     take such actions as are necessary or appropriate to wind-down and dissolve the Debtors;

(k)     comply with the Plan, exercise the Plan Administrator's rights, and perform the Plan Administrator's obligations; and

(l)     exercise such other powers as deemed by the Plan Administrator to be necessary and proper to implement the Plan.

To the extent necessary to give full effect to its administrative rights and duties under the Plan, the Plan Administrator shall be deemed to be vested with all rights, powers, privileges, and authorities of (i) an appropriate corporate or partnership director, officer, or manager of each of the Debtors under any applicable nonbankruptcy law and (ii) a "trustee" of each of the Debtors under chapter 7 of the Bankruptcy Code and section 1106 of the Bankruptcy Code.

### 4.     Limitation of Liability

The Plan Administrator shall enjoy all of the rights, powers, immunities, and privileges applicable to a Bankruptcy Code chapter 7 trustee with respect to limitations of liability. The Plan Administrator may, in connection with the performance of its functions, in its sole and absolute discretion, consult with its attorneys, accountants, advisors, and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such Persons, regardless of whether such advice or opinions were in writing. Notwithstanding such authority, the Plan Administrator shall be under no obligation to consult with any such attorneys, accountants, advisors, or agents, and its determination not to do so shall not result in the imposition of liability on the Plan Administrator unless such determination is based on willful misconduct, gross negligence, or fraud. Persons dealing with the Plan Administrator shall look only to the Post-Effective Date Debtors' Assets to satisfy any liability incurred by the Plan Administrator to such Person in carrying out the terms of the Plan, and the Plan Administrator shall have no personal obligation to satisfy such liability.

## 5.    Indemnification

The Post-Effective Date Debtors shall indemnify the Post-Effective Date Indemnified Parties for, and shall defend and hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including the reasonable fees and expenses of their respective professionals) incurred without gross negligence or willful misconduct on the part of the Post-Effective Date Indemnified Parties (which gross negligence or willful misconduct, if any, must be determined by a final, non-appealable order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by such Post-Effective Date Indemnified Parties in connection with the acceptance, administration, exercise, and performance of their duties under the Plan. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence or willful misconduct. In addition, the Post-Effective Date shall, to the fullest extent permitted by law, indemnify, defend, and hold harmless the Post-Effective Date Indemnified Parties, from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Post-Effective Date Debtors or the implementation or administration of the Plan if such Post-Effective Date Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Post-Effective Date Debtors. To the extent the Post-Effective Date Debtors indemnifies, defends, and holds harmless any Post-Effective Date Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Plan Administrator in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Post-Effective Date Debtors' Expenses. The costs and expenses incurred in enforcing the right of indemnification in Section 5 of the Plan shall be paid by the Post-Effective Date Debtors.

88

### 6. Insurance

The Plan Administrator shall be authorized, but not required, to obtain any insurance coverages deemed to be reasonably necessary, at the Post-Effective Date Debtors' sole expense, for themselves and their respective agents, including coverage with respect to the liabilities, duties, and obligations of the Plan Administrator, which insurance coverage may, at the sole discretion of the Plan Administrator, be extended for a reasonable period after the termination of the Debtors' cases.

### 7. Tax Reporting

(a) The Post-Effective Date Debtors shall be responsible for timely payment of all taxes (if any) imposed on and payable by the Post-Effective Date Debtors, the Debtors, or any Post-Effective Date Debtors' Assets.

(b) The Plan Administrator shall distribute such tax-related notices, beneficiary statements, and information returns, as applicable, to the applicable Holders of Allowed Claims as are required by applicable law or that the Plan Administrator determines are otherwise necessary or desirable.

(c) The Plan Administrator is authorized to file a request for expedited determination under Bankruptcy Code section 505(b) for any tax returns filed with respect to the Debtors.

### 8. Cash Investments

The Plan Administrator may invest Cash of the Post-Effective Date Debtors, including any earnings thereon or proceeds therefrom, which investments, for the avoidance of doubt, will not be required to comply with Bankruptcy Code section 345(b).

### 9. Pursuit and Resolution of Post-Effective Date Debtors' Causes of Action

The Plan Administrator, on behalf of the Post-Effective Date Debtors, as successors in interest to the Debtors and the Estates, may, and will have the exclusive right, power, and interest on behalf of itself, the Post-Effective Date Debtors, the

89

Debtors, and the Estates to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all Post-Effective Date Debtors' Causes of Action, if any, without any further order of the Bankruptcy Court, except as otherwise provided in the Plan. From and after the Effective Date, the Plan Administrator, in accordance with Bankruptcy Code section 1123(b)(3), shall serve as representative of the Estates with respect to any and all Post-Effective Date Debtors' Causes of Action that were Estate Assets and shall retain and possess the right to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all Post-Effective Date Debtors' Causes of Action in any court or other tribunal.

The Plan Administrator may seek Bankruptcy Court approval of any individual or global settlement of Post-Effective Date Debtors' Causes of Action.

### 10. No Successor Liability

Except as otherwise expressly provided in the Plan and Confirmation Order, the Post-Effective Date Debtors (i) are not, and shall not be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors prior to the Effective Date; (ii) are not, and shall not be, a successor to the Debtors by any reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date; and (iii) shall not have any successor or transferee liability of any kind or character.

### 11. Preservation of Privileges and Defenses

The actions taken by the Debtors, the Post-Effective Date Debtors, FRI, or any of their respective Related Parties in connection with the Plan shall not be (or be deemed to be) a waiver of any privilege or defense of the Debtors, the Post-Effective Date Debtors, or FRI as applicable, including any attorney-client privilege or work-product doctrine. Notwithstanding any Debtors providing any privileged information related to any Post-Effective Date Debtors' Causes of Action to the Plan Administrator, the Post-

90

Effective Date Debtors, or any Person associated with any of the foregoing, such privileged information shall be without waiver in recognition of the joint, common, or successor interest in prosecuting the Post-Effective Date Debtors' Causes of Action and shall remain privileged. The Post-Effective Date Debtors shall retain the right to waive their own privileges. Only the Plan Administrator shall have the right to waive the attorney-client privilege, work-product doctrine, or other protections as to the Debtors and the Post-Effective Date Debtors; provided that, in the event any such protections are asserted or assertable by FRI, the Plan Administrator shall confer and cooperate with FRI with respect to any decision by the Plan Administrator to waive such protection.

### D. Preservation of Rights of Action

#### 1. Maintenance of Avoidance Actions and Causes of Action

Except as otherwise provided in the Plan or the Confirmation Order, from and after the Effective Date, the Plan Administrator will retain all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors' or the Estates' Causes of Action (whether existing as of the Petition Date or thereafter arising), as Post-Effective Date Debtors' Causes of Action, in each case in any court or other tribunal, including in an adversary proceeding Filed in the Chapter 11 Cases. The Plan Administrator, on behalf of the Post-Effective Date Debtors, as successors in interest to the Debtors and their Estates, may, and will have the exclusive right, power, and interest to, enforce, sue on, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Post-Effective Date Debtors' Causes of Action Actions without notice to or approval from the Bankruptcy Court. In accordance with the Plan, and pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, from and after

91

the Effective Date, the Plan Administrator may compromise and settle the any Post-Effective Date Debtors' Causes of Action.

### 2. Preservation of All Post-Effective Date Debtors' Causes of Action Not Expressly Settled or Released

The failure to specifically identify in this Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action as a Post-Effective Date Debtors' Causes of Action is not intended to and shall not limit the rights of the Plan Administrator to pursue any such Avoidance Actions or Causes of Action. Unless a Post-Effective Date Debtors' Cause of Action is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Post-Effective Date Debtors' Cause of Action for later resolution by the Plan Administrator (including any Avoidance Actions or Causes of Action not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist). As such, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to any such Avoidance Actions or Causes of Action upon or after Confirmation of the Plan based on this Disclosure Statement, the Plan, or the Confirmation Order, except when such Avoidance Actions or Causes of Action have been expressly released. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor or Plan Administrator, on behalf of the Post-Effective Date Debtors, is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co-defendants in such lawsuits.

DOCS_NY:45732.2

### E. Cancellation of Instruments

Except to the extent necessary to give effect to the treatment of any Holder of an Allowed Claim and except with respect to any executory contracts and unexpired leases that are assumed under the Plan or otherwise assumed and assigned pursuant to a Final Order, any agreement, bond, certificate, contract, indenture, lease, note, security, warrant, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be deemed cancelled on the Effective Date, and all Liens, mortgages, pledges, grants, trusts, and other interests relating thereto shall be automatically cancelled, and all obligations of the Debtors thereunder or in any way related thereto shall be released, *provided, however*, that any of the Interests in Ranches shall be deemed to be held in trust by the Plan Administrator to the extent necessary for the Plan Administrator to perform its duties in the Plan.

## VI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Rejection of Executory Contracts and Unexpired Leases

#### 1. Rejection of Agreements.

Except for any Executory Contracts of the Debtors: (i) that previously were assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code; (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been Filed and served prior to, and remains pending as of, the Effective Date; or (iii) that were previously assumed and assigned to FRI, each Executory Contract and Unexpired Lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. Nothing herein is intended to affect the validity of contracts and leases entered into by the Debtors on or after the Petition Date, or the rights of the

93

DOCS_NY:45732.2

Debtors thereunder, which shall remain in full force and effect after the Effective Date in accordance with their terms.

The Insurance Policies shall not be considered Executory Contracts for purposes of subsection (a), above. As discussed in Section 5.12 of the Plan, the Insurance Policies shall remain in full force and effect following the Effective Date.

### i. Rejection Claims Bar Date

Any Rejection Claim or other Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed and served no later than the Rejection Claims Bar Date. Any such Rejection Claims that are not timely Filed and served will be forever disallowed, barred, and unenforceable, and Persons holding such Claims will not receive and will be barred from receiving any Distributions on account of such untimely Claims. If one or more Rejection Claims are timely Filed pursuant to the Plan, the Post-Effective Date Debtors may object to any Rejection Claim on or prior to the Claim Objection Deadline. For the avoidance of doubt, the Rejection Claims Bar Date established by the Plan does not alter any rejection claims bar date established by a prior order of the Bankruptcy Court with respect to any executory contract or unexpired leases that was previously rejected in these Chapter 11 Cases.

### ii. Previously Assumed & Assigned Executory Contracts or Unexpired Leases

Nothing in the Plan or the Plan Supplement, or any Schedule or Exhibit relating to the foregoing, shall alter or affect the assumption and assignment, or sale, of those contracts and leases identified in or related to the Purchase and Sale Agreement, and neither the Plan, Plan Supplement, or any Schedule relating to the foregoing shall affect or alter the Debtors' obligations under the Purchase and Sale Agreement, including without limitation under the Temporary Lease Agreement, as they relate to the assumed and assigned contracts and leases identified thereunder, during the postpetition period prior to the Effective Date.

# VII. RISK FACTORS

Prior to voting on the Plan, each Holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all other information contained in this Disclosure Statement, including the exhibits hereto. These risk factors should not be regarded as the only risks involved in connection with the Plan and its implementation.

## A. Parties May Object to the Plan's Classification of Claims and Interests

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## B. The Debtors May Not Be Able to Obtain Confirmation of the Plan

With regard to any proposed plan, the Debtors may not receive the requisite acceptances to confirm a plan. In the event that votes with respect to Claims in the Classes entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may not be able to obtain Confirmation of the Plan. Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court still might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under Bankruptcy Code section 1129 have not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan would be on terms as favorable to any Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtors will be

95

DOCS_NY:45732.2

able to successfully develop, prosecute, confirm, and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

### C. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in the Plan, the Effective Date is subject to several conditions precedent. Among other conditions, the total amount of Allowed Claims in Class 1 and Allowed Claims in Class 3 cannot exceed $21,100,000 unless Tyson, Segale, and the Ranches Committee agree to waive such condition. The Debtors cannot guaranty that such claims will not exceed the limit or that Tyson, Segale, and the Ranches Committee will be willing to waive the condition. Additionally, the consent of the DOJ is required for certain of the transactions relating to Cody Easterday's contributions contained in the Plan. The DOJ has not yet provided such consent, and there can be no guaranty that the DOJ will provide such consent. The terms of the Global Settlement embodied in the Plan further require that the Debtors obtain releases from certain third parties of their potential claims against the Easterday Family Released Parties. The failure to obtain such releases, if not waived by the Easterday Family, would prevent the occurrence of the Effective Date.

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Sections 9.1 and 9.2 of the Plan by July 31, 2022, upon notification filed by the Debtors or any of the Settling Parties with the Bankruptcy Court, (i) the Confirmation Order shall be vacated; (ii) no Distributions shall be made; (iii) the Debtors, the Estates, and all Creditors shall be restored to the *status quo* as of the day immediately preceding the Confirmation Hearing as though the Confirmation Order was not entered; (iv) all of the Debtors' and the Estates' obligations with respect to Claims shall remain unchanged and nothing contained in the Plan shall constitute a waiver or release of any Causes of Action by or against the Debtors, the Estates, or any other Person or prejudice in any manner the rights, claims, or defenses of the Debtors,

96

the Estates, or any other Person; and (v) the Easterday Family may exercise their rights under the Abeyance and Suspense Order (Adv. Pro. No 22-80008, Docket No. 39).

### D. Claims Estimation and Allowance of Claims

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual amount of Allowed Claims may differ significantly from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

### E. Tax Considerations

There are several material income tax considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims, Holders of Interests, and other interested parties should read carefully the discussion set forth in Article IX for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

## VIII. **CONFIRMATION OF THE PLAN**

### A. The Confirmation Hearing

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing regarding Confirmation of the Plan. Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on **July 19, 2022, at [__:__] [_].m. (Pacific Time)**, before the Honorable Whitman L. Holt, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Eastern District of Washington. The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing, has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without

DOCS_NY:45732.2

further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be Filed and served so that they are actually received by no later than [**10 calendar days prior to the Confirmation Hearing] at 5:00 p.m.** (**Pacific Time**). **Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court**.

### B.      Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Bankruptcy Code section 1129. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. More specifically, the Debtors believe that the Plan satisfies or will satisfy the following applicable Confirmation requirements of Bankruptcy Code section 1129:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection

98

DOCS_NY:45732.2

with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of a Claim in an Impaired Class of Claims has accepted the Plan, or each such Holder will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.

- The Classes of Claims that are entitled to vote on the Plan will have accepted the Plan, or at least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class, and the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims that is impaired under, and has not accepted, the Plan.

- Except to the extent a different treatment is agreed to, the Plan provides that all Allowed Administrative Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid through the Effective Date.

## C.     Best Interests of Creditors

Often called the "best interests of creditors" test, Bankruptcy Code section 1129(a)(7) requires that a bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the effective date of the plan.

The Plan is a plan of liquidation. However, the costs of liquidation under chapter 7 of the Bankruptcy Code would be greater as they would include the fees payable to

99

DOCS_NY:45732.2

two chapter 7 trustees including 3% of the distributable assets, which are projected to be in excess of $100 million dollars, and the fees that would be payable to additional attorneys and other professionals that such trustees may engage. Additionally, the Debtors would not receive the $5,000,000 Plan Sponsor Contribution. Those two items together would deplete the Estates by at least $8,000,000 even before the additional fees and expenses of counsel or other advisors for the chapter 7 trustees.

Additionally, without the settlements incorporated in the Plan, the Debtors would face the risk of additional litigation, including the Allocation Adversary Proceeding. Not only would such continued litigation materially delay and potentially reduce any Distribution to creditors, the Debtors would not necessarily receive the full balance of the Net Sale Proceeds then in the Escrow Account or the benefit of the Easterday Family Contribution. As described in Exhibit C hereto, the Debtors submit that the benefits of the resolution of issues with the Easterday Family are in the best interests of the Estates and their creditors.

As set forth in the Liquidation Analysis, the Debtors estimate that in a chapter 7 liquidation, the Holders of Allowed Class 3 Claims would receive a recovery on such Claims between one percent (1%) and eighty-four percent (84%), far less than the one hundred percent (100%) provided for under the Plan. Additionally, in a chapter 7 liquidation, Holders of Allowed Class 4 Claims are estimated to recover between four percent (4%) and nine percent (9%), far less than the sixty-five percent (65.3%) provided for under the Plan.

Further, outside of the Plan, the issue of substantive consolidation may create risks for the Holders of Claims against Farms. While the outcome of any substantive consolidation motion is uncertain, it would lead to substantial costs and delay any recovery to the creditors, particularly the Holders of Claims against Farms. Moreover, if substantive consolidation were granted, in light of the amount of the Tyson Claims,

100

DOCS_NY:45732.2

recoveries by the Holders of Farms General Unsecured Claims in Class 3 would be substantially reduced and could be as low as one percent (1%).

Conversion to chapter 7 of the Bankruptcy Code would also mean the establishment of a new claims bar date, which could result in new General Unsecured Claims being asserted against the Estates, thereby diluting the recoveries of other Holders of Allowed Claims.

On balance, the Debtors believe that chapter 7 trustees would be less likely to maximize the value available from all the Estate Assets. Therefore, the Debtors believe that confirmation of the Plan will provide each Holder of an Impaired Claim with an equal or greater recovery than such Holder would receive pursuant to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### D. Feasibility

Bankruptcy Code section 1129(a)(11) requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors, or any successor to the Debtors (unless such liquidation or reorganization is proposed in the plan). This requirement is satisfied as the Plan specifically proposes a liquidation and the Debtors believe the Debtors' Cash and any additional proceeds from the Post-Effective Debtors' Assets will be sufficient to allow the Plan Administrator to make all payments required to be made under the Plan. Accordingly, the Debtors believe that the Plan is feasible.

### E. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

DOCS_NY:45732.2

A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims held by creditors that actually voted to accept or reject the plan. Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

### F. Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted that plan, *provided* that the plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan under Bankruptcy Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

DOCS_NY:45732.2

### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair" under the circumstances. In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account various factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Debtors submit that if they are required to "cramdown" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that it does not "discriminate unfairly" against any rejecting Class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending on the type of claims or interests in such rejecting class. The Debtors submit that if they are required to "cramdown" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that the applicable "fair and equitable" standards are met.

### G. Alternatives to Confirmation and Consummation of the Plan

The Debtors believe that the Plan affords Holders of Claims the potential for a materially better realization on the Estate Assets than a chapter 7 liquidation, and,

103

therefore, is in the best interests of all such Holders. If, however, the requisite acceptances of the voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative chapter 11 plan or plans, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors or another party in interest could attempt to formulate and propose a different plan or plans. The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan, has the greatest chance to be confirmed and consummated.

The Chapter 11 Cases may also be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a statutory trustee would be elected or appointed to complete the liquidation of the Estate Assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Debtors believe that the Plan will provide each Holder of an Allowed General Unsecured Claim with an equal or greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### H.   Revocation, Withdrawal, or Non-Consummation.

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Hearing and to File subsequent plans. If the Debtors revoke or withdraw the Plan prior to the Confirmation Hearing, or if the Effective Date does not occur, then (a) the Plan shall be null and void in all respects; and (b) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Interests in, any Debtor, or any Causes of Action by or against any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any other Person in any

104

further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

**IX.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF ALLOWED CLAIMS**

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

This discussion is provided for information purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "***IRC***"), Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the discussion set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the United States federal income tax consequences of the Plan to Holders of Allowed Claims.

The following summary is limited to Holders of Allowed Claims that are United States persons within the meaning of the IRC.  For purposes of the following discussion, a "***United States person***" is any of the following:

- An individual who is a citizen or resident of the United States;

- A corporation created or organized under the laws of the United States or any state or political subdivision thereof;

DOCS_NY:45732.2

- An estate, the income of which is subject to United States federal income taxation regardless of its source; or

- A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust or (b) has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

This discussion does not address all aspects of United States federal income taxation that may be relevant to a particular Holder of an Allowed Claim in light of such Holder's particular facts and circumstances, or to certain types of Holders subject to special treatment under the IRC. Examples of Holders subject to special treatment under the IRC include, without limitation, governmental entities and entities exercising governmental authority, foreign companies, persons who are not citizens or residents of the United States, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, persons that have a functional currency other than the United States dollar, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction. This discussion does not address the state, local, or foreign tax consequences of the Plan with respect to any Holder. Partnerships holding Allowed Claims and partners in such partnerships should consult their tax advsiors as to the particular United States federal income tax consequences of owning and disposing of Allowed Claims.

The tax treatment of Holders of Allowed Claims and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary depending upon a number of factors, including without limitation: (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the

106

Holder in exchange for the Claim, and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to United States federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the Holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for United States federal income tax purposes; and (xi) whether the "market discount" rules apply to the Holder. Therefore, each Holder should consult such Holder's own tax advisor for tax advice with respect to that Holder's particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the United States federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling has been or will be sought from the Internal Revenue Service ("IRS") or any other taxing authority with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtor with respect thereto. No representations are being made regarding the particular tax consequences of confirmation or implementation of the Plan as to any Holder of a Claim. This discussion is not binding upon the IRS or other taxing authorities. The IRS or another taxing authority could

DOCS_NY:45732.2

assert, and a court sustain, a different position from any discussed herein and no assurance is given as to whether such a different position will or will not be asserted.

### A. Certain Tax Consequences to Holders of Allowed Claims

A Holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Allowed Claim and the amount realized by the Holder in respect of its Allowed Claim. Over time and on a cumulative basis, the amount realized generally will equal the aggregate amount of the Cash (and the fair market value of property, if any) distributed to the Holder by the Plan Administrator, less the amount, if any, attributable to accrued but unpaid interest.

The character of any gain or loss recognized by a Holder will depend upon a number of factors, including the status of the Holder, the nature of the Allowed Claim in the Holder's hands, whether the Allowed Claim was purchased at a discount, whether and to what extent the Holder has previously claimed a bad debt deduction with respect to the Allowed Claim, and the Holder's holding period of the Allowed Claim. If the Allowed Claim in the Holder's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Holder held such Allowed Claim for longer than one year or short-term capital gain or loss if the Holder held such Allowed Claim for one year or less. Any capital loss realized generally may be used by a corporate Holder only to offset capital gains and by an individual Holder only to the extent of capital gains plus a certain limited statutorily proscribed amount of ordinary income in any single taxable year, currently $3,000.

A Holder of an Allowed Claim will generally recognize ordinary interest income to the extent that the amount of Cash or property received (or deemed received) under the Plan is attributable to interest that accrued on a Allowed Claim but was not previously paid by the Debtors or included in income by the Holder of the Allowed Claim. If the amount paid to a Holder is not sufficient to fully satisfy all principal and

DOCS_NY:45732.2

interest on a Claim, the extent to which such consideration will be attributable to accrued but unpaid interest is not entirely clear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest, while certain Treasury regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by a Holder of an Allowed Claim should be allocated in a manner other than as provided in the Plan, which could include allocating consideration first to any accrued but unpaid interest under the aforementioned Treasury regulations.

A Holder of an Allowed Claim who receives, in respect of the Holder's Allowed Claim, an amount that is less than that Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC Section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to the ability to take a bad debt deduction. A Holder that has previously recognized a loss or deduction in respect of that Holder's Allowed Claim may be required to include in gross income any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Allowed Claim.

A Holder of an Allowed Claim constituting an installment obligation for United States federal income tax purposes may be required to currently recognize any gain

DOCS_NY:45732.2

remaining unrecognized with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than face value or distributed, transmitted, sold, or otherwise disposed of within the meaning of IRC Section 453B.

**B.   Disputed Ownership Funds**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Plan Administrator intends to (i) treat Post-Effective Date Debtors' Assets reserved for Holders of Disputed Claims, Contingent Claims or Unliquidated Claims with respect to the Post-Effective Date as one or more reserves ("Distribution Reserves") held in a "disputed ownership fund" governed by Treasury regulation section 1.468B-9 (which fund will be taxable as a "qualified settlement fund" if all assets transferred to the fund are passive investment assets for tax purposes and otherwise will be taxable as a C corporation), and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including, without limitation, the Post-Effective Date Debtors, the Plan Administrator, and the Holders of Disputed Claims, Contingent Claims and Unliquidated Claims) will be required to report for tax purposes consistently with such treatment. Accordingly, each Distribution Reserve will be a separate taxable entity for United States federal income tax purposes, and all interest and earnings of a Distribution Reserve will be taxable to such entity.

Under such treatment, a separate United States federal income tax return will be filed with the IRS for each Distribution Reserve, and each Distribution Reserve will be subject to tax annually on a separate entity basis. The Plan Administrator will be responsible for payment of any taxes imposed on each Distribution Reserve. Accordingly, distributions from each Distribution Reserve will be net of any taxes relating to the retention, disposition and distribution of assets in such Distribution Reserve. In the event, and to the extent of, any cash of a Distribution Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income

110

arising from the assets of such Distribution Reserve (including any income that may arise upon the distribution of the assets in such Distribution Reserve), assets of such Distribution Reserve may be sold to pay such taxes.

### C. Backup Withholding

Under backup withholding rules, a Holder of an Allowed Claim may be subject to backup withholding with respect to payments made pursuant to the Plan unless such Holder: (i) is a corporation or is otherwise exempt from backup withholding and, when required, demonstrates this fact; or (ii) provides a correct taxpayer identification and certifies under penalty of perjury that (a) the taxpayer identification number is correct and (b) the Holder is not subject to backup withholding because of failure to report all dividend and interest income. Any amount withheld under such rules will be credited against the Holder's federal income tax liability.

### D. Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS: (I) INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF ALLOWED CLAIMS; (II) NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL; AND (III) FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES TO EACH HOLDER ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT WITH SUCH HOLDERS' TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

111

## X. __RECOMMENDATION__

The Debtors believe that confirmation and implementation of the Plan are the best alternative under the circumstances and urge all Impaired Creditors entitled to vote on the Plan to vote in favor of and support confirmation of the Plan.

Respectfully,

**EASTERDAY RANCHES, INC.**

By: ___*/s/ Peter Richter*___
Name: Peter Richter
Title: Co-Chief Restructuring Officer

**EASTERDAY FARMS**

By: ___*/s/ Peter Richter*___
Name: Peter Richter
Title: Co-Chief Restructuring Officer

112

DOCS_NY:45732.2

Submitted by:

Dated: May 24, 2022

BUSH KORNFELD LLP

*/s/ Thomas A. Buford, III*

THOMAS A. BUFORD, III (WSBA 52969)
BUSH KORNFELD LLP

RICHARD M. PACHULSKI (admitted *pro hac vice*)
JEFFREY W. DULBERG (admitted *pro hac vice*)
MAXIM B. LITVAK (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP

*Attorneys for Debtors and Debtors in Possession*

# EXHIBIT A

**Modified Third Amended Joint Chapter 11 Plan of Liquidation**
**[Filed Separately]**

DOCS_NY:45732.2

# **EXHIBIT B**

## **Liquidation Analysis**

DOCS_NY:45732.2

1

**LIQUIDATION ANALYSIS**

***General Assumptions***

- Hypothetical conversion date (the "Conversion Date"): July 19, 2022
- Upon conversion to chapter 7, the U.S. Trustee will appoint two separate chapter 7 trustees (each, a "Trustee"), one for each estate.

***Distributable Value***

**A.     Real Estate**

        i.      Gross Real Estate Value

Total net real estate proceeds (*i.e.*, net of mortgage obligations), totaled $111.9M.

The Liquidation Analysis assumes that allocation of the real estate value will be contested between the Easterday Family and each of the Trustees.  For purposes of allocating value between the respective farms that were liquidated, the Liquidation Analysis assumes that value will be allocated on a *pro rata* basis using total acreage, as follows:

|                  | Acres  | % of Whole |
|------------------|-------:|-----------:|
| Cox Farm         | 7,552  | 34%        |
| River Farm       | 5,847  | 26%        |
| 9 Canyon         | 3,048  | 14%        |
| Storage Complex  | 22     | 0%         |
| Goose Gap        | 5,949  | 27%        |
|                  |        |            |
| Totals:          | 22,418 | 100%       |

1

With respect to how value is ascribed between the Debtors and the Easterday Family, the Liquidation Analysis considers a "high" and a "low" case. For a high case (*i.e.*, the high end of potential recoveries), the Liquidation Analysis assumes that the allocation is ultimately determined to be consistent with the "Partnership Theory" – in other words, property held in the names of the individual partners belongs to Easterday Farms. For a low case (*i.e.*, the low end of potential recoveries), the Liquidation Analysis assumes that the allocation is ultimately determined to be consistent with how the real estate was titled as of the Petition Date.[1] The tables below reflect the assumed real estate allocations, for the high and low cases.

**Low Case**

| Farm | Ranches | Farms | Easterday Family |
|---|---|---|---|
| Cox Farm | $ 21,462 | $ 2,362 | $ 13,879 |
| River Farm | $ - | $ 154 | $ 29,040 |
| Nine Canyon Farm | $ 15,218 | $ - | $ - |
| Benton Storage Complex | $ - | $ 111 | $ - |
| Goose Gap Farm | $ - | $ 29,703 | $ - |
| **TOTALS:** | $36,680 | $32,330 | **$42,920** |

**High Case**

| Farm | Ranches | Farms | Easterday Family |
|---|---|---|---|
| Cox Farm | $ 21,462 | $ 16,242 | $ - |
| River Farm | $ - | $ 29,194 | $ - |
| Nine Canyon Farm | $ 15,218 | $ - | $ - |
| Benton Storage Complex | $ - | $ 111 | $ - |
| Goose Gap Farm | $ - | $ 29,703 | $ - |
| **TOTALS:** | $36,680 | $75,250 | $0 |

ii. <u>Washington Trust Deduction</u>

Pursuant to that certain *Stipulated Order Approving Settlement Agreement and Release With Washington Trust Bank* [Docket No. 1572], the Debtors previously paid a total of $44.89M to satisfy secured claims held by Washington Trust. Of that amount, $20M was paid from the Debtors' cash and $24.89M was paid from the proceeds of the Debtors' real estate. The Debtors, in consultation with certain of the Settling Parties, previously allocated 81% of the Washington Trust claims to Farms, and 19% to Ranches, based on the collateral that each estate owned. The Liquidation Analysis assumes that the Trustees will adopt the same allocation, such that (1) $16.2M was properly paid from Farms' cash and $3.8M was properly paid from Ranches' cash, and (2) $20.16M of Farms' real estate proceeds will have been used to pay the Washington Trust claims, and $4.73M of Ranches' real estate proceeds will have been used to pay Washington Trust claims.

The tables below reflects the assumed real estate values available to each estate, after accounting for payment of the portion of Washington Trust claims paid from real estate proceeds.

---

[1]     Certain parcels of real estate were titled in the name of Easterday family members, "dba Easterday Farms." The low case assumes that these parcels are ultimately considered to be owned by Farms.

| Low Case | | | | |
|---|---|---|---|---|
| **Farm** | **Ranches** | | **Farms** | |
| Cox Farm | $ | 21,462 | $ | 2,362 |
| River Farm | $ | - | $ | 154 |
| Nine Canyon Farm | $ | 15,218 | $ | - |
| Benton Storage Complex | $ | - | $ | 111 |
| Goose Gap Farm | $ | - | $ | 29,703 |
| **TOTALS:** | | $36,680 | | $32,330 |
| Washington Trust Claims: | | $4,729 | | $20,161 |
| Net Real Estate: | | **$31,951** | | **$12,169** |

| High Case | | | | |
|---|---|---|---|---|
| **Farm** | **Ranches** | | **Farms** | |
| Cox Farm | $ | 21,462 | $ | 16,242 |
| River Farm | $ | - | $ | 29,194 |
| Nine Canyon Farm | $ | 15,218 | $ | - |
| Benton Storage Complex | $ | - | $ | 111 |
| Goose Gap Farm | $ | - | $ | 29,703 |
| **TOTALS:** | | $36,680 | | $75,250 |
| Washington Trust Claims: | | $4,729 | | $20,161 |
| Net Real Estate: | | **$31,951** | | **$55,089** |

## B.     Cash

Cash balances represent the projected balances as of the Conversion Date.  The cash includes, among other things, the following:

1. Proceeds from the settlement with CHS, Inc.; *plus*
2. Equipment sale proceeds; *plus*
3. Proceeds from crop sales; *plus*
4. Proceeds from liquidation of an airplane and hangar; *less*
5. Repayment of Farms' debtor in possession loan.

As discussed above, (1) $20M of the payment made to Washington Trust prior to the Conversion Date was from the Debtors' cash, and (2) the Liquidation Analysis assumes that the Washington Trust settlement payment is attributed 81% to Farms and 19% to Ranches.  The assumed cash balances assume this allocation.

## C.     Litigation Claims and Other Assets

In connection with the real estate sale, the purchaser agreed to contribute $5.0M upon confirmation of a chapter 11 plan in the Chapter 11 Cases.  The Liquidation Analysis does not include these amounts because the case is assumed to be converted to chapter 7.

The Liquidation Analysis does not assume any positive proceeds from litigation claims.  Such claims, including the cost to pursue them and the resulting proceeds, are speculative.

## D.     Pre-Conversion and Winddown Expenses

The Liquidation Analysis assumes that accrued administrative expenses (*i.e.*, chapter 11 professional fees) and administrative expenses incurred by each of the Trustees will be paid prior

3

to calculating distributable value available for creditors. These amounts are, therefore, reflected as deductions against distributable value in order to calculate total net liquidation proceeds.

i.      <u>Accrued Chapter 11 Professional Fees</u>

The Liquidation Analysis assumes that prior to conversion to chapter 7, accrued professional fees will be paid from the allocated real estate. Significant amounts of professional fees have already been paid to professionals on an interim basis. The amounts reflected below are the total projected fees for the case, inclusive of what has already been advanced.

Total professional fees through the date of conversion are estimated as follows:

| Constituency | Farms (in $000's) | Ranches (in $000's) |
|---|---|---|
| Debtors | $10,224 | $12,900 |
| Committee | $6,107 | $4,490 |
| U.S. Trustee | $674 | $630 |
| **Totals:** | **$17,005** | **$18,106** |

ii.      <u>Chapter 7 Trustee Fees</u>

Pursuant to Section 326 of the Bankruptcy Code, chapter 7 trustee fees are calculated as 3.0% of liquidation proceeds in excess of $1 million.

iii.      <u>Chapter 7 Trustee Professionals</u>

The Liquidation Analysis assumes that each Trustee will retain its own professionals. Fees for those professionals are assumed to be 5% of distributable value.

In addition to the professional fees referenced above, the Liquidation Analysis assumes that, under any scenario, the Trustees and their respective estates will be engaged in expensive and protracted litigation regarding substantive consolidation of the two estates. The Liquidation Analysis further assumes that substantive consolidation will ultimately be unsuccessful.[2] The professional fees for that litigation are projected to be the lesser of (i) $5.0 million per estate, and (ii) liquidated amounts remaining in the estate.

After accounting for all available sources of liquidity (discussed above) and pre-conversion administrative and winddown expenses, the table below reflects the total distributable amounts projected for both the high and low cases.

---

[2]      The Debtors have modeled potential substantive consolidation scenarios and have determined that such scenarios, even in the event of a successful substantive consolidation claim by the Ranches' estate, represent an approximate mid-point between the high-low cases presented herein.

4

| (000's) | High Case | | | Low Case | | |
|---|---|---|---|---|---|---|
| | Farms | | Ranches | Farms | | Ranches |
| **Gross Liquidation Proceeds** | | | | | | |
| Real Estate | $ 55,089 | $ | 31,951 | $12,169 | $ | 31,951 |
| Cash | 13,328 | | 6,191 | 13,328 | | 6,191 |
| Intercompany Claim | - | | 15,400 | - | | 265 |
| **Total Gross Liquidation Proceeds** | $ 68,417 | $ | 53,542 | $ 25,497 | $ | 38,408 |
| **Pre-Conversion and Winddown Expenses** | | | | | | |
| (-) Accrued Chapter 11 Pro Fees | (17,005) | | (18,020) | (17,005) | | (18,020) |
| (-) Trustee Fees | (2,053) | | (1,606) | (765) | | (1,152) |
| (-) Chapter 7 Trustee Professionals | (8,421) | | (7,677) | (6,275) | | (6,920) |
| **TOTAL NET LIQUIDATION PROCEEDS** | $ 40,938 | $ | 26,238 | $ 1,452 | $ | 12,314 |

### *Claims and Recoveries*

*Discounting for Present Value.*  The Liquidation Analysis assumes that the Trustees will engage in significant litigation (particularly with respect to substantive consolidation) prior to making any distributions.  The Liquidation Analysis assumes that this litigation will take three (3) years to resolve (including time for appeals).  Distributions reflected in the Liquidation Analysis are therefore discounted to the present value for payments made three (3) years after the conversion date.  Calculation of this discounting assumes an annual interest rate of 6.0%.

*Class 1: Secured Claims.*  The Liquidation Analysis estimates a total of approximately $2.6 million in remaining Secured Claims.  These amounts are comprised of claims that were secured by the Debtors' liquidated equipment.

*Intercompany Claim.*  Ranches has an Intercompany Claim against Farms totaling $15.4 million.  The Debtors have reviewed the Intercompany Claim and believe that it is valid and supportable.  The Liquidation Analysis assumes that the Intercompany Claim will be asserted by the Trustee for Ranches against Farms, and will ultimately be allowed.

The table appended hereto reflects the projected recoveries under the Liquidation Analysis.  As reflected therein, all classes will do better under the Plan than under a hypothetical chapter 7.

5

**Liquidation Analysis**

|  | Farms | | Ranches | |
|---|---|---|---|---|
| Projected Distributions | High | Low | High | Low |
| Amts. Available for Distribution | $40,938 | $1,452 | $26,238 | $12,314 |

| (000's) | Farms | | | | | | | Ranches | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Claim Amts. | Plan | | High | | Low | | Claim Amts. | Plan | | High | | Low | |
|  |  | $ | % | $ | % | $ | % |  | $ | % | $ | % | $ | % |
| _Secured Claims and Priority Claims_ |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Class 1: Secured Claims | $2,599 | $2,599 | 100% | $2,182 | 84% | $0 | 0% | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Class 2: Other Priority Claims | $868 | $868 | 100% | $729 | 84% | $729 | 84% | $0 | $0 | 0% | $0 | 0% | $0 | 0% |
| _General Unsecured Claims_ |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Class 3: Farms General Unsecured Claims | $18,500 | $18,500 | 100% | $15,533 | 84% | $319 | 2% | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Class 4: Ranches General Unsecured Claims | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $3,969 | $2,594 | 65% | $320 | 8% | $150 | 4% |
| Class 5: Tyson Claims | $0 | $0 | 0% | $0 | 0% | $0 | 0% | $232,266 | $61,553 | 27% | $21,074 | 9% | $9,891 | 4% |
| Class 6: Segale Ranches Claims | $0 | $0 | 0% | $0 | 0% | $0 | 0% | $7,884 | $2,720 | 35% | $636 | 8% | $298 | 4% |
| Class 7: Subordinated Claims | $0 | $0 | 0% | $0 | 0% | $0 | 0% | $0 | $0 | 0% | $0 | 0% | $0 | 0% |
| Class 8: Intercompany Claims | $15,400 | $0 | 0% | $12,930 | 84% | $265 | 2% | N/A | N/A | N/A | N/A | N/A | N/A |
| Class 9: Interests | $0 | $0 | 0% | $0 | 0% | $0 | 0% | $0 | $0 | 0% | $0 | 0% | $0 | 0% |

DOCS_SF:107389.10

# EXHIBIT C

## Description of Potential Claims Against the Easterday Family[1]

**PURSUANT TO THE TERMS OF THE PLAN, ON THE EFFECTIVE DATE, THE DEBTORS WILL RELEASE THE EASTERDAY FAMILY RELEASED PARTIES FROM ANY AND ALL CAUSES OF ACTION (OTHER THAN SUCH CAUSES OF ACTION ARISING FROM OR RELATING TO THE EASTERDAY FAMILY SETTLEMENT AS SET FORTH IN THE PLAN), INCLUDING BUT NOT LIMITED TO, THE FOLLOWING**:

- claims relating to or arising from any alleged breach of fiduciary duties of any member the Easterday Family in such family member's individual capacity as a director and/or officer of Easterday Ranches;

- claims relating to or asserted in the Allocation Complaint;

- claims relating to or asserted in the 3E Properties Complaint;

- claims relating to substantive consolidation of the Estates of the Debtors or substantive consolidation of any affiliate of the Debtors with the Estates of one or both Debtors;

- claims relating to any alleged activity of any Easterday Released Party in any fraud committed by Cody Easterday; and

- claims relating to the Post-petition Corporate Actions;

Throughout these Chapter 11 Cases, the Debtors investigated and analyzed various potential claims against the Easterday Family Released Parties, including, but not limited to (i) the claims in the Allocation Complaint, (ii) the claims in the 3E Properties Complaint, (iii) potential breach of fiduciary duty claims against the Easterday Family as former directors and officers of Ranches, and (iv) claims relating to the potential substantive consolidation of the Estates and/or non-debtor affiliates of the Debtors, including the Easterday Family.  Below is a general description of the

---

[1] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Plan

DOCS_NY:45732.2

potential claims against the Easterday Family Released Parties that are being released pursuant to the terms of the Plan.

### A. The Allocation Dispute

In connection with the Sale Process, the Debtors and the Easterday Family entered into a Cooperation Agreement to provide for the sale of the Sale Properties with a reservation of rights of the Easterday Family and the Debtors concerning the ultimate allocation of the Net Sale Proceeds. The cooperation of the Easterday Family was necessary at the time because the Easterday Family asserted an ownership interest in certain of the Sale Properties on the basis that certain of the Sale Properties were titled either in their individual names or in their individual names doing business as Farms and cooperation would result in the highest and best value being obtained for all of the Sale Properties if sold at the same time. There was no known dispute as to the ownership interests in the Sale Properties at the inception of the case.

Subsequent to the entry of the Cooperation Agreement, and as a result of the Debtors' continuing due diligence, the Debtors asserted that *all* of the Sale Properties were owned by the Debtors, primarily on the legal theory that (i) the Farms Partnership Agreement contemplated that the Easterday Family would hold *partnership property* in their individual names and (ii) such property was primarily used by the Debtors in support of their business operations. On September 22, 2021, the Debtors filed a *Complaint (I) to Determine Validity, Priority, or Extent of Interests in Property and (II) for Declaratory Judgment* (as may be amended, modified or supplemented, the "Ownership Complaint") against the Easterday Family (Adv. No. 21-80050, the "Allocation Adversary"), seeking a determination regarding the interests of the Estates in certain real estate and related property (collectively, the "Disputed Property") that was allegedly owned, at least in part, by individual members of the Easterday Family (the "Allocation Dispute").

The Easterday Family has vigorously disputed the allegations in the Ownership Complaint and asserts that certain of the Sale Properties are properly titled in and owned by the Easterday Family entitling them to a share of the Net Sale Proceeds (~$100

2

million).  Additionally, the Easterday Family has asserted defenses and counterclaims in the Allocation Dispute, including ownership interests in various water rights and improvements associated with the Sale Properties.

As part of the Global Settlement embodied in the Plan, the Easterday Family is relinquishing any interest in the Net Sale Proceeds, other than $6 million, which is to be returned to Karen Easterday and used for other Plan-related payments.  The Debtors believe that the consensual resolution of the Allocation Dispute, as set forth in the Plan, is in the best interests of creditors, as it avoids protracted and expensive litigation, and provides for an immediate distribution to creditors.

### B.     The 3E Properties Complaint

On December 27, 2021, Farms filed a complaint against 3E Properties, Jody Easterday, Estate of Gale A. Easterday (Deceased), Karen L. Easterday, Cody A. Easterday, and Debby Easterday (the "3E Defendants") [Adv. Proc. No. 21-80057] (the "3E Complaint"), seeking a determination of the ownership interests of Farms' estate in that certain property commonly referred to as the "Onion Shed" located in Pasco, Washington (the "Onion Shed Property").  The 3E Complaint alleges that the Onion Shed Property is owned by Farms and not by 3E Properties because it was originally purchased by Farms, titled in Farms' name, and not properly transferred to 3E Properties.  As a result, the 3E Complaint asserts that the Onion Shed Property is an asset of the Farms Estate and available to Farms Creditors.  The 3E Defendants have filed answers to the 3E Complaint and assert numerous defenses as well as a counterclaim for tortious interference with contract against Farms relating to the *lis pendens* that was filed by Farms against the Onion Shed Property.  The 3E Defendants maintain that they are the properly titled owners of the Onion Shed Property.  The Debtors have considered the defenses available to the 3E Defendants, the time and expense of pursuing the litigation, including substantial fact discovery, and the risks of litigation in light of the potential benefits of the value of the Onion Shed Property and have determined that the global resolution of the disputes with the Easterday Family

3

Released Parties, including the resolution of the 3E Complaint is in the best interests of the Estates and their creditors.

## C. Breaches of Fiduciary Duty

During these Chapter 11 Cases, the Debtors investigated and analyzed potential claims against Karen Easterday, Gale Easterday, and Debby Easterday (the "Ranches Directors") for breaches of fiduciary duty as former directors and officers of Ranches. The Debtors examined the conduct of each of the Ranches Directors in connection with the operations of Ranches and whether the Ranches Directors knew or should have known about and taken action with respect to Cody Easterday's commodity trading activities that resulted in losses of hundreds of millions of dollars – losses that were largely funded through Cody Easterday's fraudulent "forward billing" practices relating to the purchase and feeding of "non-existent" or "missing" cattle.

The Ranches Directors owed duties of due care and loyalty to Ranches under Washington law, which obligated them to monitor Ranches' financial affairs and maintain at least a rudimentary understanding of Ranches' business operations. Based on their preliminary investigation, the Debtors believe that there are viable breach of fiduciary duty claims that could be asserted against the Ranches Directors. However, the Ranches Directors are likely to vigorously oppose such claims and assert, among other things, that it would have required extraordinary diligence for them to uncover the extent of Cody Easterday's trading losses and/or his fraudulent scheme to cover and fund those losses.

The Debtors have considered these defenses, the time and expense of pursuing a full investigation of the facts and circumstances relating to such potential claims, including substantial fact discovery, and the risks of litigation in light of the potential benefits to Ranches, including the time and risks associated with the collection of a judgment. Additionally, not only is there risk of loss in connection with such litigation, but the Ranches Directors may assert claims for indemnification relating to such claims if the Debtors are not successful in prosecuting such claims. The Debtors submit the

4

global resolution of the disputes with the Easterday Family Released Parties, including the release of any claims against the Ranches Directors for breach of fiduciary duty, is in the best interests of the Estates and their creditors.

### D. Substantive Consolidation

Though not a direct claim against any Easterday Family Released Party, as part of the Global Settlement embodied in the Plan, the Debtors are also releasing any claim that the Estates should be substantively consolidated with one another.[2]

Substantive consolidation is a remedy utilized by bankruptcy courts to combine the assets and liabilities of separate entities when the circumstances warrant treating such entities as if they were one and the same. The Ninth Circuit Court of Appeals recently summarized the concept and history of substantive consolidation:

> Orders of substantive consolidation combine the assets and liabilities of separate and distinct – but related – legal entities into a single pool and treat them as though they belong to a single entity. Substantive consolidation enables a bankruptcy court to disregard separate corporate entities . . . in order to reach assets for the satisfaction of debts of a related corporation. The consolidated assets create a single fund from which all claims against the consolidated debtors are satisfied.

*Leslie v. Mihranian (In re Mihranian)*, 937 F.3d 1214, 1216 (9th Cir. 2019) (citing *In re Bonham*, 229 F.3d 750, 764 (9th Cir. 2000).

---

[2]  The Debtors are also releasing any substantive consolidation claim relating to any of the Easterday Family Released Parties, including, but not limited to, claims any entities in which the Easterday Family owns or owned an interest could be substantively consolidated with the Debtors. While the Debtors have not conducted an extensive investigation as to whether such claims may be colorable, in light of the complexities and factual intensity of any claim of substantive consolidation, the Debtors submit that the global resolution of any such claims as part of the proposed settlement with the Easterday Family is in the best interests of the Debtors' estates and their creditors.

5

In the Ninth Circuit, substantive consolidation is appropriate when (i) creditors dealt with the debtor entities as a single economic unit and did not rely on their separate identities in extending credit, or (ii) the affairs of the debtors are so entangled that consolidation will benefit all creditors. *Bonham*, 229 F.3d at 766.

If the Estates were substantively consolidated, the recoveries available to Farms Creditors would be significantly reduced and expose the Easterday Family, as partners of Farms, to liability with respect to the resulting deficiency claims. Moreover, there would be no distribution to the Easterday Family to cover these deficiency claims.

The Debtors have conducted a preliminary analysis of the facts and law and believe there is a colorable claim for substantive consolidation of the Estates based on the substantial financial and operational entanglement between them. For example, both Ranches and Farms were under the control of Cody Easterday and the Ranches Directors were also the partners of Farms, and prior to the Petition Date, numerous transactions were engaged in between the Estates, other affiliates and the Easterday Family, including one entity paying the contractual obligations of another entity or being charged for goods or services that were received by another entity. The Official Committee of Unsecured Creditors of Farms and the Easterday Family resolutely dispute the validity of any claim for substantive consolidation. The Debtors believe that, in light of the fact specific nature of the substantive consolidation inquiry, the prosecution of any such substantive consolidation claims could take years and would involve significant expense and uncertainty. In light of the time, risks and costs of such litigation, the Debtors submit that the global resolution of the claims with the Easterday Family provides substantial benefits to the Estates and that the release of the substantive consolidation claims is in the best interests of the Debtors and their creditors.

DOCS_NY:45732.2

**E.    Other Claims and Causes of Action Against the Easterday Family Released Parties**[3]

In addition to the above-referenced claims, the Debtors have considered other potential claims and causes of actions against the Easterday Family and the Easterday Family Released Parties, including, but not limited to, claims against the Easterday Family's business advisor and accountants.  With respect to these potential claims, the Debtors have not done a full investigation or analysis, and there may be colorable claims and causes of action that the Debtors have not considered.  The Debtors understand that the Easterday Family Released Parties, including, but not limited to, the Easterday Family's business advisor and accountants, strongly deny the suggestion that any colorable or viable claims of any nature against them exist.  In light of the substantial benefits to the Estates from the Global Settlement embodied in the Plan, including, but not limited to, the release of the Easterday Family's interest in the Net Sale Proceeds, the resolution of these claims on the terms set forth in the Plan is in the best interests of the Debtors, their estates, and their creditors.

---

[3]    Though not a claim against the Easterday Family Released Parties, as part of the Global Settlement embodied in the Plan, the Debtors will assign their claims against Canyon Farm, LLC and its affiliates to Karen Easterday or her designee, which claims include potential fraudulent transfer claims (~$3.5 million) arising from the sale of real property prior to the Petition Dates.

7

DOCS_NY:45732.2

# EXHIBIT D

**THIS EXHIBIT D (THE "<u>EASTERDAY FAMILY STATEMENT</u>") WAS PREPARED SOLELY BY THE EASTERDAY FAMILY. THE DEBTORS DO NOT AGREE WITH CERTAIN OF THE STATEMENTS CONTAINED HEREIN. THE INCLUSION OF THE EASTERDAY FAMILY STATEMENT IN THESE SOLICITATION MATERIALS MAY NOT BE DEEMED AN ADMISSION BY THE DEBTORS OR ANY OTHER PARTY IN INTEREST OF SUCH STATEMENT. FURTHER, THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF WASHINGTON HAS MADE NO FINDINGS OF FACT WITH RESPECT TO SUCH STATEMENT.**

## EASTERDAY FAMILY CONTRIBUTIONS

The Easterday family contributed greatly to the value generated for the benefit of creditors of both Easterday Farms ("Farms") and Easterday Ranches, Inc. ("Ranches") (together the "Debtors"). This memo describes some of the key events, decisions, and contributions made by Cody Easterday, Karen Easterday, and Debby Easterday (collectively, the "Easterday Family"), and their family members for the benefit of the Farms and Ranches Estates, and their respective creditors, both pre-petition and during the course of the bankruptcy cases in six main categories: (1) employee retention, (2) marketing the Benton County properties; (3) crops and crop inventories; (4) marketing the equipment; (5) surrender of collateral to lenders, and (6) the CHS Patron Equities.

**Prepetition Activities**

On November 30, 2020, Cody Easterday ("<u>Cody</u>") self-reported to Tyson management. After self-reporting to Tyson, Cody then told his wife Debby Easterday ("<u>Debby</u>"). Debby supported Cody's decision to take responsibility for his actions and work to find a solution to repay Tyson. Cody and the Ranches staff fully cooperated with Tyson's investigation, records audit, inventory verifications, cattle management, and shipping schedules from the time of Cody's self-reporting until the last cattle were shipped.

On December 14, 2020, Cody engaged Widner Consulting, LLC ("Widner") to assist him. Cody and Debby asked Widner to assist them in navigating the situation with the goal of creating the best outcome possible for all creditors.

Cody, Debby, and Widner quickly determined that the Benton County properties would need to be sold. Widner immediately identified Skye Root as the broker best suited to market the properties at the highest value because of his connections to institutional real estate investors who Cody and Widner anticipated would be the buyers most likely to pay the highest value for the properties. By December 21, 2020, a listing agreement was executed between Root Realty and Farms, Ranches, and Cody to sell

the Benton County properties. Favorable listing terms were negotiated with the broker's commission capped well below the 3-5% standard in the market. This saved over $4 million, which was value that ultimately flowed directly to creditors.

Cody and Widner assembled nearly all the property data necessary to complete the buyer's data room to facilitate a quick and maximum-value sale of the Benton County properties. They assisted Skye Root / Root Ag Advisory in the development of the property listing brochures, in assembling and organizing information, and in understanding the properties so that they could be marketed effectively and for the highest value. This took over 200 hours of total time by the Easterday Family and its advisors and added significant value. This could not have been hired out to third parties because it required: (1) knowledge of the irrigation system (both engineering and operation), key infrastructure (pumping stations, booster stations, panels, etc.), and crop rotation and yield history, (2) familiarity with and access to legal documents associated with the property, and (3) an understanding of the irrigation equipment inventory, historical water usage, and operating cost history.

All of this work occurred prior to the petition dates and substantially benefitted Farms, Ranches, and their creditors.

**Postpetition Activities**

(1) <u>Employee Retention.</u>

By the end of December 2020, it was clear that Ranches would cease operations. By January 2021, it became clear that the issues at Ranches were going to spill over and create an uncertain future for Farms' employees. As of the petition dates, Farms had 124 employees and Ranches had 76 employees. A significant portion of these employees worked for the Easterday Family for over 15 years. The Debtors benefitted from a very enviable and unusual position for companies in bankruptcy – a consistent and reliable workforce.

The Easterday Family asked the employees of Ranches and Farms to stay on to wind down operations and create as much value for the Estates as possible. All employees that the Easterday Family asked to stay on did. These employees stayed not knowing their future and with significant pressure from other farm employers seeking to hire them. There is presently a shortage of skilled farm and agricultural labor in Eastern Washington and every single key employee of Farms and Ranches could have immediately found a job and received a pay increase as a result. Cody, Debby, and Karen Easterday ("Karen") said, "This was a huge ask of some of the greatest people on earth. To continue with the only certainty being that they would lose their job at the end shows their dedication to the family." None of these employees would have stayed on had the family left. They also worked knowing they would not get their typical end

2

DOCS_NY:45732.2

of year bonus. The Easterday Family's commitment to creating the best possible outcome for creditors of the Estates created the same commitment in the employees.

At Paladin's direction, Cody handled all sensitive dealings with employee matters including meeting personally with employees who were being terminated. On his own initiative, Cody assisted employees in finding new jobs. Karen and Debby worked to provide the emotional support to employees as they stayed and facilitated the orderly liquidation of assets for maximum value. The value resulting from employee retention manifested itself in a myriad of ways, but can be largely bucketed into two primary categories:

a) *Feed, care, security, and delivery of cattle to Tyson*: Cody asked Ranches employees to stay on to feed, care, and deliver cattle according to Tyson's instructions. Most of these employees wanted to leave given the future was clear that cattle feeding operations would end. They did not leave because Cody asked them to stay for the benefit of Tyson and Ranches. This allowed Tyson to leave approximately 70,000 head of cattle valued at over $100 million in the Ranches facilities and ship them to the Tyson Wallula plant according to schedule.

Leaving cattle in the Ranches facilities is unheard of in a situation like this, where normal practice would be to get cattle out of the feedyards and into alternative facilities. In this region, it was not economic for Tyson to move cattle out of the Ranches facilities due to a lack of bunk space in the region–a point that is clear given Tyson did not move cattle out of the Ranches facilities when asked to do so in January and February.

b) *Care, Maintenance, Security, and Orderly Liquidation of All Assets Other than Cattle Delivered to Tyson*: Retention of trusted, skilled, and reliable employees to maintain, secure, and handle the logistics of an orderly sale of all other assets of the Debtors (excluding cattle) was critical to maximizing recoveries for the Estates. There were no theft or security issues. Employees worked diligently to make sure all equipment and crop inventories and real estate assets were secured and preserved to allow for the highest possible sales value. Sales of these assets generated over $250 million in gross sale proceeds on a combined basis for the Debtors. Had the existing staff not stayed on, this would not have been possible.

Irrigation systems, controlled atmosphere storage facilities, feedlot improvements, and equipment could easily have been damaged without the experienced staff to ensure the security, maintenance, repairs, and care of

3

these assets. Likewise, perishable crop commodities require experienced staff to maintain marketable quality. Employees were critical to preserving, generating, and returning value to creditors. Given a labor shortage and the fact the Debtors were in bankruptcy, they could not easily replace key employees and a complete turnover of staff would have been devastating.

    i. Administrative employees allowed the Debtors' professionals to transition seamlessly into management of all books and records. These employees facilitated continuity of operations and an effective wind-down, allowing for as normal of business functions as possible under the circumstances.

   ii. Farms' employees tilled, planted, irrigated, and harvested all wheat. They prepared, cleaned, and organized equipment until the end of their employment to ensure it brought maximum value.

  iii. Farms' transportation employees delivered and transported crops as they were marketed and cattle as per Tyson's specifications.

  iv. Farms' agronomy staff oversaw the care and management of the potatoes and onions in storage. Both commodities are stored in climate-controlled facilities as they are a perishable product. Any kind of neglect results in catastrophic inventory losses whereby the crops become unmarketable. The staff, under Cody's direction, ensured this did not occur.

   v. Farms' staff cleaned and prepared the properties sold in Benton County for the transition to a new owner even though these employees were losing their jobs. When the properties were turned over to the ultimate buyer, Farmland Reserve, Inc. ("Farmland"), they showed pride of ownership all the way down to shop floors and granaries fully cleaned out.

(2) <u>Marketing Real Estate</u>

The Easterday Family was significantly involved in the efforts to market the Benton County real estate and, as noted under the Prepetition Activities, had commenced the process well in advance of Paladin and Debtors' counsel being engaged and in advance of the petition dates. The Easterday Family was critical to maximizing the value of the property and allowing for an orderly and efficient sales process. Their cooperation and contributions resulted in the property selling above appraised value, as opposed to what would normally be expected of a complex farm property sold under bankruptcy where properties typically sell at a discount to market or appraised value.

a) The Debtors could not have sold the properties without the cooperation of the Easterday Family. The individuals of the Easterday Family were in title to approximately 60% of the total acres sold. The acreage owned by the Debtors were interspersed with acreage owned by the individuals. Irrigation and water rights were also entangled as between rights owned by the individuals and rights owned by one or the other of the Debtors. In order to maximize the value for creditors, the Easterday Family proposed to sell the property owned by the individuals along with the property owned by the Debtors so that the properties could all be sold at the same time. That would allow a sale to result in the highest and best value being obtained for all of the property and provide a maximum return to creditors. The Easterday Family also repeatedly stated their intent to contribute the proceeds from the sale of the individually owned property to pay creditors to further maximize the benefit to creditors.

   i. The buyer's counsel's statements in the sale confirmation hearing reaffirmed exactly how important this cooperation was to Farmland's ability to purchase the property for full value.

   ii. The sale would not have closed had the Easterday Family not personally signed the deeds on property titled in their names. Farmland made it clear at the closing that, notwithstanding the Cooperation Agreement provision that the Debtors had the power of attorney to sign on behalf of the Easterday Family, Farmland insisted on requiring the Easterdays to each personally sign the deeds. Despite the fact the Debtors, at that point, had started to allude to potential disputes as to ownership, the Easterdays signed the deeds allowing the sale to close thereby allowing the sale to be completed.

   iii. Although there was initially no dispute as to property ownership, if the Debtors had commenced litigation over ownership prior to a sale, such litigation would likely have resulted in no sale occurring or a sale for a significantly reduced value. Debtors would have had to sell the parcels titled in their name at a significant discount compared to the value obtained through the joint sale process. In addition, litigation over ownership of the remaining parcels would have taken years and cost hundreds of thousands of dollars, if not millions. This process would have destroyed value to the creditors by reducing the number of interested buyers and incurring significant additional expenses (litigation, ownership, interest, and other carrying costs).

DOCS_NY:45732.2

b) Cody managed, directed, and oversaw the cleaning and organizing of the properties to allow for maximum value and eliminate items potential buyers could point to as a reason to deduct value.

c) Cody and Widner advised developing a marketing plan to encourage a competitive bidding process, including Debtors completing all buyer diligence items and allowing for the properties to be sold individually or in the aggregate. Cody and Widner raised and explained elements that would lead to a competitive bidding process for this type of property based on their combined experience and knowledge of how large, complex, agricultural properties transact, with over 45 years combined experience in farm real estate acquisitions and sales. They knew institutional buyers would be the most likely highest bidders for properties of this type and size, and suggested Debtors consider completing all property due diligence that would be standard for all institutional buyers (surveys, Phase I, soil tests, water test, pump tests), which were estimated to cost approximately $500,000 at the time. Few institutional buyers would be willing to lay out $500,000 if they were not sure they would end up with the properties. Cody and Widner advised Debtors that if the diligence was left to buyers to complete (as would normally be the case), the cost of diligence would result in reduced buyers and a non-competitive process under a section 363 sale.

d) Upon Debtors employment of Root Realty and formal listing, Cody and Widner answered virtually all buyer and broker questions about the properties and continued to support the diligence, sales and marketing efforts. These activities required significant additional time, commitment, and efforts of the Easterday Family, their immediate family members, and representatives.

   i. Cody assisted in the critically important and complicated Phase I environmental inspection. (Two full days of on-site inspections, plus documents and completion of affidavits.)

   ii. Cody and Debby, their immediate family members, and advisors facilitated and accommodated physical property inspections by potential buyers. Each of the multiple potential bidders toured the properties with various Easterday family members. Serious potential bidders conducted numerous site visits and inspections in the course of their diligence efforts and reached out to the Easterday Family, their immediate family members, or their representatives on numerous occasions to get questions answered about the irrigation system and operations.

6

DOCS_NY:45732.2

iii. The cooperation by the Easterday Family was critical to selling the properties for the most value and required a detailed, practical, and comprehensive understanding of the properties which only the Easterday Family had.

e) Cody and Widner advised the Debtors and assisted in carrying out the "Wheat Crop Plan," which allowed the properties to be cropped while simultaneously marketed for a timely sale in order to maximize value. All parties agreed it was important the properties be cropped to bring the highest value. Cody and Widner communicated to Debtors the numerous pitfalls of a traditional potato/onion rotation or leasing the properties out to other parties for a similar rotation, which could have resulted in the properties selling for a reduced value, including, but not limited to, (1) a need to occupy the storages through August 2022 (which would not be viewed favorably by potential buyers), (2) risk to the highly complex and expensive irrigation system essential to the value of the farms, and (3) execution risk if the Debtors had attempted to take on the complex task of farming vegetables while operating under the constraints of a bankruptcy (vegetable crops have high input costs and are vulnerable to failure if timely decisions are not made throughout the growing season). Wheat is a crop that is aesthetically pleasing in May and June (the period when most buyers were inspecting the property) and demands significantly less labor, water, and equipment than a traditional crop rotation. Wheat is harvested in July and August and had no storage needs or requirements allowing for a timely transition and turnover to any potential buyer.

f) Farmland, the ultimate buyer of the property, was familiar with the properties and the Easterday Family. The Easterday Family knew them to be a highly motivated buyer. In March of 2021, after initially being unable to successfully engage with the Debtors, Farmland reached out to the Easterday Family's counsel for assistance in making a bid. Farmland's familiarity with the Easterday Family and the respective counsels' communications and familiarity with each other aided in the process of Farmland becoming the initial stalking horse bidder.

(3) <u>Crops and Crop Inventory</u>

As of the petition dates, Farms had over $27.5 million in crop inventories. Crop inventories included potato and onion crops in storage valued at approximately $17 million and feed inventories valued at approximately $10.5 million. Various members

7

DOCS_NY:45732.2

of the Easterday family, under Cody's leadership, were involved throughout the bankruptcy in managing and marketing these inventories on behalf of Farms and for the benefit of all creditors and parties in interest.

a) Potatoes and onions are a perishable product and require significant expertise and attention. Cody had the necessary expertise to manage the storage, quality control, and logistics of getting these products to market in an orderly fashion. Had he not continued in this role, we estimate that the value recovered by Farms would have been reduced by at least 40%.

b) A portion of the stored potatoes were under contract to Lamb Weston. The Debtors initially considered rejecting this contract and selling the potatoes on the open market. Cody advised Farms to deliver under the Lamb Weston contract which had tremendous value to the Farms Estate. Had the contract been rejected and potatoes sold on the open market, they would have sold for no more than 50% of value (the open market price at the time for process grade potatoes was approximately $80-$85 per ton). This preserved millions of dollars in value for creditors.

c) Marketing of feed crops required significant logistics, timing of marketing decisions, and balancing with the feed needs of Ranches and Tyson. Cody assisted in all aspects of this process and brought all the various feed crop buyers to the table. This contributed at least 20% of additional value to Farms for feed crops.

d) Marketing of all crop inventories also required consideration of crop storage. Cody advised Debtors during the initial months of the bankruptcy as to which leases were critical for orderly liquidation of crop inventories because they had crops stored on them and he helped to facilitate any renegotiations required.

e) The Debtors ultimately agreed with the recommendation to plant wheat on the Benton County river farms. There were many delays in getting to this decision that complicated the execution of tillage, planting, and establishing a viable wheat crop.

   i. Once the decision was made, wheat planting activities ran 24 hours a day due to the delays. Cody led these efforts by managing crews, labor, and logistics. Cody used his knowledge and experience to advise the Debtors under very difficult circumstances on variety selection and crop

8

marketing. He and his immediate family members managed all of the seed procurement, cultivation, fertility, pest management, and irrigation practices. His involvement allowed for the successful establishment and production of a saleable crop under extremely difficult circumstances – both caused by the delays of the bankruptcy as well as weather-related challenges, with several weeks in June over 100ºF and several days posting record heat over 110ºF.

    ii. Debby also was instrumental in supporting employees and Cody as they set about successfully executing the Wheat Crop Plan. She ran parts and worked full-time to support the efforts of the Debtors. During wheat harvest one of the combines broke down. Due to supply chain issues, it was going to take 6 weeks for replacement parts to be delivered to repair the combine, which would have pushed harvest past the agreed upon date with Farmland under the Asset Purchase Agreement. Cody and his sons worked to locate parts and found them in Nebraska in two different stores located approximately 100 miles apart. Debby left one afternoon and drove overnight to get to Nebraska by the next morning, picked up parts and drove all day and through the night to get back to Washington with the necessary parts so the combine could be fixed. Had the Easterday Family not made efforts like this throughout the crop season, harvest would not have been completed on time and Farms and Ranches would have breached their agreement with Farmland or forfeited a significant portion of the 2021 wheat crop that was harvested from the farm.

(4) <u>Marketing Equipment.</u>

The Easterday Family was critical to the marketing of the rolling stock and personal property equipment owned by the Debtors and was significantly involved in the coordination and management of the logistics of marketing the equipment.

    a) Cody and Widner spent over 200 hours reviewing and correcting the equipment lists through various iterations from March through November 2021.

    b) Cody worked with Farms' employees to ensure all equipment was cleaned, stored, and kept secure. Typically, equipment theft is a major issue in a farm bankruptcy. The fact that all equipment was safely kept and available for sale was critical to driving the value returned to creditors.

9

DOCS_NY:45732.2

c) Farm equipment is typically sold at a discount to market when sold out of a bankruptcy. Cody and Widner advised Debtors to consider a bulk sale and make the buyer responsible for removal and clean-up, particularly since Debtors did not have sufficient remaining staff to complete and accomplish the task. It also eliminated downside risk and uncertainty for the Debtors as to final value.

(5) Surrender of Collateral

The Easterday Family, their family members, and representatives were instrumental in surrendering equipment to secured lenders that was subject to relief from stay. Surrender of equipment occurred from July 2021 through March of 2022, when the Debtors did not have labor sufficient to facilitate all the logistics of the turnover. Ranches had few remaining employees and all of Farms' employees were engaged in the wheat harvest in July of 2021. The next surrender of equipment occurred at the end of September 2021, with the remainder of the equipment surrender occurring from October 2021 through March 2022 when neither Farms nor Ranches had any remaining employees to complete the asset surrenders. The costs of these activities were not billed to either the secured creditors or the Debtors and is value directly contributed for the benefit of all creditors by reducing the deficiency claims of lenders and reducing administrative expenses of the Estates.

All equipment was disassembled, drained of fluids, cleaned and washed, and loaded onto trucks per the specification of each secured creditor involved. The return of equipment was labor and management intensive given the amount of equipment involved and required significant coordination with creditors and numerous different contracted transportation/trucking companies to get the right equipment to the right final destinations. In July it required 16 straight days (no days off) with 4 FTEs and one supervisor working at least 14-hour days.

(6) CHS Patron Equity

As of the petition dates, there were approximately $7.7 million of Patron Equities with CHS Inc. The Easterday Family identified the existence of the Patron Equities and communicated their willingness to have them liquidated so the proceeds could go to creditors. Those Equities would otherwise have been attributable to and payable to each of respective Easterday owners individually.

CHS Inc. is a cooperative and pays out a certain percentage of accrued patronage each year and retains the balance as equities to capitalize and preserve the net worth of the cooperative. Patron Equities are not generally considered liquid and the ability to

10

redeem them is governed by the bylaws of CHS Inc. and its Policy for the Redemption of CHS Inc. Equities Effective as of September 1, 2016 ("Redemption Policy"). Pursuant to the Redemption Policy, Cody, Debby, Karen, and the Estate of Gale Easterday ("Gale") are eligible to apply to redeem their share of Patron Equities upon attaining the minimum age of 70 years old. Gale and Karen had already applied to redeem and receive their distribution of accrued Patron Equities after they turned 70. They continued to have to apply annually for the release of Patron Equities accrued in the most recent year but did not have a material Patron Equities balance. However, Patron Equities attributable to Cody and Debby made up the majority of the $7.7 million balance. They each could have applied in the future to redeem their share of equity upon reaching the age of 70.

Cody and Widner notified the Debtors and the two committees for the unsecured creditors of each Farms and Ranches of the accounts and communicated the Easterday Family's willingness to contribute Patron Equities attributable to each of them individually to be paid to the Debtors for the benefit of creditors instead of keeping the accounts for themselves for their own retirement.

The Debtors have now reached an agreement with CHS, Inc. to receive $7.4 million which will cancel all Patron Equities to the individuals and distribute those funds to the creditors.

11

DOCS_NY:45732.2

# **EXHIBIT E**

## **Ranches Committee's Support Letter**

DOCS_NY:45732.2

1

# Cooley

May 25, 2022

General Unsecured Creditors of
Easterday Ranches, Inc.

**Re:  Recommendation of the Ranches Committee**
**in Favor of Chapter 11 Plan of Reorganization**

Dear Creditor:

We represent the official committee of unsecured creditors (the "<u>Ranches Committee</u>") [1] of Easterday Ranches, Inc. ("<u>Ranches</u>," and together with Easterday Farms, the "<u>Debtors</u>") in these chapter 11 cases.  The Ranches Committee supports the Debtors' chapter 11 plan (the "<u>Plan</u>") and urges you to vote to accept it.  Copies of the Plan and related disclosure statement (the "<u>Disclosure Statement</u>") are being distributed to each holder of a claim against the Debtors who is entitled to vote to accept or reject the Plan, along with a ballot with which to cast its vote.  **The Disclosure Statement contains extensive information with respect to the Plan, and we encourage you to review the Plan and the Disclosure Statement carefully before you cast a vote(s) to accept or reject the Plan.**

Since its appointment on February 16, 2021, the Ranches Committee has taken an active role in the Debtors' bankruptcy cases.  The Ranches Committee conducted a thorough Bankruptcy Rule 2004 investigation of, among other things, the circumstances surrounding the bankruptcy filing and potential claims against the members of the Easterday family (the "<u>Easterday Family</u>") and other parties.  The Ranches Committee supervised the sale of land owned by the Debtors and the Easterday Family to a third-party buyer and was heavily involved in the ensuing negotiations over the allocation of such sale proceeds.  Importantly, the Ranches Committee has analyzed and extensively participated in discussions and negotiations over the Plan and Disclosure Statement.  The Plan and Disclosure Statement now embodies a fully consensual settlement among various key constituents as to allocation of sale proceeds and other assets among the creditors.

The Ranches Committee believes that acceptance of the Plan and the resulting distribution are in the best interest of general unsecured creditors of Ranches and the settlement embodied in the Plan represents a fair and equitable result.  The Plan provides for an estimated recovery of approximately 71% to a holder of an Allowed Ranches General Unsecured Claim, although such recovery is subject to change.

**The Ranches Committee recommends that, by indicating on the enclosed ballot, you vote in favor of the Plan.**

You should make your own determination on whether to accept or reject the Plan after reading and giving careful consideration to both the Plan and Disclosure Statement, and in consultation with your own advisors and professionals.

In order to count, ballots must be **received** no later than the date that is 14 days prior to the Confirmation Hearing at 5:00 p.m. (Pacific Time).  Ballots can be submitted at the following address:

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan and Disclosure Statement.

**Error! Reference source not found.**



<u>Physical Mail</u>:
Easterday Ballot Processing Center
c/o Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067-4003
Attn: Patricia Jeffries
-or-
<u>Electronic Mail</u>:
Email Address: pjeffries@pszjlaw.com
Subject Line: Easterday Ballot Submission
Attachment: A completed and signed ballot must be attached in PDF format.

The description in this letter of the terms of the Plan is qualified by and subject to the discussion and provisions contained in the Plan and Disclosure Statement.

If you have any questions, please contact the undersigned.

Sincerely,

Michael Klein                                          Seth R. Freeman
Christopher B. Durbin                                  George Demos
Weiru Fang                                             Brett King
                                                       Coral Hansen

Cooley LLP                                             B. Riley Advisory Services
Counsel for the Official                               Financial Advisor for the Official
Committee of Unsecured Creditors of                    Committee of Unsecured Creditors of
Easterday Ranches, Inc.                                Easterday Ranches, Inc.
(202) 776-2110                                         (415) 229-4860

**<u>Committee Members</u>**

J.R. Simplot Company
Alto Nutrients, LLC
Animal Health International Inc.

**Error! Reference source not found.**

# <u>EXHIBIT F</u>

## Farms Committee's Support Letter

1

DOCS_NY:45732.2

**RECOMMENDATION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF EASTERDAY FARMS TO VOTE
TO *ACCEPT* THE PLAN OF LIQUIDATION**

May __, 2022

To:     All Holders of Class 3 – Easterday Farms General Unsecured Claims

Re:     *In re Easterday Ranches, Inc., et al.[1]*, Case No. 21-00141-11 (WLH)

Dear General Unsecured Creditors of Easterday Farms:

The Official Committee of Unsecured Creditors of Easterday Farms, a Washington General Partnership (the "Farms Committee") appointed in the above-referenced chapter 11 cases (the "Chapter 11 Cases") submits this letter to all Holders of Allowed General Unsecured Claims entitled to vote (the "Voting Creditors") on the *Third Amended Joint Chapter 11 Plan of Liquidation of Easterday Ranches, Inc. and Easterday Farms* (as may be amended or modified from time to time, the "Plan")[2] filed by the above-referenced debtors and debtors-in-possession (collectively, the "Debtors").

In light of the facts and circumstances of the Chapter 11 Cases and for the reasons described in this letter, the Farms Committee recommends that the Voting Creditors **vote to ACCEPT the Plan**.  **The Plan provides a 100% recovery for Allowed General Unsecured Claims against Farms**.[3]

On February 8, 2021, Farms filed a voluntary chapter 11 petition in the Bankruptcy Court. On February 22, 2021, the Office of the United States Trustee appointed certain creditors of Farms to the Farms Committee.  Under the Bankruptcy Code, the Farms Committee represents the interests of the general unsecured creditors of Farms.

The Farms Committee has worked consistently and diligently for over a year to maximize recoveries for the general unsecured creditors of Farms, including by:

- assisting the Debtors in connection with the successful sale of substantially all of the Debtors' farmland for a purchase price of over $204 million;

---

[1] The Debtors (along with their case numbers) are Easterday Ranches, Inc. (21-00141) ("Ranches") and Easterday Farms, a Washington general partnership (21-00176) ("Farms").

[2] Capitalized terms used and not defined in this letter shall have the meanings ascribed to such terms in the Plan.

[3] Recoveries for Farms General Unsecured Claims under the Plan do not include amounts for post-petition interest or attorneys' fees.  The Farms Committee urges Voting Creditors to review the Plan and Disclosure Statement for specific information regarding recoveries.

1

- assisting the Debtors in the liquidation of substantially all of Farms' equipment for a purchase price of approximately $14 million;

- advising the Debtors regarding, and advocating in favor of, legal positions that ultimately secured tens of millions of dollars of additional recoveries for the Farms estate; and

- negotiating the terms of the agreed-upon Plan with the Debtors and other principal parties in interest to ensure that Farms General Unsecured Creditors receive a 100% recovery on account of their Allowed Claims.

Not only does that Plan provide a 100% recovery for Farms General Unsecured Creditors, but it also provides material recoveries to the general unsecured creditors of Ranches. The Plan therefore avoids costly and protracted litigation among the principal parties in interest, which could have delayed payment to Farms General Unsecured Creditors for many months or years.

Because the Plan is intended to comprehensively resolve all litigation among the parties, Article X of the Plan contains certain release and exculpation provisions (the "Releases"). The Releases include releases by the estates and creditors in favor of certain parties, including, without limitation, members of the Easterday family (the "Third-Party Releases"). You will be deemed to have consented to such Third-Party Releases if you vote to accept the Plan and do not "opt out" of the Third-Party Releases in accordance with the instructions set forth on your ballot.

## DISCLAIMER:

**THE FARMS COMMITTEE REPRESENTS THE INTERESTS OF ALL GENERAL UNSECURED CREDITORS AS A WHOLE, RATHER THAN THE INTERESTS OF ANY PARTICULAR CREDITOR. THE FARMS COMMITTEE RECOMMENDS THAT YOU CONSULT WITH YOUR OWN COUNSEL REGARDING THE PLAN, YOUR VOTE, THE IMPACT OF THE PLAN MAY HAVE ON ANY CLAIMS OR CAUSES OF ACTION THAT MAY BE HELD BY YOU, AND ANY OTHER MATTERS CONCERNING THE CHAPTER 11 CASES. THE FARMS COMMITTEE CANNOT ADVISE YOU REGARDING THE IMPACT OF THE PLAN ON ANY CLAIMS OR CAUSES OF ACTION THAT MAY BE HELD BY YOU.**

**THIS LETTER IS NOT INTENDED TO SUBSTITUTE FOR OR REPLACE THE DISCLOSURES, INCLUDING WITH RESPECT TO CERTAIN RISK FACTORS, SET FORTH IN THE PLAN. YOU SHOULD READ THE PLAN AND ALL THE DISCLOSURES SET FORTH THEREIN AND IN THE DISCLOSURE STATEMENT AND MAKE YOUR OWN DETERMINATION REGARDING WHETHER THE PLAN IS ACCEPTABLE.**

The Debtors have provided you with a Ballot to vote to accept or reject the Plan. Please carefully review the materials included with your Ballot for instructions regarding how to complete and return your Ballot to ensure that your vote is counted. The Farms Committee recommends that you **vote to ACCEPT the Plan**

**The voting deadline is [____], 2022 at [_____] (prevailing Pacific Time)**.


Very truly yours,


William Knox
The McGregor Company
Chairperson
Official Committee of Unsecured Creditors of
Easterday Farms, a Washington General
Partnership

3