

Whitman L. Holt
Bankruptcy Judge

*FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Lead Case No. 21-00141-WLH11 |
| EASTERDAY RANCHES, INC., et al., | (Jointly Administered) |
| Debtors. | **MEMORANDUM OPINION** |

The Bankruptcy Code is generally designed for single-debtor cases. When affiliated corporate debtors file related cases, administration of those cases sometimes reveals gaps and ambiguities in the statutory scheme, particularly regarding intercompany rights. This uncertainty matters because intercompany disputes are increasingly marquee events in multi-debtor chapter 11 cases.

Although the instant cases involved just two affiliated debtors, they required navigating many significant and complex intercompany issues. The United States trustee (the "UST") contends that the debtors' lead bankruptcy counsel crossed lines during that voyage in a way requiring denial of some of the law firm's requested final fees. For the reasons detailed below, the court disagrees.

## BACKGROUND & PROCEDURAL POSTURE

### *The Easterday Entities – A Prelude to Bankruptcy*

Debtor Easterday Ranches, Inc. ("Ranches") was a Washington corporation engaged in, among other things, cattle ranching activities in eastern Washington. Easterday family members owned and managed Ranches.

Debtor Easterday Farms ("Farms") was a Washington general partnership engaged in, among other things, farming activities in eastern Washington. Easterday family members were general partners of the Farms partnership and Farms' managers.

Over a period of several years, Cody Easterday—an Easterday family member and Ranches' president—engaged in activity through Ranches that defrauded Tyson Fresh Meats and Segale Properties out of more than $244,000,000. Mr. Easterday accomplished this by charging Tyson and Segale for approximately 265,000 head of nonexistent, or "ghost," cattle. Soon after Mr. Easterday and Tyson personnel met to discuss the fraud, Tyson sued Ranches in Washington state court. This lawsuit, in turn, precipitated the Ranches chapter 11 bankruptcy petition at issue here.

Farms was not part of the ghost-cattle fraud, but Farms was jointly liable with Ranches on some funded debt. Because the Ranches bankruptcy filing (among other possible events) triggered a default of that debt, Farms followed Ranches' lead and filed its own chapter 11 bankruptcy petition.

## *Key Events During the Bankruptcy Cases*

These have been active and involved bankruptcy cases punctuated with many disputes along the way. Although the complete history of the cases provides background context for the present dispute, in the interest of brevity the court highlights only the most relevant events.

At the outset, it was apparent that Ranches, Farms, and their respective stakeholders held certain diverging interests. As a result, the UST determined it appropriate to appoint two official committees of unsecured creditors—one for each debtor. Each committee retained capable counsel and financial advisors.

Unsatisfied with this structural divide, the UST also objected to the proposed retention of common counsel and other professionals for the debtors. From the UST's perspective, the potentially divergent interests created insoluble conflicts that necessitated separate representation. The court overruled this objection, including because any intercompany disputes were theoretical at the time and because the dueling creditors' committees provided structural checks against the dormant conflicts. The court agreed with debtors' counsel that the common professionals could appropriately serve as a proverbial "honest broker" to mediate and facilitate resolution of issues among the various stakeholders. Debtors'

counsel also conceded, however, that separate representation would be required if the need for actual litigation between the Ranches and Farms arose.

During the middle phase of the cases, the debtors liquidated substantially all of their property, along with property that arguably belonged to the Easterday family. This included many acres of real property, substantial farm equipment, various crops, and aircraft. Liquidation of these assets created a "pot" containing hundreds of millions of dollars. Myriad complex issues then arose regarding the appropriate allocation of the pot among the two estates and the Easterday family.

The debtors sought to resolve the allocation and other issues through a comprehensive settlement, which involved trying to find consensus about many subjects among the creditors' committees, Tyson, Segale, the Easterday family, and others. In the midst of protracted and undoubtedly difficult negotiations, the debtors filed a series of proposed chapter 11 plans and related papers. At a very high level, those plans can be summarized as follows:

- The debtors filed their first plan in August 2021, which contemplated the creation of two liquidating trusts. The plan provided that creditors of both debtors would get interests in their respective trust and the trusts would then engage in postconfirmation litigation about the allocation issues and other disputes.

- The debtors filed a second plan in December 2021. They built this plan around a "toggle" keyed to the outcome of an adversary proceeding the debtors commenced against the Easterday family. The plan projected recovery for creditors as follows: (i) Farms' unsecured creditors were expected to receive 89%–94%; (ii) Ranches' unsecured creditors were expected to receive 48%–49%; and (iii) Tyson and Segale were expected to receive 22% and 33%, respectively.

- The debtors filed a third plan in February 2022. This plan provided an 89% recovery for Farms' unsecured creditors, but only if the class voted to accept the plan and only if individual creditors assigned their own claims against the Easterday family to a liquidation trust (if the class voted to reject, the maximum recovery would be fixed at 66.67% and further reductions applied to non-assigning individual creditors). The relative recoveries among Ranches' general unsecured creditors, Tyson, and Segale were defined by a complex waterfall mechanic. The Easterday family vehemently opposed this plan.

**MEMORANDUM OPINION**             Page 3

- The debtors filed the fourth and final plan in May 2022. This plan contained a global settlement among the two committees, Tyson, Segale, and the Easterday family. The plan provided a 100% recovery (without postpetition interest or attorneys' fees) for Farms' unsecured creditors and an agreed relative distribution of remaining value among Ranches' unsecured creditors, Tyson, and Segale. The Easterday family contributed assets and made other concessions to fund the plan.

The debtors solicited votes only for the fourth and final plan. All impaired voting classes overwhelmingly accepted the plan and, with minor preconfirmation modifications, the court ultimately confirmed that plan. The confirmed plan comprehensively resolved many issues that would have—probably individually and certainly collectively—taken many years to litigate on the merits, including:

- The relative allocation of asset-sale proceeds as among the Ranches estate, the Farms estate, and the Easterday family;

- The relative allocation of liabilities as between the Ranches estate and the Farms estate, including relative liability for bankruptcy administrative expenses and regarding co-liable secured debts satisfied during the cases;

- The existence, amount, and priority of any other intercompany claims by Ranches against Farms and vice versa;

- Whether and how the Ranches estate, the Farms estate, and any nondebtor affiliates should be combined based on the doctrine of substantive consolidation;

- Potential affirmative claims that the Ranches estate or the Farms estate could assert against members of the Easterday family (or their nondebtor relatives and affiliated entities), Tyson, or Segale; and

- Any other issues bearing on the relative claims and rights of Farms' creditors, Ranches' general unsecured creditors, Tyson, Segale, and the Easterday family regarding the value to be distributed under the plan.

The negotiation and confirmation of this plan is an unquestioned success and a laudable example of how to utilize the bankruptcy process to resolve highly-complex disputes capable of consuming tremendous resources to litigate to finality.

**MEMORANDUM OPINION**        Page 4

## *The PSZJ Fee Dispute*

The UST initiated the present dispute by objecting to the fourth interim fee application of Pachulski Stang Ziehl & Jones LLP ("PSZJ"), which sought compensation in the firm's capacity as the debtors' lead bankruptcy counsel.[1]

The thrust of the UST's objection is that (i) the December 2021 and February 2022 plans (together, the "Offending Plans") impermissibly subordinated the interests of the Farms stakeholders to those of the Ranches estate; (ii) giving rise to an actual conflict between the estates; and (iii) therefore, the court should deny PSZJ compensation for all related work.[2] The UST's position is partially predicated on the notion that the available funds entitled Farms' creditors to a 100-cent recovery, which the debtors' own "waterfall" analyses made evident from the start—thus the Offending Plans proposing something less improperly stripped value from those stakeholders.[3] Due to the same asserted conflict, the UST contends that all PSZJ's work related to the Offending Plans amounted to the law firm representing "an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed" under Bankruptcy Code section 328(c). From these premises the UST further concludes that PSZJ's associated "fees were not reasonable nor beneficial for the Farms' case" under Bankruptcy Code section 330(a).[4] The UST thus requests that the court "deny approval of the fees for the time spent related to the plan(s) that favored Ranches over Farms."[5]

With the parties' consent, the court preserved all issues raised by the UST's objection and deferred consideration of those issues until PSZJ filed its final fee application.[6] The UST timely supplemented its objection, including by further refining the temporal scope of the objection[7]; PSZJ replied[8]; and the court heard oral argument. The matter is now ready for decision.

---

[1]   ECF No. 1726.

[2]   *See* ECF No. 1783 at pp. 10-12.

[3]   *See id.* at pp. 8-10.

[4]   *See id.* at pp. 4-6, 12-13.

[5]   *Id.* at p. 13.

[6]   ECF No. 1850.

[7]   *See* ECF No. 1865.

[8]   ECF No. 1879.

**MEMORANDUM OPINION**          Page 5

# DISCUSSION

## *Jurisdiction & Power*

The court has subject matter jurisdiction regarding these bankruptcy cases pursuant to 28 U.S.C. §§ 157(a) & 1334(b) and LCivR 83.5(a) (E.D. Wash.). The parties' dispute regarding the allowance of professional fees incurred during the bankruptcy cases is statutorily "core" and "the action at issue stems from the bankruptcy itself."[9] Indeed, Supreme Court precedent holds "that the bankruptcy court has exclusive authority . . . to fix the amount of allowances for fees" incurred by corporate debtors' counsel during a bankruptcy case.[10] Accordingly, the court may properly exercise the judicial power necessary to finally decide this dispute.

## *Retention & Compensation of Bankruptcy Professionals*

Being retained and paid for professional work in a bankruptcy case is a uniquely challenging task. Bankruptcy professionals not only must comply with generalized ethical and regulatory regimes applicable to all professionals (such as state legal ethics rules), but also are required to complete thorough disclosure and approval processes that have no nonbankruptcy analog.

Things begin with the court considering an application seeking the employment of a professional, which application must include detailed public disclosures.[11] Courts deny these applications if the proposed employment terms are unreasonable, the professional holds or represents "an interest adverse to the estate," or the professional otherwise is not a "disinterested person."[12] In the context of a law firm, this often requires an analysis of whether a past or present representation by the firm constitutes an impermissible conflict of interest.

The concurrent representation of affiliated debtors with potential intercompany claims against each other is not a categorical bar to court approval of common counsel or other professionals for joint debtors.[13] As the Collier treatise

---

9     *See* 28 U.S.C. § 157(b)(2)(A); *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

10    *See Brown v. Gerdes*, 321 U.S. 178, 188 (1944) (Douglas, J.).

11    *See* 11 U.S.C. §§ 327(a), 329(a), 1103(a); Fed. R. Bankr. P. 2014(a), 2016(b).

12    *See* 11 U.S.C. § 327(a); *see also id.* § 101(14) (defining "disinterested person").

13    *See, e.g., id.* § 327(c); *In re BH&P, Inc*., 949 F.2d 1300, 1314-15 (3d Cir. 1991); *Katz v. Kilsheimer*, 327 F.2d 633, 635-36 (2d Cir. 1964); *In re Adelphia Commc'ns Corp*., 342 B.R. 122, 126-28 (S.D.N.Y. 2006); *Tri-State Leasing Corp. v. United States Tr. (In re Coal River Resources, Inc.)*, 321 B.R. 184, 188 n.4 (W.D. Va. 2005);

explains, in the face of such proposed representation, "courts should examine the factual circumstances surrounding the representation to determine whether it is appropriate," including the details of the potential conflict and any structural checks on the potential conflict evolving to the level of an actual conflict.[14]

After the court assesses all relevant factors and approves a professional's employment, the professional may periodically seek court approval of interim compensation requests.[15] The general standard permits only "reasonable compensation for actual, necessary services rendered by the" professional.[16] The statute further mandates that, subject to an exception for certain cases involving individual debtors, bankruptcy courts must "not allow compensation for . . . services that were not reasonably likely to benefit the debtor's estate or necessary to the administration of the case."[17]

Along with these basic checks, an additional throttle on professional compensation appears in Bankruptcy Code section 328(c). Subject to certain exceptions, section 328(c) provides that the bankruptcy court "***may*** deny allowance of compensation for services . . . of a professional person . . . if, at any time during such professional person's employment . . . , such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."[18] This subsection thus "authorizes a 'penalty' for failing to avoid a disqualifying conflict of interest."[19] By its plain terms, imposition of any sanction under section

---

*In re M&P Collections, Inc.*, 599 B.R. 7, 11-12 (Bankr. W.D. Ky. 2019); *In re Mulberry Phosphates, Inc.*, 142 B.R. 997, 998-99 (Bankr. M.D. Tenn. 1992); *In re Global Marine, Inc.*, 108 B.R. 998, 1003-04 (Bankr. S.D. Tex. 1987); *In re Guy Apple Masonry Contractor, Inc.*, 45 B.R. 160, 166 (Bankr. D. Ariz. 1984); *In re O.P.M. Leasing Servs., Inc.*, 16 B.R. 932, 941 (Bankr. S.D.N.Y. 1982).

[14] *See* 3 COLLIER ON BANKRUPTCY ¶ 327.04[5][a] (16th ed. rev. 2022); *see also id.* ¶ 327.04[5][b] ("Courts tend to examine this factor on a case-by-case basis rather than finding it to be a *per se* conflict of interest.").

[15] *See* 11 U.S.C. § 331; Fed. R. Bankr. P. 2016(a).

[16] 11 U.S.C. § 330(a)(1)(A). *See also, e.g.*, *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 127-28 (2015). An exception to this general standard exists when the bankruptcy court preapproves compensation terms under Bankruptcy Code section 328(a), which are not subject to a subsequent reasonableness analysis but instead only whether "such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." *See generally Circle K Corp. v. Houlihan, Lokey, Howard & Zukin, Inc. (In re Circle K Corp.)*, 279 F.3d 669, 671 (9th Cir. 2001) (quoting 11 U.S.C. § 328(a) and contrasting the two modes of employment and standards).

[17] 11 U.S.C. § 330(a)(4)(A) (internal substructure omitted).

[18] *Id.* § 328(c) (emphasis added).

[19] *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994). *See also, e.g.*, 3 COLLIER ON BANKRUPTCY ¶ 328.05[4] (16th ed. rev. 2022) ("The sanction contained in section 328(c) ensures the enforcement of the Code's requirement that professional persons be 'disinterested.'").

---

**MEMORANDUM OPINION**        Page 7

328(c) is permissive, not mandatory, which means any "decision whether to deny fees to a professional who is not disinterested is within the discretion of the bankruptcy court."[20]

One of section 328(c)'s stated exceptions is the circumstances provided in Bankruptcy Code section 327(c), the latter of which provides statutory support for a case-by-case approach regarding intercompany conflicts in multi-debtor cases.[21] Thus, courts in the compensation context similarly should analyze whether a potential intercompany conflict ever rose to the level of an "actual conflict" while also balancing "on a case by case basis, the benefits to the bankruptcy estate and creditors against the effects of an actual conflict."[22]

## *Fiduciary Duties in Bankruptcy*

To properly apply the factors just discussed, it helps to consider the obligations employed professionals owe to a bankruptcy estate. A bankruptcy filing creates a distinct legal entity or "estate," which consists of a defined *res* to be administered during the bankruptcy case.[23] The estate representative[24] and its professionals owe fiduciary duties—such as the classic duties of care and loyalty—to the estate.[25] Case law occasionally references an estate representative's duties *to* creditors and, in a potentially solvent case, *to* equityholders.[26] These duties are not owed directly to individual creditors or equityholders, but rather are collective and

---

[20]   3 COLLIER ON BANKRUPTCY ¶ 328.05[4] (16th ed. rev. 2022). *See also, e.g.*, *Siegel v. Fitzgerald*, 142 S. Ct. 1770, 1777 & 1782 n.2 (2022) (articulating how use of the word "may" in bankruptcy fee statute did not create a requirement, unlike the word "shall"); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (contrasting statutory use of permissive term "may" with mandatory term "shall"); *In re Shafer Bros. Constr. Inc.*, 525 B.R. 607, 613 (Bankr. N.D.W. Va. 2015) (highlighting how section 328(c)'s text supports "the bankruptcy court's appropriate application of its discretion when compensating professionals").

[21]   *See* note 13.

[22]   *See, e.g.*, *In re Global Marine, Inc.*, 108 B.R. at 1006.

[23]   *See* 11 U.S.C. § 541(a).

[24]   The most common estate representative is the bankruptcy trustee, but in chapter 11 cases the debtor usually remains in possession of its estate with the rights and duties of a trustee. *See id.* §§ 1101(1), 1107(a). Chapter 11 plans often install a postconfirmation representative, such as a plan trustee, agent, or administrator.

[25]   *See, e.g.*, *Wolf v. Weinstein*, 372 U.S. 633, 649-50 (1963); *United States ex rel. Willoughby v. Howard*, 302 U.S. 445, 450-52 (1938); *In re Intermagnetics Am., Inc.*, 926 F.2d 912, 917 (9th Cir. 1991).

[26]   *See, e.g.*, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (observing that "the fiduciary duty of the trustee runs to shareholders as well as to creditors"); *Kalyna v. Swaine (In re Accomazzo)*, 226 B.R. 426, 429 (D. Ariz. 1998) ("As representatives of the estate, a bankruptcy trustee owes a fiduciary duty to creditors of, and parties-in-interest to, a bankruptcy estate.").

**MEMORANDUM OPINION**          Page 8

generalized duties flowing through the estate to all its residual beneficiaries (similar to the general duties corporate fiduciaries might owe stockholders).[27]

To fulfill its fiduciary obligations, a representative should maximize the estate's value. Doing so generally entails bringing assets into the estate and reducing or eliminating parasitic costs.[28] But the process does not require raw maximization at the expense of all other considerations. An estate representative's duty is more nuanced. For example, in the overwhelming majority of bankruptcy cases the intrinsic time value of money is amplified because creditors receive only partial distributions (i.e., get paid in so-called "bankruptcy dollars"). This consideration places a premium on speed.[29] With this in mind, a representative might reasonably decline to pursue a strategy likely to augment the estate if the eventual benefit is temporally distant or uncertain. In such an instance, the representative might opt for a more immediate resolution on the premise that the net time-adjusted return of the declined strategy to the estate (and hence to creditors) is unfavorable. For similar reasons, risky investment strategies designed

---

[27] *See, e.g.*, *ICM Notes, Ltd. v. Andrews & Kurth, L.L.P.*, 278 B.R. 117, 125-26 (S.D. Tex. 2002) (finding "that counsel for a debtor-in-possession does not owe any fiduciary duties to a particular creditor" because any duty is more generalized), *aff'd*, 324 F.3d 768 (5th Cir. 2003); *Duke Energy Trading & Mktg., L.L.C. v. Enron Corp. (In re Enron Corp.)*, 2003 Bankr. LEXIS 330, at *24 (Bankr. S.D.N.Y. Apr. 17, 2003) (explaining how "the duty of the trustee or debtor-in-possession is to gather estate assets for pro rata distribution to all creditors," which creates "a fiduciary duty to all creditors . . . to protect the interests of all creditors collectively" – i.e., a duty running "to the class of creditors, not individual creditors"). *See also generally Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 546-48 (Del. Ch. 2015) (providing clear and detailed bulleted list of fiduciary duty principles applicable in the context of insolvent Delaware corporations, which principles can logically be extended to the bankruptcy context).

[28] *See, e.g.*, *In re Reliant Energy Channelview LP*, 594 F.3d 200, 210 (3d Cir. 2010) (observing that "debtors-in-possession have a fiduciary duty to maximize the value of the estate"); *United States v. Sims (In re Feiler)*, 218 F.3d 948, 952 (9th Cir. 2000) (explaining how "the trustee's duty is to maximize the assets of the bankruptcy estate to allow maximum recovery for the debtor's creditors"); *Cheng v. K&S Diversified Invs., Inc. (In re Cheng)*, 308 B.R. 448, 455 (B.A.P. 9th Cir. 2004) ("The debtor in possession performing the duties of the trustee is the representative of the estate and is saddled with the same fiduciary duty as a trustee to maximize the value of the estate available to pay creditors."), *aff'd*, 160 F. App'x 644 (9th Cir. 2005).

[29] *See, e.g.*, *Bullard v. Blue Hills Bank*, 575 U.S. 496, 505 (2015) ("[E]xpedition is always an important consideration in bankruptcy."); *Katchen v. Landy*, 382 U.S. 323, 328-29 (1966) (describing longstanding recognition "that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period'" (quoting *Ex parte Christy*, 44 U.S. (3 How.) 292, 312 (1845))); *Wiswall v. Campbell*, 93 U.S. 347, 350-51 (1876) (emphasizing how "[p]rompt action is everywhere required by law," and that this principle requires quick resolutions of claims against a bankruptcy estate, as "[w]ithout it there can be no dividend"); *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346-47 (1875) (discussing how "[i]t is obviously one of the purposes of the Bankrupt law, that there should be a speedy disposition of the bankrupt's assets," which is a goal "only second in importance to securing equality of distribution"). This court has highlighted the value of haste in chapter 11 cases elsewhere. *See Foster v. First Interstate Bank (In re Shoot the Moon, LLC)*, 635 B.R. 568, 570 (Bankr. D. Mont. 2022) (recognizing that the "need for speed derives from some debtors being the proverbial 'melting ice cube' . . . and more generally from the reality that delay rarely increases stakeholder recoveries").

---

**MEMORANDUM OPINION**       Page 9

to maximize returns for a private investment vehicle are often imprudent, or even prohibited, uses of a bankruptcy estate's capital.[30]  While this discussion is not exhaustive, the point is that an estate representative must perpetually balance potential value maximization against any countervailing costs, risks, and delays as part of satisfying the representative's fiduciary duties.[31]

The estate representative's work is not limited to building and preserving the estate.  For instance, when warranted, the statute requires the representative to pursue claim objections even though the result is no more than a resorting of creditors' relative distributional entitlements without impact on the overall size of the estate.[32]  Indeed, consistent with the generalized nature of the estate representative's fiduciary duties, representatives often weigh in on distributional issues that could be reframed as purely intercreditor disputes, such as claim allowance, priority, or subordination.[33]  Fiduciary duties in bankruptcy do not prevent an estate representative from taking sides with one stakeholder faction against another.  To the contrary, the formation and shifting of alliances is a key facet of chapter 11 practice.[34]

In sum, a chapter 11 debtor in possession and its professionals owe fiduciary duties to the bankruptcy estate and, in a generalized fashion, to the estate's stakeholders.  Those fiduciaries satisfy their duties when acting in good faith to pursue a strategy reasonably designed to maximize the estate after accounting for the attendant costs, risks, and time.  And, as mentioned, the chosen strategy may

---

[30]  *See, e.g.*, 11 U.S.C. § 345(b); *In re King Mt. Tobacco Co.*, 623 B.R. 323, 327-29 (Bankr. E.D. Wash. 2020).

[31]  An obvious example of this balancing is seen in the context of proposed settlements, which are always encouraged in bankruptcy even when full-blown litigation is expected to yield a larger, but delayed, recovery.  *See, e.g.*, *In re Shoot the Moon, LLC*, 635 B.R. at 575-76.  Another example arises in the context of sales under Bankruptcy Code section 363(b) where estate representatives and courts often use a "highest ***and best***" standard to evaluate competing bids or proposals.  *See, e.g.*, *In re Family Christian, LLC*, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015).  The "best" component of the standard means that an offer for nominally fewer dollars may nevertheless be the winning bid after weighing relevant nonmonetary considerations, such as the certainty or speed of closing.  *See, e.g.*, *In re Bakalis*, 220 B.R. 525, 531-34 (Bankr. E.D.N.Y. 1998).  Again, the key lesson is that the estate representative can and should act in a considered, holistic fashion.

[32]  *See* 11 U.S.C. § 705(a)(5).

[33]  *See, e.g.*, *Apollo Global Mgmt., LLC v. BOKF, NA (In re MPM Silicones, L.L.C.)*, 874 F.3d 787, 794-97 (2d Cir. 2017) (affirming substantive position taken by chapter 11 debtors' plan regarding intercreditor subordination dispute); *In re Eddy*, 572 B.R. 774 (Bankr. M.D. Fla. 2017) (resolving chapter 7 trustee's effort to equitably subordinate claim under Bankruptcy Code section 510(c)); *Broadfoot v. Jamestown Mgmt. Corp. (In re Int'l BioChemical Indus., Inc.)*, 521 B.R. 395 (Bankr. N.D. Ga. 2014) (addressing chapter 7 trustee's objection to landlord's proof of claim).

[34]  *See, e.g.*, Kenneth Ayotte, Anthony J. Casey & David A. Skeel, Jr., *Bankruptcy on the Side*, 112 Nw. U.L. Rev. 255, 296 (2017); Daniel J. Bussel, *Coalition-Building Through Bankruptcy Creditors' Committees*, 43 UCLA L. Rev. 1547, 1568-69 (1996).

appropriately involve the debtor taking positions adverse, or even openly hostile, to a given stakeholder or class thereof.

### *The Bankruptcy Plan Process*

A bankruptcy plan details when and how the property of one or more bankruptcy estates will be distributed to the varied stakeholders. Plans are among chapter 11's most flexible and powerful tools, which makes the proposal, negotiation, and confirmation of a plan focal points of many chapter 11 cases.[35] The sequencing of plan proposal and negotiation varies across different cases, but the process always involves at least one public act: filing a plan and, if required, related disclosure statement.[36] Except in prepackaged or prenegotiated cases, the final form of the confirmed plan usually differs, often tremendously, from the initial plan.

The act of filing a plan may serve one or more of the following functions:

- Memorializing an Agreement. A plan, together with any materials in a plan supplement, is the definitive documentation regarding the parties' postconfirmation rights and obligations. Once general terms are reached among the plan proponent and some or all of the relevant stakeholders (typically in a term sheet or plan/restructuring support agreement), the details will be filled out and crystalized in the full plan documents.

- Making a Proposal. In some cases, the plan proponent does not know what terms may be acceptable to some or all of the relevant stakeholders. The plan proponent might file a plan to make an initial offer,[37] one that

---

[35] *See, e.g.*, *In re Astria Health*, 623 B.R. 793, 797 (Bankr. E.D. Wash. 2021). The power of the bankruptcy system has been harnessed to deal with an array of complex problems, but there is room for disagreement about whether it is proper for bankruptcy to displace other systems Congress created to address some of those problems. *See generally, e.g.*, *In re LTL Mgmt. LLC*, 637 B.R. 396, 410-15 (Bankr. D.N.J. 2022) (juxtaposing bankruptcy, class action, and MDL systems), *appeal pending as* Case No. 22-2003 (3d Cir.).

[36] *See* 11 U.S.C. §§ 1121, 1125; Fed. R. Bankr. P. 3016.

[37] Chapter 11 plans are often described and analyzed as contracts binding all the applicable parties. *See, e.g.*, *Iberiabank v. Geisen (In re FFS Data, Inc.)*, 776 F.3d 1299, 1304 (11th Cir. 2015); *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir. 2004). "Any first-year law student knows that contract formation requires offer, acceptance, and consideration." *Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 628 (7th Cir. 2017).

---

will either be accepted or be rejected through the formal voting process or one that might prompt further negotiations before any vote.[38]

- Making a Threat.  One of chapter 11's most potent weapons is the ability to "cramdown" a class of stakeholders—to force unfavorable treatment on the class without its consent—the prospect of which often induces compromise.[39]  To this end, a plan proponent might propose a plan containing extremely onerous cramdown provisions as a strategy to elicit concessions from the targeted creditor or even to frame matters favorably to the proponent in advance of a settlement meeting or mediation.

- Complying with Deadlines.  The Bankruptcy Code contains dates by which a debtor typically wants to file a plan and additional deadlines are often imposed by early-case financing orders.[40]  The unyielding progression of the calendar may prompt the filing of a plan simply to meet a deadline even though the debtor is not prepared to solicit votes.[41]

While the plan process, parties' motivations, and negotiation dynamics may be more or less intricate in any given case, the vast majority of chapter 11 plans are filed for reasons fitting within the preceding framework.

Because of the flexibility built into chapter 11 and the expansive reach of the plan process (including broad notice and the ability to bind dissenters and nonparticipants), bankruptcy plans are excellent vehicles to motivate and effectuate settlements.  This has been true for decades,[42] but modern chapter 11 practice in

---

[38]  Because chapter 11 cases can involve highly complex, multiparty negotiations among sophisticated parties and advisors, even more advanced negotiation strategies are sometimes observed in the wild.  For instance, a plan proponent may file what is colloquially called a "decoy plan" to suss out another party's position or reaction. *See generally* Charles E. Rendlen & Abigail B. Willie, *The Cerebral Hercules and the Bankruptcy Hydra: How Judge Schermer Slayed a Multi-Headed Monster While Deep in the Heart of Texas*, 55 WASH. U. J.L. & POL'Y 63, 65 (2017) (describing how mediating a complex chapter 11 case "was akin to playing a chess game, simultaneously on four planes, with eight sets of sixteen pieces – while time-traveling, blindfolded").

[39]  *See, e.g.*, *In re Claar Cellars LLC*, 623 B.R. 578, 601 n.49 (Bankr. E.D. Wash. 2021).

[40]  *See, e.g.*, 11 U.S.C. §§ 362(d)(3)(A), 1121(b)-(c); *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 814-15 (Bankr. S.D.N.Y. 2020).

[41]  These plans are sometimes called "placeholder" or "off the shelf" plans.  *See, e.g.*, *In re Boy Scouts of Am. & Del. BSA, LLC*, 642 B.R. 504, 535 (Bankr. D. Del. 2022).

[42]  *See, e.g.*, *Gardner v. New Jersey*, 329 U.S. 565, 581 (1947) (Douglas, J.) (observing that "one useful and fitting function of a reorganization court was the compromise or settlement of claims, so that interminable litigation might be ended and the interests of expedition in promulgating a plan of reorganization served"); *Grp. of Inst. Invs. v. Chicago, M., St. P. & P. R. Co.*, 318 U.S. 523, 565 (1943) (Douglas, J.) ("[C]ompromises, settlements, and concessions are a normal part of the reorganization process.").

particular favors "global" plan settlements, which in multi-debtor cases often involve agreed resolutions of potential intercompany claims or liens, substantive consolidation theories, and the like.[43]

Finally, and in contrast to the ends discussed above, the bankruptcy plan process remains subject to abuse. When abuse occurs, such as when a plan is filed merely as a delay tactic, parties in interest can pursue various remedies. These remedies may include termination of plan exclusivity, appointment of a trustee or examiner, or even dismissal.[44] In addition, a plan proponent's counsel may be subject to sanctions or other consequences if counsel files a facially unconfirmable or otherwise frivolous plan.[45] Relevant for purposes here, a court may disallow counsel's compensation under Bankruptcy Code section 328(c) or 330(a).

## ANALYSIS OF THE OBJECTION

### *Primary Ruling – The Circumstances Here Did Not Trigger Section 328(c)*

The UST's objection presents the central question whether PSZJ's filing of the Offending Plans crossed the line dividing a potential Ranches-Farms conflict from an actual Ranches-Farms conflict, thereby implicating section 328(c). For several reasons, the court finds and concludes that the filings did not cross the line.

*First*, PSZJ's acts of filing the Offending Plans comported with the interests of Farms and its stakeholders. Obtaining a comprehensive settlement that preserved estate value and facilitated timely distributions to Farms' creditors is a goal entirely compatible with PSZJ's fiduciary obligations to Farms. PSZJ filed the Offending Plans as part of a dynamic, multiparty, multifactor negotiating

---

[43]   *See, e.g.*, *NCA Inv'rs Liquidating Trust v. Berkowitz, Trager & Trager, LLC (In re Seaboard Hotel Mbr. Assocs., LLC)*, 2021 Bankr. LEXIS 1564, at *9-11 (Bankr. D. Del. June 10, 2021); *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 771-73 (Bankr. D. Del. 2018); *In re Idearc, Inc.*, 423 B.R. 138, 150-52 (Bankr. N.D. Tex. 2009).

[44]   *See, e.g.*, 11 U.S.C. §§ 1104, 1112(b)(4)(J), 1121(d)(1).

[45]   *See, e.g.*, *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1219 (9th Cir. 1994). There is an important distinction between an obviously unconfirmable plan and one with elements that may be considered aggressive or creative. For example, in *In re Acis Capital Management, L.P.*, Bankruptcy Judge Jernigan astutely observed how:

> In the Chapter 11 process, it is common for plan proponents to propose plans that represent creative attempts to deal with difficult problems. Such plans often contain provisions that are legally questionable or challengeable, and sometimes cannot be confirmed without the consent of affected parties. The proposal of such plans is not unusual, but is simply the nature of the plan negotiation process inherent in many Chapter 11 cases.

603 B.R. 300, 304-05 (Bankr. N.D. Tex. 2019).

MEMORANDUM OPINION                    Page 13

framework for the purpose of pressuring certain parties to bridge the remaining gaps with other case participants.[46]  The strategy PSZJ executed on both debtors' behalf proved successful and yielded an outcome greatly benefitting the Farms estate and its stakeholders collectively, even though the approach pointedly and deliberately pressured some specific stakeholders.

The UST's contrary position unduly minimizes the serious risks that Farms and its unsecured creditors faced in the absence of a global settlement resolving troubling issues related to substantively consolidating the two estates.  As all economic stakeholders recognized, consolidation would have been extremely detrimental to Farms' creditors.[47]  This detriment arises in part from the fact-specific, and thus time-consuming, nature of applying the substantive consolidation doctrine.[48]  Given the stakes at issue here, simply completing this exercise would require lengthy and expensive litigation.  And if the Farms side lost the battle, then their recoveries would plummet.  Settlement of these consolidation issues formed the basis for the debtors' waterfall analyses on which the UST appears to rely for the proposition that Farms' creditors would always fully recover.[49]  Even assuming the value the Offending Plans proposed to reallocate to settle the consolidation issues was on the high side, Farms and its stakeholders might make a rational decision to forgo such value to avoid costs and risks that could deplete even more value.  It is not accurate simply to assume that Farms' creditors necessarily were entitled to a 100-cent recovery in all scenarios or that proposed settlements incorporating a lower recovery deprived them of this entitlement.

The UST's position also unduly minimizes the time value of money for Farms' creditors.  Absent settlement, a fully-litigated determination of the allocation, substantive consolidation, and other issues would have taken several

---

[46]   Employing similarly complex negotiating strategies is often referred to as "playing the long game" or, in more contemporary slang, "playing chess rather than checkers."  *See* note 38.

[47]   In unchallenged confirmation testimony, the debtors' co-CRO credibly declared: "Litigation regarding substantive consolidation would create risks for the Holders of Claims against Farms.  While the outcome of any substantive consolidation motion is uncertain, it would lead to substantial costs and delay any recovery to the creditors, particularly the Holders of Claims against Farms.  Moreover, if substantive consolidation were granted, in light of the amount of the Tyson Claims, recoveries by the Holders of Farms General Unsecured Claims in Class 3 would be substantially reduced and could be as low as 1%."  Decl. of Peter Richter ¶ 13, ECF No. 1779 at pp. 60-61 of 62.

[48]   The doctrine is particularly malleable in the Ninth Circuit—and thus its application potentially even more powerful and uncertain.  *Compare, e.g.*, *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 763-71 (9th Cir. 2000), *with, e.g.*, *In re Owens Corning*, 419 F.3d 195, 210-16 (3d Cir. 2005).

[49]   *See* ECF No. 1383 at p. 78 of 81; ECF No. 1284 at p. 78 of 82.  Notably, the waterfall analyses also incorporated assumptions about various others issues undoubtedly destined for litigation absent settlement.

years and cost both estates millions of dollars. Even assuming the best possible
results for Farms, Farms' unsecured creditors would eventually receive a full par
recovery, but with interest only at the applicable federal judgment rate of **0.07%**
per annum, compounded annually.[50] In an environment marked by the highest
inflation in decades, this interest rate is woefully less than the discount rate
creditors would use to determine the present value of their eventual payments
several years hence. Indeed, the federal judgment rate in effect for the week
ending November 20, 2022, is 4.73%, which is more than 67 times the operative
rate in Farms' bankruptcy case. Against this backdrop, rational creditors would
opt to accept the certainty of a less-than-100-cent recovery today instead of an
uncertain, delayed, and also less-than-100-cent recovery when adjusted to present
value. For these reasons, PSZJ's consideration of temporal realities and
corresponding present value implications when pushing a near-term settlement was
entirely consistent with the fiduciary duties PSZJ owed to Farms.

In the end, the court does not believe either Offending Plan was facially
unconfirmable and, depending on the votes of Farms' creditors and evidence
presented at a confirmation hearing, the court may well have confirmed one of
those plans. Further, because PSZJ filed the Offending Plans to tee up a settlement
framework while advancing fluid negotiations, PSZJ's acts aligned with the Farms
estate's interests, particularly when considering all relevant risks and the high
premium bankruptcy places on expediting creditor distributions.

***Second***, apart from Farms' standalone interests, reaching a consensual
resolution and ending the debtors' costly stay in bankruptcy was undoubtedly in
the interest of both debtors combined and the collective interest of all their
stakeholders. This common interest justifies PSZJ's filing of the Offending Plans,
at least in the Ninth Circuit. In *JPMCC 2007-C1 Grasslawn Lodging, LLC v.
Transwest Resort Properties, Inc. (In re Transwest Resort Properties, Inc.)*, the
Ninth Circuit Court of Appeals rejected a strict entity-by-entity approach in the
chapter 11 plan context, holding that Bankruptcy Code "section 1129(a)(10)
applies on a 'per plan' basis" and therefore permits confirmation of a plan
obtaining an impaired consenting class at only one of perhaps many individual
debtors and estates.[51] *Transwest* thus eschews a rigid, formalistic approach
whereby wooden application of the Bankruptcy Code at each individual debtor
level hamstrings the collective interests of the entire debtor group. The proposal of

---

[50]  *See* 11 U.S.C. §§ 1129(a)(7)(A)(ii), 726(a)(5); 28 U.S.C. § 1961; *Ad Hoc Comm. of Holders of Trade Claims v.
Pac. Gas & Elec. Co. (In re PG&E Corp.)*, 46 F.4th 1047, 1055 (9th Cir. 2022).

[51]  *See* 881 F.3d 724, 729-30 (9th Cir. 2018).

a joint plan advancing the common good for both Ranches and Farms is permissible under the "per plan" framework the *Transwest* panel endorsed. This is true even assuming, solely for the sake of analysis, that the plan did not specifically advance Farms' standalone interests.

      ***Third***, there is an important distinction—one perhaps possessing constitutional significance—between pressing affirmative litigation to determine the merits of a claim and negotiating the settlement or release of that claim, including through a bankruptcy plan.[52] This distinction is also observed in legal ethics rules.[53] Thus, it is no surprise that the Collier treatise describes the framework under Bankruptcy Code section 327(c) as one where no actual conflict arises unless "it become[s] apparent that the claims among the affiliated debtors cannot be resolved through negotiation."[54] As discussed, the acts of proposing and filing a chapter 11 plan are part of a negotiation process. This process differs both substantively and procedurally from affirmative litigation prosecuted via adversary complaint.

      At bottom, PSZJ's representation of both Ranches and Farms in the plan process was part of complex negotiation among numerous represented stakeholders that eventually produced a holistic settlement of intercompany and other disputes. This activity does not constitute an actual conflict triggering Bankruptcy Code section 328(c). To the contrary, the record makes clear that PSZJ "determined in good faith and as an exercise of [their] professional judgment that the course complies with the Bankruptcy Code and serves the best interests of the estate," consistent with the firm's professional "responsibility . . . to help lead the estate on

---

[52] *See, e.g.*, *In re Cal. Associated Prods. Co.*, 183 F.2d 946, 949-50 (9th Cir. 1950) ("The primary purpose of a compromise settlement is to avoid the necessity of determining sharply contested and dubious issues."); *Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 591 B.R. 559, 576-77 (D. Del. 2018) (rejecting argument that bankruptcy court's approval of settlement with related releases and injunctions "was tantamount to resolution of those claims on the merits"), *aff'd*, 945 F.3d 126 (3d Cir. 2019); *Police & Fire Ret. Sys. of the City v. Ambac Fin. Grp., Inc. (In re Ambac Fin. Grp., Inc.)*, 2011 U.S. Dist. LEXIS 149610, at *24 (S.D.N.Y. Dec. 29, 2011) (concluding that "the distinct nature of settlement review as compared to final adjudication" avoids any "constitutional infirmity" when a bankruptcy court approves a proposed settlement); *In re Washington Mut., Inc.*, 461 B.R. 200, 215-16 (Bankr. D. Del. 2011) (detailing the "fundamental difference between approval of a settlement of claims . . . and a ruling on the merits of the claims"), *vacated in part on other grounds*, 2012 Bankr. LEXIS 895 (Bankr. D. Del. Feb. 23, 2012).

[53] *Compare* Wash. R. Prof. Conduct 1.7(b)(3) (categorical prohibition of representation involving "the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal"), *with id.* 1.8(g) (permitting "lawyer who represents two or more clients" to "participate in making an aggregate settlement of the claims of or against the clients" if "each client gives informed consent").

[54] 3 COLLIER ON BANKRUPTCY ¶ 327.04[5][b] (16th ed. rev. 2022).

a just, speedy, inexpensive and lawful path out of bankruptcy."[55]  Moreover, because the Farms estate ultimately and obviously benefitted in tangible ways from PSZJ's work regarding the Offending Plans, the related professional fees are compensable under Bankruptcy Code section 330(a) despite the fact that the court confirmed neither plan.[56]

### *Alternative Ruling – No Penalty Would Be Warranted Under Section 328(c)*

Setting aside the preceding analysis, for the sake of completeness the court has considered whether application of Bankruptcy Code section 328(c) justifies a reduction of PSZJ's compensation.  After weighing the totality of the record, the court in an exercise of its discretion under section 328(c) finds and concludes that no penalty would be warranted for two reasons.

***First***, as the prior discussion demonstrates, the applicability of section 328(c) here is, at best, a close call.  As both sides agreed at oral argument, there is no precedent offering guidance about how section 328(c) applies in the context of joint plans proposed in multi-debtor cases.  Nor is the court aware of instructive secondary materials.  Navigating such a gray area is different from circumstances unquestionably implicating section 328(c), such as a failure to disclose a known connection, noncompliance with basic requirements for court approval of employment, or simultaneous representation of a nondebtor party with interests plainly adverse to the estate.[57]  It would be unreasonable and punitive to adopt a novel interpretation of section 328(c) and apply that standard retroactively with maximum force.[58]  The UST's objection here provides an important opportunity to develop case law about the topic so parties in future cases may adjust their conduct and expectations accordingly.

***Second***, the court is mindful of the Collier treatise's teaching that "[b]ecause the denial of compensation and reimbursement of expenses after services have been performed may be draconian and inherently unfair, this sanction should not

---

[55] *In re Perez*, 30 F.3d at 1219.  *See also generally* Douglas G. Baird, THE UNWRITTEN LAW OF CORPORATE REORGANIZATIONS 183 (Cambridge University Press 2022) ("The judge polices the bargaining to ensure only that the process respects the rights of all the players.  As long as the process is sound, the negotiations themselves are largely beyond the judge's mandate.  It is the province of the professionals . . . .  Such matters are left to them and their norms and their rituals.").

[56] *See, e.g.*, *In re Broughton Ltd. P'ship*, 474 B.R. 206, 218-19 (Bankr. N.D. Tex. 2012).

[57] *See, e.g.*, *Rome v. Braunstein*, 19 F.3d 54; *In re Land*, 116 B.R. 798 (D. Colo. 1990); *In re 765 Assocs.*, 14 B.R. 449 (Bankr. D. Haw. 1981).

[58] *Cf. In re Mensonides Dairy, LLC*, 2021 Bankr. LEXIS 3467, at *70-71 (Bankr. E.D. Wash. Dec. 19, 2021).

**MEMORANDUM OPINION**                    Page 17

be rigidly applied in the absence of actual injury or prejudice to the debtor's estate."[59]  Here, there is no evidence of injury or prejudice to Farms.  PSZJ's dual representation was obviously disclosed and known by all negotiating stakeholders.  The firm's proposed paths always remained subject to this court's independent review and analysis, with all parties in interest having a full and fair opportunity to express objections.  As an end result of PSZJ's work, Farms' unsecured creditors received a 100-cent recovery and any impairments of the economic and legal rights of Farms' secured creditors or the Easterday family were negotiated and agreed by those parties.  The Offending Plans that the UST now questions with the benefit of hindsight advanced negotiations and provided a framework for the consensual plan that the court ultimately confirmed.  In this context, penalizing PSZJ under section 328(c) would be unwarranted.[60]

## SUMMATION

For the reasons detailed above, the court concludes that (i) PSZJ did not inappropriately represent an interest adverse to either bankruptcy estate; and (ii) in any event, no reduction of the requested fees is warranted under Bankruptcy Code section 328(c) or 330(a).  Accordingly, the UST's objection to the applicable PSZJ fee applications is overruled.  Debtors' counsel should circulate a proposed form of approval order to counsel for the UST and thereafter upload an order for the court's review and signature.

---

[59]  3 COLLIER ON BANKRUPTCY ¶ 328.05[3] (16th ed. rev. 2022).

[60]  *Cf. In re Global Marine, Inc*., 108 B.R. at 1006; *In re Guy Apple Masonry Contractor, Inc*., 45 B.R. at 166-67; *In re General Coffee Corp*., 39 B.R. 7, 8 (Bankr. S.D. Fla. 1984).  Such a penalty would also be a questionable precedent for the bankruptcy system as a whole insofar as it would effectively limit the negotiation strategies that can be pursued by debtors in multi-debtor cases (because the professionals would bear the risk of going uncompensated for pursuing those strategies) even when those strategies are the best way to bring these cases to a successful resolution.  The court sees nothing in the current statutory scheme even suggesting that Congress made such a policy decision.  *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012).